CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

**EXHIBIT F - 1**

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| SUFFOLK, ss | SUPERIOR COURT DEPARTMENT<br>CIVIL ACTION NO. 2184CV00741 |

AUSTIN O'TOOLE, and THE LAW OFFICES )
OF AUSTIN SCOTT O'TOOLE, P.C., )
                                           Plaintiff          )

v.                                                          )

DAVID HOEY AND THE LAW OFFICES )
OF DAVID HOEY, P.C., AND )
KIRA WAHLSTROM, )
                                            Defendants       )

## AFFIDAVIT OF KRZYSZTOF SOBCZAK

I, Krzysztof Sobczak, am an attorney licensed to practice law in the Commonwealth of Massachusetts. I have been in active practice and in good standing in the Commonwealth of Massachusetts since 2011. Prior to my admission to the Massachusetts bar, I graduated from Boston College Law School with a J.D. in 2010, having previously received M.S. from Boston University in 2013, and B.S. from Massachusetts Institute of Technology in 2000. I make these averments based on my personal knowledge and recollections:

1.      In 2014 I started to work at and for the Law Offices of David J. Hoey, P.C. ("Hoey Law").

2.      While working for Hoey Law, among other cases, I worked on the matter of *Kira Wahlstrom v. Rivera et al*, C.A. 1084-cv-01022 (Suffolk), having first filed my appearance in

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

**EXHIBIT F - 2**

said case in April 2014. The Wahlstrom matter was a major premises liability case that derived from an attack that Kira suffered in the Radisson Boston parking garage. The case tried in July and August, 2015 resulting in jury verdict for the Plaintiff. As a result of pleadings that Mr. Hoey filed in that case subsequently, it is a matter of public record that on November 18, 2019, Ms. Wahlstrom recovered $9,987,683.80.

3.  I was part of the trial team that successfully tried the Wahlstrom case. I was involved in all phases of the preparation for the trial and examined or cross-examined many of the witnesses. I also drafted many of the pre-trial and in-trial motions and was involved with nearly every aspect of preparing the case for trial.

4.  During the time that we were preparing the case for trial, I was frequently in contact with Kira. I also was in frequent contact with the third member of the trial team, Attorney Don C. Keenan of Atlanta, as well as his associate, Attorney Andrew Gould. It is a matter of public record that on March 13, 2015, a motion to admit Attorney Keenan *pro hac vice* was filed in the Wahlstrom case, a motion that the court allowed.

5.  During the time that I worked at Hoey Law, it was customary for Attorney Keenan, on Attorney Hoey's request, to become involved in certain cases where the damages appeared to be significant. Hoey very seldom tried cases on his own and preferred to settle them or if they were to be tried, sought other counsel to try them with him or for him.

6.  When Hoey would hire Keenan into a case, the portion of the attorney fee that was recovered that Keenan was to paid upon successful resolution varied, and escalated depending upon the extent of Keenan's involvement in the case. When Keenan consulted on a case, his usual fee was 30% of all the attorney's fees recovered. When Keenan tried a case with

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

**EXHIBIT F - 3**

Hoey (the highest level of involvement), Keenan was entitled to higher percentage. I have seen copies the contract between Hoey and Keenan in the Wahlstrom case, and it called for 40% or 50% percent of all attorneys' fees to be due to Keenan. To the best of my recollection, at the time Hoey hired Keenen to help on the Wahlstrom case the client, Kira Wahlstrom was not aware of this arrangement, as it would not affect the total attorneys' fees either way.

7. Throughout the time that I worked at Hoey Law, Hoey maintained a recording system that taped certain important calls on cases, including conference calls to and from Keenan. When there was an important call about a case, the conversation was usually taped. After the recordings were made, Hoey would send them out to a commercial service for transcription.

8. Before the trial of the Wahlstrom case, there were multiple discussions about the division of the potential attorney's fee, once and when the case is successfully resolved, as I was also promised a portion of the attorneys' fees recovered on the case, and since Hoey had taken the Wahlstrom case on referral from attorney Austin O'Toole, he also was potentially due a portion of the attorneys' fees. In discussions with Keenan where I was present, Hoey described the referral fee agreement as one in which O'Toole was entitled to one third of Hoey's fee. Given that O'Toole was to get one-third of the fee in the case, and Keenan was to get 50% of the fee, that would potentially leave Hoey with a very small fee for five years of work and a very substantial outlay of costs.

9. Initially, Hoey though that he might not have to pay O'Toole because the BBO had ordered that O'Toole be suspended from the practice of law for six months, and looked into this, including potentially hiring outside counsel, to determine whether or not O'Toole would need to be paid out of this case.

