**Exhibit 1 - 1**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.  21-0741

|  |  |
|---|---|
| AUSTIN O'TOOLE, and THE LAW OFFICES OF AUSTIN SCOTT O'TOOLE, P.C.,<br><br>Plaintiff<br><br>v.<br><br>DAVID HOEY AND THE LAW OFFICES OF DAVID HOEY, P.C., KIRA WAHLSTROM, DON KEENAN, AND THE KEENAN LAW FIRM, P.C.<br><br>Defendants | **LEAVE TO FILE GRANTED FEBRUARY 16, 2022**<br><br>2/23/2022 e-filed KG |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      This is a complaint to enforce a fee agreement between the plaintiffs (collectively, "O'Toole") on the one hand and the defendants on the other.  In 2010, the parties jointly executed a fee agreement relating to the representation of Kira Wahlstrom.  Under the fee agreement, David Hoey and the Law Offices of David Hoey, P.C. (collectively, "Hoey") would receive one third of Wahlstrom's recovery relating to an incident that took place in a parking garage in Boston in May 2009.  O'Toole, as the referring attorney, was entitled to receive one third of the total fee paid.

2.      In November 2019, Wahlstrom received $9,987,683.80 from the insurer of the defendant in the underlying case.   Ultimately, Wahlstrom was required to pay a fee of over $3 million and O'Toole was entitled to one third of that amount. . Despite the unambiguous clarity of the fee agreement, however, Hoey and Wahlstrom have failed to pay the full amount due, with Hoey belatedly tendering only $250,000.  Hoey's justification is a collusive 'fee agreement' with Don

**Exhibit 1 - 2**

Keenan, a Georgia attorney who served at co-counsel at trial. O'Toole brings this suit to, among other things, recover for the Hoey's and Wahlstrom's breach of contract and breach of the duty of good faith and fair dealing, and to recover for Hoey's and Keenan's violation of G. L. c. 93A, sec. 11 and various common law torts. O'Toole also seeks a declaration that the fee agreement extends to other cases relating to the May 2009 incident now in or soon to be in litigation.

**PARTIES**

3.      The Plaintiff Austin O'Toole is an attorney licensed to practice law in the Commonwealth of Massachusetts. He resides and maintains a place of business at 35 Upton Street, Boston, MA 02118.

4.      The Law Offices of Austin Scott O'Toole has a place of business at 35 Upton Street, Boston, MA 02116. Throughout this complaint, Mr. O'Toole and the Law Offices of Austin Scott O'Toole are collectively referred to as "O'Toole."

5.      The Defendant, David Hoey, is an attorney licensed to practice law in the Commonwealth of Massachusetts. He maintains a place of business at 352 Park Street, Suite 105, North Reading, MA 01864.

6.      The Defendant, The Law Offices of David J. Hoey, P.C. is located at 352 Park Street, Suite 105, North Reading, MA 01864. Throughout this complaint, Mr. Hoey and the Law Offices of David Hoey are collectively referred to as "Hoey."

7.      The Defendant Kira Wahlstrom formerly resided in Essex County. Because of the nature of the injuries she suffered in the underlying case, further information about Wahlstrom's residence is not provided in this complaint, but will be furnished on a confidential basis to the Court on request. At the time this First Amended Complaint is filed, Ms. Wahlstrom is represented by Attorney Amy Goganian, 144 Gould St., Needham, MA.

**Exhibit 1 - 3**

8.      Don Keenan is an attorney licensed to practice in Georgia. He is the founder of the Keenan Trial Institute, an organization intended to publicize his provocative theory that jurors will render large plaintiffs' verdicts if one appeals to their most basic instincts. Among other books, Mr. Keenan has authored "Reptile! The 2009 Manual of the Plaintiff's Revolution." He maintains a principal place of business at 148 Nassau St. N.W., Atlanta, GA 30303.

9.      The Keenan Law Firm P.C. is a Georgia professional corporation believed to be wholly owned by Mr. Keenan. It maintains a principal place of business at 148 Nassau St. N.W., Atlanta, GA 30303. Throughout this complaint, Mr. Keenan and the Keenan Law Firm P.C. will be referred to together as "Keenan."

**FACTS**

10.      In May 2009, Wahlstrom was violently attacked in the parking garage of the Radisson Hotel in Boston.  Thereafter, she approached O'Toole about representing her, and he agreed to do so.

11.      In late 2009, O'Toole and Wahlstrom agreed that an attorney who specialized in trying premises liability actions should be engaged.  After consulting with Hoey, Wahlstrom agreed.

12.      On or about February 5, 2010, Wahlstrom, Hoey, and O'Toole (collectively "the parties") jointly entered into a fee agreement. The fee agreement, a true and accurate copy of which is attached as Exhibit A, required Ms. Wahlstrom to pay "33 1/3% of the gross amount received" [Ex. A at par. 4] on any "claim, controversy, and other matters with reference to . . . premises liability and injuries received on or about May 1, 2009 in the Radisson Parking garage." Ex. A at par. 1.  Under the agreement, Ms. Wahlstrom was to pay the one third fee to Hoey and Hoey was to pay one third of that amount to O'Toole.  The fee agreement directed Mr. Hoey to provide O'Toole with periodic updates on the status and disposition of the case. Ex. A at par. 5(b).

