**Exhibit 2 - 1**

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| SUFFOLK, ss | SUPERIOR COURT DEPARTMENT<br>CIVIL ACTION NO. 2184-CV-00741 **F** |

|  |  |
|---|---|
| AUSTIN O'TOOLE, and THE LAW OFFICES OF AUSTIN SCOTT O'TOOLE, P.C.,<br><br>    Plaintiff,<br><br>        v.<br><br>DAVID HOEY AND THE LAW OFFICES OF DAVID HOEY, P.C., KIRA WAHLSTROM, DON KEENAN, AND THE KEENAN LAW FIRM, P.C.,<br><br>    Defendants. | 4/12/2022 e-filed KG |

**MEMORANDUM IN SUPPORT OF DEFENDANT KIRA WAHLSTROM'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Rule 12(b)(6), Defendant Kira Wahlstrom moves to dismiss the claims asserted against her: Count I for Breach of Contract, Count II for Breach of the Covenant of Good Faith and Fair Dealing, and Count IV for Declaratory Judgment.

The contract terms and facts involved, long known to Plaintiff Austin O'Toole, his firm, and their counsel, so clearly establish that Ms. Wahlstrom should not be a party to this attorney dispute over fees between them that Rule 11 sanctions are appropriate.

In sum, Ms. Wahlstrom suffered a brutal attack and rape in a downtown garage where another woman had just been raped by the same man twelve days earlier and the garage failed to take appropriate security measures to protect garage patrons. O'Toole, who first knew Ms. Wahlstrom as a friend and was contacted for assistance, referred her premises liability case to Defendant David Hoey. Attorneys O'Toole and Hoey entered a referral agreement under which

1

O'Toole would be paid 33% by Hoey out of the attorney fee that Hoey recovered, and O'Toole now claims he was not paid all he is owed but was shortchanged by Hoey.

O'Toole's involvement in Ms. Wahlstrom's premises liability case ended when he referred the case to Hoey. Nevertheless, O'Toole has now sued Ms. Wahlstrom, claiming that Ms. Wahlstrom personally owes him a referral fee not only in this case but in two additional cases in which he was never involved and has no referral fee agreement. O'Toole knew before filing his amended complaint that Ms. Wahlstrom agreed to pay an attorney fee of 33.33% of her recovery in the premises liability case and that she not only paid that amount but in fact paid over 40% of her recovery in attorneys' fees to Hoey and his co-counsel at trial, Defendant Don Keenan. This dispute is between the attorneys and dragging Ms. Wahlstrom into it when she clearly is not obligated to pay O'Toole any money – as she was never obligated to pay him directly for his fee and has paid more than owed in attorneys' fees – is a blatant money grab from a rape victim after she went through nine years of litigation to finally recover compensation for her injuries and trauma in the underlying case. Knowing all this, O'Toole wrongfully accuses Ms. Wahlstrom of misconduct and has entangled her in this litigation undoubtedly to use her as a pawn in O'Toole's battle with the other attorneys.

Dismissal and sanctions should be entered.

## RELEVANT FACTS

On May 1, 2009, Ms. Wahlstrom was brutally raped by Jose Rivera III in a downtown parking garage connected to the Radisson Hotel. **Exhibit 1**, First Amended Complaint (herein, "FAC"), ¶10. Rivera had just raped another woman twelve days before in the same garage before he returned to the garage and raped Ms. Wahlstrom. At that time Ms. Wahlstrom had known attorney Austin O'Toole as a friend and contacted him for assistance as she was dealing with the grand jury related to the rape. As plead, O'Toole thereafter referred Ms. Wahlstrom to attorney

**Exhibit 2 - 3**

David Hoey as an attorney "who specialized in trying premises liability actions" and because the case is outside the areas of O'Toole's experience and expertise. FAC, ¶11.

As plead in the First Amended Complaint, there are two contracts involved in this action. *See*, Exhibit 1, FAC with Exhibits A and B. The first is the 2010 Fee Agreement executed by Ms. Wahlstrom and David Hoey in 2010 and which states in relevant part that Ms. Wahlstrom:

> retains as "Attorney" the Law Offices of David Hoey, P.C. with an address of 352 Park St., Suite 105, North Reading, MA 01864 and Austin S. O'Toole, Esquire with an address of 18 Tremont Street, Suite 1010, Boston, MA 02108 to perform the legal services referred to in Paragraph (1) below.

Exhibit 1-19.

