**Exhibit 3 - 1**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. **21-0741 F**

|  |  |
|---|---|
| AUSTIN O'TOOLE, and THE LAW OFFICES OF AUSTIN SCOTT O'TOOLE, P.C., | ) ) ) |
| Plaintiff | ) 4/12/2022 e-filed KG ) ) |
| v. | ) ) |
| DAVID HOEY AND THE LAW OFFICES OF DAVID HOEY, P.C., KIRA WAHLSTROM, DON KEENAN, AND THE KEENAN LAW FIRM, P.C. | ) ) ) ) ) |
| Defendants | ) ) ) |

### PLAINTIFFS' OPPOSITION TO KIRA WAHLSTROM'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Edward Foye (BBO#562375)
**Arrowood, LLP**
10 Post Office Square, 7th Floor South
Boston, Massachusetts 02109
Tel: 617-849-6200/Fax: 617-849-6201
efoye@arrowoodllp.com

Attorney for AUSTIN O'TOOLE AND THE LAW
OFFICES OF AUSTIN O'TOOLE, P.C.

Dated:  April 4, 2022

**Exhibit 3 - 2**

The defendant, Kira Wahlstrom ("Wahlstrom") has moved to dismiss the First Amended Complaint ("FAC") of the plaintiffs (collectively, "O'Toole").  O'Toole herewith opposes that motion.

###### i.      Preliminary Statement and Summary of the Argument

In brief summary, Wahlstrom acknowledges that there is a triable issue about which of two fee agreements governs the rights of the parties.  In 2010, she signed an agreement ("the 2010 Agreement") naming Defendants David Hoey and The Law Offices of David Hoey, P.C., (together "Hoey") and O'Toole as her attorneys.  The 2010 Agreement provided that Hoey would get 1/3 of the total recovery in that case or any other deriving from her attack, and O'Toole would get 1/3 of Hoey's fee.  See First Amended Complaint ("FAC") at Ex. A.[1]  In 2015, she signed another fee agreement ("the 2015 Agreement") purporting to install the defendants Don Keenan and The Keenan Law Firm, P.C. ("together, "Keenan") as lead counsel. The 2015 Agreement provided Hoey with some unspecified referral fee.  See FAC Ex. B, at ¶ 4. The 2015 Agreement also specifically obligated Wahlstrom to pay the fees of all prior counsel, O'Toole apparently included.[2]  At the time Wahlstrom executed the 2015 Agreement, Keenan had already agreed to serve as her counsel, and indeed had already entered a notice of appearance in her case, and Hoey continued to function as trial counsel.  Thus, the 2015 Agreement (for reasons detailed below) was, according to a percipient witness who was involved with its drafting, a sham that had no purpose other than to hammer down the amount of O'Toole's fee by rearranging the distribution of the fees.

---

[1]  For ease of reference, Exs. A. and B to the FAC are also attached to this Memorandum as Exhibits A and B, respectively.

[2]  We say "O'Toole apparently included" because the document is, for reasons explained in Part I(B) of the argument below, ambiguous.

**Exhibit 3 - 3**

Because there is a live controversy about whether the 2010 Agreement or the 2015 Agreement governs the rights of the parties, Wahlstrom understands that if there is any possibility she could be liable under *either* Agreement, she can't be dismissed.  In fact, she is liable no matter which one of the two Agreements is the operative contract.

     I.      As to the 2010 Hoey/Wahlstrom/O'Toole fee agreement ("the 2010 Agreement"), Wahlstrom argues that there are multiple related contracts and that she is a party only to one of them.  In fact, there is one agreement, contained in two writings that were agreed to as "part of one transaction and were, therefore, to be read together."  <u>Chase Commercial Corp. v. Owen</u>, 32 Mass. App. Ct. 248, 251 (1992).  Even if Wahlstrom were correct that there were two separate contracts, *she signed both of them*, *and they both reflect the same deal*.  The contract explicitly states that she must pay a fee to "Attorney" and that term is defined to mean Hoey **and** O'Toole.  That document bears her signature.  The alleged separate fee agreement between Hoey and O'Toole reiterates and specifies that the amount of the referral fee will be 33.3% of the recovery.  Wahlstrom signed that document too.  It is vanishingly unclear what more Wahlstrom thinks is needed to make for an enforceable agreement, but whatever she has in mind, two separate signed documents are more than sufficient.

     II.      The 2015 Hoey/Wahlstrom/Keenan fee agreement ("the 2015 Agreement") is alleged by Hoey and Keenan to have superseded the 2010 Agreement.  **<u>If</u>** that is so, paragraph 10 of that document appears to specifically obligate Wahlstrom to pay the fees for all prior counsel except for the fees owed to Hoey.[3]  The rule in Massachusetts on contingency fee agreements is that successor counsel is typically responsible for any fees owed to his predecessor, *except where the parties explicitly contract otherwise*.  <u>See</u> SJC Rule 3:07, Rule 1.5(f); <u>Malonis v. Harrington</u>,

---

[3]  In addition to being the referring attorney on the case, O'Toole alone represented Wahlstrom prior to the time that Hoey was hired, <u>i.e.</u>, from May 2009 to February 2010.  <u>See</u> FAC at ¶¶ 10-12.

