**Exhibit 4 - 1**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                              SUPERIOR COURT DEPARTMENT
                                         CIVIL ACTION NO. 21-0741

| | |
|---|---|
| AUSTIN O'TOOLE and THE LAW | ) |
| OFFICES OF AUSTIN O'TOOLE, P.C., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID HOEY, THE LAW OFFICES OF | ) |
| DAVID HOEY, P.C., KIRA | ) |
| WAHLSTROM, DON KEENAN, and | ) |
| THE KEENAN LAW FIRM, P.C., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**NEWLY ADDED DEFENDANTS DON KEENAN AND
THE KEENAN LAW FIRM, P.C.'S MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION TO DISMISS</u>**

**Exhibit 4 - 2**

### i.    **Introduction**

Unsatisfied with receiving a $250,000 referral fee for making a simple introduction (and doing nothing else), attorney Austin O'Toole ("O'Toole") and The Law Offices of Austin O'Toole, P.C. (together, "Plaintiffs") bring this action seeking, improperly, to rewrite their referral agreement with defendants, attorney David Hoey and The Law Offices of David Hoey, P.C. (together, "Hoey").  Whatever dispute Plaintiffs may have with Hoey, their claims against the newly added defendants, attorney Don Keenan and The Keenan Law Firm, P.C. (together, "Keenan"), fail as a matter of law based upon the plain language of the contracts Plaintiffs' Amended Complaint places at issue and the Massachusetts Rules of Professional Conduct.

Plaintiffs referred Kira Wahlstrom ("Wahlstrom"), a personal injury claimant who was the victim of a brutal sexual assault in a Boston hotel parking garage, to Hoey pursuant to a written referral agreement which provided that Plaintiffs would receive "33% of [Hoey's] fee from the sum recovered."  First Amended Complaint ("FAC"), Exhibit A.  This is the *only* contract Plaintiffs ever executed with anyone about their referral of the matter.

Thereafter, Wahlstrom decided to add to her legal team by engaging Keenan, who has recognized expertise in premises liability trials.  To do so, Wahlstrom entered into a separate contingent fee agreement directly between she and Keenan.  FAC, Exhibit B.  As a result of Keenan's efforts at trial, Wahlstrom secured a substantial jury verdict in the millions of dollars, which was later affirmed on appeal.  Hoey (not Keenan) then "sent O'Toole a check for only $250,000" with a "cover letter [that] claimed that the remittance represented one-third of Hoey's 'net fee," (i.e., $750,000), FAC, ¶21, *which it in fact did*.

Plaintiffs claim they are somehow entitled to more, specifically a portion of Keenan's fee although they never entered into any agreement with Keenan whatsoever.  Plaintiffs allege,

without any legal or factual basis, that the referral fee paid to them by Hoey based upon what Hoey received should have been larger because, according to the Plaintiffs, "O'Toole, as the referring attorney, was entitled to receive one third of the **total** fee paid." FAC, ¶1 (emphasis supplied). That is not what the referral agreement Plaintiffs signed with Hoey states and, again, Plaintiffs had no agreement with Keenan. The agreement Plaintiffs signed with Hoey is unambiguous in that Plaintiffs are entitled only to **one third of Hoey's fee**, not the total attorney fee. Nor did the agreement between Plaintiffs and Hoey somehow restrict Hoey from bringing in Keenan to help win the case. Hoey and, more importantly, Wahlstrom had the right to bring on a premises liability trial expert like Keenan if they believed it was in Wahlstrom's best interests, and they turned out to be right.

In the alternative, Plaintiffs appear to claim that their referral fee should have been larger because, according to them, Hoey received more than $750,000 pursuant to "an ongoing referral arrangement [between Hoey and Keenan] whereby Keenan would receive between 30-50% of the legal fee on any matter in which he became involved, with the size of the fee depending on the degree on involvement." *Id.*, ¶14.[1] Plaintiffs further allege that "[a]t no time did O'Toole learn about or give his assent to any modification or novation of the fee agreement to which he was a party." FAC, ¶18. But whatever alleged agreement exists between Hoey and Keenan is utterly irrelevant here as to the claims against Keenan.

Indeed, even accepting Plaintiffs' allegations as true, and they are not, Plaintiffs have no claim whatsoever against Keenan who was at all times a stranger to any contract with them. Plaintiffs' tortious interference and related claims against Keenan all fail because Plaintiffs must concede and logic, if nothing else, dictates that because Keenan did the actual work, without

---

[1] This is not true, but nevertheless must be accepted as true for the purposes of this motion only.

Exhibit 4 - 4

which there would not have been any recovery, he had a right to earn a fee for winning the case.

"That the [P]laintiff[s] may have suffered a loss as a consequence of [Keenan's] pursuit of [his and Wahlstrom's] own interest . . . does not render [Keenan's] effort tortious." *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.,* 62 Mass. App. Ct. 34, 39 (2004).

First, the contracts at issue must be read in accordance with their plain and simple language: Plaintiffs agreed to be paid one-third of whatever fee was ultimately paid to Hoey (and not one third of the total fee). Wahlstrom, the client, had every right to engage additional counsel and did so. Plaintiffs did not bargain for any restriction in this regard.

Second, Plaintiffs could not legally bargain for any restriction on Hoey and Wahlstrom to engage Keenan (or any other additional counsel) because doing so would violate the Massachusetts Rules of Professional Conduct and applicable case law concerning a client's unrestricted right to retain counsel of her own choosing. "In particular, [the Massachusetts Appeals] [C]ourt has identified a strong public policy in protecting a client's right to seek advice and change counsel without subjecting new counsel to liability for tortious interference by former counsel." *Bartle v. Berry*, 80 Mass. App. Ct. 372, 380 (2011).

Third, Plaintiffs' claims are based on the factually and legally untenable premise that Wahlstrom could not engage Keenan without Plaintiffs' consent. *See* FAC, ¶18, 22. But, again, nothing in the engagement letter between Wahlstrom and Hoey, or in the referral agreement between Plaintiffs and Hoey, prevented or legally could prevent Wahlstrom from retaining Keenan. *See Bartle*, supra.

