# Exhibit F

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
NO. 1:22-CV-10792-RGS

------------------------------------------
                                          )
KIRA WAHLSTROM,                           )
         Plaintiff,                       )
                                          )
         vs.                              )
                                          )
DAVID J. HOEY, LAW OFFICES OF             )
DAVID J. HOEY, P.C., DON C. KEENAN,       )
AND D.C. KEENAN & ASSOCIATES, P.C.        )
D/B/A THE KEENAN LAW FIRM, P.C.,          )
         Defendant.                       )
                                          )
------------------------------------------

   DEPOSITION OF ERIN HIGGINS, ESQ., taken before
June Poirier, Shorthand Reporter and Notary Public,
at the offices of Wilson, Elser, 260 Franklin
Street, Boston, Massachusetts, on Wednesday,
June 28, 2023, commencing at 10:00 a.m.

2

```
 1  APPEARANCES:
 2  BRIDGET A. ZERNER, ESQ.
    Markham, Read, Zerner, LLC
 3  One Commercial Wharf West
    Boston, MA 02110
 4  bzerner@markhamreadzerner.com
      For Kira Wahlstrom
 5
 6  CHRISTINE A. KNIPPER, ESQ.
    JOHN P. LIBERTY, ESQ.
 7  Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
    260 Franklin Street, 14th Floor
 8  Boston, MA 02110
    christine.knipper@wilsonelser.com
 9    For David J. Hoey and Law Offices of
            David J. Hoey, P.C.
10
11  DANNI SHANEL, ESQ.
    Troutman, Pepper, Hamilton, Sanders
12  125 High Street, 19th Floor
    Boston, MA 02114
13  danni.shanel@troutman.com
      For Keenan's Kids Foundation, Inc.
14
15  JOHN J. O'CONNOR, ESQ.
    Peabody & Arnold, LLP
16  Federal Reserve Plaza
    600 Atlantic Avenue
17  Boston, MA 02210-2100
    joconnor@peabodyarnold.com
18      For Don C. Keenan and D.C. Keenan & Associates,
            P.C., d/b/a The Keenan Law Firm, P.C.
19
20  ALSO IN APPEARANCE:
21  DAVID HOEY
22
23
24
```

3

```
 1                    I N D E X
 2   WITNESS            DIRECT/REDIRECT    CROSS
 3   ERIN HIGGINS
 4      By Ms. Knipper        4          204
 5      By Mr. O'Connor                  140
 6      By Ms. Shannel                   197
 7      By Ms. Zerner                    202
 8
 9                    E X H I B I T S
10   EXHIBIT NO.      DESCRIPTION              PAGE NO.
11       1    Report of Erin Higgins, Esq.......   26
12       2    Rule 1.4..........................   39
13       3    Contingent Fee Agreement 2/2/10...   48
14       4    Contingent Fee Agreement 6/1/15...   48
15       5    ABA Formal Opinion 484 11/27/18...   52
16       6    H. LaVigne Financing Litigation...   55
17
18
19
20
21
22
23        Attorney Knipper retained the exhibits
24
```

149

1  would you take into account?  It sounds like
2  you're agreeing with me you would consider all
3  of the evidence and all of the pertinent
4  circumstances, correct me if I'm wrong.
5  A.   If it's relevant.
6  Q.   Right.  All of the evidence and all of the
7  circumstances, course of conduct, course of
8  dealing, industry, trade, and custom, usage,
9  those are all things in theory in a given case
10 that could be pertinent, couldn't they, in how
11 to evaluate reasonableness?
12      MS. ZERNER:  Objection.
13 A.   I would consider anything that I found to
14 be relevant.
15 Q.   Okay. Were you asked to opine in this
16 case as to whether either the defendants had
17 committed fraud?
18 A.   So I was asked to evaluate the conduct of
19 both attorneys in the way that I described and
20 nobody asked me to determine that there was
21 fraud.  But as I noted -- as my report says in
22 one instance I concluded there was a
23 misrepresentation.
24 Q.   Okay.  Beyond that one instance, any other

150

1  findings or opinions that you express in the
2  report as to fraud?
3  A.   I wouldn't know -- no, I did not see
4  sufficient information to reach that conclusion
5  other than in that one instance.
6  Q.   Same question as to alleged violations of
7  Chapter 93A, unfair and deceptive conduct, 93A,
8  any opinions on that?  Were you asked to render
9  any opinions on that issue?
10 A.   On whether the conduct described in my
11 report rose to the level of a 93A violation?
12 Q.   Right.
13 A.   I was not asked to express an opinion.
14 Q.   In fact, you never expressed that opinion
15 on that issue; correct?
16 A.   In my report, no.
17 Q.   Were you given sort of free rein to just
18 evaluate the matter and identify issues as you
19 saw them or did you have a more confined
20 mandate?
21 A.   The former.
22 Q.   To the extent we don't see a concern or
23 critique expressed in your report you don't
24 have anything more to say in that respect; is

151

1  that correct?
2  A.   That's correct.  I didn't have sufficient
3  information to make -- to render opinions other
4  than what's there.
5  Q.   You don't render an opinion as to whether
6  the breaches in the standard of care you talked
7  about in your report made any difference to the
8  results of the trial, the jury verdict, do you?
9  A.   No.
10 Q.   Do you have evidence that if Attorneys
11 Hoey and Keenan had conducted themselves in the
12 way in your report you say they should have
13 that that would have changed the result or any
14 of the ultimate disbursements in any way in the
15 case?
16 A.   Yes.
17 Q.   You do have evidence.  What is that
18 evidence?
19 A.   As I said when Attorney Knipper was asking
20 me questions if the attorneys had interpreted
21 the fee agreement in a way that I think a
22 reasonable client would have interpreted the
23 fee agreement more of the recovery would have
24 gone to Miss Wahlstrom.

