UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIRA WAHLSTROM,

     *Plaintiff*

v.

DAVID J. HOEY, LAW OFFICES OF
DAVID J. HOEY, P.C., DON C. KEENAN,
AND D.C. KEENAN & ASSOCIATES, P.C.
D/B/A THE KEENAN LAW FIRM, P.C.

     *Defendant*

1:22-cv-10792-RGS

**MEMORANDUM IN SUPPORT OF DEFENDANTS DAVID J. HOEY AND THE LAW
OFFICES OF DAVID J. HOEY, P.C.'S MOTION FOR SUMMARY JUDGMENT**

     For twelve years, David J. Hoey zealously represented Wahlstrom. He was not only her

attorney but her friend and confidant. Whether it was assistance with obtaining a loan, eviction

proceedings, her job, or to talk, Hoey was there. He missed vacations, holidays, and countless

times with his family to be available and to help Wahlstrom.  Like most Plaintiff attorneys in tort

cases, Hoey did this all knowing he may not get paid for his efforts while simultaneously putting

his assets on the line, risking hundreds of thousands of dollars.  Hoey's efforts, combined with

Don Keenan's and all of the others involved, including consultants, resulted in the largest premises

liability verdict for such a case in Massachusetts at that time.

     Yet, despite all of this, Wahlstrom, close to 7 years after the underlying verdict and 2 years

after approving all charges and expenses, decided to make scurrilous accusations, including fraud

and c. 93A violations.  Tellingly, she does not assert a breach of contract count, nor a negligence

count (because there was none). Instead, Wahlstrom alleges that the defendants (1) engaged in

unfair and deceptive acts by overcharging her and deceiving her into paying improper, unearned,

1

and excessive fees and unreasonable expenses; (2) made false representations to induce her to enter into a fee agreement and agree to more costs; and (3) presented an inaccurate itemization of fees and expenses owed. Complaint, ¶¶ 76, 77, 89, 99.  She even claims that Hoey is responsible for legal fees she incurred in defending against actions of attorneys Krzysztof Sobczak and Austin O'Toole – attorneys who took no risks and seek unearned fees.

The Hoey Defendants vociferously deny the letter and spirit of Wahlstrom's accusations. Wahlstrom voluntarily made a deal, took the benefit from the deal and now seeks to better her bargain by rewriting the contract she unreservedly agreed to and ratified years ago.  The undisputed facts show that, at most, this is an action regarding whether Plaintiff *now* believes that certain expenses were not warranted, but that is not her claim – she alleges fraud and c. 93A violations. Wahlstrom reviewed, signed, and initialed the 2010 Contingent Fee Agreement and the 2015 Contingent Fee Agreement.  She unequivocally testified that she reviewed and approved of all of the expenses, ratifying the agreement.  She cannot now claim that she should get the money back. Her claims fail.

## FACTUAL BACKGROUND[1]

### I.   Underlying Premises Liability Lawsuit

On May 1, 2009, Ms. Wahlstrom ("Plaintiff" or "Wahlstrom") was attacked in a parking garage attached to the Radisson hotel in Boston, which was owned by JPA IV Management Company, Inc. and managed/operated by JPA I Management Company, Inc. ("JPA defendants"). (SOF ¶1). Due to the complexity of the case, Wahlstrom sought legal representation and was introduced to David J. Hoey through her friend Austin O'Toole, Esq. (SOF ¶2). On February 2,

---

[1] This abbreviated summary of facts is provided for the Court's convenience. A full recitation of facts is provided in the accompanying Statement of Undisputed Facts ("SOF") submitted herewith. These facts are submitted as undisputed for the purposes of this motion only. The Hoey Defendants deny liability.

2010, Wahlstrom entered into a contingency fee agreement ("2010 CFA") with Hoey Law. (SOF ¶3). The 2010 CFA stated that the fee would only be paid upon recovery and that Wahlstrom would not be liable for compensation other than from the recovered amount. (SOF ¶4). It also outlined her responsibility for expenses and disbursements related to the case. (SOF ¶5). Hoey Law agreed to pay O'Toole "33% of my fee from the sum recovered." (SOF ¶9).

Wahlstrom acknowledged that she read the 2010 CFA before she signed it. (SOF ¶6). When she reviewed and executed the 2010 CFA, Wahlstrom understood that (1) if there were a recovery, she would be responsible for reasonable expenses concerning her case and (2) Hoey Law could borrow money to finance the case and that she would be responsible for reimbursement of any interest charge or related expenses in relation to the financing of her case. (SOF ¶¶7-8).

On March 12, 2010, Hoey filed suit on behalf of Plaintiff against the JPA defendants and others in Suffolk Superior Court, Wahlstrom v. JPA IV Management Company, Inc. et al., Civil Action No. 1084CV01022 ("Underlying Lawsuit"). (SOF ¶ 10). In June 2012, Hoey sought the informal assistance of Don Keenan and the Keenan Law Firm (collectively the "Keenan Defendants") to advise in preparing the case. After receiving and rejecting a nominal offer of $450,000, Hoey suggested formally bringing Don Keenan on board as counsel due to the direction the underlying case was heading and the possibility of an unfavorable verdict. (SOF ¶ 13).

Wahlstrom and Keenan met in February 2015, and she agreed to retain Keenan. (SOF ¶¶15-16). In March 2015, Wahlstrom moved to admit Keenan PHV as her counsel, which was allowed on March 27. (SOF ¶17). As trial approached, on June 11, 2015, Hoey emailed Wahlstrom requesting that she come to the office to sign a new fee agreement with Keenan. (SOF ¶18). Within this exchange, Wahlstrom stated she was dyslexic. She testified that her alleged dyslexia did not

preclude her from reviewing and understanding any documents presented at her deposition, including the 2010 CFA and 2015 Contingent Fee Agreement ("2015 CFA"). (SOF ¶20).