3

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

**EXHIBIT F - 4**

10. I was not directly privy to whatever advice Hoey was given, but in any event the conclusion was made that O'Toole would need to be paid the referral fee. However, in order to reduce what O'Toole would be potentially paid, Hoey decided that Kira should sign a new fee agreement directly with Keenan on which Hoey would become the referring attorney, thus whatever fee O'Toole would be due would be only from the Hoey portion and not the full attorneys' fees amount. However, both the original and the new contingent fee agreement that the client (Kira Wahlstrom) as presented indicated that she would be paying one fixed amount for attorneys' fees and all involved and associated attorneys would be paid out of that fee. To illustrate their thinking, if Hoey was paid the full fee, then O'Toole would get one third of that amount. However, under this new scheme, if the full fee was paid directly to Keenan, O'Toole would not get any part of that portion of the fee. Instead, O'Toole would only get one third of the portion of the fee allocated to Hoey, in other words, one-third of 50% or 60% of the fee, rather than one third of 100% of the fee if it were paid to Hoey.

11. To my recollection and knowledge, there was no discussion of any other purpose of the new fee agreement other than reducing O'Toole's recovery. There were also no conversations about possibly informing O'Toole about the situation or inviting him to discuss the situation. Nor was there any explanation to Kira as to why the new fee agreement was being presented to her and how that would affect how any and all attorneys would get paid. Indeed, at the time that the discussions were taking place in May and June 2015 (just before the Wahlstrom trial was scheduled to begin), Keenan had already entered his notice of appearance for Kira months earlier. The fee agreement between Keenan and Hoey dividing Hoey's fee with Keenan had also been signed many months before the Keenan/Wahlstrom agreement.

4

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED   **EXHIBIT F - 5**

12.  To my recollection and knowledge there was no discussion at this time about reducing or reallocating the percentage of the recovery that would go to Hoey or Keenan. There was also nothing that changed about the allocation of Hoey's and Keenan's responsibilities in the case once the new agreement was signed. We continued preparing for trial just as we had, and the relative responsibilities all stayed the same. Based on discussions that I was a part of, the only purpose of the new fee agreement between Kira and Keenan was to ensure that there was more money for Hoey and less money for O'Toole.

13.  After we obtained a successful jury verdict on the case, multiple post trial motions ensued, and additional attorneys, including appellate attorneys were brought onboard to the team.

14.  While this case was pending on appeal, in or around January 2017, with advice and consultation from attorney Keenan, I ended my employment with Hoey Law, and thus client choice of counsel letters were to be sent to all the pending active cases in which I had an appearance, which included the Wahlstrom case.

15.  Hoey generally refused to send such letters out, and specifically with regard to this case, on January 22, 2017, Hoey send me a copy of a January 20, 2017 letter he sent to the Plaintiff, informing Kira Wahlstrom that with her permission and consent, Sobczak will remain on this case until its conclusion.

16.  On January 24, 2017 Plaintiff Kira Wahlstom confirmed to me that she wants to retain me to stay on the case, thus authorizing and ratifying in writing my continued employment on the matter, now under my own firm, as an associated lawyer under the terms of the last active fee agreement she signed on this case.

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGE **EXHIBIT F - 6**

17.     However, after Hoey-Sobczak relationship deteriorated further, upon information and belief, Hoey subsequently pressured certain client to discharge me, and on March 6, 2017 I received a letter from attorney DeJuneas (who was brought into the case after the verdict to assist with the post trial motions (and had an appearance on the case since 2015) with an alleged note from the Plaintiff, dated in 2007 asking me to withdraw from the case to assist with the appeal, but not relieving me as her counsel.

18.     Around this time I also heard from Attorney Keenan, who learned that Hoey also owed a portion of the potential legal fee on this case to me, asking that I only communicate with him via his counsel, as we were now at potential conflict over portions of the legal fee.

19.     Having learned that the Plaintiff was allegedly relieving all her "trial" counsel as part of the appeal strategy, I filed my notice of withdrawal with the Court.

20.     On June 10, 2019, the Appeals Court essentially reversed the trial court's order, correcting several of the false allegations in the trial court's 2016 order and restoring the jury verdict.

21.     Thus, on June 11, 2019, following the Appeals Court decision in this matter, I filed an attorney's lien pursuant to Mass. G. L. ch. 221, sec. 50, to put the various parties on notice of my claim, which at this point would be on the basis of quantum meruit for the 1200 plus hours on worked on this case.

22.     As of the date of this affidavit, my attorney's fees dispute is a live controversy.

Signed and sworn under the pains and penalties of perjury on February 6, 2022.

_____
Krzysztof Sobczak