**Exhibit 1 - 4**

13.     On or about March 12, 2010, Hoey filed a complaint in the Suffolk Superior Court on behalf of Ms. Wahlstrom against various defendants, docketed as 1084-cv-01022 ("the underlying case" or "the Wahlstrom action").

14.     At some point during the pretrial proceedings, Hoey apparently engaged Keenan. a Georgia attorney who claims to be an expert in trial advocacy, to assist in the trial of the Wahlstrom action.  At the time of the engagement, Hoey and Keenan had an ongoing referral arrangement whereby Keenan would receive between 30-50% of the legal fee on any matter in which he became involved, with the size of the fee depending on the degree on involvement. They have collaborated on multiple cases together, both before and since the Wahlstrom action. Mr. O'Toole was not informed about Keenan's engagement, despite his right to periodic updates on the status of the case.

15.     On March 13, 2015, Keenan filed a motion for admission pro hac vice in the underlying action. Neither Hoey nor Wahlstrom at any time advised O'Toole that Keenan was now co-counsel in the case.

16.     In June 2015, with trial only a month away, Keenan and Wahlstrom entered into a new purported fee agreement attached hereto as Exhibit B. This agreement ostensibly superseded the prior Hoey/Wahlstrom/O'Toole fee agreement (Ex. A). Under the new agreement (Ex. B), Keenan became the lead attorney, and Hoey (pursuant to par. 4) was agreed to be entitled to some unspecified referral fee. In violation of Massachusetts law, the agreement did not specify the amount of the referral fee that Hoey was entitled to receive, and Hoey has stated under oath that there is no writing in which Wahlstrom approved the particular fee division as of the time that Ex. B was signed. Upon information and belief, Hoey and Keenan intended that the amount of the referral fee would be governed by the pre-existing and ongoing referral fee arrangement described in paragraph 14 above.  Hoey has acknowledged under oath the existence of such a written referral fee agreement between him and Keenan but claims that it has been lost or destroyed.

4

**Exhibit 1 - 5**

17.     The Keenan/Hoey/Wahlstrom fee agreement (Ex. B) was, according to one percipient witness, created while Keenan was on one of his periodic visits to Massachusetts, and Keenan's and Hoey's expressed purpose in creating it was to significantly reduce Mr. O'Toole's fee by rearranging the waterfall of any fee distribution.  Indeed, there was and is no other conceivable purpose for rearranging the funds flow so that Keenan was the lead attorney and doing so less than a month before trial, when Keenan had *already* agreed to represent Ms. Wahlstrom and had *already* appeared for her months previously.  By way of illustration and not limitation, under the original fee agreement (Ex. A), a $4,000,000 fee paid to Hoey would go 33.3% to O'Toole, resulting in a $1,332,000 fee to him. By contrast, under the 'superseding' fee agreement (Ex. B), a $4,000,000 fee paid to Keenan, 50% of which was then paid to Hoey, would result in a fee of only $660,000 to O'Toole (assuming, contrary to law and fact, that Keenan's and Hoey's unlawful scheme were given effect).

18.     At no time was O'Toole informed that any ancillary agreements existed or were being devised. At no time did O'Toole learn about or give his assent to any modification or novation of the fee agreement to which he was a party.

19.     In 2015, a substantial judgment entered in Wahlstrom's favor.  In May 2016, the Superior Court (Wilson, J.) ordered a new trial on grounds of gross misconduct by Hoey and Keenan.  The Appeals Court agreed that misconduct had occurred but deemed it insufficient to justify overturning a jury verdict.

20.     According to pleadings Hoey filed in the Superior Court, the insurer for one of the defendants thereafter paid Wahlstrom $9,987,683.80 on November 18, 2019 in full satisfaction of the judgment plus accrued interest.  Based on the O'Toole/Hoey/Wahlstrom fee agreement (Ex. A), Hoey's fee should have been $3,329,227.93, and of that amount O'Toole was entitled to be paid $1,109,742.64.

**Exhibit 1 - 6**

21.     Apparently, however, Hoey and Keenan decided that giving Mr. O'Toole 33.3% of Hoey's fee under the superseding fee agreement would still be too much money.  Instead of sending O'Toole a check for one third of Hoey's fee, Hoey on May 20, 2020 sent O'Toole a check for only $250,000.  The cover letter claimed that the remittance represented one-third of Hoey's "net fee." Both before and after the May 2020 payment – and indeed, up to the time that O'Toole was obliged to file this lawsuit – Hoey refused to provide any information about the recovery (including but not limited to a breakout of the fee and all fee-related dispersals) despite the clear language in the fee agreement requiring periodic updates and information on the disposition of the case.

22.     In late 2020, Hoey claimed through counsel that a second agreement "superseded" the fee agreement among the parties.  The correspondence from Mr. Hoey's counsel was the first time anyone told O'Toole about Ex. B, and not until well into the present litigation did Hoey belatedly produce this alleged secret 'superseding' fee agreement.  More to the point, whatever any 'superseding' agreement might say, no one ever sought O'Toole's assent to it, and (manifestly) he never gave his assent to any agreement other than the one (Ex. A) to which he is a party.