> Paragraph (1), in turn, states (italics in original):
>
> (1) The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

*Id*.

> As relevant to this fee dispute, the 2010 Fee Agreement further provides:
>
> (3) The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none.
>
> (4) Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associate counsel shall be the following percentage of the gross amount collected for the client.
>
>> 33.3% of the gross amount recovered;
>
> (5) The Client is to be liable to the attorney for his reasonable expenses and disbursements only if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

3

**Exhibit 2 - 4**

The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

a) **It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE**, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b) AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, **representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally**. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.

* * *

(7) This fee agreement applies to all services rendered in pursuing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

* * *

Exhibit 1-19 to 20.

In the accompanying Referral Agreement, Attorney Hoey agreed to pay to O'Toole the referral fee upon recovery of "33% of my fee from the sum recovered." Exhibit 1-18. Ms. Wahlstrom is not a party to the Hoey/O'Toole Referral Agreement. Rather, Ms. Wahlstrom – as required by the Rules of Professional Conduct – executed her **consent** to the Hoey/O'Toole referral fee that stated:

> I, Kira Wahlstrom, hereby consent to Attorney Austin O'Toole receiving a referral fee in this matter and understand that I will not be charged any additional legal fees for this referral by Attorney Hoey to Attorney O'Toole. [sic]

Exhibit 1-18.

4

**Exhibit 2 - 5**

The second agreement involved here was executed by Ms. Wahlstrom and attorney Don Keenan in June 2015 (the "2015 Fee Agreement") (at FAC Exhibit B), which provides in relevant part that Ms. Wahlstrom:

> …retains as "Attorney" DON C. KEENAN and THE KEENAN LAW FIRM, P.C. …to perform the legal services referred to in Paragraph (1) below.

Exhibit 1-23.  Paragraph (1) states (italics in original):

> (1) The claim, controversy, and other matters with reference to which the services are to be performed are:
> *Premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

*Id*. (This is the exact same language as in the 2010 Fee Agreement).

> The 2015 Fee Agreement further provides
>
> The Attorney will be providing services, including legal services and consulting, to the Client in connection with the Claim identified in paragraph 1 above. Because the engagement is limited to this specific undertaking, the Attorney's acceptance of this engagement does not involve an undertaking to provide any services to the Client or any of the Client's interests in any other matter unless specifically requested by the Client and agreed to by the Attorney in writing. After completion of this matter, changes may occur in pertinent laws or regulations that may have an impact upon your future rights and liabilities. Unless the Client engages the Attorney after completion of this matter to provide advice on future issues arising from this matter, the Attorney will have no obligation to provide any advice to the Client with respect to future legal developments.
>
> The Client may limit or expand the scope of this engagement from time to time, provided that the Attorney must agree in writing to any changes in the scope of the representation. Except as otherwise agreed to in writing, the terms of this Agreement apply to all changes in the scope of engagement and to all additional engagements for the Client which the Attorney may undertake.
>
> \* \* \*
>
> (3) The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: If no recovery is made, the Client shall not owe the Attorney any sum as attorney's fees, nor shall the Client be responsible to reimburse the Attorney for any costs, except as provided in Sections 6, 7 and 8.
>
> (4) Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney [Don C. Keenan

and The Keenan Law Firm PC], but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:

33 and 1/3 (thirty-three and one-third percent) of gross amount recovered

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney [Don C. Keenan and The Keenan Law Firm PC] on behalf of the Client, and an additional 5% of gross recovery Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.

The percentage shall be applied to the amount of the recovery not including an attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

<u>Referring/Associated Counsel:</u>

The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees. Client understands that the Client will not be charged any additional legal fees.

(5) The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may choose to do so, and may choose to cease doing so for any reason, whatsoever, with notice to the Client.

*   *   *

(7) This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims. such as probate court proceedings, guardianships and trusts or estate services, and resolutions of Medicare liens and Medicaid claims.

*   *   *

(10) The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1), except if the former/prior counsel is identified as the referring or associated counsel in paragraph (4),

\* \* \*

Exhibit 1-23 to 26.