Exhibit 3 - 4

442 Mass. 6792, 698-700 (2004).  The 2015 Agreement can be read as just such a contract.  The language in the 2015 Agreement tracks the language in the Model Rules in which a client assumes responsibility for prior counsel's fees.  At a minimum, the meaning of the contract cannot be resolved as a matter of law on this record.

III.     Wahlstrom also argues that the declaratory judgment count against her must be dismissed.  Under the 2010 Agreement, O'Toole is entitled to 33.3% of any fee deriving from "injuries received as a result of an assault on or about May 1, 2009 in the Radisson Hotel Boston parking lot."  That language is broad enough to encompass not only the original case that resulted in a $10 million judgment, but also the cases now pending against the insurer for failing to settle the original case and the loss of consortium case now pending. Wahlstrom takes a very different view of the language of the 2010 Agreement, but that only demonstrates that live controversy exists.  Deciding which interpretation of a contract is the correct one is a classic case for judicial intervention and interpretation.  Accordingly, a declaratory judgment will lie and that cannot also cannot be dismissed.

One other point should be made at the outset.  Wahlstrom repeatedly references in the most emotional terms the very unfortunate circumstances surrounding her 2009 attack in the Raddison garage, the attack that led to the $10 Million recovery that is at the heart of this lawsuit.  And the Court, up to a point, *should* be sympathetic.  The events of 2009 were indeed horrendous.  But that has not stopped Wahlstrom from being the plaintiff not only in the underlying suit to recover for her injuries, but also in two lawsuits against the parking garage's insurer which were brought after she won her judgment.  She is an active participant in the loss of consortium suit nominally brought on behalf of her children that was filed after she won her judgment.  Her new lawyers have now sent Ch. 93A demand letters to Hoey and Keenan about

Exhibit 3 - 5

their overcharging her for legal fees (among other claims), and Wahlstrom now seems poised to sue them as well.  Under the circumstances, her moral outrage at O'Toole for dragging her into a lawsuit seems to lack a certain self-awareness.

If the facts are what Wahlstrom claims they are, she will have potent third-party claims for indemnity and legal malpractice against Hoey and Keenan.  But the fact that Wahlstrom may have a formidable cross-claim against Hoey and Keenan for malpractice and indemnification does not mean that she is not liable on the contract that she signed.  The immediate issue before the Court is whether the Complaint states a claim upon which relief can be granted, and "my lawyer convinced me to do the wrong thing" is not a defense to a breach claim, at least not on a motion to dismiss.  Thus, whatever claims for relief that Wahlstrom may someday assert against others, the FAC states valid claims for relief and cannot be dismissed.

## The Allegations of the First Amended Complaint (FAC)

### A.    *The 2010 Agreement*

According to the FAC, Wahlstrom approached O'Toole in 2009 about representing her in connection with an attack which had occurred in May of that year in the Radisson Hotel parking lot in Boston.  FAC at ¶¶ 1, 10.  Later, O'Toole and Wahlstrom agreed that Hoey should be engaged as a specialist in trying premise liability actions.  Id. at ¶ 11.

Hoey, Wahlstrom, and O'Toole all collectively entered into the 2010 Agreement in February, 2010.  FAC at ¶ 12.  In it, Wahlstrom agreed to pay "33.3%" on the gross amount recovered as a fee, and 33% of that fee was to go to O'Toole.  Id. and Ex. A (2010 Agreement) at ¶ 4.  O'Toole was contractually entitled to periodic updates on the status and disposition of the case.  Id. at ¶ 12 and Ex. thereto at ¶ 5(b).

**Exhibit 3 - 6**

At some point during the pretrial proceedings, Hoey and Wahlstrom apparently engaged Keenan, an Atlanta trial lawyer, as associate counsel.  FAC at ¶ 14.  At the time of the engagement, Hoey and Keenan had an ongoing referral arrangement whereby Keenan would receive between 30-50% of the legal fee on any matter in which he became involved, and they worked on multiple cases together.  Id.  Keenan claims to be a trial advocacy expert.  Id.  See also Wahlstrom v. LAZ Parking Ltd., LLC, 2016 WL 3919503 at *4 (May 19, 2016) (Wilson, J.).[4]

In March 2015, Keenan was admitted pro hac vice in the Wahlstrom case.  FAC at ¶ 15. Neither Hoey nor Wahlstrom advised O'Toole that Keenan was now co-counsel in the case.  Id. "At no time did O'Toole learn about or give his assent to any modification or novation of the fee agreement to which he was a party."  Id. at ¶ 18.