Fourth, Keenan, as an attorney engaged to represent his client's interests, could not have acted with improper motive as a matter of law. *See Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 658 (2006) ("To the extent that [prior counsel's] claim rests on [successor counsel's] interference

3

Exhibit 4 - 5

by improper motive with [prior counsel's] representation of the clients in the civil matter, (i.e., that [successor counsel] disparaged [prior counsel] 'with the intention of terminating the contractual relationship between [prior counsel] and the clients in order to advance his own economic interest'), it is precluded, on policy grounds."). Further, Plaintiffs' claim that Keenan somehow acted with improper means is not supported factually because "a plaintiff must prove improper conduct beyond the fact of the interference itself." *Bartle*, 80 Mass. App. Ct. at 380.

Finally, Plaintiffs' remaining claims (civil conspiracy, unjust enrichment/constructive trust, violation of G.L. c. 93A, and declaratory judgment) likewise fail where they are solely derivative of the failed tortious interference claim. They also fail for other reasons.

The Court should dismiss all claims against Keenan.

### ii.     Background

In May 2009, Wahlstrom was violently attacked and raped in the parking garage of a Boston hotel. FAC, ¶10. After Plaintiffs agreed to represent Wahlstrom, they agreed that an attorney who specializes in premises liability should be engaged. *Id*., ¶¶10-11. They approached Hoey and, on or about February 2, 2010, Hoey (identified as the "Attorney")[2] and Wahlstrom (identified as the "Client") entered into a Contingent Fee Agreement ("First Fee Agreement"). FAC, Exhibit A. Plaintiffs did ***not*** sign the First Fee Agreement. *Id*.

The First Fee Agreement provided that Hoey agreed to perform legal services concerning the "premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage." *Id.*, ¶1 (emphasis omitted). "Reasonable compensation of the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client[:] 33.3% of

---

[2] *See also* First Fee Agreement, ¶5(b) ("representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally").

**Exhibit 4 - 6**

the gross amount recovered." *Id*., ¶4.  The agreement further provided that "[i]t is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court." *Id*., ¶5(a).  Also on February 2, 2010, Hoey sent Plaintiffs a letter agreement ("Referral Agreement") stating,

> This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be any recovery in this case:
>
> 33% of ***my fee*** from the sum recovered.
>
> Will you kindly acknowledge your acceptance of the above on the additional copy of this letter, adding the date and return to this office at your earliest convenience.

FAC, Exhibit A (emphasis added).  Plaintiffs accepted and agreed to the terms of the Referral Agreement by signing same.  *Id*.  Wahlstrom also signed an acknowledgment of same.  *Id*.[3]

In June 2015, Wahlstrom and Keenan, "an expert in trial advocacy," FAC, ¶14, entered into a Contingent Fee Agreement ("Second Fee Agreement").  FAC, ¶16.  The Second Fee Agreement identified Keenan as the "Attorney" and Wahlstrom as the "Client" for legal services concerning "[p]remises liability claims and injuries received as a result of assault on or about May 1, 2009 in the Radisson Hotel Boston parking lot."  FAC, Exhibit B, ¶1 (emphasis omitted).

The Second Fee Agreement provided that "[t]he contingency upon which compensation is to be paid is: recovery of damages, whether by settlement, judgment or otherwise."  *Id*., ¶2

---

[3] Even though the First Fee Agreement and Referral Agreement are separate agreements, Plaintiffs refer to them together throughout their complaint as the "O'Toole/Hoey/Wahlstrom fee agreement" attached to the Amended Complaint at Exhibit A.

(emphasis omitted).  "Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client: 33 and 1/3% (thirty-three and one-third percent) of gross amount recovered."  *Id*., ¶4 (emphasis omitted).  The percentage increased if the claim concluded after various stages of any appeal.  *See id*.  The agreement provided that, "The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees.  Client understands that the Client will not be charged any additional legal fees."  *Id*.

Keenan, as lead counsel, obtained a jury trial verdict of $4,000,000.  *Id*., ¶19.  After the verdict was affirmed on appeal, the insurer for one of the underlying defendants paid $9,987,683.80 in satisfaction of the judgment plus accrued interest and costs.  *Id*., ¶20.  Hoey then "sent O'Toole a check for only $250,000" with a "cover letter [that] claimed that the remittance represented one-third of Hoey's 'net fee.'" (i.e., $750,000).  *Id.*, ¶21.

### iii.    Argument

### I.    Count V (Tortious Interference with Contractual Relations) Fails to State a Claim against Keenan

Typically, for "tortious interference with contractual relations, a plaintiff must demonstrate that (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  *Cavicchi*, 67 Mass. App. Ct. at 657 (quotations and citations omitted).

But this is not a typical tortious interference claim.  "As concerns the specific claim of tortious interference against other attorneys for rights to prospective fees under a contingent fee

**Exhibit 4 - 8**

agreement, Massachusetts courts have recognized that special policy considerations are

implicated." *Bartle*, 80 Mass. App. Ct. at 380.  Indeed,

> [t]here is a reluctance on the part of appellate courts to impose liability in tort for
> interference with advantageous relations when a client simply decides to turn to
> another lawyer or chooses to deal directly with one representing the opponent
> instead of the client's own counsel.  In *Walsh v. O'Neill*, 350 Mass. 586 (1966),
> the Supreme Judicial Court characterized cases like [*Tauro v. General Accident
> Fire & Life Assurance Corp.*, 297 Mass. 234, 235 (1937)] and [*Herbits v.
> Constitution Indem. Co.*, 279 Mass. 539, 541–542 (1932)] as examples of a
> refusal to extend to the attorney-client relationship the principle that interference
> with an existing business relationship, if malicious or without justification, may
> be the basis for recovery in tort. *Walsh*, supra at 589–590. The reason suggested is
> the significant public policy that a client should at all times have the freedom to
> choose or to reject an attorney. To put a lawyer to whom a client resorts for a
> second opinion at risk of tort liability might have a chilling effect on the exercise
> of the client's unfettered right to choose.
>
> > "There is, we think, a strong public policy to assure one in need of
> > legal help freedom to select an attorney, to change attorneys, and
> > to seek and obtain advise as to the competency and suitability of
> > any attorney for the particular needs of the client."
>
> *Id*. at 590.  "Of course, if the interferer resorts to means which are themselves a
> recognized basis for liability in tort, such as defamation, it is that conduct which
> may be the basis for liability; the loss of the business relationship is then merely
> one element of any damages recovered."

*Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C.*, 2005 WL 851085, at *3-4

(Mass. App. Div. 2005).  Given that backdrop, Plaintiffs' tortious interference claim against

Keenan fails because, as a matter of law, (a) nothing in the First Fee Agreement or Referral

Agreement prevented or legally could prevent Wahlstrom from retaining Keenan, and (b)

Keenan's alleged interference was not improper in motive or means.