153

Q. Do you have evidence that if there had been additional communication here of the sort you say was required that she would have said those terms are unacceptable to me, as opposed to doing what she did?

A. I think that more probably than not -- again, I wasn't asked to render an opinion on this but I am a lawyer, a trial lawyer, I think probably more than not had Miss Wahlstrom been told there are significant changes to this fee agreement that could work against you, you should consult with your own counsel, separate attorney on that, had she done that another attorney would have negotiated a different fee agreement, I think that's very much more likely than not.

Q. Correct me if I'm wrong but it sounds like you're assuming that she didn't understand the agreement when she read it. Is that an assumption you're making?

A. Well, I'll answer that question in two parts. I don't think that's an assumption on my part, she was told it was the same agreement, there was no -- there was no

163

1  Q.   Okay.  I'm not focusing on a contingent
2  fee agreement, I'm focusing on the agreement
3  between the lawyers.  To the extent that the
4  agreement changes the earlier agreement is
5  moot, not relevant any longer; correct?
6  A.   It's not my job as the expert to say
7  what's relevant, I'm offering opinions as to
8  whether they met the standard of care at the
9  time and my opinion is they did not.
10 Q.   What was the harm to Miss Wahlstrom to the
11 extent that there was some agreement between
12 the lawyers that she didn't learn of right
13 away?
14        MS. ZERNER:  Objection.  Outside the
15 scope.
16 A.   So is your question whether I have an
17 opinion as to whether --
18 Q.   Why don't we back up and start with that.
19 Do you have an opinion as to whether Miss
20 Wahlstrom suffered any harm because of what
21 you're referring to here in paragraphs 28 and
22 92 and 95?
23 A.   So my opinion in that instance is that
24 they breached the standard of care, I don't

164

1  have an opinion as to whether it caused harm to
2  Miss Wahlstrom.
3  Q.   Okay.  Would you agree that an attorney in
4  a situation like this representing a client in
5  a contingency case has some discretion to incur
6  and take on expenses without notifying the
7  client every step of the way?
8  A.   Yeah.
9  Q.   How would you define the scope of that
10  discretion?
11  A.   I would define it by looking at Rule 1.4.
12  Q.   So you would consult the rule.  Anything
13  else?
14  A.   Well, if you're asking -- I'm not sure
15  you're asking me whether -- are you asking me
16  whether as a lawyer representing a client how I
17  make that determination or how I make that
18  determination --
19  Q.   I'm curious how you would outline the
20  scope of the discretion there.
21  A.   So if you let me finish my -- I'm trying
22  to clarify the scope of your question.  Are you
23  asking me in my role here as an expert?
24  Q.   Wear whatever hat you want, you're a smart

181

1  decision to hire attorneys for various reasons
2  and not have those attorneys' fees included in
3  the percentage attorney fee and basically
4  deduct it from Miss Wahlstrom's share of the
5  recovery as I've already said I think that it
6  was the standard of care that was the
7  attorneys' interpretation of the agreement to
8  disclose that to Miss Wahlstrom so that she
9  could make an informed decision about whether
10 she wanted to pay for those attorneys out of
11 her share of the recovery
12 Q.   So we have expanded that.  Appeals costs
13 and any attorneys who consulted.  Is there any
14 other issue as to which you have an opinion
15 that touches on causation or damages?
16 A.   No.
17 Q.   Do you have an opinion that if there had
18 been communication here of the sort that you
19 say was necessary that the verdict would have
20 been even higher than $4 million?
21 A.   Do I have that opinion?  No.
22 Q.   Okay.  I think you testified that you have
23 not seen a lot of contingent fee agreements,
24 correct me if I'm wrong.  Are you familiar with

182

1   the fact that it's very common for contingent
2   fee agreements to have escalation provisions
3   that provide that the contingency with one
4   figure through a designated point, say the end
5   of trial, another figure through appeal,
6   another figure through re-trial, are you aware
7   of that?
8   A.   I have seen a lot of contingent fee
9   agreements in the course of my work for
10  attorneys.
11  Q.   Forgive me, I'm sorry.
12  A.   So I am familiar with -- I have seen many
13  contingency fee agreements that have different
14  percentages of recovery for, you know, a case
15  settling on a demand letter, pretrial, within a
16  month of trial, after trial.  I'm not as
17  familiar with this appellate contingency.  I
18  can't remember a contingency agreement I've
19  seen that has one.
20  Q.   Would you disagree with me if I said
21  they're very common and I've seen dozens of
22  them over the years?
23  A.   I can't disagree with what you've seen.
24  Q.   Okay.  If the plaintiff were to testify

209

Commonwealth of Massachusetts

I, June N. Poirier, Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 28th day of June, 2023, the deponent herein, who was duly sworn by me; that the ensuing examination upon oath of the said deponent was reported stenographically by me and transcribed into typewritten form under my direction and control; and that the within transcript is a true record of the questions asked and the answers given at said deposition, to the best of my knowledge, skill and ability.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or financially interested in the outcome of the action.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my seal of office this 30th day of June, 2023.

*June N Poirier*

June N. Poirier, Notary Public
Commonwealth of Massachusetts
My Commission Expires:
May 25, 2025

Dunn Reporting Services, Inc.
617-422-0005