On June 19, 2015, Wahlstrom executed the 2015 CFA with Keenan. (SOF ¶22). The Keenan Law Firm drafted the 2015 CFA with assistance from Krzysztof Sobczak, who became affiliated with Hoey Law in 2014. (SOF ¶¶12, 21). The 2015 CFA explained the compensation structure, including the possibility of an increased fee in case of an appeal. (SOF ¶28). It also outlined Wahlstrom's liability for expenses and disbursements, including the reimbursement of interest charges and related expenses related to financing the case and limited referring and associated counsel to only Hoey Law. (SOF ¶¶28-30). Wahlstrom testified that she read and understood the agreement before signing it and initialing each paragraph. (SOF ¶¶25-27, 31-32). Wahlstrom could not afford to advance funds to prosecute her case and was aware that Hoey Law was advancing money, including their own money and through financing. (SOF ¶33). Wahlstrom understood that if she lost her case, Hoey Law would cover the expenses and costs. (SOF ¶32). The Hoey Defendants were not a party to the 2015 CFA. (SOF ¶22; Ex. J). The 2015 CFA was between the Keenan Law Firm and Wahlstrom.

The trial began on July 24, 2015 and ended with a jury verdict on August 11. (SOF ¶35). Before trial, the parties filed numerous motions in limine, including defendant LAZ Parking Limited, LLC's motion in limine to preclude the use of the computer animation as a demonstrative aid at trial. (SOF ¶38). Extraordinary efforts were required to convince a jury to find for Wahlstrom. Severe financial risks were involved in funding the litigation necessary to achieve such a victory—none of which were taken by Wahlstrom (or her new counsel). (SOF ¶33).

During trial, the JPA defendants offered $2.25 million to settle. (SOF ¶39). Hoey and Keenan agreed that Hoey would get 100% of the attorney fee from this offer (~$750,000), and

4

Keenan would get the remaining fee should the case proceed. (SOF ¶39). The jury awarded Wahlstrom $4,000,000, resulting in a total judgment of $6,650,829.58. (SOF ¶40).

## II.   Motion for New Trial and Subsequent Appeal

On November 19, 2015, the JPA defendants filed a Motion for New Trial based on alleged Wahlstrom's attorneys' misconduct, which Judge Wilson granted on May 19, 2016. (SOF ¶¶41-42, 45). Wahlstrom filed a Petition for Interlocutory Relief, which was granted by a Single Justice (Trainor, J.) on July 18, 2016. (SOF ¶47). She filed a motion to disqualify Judge Wilson, citing certain disparaging remarks about her trial lawyers and other extrajudicial comments by Judge Wilson. (SOF ¶48). She also filed a judicial complaint against Judge Wilson. (SOF ¶66).

On February 28, 2017, Wahlstrom entered into a fee agreement with Patricia DeJuneas for the interlocutory appeal. (SOF ¶49). DeJuneas had previously appeared on Wahlstrom's behalf at the Motion for New Trial hearing. (SOF ¶44) She also requested that Sobczak, who had ended his affiliation with Hoey Law but remained on the case with Wahlstrom's consent, withdraw as counsel. (SOF ¶50). Retired Judge Robert J. Cordy was retained to consult with the appeal. (SOF ¶51). The Hoey Defendants fronted the payment for Cordy's services, even though his engagement agreement was with Sibbison & DeJuneas. (SOF ¶51). Throughout the appellate process, similar to Cordy, Hoey reviewed and commented on the briefs and was in frequent contact with DeJuneas, including 1000s of emails between them and numerous telephone calls. (SOF ¶54).

Wahlstrom filed her appeal brief on March 9, 2018. (SOF ¶55). Hoey's and Keenan's names were intentionally left off as a strategic decision by DeJuneas. (SOF ¶55) The Appeals Court issued the *Wahlstrom I* decision on June 10, 2019, stating that Judge Wilson applied the wrong legal standard in assessing the new trial motion. (SOF ¶58) The Appeals Court stayed the appeal to allow Wahlstrom's motion to disqualify Judge Wilson to be litigated. (SOF ¶58)

On June 13, 2019, disgruntled and looking for more money and after trying to get money from Hoey, Sobczak filed a Notice of Attorney's Lien for his alleged fees and expenses, even though he had no fee agreement with Wahlstrom. (SOF ¶59). Goganian was brought in to defend against Sobczak's lien, and the Court dismissed the lien in February 2020. (SOF ¶59). The Court stated "Wahstrom's] agreement was with attorneys other than Mr. Sobczak, and she had no obligation to pay Sobczak on any theory." (SOF ¶60). Wahlstrom understood Goganian was involved and that the lien was against her. (SOF ¶55).