23.     During discovery in this case, Hoey belatedly produced a settlement statement showing the disposition of the $9.99 million recovered in the Wahlstrom action.  Given that the fee split between Hoey and Keenan in the lost or destroyed agreement (referenced in pars. 14 and 16 above) is apparently 50/50, O'Toole expects to prove that his fee should have been not less than $670,000.  If the fraudulent 'superseding' fee agreement is disregarded, as it should be, O'Toole expects to prove that his total fee should have been over $1,340,000.  These calculations do not include appropriate attorney's fees and multiple damages under c. 93A.

24.     On or about March 1, 2020, O'Toole, through counsel, sent the demand letter to Hoey attached hereto as Exhibit B.  Although no formal demand is required under G.L. c. 93A, sec. 11, the letter gave Hoey the opportunity to pay Mr. O'Toole the amounts he is plainly due under the parties'

Exhibit 1 - 7

contract, and the letter again "demand[ed] a report on the disposition of the case, a copy of the alleged superseding contract(s), and the dispersal detail of fees paid" in the case. Ex. B at 3. However, both Hoey and Wahlstrom have refused to pay O'Toole the fee that he is owed, necessitating this lawsuit.

## COUNT I
### Breach of Contract ( Mr. Hoey, Hoey Law, and Ms, Wahlstrom )

25.     O'Toole incorporates by reference each of the allegations set forth above.

26.     The O'Toole/Hoey/Walstrom fee agreement (Ex. A) was a valid and binding contract, enforceable on its terms.

27.     As set forth above, Wahlstrom and Hoey breached that contract in multiple respects. These breaches include, but are not limited to, (i) failure to provide O'Toole with periodic updates on the status and disposition of the case despite multiple requests and (ii) failure to pay O'Toole the amounts due under the contract.

28.     O'Toole was harmed in an amount to be demonstrated at trial, but currently believed to be not less than $ $1.1 million.

29.      Indeed, even if the alleged 'superseding' the agreement (Ex. B) and the lost or destroyed referral agreement between Keenan and Hoey described in paragraph 14 were given effect, as it should not be, a breach of contract still occurred in so far as O'Toole was underpaid by an amount to be proven at trial but currently believed to be not less than $445,000.

## COUNT II
### Breach of the Covenant of Good Faith
### and Fair Dealing (Mr. Hoey, Hoey Law, and Ms. Wahlstrom)

30.     O'Toole incorporates by reference each of the allegations set forth above.

**Exhibit 1 - 8**

31.     As a valid and binding contract, the original fee agreement (Ex. A) incorporated within its terms an implied covenant of good faith and fair dealing.  That covenant provides, among other things, that no party shall deprive any other party of the intended benefit of his or her bargain.

32.     The actions set forth conduct set forth above constitute multiple violations of the covenant.  Further, the alleged 'superseding contract' among Keenan, Hoey, and Wahlstrom, is not binding on O'Toole absent his assent, which he manifestly never gave.

33.     Even if that 'superseding contract' did constitute a valid and binding agreement, which O'Toole specifically denies and does not concede, surreptitiously entering into such a contract would itself constitute a breach of the covenant insofar as it would have the effect of depriving O'Toole of the benefit of his intended bargain.  Further, even if the fee distribution under the 'superseding agreement' (Ex. B) and the lost or destroyed Keenan/Hoey fee-splitting arrangement were given effect,

34.     O'Toole was harmed in an amount to be demonstrated at trial, but currently believed to be not less than $859,742.64.

**COUNT III**
**Violation of c. 93A § 11**
**(David Hoey and the Law Offices of David Hoey)**

35.     O'Toole incorporates by reference each of the allegations set forth above.

36.     Hoey and O'Toole are each engaged in trade or commerce within the meaning of G. L. c. 93A.

37.     Hoey committed unfair and deceptive acts or practices in the conduct of trade or commerce within the meaning of G. L. c. 93A, secs. 2 and 11.  Hoey's unfair and deceptive acts and practices consist of at least the following: (A) Acting in known disregard of existing contractual arrangements by failing to provide O'Toole with information and making required payments; (B) Violating the covenant of good faith and fair dealing, as alleged in Count II, as a violation of the

covenant also constitutes a per se violation of c. 93A; (C) Clandestinely entering into an agreement

intended to devest O'Toole of his bargained-for rights under the fee agreement;; (D) Engaging in

evasive pre- and post-breach conduct and refusing to engage in good faith negotiations with O'Toole

or to provide O'Toole with even the most basic information about existing arrangements which

purportedly affect O'Toole's right to payment under the fee agreement; and (E) Conducting the

business of his law practice in disregard of SJC Rule 3:07, Rule 8.4(c), which prohibits an attorney

from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation."

38.     Hoey's actions caused O'Toole harm in an amount to be proven at trial.

39.     Hoey's actions were knowing and willful, entitling O'Toole to double or treble

damages as well as reasonable attorney's fees.