Ms. Wahlstrom's underlying premises liability case was filed on March 12, 2010 and went to trial on July 14, 2015 and concluded on August 11, 2015. *See,* **Exhibit 2**, Docket in *Wahlstrom v. Rivera et al.*, Case No. 1084CV01022, Suffolk Superior Court. The jury returned with a $4 million verdict for Ms. Wahlstrom against the two companies that owned, managed, and operated the garage (JPA IV Management Company, Inc. and JPA I Management Company, Inc., collectively "JPA"). *See,* FAC, ¶19 and Exhibit 2, *Wahlstrom v. Rivera* at Docket No. 231. Pre-judgment interest in the amount of $2,640,657.53 and $10,172.05 in costs were awarded for a total judgment of $6,650,829.58 against JPA which was entered on September 14, 2015. Exhibit 2, *Wahlstrom v. Rivera* at Docket No. 235.

In May 2016, the Superior Court ordered a new trial, having found multiple instances where two of Ms. Wahlstrom's trial attorneys – including Hoey personally – engaged in misconduct throughout the trial. FAC, ¶ 19; Exhibit 2, *Wahlstrom v. Rivera* at Docket No. 267. An interlocutory appeal was granted and ultimately, on November 6, 2019, the Appeals Court agreed that misconduct had occurred but deemed it insufficient to justify overturning the jury verdict. FAC, ¶ 19. Thereafter, a total of $9,987.683.80, which included interest, was paid by the JPA's insurance carriers to attorney Keenan. FAC, ¶ 20. Hoey and Keenan took an attorney fee of over $4 million which was over 40% of the recovery. FAC, ¶ 2.

Now attorney O'Toole has sued Ms. Wahlstrom claiming she breached their agreement and owes him not only more money on the underlying premises liability suit but that he is entitled to an additional referral fee (FAC, ¶¶ 40-45) if there is a recovery in her separate pending suit against the defense insurance carriers for their bad faith in handling the claim filed in August, 2019. **Exhibit 3**, Complaint filed in *Wahlstrom v. Zurich, et al.* Case No. 1:19-cv-12208-LTS (D. Mass)). O'Toole further claims (FAC, ¶¶ 40-45) that he is entitled to a referral fee on a separate suit brought by Ms. Wahlstrom's children and their father – not Ms. Wahlstrom herself – against JPA for loss of consortium filed in June, 2020. **Exhibit 4**, Complaint filed in *Helmeke, et al. v. JPA IV Management Company, Inc.*, et al. Case No. 2077CV00542, Suffolk Superior).

## ARGUMENT

I.     **12(b)(6) Motion Standard**

A motion to dismiss under Rule 12(b)(6) should be allowed if O'Toole has "fail[ed] to state a claim upon which relief can be granted." *Schaer v. Brandeis U.*, 432 Mass. 474, 477-78, 735 N.E.2d 373, 377-78 (Mass. 2000) In evaluating a Rule 12(b)(6) motion, courts consider "the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Id.*, citing 5A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1357, at 299 (1990). The plaintiff's factual allegations are accepted as true, however, courts do not accept legal conclusions cast in the form of factual allegations. *Id*. "The rule that we accept [plaintiff's] well-pleaded factual averments and indulge every reasonable inference hospitable to his case 'does not entitle him to rest on "subjective characterizations" or conclusory descriptions of a "general scenario which could be dominated by unpleaded facts." ' " *Id*. (internal citations omitted)

## II.   O'Toole Cannot State a Breach of Contract Claim Against Ms. Wahlstrom

The interpretation of the parties' unambiguous written contracts is a question of law that the court may resolve when deciding whether a party has asserted a viable contract claim. *See, e.g., Eigerman v. Putnam Investments, Inc.,* 450 Mass. 281, 287 (2007) (affirming dismissal of complaint for failure to state a viable claim for breach of contract). Similarly, whether language used in a contract "is ambiguous is also a question of law for the court." *Berkowitz v. President & Fellows of Harvard College,* 58 Mass.App.Ct. 262, 270, rev. denied, 440 Mass. 1101 (2003) (ordering dismissal of complaint for failure to state a viable claim for breach of contract).  "It is ... elementary that an unambiguous agreement must be enforced according to its terms." *Schwanbeck v. Federal-Mogul Corp.,* 412 Mass. 703, 706 (1992) "[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose." *Anderson St. Assocs. v. Boston,* 442 Mass. 812, 819 (2004); *Compare, also, Wal-Mart Real Est. Bus. Tr. v. New Hawthorne Mgt. Services, Inc.*, 010810A, 2005 WL 1009571, at *1–2 (Mass. Super. Apr. 19, 2005) (granting motion to dismiss claim for commission where contract provided for payment of commission upon closing and no closing occurred).