**B.    _The 2015 Agreement_**

In June 2015, with trial only a month away, Keenan and Wahlstrom supposedly entered into a new fee agreement.  FAC at ¶ 16 and Ex. B.  Hoey and Keenan allege that the 2015 Agreement superseded the 2010 Agreement with Hoey.  Under the 2015 Agreement, Keenan supposedly became the lead attorney, and Hoey (pursuant to ¶ 4) became entitled to some unspecified referral fee.  Ex. B at ¶ 4.  In violation of Massachusetts law, the Agreement did not specify the amount of the referral fee that Hoey was entitled to receive, and Hoey has stated under oath that Wahlstrom never gave written approval to the percentage of the fee that Hoey was to receive.  FAC at ¶ 16.  The 2015 Agreement also was, as a practical matter, completely

---

[4] According to Judge Wilson's decision, Keenan "travels the country teaching seminars to plaintiffs' personal injury lawyers based on his book entitled "Reptile, The 2009 Manual of the Plaintiff's Revolution."  2016 WL 3919503 at *4.  "Mr. Keenan teaches that plaintiffs' lawyers should appeal to the primitive, reptilian portions of jurors' brains, which will cause them to decide cases based on their subconscious desire to protect themselves and their loved ones from the danger posed by the allegedly negligent behavior of any defendant."  Id.

**Exhibit 3 - 7**

unnecessary, as Keenan had already agreed to represent Wahlstrom at the trial, and indeed had entered his pro hac vice appearance on her behalf months before.  Id.

The 2015 Agreement among Keenan, Hoey, and Wahlstrom was, according to one percipient witness, created for the expressed purpose of significantly reducing O'Toole's fee by rearranging the waterfall of any fee distribution.  Id.  Indeed, there was no other conceivable purpose for rearranging the funds flow so that Keenan was the lead attorney and doing so less than a month before trial, when Keenan had *already* agreed to represent Ms. Wahlstrom and had *already* appeared for her months previously.  Id.[5]  No one, Wahlstrom included, informed O'Toole about the 2015 Agreement. Id. at ¶ 18.  Hoey's role at the trial was at least as substantial as Keenan's.  See Wahlstrom, 2016 WL 3919503 at *5-6.

In 2015, a judgment entered in Wahlstrom's favor. FAC at ¶ 19.  In May 2016, the Superior Court (Wilson, J.) ordered a new trial on grounds of gross misconduct by Hoey and Keenan.  Id.  The Appeals Court agreed that misconduct had occurred but deemed it insufficient to justify overturning a jury verdict.  Id.  In November 2019, the insurers paid Wahlstrom $9,987,683.80 in full satisfaction of the judgment plus accrued interest.  Id. at ¶ 20.  Under the 2010 Agreement, Hoey's fee should have been $3,329,227.93, and O'Toole should have received $1,109,742.64.  Id.

Instead, Hoey sent O'Toole $250,000.  FAC at ¶ 21.  The cover letter claimed that the remittance represented one-third of Hoey's "net fee."  Id.  Both before and after the payment – and indeed, up to the time that O'Toole was obliged to file this lawsuit – Hoey refused to provide

---

[5]  By way of illustration, under the 2010 Agreement (FAC at Ex. A), a $4,000,000 fee paid to Hoey would go 33.3% to O'Toole, resulting in a $1,332,000 fee to him and $2,778,000 for Keenan and Hoey to divide up. FAC at ¶ 17.  By contrast, under the 'superseding' 2015 Agreement (FAC at Ex. B), a $4,000,000 fee paid to Keenan, 50% of which was then paid to Hoey, would result in a fee of only $660,000 to O'Toole, with Hoey and Keenan dividing $3,340,000. FAC at ¶ 17.

Exhibit 3 - 8

any information about the recovery (including but not limited to a breakout of the fee and all fee-related dispersals) despite the clear language in the fee agreement requiring periodic updates and information on the disposition of the case.[6]  Id.  Wahlstrom advised O'Toole to direct all questions to Hoey.

After O'Toole pressed Hoey on the payment, Hoey claimed for the first time that the 2015 Agreement "superseded" the prior fee agreement among the parties.  FAC at ¶ 22.  That was the first time anyone told O'Toole about the 2015 Agreement, and not until well into the present litigation did Hoey belatedly produce this alleged secret 'superseding' fee agreement.  Id.

The FAC contains nine counts, three of which are asserted against Wahlstrom.  Count I alleges breach of contract.  Count II alleges breach of the covenant of good faith and fair dealing.  Count IV is asserted against both Wahlstrom and Hoey, and seeks a declaratory judgment on the scope of the 2010 Agreement.  In particular, it seeks a declaration that the unconditional promise to pay a referral fee to O'Toole extends to other pending litigation concerning the incident in the Radisson parking garage.

**C.**     ***Relevant Provisions of the 2010 Agreement***

A copy of the 2010 Agreement is attached to the Complaint as Exhibit A, and for ease of reference is also attached hereto as Exhibit A.  In the Agreement, Wahlstrom "retain[ed] as 'Attorney' the Law Offices of David J. Hoey, P.C. with an address of 352 Park St., Suite 105, North Reading MA 01864 and Austin S. O'Toole, Esq. with an address of 18 Tremont St., Suite 1010, Boston MA 02108 to perform the legal services referred to in paragraph (1) below."  Ex. A at 3, opening paragraph.  In turn, paragraph 1 defined the legal services to be provided as relating

---

[6] Indeed, Hoey and Keenan did not even give Mr. O'Toole the fee payment that he would have been due under the 2015 Agreement. FAC at ¶ 21. Even if the 2015 Agreement were given effect, O'Toole should have received at least $660,000.  FAC at ¶¶ 17, 21; supra note 4.