    **a.**   **Wahlstrom Had the Absolute Right to Retain Keenan**

Plaintiffs improperly attempt to rewrite the First Fee Agreement and Referral Agreement,

which Plaintiffs refer to as the singular "O'Toole/Hoey/Wahlstrom fee agreement," based on the

**Exhibit 4 - 9**

faulty premise that Wahlstrom could not engage Keenan without Plaintiffs' consent. *See* FAC,

¶18 ("At no time did O'Toole learn about or give his assent to any modification or novation of

the fee agreement to which he was a party."); *Id.*, ¶22 ("More to the point, whatever any

'superseding' agreement might say, no one ever sought O'Toole's assent to it, and (manifestly)

he never gave his assent to any agreement other than the one (Ex. A) to which he is a party.").

The fundamental problem with Plaintiffs' claims against Keenan is that there is no requirement

in the "O'Toole/Hoey/Wahlstrom fee agreement," Massachusetts law, or the Rules of

Professional Conduct that require Plaintiffs' consent for Wahlstrom to engage Keenan.

Indeed, Plaintiffs' theory has been squarely rejected by at least two courts based on

nearly identical facts. First, in *Donovan v. Mahoney*, 2008 Mass. App. Div. 41, at *1 (2008)

(*Donovan I*), "Donovan, who was retiring from the practice of law, and Mahoney agreed in

writing that Donovan would refer personal-injury clients to Mahoney. Mahoney would

compensate Donovan in the amount of one-third of any contingency fee collected, plus any costs

Donovan had incurred." Donovan referred a case to Mahoney, who in turn referred the case to

attorney Cloherty. *Id*. Cloherty settled the case and "sent a $13,000.00 referral fee to Mahoney.

Mahoney forwarded $5,214.00, slightly more than one-third of the referral fee, to Donovan." *Id*.

Like here, "[d]iscontented with that fee, Donovan brought … suit against Mahoney to

recover $7,780.00, alleging that Mahoney had breached their referral agreement by 're-

assigning' [the] claim to another lawyer without Donovan's consent." *Id*. The trial Court

allowed Donovan's motion for summary judgment, and Mahoney appealed. *Id*. The Appeals

Court reversed the decision, holding that:

> The 2003 referral-fee agreement signed by both parties neither forbade Mahoney
> from further referring the cases he received from Donovan, nor obligated him to
> consult with Donovan or to notify him before doing so…. Nothing in the
> agreement addressed Donovan's reliance on Mahoney's expertise, or any

"expectations" Donovan had that Mahoney would see matters through to conclusion. The core of the agreement was that Mahoney would pay Donovan one-third of any fee realized by Mahoney from a referred case. Mahoney did just that…. [T]here is no interpretation of that contract that leads ineluctably to a ruling that Donovan was entitled to one-third of Cloherty's fee, or to any more than he received from Mahoney.

*Id.* at *2 (footnotes omitted).

Thereafter, a directed verdict was entered against Donovan following a jury-waived trial.

*Donovan v. Mahoney*, 2012 Mass. App. Div. 4, at *1 (2012) (*Donovan II*).  This time Donovan appealed, and the Appeals Court affirmed the verdict, holding that:

Donovan's claim … is for breach of a contract term that was never included in the written contract signed by the parties…. [N]o provision of that agreement prohibits Mahoney from referring a case received from Donovan to another attorney. Despite these unequivocal facts, Donovan states in his brief that "[t]he only issue is whether by referring the case of Daniel Donovan to another attorney without the knowledge or consent of [Donovan], [Mahoney] violated the terms of the written contract which [Mahoney] had drawn up." The answer to that question, based solely on the written fee agreement itself, has to be no.

*Id.* at *3.

As in *Donovan I* and *II*, neither the Referral Agreement nor the First Fee Agreement required Plaintiffs' consent in order for Hoey to refer the case to Keenan or for Wahlstrom to retain Keenan.  Therefore, Keenan cannot be liable for agreeing to represent Wahlstrom.  In fact, Keenan is even further removed from the allegedly improper conduct at issue in *Donovan I* and *II* where the plaintiff did not even sue successor counsel (Cloherty).

If Plaintiffs are correct that their consent was necessary, and they certainly are not, then referring counsel can essentially hold the client hostage by refusing to allow the client to select new counsel unless and until referring counsel is satisfied with the new arrangement.  To the contrary, "[a] client's right to change his lawyer at any time for any cause or no cause at all is inherent in the characteristics of trust and confidentiality in the lawyer-client relationship."

*Salem Realty Co. v. Matera*, 10 Mass. App. Ct. 671, 575 (1980), aff'd, 384 Mass. 803 (1981).

"But the right of a client so to do has not much value if the client is put at risk to pay the full contract price for services not rendered and to pay a second lawyer as well." *Id.* Put simply, Hoey's and Plaintiffs' corresponding shares of the attorney contingent fee portion of the recovery were reduced because Wahlstrom engaged Keenan, as was her right.

 To the extent Plaintiffs allege that the $250,000 they received is less than one third of the amount that Hoey actually received because of some alleged agreement between Keenan and Hoey to split the attorneys' fees on any potential recovery 50/50 (or any other percentage for that matter), *see* FAC, ¶23, that is a dispute between Plaintiffs and Hoey which has nothing to do with Keenan. Plaintiffs do not allege (nor could they) that Keenan was precluded from earning a fee on the case. The Second Fee Agreement does not mention Plaintiffs. Nor do Plaintiffs allege that anything in the Second Fee Agreement precluded Plaintiffs from receiving any amount of the attorney's fees recovered. And again, neither the First Fee Agreement nor the Referral Agreement required Plaintiffs to consent to any allocation of the attorney contingent fee portion between Plaintiffs, Hoey and Keenan. *See Donovan I*, supra; *Donovan II*, supra.

 The Plaintiffs' allegation that, "[i]n violation of Massachusetts law, the [Second Fee Agreement] did not specify the amount of the referral fee that Hoey was entitled to receive," FAC, ¶16, is also meritless. The only requirement is that the client acknowledge that certain attorneys will share in the attorney contingent fee portion of any recovery, but not the specific allocation between those attorneys. Rule 1.5(e) provides: "A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is

reasonable." Mass. R. Prof. C. 1.5(e). "The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer." *Id*., cmt 7A. In fact, the Second Fee Agreement mirrors the language recommended by the Rules of Professional Conduct,[4] specifically that Wahlstrom "is responsible for payment of all of [her] former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between [her] and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1)…." Second Fee Agreement, ¶10.