On August 1, 2019, Judge Wilson recused himself. (SOF ¶48) On November 6, 2019, the Appeals Court issued the *Wahlstrom II* decision, concluding "that the cumulative effect of the attorneys' misconduct does not meet the 'relatively high' burden necessary to warrant a new trial." (SOF ¶65) The verdict was reinstated. *Id.*

## III. Disbursement of Fees

In November 2019, the defendants' insurers wired a total of $9,987,683.80 to Keenan's IOLA account, satisfying the judgment. (SOF ¶68). Wahlstrom received $4.85 million from Keenan's account on or about December 17, 2019. (SOF ¶70). Wahlstrom and Hoey met in mid-December to review the expenses, and Hoey sent an Excel spreadsheet outlining the various expenses with descriptions on March 29, 2020. (SOF ¶¶69-76). Wahlstrom had no questions or concerns about the expenses and approved them. *Id*. She acknowledged that she had an opportunity to ask or dispute the charges – she did not. (SOF ¶76)[2] The Hoey Defendants received $750,000,

---

[2] Prior to filing her Complaint, Plaintiff terminated Hoey in February 2022 after twelve (12) years of representation. During those twelve (12) years, Plaintiff acknowledged that she and Hoey met and talked about her case all the time, including her appeal. (SOF ¶87). Despite her constant contact with Hoey, including when she apparently started to question the payout amounts made in the Underlying Lawsuit in fall of 2021, Plaintiff, at no point in time, raised any concerns, questions, or issues with Hoey concerning her expenses. (SOF ¶88). Instead, Plaintiff consulted with Goganian and DeJuneas, both of whom were paid for their work and took the money. (SOF ¶89). Yet, she never stopped praising the Defendants for their work in her case. (SOF ¶¶90-91).

with $250,000 going to O'Toole per the Referral Agreement. (SOF ¶77) They did not receive the 7% appellate charge. *Id.* The Hoey Defendants received their fee on May 15, 2020. *Id.*

## IV.    O'Toole Lawsuit

On May 20, 2020, the Law Offices of David J. Hoey, P.C. sent the Law Office of Austin O'Toole, P.C. a $250,000.00 check pursuant to the 2010 agreement. (SOF ¶78) Short of a year later (10 months), O'Toole and his firm later filed a lawsuit against Wahlstrom and the Hoey Defendants claiming they were owed more money. (SOF ¶79) In early 2022, they added Keenan and his firm. (SOF ¶81). O'Toole alleged in part that Ms. Wahlstrom breached her agreement with him and personally owed him more money. (SOF ¶79). Ultimately, the court granted Wahlstrom's motion to dismiss. (SOF ¶83).

## ARGUMENT

## I.    **Wahlstrom has not and cannot establish Fraud, and has not plead the elements with particularity in any event.**

To recover on her fraud claim,[3] Wahlstrom must show that "'[the Hoey Defendants] made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relief upon the representation as true and acted upon it to [her] damage." Squeri v. Mount Ida Coll., No. 18-12438-RGS, 2019 U.S. Dist. LEXIS 88273, at *6 (D. Mass. May 24, 2019) (citations omitted). Plaintiff's reliance on the representation must be reasonable. Id. (emphasis added); *see also* Stolzoff v. Waste Sys. Int'l, 792

---

[3] Plaintiff's expert, Erin Higgins, admitted that she did not give an opinion in support of the fraud or c. 93A claim. (SOF ¶92). The fraud claim is premised upon the following: (1) the June 2015 email and statement by Attorney Hoey that the 2015 Contingency Fee Agreement was "the same fee agreement as before…[and] doesn't change your percentage or cost you more money[,]", (2) the alleged failure to tell Plaintiff that she would be charged more in light of the associated counsel clause, (3) "falsely" claiming that she owed money for expenses, other attorneys and the appeal, and (4) failing to "disclose" that the agreement would be used to reduce Austin O'Toole's fee – i.e., that the attorneys' fees would be paid to Keenan rather than Hoey and that Hoey would receive a portion of the compensation paid to Keenan without alleging disclosing that the change in the fee agreement would be used to reduce O'Toole's recovery.

N.E.2d 1031, 1041 (Mass. App. Ct. 2003) (citing Saxon Theatre Corp. of Boston v. Sage, 200 N.E. 2d 241, 244-45 (Mass. 1964) (stating that although reliance on opinions may be actionable under certain circumstances, plaintiff must demonstrate her reliance on said opinions was reasonable). To rely on prior representations that are contradicted by the terms of a written contract is unreasonable. See id. at 541. "'The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if [s]he knows that it is false or its falsity is obvious to h[er]' [and] 'if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541." Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 781 N.E.2d 787, 795 (Mass. 2003) (summary judgment allowed because it was unreasonable to rely on oral statements that conflicted with a written price quotation.).

While typically reliance is a question for a jury, in some circumstances, including where a plaintiff has unreasonably relied on statements when there were contrary written statements, courts may make a finding as a matter of law. *See, e.g.*, Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1031 (Mass. 2004) (citation omitted) (summary judgment appropriate where "a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law []").

Further, fraud must be pled with particularity. Fed. R. Civ. P. 9 requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. Civ. R. P. 9(b). Put another way, the party alleging fraud is "'expected to specify the who, what, where, and when of the allegedly false or fraudulent representation.'" Hoffman v. Thras, 538 F. Supp. 3d 196, 203 (D. Mass. 2021) (quoting Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004)).

A contingency fee agreement is an enforceable contract. Barbacki v. Williams (No. 1), 207 N.E.3d 534 (Mass. App. Ct. 2023).

a.   Wahlstrom's reliance on the June 11, 2015 e-mail cannot be the basis for her fraud claim and was unreasonable in any event:

Wahlstrom relies on the June 11, 2015 email as a basis for her fraud claim, and in particular the statement wherein Hoey writes: "It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13[th]. It doesn't change your percentage or cost you more money. Ill (sic) show it to you next time I see you." Ex. I. [4]  Because the 2015 CFA differed from the 2010 CFA, Wahlstrom alleges that this email proves that Hoey Defendants committed fraud. Complaint, ¶¶ 90-93, 96-97.