## COUNT IV
### Declaratory Judgment (all defendants)

40.     O'Toole incorporates by reference each of the allegations set forth above.

41.     The O'Toole/Hoey/Wahlstrom fee agreement (Ex. A) is a legally binding contract

that sets forth the rights of the parties.  The actions of Hoey and Wahlstrom, however, have given

rise to an actual controversy about O'Toole's rights under the fee agreement.

42.     Wahlstrom has filed additional litigation in matters relating to injuries received as a

result of the events occurring in the Radisson parking garage. Specifically, Wahlstrom, represented

by Hoey, has filed a 176D action against the insurer of the defendants, which is currently filed in the

federal court in Boston.

43.     It is also known  that Ms. Wahlstrom has authorized  a loss of consortium action on

behalf of her minor children in which her ex-husband is the nominal plaintiff.

44.     Any recoveries in the 176D suit or any future lawsuit filed for loss of consortium fit

comfortably within the terms of the fee agreement as a 'claim, controversy, or other matter' related

Exhibit 1 - 10

to the May 1, 2009 event, particularly since paragraph 5(a) of the fee agreement entitles Mr. O'Toole

to a one-third fee on "*any* fee to be paid pursuant to a matter referred to in paragraph 1." (Emphasis

supplied.)  However, Hoey and Wahlstrom have refused to acknowledge Mr. O'Toole's rights to

share in any fees which the pending 176D litigation or the loss of consortium litigation generate.

45.      As a result, an actual controversy has arisen between the parties. This Court can and

should remove that uncertainty by declaring the rights of the parties to the fee agreement including

but not limited to a declaration that (A) the fee agreement is a binding contract, enforceable on its

terms, and that O'Toole's rights under it were not affected by any subsequent contract that Mr.

O'Toole did not assent to and (B) the fee agreement entitles Mr. O'Toole to one third of the fees

generated by underlying case and any fees to be generated by the 176D action or any future lawsuit

which relates to the May 1, 2009 event in the Radisson garage.

**COUNT V**
**Tortious Interference with Contractual Relations (Mr. Keenan and Keenan Law)**

46.      O'Toole incorporates by reference each of the allegations set forth above.

47.      At the time the Keenan entered into the Keenan/Hoey/Wahlstrom fee agreement (Ex..

B), he was aware of the existence of the O'Toole/Hoey/Wahlstrom fee agreement (Ex. A).

Nevertheless, Keenan interfered with those contractual relations intentionally, and with improper

motive and means insofar as he intended to and assist Hoey in a scheme intended to reduce

O'Toole's compensation under his contract and/or to make enforcement of that contract more

difficult by creating a sham arrangement in which he became the putative lead attorney on the case,

even though Hoey continued to act, in substance, as primary trial counsel. Indeed, by the time that

Ex. B was confected, Hoey had apparently already invested (according to materials produced on

discovery) well over a half million dollars in expenses.

**Exhibit 1 - 11**

48.     O'Toole was harmed in an amount to be proven at trial, but currently believed to be not less than $1 .1 million.

## COUNT VI
### Civil Conspiracy (Mr. Hoey, Hoey Law, Mr. Keenan, and Keenan Law)

49.     O'Toole incorporates by reference each of the allegations set forth above.

50.     At the time that the Keenan/Hoey/Wahlstrom fee agreement (Ex. B) was signed, O'Toole was a party to a valid and binding fee agreement that entitled him to 33.3% of the proceeds of any suit arising out of the May 1, 2009 attack in the Radisson garage.  Keenan and Hoey acted according to a common design or agreement to do the wrongful act of depriving O'Toole of the benefits of his contract. Keenan aided and abetted Hoey's wrongful purpose by joining with him to confect a subsequent fee agreement whose primary purpose was to ensure that O'Toole's bargained for compensation would not be paid. The means of accomplishing this and included, but are not limited to, creating documentation which falsely described Hoey's burned compensation on the case as only $750,000 when he in fact had a right to payment that was 2-3 times that amount.

51.     O'Toole was harmed in an amount to be proven at trial, but currently believed to be not less than $1.1 million.

## COUNT VII
### Unjust Enrichment/Constructive or Resulting Trust (Mr. Keenan and Keenan Law )

52.     O'Toole incorporates by reference each of the allegations set forth above.

53.     In the alternative to the counts above, and assuming, arguendo, that the Keenan/Hoey/Wahlstrom fee agreement (Ex. B) is valid, Mr. Keenan assumed responsibility for ensuring that the proceeds of the Wahlstrom action were distributed in accordance with all lawful existing fee arrangements, including the terms of the O'Toole/Hoey/Wahlstrom fee agreement (Ex. A).

**Exhibit 1 - 12**

54.     If documents produced by Hoey and apparently countersigned by Wahlstrom accurately described the distribution of the proceeds of the Wahlstrom action, Mr. Keenan obtained a fee of over $3.3 million, which is substantially greater than that which he would have been entitled to. Upon information and belief, Mr. Keenan continues to hold funds to which Hoey has a contractual entitlement. O'Toole, in turn, is contractually entitled to one third of the portion of Hoey's fee that Keenan continues to hold.