Looking at the facts in a light most favorable to O'Toole, it is impossible for O'Toole to prove a set of facts to support his claim that Ms. Wahlstrom breached the 2010 Fee Agreement. First, O'Toole alleges that Ms. Wahlstrom beached by failing to provide O'Toole periodic updates on the underlying case. FAC, ¶¶ 15, 18, 27. However, the 2010 Fee Agreement is clear that this was attorney Hoey's obligation and not Ms. Wahlstrom's. Exhibit 1, FAC Exhibit A, p. 4 at paragraph 5(b): "AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports *from the Attorney* concerning the progress and disposition of the matter referred to in Paragraph (1)

9

above." (emphasis added) O'Toole admits this in his pleading at FAC, paragraph 12: "The fee agreement directed *Mr. Hoey* to provide O'Toole with periodic updates on the status and disposition of the case." (emphasis added) As a matter of law, Ms. Wahlstrom cannot breach a contract provision that does not even apply to her.

Second, O'Toole alleges breach simply because Hoey did not pay him a higher referral fee than he received. FAC, ¶¶2, 20, 24, 27. Again, this is not a breach by Ms. Wahlstrom. The 2010 Fee Agreement provides that Ms. Wahlstrom was to pay "33.3% of the gross amount" recovered to attorney Hoey (Exhibit 1-19) and that "[i]t is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE…." Exhibit 1-20. Ms. Wahlstrom was not obligated to pay O'Toole directly. *Id.*, *see also,* Exhibit 1-18 where Hoey states to O'Toole: "This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be a recovery in this case: 33% of *my fee* from the sum recovered" (emphasis added). Ms. Wahlstrom consented to this monetary arrangement between O'Toole and Hoey but she did not agree to pay O'Toole directly. Her consent, in its entirety, states: I, Kira Wahlstrom, hereby consent to Attorney Austin O'Toole receiving a referral fee in this matter and understand that I will not be charged any additional legal fees for this referral by Attorney Hoey to Attorney O'Toole." *Id.* (There is no dispute that the referral was from O'Toole to Hoey and the converse is a typo.)[1]

---

[1] Hoey contends that he only received $750,000 as his fee so that he has fully paid O'Toole his 33% through the $250,000 paid by Hoey and accepted by O'Toole. FAC ¶¶ 2, 22. If this is true, then O'Toole has been fully paid and is entitled to no more. Either way, Ms. Wahlstrom has paid more than the attorneys' fee required by the contracts and has no further obligation to O'Toole.

10

O'Toole has specifically plead that Ms. Wahlstrom has paid over 40% of the recovery in attorneys' fees in the underlying premises liability case yet he insists that she pay him out of her portion of the recovery contrary to the contracts, facts, and law.  FAC, ¶ 2 ("…Wahlstrom was required to pay a fee of over $4 million") *See, Malonis v. Harrington*, 442 Mass. 692, 702, 816 N.E.2d 115, 123 (2004) ("A client should never be made to pay twice.")

As to the 2015 Fee Agreement, O'Toole alleges that agreement is invalid and not binding on him (FAC, ¶¶ 18, 22, 29), but then makes alternative arguments if it is binding. To the extent O'Toole relies on the 2015 Fee Agreement to keep Ms. Wahlstrom entangled in this attorney fee dispute, the 2015 Fee Agreement's paragraph 10, which he has cited, does not obligate Ms. Wahlstrom to O'Toole as that paragraph unambiguously provides she is "responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses…" not for payment of any referral fees, which is all to which O'Toole is entitled in the premises liability case. *See*, Exhibit 1-26. That same paragraph states that Ms. Wahlstrom is *not* responsible for paying "referring or associated counsel in paragraph (4)." *Id*. Hoey is identified in paragraph 4 as referring/associated counsel who is to receive a portion of the attorneys' fee and that same paragraph states "Client understands that the Client will not be charged any additional fees." Exhibit 1-24. This only reenforces that Ms. Wahlstrom does not owe any monies to O'Toole but that Hoey's fee would be paid from the attorneys' fee and Hoey remained the person who would pay O'Toole from the fee Hoey recovered.

Thus, Ms. Wahlstrom has not breached her contractual obligations and O'Toole cannot state a claim against Ms. Wahlstrom on the basis that attorney Hoey owes O'Toole more from the fee she already paid.