Exhibit 3 - 9

to "premises liability and injuries received on or about May 1, 2009 in the Radisson parking

garage".  Id.  The fee agreement further said that Wahlstrom was to pay "Attorney" (previously

defined to be Hoey and O'Toole) compensation.  Id. at ¶ 4.  It provided that "compensation,

*including that of any associated counsel* shall be the following percentage of the gross amount

collected for the client . . . 33.3% of the gross amount recovered".  Id. at ¶ 4 (emphasis supplied).

In paragraph 5 (a), it was "understood and agreed" that "any fee to be paid pursuant to a matter

referred to in paragraph (1), above, is to be divided in part with Austin S. O'Toole, Esq, pursuant

to the applicable provisions of the Code of Professional Responsibility . . .".  The Agreement was

signed by Wahlstrom and Hoey.

      As part of the same transaction, Hoey sent O'Toole a letter stating that O'Toole would

"receive the following referral fee should there be a recovery in this case: 33% of my fee from

the sum recovered."  Ex. A at 2.  The letter was countersigned by O'Toole and contained an

additional provision in which Wahlstrom "consent[ed] to Attorney Austin O'Toole receiving a

referral fee in this matter" with the understanding that she would "not be charged any additional

legal fees for this referral by [*sic*] Attorney Hoey to [*sic*] Attorney O'Toole."  Id.  Wahlstrom

countersigned that letter as well to show her agreement with it.  Id.

**D.**    ***Relevant Provisions of the 2015 Agreement***

      The 2015 Agreement is dated June 1, 2015 (presumably when Keenan signed it) and June

19, 2015 (presumably when Wahlstrom signed it).  See FAC at Ex. B, copy attached hereto as

Exhibit B at 1.  The scope of the engagement was substantively identical to the 2010 Agreement:

"Premises liability claims and injuries received as a result of an assault on or about May 1, 2009

in the Radisson Hotel Boston parking lot."  Id. at ¶ 1.  The Agreement provided that Keenan

would receive 33 1/3% of the gross amount recovered, plus an additional 5% of the gross

recovery "if the matter is retried/concluded/settled following an appellate decision."  Ex. B at

¶ 4.

**Exhibit 3 - 10**

There was nothing in the 2015 Agreement that explicitly abrogated the 2010 Agreement. However, under the subhead "<u>Referring/Associated Counsel</u>", paragraph 4 stated: "Client understands that a portion of the compensation payable to the attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees." <u>Id</u>.  However, there was no 'division of fees' specified in the agreement, and Hoey testified under oath that there is no separate writing signed by Wahlstrom which sets out the percentage of the fee that Hoey is entitled to.  FAC at ¶ 17.

> Paragraph 10 stated:
> The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph 1 except if the former/prior counsel is identified as the referring or associated counsel in paragraph 4.

O'Toole is neither referred to nor identified in paragraph 4.

By her signature on the agreement, Wahlstrom "acknowledge[d] and confirm[ed] . . . that the Attorney [Keenan] has explained the provisions of this agreement, where it differs from the SJC Model Form agreement, and specifically with respect to responsibility for court costs and expenses of litigation."  Ex. B at ¶ 12. Ms. Wahlstrom further acknowledged that Keenan had advised her "that different forms of agreements may be available, and that the Client selects the provisions as stated herein."  <u>Id</u>.  The contract further recited that Wahlstrom "carefully read this agreement, understands its contents, and agrees to be bound by all of its terms and conditions . . ." .  <u>Id</u>.  The 2015 Agreement further stated that it was "subject to rule 1.5 of the Rules of Professional Conduct as adopted by the Supreme Judicial Court ("SJC") of Massachusetts."  <u>Id</u>. at ¶ 15.

I.   **O'TOOLE HAS STATED A CLAIM AGAINST WAHLSTROM FOR BREACH OF CONTRACT**

"The relationship of attorney and client is highly fiduciary in nature." <u>Goldman v. Kane</u>, 3 Mass. App. Ct. 336, 340 (1975).  Although the duties of the attorney to the client understandably receive the most attention in the cases, the duties are mutual.  "[A] client, when

engaging counsel, assumes an obligation of good faith and must act with due regard for an attorney's right to be compensated for work done on the client's behalf." Hammond v. T. J. Litle and Co., Inc., 809 F. Supp. 156, 163 (D. Mass. 1992) (Keeton, J.).

Here, the FAC pleads, in the alternative, that Wahlstrom breached *both* the 2010 Agreement, if that is the legally operative document, *and* that she breached the 2015 Agreement, if that is the legally operative document. Thus, as Wahlstrom implicitly recognizes, if O'Toole has stated a claim for breach under *either* contract, the Count I must go forward because on this record the Court cannot decide what the operative contract is. For the reasons discussed below, O'Toole has stated a claim for breach of both Agreements.

**A.      The FAC states a case for breach of contract as to the 2010 Agreement**

Wahlstrom's primary argument is that the 2010 Agreement is actually *two* contracts, one between her and Hoey, and another between Hoey and O'Toole. See Wahlstrom Memo at 9. Wahlstrom contends that, based on that understanding, she lacked any expectation that O'Toole would seek payment of a fee from her. Id.