### b.  Keenan's Alleged Interference Was Not Improper in Motive or Means

Plaintiffs' tortious interference claim fails also because Keenan's alleged interference was not improper in motive or means. "The improper conduct may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion); the plaintiff need not prove both." *Cavicchi*, 67 Mass. App. Ct. at 658 (quotations and citations omitted).

Plaintiffs allege that Keenan acted "with improper motive and means insofar as he intended to and assist Hoey in a scheme intended to reduce O'Toole's compensation under his contract and/or to make enforcement of that contract more difficult by creating a sham arrangement in which he became the putative lead attorney on the case, even though Hoey continued to act, in substance, as primary trial counsel." FAC, ¶47. Even if this conclusory allegation is true, it is insufficient to prove improper motive or means.

---

[4] The Rules of Professional Conduct provide an example of an approved and recommended contingent fee agreement. It provides, in part, the following: "The client is responsible for payment of former counsel's reasonable attorney's fees and expenses and the cost of resolving any dispute between the client and prior counsel over fees or expenses." Mass. R. Prof. C. 1.5(f), Contingent Fee Agreement, Form B.

**Exhibit 4 - 13**

1. **Improper Motive**

Typically, "[a]s to improper motive, evidence of retaliation or ill will toward the plaintiff will support the claim." *Cavicchi*, 67 Mass. App. Ct. at 658. "The motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement. Similarly, personal dislike will not warrant an inference of the requisite ill will." *King v. Driscoll*, 418 Mass. 576, 587 (1994) (quotations and citations omitted).

Again, tortious interference claims arising from attorney-client contracts are treated differently. It is well-settled that, as a matter of law, a tortious interference claim against successor counsel cannot be based on improper motive because of a client's absolute right to obtain new counsel. *See Cavicchi*, 67 Mass. App. Ct. at 658 ("To the extent that Cavicchi's claim rests on Koski's interference by improper motive with Cavicchi's representation of the clients in the civil matter, (i.e., that Koski disparaged Cavicchi 'with the intention of terminating the contractual relationship between Cavicchi and the clients in order to advance his own economic interest'), it is precluded, on policy grounds."); *Walsh,* 350 Mass. at 589–590 (declining "to extend to the attorney client relationship the principle that interference with an existing business relationship, if malicious or without justification, is actionable").

Even if Plaintiffs could base their claim on improper motive, they fail to allege any facts to support such a theory. There are no allegations of Keenan's ill will or hatred of Plaintiffs. The most that can be gleaned from the Amended Complaint is that, whether intended or not, the Second Fee Agreement resulted in an additional attorney to whom the attorney contingent fee portion of any potential recovery also had to be allocated, which naturally resulted in Hoey and

Date Filed 5/16/2022 10:44 AM
Superior Court - Suffolk
Docket Number 2184CV00741

**Exhibit 4 - 14**

Plaintiffs receiving less.[5]  "That the plaintiff may have suffered a loss as a consequence of the defendant's pursuit of its own interest . . . does not render the defendant's effort tortious." *Pembroke Country Club, Inc.*, 62 Mass. App. Ct. at 39.

### 2. __Improper Means__

Plaintiffs are thus left with improper means to support their claim, which fares no better. "To demonstrate improper means, a plaintiff must prove improper conduct beyond the fact of the interference itself." *Bartle*, 80 Mass. App. Ct. at 380. *See also Wozniak & Padula, P.C.*, 2005 WL 851085, at *4 ("the interferer [must] resort[] to means which are themselves a recognized basis for liability in tort, such as defamation").

"Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation." *Cavicchi*, 67 Mass. App. Ct. at 658. But "even the violation of a statute or common-law rule does not necessarily constitute improper means." *Bartle*, 80 Mass. App. Ct. at 382. "[F]or public policy reasons, in the context of an attorney-client relationship and the duty implicated thereby, the improper means alleged by one attorney against another must be 'unlawful' to be actionable." *Id.* "It is well established that a violation of the disciplinary rules does not provide an independent basis for liability against an attorney. [Courts] therefore decline to equate a violation of the disciplinary rules with the type of independent legal wrong necessary to establish a claim of tortious interference between attorneys." *Id.* (citation omitted).

Plaintiffs fail to allege anything improper other than the alleged interference itself, which is insufficient. *See Bartle*, supra; *Wozniak & Padula, P.C.*, supra. Plaintiffs do not allege that

---

[5] If Plaintiffs survive this motion, they will somehow have to prove that they would have received more than $250,000 as a referral fee if Keenan did not agree to represent Wahlstrom as trial counsel. Put another way, Plaintiffs will have to prove that Hoey, without the expertise of Keenan, would himself have secured a judgment or settlement worth more than $2,250,000.

Date Filed 5/16/2022 10:44 AM
Superior Court - Suffolk
Docket Number 2184CV00741
Case 1:22-cv-10792-RGS    Document 40-4    Filed 11/18/22    Page 15 of 29

**Exhibit 4 - 15**

Keenan made any threats or misrepresentations to Wahlstrom, or that Keenan defamed Plaintiffs. *Compare Cavicchi*, 67 Mass. App. Ct. at 658-59 (complaint sufficiently alleged "improper means by asserting that Koski knowingly made material misrepresentations to the clients about Cavicchi's reputation that induced the clients to discharge him").

## II.    Count VI (Civil Conspiracy) Fails to State a Claim against Keenan

"To prove their claims for civil conspiracy, the [P]laintiffs must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement." *Bartle*, 80 Mass. App. Ct. at 383–84. The underlying tortious act upon which Plaintiffs rely is Keenan's alleged tortious interference of the "O'Toole/Hoey/Wahlstrom fee agreement." FAC, ¶¶49-50. But Plaintiffs do not have a viable tortious interference claim against Keenan, and fail to allege any other tort claims against any of the defendants.[6]

The conspiracy claim fails without an actionable underlying tort. *See Bartle*, 80 Mass. App. Ct. at 384 ("For the requisite underlying tortious act, the plaintiffs rely on the same allegations underpinning their claim of tortious interference. We already have concluded, however, that public policy protected the defendant attorneys in their filing of class action suits on behalf of their clients. Accordingly, the plaintiffs' claims that the defendant attorneys conspired against them necessarily fails."); *Quaglieri v. Steeves*, 2013 WL 1222220, at *11 (D. Mass. 2013) ("Because the Court grants the motion for summary judgment as to Quaglieri's interference claim, the conspiracy claim must fail for lack of an 'underlying tortious act.'") (citation omitted).