However, fatal to her claims, Wahlstrom executed the 2015 CFA eight days *later* (on June 19, 2015), and the CFA clearly and unequivocally reflects an additional charge / percentage for any appeal work. Wahlstrom initialed every paragraph.  She testified that she read Paragraph 4 of the 2015 CFA, outlining reasonable compensation before she signed and initialed it. Wahlstrom was well aware of the possible increase related to an appeal.[5]  Likewise, she initialed the associated counsel provision.  As a matter of law, she cannot now claim she relied upon the e-mail.

The 2015 CFA supersedes any earlier representation or statement – it was a fully integrated agreement[6] and contains the following integration clause:

(13) This Contingent Fee Agreement (6 pages, 14 paragraphs, and attachments) encompasses the entire agreement of the parties (the

---

[4] At deposition, Attorney Hoey explained that he was referring to the underlining fee, which in the 2010 CFA is 33.3% of the recovery and remains the same in the 2015 CFA. As the case had not yet tried, the parties were not considering appeal. (SOF ¶19; Dep. of Hoey, 55:15-56:1).

[5] Plaintiff now claims that the defendants should return the money because their names were not on the brief.  The argument is without merit. Defendants spent countless hours working on the appeal, exchanging over 1000 emails and numerous calls discussing strategy. (SOF ¶54). The fact that Hoey's and Keenan's names were left off Plaintiff's brief was nothing more than a strategic decision by DeJuneas. (SOF ¶55).  Plaintiff's own expert testified that she had no opinion on whether the act of filing of the brief alone was significant. (SOF ¶93; Dep. of Higgins, 197).  Plaintiff's argument is also contrary to a clear reading of the agreement, which reflects that the only condition on the additional five percent (5%) was if the matter was retried/concluded/settled following an appellate decision.

[6] "A fully integrated agreement is a statement which the parties have adopted as a complete and exclusive express of their agreement." Scalli v. Citizens Fin. Grp., Inc., No. 03-12413-DPW, 2006 U.S. Dist. LEXIS 7717, at *34 (D. Mass. Feb. 28, 2006) (internal quotations and citations omitted).

> Client and the Attorney), and supersedes all previous understandings and agreements between the parties, whether oral or written. The parties hereby acknowledge and represent that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this agreement. [].

Exhibit J, 2015 Contingent Fee Agreement, ¶ 13; see Scalli v. Citizens Fin. Grp., Inc., No. 03-12413-DPW, 2006 U.S. Dist. LEXIS 7717, at *34, 43 (D. Mass. Feb. 28, 2006) (summary judgment granted where plaintiffs unreasonably relied on promises made during the negotiation phase prior to executing their contracts which did not contain those additional terms).

Wahlstrom had previously read and executed the 2010 CFA and understood the terms. (SOF ¶¶3-8). On June 19, 2015, she was presented with a copy of the 2015 CFA, and had an opportunity to review and ask questions before signing. (SOF ¶22). There is no dispute that Wahlstrom read the 2015 CFA before signing and initialing each paragraph, including Paragraphs 4 and 13. (SOF ¶¶25-28) Wahlstrom cannot claim that she relied on an email that Hoey sent days before she executed the 2015 CFA to stand for the proposition that the attorney's fee would not change when she read the 2015 CFA before she signed it and initialed each paragraph. (SOF ¶25; Ex. J) Wahlstrom testified that she read Paragraph 4 of the 2015 CFA, which outlines reasonable compensation, including the 7% increase before she signed and initialed it. (SOF ¶¶27-28). Thus, she was aware that should there be an appeal, not something contemplated at the time (as the case had not yet gone to trial), she would be charged an increased fee.

For the same reasons, any fraud claim based upon the alleged failure to disclose that the attorneys' fees would be paid to Keenan (such as to allegedly reduce Austin O'Toole's fees), or the associated counsel provision, fails as a matter of law. On its face, the 2015 CFA calls for the

fee to be paid to Keenan, with a portion to the Hoey defendants.[7]  Likewise, the 2015 CFA

specifically sets out that the only "Referring/Associated Counsel" is Hoey Law, as follows:

> Referring/Associated Counsel:
> The Client understands that a portion of the compensation payment
> to the Attorney pursuant to the paragraph above shall be paid to: the
> Law Offices of David J. Hoey, P.C. and consents to this division of
> fees. Client understands that the Client will not be charged any
> additional legal fees.

(SOF ¶29). The 2015 CFA does not refer to any other counsel as referring and/or associated

counsel. Thus, work by other lawyers outside of Hoey Law and the Keenan Law Firm is plainly

not within the above provision of the 2015 CFA.[8] This is further evidenced by the fact that

DeJuneas' firm had its own agreement with Wahlstrom. (SOF ¶49)

Wahlstrom's claims that Hoey's representation induced her to sign the 2015 CFA cannot

penetrate the integrated documents barrier because a clear reading of the agreement shows that his

statement, if understood as Wahlstrom so alleges, was inaccurate. Any reliance on the email would

be unreasonable.[9]

---

[7] The 2015 CFA was required Keenan could not ethically represent a client that he does not have a signed agreement with and unwilling to try the case without one. (SOF ¶21).  As outlined in more detail below, although the Defendants categorically deny the claimed improper purpose in entering into the 2015 CFA, as alleged by Mr. Sobczak, plaintiff is not looking to vitiate the 2015 CFA, nor has she alleged a breach of contract count.  Instead, as to this allegation, she is simply looking for her alleged legal fees back in defending the O'Toole litigation.  The problem is that plaintiff cannot establish causation nor a theory of liability which would entitle her to recover the fees – O'Toole claimed breach of contract directly against her and the Court ultimately dismissed his claims as without basis.  Further, it is worth noting that Mr. Sobczak's affidavit comes 7 years after the alleged events at issue, 5 years after he was terminated by plaintiff and after he lost his cases in Middlesex and Suffolk Superior Court against Hoey.  Sobczak was sanctioned for filing a frivolous appeal and was also ordered to pay Hoey.