55.     Because Keenan holds money in violation of fundamental principles of justice and equity, the court should impose a constructive trust upon those funds, and determine that Mr. O'Toole is entitled to 33.3% of them.

**COUNT VIII**
**(Violation of Ch. 93A sec. 11 (v. Mr. Keenan and Keenan Law)**

56.     O'Toole incorporates by reference each of the allegations set forth above.

57.     Keenan and O'Toole are each engaged in trade or commerce within the meaning of G.L. c. 93A.

58.     Keenan committed unfair and deceptive acts or practices in the conduct of trade or commerce within the meaning of G.L. c. 93A, sec. 11, including but not limited to: (A) entering into a second fee agreement whose primary purpose was to divest Mr. O'Toole of his right to payment; (B) failing to ensure that the proceeds of the funds in the Wahlstrom action (in which Keenan was at least nominally the lead attorney) were distributed in conformance with terms of all existing contractual obligations; (C) assisting in the creation of documentation intended falsely to suggest that Mr. Hoey had a right to no more than $750,000 in fees; and (D) conducting the business of his law practice in disregard of SJC Rule 3:07, rule 8.4 (c), which prohibits an attorney from "engaging in conduct involving dishonesty, fraud, deceit or misrepresentation."

59.     Keenan's actions caused O'Toole harm in an amount to be proven at trial.

Exhibit 1 - 13

60.     Keenan's actions were knowing and willful, entitling O'Toole to double or treble damages as well as reasonable attorney's fees.

61.     COUNT IX

62.     Declaratory Judgment (Mr. Hoey, Hoey Law, Mr. Keenan, Keenan Law)

63.      O'Toole incorporates by reference each of the allegations set forth above.

64.     At the time that Keenan and Hoey resolved to enter into the Keenan/Hoey/Wahlstrom fee agreement (Ex. B), they did so with the specific and actual intent of causing tortious injury to Mr. O'Toole. Further, the failure to disclose the material fact that they had entered into a new fee agreement constituted a fraudulent omission insofar as they were under a duty to disclose the existence of the second fee agreement and their omission to do so was motivated by an intent to deceive. Further, their client, Ms. Wahlstrom, obtained nothing of value from the second fee agreement which she was not entitled to receive from the first one. Mr. O'Toole justifiably relied on the existence of the first fee agreement and the omission to disclose the second.

65.     Further, at the time Keenan and Hoey entered into the Keenan/Hoey/Wahlstrom fee agreement (Ex. B), they committed a willful and malicious injury insofar as their actions knowingly constituted a deliberate or intentional injury, not merely a deliberate or intentional act that led to injury. Both had a subjective motive to inflict the injury and they knew and understood that injury was substantially certain to occur as a result of their conduct.

66.     If the facts set forth in either of the prior 2 paragraphs are shown by a preponderance of the evidence, the debt that Keenan and/or Hoey owes to O'Toole will be nondischargeable in bankruptcy pursuant to 11 U.S.C. sec. 523(a)(2)(A) and sec. 523 (a)(6). While a state court has no power to determine a debt to be nondischargeable as such, it can find facts which will be preclusive of the matter in subsequent proceedings before the Bankruptcy Court. As such, a real and concrete

**Exhibit 1 - 14**

controversy exists as to the nature of Keenan's and Hoey's actions, and it is a controversy that this Court can obviate by finding and declaring the facts set forth immediately above.

WHEREFORE, Plaintiffs herewith request that this Honorable Court:

A.   Enter judgment in their favor against Wahlstrom and Hoey on Counts I and II in an amount to be proven at trial, but currently believed to be not less than $859,742.64, plus prejudgment interest and any other damages allowed by law; and

B.   Enter judgment in their favor against Hoey on Count III and against Keenan  on Count VIII in an amount to be proven at trial, and in addition award O'Toole reasonable attorney's fees, and if Hoey's and/or Keenan's actions are found to be knowing and willful within the meaning of ch. 93A, double or treble the amount of actual damages proven; and

C.   Issue, on Count IV, a declaratory judgment consistent with that requested in paragraph 33 above; and issue, on Count IX, a declaratory judgment consistent with that requested in paragraphs 65 and 66 above; and

D.   Enter judgment in their favor against Keenan on counts V, VII and VIII in an amount to be proven at trial, plus any prejudgment interest and any other damages allowed by law; and

E.   Enter judgment in their favor on Count VI against Hoey and Keenan jointly and severally in an amount to be proven at trial, plus prejudgment interest from the date of the wrong and any other damages allowed by law; and

F.   Award any other or additional equitable or monetary relief that this Honorable Court deems just under the circumstances.

**Exhibit 1 - 15**

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

AUSTIN O'TOOLE, and THE LAW OFFICES
OF AUSTIN SCOTT O'TOOLE, P.C.