    **III.**    **O'Toole's Breach of the Covenant of Good Faith and Fair Dealing Also Fails**

The "purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract" and "when performing the obligations of the contract, the parties 'remain faithful to the intended and agreed expectations' of the contract." *Eigerman v. Putnam Investments, Inc.*, 450 Mass. 281, 877 N.E.2d 1258, 1264 (Mass. 2007) A breach occurs when one party violates the reasonable expectations of the other. *Id*. The scope of the covenant is only as broad as the contract that governs the particular relationship. *Id*. The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract. *Id.*

As shown above, Ms. Wahlstrom is not a party to the Referral Agreement between O'Toole and Hoey. She performed under the 2010 Fee Agreement and has not breached any obligation to O'Toole under the contract or the implied covenant of good faith and fair dealing. "The covenant concerns the manner in which existing contractual duties are performed." *Eigerman*, 877 N.E. 2d. at 1265.

O'Toole claims that, if the 2015 Fee Agreement between Ms. Wahlstrom and Keenan is valid and binding, it shortchanges him and thus deprived him of the intended benefit of the bargain his Referral Agreement. *Id*., ¶¶ 31-33. O'Toole alleges only that Ms. Wahlstrom entered the 2015 Agreement (FAC, ¶16) and nothing more to support a covenant breach by Ms. Wahlstrom.

As a matter of law, O'Toole's theory fails for at least two reasons:

First, the 2010 Fee Agreement between Ms. Wahlstrom and Hoey did not in any way prohibit Ms. Wahlstrom from entering a fee agreement with another additional attorney related to the underlying case nor could O'Toole have reasonably so expected. O'Toole's Referral Agreement provides no such prohibition or expectation. *See, Eigerman*, 877 N.E.2d at 1265 ("the

12

implied covenant of good faith and fair dealing cannot create rights and duties that are not already present in the contractual relationship")[2]

Second, Ms. Wahlstrom's execution of this agreement did not interfere with O'Toole's recovery of a proper referral fee from Hoey. The 2010 Agreement made clear that, as to attorney fees, Ms. Wahlstrom would only have to pay 33.3% of the recovery "including that of associated counsel" and that O'Toole would be owed from that same fee. Exhibit 1-19 at paragraph (4). The 2015 Fee Agreement repeats the same – providing that Ms. Wahlstrom would pay only 33 and 1/3 % of the recovery and that Ms. Wahlstrom "understands that a portion of the compensation payable to the Attorney…shall be paid to … David J. Hoey, PC, and consents to this division of fees. *Client understands that the Client will not be charged any additional legal fees*." Exhibit 1-24 at para. 4 (emphasis added). The 2015 Fee Agreement does not indicate the manner in which Keenan and Hoey would split the 33 1/3% attorney fee, nor does it change the referral fee agreement between Hoey and O'Toole.

For these reasons, O'Toole's has not stated a claim against Ms. Wahlstrom for breach of the covenant of good faith and faith dealing owed to O'Toole. *See*, *Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 782, 871 N.E.2d 1117, 1126 (2007)("There is no breach of the covenant 'so long as neither party injures the rights of [the other] to reap the benefits prescribed by the terms of the contract.' ")

### IV.    O'Toole Does Not State an Actual Controversy to Pursue Declaratory Judgment

---

[2]    *Compare also, Donovan v. Mahoney*, 2008 Mass. App. Div. 41 (Dist. Ct. 2008)(reversing allowance of plaintiff's summary judgment motion where plaintiff attorney claimed his own intentions were unmet because a case he referred to the defendant attorney was then referred on to another attorney, finding that the referral-fee agreement signed by both parties neither forbade defendant from further referring the cases he received from plaintiff, nor obligated him to consult with plaintiff or to notify him before doing so, and nothing in the agreement addressed any "expectations" that the defendant attorney would see the case through to conclusion.)

13

Finally, O'Toole not only seeks a greater referral fee for the underlying premises liability suit but seeks a declaratory judgment that he is now also entitled to referral fees from any recovery on Ms. Wahlstrom's pending 93A / 176D claim against the defendant insurance companies (FAC, ¶ 42) and that he is entitled to a fee from any recovery by Ms. Wahlstrom's children for loss of consortium (a case to which Ms. Wahlstrom is not a party) (FAC, ¶43).