In fact, the documents that the parties executed at the time Hoey was engaged were contemporaneously drafted and agreed to as part of a single transaction. Accordingly, they must be read together as a single document. See Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 505 (1942) ("It is a general rule that when several writings evidence a single contract between the parties, they will be read together in order to arrive at an interpretation of the contract."); Chase Commercial Corp. v. Owen, 32 Mass. App. Ct. 248 (1992).[7] See also Gilmore v. Century Bank and Trust Co., 20 Mass App. Ct. 49, 56 (1985) (identifying factors, but stressing that "the sense of the thing" dictates whether two or more writings should be read

_____

[7] In Chase, the trial court found that the individual defendants were subject to a jury waiver provision contained in the corporation's loan agreement (which they did not sign), notwithstanding the absence of such a term in their individual agreements. Id. at 251. The trial court determined that, as a matter of fact, the documents were "part of one transaction and were, therefore, to be read together." Id. In ratifying this decision, the Appeals Court considered several factors, including (1) the documents were contemporaneously agreed to; (2) the documents cross referenced each other at various points; and (3) two contracts "were interrelated in purpose." Id.

together).  Obviously, assaying such a factual determination is inappropriate on a motion to dismiss, but when all inferences from the pleaded facts are drawn in O'Toole's favor, as they must be, what Wahlstrom describes as two contracts are, in substance, one deal, and they must be read as such.

There is no reasonable doubt that Wahlstrom is an obligor under the 2010 Agreement. The primary and inflexible rule of contract interpretation is that contracts must be interpreted to ascertain the true intention of the parties and to give effect to the purpose of the agreement.  Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981).  The first paragraph states that "The Client [name and address specified] retains as 'Attorney' the Law Offices of David J. Hoey [address specified] and **Austin S O'Toole Esq.** [address specified] to perform the legal services referred to in Paragraph (1) below."  Ex. A at p. 3, introductory paragraph (emphasis added).  Paragraph (1) describes the services to be performed as being in connection with "premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage".  Id.  The Agreement unquestionably requires Wahlstrom to pay "Attorney'' – defined to include O'Toole – the specified fee.  See Ex. A. at ¶ 4.  Wahlstrom was plainly aware of what O'Toole's fee would be, because she countersigned the letter specifying that it would be upon "the sum recovered."  Ex. A at 2.  At a bare minimum, O'Toole was an intended beneficiary who was supposed to receive the benefit of the promised performance, Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366-67 (1997), and that too would give him standing to assert a breach claim against Wahlstrom.

A key corollary of Shea rule is that a contract should be construed to give it effect as a rational business instrument in a manner that will effectuate the intent of the parties.  Starr v. Fordham, 420 Mass. 178, 192 (1995).  Wahlstrom hired both O'Toole and Hoey as "Attorney." Ex. A at 3, introductory paragraph.  She agreed to pay "Attorney" for services to be rendered.  Id. at ¶ 1.  The document goes on to say, "It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1) above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE . . .".  Id. at ¶ 5(b).

**Exhibit 3 - 13**

Whether or not the amount of that fee was measured by Hoey's fee, it would in any event necessarily be paid by or with the approval of Wahlstrom, because as the client in a contingency fee case she is the only one capable of paying a fee. Paragraph 4 confirms the point explicitly.  It states that "**reasonable compensation** on the foregoing contingency is to be paid **by the Client to the Attorney** [previously defined as Hoey and O'Toole], but such compensation **including that of associated counsel** shall be the following percentage . . .". Id.  Thus, the contract places the burden of paying fees (including fees of associated counsel) exactly where one would suppose: on the client.

In short, Wahlstrom agreed to pay a referral fee to O'Toole from any recovery that she received in the case, and she agreed what the amount would be and how it would be disbursed. That is a contract, and when the deal wasn't carried out, that was a breach.  Accordingly, Count I states a sufficient case for breach of the 2010 Agreement, and cannot be dismissed.

### B.     O'Toole has stated a prima facie case for breach of contract in connection with the 2015 Agreement

In connection with the 2015 Agreement, the case for contract liability is, if anything, even stronger than in connection with the 2010 Agreement. Paragraph 10 of the 2015 Agreement states:

> The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph 1 except if the former/prior counsel is identified as the referring or associated counsel in paragraph 4.

The *only* 'former/prior counsel' who is identified in paragraph 4 is David Hoey.  Although Mr. O'Toole was the referring counsel as to Hoey (and arguably, given the language of the 2010 Agreement, associated counsel as well) he is never referenced.  O'Toole was also Wahlstrom's former counsel, having served as her only attorney between May 2009 and February 2010.  Thus, paragraph 10 appears to place the responsibility for paying O'Toole's fee directly on Wahlstrom.