---

[6] Plaintiffs' breach of contract claim (Count I) is not a tort. Neither is their claim for breach of the implied covenant of good faith and fair dealing. *See Jennings v. Nathanson*, 404 F. Supp. 2d 380, 399 (D. Mass. 2005) ("Claims based on a breach of the implied covenant of good faith and fair dealing sound in contract as opposed to tort.").

### III. Count VII (Unjust Enrichment/Constructive or Resulting Trust) Fails to State a Claim against Keenan

Plaintiffs' fallback claim for unjust enrichment/constructive or resulting trust should also be dismissed.  Plaintiffs allege that if the Second Fee Agreement "is valid, Mr. Keenan assumed responsibility for ensuring that the proceeds of the Wahlstrom action were distributed in accordance with all lawful existing fee agreements, including the terms of the O'Toole/Hoey/Wahlstrom fee agreement (Ex. A)."  FAC, ¶53.

First, Plaintiffs' claim disregards the plain terms of the Second Fee Agreement, specifically Paragraph 10 which provides that "[t]he Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1)…."

Second, Plaintiffs do not allege any facts that could possibly be construed as giving rise to a responsibility or duty on the part of Keenan to disburse money, regardless of the amount, to Plaintiffs.  *Compare Malonis v. Harrington*, 442 Mass. 692, 697-98 (2004) (prior counsel (Malonis) entitled to portion of settlement proceeds from successor counsel (Harrington) based on unjust enrichment where "case was settled with the knowledge and understanding that [] Harrington was to see to Malonis at no cost to [client] whatsoever," underlying defendant's "counsel testified as to Harrington's specific assurance that he would 'take care of' Malonis," and "there [was] no question that Harrington himself understood that Malonis was entitled to payment, as shown by four written requests for an itemized bill for his legal services") (cleaned up).

Third, "a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties."  *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 641 (2013)

(quotations and citation omitted).  There is a contract that defines Plaintiffs' rights to recover a referral fee, either the Referral Agreement that provides Plaintiffs receive "33% of [Hoey's] fee from the sum recovered," FAC, Exhibit A, or Paragraph 10 of the Second Fee Agreement. Plaintiffs cannot rely on an unjust enrichment claim to get around these agreements.

Fourth, "[u]njust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329–30 (2005) (quotations and citation omitted).  The unjust enrichment claim fails because it is derivative of Plaintiffs' other deficient claims. *See Fisher v. Fisher*, 99 Mass. App. Ct. 1132 (2021) (unpublished opinion) (where undue influence claim was properly dismissed, "[b]ecause the … equitable remedies of rescission, constructive trust, and unjust enrichment were derivative of the undue influence claim, these claims also were properly dismissed.").  That Plaintiffs' referral fee may have decreased because Wahlstrom engaged an additional attorney does not give rise to an unjust enrichment claim against Keenan.

Fifth, a constructive or resulting trust is not a claim.  *See Shick v. Farmers Home Admin.*, 583 F. Supp. 534, 536 (D. Mass. 1984) ("Constructive trust is a remedy, not a cause of action."), aff'd in part, rev'd in part sub nom. on different grounds, 748 F.2d 35 (1st Cir. 1984).

Sixth, "[a] constructive trust is imposed in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or arose where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information." *Meskell v. Meskell*, 355 Mass. 148, 151 (1969) (citation and quotations omitted).  Plaintiffs have not alleged any basis for fraud or even asserted a fraud claim.  There was no fiduciary

relationship between Plaintiffs and Keenan, and Plaintiffs have not alleged one.  Nor do

Plaintiffs' claims concern the use of confidential information.

**IV.**     **Count VIII (Violation of G.L. c. 93A, § 11) Fails to State a Claim against Keenan**

Keenan did not violate G.L. c. 93A, § 11 as a matter of law.  First, the c. 93A claim fails

because Plaintiffs fail to state any other cognizable claim against Keenan.  *See Park Drive*

*Towing, Inc. v. City of Revere*, 442 Mass. 80, 85-86 (2004) (where c. 93A claim was "derivative

of … breach of contract claim, … [i]n light of our conclusion that no contract existed between

the parties, this claim must also fail"); *Macoviak v. Chase Home Mortgage Cory*., 40 Mass. App.

Ct. 755, 760 (1996), rev. denied, 423 Mass. 1109 (1996) (affirming dismissal of c. 93A claim

"based upon ... underlying claim for common law fraud" that failed as a matter of law).

Second, § 11 simply does not apply.  "Generally, only a client or someone standing in

privity with a client can assert a G.L. c. 93A claim against an attorney stemming from legal

services rendered.  For situations outside of the attorney-client relationship, the attorney must be

shown to have acted in a business context for a non-client to have a cause of action."  *Wozniak &*

*Padula, P.C.*, 2005 WL 851085, at *2 (citations omitted).  The applicable law was laid out in

*Cavicchi*, 67 Mass. App. Ct. at 662:

> Whether G.L. c. 93A, § 11, applies "requires a dual inquiry: first, the court
> assesses whether the interaction is 'commercial' in nature, and second, it
> evaluates whether the parties were both engaged in 'trade or commerce,' and
> therefore acting in a 'business context.'" *Linkage Corp. v. Trustees of Boston
> Univ*., 425 Mass. 1, 22–23, cert. denied, 522 U.S. 1015 (1997). "It is clear as
> matter of law that . . . internal disputes that are intra-enterprise, i.e., between
> parties in the same venture, do not fall within the scope of c. 93A, § 11." *Steele v.
> Kelley*, 46 Mass. App. Ct. 712, 726 (1999).  "Chapter 93A does not apply to
> internal disputes between parties who associated 'in the interests of forming a
> business venture together.' *Szalla v. Locke*, 421 Mass. 448, 451–453 (1995)
> (parties who serve different roles in formation of business are involved in 'same
> venture' so long as they contributed to project)." *Lattuca v. Robsham*, 442 Mass.
> 205, 209 (2004). *See Newton v. Moffie*, 13 Mass. App. Ct. 462, 467 (1982) ("as a

matter of statutory construction, . . . § 11 was intended to apply only to dealings between legally separate 'persons' engaged in arm's length transactions, and not to dealings between members of a single legal entity like a partnership" [footnote omitted]).