[8] Plaintiff contends the work performed by the various attorneys outlined in the Complaint was not on her behalf but rather on the defendants' behalf.  Where Plaintiff was regarded the charges and the spreadsheet so reflects, whether one could say that they also benefited the defendants does not amount to fraud or unfair or deceptive conduct.  For example Bolan's expenses outlined on the March 29, 2020 Excel spreadsheet reflect for example that he was consulted concerning Judge Wilson, the Appeal, and other areas of concern. (SOF ¶72).  Irrespective, and without admitting liability, the Hoey Defendants sent Plaintiff a check for Bolan's expenses ($8,432.99), which she returned.

[9] Any claim that Plaintiff's alleged dyslexia affected her comprehension of the 2015 CFA fails.  "A party's signature represents assent to all terms of a contract, regardless of their subjective understanding or knowledge of the contract's terms, unless those terms are unreasonable." T.H. Glennon Co. v. Monday, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *17 (D. Mass. Mar. 17, 2020) (An NDA was binding when signed regardless if the employee elected

b. Wahlstrom has not otherwise pled her fraud claim with particularity:

Wahlstrom's claims that Hoey did not explain the Referring/Associated Counsel provision and knew Wahlstrom would be charged for services of other attorneys, and that he somehow "falsely" charged her for the expenses, are without basis. Plaintiff has not pled any of the alleged misrepresentations with particularity. In fact, she has not identified any fraudulent statement made to induce her – an alleged disagreement over interpreting a contract is not tantamount to fraud.

Wahlstrom's remaining fraud claims are apparently premised on the following: (1) the alleged failure to tell Wahlstrom that she would be charged more in light of the associated counsel clause, (2) "falsely" claiming that she owed money for expenses, other attorneys and the appeal. These remaining claims are conclusory claims. Wahlstrom can present no evidence to show that Hoey misrepresented the associated counsel clause or somehow knew that there would be charges for services of other attorneys at the time the 2015 CFA was signed. At the time the 2015 CFA had been signed, no other attorneys outside of Hoey's and Keenan's firm had been retained. (SOF ¶24). The sole focus was trial. An appeal, where most of the outside attorneys were retained, had not even been considered. Where is the misrepresentation?

Likewise, Wahlstrom's allegation that somehow the Hoey Defendants "falsely" represented to her that she owed money for expenses, other attorneys, and the appeal is an insufficient vague, conclusory allegation. Simply asking a client to pay expenses owed pursuant to a fee agreement is not fraud. Setting aside that the expenses and disbursements accrued over ten

---

not to read it due to his learning ability (i.e., dyslexia), where the employee did not request anyone read it to him, show it to a lawyer, ask for more time to understand it or request an explanation) (citing Restatement (Second) of Contracts § 211). Here, it is undisputed that Plaintiff agreed to all terms within the 2015 CFA. She read the 2015 CFA before she signed, initialed each paragraph and understood she would be responsible for reasonable expenses and disbursements. (SOF ¶¶25-27). The terms within the agreement were not unreasonable. Plaintiff admitted at her deposition that her alleged dyslexia did not preclude her from reviewing and understanding any documents presented to her, as well as loan documents related to her home or truck, or agreements with her financial advisor. (SOF ¶20). Further, Plaintiff has not disclosed a medical expert pursuant to Fed. R. Civ. P. 26(a)(2) to opine on her condition and its effect, if any, on her ability to comprehend documents. Plaintiff is bound by the document she signed.

years were reasonable, justified, and accurate, Attorney Hoey reviewed the expenses and disbursements with Wahlstrom on more than one occasion. By Wahlstrom's own admission, she understood and accepted the charges when she signed off on them. (SOF ¶¶69-76) Hoey first met with Wahlstrom in mid-December to review the expenses. (SOF ¶69). Then, on March 29, 2020, Hoey emailed Wahlstrom an Excel spreadsheet outlining the various expenses. (SOF ¶71). Wahlstrom testified that she read the spreadsheet and had no questions or concerns. (SOF ¶73). Thereafter, Hoey met with Wahlstrom again to review the expenses. (SOF ¶¶74-76). Wahlstrom, at no point in time, raised any concerns, questions, or issues with Hoey, yet somehow they were misrepresented to her. (SOF ¶¶73-76). Pursuant to the 2015 CFA, Wahlstrom understood that she would be responsible for reasonable expenses and disbursements following a successful disposition, including reimbursement of interest charges and related expenses. (SOF ¶31). Her own expert does not opine that the expenses were not reasonable. Attorney Hoey did not make any false representations concerning the fees or expenses, as they were all laid out to Wahlstrom and explained on multiple occasions. There is no evidence that the Hoey Defendants tried to conceal any charges. In fact, the spreadsheet specifically made note of what she now claims is improper.[10] Wahlstrom was closely involved in prosecuting her case, knew of the work involved, and approved after being fully advised of the expenses and distribution of the funds. (SOF ¶¶69-

---

[10]   The spreadsheet given and reviewed by Plaintiff specifically stated, in part, as follows  (SOF ¶72):

| | | |
|---|---|---|
| Amy Goganian, Esq. | $41,231.72 | This is who we hired to fight the Sobczak lien. |
| Richard Goren, Esq. | $20,824.00 | This is who we hired to fight Intellectual Property, Patent, Trademark Infringment [sic] and confidentiality. |
| James Bolan, Esq. | $8,432.39 | This was Ethics counsel who consulted regarding Wilson, Sobczak, the Appeal and other areas of concern. |
| Lewis Brisois Bisgaard Smitth | $561.24 | Related to Sobczak and complaint to the Board |
| John Vail, Esq. | $2,655.00 | Constitutional Law attorney |
| Catherine Giordano, Esq. | $1,316.00 | Research and writing attorney |

76, 87) Again, where is the misrepresentation? Summary judgment must enter in favor of defendants.