By their attorneys,


_/s/ Edward Foye_
Edward Foye (BBO#562375)
**Arrowood, LLP**
10 Post Office Square
7th Floor South
Boston, Massachusetts 02109
Tel: 617-849-6200
Fax: 617-849-6201
efoye@arrowoodllp.com

Dated:  February 23, 2022

CERTIFICATE OF SERVICE

I, Edward Foye, hereby certify that I have caused a copy of the foregoing document to be served upon counsel of record via email on this 23rd day of February, 2022, and upon Howard M. Cooper, Esq., Todd & Weld, 1 Federal Street, Boston, MA  02110 via e-mail.

_/s/ Edward Foye_
Edward Foye (BBO#562375)

15

Exhibit 1 - 16

# Exhibit A





**HOEYLAW**

LAW OFFICES OF DAVID J. HOEY, P.C.

David J. Hoey*
Richard T. Bromby
Andrew A. Hamilton
Suzanne CM McDonough*
Nicole R. G. Paquin*
*also admitted in New Hampshire

352 Park Street, Suite 105
North Reading, MA 01864
hoeylaw@earthlink.net
www.hoeylaw.com
P: (978) 664-3633
F: (978) 664-3643

February 25, 2010

Austin S O'Toole, Esq.
18 Tremont Street
Suite 1010
Boston MA 02108

RE:  Premises Liability-Personal Injury-May 1, 2009

Dear Attorney O'Toole

Enclosed please find copies of the following:

1.  Massachusetts Contingent Fee Agreement;
2.  Referral Agreement;

Please do not hesitate to contact me should you have any questions or concerns regarding the same.

Very truly yours,

Suzanne CM McDonough

**Exhibit 1 - 18**



LAW OFFICES OF DAVID J. HOEY, P.C.

David J. Hoey*
Richard T. Bromby
Andrew A. Hamilton
Suzanne CM McDonough*
Nicole R. G. Paquin*
*also admitted in New Hampshire

352 Park Street, Suite 105
North Reading, MA 01864
hoeylaw@earthlink.net
www.hoeylaw.com
P: (978) 664-3633
F: (978) 664-3643

February 2, 2010

Austin S. O'Toole, Esq.
Legal Counsel
18 Tremont Street, Suite 1010
Boston, MA 02108

     Re: <u>Kira Wahlstrom v. Jose Ruben Rivera, et al</u>

Dear Attorney O'Toole:

     This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be a recovery in this case:

     33% of my fee from the sum recovered.

     Will you kindly acknowledge your acceptance of the above on the additional copy of this letter, adding the date and return to this office at your earliest convenience.

          Very truly yours,

          DAVID J. HOEY

ACCEPTED AND AGREED TO: _____ DATE: _____

I, Kira Wahlstrom, hereby consent to Attorney Austin O'Toole receiving a referral fee in this matter and understand that I will not be charged any additional legal fees for this referral by Attorney Hoey to Attorney O'Toole.

ACCEPTED AND AGREED TO: _____ DATE: 2/10/10

**Exhibit 1 - 19**

<u>MASSACHUSETTS CONTINGENT FEE AGREEMENT</u>
<u>(TO BE EXECUTED IN DUPLICATE)</u>

<u>Date: February 2, 2010</u>

<u>The Client:</u>


Kira Wahlstrom             1 Whittier Place                Haverhill, MA 01832

         (Name)                      (Street and Number)                (City or town)

retains as "Attorney" the Law Offices of David J. Hoey, P.C. with an address of 352 Park St,
Suite 105, North Reading MA 01864 and Austin S. O'Toole, Esquire with an address of 18
Tremont Street, Suite 1010, Boston, MA 02108 to perform the legal services referred to in
Paragraph (1) below. The Attorney agrees to perform them faithfully and with due diligence.

(1)     The claim, controversy, and other matters with reference to which the services are to be
        performed are: *premises liability and injuries received on or about May 1, 2009 in the*
        *Radisson parking garage*

(2)     The fee is to be paid only upon recovery.

(3)     The Client is not to be liable to pay compensation otherwise than from amounts collected
        for (him) / (her) by the Attorney except as follows: none.

(4)     Reasonable compensation on the foregoing contingency is to be paid by the Client to the
        Attorney, but such compensation including that of any associated counsel shall be the
        following percentage of the gross amount collected for the client.

           33.3% of the gross amount recovered;

(5)     The Client is to be liable to the attorney for his reasonable expenses and disbursements
        only if there is a favorable disposition of the legal matter. In the event of a favorable
        disposition, expenses and disbursements will be deducted after the contingent fee is
        calculated. The Client acknowledges and agrees that the attorney may borrow funds from
        time to time to pay certain of the costs associated with pursuing and litigating the case
        and agree that, in addition to reimbursing the attorney for the amount of such costs, the
        client also will reimburse the attorney for any interest charges and related expenses the
        attorney incurs in connection with such borrowings.

The client acknowledges the following with respect to (his) (her) legal representation by the
Attorney:

**Exhibit 1 - 20**

a) It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b) AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.