When evaluating a motion to dismiss a claim for declaratory relief under rule 12(b)(6), first, the court must determine whether the claim was "properly brought." *Buffalo-Water 1, LLC v. Fid. Real Est. Co., LLC*, 481 Mass. 13, 18, 111 N.E.3d 266, 272 (2018) A claim for declaratory relief is "properly brought" where the plaintiff demonstrates that an actual controversy exists, see G. L. c. 231A, § 1 (courts may issue declaratory judgments where "an actual controversy has arisen and is specifically set forth in the pleadings") and that the plaintiff has legal standing to sue. *Id*.

Here, O'Toole alleges that:

Any recoveries in the 176D suit or the loss of consortium suit fit comfortably within the terms of the fee agreement as a 'claim, controversy, or other matter' related to the May 1, 2009 event, particularly since paragraph 5(a) of the fee agreement entitles Mr. O'Toole to a one-third fee on "any fee to be paid pursuant to a matter referred to in paragraph 1." (Emphasis added) However, Hoey and Wahlstrom have refused to acknowledge Mr. O'Toole's rights to share in any fees which the pending 176D litigation or the loss of consortium litigation generate.

FAC, ¶44.

O'Toole's theory of liability contradicts the clear terms of the contract. His claim therefore fails as a matter of law. Indeed, contract language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co.*, 433 Mass. 373, 376, 742 N.E.2d 76 (2001). "[W]hen the language of a contract is clear, it alone determines the contract's meaning." *James B. Nutter & Co. v. Est. of Murphy*, 478 Mass. 664, 669, 88

N.E.3d 1133, 1138–39 (2018) A contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co. v. Gomez,* 426 Mass. 379, 381, 688 N.E.2d 951 (1998). The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.*, 419 Mass. 462, 466, 645 N.E.2d 1165 (1995); *see, Browning-Ferris Indus. v. Casella Waste Mgmt. of Mass.*, 79 Mass. App. Ct. 300, 307, 945 N.E. 2d 964, 970-971 (2011). When the language is ambiguous, it is construed against the drafter, "if the circumstances surrounding its use ... do not indicate the intended meaning of the language." *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724, 363 N.E.2d 688 (1977). "The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party." *Id.* The Court must construe the contract as a whole in a manner that will "give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." *Robert and Ardis James Foundation v. Meyers,* 474 Mass. 181, 188 (2016). And "the parties' intent 'must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part.' " *Kingstown Corp. v. Black Cat Cranberry Corp.,* 65 Mass.App.Ct. 154, 158 (2005).

The 2010 Fee Agreement provides in full that Hoey was retained as the Attorney to perform legal services referred to in Paragraph (1) which states:

> (1) The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

Exhibit 1-19.

**Exhibit 2 - 16**

The 2010 Fee Agreement further provides, "The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none," *id*., at paragraph (3), and that O'Toole was to be paid from "any fee to be paid pursuant to a matter referenced in Paragraph (1)**.** Exhibit 1-20 at paragraph (5)(a). The only matter covered in paragraph (1) is the claim for "premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage" which was the claim pursued in the underlying action that went to trial and nothing more. The language is not only clear and unambiguous in the 2010 Fee Agreement but it is then reenforced by the written Referral Agreement between O'Toole and Hoey in which the subject line identifies the case "Kira Wahlstrom v. Jose Ruben Rivera, et al." and states "This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be a recovery in this case: 33% of my fee from the sum recovered." Exhibit 1-18. Ms. Wahlstrom consented with the understanding that she "will not be charged any additional legal fees for this referral…" *Id.* O'Toole signed on the "Accepted and Agreed to" line without modification. *Id.* Furthermore, the 2010 Fee Agreement specifically states: "This fee agreement applies to all services rendered in pursuing the above referenced claim, but not to matters ancillary to the above claims…" Exhibit 1-20, at paragraph 7.

When reading the contract terms – fairly constructing the contract as a whole, and giving it effect as a rational business instrument and in a manner which will carry out the intent of the parties – O'Toole is simply not entitled to a referral fee beyond the underlying case as O'Toole now desires. The contract clearly states that it concerns fees for recovery for "*premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*." (emphasis added). Since Ms. Wahlstrom's insurance bad faith claim and her children's loss of consortium

claims do not sound in premises liability and do not seek recovery for any injuries caused to Ms. Wahlstrom on May 1, 2009, O'Toole is not entitled to two more paydays.