**Exhibit 3 - 14**

The import of the plain language of the agreement is confirmed by the Rules of professional conduct and the case law interpreting them.  SJC Rule 3:07 requires a written fee agreement in contingency cases, and where successor counsel (Keenan) is concerned, gives the parties two choices.  See Rule 1.5(f)(1), reproduced as Exhibit C.  The lawyer who uses Form A "does not need to provide any additional explanation to a client beyond that otherwise required by this rule."  The Form A language is set forth in the margin so the Court can see for itself that Keenan and Wahlstrom did not select that option.[8]  The Form B language gives the parties a choice:

> (7) [USE IF LAWYER IS SUCCESSOR COUNSEL] Payment of any fees owed to former counsel. The client should initial next to the option selected.
>
> (i)      The lawyer is responsible for payment of former counsel's reasonable attorney's fees and expenses and the cost of resolving any dispute between the client and prior counsel over fees or expenses; or
>
> (ii)      The client is responsible for payment of former counsel's reasonable attorney's fees and expenses in the cost of resolving any dispute between the client and prior counsel over fees or expenses.

Paragraph 10 of the 2015 Agreement is clearly patterned after option (ii), in which the client agrees to be responsible for former counsel's fees.  The mere fact that the parties chose not to use option (i), which would have made absolutely clear that payment of O'Toole's fees were the responsibility of Keenan, confirms their intention.[9]  So does Wahlstrom's acknowledgement in the contract "that different forms of agreements may be available, and that the Client selects the provisions as stated herein."  Ex. B at ¶ 12.  Thus, if the intention was to make Keenan and not Wahlstrom liable to pay O'Toole, it would have been easy enough to say so.

---

[8]  (7)[USE IF LAWYER IS SUCCESSOR COUNSEL] : The lawyer is responsible for payment of former counsel's reasonable attorney's fees and expenses in the cost of resolving any dispute between the client and prior counsel over fees or expenses.

[9]  The fact that Rule 1.5 explicitly allows parties to agree that the client will pay the fees of a predecessor counsel also fully disposes of the public policy veneer to Wahlstrom's arguments   Paying one's bills is not inconsistent with hiring a lawyer of one's choice.  See Wahlstrom Memo at 8.  As Comment 4 to Mass. R. Prof. C. 1.16 states, with emphasis supplied, "A client has a right to discharge a lawyer at any time, with or without cause, *subject to liability for payment for the lawyer's services*."  See also Malonis, 442 Mass. at 702, n. 12.

**Exhibit 3 - 15**

Wahlstrom's claim that she did not think that the 2015 Agreement required her to pay O'Toole does nothing more than raise a factual issue about her intention and Keenan's at the time they executed the contract.  See, e.g., Cardoni v. Boston Regional Medical Center, Inc., 60 Mass. App. Ct. 179, 186 (2003) (intention of the parties is a question of fact); Reardon v. Commissioner of Correction, 20 Mass. App. Ct. 946, 947 (1985) (motion to dismiss "is ordinarily not the proper vehicle for testing the factual sufficiency of a plaintiff's claim."). Perhaps Wahlstrom's alleged intention, expressed in her moving papers to the Court, will someday carry the day, but until discovery can be had and facts can be assembled, it is not appropriate for consideration now.  "Assertions set out in a motion to dismiss are not part of the rule 12(b)(6) review equation."  Fraelick v. Perkett PR, Inc., 83 Mass. App. Ct. 698, 700 (2013). That rule is applied with strictness where, as here, "many relevant facts may not be known to the plaintiff."  Coughlin v. Department of Correction, 43 Mass. App. Ct. 809, 817 (1997) (reversing allowance of motion to dismiss).  If her own lawyer, Keenan, failed to effectuate her intention at the time of the contract, she would seem to have a winning indemnification claim against him, but that does not mean that she is not, in the first instance, liable to pay O'Toole.

The only case that Wahlstrom cites in connection with the 2015 Agreement cuts directly against her.  See Malonis v. Harrington, 442 Mass. 692, 698-700 (2004).  The Malonis court, in the context of deciding whether the lawyer or the client was responsible for paying predecessor counsel, announced the default rule that the attorney was presumptively responsible, but left open the possibility that the client could elect to assume such responsibility.  Id.  See also Lubell v. Martinez, 901 So. 2d 951, 953 (Fla. Dist. Ct. App. 2005) (in connection with contingency fee agreement, client "cannot now complain about paying two sets of attorney's fees because [successor counsel] notified her that this was a possibility when she retained him").  Rule 1.5, as amended in 2010, implements that policy decision.  Accordingly, it is far too soon for the Court to weigh in on factual issues about Wahlstrom's intent, even assuming that intent could override the language of the contract that she signed. O'Toole has therefore stated a sufficient breach of contract case, and Count I cannot be dismissed.

Exhibit 3 - 16

## II.     THE COMPLAINT ADEQUATELY STATES CLAIMS FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Wahlstrom makes two arguments, both inherently factual and neither one based upon the allegations of the FAC, in an effort to dismiss Count II.  First, she claims that she had every right to execute a second fee agreement, *the sole purpose of which* was to reduce O'Toole's bargained-for fee and give it to Keenan. Second, she claims that she was not even obliged to inform O'Toole that she had, in fact, executed such an agreement.