"This is essentially a dispute between two law firms regarding apportionment of the proceeds of a settlement and does not entail unfair or deceptive acts or practices in the course of trade or commerce." *Wozniak & Padula, P.C.*, 2005 WL 851085, at *2.  There is no allegation of any communications, dealings or interactions between Plaintiffs and Keenan, let alone a "commercial relationship" necessary to maintain a § 11 claim.  Keenan's representation of Wahlstrom in a matter that Plaintiffs initially referred to Hoey is insufficient to make out a § 11 claim.  *See Cavicchi*, 67 Mass. App. Ct. at 663 (prior and successor counsel "were engaged in an intra-enterprise dispute and their transactions [did] not fall within the scope of c. 93A"); *Wozniak & Padula, P.C.*, 2005 WL 851085, at *2 ("There was no allegation in this case of a commercial relationship between the two law firms; their sole contact appears to have been in connection with this litigation. That interaction alone is insufficient to warrant a finding of a commercial relationship.  In the absence of a commercial transaction between the parties, it is clear that not every species of competitive practice which may be deemed odious falls within the ambit of G.L. c. 93A.") (citation omitted).

**V.      Count IV (Declaratory Judgment) Fails to State a Claim against Keenan**

Count IV is another attempt by Plaintiffs to rewrite the "O'Toole/Hoey/Wahlstrom fee agreement."  Plaintiffs request a declaratory judgment that they are entitled to a referral fee for other pending actions, specifically two G.L. c. 176D actions filed by Wahlstrom against the

insurers of the defendants in the underlying action,[7] and a consortium action filed by

Wahlstrom's children,[8] because, according to Plaintiffs, these other actions are "related to the

May 1, 2009 event."  FAC, ¶44.

Not only is the term "related to" nowhere to be found in the First and Second Fee

Agreements, but they also concern separate claims, injuries and/or plaintiffs.  The First Fee

Agreement provides that that "[t]he claim, controversy, and other matters with reference to

which the services are to be performed are: premises liability and injuries received on or about

May 1, 2009 in the Radisson parking garage".  FAC, Ex. A (emphasis omitted).  The Second Fee

Agreement similarly provides that "[t]he claim, controversy, and other matters with reference to

which the services are to be performed are: Premises liability claims and injuries received as a

result of assault on or about May 1, 2009 in the Radisson Hotel Boston parking lot".  FAC, Ex. B

(emphasis omitted).

Regarding Wahlstrom's c. 176D actions,[9] she asserts single counts for unfair claim

settlement practices in violation of G.L. c. 93A, §§ 2, 9 and G.L. c. 176D, § 3(9), where the issue

is the conduct of the insurers.  *See* Wahlstrom I, ¶49; Wahlstrom II, ¶70.  These are not

"premises liability" claims identified in the First and Second Fee Agreements where the issue

was the conduct of the insureds.  Further, Wahlstrom's injuries in the premises liability claim

(i.e., physical, mental and emotional, lost wages, etc.) are completely different than her injuries

---

[7] A copy of the Complaints, styled *Kira Wahlstrom v. Zurich American Insurance Company and American Guarantee and Liability Insurance Company*, 1:19-cv-12208-LTS, United States District Court, District of Massachusetts (Wahlstrom I) and *Kira Wahlstrom v. Zurich American Insurance Company and American Guarantee and Liability Insurance Company*, 1:22-cv-10037-LTS, United States District Court, District of Massachusetts (Wahlstrom II), are attached hereto at **Exhibit A** and **Exhibit B**, respectively.

[8] A copy of the Amended Complaint, styled as *Scarlett Helmeke, by her guardian and next friend Todd Helmeke and Jackson Helmeke, Individually v. JPA IV Management Company, Inc., as Trustee of the John Philopoulos Associates Trust, and JPA I Management Company, Inc.*, 2077CV00542, Massachusetts Superior Court, Essex County, is attached hereto at **Exhibit C**.

[9] Wahlstrom I and Wahlstrom II concern the insurers' conduct during different periods of time.

**Exhibit 4 - 21**

in the c. 176D actions.  *See Chiulli v. Liberty Mut. Ins., Inc.*, 97 Mass. App. Ct. 248, 258 n.18

(2020), *rev. denied,* 485 Mass. 1102 (2020) ("While loss of the use of funds is the typical

measure of damages from the failure to make a prompt offer of settlement, we note that where …

the claimant has recovered a judgment on the underlying claim, the entire amount of that

judgment … is subject to multiplication if the violation is found to be willful and knowing.");

*McLaughlin v. Am. States Ins. Co.*, 90 Mass. App. Ct. 22, 33 (2016) ("where an insurer's

protracted delay in settling the underlying tort case requires a plaintiff to proceed to trial on that

case, the plaintiff's attorney's fees and expenses incurred in that suit are properly recoverable as

actual damages caused by the statutory violation").

Regarding Wahlstrom's children's consortium action, she is not even a plaintiff in that

action.  The "Client" in both the First and Second Fee Agreements is clearly limited to Kira

Wahlstrom individually, and not in any representative capacity.  And of course, Wahlstrom's

injuries are different than her children's.

## VI.  Count IX (Declaratory Judgment) Fails to State a Claim against Keenan

Count IX appears to preemptively request a finding of fraud against Keenan to prevent

any potential judgment from being discharged in bankruptcy.  However, Plaintiffs do not even

assert a fraud claim.  Count IX is also based on the faulty premise that Keenan "was under a duty

to disclose the existence of the second fee agreement" to Plaintiffs.  FAC, ¶64.  Keenan owed no

such duty to Plaintiffs.  In any event, this count is derivative of Plaintiffs' other meritless claims.

## VII.  Conclusion

For the reasons discussed above, defendants Don Keenan and The Keenan Law Firm,

P.C. respectfully request that the Court allow this motion and dismiss the claims against them

with prejudice.

**Exhibit 4 - 22**

Defendants,

DON KEENAN and
THE KEENAN LAW FIRM, P.C.,

By their attorneys,

 /s/ Ian J. Pinta
Howard M. Cooper, Esq. (BBO # 543812)
hcooper@toddweld.com
Ian J. Pinta, Esq. (BBO # 667812)
ipinta@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel.:  617-720-2626
Dated:  March 25, 2022                    Fax:  617-227-5777


### CERTIFICATE OF SERVICE

I, Ian J. Pinta, hereby certify that on this 25th day of March, 2022, I caused a true and accurate copy of the foregoing document to be served on counsel of record for all parties via email.