## II. **The Hoey Defendants Did Not Violate Chapter 93A**

Chapter 93A prohibits the use of unfair or deceptive practices in trade or commerce. Mass. Gen. Laws ch. 93A § 2(a). A plaintiff must prove that the defendant engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce[,]" to obtain relief under Chapter 93A. Id. at § 2. Additionally, "causation is a required element of a successful [Chapter] 93A claim." Apsinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 491 (Mass. 2004). "To establish causation, a plaintiff must 'prove that the defendant's unfair or deceptive act caused an adverse consequence or loss.'" Walsh v. TelTech Sys., 821 F.3d 155, 160 (1st Cir. 2016) (quoting Rhodes v. A.I.G. Domestic Claims, Inc., 961 N.E.2d 1067, 1076 (Mass. 2012)). Failure to establish factual and proximate cause is fatal to a c. 93A claim. Walsh, 821 F.3d at 160 (emphasis added) (citations omitted). Thus, a plaintiff must "show that they were injured by the conduct at issue, and that the conduct caused some loss beyond the mere fact that a violation occurred." Gottlieb v. Amica Mut. Ins. Co., 57 F.4th 1, 10 (1st Cir. 2022) (citation omitted); Hershenow v. Enterprise Rent-A-Car Co. of Bos., 840 N.E.2d 526, 528 (Mass. 2006). Neither a simple or even intentional breach of contract, nor negligence, is sufficient to give rise to a Chapter 93A violation. Mass. Emp'rs Insur. Exchange v. Propac-Mass. Inc., 420 Mass. 39, 43 (1995) (citing Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01 (1979)); Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992).

Plaintiff's Chapter 93A count is premised upon the same allegations that Plaintiff has made vis-à-vis the fraud count. *See* Complaint at ¶ 76. As such, where Plaintiff has no expectation of meeting her burden with respect to the fraud claim, the Chapter 93A claim fails as well. See Fernandes v. Rodrigue, 38 Mass.App.Ct. 926, 928 (1995) (holding that the 93A claim was

"absorbed in and vanish[ed] with the misrepresentation claim," further stating "Chapter 93A does not make actionable the failure to disclose a fact unknown to the person who the plaintiff thinks ought to have disclosed it."); Macoviak v. Chase Home Mortg. Corp., 40 Mass.App.Ct. 755, 760 (1996) (finding that plaintiff's 93A claim was without merit and was solely based upon his underlying claim for common law fraud, such that "as a matter of, the plaintiff [had] no reasonable expectation of proving a violation of c. 93A.").

Further, the alleged conduct at issue does not amount to a c. 93A violation in any event – Ms. Wahlstrom reviewed and approved the 2015 CFA and she reviewed and approved the expenses in 2019 and again in 2020. She was given the opportunity to ask any questions and to dispute any of the charges. She did not do so. In short, she cannot establish causation – any claim to the contrary is speculative at best. See, e.g. Walsh, 821 F.3d at 160 (quoting Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 486-87 (Mass. 2004) (a deceptive act or practice is one that "'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'"). For example, the last offer prior to trial was only $450,000. (SOF ¶¶13-14). Wahlstrom moved for Keenan to serve as her counsel and had taken steps consistent with her eventual execution of the 2015 CFA long before the alleged offending e-mail. (SOF ¶¶15-17).[11]

Wahlstrom cannot prove that the Hoey Defendants engaged in any unfair or deceptive acts or practices or she suffered an adverse consequence or loss. She cannot prove that the fees and expenses were deceptive. The Hoey Defendants are entitled to summary judgment on Count I.

**III.   Wahlstrom reviewed, approved and voluntarily paid for all expenses and disbursements – her conduct ratified the agreement:**

---

[11] Any argument by plaintiff that alleged ethical violations warrant a c. 93A finding miss the mark. Although a violation of the Rules of Professional Conduct can constitute an unfair or deceptive act or practice, McLane, Graf, Raulerson & Middleton, P.C. v. Grady, 32 Mass. L. Rep. 73 (Mass.Super.Ct. 2014), plaintiff here cannot establish causation vis-à-vis same.

Wahlstrom reviewed all expenses and approved them. Her conduct constitutes a ratification of her agreement to pay the fees and expenses per the 2015 CFA and thus, a waiver of her right to avoid those fees and expenses. Ratification may be found under a variety of circumstances: "(1) intentionally accepting benefits under the contract, (2) remaining silent or acquiescing in the contract for a period of time after having the opportunity to avoid it, or (3) recognizing the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it." Dorn v. Astra USA, 975 F. Supp. 388, 393 (D. Mass. 1997) (citation omitted). A plaintiff waives their opportunity to challenge fees charged when they paid those fees without protest or challenge, unless payment has been exacted under duress. Mantia v. Bactes Imaging Solutions, Inc., 29 Mass. L. Rep. 21 (Mass.Super.Ct 2011) (summary judgment motion was allowed as to breach of contract claims, where plaintiffs' challenges to a fee were waived when they paid the fees) (citing Selectmen of Hull v. Cty. Comm'rs of Cty. of Plymouth, 422 N.E.2d 787 (Mass. App. Ct. 1981).