(6)     In the event that the Law Offices of David J. Hoey, P.C. makes a recommendation regarding the pursuit of the claim including that a claim not be pursued or that the claim should be settled or that the claim may be dismissed and the Client refuses to accept the recommendation by the Law Offices of David J. Hoey, P.C., the Client agrees to pay all costs and expenses as incurred from that time forward, payable in advance. If the client fails or refuses to pay any such costs or expenses, the Client agrees that the Law Offices of David J. Hoey, P.C. may, at its option, withdraw from representation if permitted by the court to dismiss the claim.

(7)     This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

   a) We understand that current law and regulations regarding Medicare, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, law firm defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. We agree that the law firm may take all steps in this matter deemed advisable for the handling of our claim, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from our net recovery and shall not be paid out of the law firm's contingent fee in this matter.

**Exhibit 1 - 21**

This agreement and its performance are subject to Rule 1.5 of the Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court.

WE HAVE EACH READ AND AGREED THE ABOVE AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.

Signatures

X Kira Wahlstrom                     _____
Client (Print)                       Attorney (Print)

X _____                    David Hoey
(Signature of Client)                (Signature of Attorney)

**Exhibit 1 - 22**

# Exhibit B



## MASSACHUSETTS CONTINGENT FEE AGREEMENT
### (TO BE EXECUTED IN DUPLICATE)

Date: 6/1/15   6/19/15

The Client(s):

Kira Wahlstrom                  1227 Boston Road          Haverhill, MA 01835

_____
        (Name)                  (Street and Number)          (City or town)

following the Court's allowance of the Pro Hac Vice admission motion, retains as "Attorney"
**DON C. KEENAN** and **THE KEENAN LAW FIRM. P.C.** with an address of 148 Nassau St
NW, Atlanta GA to perform the legal services referred to in Paragraph (1) below. The Attorney
agrees to perform them faithfully and with due diligence.

(1)     The claim, controversy, and other matters with reference to which the services are to be
        performed are:
        *Premises liability claims and injuries received as a result of assault on or about May 1,*
        *2009 in the Radisson Hotel Boston parking lot*

        The Attorney will be providing services, including legal services and consulting, to the
        Client in connection with the Claim identified in paragraph 1 above.  Because the
        engagement is limited to this specific undertaking, the Attorney's acceptance of this
        engagement does not involve an undertaking to provide any services to the Client or any
        of the Client's interests in any other matter unless specifically requested by the Client and
        agreed to by the Attorney in writing.  After completion of this matter, changes may occur
        in pertinent laws or regulations that may have an impact upon your future rights and
        liabilities.  Unless the Client engages the Attorney after completion of this matter to
        provide advice on future issues arising from this matter, the Attorney will have no
        obligation to provide any advice to the Client with respect to future legal developments.

        The Client may limit or expand the scope of this engagement from time to time, provided
        that the Attorney must agree in writing to any changes in the scope of the representation.
        Except as otherwise agreed to in writing, the terms of this Agreement apply to all changes
        in the scope of engagement and to all additional engagements for the Client which the
        Attorney may undertake.

(2)     The contingency upon which compensation is to be paid is: **recovery of damages,**
        **whether by settlement, judgment or otherwise.**

(3)     The Client is not to be liable to pay compensation otherwise than from amounts collected
        for (him) / (her) by the Attorney except as follows: If no recovery is made, the Client
        shall not owe the Attorney any sum as attorney's fees, nor shall the Client be responsible
        to reimburse the Attorney for any costs, except as provided in Sections 6, 7 and 8.

**Exhibit 1 - 24**

(4)   Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:



**33 and 1/3 % (thirty-three and one-third percent)** of gross amount recovered

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.

The percentage shall be applied to the amount of the recovery not including any attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

<u>Referring/Associated Counsel:</u>
The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: <u>the Law Offices of David J. Hoey, P.C.</u> and consents to this division of fees.  Client understands that the Client will not be charged any additional legal fees.



(5)   The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of the Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may choose to do so, and may choose to cease doing so for any reason whatsoever, with notice to the Client.

(6)   In the event that the Attorney makes a recommendation regarding the pursuit of the claim, including that a claim not be pursued, or that the claim should be settled, or that the claim should be dismissed, and the Client refuses to accept the recommendation by the Attorney, the Attorney may, at its option, withdraw from representation. If the claim



**Exhibit 1 - 25**

is in litigation, withdrawal will be subject to Court approval. Should the Attorney continue representation, the Client agrees to reimburse the Attorney for the amount of such costs, reasonable expenses and disbursements incurred thus far, and to pay all costs and expenses as incurred from that time forward, payable in advance.

(7)   This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, and resolutions of Medicare liens and Medicaid claims.

Pursuant to Massachusetts General Laws, any net proceeds (gross recovery less compensation, costs, and expenses) due to the Client at the time of settlement may, and if applicable, will, be subject to liens/attachment by, but not limited to, Medicare, Medicare Advantage Plans, MassHealth, Medicaid, Department of Revenue, Department of Transitional Assistance, Department of Estate Recovery, Department of Liability Recovery, SSI, private Health Insurance, Short Term/Long Term Disability claims, and medical providers, if any, that may be owed by the Client. All proper Liens will have to be satisfied before the balance of the settlement can be remitted to the Client.