Ms. Wahlstrom's 93A claims against the insurance companies "allow a plaintiff to remedy the separate harm caused by the insurer's unfair settlement practices." *See, Chiulli v. Liberty Mut. Ins., Inc*., 146 N.E.3d 471, 478–79 (Mass. App. 2020), review denied, 150 N.E.3d 1119 (Mass. 2020). Such claims had not arisen or been contemplated at the time of the 2010 Fee Agreement (dated February 2 before the lawsuit was then filed on March 12, 2010) as is clear from the fee agreement language itself.  Such injuries were not "received on or about May 1, 2009 in the Radisson parking garage." Incredibly, O'Toole also now wants a cut of any attorney fee paid from any recovery by Ms. Wahlstrom's children who are pursuing loss of consortium claims for their own damages. Nowhere does the 2010 Fee Agreement and Referral Agreement address such a claim or entitle O'Toole to a fee for this case in any way, as O'Toole surely knows.

**V.      Rule 11 Sanctions**

Rule 11(a), Mass. R. Civ. P., authorizes courts to impose attorneys' fees and costs where an attorney "has failed to show a subjective good-faith belief that the pleading was supported in both fact and law." *Van Christo Advertising, Inc. v. M/A–Com/LCS*, 426 Mass. 410, 416 (1998). The test is whether the complaint shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *U.S. Funding, Inc. of America v. Bank of Boston Corp*., 28 Mass.App.Ct. 404, 408 (1990).

 O'Toole is an attorney suing a former friend who suffered a brutal attack and rape, endured a nine-year litigation saga before seeing a recovery, and paid over $4 million in attorneys' fees – over 40% of the recovery.  By the unambiguous terms of the Fee Agreements,

17

she owes absolutely nothing to O'Toole. The facts were well known to O'Toole and his counsel when they sought to amend their complaint and yet still kept Ms. Wahlstrom on as a defendant. In essence, they take the position that Ms. Wahlstrom should have to pay out even more. The facts do not give rise to any reasonable or good faith belief that O'Toole has a valid claim against Ms. Wahlstrom, where the contracts and facts in no way support them. Instead, it is abundantly clear that the true motive for suing Ms. Wahlstrom is to gain leverage and a tactical advantage in their effort to obtain part of Hoey's actual fee. O'Toole's counsel even admitted as much at the motion hearing on February 16, 2022, after Hoey's counsel stated, "We do agree on behalf of my clients that Kira Wahlstrom does not belong in the case." Affidavit of Bridget Zerner, ¶6. O'Toole's counsel then responded, citing to paragraph 10 of the 2015 Fee Agreement – which, by its plain and unambiguous language does not obligate Ms. Wahlstrom to pay a dime to O'Toole – and announcing that he sued Ms. Wahlstrom because he feared the proverbial "empty chair" at trial, elaborating: "I don't want to be at a trial where Mr. Keenan and Mr. Hoey are then pointing to Ms. Wahlstrom as the person who should've been sued after she's out of the case. That's where I'm coming from." Affidavit of Bridget A. Zerner, ¶7.

     Against this backdrop, sanctions are more than warranted, particularly where the plaintiff is an attorney with experienced counsel both practicing for decades. *Compare, Admiral Metals Servicenter Co. Inc. v. Micromatic Prod. Co. Inc.*, No. CIV.A. 01-4740-C, 2008 WL 5505667, at *8 (Mass. Super. Oct. 8, 2008)(sanctions imposed where record revealed no basis in fact, nor even a basis for a subjective, good-faith belief, that individual party was or could be held liable for defendant company's debt to plaintiff and prior to filing the complaint, counsel learned facts establishing plaintiff had no direct claim against individual party for company's debt and it was plaintiff's apparent goal to try to discover, after the fact, some basis for its claim).

## CONCLUSION

All claims against Ms. Wahlstrom should be dismissed and sanctions are warranted. Ms. Wahlstrom should be permitted to make a further submission to the Court of the reasonable attorney's fees and costs for which she should be reimbursed for the frivolous claims made against her.

Dated: March 18, 2022

Respectfully submitted,

/s/ Bridget A. Zerner
Bridget A. Zerner (BBO No. 669468)
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617) 742-8604
bzerner@markhamreadzerner.com
*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

Pursuant to Mass. R. Civ. P. 5(a) and/or Sup. Ct. R. 9A and Mass. Rules of Electronic Filing Rule 7, I hereby certify that a copy of the foregoing document has been served via email on all counsel of record via electronic mail.

Date: March 18, 2022

/s/ Bridget A. Zerner
Bridget A. Zerner