"Every contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991) (internal quotation omitted).  "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .". Id. at 471-472, quoting Drucker v. Roland Wm Jutras Assocs., 370 Mass. 383, 385 (1976).  The covenant requires contracting parties "to deal honestly and in good faith *in both the performance and enforcement* of the terms of their contract . . .". Hawthorne's, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211 (1993) (emphasis supplied).  To determine whether a party to a contract breached the implied covenant of good faith and fair dealing, "[t]he essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." Wilder v. Toyota Fin. Servs. Am. Corp., 764 F. Supp. 2d 249, 259 (D. Mass. 2011) (quoting Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005)).  The overall spirit of the 2010 Agreement was that Hoey got 2/3 of the total fee, and O'Toole got 1/3.  Depriving O'Toole of his bargained-for compensation – and, for good measure, doing it behind his back – unquestionably violates the covenant.  See Lass v. Bank of America N.A., 695 F.3d 129, 137-138 (1st Cir. 2012) (purpose of implied covenant is to ensure that parties remain faithful to the reasonable expectations created by the contract).

**Exhibit 3 - 17**

Wahlstrom's arguments amount, in substance, to the claim she did not act with impure motive.  The issue of whether the covenant has been violated is rarely proper on a motion to dismiss – particularly where, as here, Wahlstrom's arguments rest on the unsworn claim that she acted without bad intent.  Lack of good faith can be inferred when the conduct at issue is "unreasonable under the circumstances," a necessarily fact-bound determination.  Robert and Ardis James Foundation v. Meyers, 474 Mass. 181, 188 (2016).  One of the main purposes of the covenant of good faith and fair dealing is to limit the discretionary authority of parties with superior bargaining and economic power under a contract.  See Bohne v. Computer Assoc. Int'l, Inc., 514 F.3d 141, 143 (1st Cir. 2008); Kuchera v. Parexal Int'l Corp, 719 F. Supp. 2d 121, 126 (D. Mass. 2010) (holding that discretionary authority under the contract did not give the defendant  "carte blanche" to make decisions in any way it saw fit); Nile v. Nile, 432 Mass. at 399 (a lack of good faith can be inferred by evidence that the party exercised its discretion in a way that "was unreasonable under all the circumstances").  Wahlstrom's position is not only that she had every right to hire Keenan – fair enough – but also *every right to pay him with O'Toole's money*.[10]  That would seem to fit anyone's definition of 'unreasonable under the circumstances'.  That is particularly true where the contract entitles O'Toole to regular updates, and Wahlstrom instead operated behind O'Toole's back and tolerated (at the least) the same from the lawyers she had the authority to direct.

The self-interested nature of Wahlstrom's actions also plainly demonstrate the necessary facts for breach of the covenant.  "Evidence that the defendant acted 'to gain an advantage for itself' can support a claim for breach of the covenant."  Lass at 138.  O'Toole had every right to believe that he was entitled to 1/3 of the recovery.  See Lass, 695 F.3d at 197-98 (duty requires parties to remain faithful to the "agreed and intended expectations" underlying contract); Weiler

---

[10]  Wahlstrom understandably just ignores the fact that she did not 'hire' Keenan through the 2015 Agreement, which was signed in June of that year.  Rather, Keenan had already agreed to represent her sometime prior to March 2015, and indeed had already entered his notice of appearance on her behalf at that time.  Self-evidently, the 2015 agreement was not about *hiring* Keenan, but rather *paying* Keenan, and (as the FAC plainly alleges) doing so with O'Toole's money. See FAC at ¶ 17.

Exhibit 3 - 18

v. Portfolioscope, Inc., 469 Mass. 75, 82 (2014) (lack of good faith "may be inferred from the totality of the circumstances") (internal quotation and citation omitted). Thus, Count II sufficiently pleads a cause of action for breach of the duty of good faith.

Finally, Wahlstrom's Memorandum ignores completely the allegations that O'Toole was shortchanged under the 2015 Agreement. Even if Wahlstrom was not directly responsible for paying O'Toole (and as explained in Part II above, she may well have been), failure to ask or care what O'Toole was getting from the total fee distribution likewise fits comfortably within the parameters of the covenant.  See Weiler, 469 Mass. at 82 (diversion of settlement proceeds in order to deprive party who was entitled to a portion of them from receiving his agreed upon share constituted breach of the duty of good faith and fair dealing, even though contract did not explicitly and in terms forbid such a transfer); Lass at 131 (contract "explicitly" gave lender "discretion to prescribe the amount of flood insurance," but lender breached covenant of good faith by exercising such right in opportunistic and financially self-serving manner).  Accordingly, the Court cannot say, certainly at this motion to dismiss stage, that the FAC fails to state a viable claim for breach of the covenant of good faith and fair dealing.

## III.   THE FAC STATES A CASE FOR A DECLARATORY JUDGMENT

O'Toole also seeks a declaratory judgment that he is entitled under the 2010 Agreement to a referral fee on other cases that Wahlstrom has brought which directly relate to the 2009 attack in the parking garage at the Radisson.  See FAC at Count IV.  These included two pending lawsuits (apparently consolidated) against the insurance companies in the underlying case for bad faith settlement practices.  See cases 1:19-cv-12208(LTS) and 1:22-cv-10037(LTS), both pending in the U.S. District Court in Boston.  Wahlstrom seeks to dismiss Count IV on the grounds that, when the contract is properly interpreted, O'Toole is just wrong, and the contract does not entitle him to any fee from her.