 /s/ Ian J. Pinta
Ian J. Pinta

**Exhibit 4 - 23**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                               SUPERIOR COURT DEPARTMENT
                                           CIVIL ACTION NO. 21-0741

_____ )
                                )
AUSTIN O'TOOLE and THE LAW      )
OFFICES OF AUSTIN O'TOOLE, P.C.,)
                                )
        Plaintiffs,             )
                                )
v.                              )
                                )
DAVID HOEY, THE LAW OFFICES OF  )
DAVID HOEY, P.C., KIRA          )
WAHLSTROM, DON KEENAN, and      )
THE KEENAN LAW FIRM, P.C.,      )
                                )
        Defendants.             )
_____ )

**NEWLY ADDED DEFENDANTS DON KEENAN AND
THE KEENAN LAW FIRM, P.C.'S REPLY IN SUPPORT OF THEIR
<u>MOTION TO DISMISS</u>**

**Exhibit 4 - 24**

Newly added defendants Don Keenan and The Keenan Law Firm, P.C. (together,

"Keenan"), respectfully submit this Reply in support of their Motion to Dismiss.

## I.     <u>Keenan Does Not Rely on Non-Alleged Facts</u>

In a tacit admission that their claims fail as a matter of law, plaintiffs Austin O'Toole

("O'Toole") and The Law Offices of Austin O'Toole, P.C. (together, "Plaintiffs") wrongly

submit that Keenan's motion relies on non-alleged facts.  Plaintiffs cannot avoid dismissal of

their claims by attempting to artificially create the appearance of a factual dispute.  Taking

Plaintiffs' allegations as true, the claims against Keenan should be dismissed.  *See*, *e.g.*, *Cavicchi*

*v. Koski*, 67 Mass. App. Ct. 654 (2006) (affirming, in part, dismissal of tortious interference

claim against successor counsel under Rule 12(b)(6)).[1]

## II.    <u>Plaintiffs' Tortious Interference Claim Fails as a Matter of Law</u>

### a.    <u>A Claim for Tortious Interference with Contract Against Successor Counsel Based on the Break of a Contingent Fee Agreement in a Then-Pending Matter Cannot Lie</u>

Plaintiffs correctly point out, and go to great lengths to emphasize, they assert a claim for

interference with *contractual relations* but not for interference with *advantageous business*

*relations*.  This distinction was addressed in *Cavicchi* where prior counsel asserted both claims

against successor counsel who allegedly interfered with two different agreements.[2]  Regarding

interference with contract (as Plaintiffs assert here), the Court held that as to potential future fees

in a pending case, and specifically potential fees based on a contingent fee agreement like

---

[1] Plaintiffs attempt to save their claims also by attaching Exhibits 1 and 2 to their Opposition, which documents were not attached to or referenced in the First Amended Complaint.  These documents are irrelevant and inflammatory, and the Court should disregard and strike them.
[2] Cavicchi, an attorney, alleged that Koski, another attorney who succeeded Cavicchi in representing the same client, caused the client to terminate Cavicchi's contingent fee agreement with the client in a then-pending civil matter, and to breach a separate fee agreement in a concluded criminal matter by not paying Cavicchi a sum certain for legal services already rendered.  *Cavicchi*, 67 Mass. App. Ct. at 655-57.

1

**Exhibit 4 - 25**

Plaintiffs' potential fee in Kira Wahlstrom's then-pending action, the claim is not actionable as a

matter of law because the client has the right to discharge counsel.  *See id.* at 661 ("As to the

contingent fee agreements in the civil matter, we conclude that the claim for tortious interference

with a contract cannot lie. These agreements govern compensation; they do not (nor could they)

prohibit the clients from discharging their attorneys. Therefore, to the extent the claim is

grounded in an allegation that the clients 'breached their contracts with Cavicchi' by terminating

his services in the civil matter, it cannot stand.") (citation and brackets omitted).  But to the

extent the claim alleged successor counsel prevented prior counsel from receiving fees already

earned and payable in the concluded criminal matter, the Court held that "Cavicchi can endeavor

to prove that Koski, with improper motive or means, induced [the client] to refuse to pay

Cavicchi's fee in the criminal case, thus breaching his contract with Cavicchi." *Id.* at 662.[3]

The parties agree that *Cavicchi* controls, but Plaintiffs attempt to distinguish it by

misrepresenting its rationale, specifically arguing "Cavicchi could not pursue an interference

claim with regard to [the client's] termination of the contingent fee agreement-but only because

there was no breach of contract, not because of any public policy."  Opposition, p. 11.  That is

not correct—public policy precluded any breach of contract.  The Court reasoned that

"[a]lthough Cavicchi had contingent fee agreements to represent the clients in the civil matter,

they did not breach the agreements by terminating his services. See our discussion in part b,

*infra.*"  *Id.* at 658 n.6.  In part b, the Court explained the public policy rationale, specifically that

contingent fee agreements "do not (nor could they) prohibit the clients from discharging their

---

[3] Similarly, in *L. Offs. of Jeffrey S. Glassman v. Palmisciano*, 690 F. Supp. 2d 5, 8 (D. Mass.
2009), plaintiff alleged that successor counsel interfered with its contingent fee agreement, which
provided plaintiff would be compensated a percentage "of the gross amount of the settlement
offer at the time of discharge," *after* a settlement offer was made.  The Court declined to dismiss
the interference claim because the contingency was earned, due and payable.  *Id.* at 18.

**Exhibit 4 - 26**

attorneys. *See Malonis v. Harrington*, 442 Mass. 692, 696 (2004) (noting principle that it is 'uniformly recognized that [a] client has [an] unquestioned right to discharge [his] attorney, with or without cause')." *Id*. at 661 (brackets appearing in *Cavicchi*). Therefore, Plaintiffs' claim for interference with contractual relations based on a contingent fee agreement seeking potential future fees in a still pending matter cannot lie as a matter of law and public policy.

      b. <u>Plaintiffs Fail to Allege Improper Motive or Means</u>

      Irrespective of the above, Plaintiffs fail to address Keenan's argument that the factual allegation in support of improper conduct, specifically Keenan entered into a "sham" contingent fee agreement with Kira Wahlstrom (the "Second Fee Agreement"), *see* First Amended Complaint ("FAC"), ¶47, is the same as the alleged interference itself. This is fatal to the interference claim because "improper conduct, beyond the interference itself, is an element" of the claim. *Cavicchi*, 67 Mass. App. Ct. at 657 (quotations and citations omitted).