Here, Wahlstrom agreed to pay the fees and expenses, through acceptance of the benefits under the 2015 CFA, by agreeing and approving all expenses and fees, and then by remaining silent and waiting approximately twenty-six (26) months before contesting the fees and expenses. Per the 2015 CFA, Wahlstrom was not liable to pay attorney's fees or reimbursement of costs unless there was a favorable outcome. Wahlstrom understood that she could not afford to fund the litigation and relied on the Hoey Defendants and the Keenan Defendants to do so. Wahlstrom readily accepted the benefit of their risk when she executed the agreement, and of the agreement. She is not asserting breach of contract. She is not looking to void the 2015 agreement.

Instead, after more than two years, Wahlstrom decides to claim fraud, leveling scurrilous allegations against the Defendants, all in order to contest the fees and expenses she paid. She did so despite going over them with Hoey on multiple occasions and approving them, and despite

accepting the benefits of the agreement. Her attempts should not be condoned. See Dorn, 975 F. Supp. at 393 (finding Plaintiffs ratified the agreements and waived their duress defenses where they accepted the benefits of their bargains and waited approximately eleven to thirty-four months to disavow the agreements because of alleged duress). Wahlstrom was obligated to seasonably disavow her obligations under the agreement. Rather, she remained silent and waited to file this lawsuit, therefore ratifying the agreement. Hills v. Chambers, CA 96-0072B, 2000 Mass. Super. LEXIS 634, at *31 (Aug. 15, 2000) (citing In re Bos. Shipyard Corp., 886 F.2d at 455).[12]

**IV.    The Hoey Defendants cannot be liable to Wahlstrom as a matter of law for the Sobczak lien dispute or the O'Toole lawsuit against Wahlstrom:**

As a matter of law, a lien pursuant to M.G.L. c. 221, §50 is one that is recoverable as against the client, M.G.L. c. 221, §50; Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1341 (1993) ("Attorneys' liens are devices…which help attorneys deal with the oft-encountered reluctance of certain clients to pay for legal fees at the conclusion of a matter."), regardless of Sobczak's stated intentions years after filing the lien that he was not seeking compensation from Wahlstrom. As Wahlstrom was aware, Sobczak's frivolous lien was against her.[13] (SOF ¶59). The lien was dismissed by the Court on February 5, 2020. (SOF ¶60).[14] The Hoey Defendants do not

---

[12] Her voluntary agreement to pay dispenses with the breach of fiduciary duty count. See, e.g., Grishman v. Clark, No. 1:22-cv-10171-RGS, 2023 U.S. Dist. LEXIS 94372, at *20 (D. Mass. May 31, 2023) (Plaintiff-in-counterclaim alleged that her literary agent breached a fiduciary duty by (1) failing to disclose his conflict of interest at the time she signed the Publishing Agreement and (2) negotiating unfavorable contract terms. However, because she knew of the alleged breaches, acquiesced to the terms of the PA, and accepted its fruits, summary judgment was allowed for the defendants-in-counterclaim.) (quoting Restat 3d of Agency, § 4.02, cmt. c.).

[13] Wahlstrom approved of the Goganian fees and ratified them – her reliance on the Goganian agreement attached to her complaint misses the mark. Goganian entered an appearance on behalf of Wahlstrom, and an appearance on behalf of Hoey Law for the limited purpose noted in the motion papers. Wahlstrom then sought by motion her fees, which motion was unfortunately denied. Wahlstrom then appealed, later withdrawing her appeal. Now she wants Hoey to pay for this.

[14] After the court dismissed Sobczak's lien, Hoey informed Plaintiff how much he was costing her ($35,000) and presented her with four options to take action against Sobczak, including (1) do nothing, (2) 93A demand letter, (3) move for costs by motion, or (4) do both motion and 93A. (SOF ¶61). After some choice words and knowing what fighting Sobczak was costing her, Plaintiff chose option 4, which would have required additional legal work paid out

control Sobczak and as the Court stated "[Wahstrom's] agreement was with attorneys other than Mr. Sobczak, and she had no obligation to pay Sobczak on any theory." (SOF ¶60; Ex. EE).

Likewise, the Hoey Defendants do not control O'Toole. (SOF ¶84) *He* sued Wahlstrom, alleging in his complaints that Ms. Wahlstrom breached her contract with him (the 2010 CFA) by not paying him what he was allegedly due. He further sought a declaratory judgment that Ms. Wahlstrom owed him further fees for the children's loss of consortium lawsuit and Ms. Wahlstrom's Chapter 176D lawsuit. (SOF ¶¶79, 81). Ms. Wahlstrom retained her own counsel to defend the claims. (SOF ¶80). Like Mr. Sobczak, Mr. O'Toole was given multiple opportunities to dismiss Ms. Wahlstrom from his lawsuit – he refused. (SOF ¶82). Ultimately, his frivolous claim was dismissed against Wahlstrom. (SOF ¶83). Wahlstrom was responsible for fees related to the O'Toole litigation strictly because of O'Toole's over-reach and strong-arm tactics and it is well known that our courts follow the "American Rule." See, e.g., John T. Callahan & Sons, Inc. v. Worcester Ins. Co., 902 N.E.2d 923, 925 (Mass. 2009).