Client hereby acknowledges and understands that current law and regulations regarding Medicare, Medicare Advantage Plans, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, attorney, defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. Client agrees that the Attorney may take all steps in this matter deemed advisable for the handling of such claims, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from the net recovery and shall not be paid out of the attorney's contingent fee in this matter.

(8)   If the client terminates the attorney-client relationship before the conclusion of the case for any reason, the attorney may seek payment for the work done and expenses advanced. Whether Attorney will receive any payment for the work done before the termination, and the amount of any payment, will depend on the benefit for the client of the services performed by Attorney as well as the timing and circumstances of the termination. Such payment shall not exceed the lesser of (i) the fair value of the legal services rendered by Attorney or (ii) the contingent fee to which the lawyer would have been entitled upon the occurrence of the contingency. This paragraph does not give Attorney any rights to payment beyond those conferred by existing law.

(9)   The Attorney may withdraw from representing the Client if withdrawal can be accomplished without material adverse effect on the interest of the Client, or if:

    (a)    the Client persists in a course of action involving the Attorney's services that the Attorney reasonably believes is criminal or fraudulent;

    (b)    the Client has used the Attorney's services to perpetuate a crime or fraud;

    (c)    the Client insists upon pursuing an objective that the Attorney considers repugnant or imprudent;

    (d)    the Client fails substantially to fulfill an obligation to the Attorney regarding its services and has been given reasonable warning that the Attorney will withdraw unless the obligation is fulfilled;

    (e)    the representation will result in an unreasonable financial burden on the Attorney or has been rendered unreasonably difficult by the Client; or

    (f)    other good cause for withdrawal exists.

(10)    The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1), except if the former/prior counsel is identified as the referring or associated counsel in paragraph (4),

(11)    During the course of the engagement, the Attorney shall maintain a file on the Client's behalf that will include both physical documents and electronically stored information ("the file"). The file may include either original or copies of material such as pleadings, transcripts, exhibits, reports, contracts, wills, certificates and other documents as are determined to be reasonably necessary to the representation. The file shall be and remain the Client's property. The Law Firm may also include in the file attorney work product, mental impressions and notes (collectively "work product"). The work product shall be and remain the property of the Attorney.

    At the termination of the engagement, if requested in writing by the Client, the Attorney will return to the Client all original documents that were provided. Further, for a period of six (6) years (unless otherwise required by the Rules of Professional Conduct or applicable laws) after termination or upon conclusion of the engagement, and provided there are no outstanding unpaid statements for fees and/or costs or expenses owed by the Client to the Attorney, the Client shall have the right on request to take possession of the file, not including the work product, unless at the conclusion of the engagement, the Client has requested and/or confirmed in writing, that the Attorney properly dispose all or parts of the file (unless otherwise required by the Rules of Professional Conduct or applicable laws). In either such event, the Attorney, at his/her/its expense may make and retain copies of all or portions of the file. If the Client does not request possession of the file within this time period, the Attorney will have no further responsibility for the retention and maintenance of the file and may at its option properly dispose of all or parts of the file without further notice to you.

(12)    The Client hereby acknowledges and confirms, by signature on this agreement, and by initialing by all paragraphs (1-14), that the Attorney has explained the provisions of this agreement, where it differs from the SJC Model Form agreement, and specifically with the respect to responsibility for court costs and expenses of litigation. Additionally, the



**Exhibit 1 - 27**

Client acknowledges that the Attorney has advised the Client that different forms of agreements may be available, and that the Client selects the provisions as stated herein. By signing below, the Client acknowledges that he or she has carefully read this Agreement, understands its contents, and agrees to be bound by all of its terms and conditions; that the Attorney has made no representation to the Client as to the likelihood of the outcome of any proceeding now pending or to be brought by or against the Client, and that the Client believes this Agreement to be fair and reasonable. The Client understands that the Attorney cannot and does not promise or even predict that its efforts will be successful, and this Agreement is not based upon any such promises or anticipated results. Furthermore, the Client understands it is possible that the cost to the Client of the Attorney's work may exceed the value of whatever the Client may gain.

(13)   This Contingent Fee Agreement (6 pages, 14 paragraphs, and attachments) encompasses the entire agreement of the parties (the Client and the Attorney), and supersedes all previous understandings and agreements between the parties, whether oral or written. The parties hereby acknowledge and represent that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this agreement.   This agreement may only be modified in writing, signed by all parties the agreement.



(14)   This agreement and its performance are subject to rule 1.5 of the Rules of Professional Conduct as adopted by the Supreme Judicial Court ("SJC") of Massachusetts. (Last updated and effective as of January 1, 2013) (copy attached)



**Exhibit 1 - 28**

WE HAVE EACH READ, UNDERSTOOD AND AGREED TO THE ABOVE
AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES
RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.

Signatures

_Kim Wahlstrom_
Client(s) (Print)

_____
(Signature of Client(s))

DON C. KEENAN
for THE KEENAN LAW FIRM, P.C.
(Attorney)

_____
(Signature of Attorney)

THIS AGREEMENT BECOMES EFFECTIVE WHEN RETURNED TO AND SIGNED
BY THE ATTORNEY FOR THE LAW FIRM.