The mere fact that Wahlstrom spends four pages arguing that O'Toole is wrong about the contract and she is right about the contract demonstrates the need for some sort of a declaratory judgment.  Under G.L.c. 231A, § 1, the Superior Court may make a declaratory judgment "either

**Exhibit 3 - 19**

before or after a breach or violation thereof has occurred in any case in which any actual

controversy has arisen . . .".  "[D]etermination of contractual rights is a proper subject of a

declaratory judgment proceeding." Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 705 (2002),

and cases cited.  As a signator to the 2010 Agreement, Wahlstrom is not only a proper party, she

is at least arguably a necessary party.  See Buffalo-Water 1, LLC v. Fidelity Real Estate Co.,

LLC, 481 Mass. 13, 18 (2018).

There is also no question that there is an actual controversy. Paragraph 5(a) entitles

O'Toole to share in "**any** fee to be paid pursuant to **a** matter referred to in paragraph 1 above."

Ex. A at 2 (emphasis supplied). The language clearly contemplates the possibility of more than

one case, and more than one fee. Paragraph 1, in turn, 'refers to' cases that derive from the attack

in the Radisson parking garage. Ex. A at 1.

Both the loss of consortium claims and the claims against the insurance company

necessarily arise from the 2009 attack. Indeed, the first sentences of the Complaint that Hoey

filed against the insurer reads as follows:

> On April 19, 2009, an employee of the then Radisson Hotel in Boston was
> raped by José Rivera III in the hotel's parking garage. Just 12 days later, on May
> 1, 2009, Ms. Kira Wahlstrom returning to her car after work was dragged, beaten
> and raped in the same hotel parking garage by the same rapist. . . . The matter of
> Kira Wahlstrom v. JPA IV Management Co., Inc. . . . went to trial on July 24,
> 2015.

See Exhibit D at 1. Wahlstrom's 93A demand letter to the insurer also makes clear that the bad

faith claims were inextricably linked to the events of the parking garage.  See Exhibit E.

Critically, at the time Hoey filed suit against the insurer, and subsequently, he was operating

under, and derived his authority from, the 2010 Agreement.[11]  That is, as of 2018 when the

demand letter was written, and indeed apparently to this day, Wahlstrom and Hoey both regarded

---

[11]  Wahlstrom will not deny that she has never produced a separate fee agreement in this litigation as
between herself and Hoey relating to the federal court bad faith claim. Furthermore, the privilege log that
she did produce, attached hereto as Exhibit F, lists no such contract as among the documents withheld
from production.

the 93A case as an offshoot of the original case and saw no need to sign a new contingent fee agreement for their 'new' case against the insurer.

It is a small wonder then, that Ms. Wahlstrom seeks to induce the court to make a declaration of the rights of the parties without taking into account any of the facts learned on discovery or any of the conflicting positions that she has taken in other pleadings in other matters.  The fact is, however, that whether one looks at the language of the contract itself, the allegations of the FAC, or the additional facts derived on discovery, there is plainly a live controversy about how this contract should be interpreted.  Accordingly, the Court should not dismiss Count IV and, equally important, should not attempt on this record to actually declare the rights of the parties.

## IV.    THE COURT SHOULD DENY WAHLSTROM'S REQUEST FOR RULE 11 SANCTIONS

Not content to rely on unsworn averments about her own state of mind, Wahlstrom has also requested Rule 11 sanctions against O'Toole and his lawyer on the grounds that Wahlstrom has paid a lot of money in attorney's fees already and is not morally blameworthy.  To state the obvious, contracts are not torts, and contract cases are not tort cases.  She must pay a fee because she promised to pay a fee.  If her lawyers have overcharged her – and they apparently did – that is for her and them to work out.  Based on the 93A letter she recently sent to Keenan (copy, without exhibits, attached as Exhibit G) she intends to do just that.  But, again, that does not mean that she should not be a defendant.

Presumably, Wahlstrom's motion will be formally withdrawn after Wahlstrom has had the opportunity to review this Memorandum, since it demonstrates, at a minimum, the existence of a justiciable controversy.  To the extent that the request is not withdrawn, and to the extent the Court believes that the issue has been properly presented for consideration, O'Toole respectfully requests leave to address the matter at oral argument or through supplemental filings.

**Exhibit 3 - 21**

AUSTIN O'TOOLE AND THE LAW
OFFICES OF AUSTIN O'TOOLE, P.C.

By their attorney,

*/s/ Edward Foye*

_____

Edward Foye (BBO#562375)
**Arrowood, LLP**
10 Post Office Square, 7th Floor South
Boston, Massachusetts 02109
Tel: 617-849-6200/Fax: 617-849-6201
efoye@arrowoodllp.com

Dated: April 4, 2022

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served upon the attorneys of record by electronic delivery on April 4, 2022.

*/s/ Edward Foye*

_____

Edward Foye (BBO#562375)