      Plaintiffs fail to allege improper motive or means regardless. Improper motive is not available in a tortious interference claim against successor counsel predicated on a contingent fee agreement in a then-pending matter. *See id*. at 658 ("To the extent that Cavicchi's [interference with advantageous business relations] claim rests on Koski's interference by improper motive with Cavicchi's representation of the clients in the civil matter, (i.e., that Koski disparaged Cavicchi 'with the intention of terminating the contractual relationship between [Cavicchi] and [the clients] in order to advance his own economic interest), it is precluded, on policy grounds.") (brackets in original); *Bartle v. Berry*, 80 Mass. App. Ct. 372, 381 (2011) (where defendant attorneys allegedly interfered with plaintiffs' contingent fee agreement, plaintiffs "must show that the defendant attorneys used improper means").

**Exhibit 4 - 27**

Regarding improper means, there are no allegations whatsoever that the "sham" Second

Fee Agreement was not a legitimate document, that Wahlstrom did not sign it, that Keenan or

David Hoey forged her signature, that Wahlstrom received her portion of the recovery under

some other agreement, or that Keenan did not act as trial counsel.  Nor do they allege that

Keenan somehow coerced Wahlstrom into signing the agreement, or that Keenan disparaged

Plaintiffs to cause Wahlstrom to sign the agreement.[4]  Simply labeling an agreement as a "sham"

does not satisfy the improper means element.

      c.  <u>Plaintiffs Fail to Allege that Hoey Broke the First Fee Agreement</u>

Plaintiffs' attempt to distinguish *Donovan v. Mahoney*, 2008 Mass. App. Div. 41 (2008)

(*Donovan I*), and 2012 Mass. App. Div. 4 (2012) (*Donovan II*), misses the mark.  While

*Donovan I* and *II* did not concern an interference claim against successor counsel, they did

squarely address an element of the claim, specifically whether Mahoney breached the referral

agreement with Donovan by referring the case to other counsel and, as a result, paying Donovan

a smaller portion of the total attorney fee.  Similarly here, nothing prevented Hoey from bringing

in Keenan, and Plaintiffs never bargained for a percentage of the *total* attorney fee.

**III.**    **<u>Plaintiffs' Conspiracy Claim Fails as a Matter of Law</u>**

Plaintiffs submit they have "pleaded the more common 'concerted action' conspiracy,"

Opposition, p. 14, but even under that "form of civil conspiracy … liability is imposed on one

individual for the tort of another."  *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998).  The

conspiracy claim against Keenan fails because Plaintiffs have not alleged any tort claims against

any defendant other than Keenan.  Compare *Kurker*, 44 Mass. App. Ct. at 190 n.5 & 191 n.7

---

[4] In fact, Keenan ensured that all prior counsel, including Plaintiffs, receive compensation to which they were entitled.  *See* Second Fee Agreement, ¶10 (Wahlstrom "is responsible for payment of all of [her] former/prior counsel's reasonable attorney's fees and reasonable costs").

(asserting claims for breach of fiduciary duty and misappropriation of corporate opportunity

against other defendants); *Torrance Van & Storage Co. v. Depietri*, 2011 WL 4424061, at *2

(Mass. Super. July 20, 2011) (asserting claim for fraud against other defendant).

### IV.   Plaintiffs' G.L. c. 93A, § 11 Claim Fails as a Matter of Law

"Turning to the [Plaintiffs'] claim under G.L. c. 93A, § 11, we begin with the established

principle that the absence of privity of contract does not bar a claim under the statute so long as

the parties were engaged in more than a minor or insignificant business relationship." *Imprimis*

*Invs., LLC v. KPMG Peat Marwick LLP*, 69 Mass. App. Ct. 218, 230 (2007) (brackets omitted).

Here, however, there was no business relationship, let alone interaction, between Plaintiffs and

Keenan.  Plaintiffs concede their commercial relationship was with only Hoey: "Section 11 may

apply when there is a commercial transaction between a person engaged in trade or commerce

[*Hoey*] and another person engaged in trade or commerce [*O' Toole*], such that they were acting

in a business context."  Opposition, p. 17 (quotations and citations omitted) (brackets in original)

(emphasis added).  *See Imprimis Invs., LLC*, supra (affirming dismissal of § 11 claim where

plaintiff "had no contact with" defendant).  Furthermore, Plaintiffs' reliance on *Vita v. Berman,*

*Devalerio & Pease, LLP*, 81 Mass. App. Ct. 748, 756 (2012) is misplaced because that case

concerned the defendant's intentional breach of a referral agreement with plaintiff to secure

unentitled benefits.  Again, Plaintiffs did not interact and had no agreement with Keenan.[5]

---

[5] To the extent there was a commercial relationship between Plaintiffs and Keenan, *Cavicchi*, supra, and *Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C.,* 2005 WL 851085 (Mass. App. Div. 2005), make clear that disputes over the apportionment of fees between attorneys who each represented the client at one time or another do not qualify as a commercial relationship under the statute.  *See also Palmisciano*, 690 F. Supp. 2d at 19 ("There is no actionable allegation in this case of a commercial relationship between the Plaintiff and the Defendant Lafazia; their sole contact appears to have been in connection with litigation on behalf of Palmisciano. I find that such an interaction alone is insufficient to warrant a finding of a commercial relationship.").

**Exhibit 4 - 29**

Defendants,

DON KEENAN and
THE KEENAN LAW FIRM, P.C.,

By their attorneys,

*/s/ Ian J. Pinta*
Howard M. Cooper, Esq. (BBO # 543812)
hcooper@toddweld.com
Ian J. Pinta, Esq. (BBO # 667812)
ipinta@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel.:  617-720-2626
Dated:  May 16, 2022                    Fax:  617-227-5777


## CERTIFICATE OF SERVICE

I, Ian J. Pinta, hereby certify that on this 16th day of May, 2022, I caused a true and accurate copy of the foregoing document to be served on counsel of record for all parties via email.

*/s/ Ian J. Pinta*
Ian J. Pinta

6