As a matter of law, Wahlstrom has not identified a viable theory under which Hoey can be found legally liable to Wahlstrom for the legal fees she incurred in defending against the Sobczak lien or the O'Toole litigation. Plaintiff's reliance on fraud and c. 93A is misplaced – as a matter of law, there can be no causation[15] and neither is not the proper vehicle for seeking reimbursement of legal fees incurred in allegedly defending a litigation brought by someone else.[16]

---

of her recovery. (SOF ¶61). Inexplicably, in February 2022, Plaintiff reached a non-monetary agreement with Sobczak rather than seek reimbursement from him. (SOF ¶63). It is telling that Plaintiff has not exhausted her remedies against Sobczak or O'Toole, instead choosing to sue Hoey.

[15] Plaintiff's theory is that, according to Sobczak, the purpose of the 2015 CFA was to diminish Mr. O'Toole's fee, an improper purpose according to Sobczak, O'Toole and Plaintiff here. The problem with the argument is that Mr. O'Toole had no basis to sue Ms. Wahlstrom, in part because his fee was tied to that of Hoey, not the overall recovery in the case, and his complaint was dismissed because he could not make out a claim as a matter of law. (SOF ¶83).

[16] Our Massachusetts courts have repeatedly held that common law indemnification is available only to one who is without fault and *who has been compelled by operation of law to defend the acts of another*. Thomas v. EDIU, 437

18

## V.     **Wahlstrom's Conversion Count fails as well**

"A plaintiff asserting a conversion claim [] must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property[;] (2) [she] had an ownership or possessory interest in the property at the time of the alleged conversion; (3) [she] was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, [her] demand for its return was refused." Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993); *see also* Henry v. Nat'l Geographic Soc'y, 147 F. Supp. 2d 16, 21 (D. Mass. 2001); Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 365 (Mass. 2014).

In this case, there is no evidence that the Hoey Defendants wrongfully exercise control or dominion over Plaintiff's property. When Wahlstrom executed the 2015 CFA, she understood that if there was a favorable outcome, she would be responsible for expenses and disbursements related to her case. As such, once the Appeals Court reinstated the verdict and the judgment was satisfied, Wahlstrom became responsible for said expenses and disbursements. Although responsible, Wahlstrom was given an opportunity to review, question, and/or dispute the charges. Hoey explained that services were assessed against the expenses, and they were not charged until Wahlstrom approved, acknowledged, and signed off on them. Ex. G, Dep. of Hoey, 111:10-20. Wahlstrom approved.  As a result, the Defendants reimbursed themselves under the 2015 CFA.

## VI.    **Count V for Accounting Must Be Dismissed as a matter of law:**

---

Mass. 536, 538 n.1 (2002); Santos v. Chrysler Corp., 430, Mass. 198, 217 (1999); Decker v. Black & Decker Mfg. Co., 389 Mass. 35, 39-41 (1983).  Vicarious or derivative liability is a necessary element of the right to common law indemnity.  Santos, 430 Mass. at 217-218 and n. 30; Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d 1, 3 (1st Cir. 1982); Decker, 389 Mass. at 40.  As noted by the Santos Court, a defendant is only entitled to common law indemnification where he is without fault and "compelled *by operation of law* to defend himself against the wrongful act of another."  Santos, at 217.[16]  Here, under no set of facts, even Ms. Wahlstrom's own claims that she is not liable to O'Toole, can it be said that the Hoey defendants would owe common law indemnity *to Ms. Wahlstrom*.  Mr. O'Toole specifically claimed that Ms. Wahlstrom owed him money pursuant to the 2010 CFA, and as such, as a matter of law, it cannot be said that she was being compelled by operation of law such as in the vicarious or derivative liability context, to defend the act of Hoey.

The Hoey Defendants provided Wahlstrom with a full accounting, including all invoices for the disputed expenses, proof of payments in the form of check stubs and credit card statements, and Advocate Capital loan documents and case balance detail.   Irrespective, this quasi-contract, equitable count does not provide for separate damages and must be dismissed because Wahlstrom has other adequate remedies at law.   Reed v. Zipcar, Inc., 883 F.Supp.2d 329, 334 (D.Mass. 2012).

## CONCLUSION

Based on the foregoing undisputed facts and legal authorities, the Hoey Defendants respectfully request that this Honorable Court enter summary judgment in their favor.

Respectfully submitted,

Defendants,
David J. Hoey and
Law Offices of David J. Hoey, P.C.,

By their attorneys,

*/s/ Christine A. Knipper*
Christine A. Knipper, BBO # 652638
Christine.Knipper@wilsonelser.com
John P. Liberty, BBO # 703627
John.Liberty@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker
260 Franklin Street, 14th Fl.
Boston, MA  02110
Tel:  617.422.5300

## CERTIFICATE OF SERVICE

I, Christine A. Knipper, hereby certify that on August 14, 2023 the foregoing document was served on the following counsel of record via ECF:

Bridget A. Zerner, Esq.
John J.E. Markham II, Esq.
Markham Read Zerner LLC
11A Commercial Wharf West
Boston, MA 02110
617-523-6329

bzerner@markhamreadzerner.com
jmarkham@markhamreadzerner.com

John J. O'Connor, Esq.
Kristyn St. George, Esq.
Peabody & Arnold, LLP
600 Atlantic Avenue
Boston, MA 02210-2261
617-951-2100
joconnor@peabodyarnold.com
kstgeorge@peabodyarnold.com

William M. Taylor, Esq.
Danni L. Shanel, Esq.
Troutman Pepper Hamilton Sanders
125 High Street, 19th Floor
Boston, MA 02114
617-204-5186
william.taylor@troutman.com
danni.shanel@troutman.com

*/s/ Christine A. Knipper*
Christine A. Knipper