# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION - BOSTON)

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>                              Plaintiff,<br><br>       -against-<br><br>DAVID J. HOEY, LAW OFFICES OF DAVID J. HOEY, P.C., DON C. KEENAN, D.C. KEENAN & ASSOCIATES, P.C. D/B/A THE KEENAN LAW FIRM, P.C., AND KEENAN'S KIDS FOUNDATION, INC.<br><br>                           Defendants | Civil Case No. 1:22-cv-10792-RGS<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT AGAINST DEFENDANTS FOR VIOLATIONS OF M.G.L. c. 93A, BREACH OF FIDUCIARY DUTY, FRAUD, CONVERSION, DEMAND FOR ACCOUNTING, AND MONEY HAD AND RECEIVED**<br><br>**JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE** |

## COMPLAINT

Plaintiff Kira Wahlstrom alleges as follows for her claims against Defendants:

## INTRODUCTION

1.      In May 2009, Ms. Wahlstrom was brutally raped inside a hotel parking garage in downtown Boston, where the same rapist had attacked and raped another woman just 12 days earlier in the same garage. She sued the owners and management of the garage for negligence. For more than a decade, Defendants here represented Ms. Wahlstrom and during that representation, went to great lengths to earn her trust. Ms. Wahlstrom, in turn, entrusted Defendants to prosecute her claims against the responsible parties and, as particularly relevant here, to charge her fair fees and expenses. Throughout the representation, Defendants knew that her mental state was fragile; that she had severe difficulties trusting others, including her long-time partner and others who had been close to her; and that she was not sophisticated in legal or financial matters.

1

2.      Defendants tried and won her case in 2015, achieving one of the largest awards given to a sexual assault victim in Massachusetts at the time. However, their achievement is now sullied by Ms. Wahlstrom's recent discovery that these same attorneys deceived and betrayed her, taking advantage of her trust and known vulnerabilities to take from her approximately one million dollars in unearned and improper fees and unreasonable expense charges. Their wrongful conduct also resulted in Ms. Wahlstrom being sued by another attorney who claims these same attorneys deceptively and improperly altered their representation agreements with Ms. Wahlstrom for their own benefit, i.e., to increase their own fees and reduce his referral fee percentage. Defendants' fraudulent and unethical conduct and rejection of Ms. Wahlstrom's request for reimbursement of the unlawful fees taken from her recovery have compelled this suit. Plaintiff Wahlstrom herein sues for fraud, breach of fiduciary duty, money had and received and conversion of trust monies that belonged to her and invokes M.G.L. c. 93A because the Defendants' conduct was unfair and deceptive in violation of that law.

**THE PARTIES**

3.      Plaintiff Kira Wahlstrom is an individual domiciled in the State of California.

4.      Defendant David J. Hoey is an individual and attorney domiciled and practicing law in the Commonwealth of Massachusetts. At all relevant times, Hoey acted on behalf of himself as well as on behalf of Defendant Law Offices of David J. Hoey P.C.

5.      Defendant Law Offices of David J. Hoey P.C. is a professional corporation, wholly owned by Defendant David Hoey, organized in Massachusetts and with its principal place of business at 352 Park Street, Suite 105, North Reading, MA 01864.

6.      Defendant Don C. Keenan is an individual and attorney domiciled in Florida and/or Georgia and practicing law in the State of Georgia. At all relevant times, Keenan acted on

2

behalf of himself as well as on behalf of Defendant D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C., and on behalf of Defendant Keenan's Kids Foundation, Inc.

7.     Defendant D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C. is a professional corporation believed to be wholly owned by Defendant Don Keenan, organized in Florida, and with its principal place of business at 148 Nassau St. N.W., Atlanta, GA 30303.

8.     Defendant Keenan's Kids Foundation, Inc. is a Georgia non-profit corporation with its principal place of business at 148 Nassau St. N.W., Atlanta, GA 30303 (the same address as Keenan Law Firm). Defendant Don Keenan is listed with the Georgia Secretary of State Corporations Division as the CEO, CFO, Secretary, and Registered Agent for this non-profit. Keenan's Kids Foundation's stated mission is charity work, community awareness, and child advocacy all focused on child safety and at-risk children. [www.keenanskidsfoundation.com]

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 (diversity of citizenship) because Plaintiff Wahlstrom is domiciled in California; Defendant Hoey is domiciled in Massachusetts; Defendant Law Offices of David J. Hoey P.C. is incorporated and has its principal place of business in Massachusetts; Defendant Don Keenan is domiciled in Florida and/or Georgia; Defendant D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C. is incorporated in Florida with its principal place of business in Georgia; and Defendant Keenan's Kids Foundation, Inc. is incorporated and has its principal place of business in Georgia. The amount in controversy exceeds $75,000 exclusive of interest and costs. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the claim against Defendant Keenan's Kids Foundation, Inc.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims stated herein occurred within this District as pleaded more specifically below.

## FACTS

**The Underlying Premises Liability Case and Fee Agreements for that Case**

11.     On May 1, 2009, Plaintiff Kira Wahlstrom was brutally raped by Jose Rivera III in a parking garage attached to the Radisson hotel, located in downtown Boston. Rivera had just raped another woman twelve days earlier in the same garage before he returned to the garage and raped Ms. Wahlstrom.

12.     The garage was owned by JPA IV Management Company, Inc. and managed/operated by JPA I Management Company, Inc. (collectively "JPA"). After the attack and rape of the first victim by Rivera, JPA failed to take measures to warn and failed to put in place increased security measures to protect other garage customers, like Ms. Wahlstrom, from the risk of a future rape.

13.     Ms. Wahlstrom had been working at a nearby nightclub and was returning to her car parked in the JPA garage after finishing work in the early morning hours of May 1, 2009, with no knowledge or warning of the recent attack. She boarded the elevator and Rivera then entered after her. When she exited the elevator on the floor on which her car was parked, Rivera followed and attacked Ms. Wahlstrom. He grabbed her by the hair and throat and dragged her screaming and fighting over a hundred feet to the nearby stairwell where he beat and raped her twice. Despite her screams, no security or garage attendants came to her aid.

14.     Just hours after Ms. Wahlstrom was attacked and brutalized, the Boston police finally arrested Rivera at nearby Tufts Medical Center when he came to the facility at the same time Ms. Wahlstrom was there in the emergency room for treatment for her injuries.

4

15.     When Ms. Wahlstrom was subpoenaed to testify against Rivera before the grand jury, she contacted one of the few attorneys she knew, her then-friend, Austin O'Toole.  Because he was not qualified to handle this complex case, O'Toole referred her to an attorney who specialized in trying premises liability cases, Defendant David Hoey.

16.     On or about February 2, 2010, Ms. Wahlstrom entered a Contingent Fee Agreement with Defendant Law Offices of David J. Hoey, P.C. to pursue claims for JPA's negligence because of its failure to warn its customers after the first attack and rape in the garage and for its failure to implement appropriate security measures. Ms. Wahlstrom agreed with Defendant Hoey to a contingent fee arrangement whereby he would receive payment from fees recovered. That 2010 Contingency Fee Agreement is attached as **Exhibit A** and referenced and incorporated as stated herein.

17.     The 2010 Contingency Fee Agreement states in its opening paragraph that Ms. Wahlstrom:

> …retains as "Attorney" the Law Offices of David Hoey, P.C. with an address of 352 Park St., Suite 105, North Reading, MA 01864 and Austin S. O'Toole, Esquire with an address of 18 Tremont Street, Suite 1010, Boston, MA 02108 to perform the legal services referred to in Paragraph (1) below.

Exhibit A, p. 3.

18.     The 2010 Contingency Fee Agreement further provides:

(1) The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

(2) The fee is to be paid upon recovery.

(3) The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none.

5

(4) Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associate counsel shall be the following percentage of the gross amount collected for the client.

      33.3% of the gross amount recovered;

(5) The Client is to be liable to the attorney for his reasonable expenses and disbursements only if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

a) It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b) AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.
         \*   \*   \*

(7) This fee agreement applies to all services rendered in pursuing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

19.    After Plaintiff Wahlstrom and David Hoey, on behalf of the Law Offices of David Hoey, P.C. (herein, "Hoey Law"), executed the 2010 Contingency Fee Agreement, Hoey sent the agreement to referring attorney O'Toole with a referral agreement that stated: "This will confirm that in connection with the above referenced matter [Kira Wahlstrom v. Jose Ruben Rivera, et al]

6

you will receive the following referral fee should there be a recovery in this case: 33% of my fee from the sum recovered." O'Toole accepted Hoey's offer and executed the referral agreement. Ms. Wahlstrom also signed the referral agreement indicating her consent as required by the Massachusetts Rules of Professional Conduct. A copy of that referral agreement is annexed hereto as **Exhibit B** and adopted herein by reference.

20.    On March 12, 2010, Hoey filed suit on behalf of Ms. Wahlstrom against the owner and operator of the hotel garage, JPA, and others, for negligence in Suffolk Superior Court titled *Wahlstrom v. JPA IV Management Company, Inc. et al*. No. 1084CV01022.

21.    Prior to trial, Defendant Don Keenan of Defendant D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C. (herein, "Keenan Law") joined Hoey as counsel on the case. Hoey and Keenan had worked together previously in other cases. As he was not a Massachusetts attorney, Keenan sought *pro hac vice* admission to appear in the Wahlstrom case on March 13, 2015, which was allowed.

22.    On June 11, 2015, Hoey contacted Ms. Wahlstrom stating that he needed her to sign a new fee agreement with Don Keenan. When Ms. Wahlstrom responded in an email asking, "What is the new fee agreement?", Hoey replied: "I mentioned it to you one of the last couple of visits. It's the same fee agreement as before but with Don's [Keenan] name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money. I'll show it to you next time I see you." Attached as **Exhibit C** is a copy of the email chain between Ms. Wahlstrom and Hoey adopted and incorporated herein.

23.    It was known to Hoey at this time that not only was Ms. Wahlstrom inexperienced in litigation and retainer agreements but that she was dyslexic and had trouble with math. Indeed, she said so explicitly in the same email chain where Hoey directed her to sign an agreement with

7

Keenan. *See*, Exhibit C, Email on June 11, 2015, Ms. Wahlstrom stating "I didn't go back to Bridgewater because I failed math, and school was very hard for me I am dislexic." [sic].

24.     Moreover, through their close working relationship over the prior five years during which Ms. Wahlstrom was coping with the trauma and difficulties in recovery from the attack and rape, she had come to particularly rely on Hoey for support and placed substantial trust in him in his role as her advocate and protector during this time of her vulnerability.

25.     On or around June 16, 2015, Hoey and Keenan had Ms. Wahlstrom sign another Contingent Fee Agreement that provides that Ms. Wahlstrom retains as "Attorney" Don C. Keenan and The Keenan Law Firm P.C. to perform legal services for her "Premises liability claims and injuries received as a result of assault on or about May 1, 2009 in the Radisson Hotel Boston parking lot."  Attached as **Exhibit D** is a copy of the 2015 Contingent Fee Agreement referred to and incorporated as stated herein.

26.     The 2015 Contingent Fee Agreement (Exhibit D) provided for compensation as follows at paragraphs 4 and 5:

>       (4) Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney [Don C. Keenan and The Keenan Law Firm PC], but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:
>
>       33 and 1/3 (thirty-three and one-third percent) of gross amount recovered
>
>       The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney [Don C. Keenan and The Keenan Law Firm PC] on behalf of the Client, and an additional 5% of gross recovery Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.
>
>       The percentage shall be applied to the amount of the recovery not including an attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage

calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

Referring/Associated Counsel:

The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees. Client understands that the Client will not be charged any additional legal fees.

(5) The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may choose to do so, and may choose to cease doing so for any reason, whatsoever, with notice to the Client.

27.     The 2015 Contingency Fee did not state the fee arrangement between Keenan and Hoey nor did Defendants otherwise disclose the arrangement to Ms. Wahlstrom. Unlike the 2010 Contingency Fee Agreement, the new agreement included an appeal contingency.

28.     David Hoey, with his law associate Krzysztof Sobczak, and Don Keenan, with his associate Andrew Gould, tried the case that began with jury selection on July 14, 2015 and ended with a verdict on August 11, 2015.

29.      Defendants obtained a jury verdict of $4 million against the garage owners and operators JPA that, with prejudgment interest and costs, resulted in a total judgment of $6,650,829.58 in 2015.

**Defendants' Trial Misconduct Resulting in a New Trial Motion and Appeal both Substantially Delaying Payment to Plaintiff Wahlstrom**

9

30.     After the verdict was rendered, JPA (the garage managers/owners) filed a motion for new trial based on attorney misconduct by Ms. Wahlstrom's trial attorneys. The trial judge (Associate Justice Paul D. Wilson) agreed that two of her attorneys (Hoey and his associate) engaged in misconduct that adversely affected JPA's substantial rights, misconduct such as repeatedly defying court orders and arguing after court rulings, often in the presence of the jury. As a result, the trial court allowed JPA's motion, vacated the verdict, and ordered a new trial. *See, Wahlstrom v. LAZ Parking Ltd., LLC*, No. SUCV20101022, 2016 WL 3919503 (Mass. Super. May 19, 2016).

31.     Ms. Wahlstrom filed a petition for interlocutory review with a Single Justice of the Appeals Court, who allowed an immediate interlocutory appeal. All appellate matters were successfully handled by appellate counsel, Patricia DeJunas, aided by Attorneys Robert J. Cordy and Ashley P. Allen. Attorney DeJunas and her team charged a separate fee for their successful work on the appeal.

32.     In an appeal in the Massachusetts appellate courts, the attorney of record in the lower court is automatically designated as the counsel of record for the appeal. In this manner, Hoey's name appeared on the docket for Ms. Wahlstrom's appeal. Hoey did not file an appearance in the Appeals Court, his name is not on Ms. Wahlstrom's briefs, and he did not sit at counsel table for the appellate oral argument.

33.     DeJunas provided regular updates on the appeal to Hoey and Keenan. Keenan had a financial interest in the outcome of the appeal, as did Hoey. Hoey also was concerned about his reputation as well as the Board of Bar Overseers.

34.     Neither Hoey nor Keenan drafted or filed the interlocutory appeal application or the appellate briefs, nor did their names or signatures appear on any of the briefs.

35.     Keenan did not file an appearance in the Appeals Court nor did he seek permission to do so via a motion for *pro hac vice* admission. At one point, Keenan himself stated to attorney DeJuneas, Hoey, and others that he is not an appellate lawyer, nor does he pretend to be.

36.     The Appeals Court first issued the *Wahlstrom I* opinion, on June 10, 2019, holding that the trial judge applied the wrong legal standard in allowing a new trial and observed in its ruling that "the purpose of an order granting a new trial motion is not to punish attorney misconduct" and that "egregiousness of misconduct absent an effect upon the jury is not a basis for finding the type of miscarriage of justice that warrants nullifying the jury's verdict." *Wahlstrom v. JPA IV Mgmt. Co., Inc*., 95 Mass. App. Ct. 445, 449–50, 453, 127 N.E.3d 274, 279, 282 (2019) As of the time of this opinion, appellate counsel DeJuneas had investigated and filed a motion to disqualify the trial judge based on public statements the judge had made about the case and these attorneys who appeared before him at the trial. The motion was still pending in the trial court and, consequently, the Appeals Court stayed the appeal pending a decision on the motion for disqualification.

37.     On August 8, 2019, the Appeals Court received report from appellate counsel that the trial judge had recused himself from the case. The Appeals Court lifted the stay and on November 6, 2019, issued the *Wahlstrom II* decision. *Wahlstrom II* holds that, even though Hoey and his associate engaged in misconduct during trial, a review of the record as a whole showed "that the cumulative effect of the attorneys' misconduct does not meet the "relatively high" burden necessary to warrant a new trial." *See, Wahlstrom v. JPA IV Mgt. Co., Inc*., 96 Mass.App.Ct. 1108, 138 N.E.3d 1045 (Mass. App. 2019)

38.     Thus, for over the four years that the new trial order was pending due to the misconduct of Hoey and Hoey Law that angered the trial judge, Ms. Wahlstrom was delayed in recovering her judgment and lost use of those funds. During this time, she also suffered emotionally with the prospect of a second trial and the accompanying time and costs that would be involved and the prospect of publicly reliving her trauma and enduring cross-examination by defense counsel yet again.

**Attorney's Lien Dispute**

39.     During the pendency of the appeal, a dispute arose between Hoey and his associate Krzysztof Sobczak over Sobczak's payment for his work on the Wahlstrom case.

40.     Sobczak first filed suit against Hoey and Hoey Law in Middlesex County Superior Court.  Then, on June 13, 2019, Sobczak filed a notice of lien for attorney's fees pursuant to Mass. G. L. ch. 221, § 50 in Ms. Wahlstrom's premises liability case.

41.     Sobczak had no fee agreement with Ms. Wahlstrom but pursued this lien because of his dispute with Hoey over payment he claimed was owed to him by Hoey for his work on the Wahlstrom trial. The dispute arose over promises that Sobczak was made by Hoey over the former's compensation that had nothing to do with Plaintiff Wahlstrom and were unknown to her.

42.     On or around June 18, 2019, Hoey – not Ms. Wahlstrom – engaged attorney Amy Goganian of Goganian & Associates PC. The engagement agreement identifies only David Hoey and Hoey Law as the "Client" for representation in responding to the attorney's lien filed by Sobczak, that Goganian was to be paid an hourly rate for her representation, and that monthly invoices would be issued to Hoey Law. Kira Wahlstrom is not mentioned in the engagement

12

agreement other than in reference to the title of the underlying case. A copy of this engagement agreement is annexed as **Exhibit E** hereto and adopted herein by reference.

43.     Amy Goganian of Goganian & Associates PC never sought or obtained a representation agreement with Ms. Wahlstrom, nor did Ms. Wahlstrom authorize Amy Goganian to file an appearance on her behalf.  Ms. Wahlstrom did not even meet or speak to attorney Goganian who handled these matters until over a year later in or around October 2020.

44.     Ultimately the lien filed by Sobczak was dismissed, but not before unnecessary, hostile and extended motion practice involving impoundment, sanctions, and reconsideration motions and the resulting legal fees generated thereby.

45.     It was Hoey and Hoey Law, not Ms. Wahlstrom, who directed and controlled all litigation related to the attorney lien, including the filing of an unsuccessful motion for sanctions and an unsuccessful motion for reconsideration of sanctions against Sobczak.

**Improper Fees Charged to Ms. Wahlstrom and Taken by Defendants from Monies Held in Trust for Her**

46.     After the Appeals Court decision was issued reversing the order granting a new trial in the underlying Wahlstrom case, the insurance companies for JPA ultimately did not pursue a further appeal.

47.     On November 18, 2019, One Beacon (the primary insurer for JPA) wired $1,670,336.42 to Don Keenan's account. On November 19, 2019, Zurich American Insurance Company (the excess insurer) wired $8,317,347.38 to Keenan's account. Judgment was thereby paid in full with interest totaling $9,987.683.80.

48.     Prior to receipt of these funds, Hoey represented to the excess insurer that Defendants assumed responsibility for the Sobczak attorney's lien that had been filed.

13

49.     On or around December 17, 2019, Hoey arranged a wire of $4,850,000.00 from Keenan's account to Ms. Wahlstrom from the above-referenced judgment funds received, a sum that was less than half of the recovery. In his email of December 17, 2019, to Ms. Wahlstrom's financial representative, an email on which Ms. Wahlstrom was copied, Hoey stated: "I just authorized a wire in the amount of $4.85 million. (More to come later)." But no additional funds were sent to Ms. Wahlstrom despite Hoey's promise to her that they would be sent.

50.     Thereafter, from the remaining funds sent by the insurance companies, Hoey and Keenan, rather than the 33.33% agreed to in the fee agreement as their fee, as clearly provided for in Exhibit D, improperly charged the following fees and improper expenses to Ms. Wahlstrom and they took these amounts from her money that they were holding in trust from the payments of the judgment made by the insurance carriers:

(a) Defendants improperly took $4,025,036.50 of the $9,987.683.80 recovery as an attorney fee, or 40.33 % of the total recovery when they were only entitled to 33.33% (or $3,329,227.93), adding an additional $695,808.57 or 7% to their fee for the successful appeal. Defendants were not entitled to any additional fee much less to the $695,808.57 that they took. Neither Hoey or Keenan participated at all on the appeal and neither Hoey nor Keenan filed the appellate brief; neither handled any aspect of the appeal at all, as detailed above in paragraphs 31 to 36 of this Complaint. Moreover, the appeal was only required because of the trial judge's problems with the conduct of their trial team (Hoey and Hoey Law) and while Ms. Wahlstrom's appellate lawyers persuaded the Appeals Court to reverse the order for a new trial, it was unreasonable for Defendants to claim an additional recovery for the appeal in this circumstance where they caused it and where no agreement had been made with

14

Plaintiff Wahlstrom to pay this additional fee. Thus, Defendants improperly overcharged Ms. Wahlstrom $695,808.57 for their fee.

(b) Hoey and Keenan also charged Ms. Wahlstrom the fees for appellate counsel, Patricia DeJuneas ($197,091.52) and Robert Cordy ($16,000), for a total of $213,091.52, in effect charging her twice for appellate work. The fee of DeJuneas and Cordy was earned and paid under their engagement agreement with Ms. Wahlstrom while Hoey and Keenan improperly charged an additional 7% of the recovery for appellate work when they had done no such work.

(c) Defendants improperly charged to Ms. Wahlstrom $20,824.00 for attorney Richard Goran to appear on October 20, 2015 for Keenan's non-party foundation, Defendant Keenan's Kids Foundation, Inc. Attorney Goran's participation in the case was strictly limited to defending Keenan's Kids Foundation, Inc. and Keenan's copyright for his litigation strategy manual.[1] Ms. Wahlstrom was not involved whatsoever in this matter, nor did she have an interest in Keenan's ability to protect his intellectual

---

[1] As described in Justice Wilson's order granting a new trial, the JPA defendants complained "that Plaintiff's counsel followed the "Reptile" playbook at trial. As defense counsel informed me in a pretrial Bench Memorandum, Plaintiff's counsel Mr. Keenan travels the country teaching seminars to plaintiffs' personal injury lawyers based on his book entitled "Reptile, The 2009 Manual of the Plaintiff's Revolution."" *Wahlstrom v. LAZ Parking Ltd., LLC, No. SUCV20101022*, 2016 WL 3919503, at *4 (Mass. Super. May 19, 2016). The JPA defendants attached a copy of the entire book to their new trial motion which attorney Goran, for Defendant Keenan's Kids Foundation, sought to impound or expunge.

Justice Wilson denied the Foundation's motion finding that "the Reptile Manuel is available for purchase at Amazon with only a standard copyright notice and a boilerplate probilution [sic] in the book itself or unauthorized reproduction. In light of the easy availability of the books at issue I conclude that the moving non-party has not adequately protected these publications from purchase by anyone willing to pay the price change of the moving non-party or by Amazon. Therefore I cannot make the "good cause" finding required for impoundment." [sic] Endorsement on Motion, 11/16/2015 in *Wahlstrom v. LAZ Parking Ltd., LLC,* No. SUCV20101022.

property. This motion benefited only Defendants Keenan and Keenan's Kids Foundation and not Ms. Wahlstrom. Attorney Goran never conferred with Ms. Wahlstrom about the taking of this fee nor did he have a fee agreement with her. Yet, Defendant Keenan's Kids Foundation had their attorney's legal fees paid by Ms. Wahlstrom.

(d) Defendants improperly charged to Ms. Wahlstrom $8,432.39 for fees for Hoey's long-time personal attorney, James Bolan, in connection with defending Hoey against the Sobczak attorney lien caused by Hoey's dispute with Sobczak over payment for Sobczak's work as described above. Bolan never conferred with Ms. Wahlstrom much less obtained her agreement for this charge nor was he retained by her.

(e) Defendants improperly charged to Ms. Wahlstrom at least $41,231.72 for attorney Amy Goganian's fees to defend against the Sobczak lien where the fee agreement was between Goganian and Hoey / Hoey Law as the client obligated to pay Goganian's fees. It now appears, from Hoey's own more recent expense itemization summaries, that he took additional money from Ms. Wahlstrom, without her knowledge, to pay attorney Goganian another $31,490.10 for his dispute with Sobczak thereby defrauding her of that additional money.

(f) Defendants also improperly charged to Ms. Wahlstrom $2,655.00 for "constitutional law attorney" John Vail, even though her case did not involve any constitutional issues. Defendant Hoey now falsely claims Vail provided necessary consultation on the appeal while Keenan falsely claims that Ms. Wahlstrom approved and agreed to engage Vail to research and review the jury charge and other matters in the case when

16

Wahlstrom did not. Vail never conferred with Ms. Wahlstrom, nor did he seek or obtain a representation agreement with her.

(g) Defendants also improperly charged to Ms. Wahlstrom $1,316.00 for attorney Catherine Giordano for "research and writing" when this should have been paid out of the agreed upon attorney fee. Defendants have falsely claimed that Ms. Wahlstrom approved and agreed to engage Giordano to research and review the jury charge and other matters in the case when she did not. Giordano never conferred with Ms. Wahlstrom.

(h) Defendants also improperly charged to Ms. Wahlstrom $561.24 for the firm Lewis Brisbois Bisgaard & Smith LLP, a firm understood to be involved with the Sobczak lien dispute and other matters concerning Hoey and Hoey Law. These attorneys never conferred with Ms. Wahlstrom and never sought or obtained a representation agreement with her.

**Improper Expenses Charged to Ms. Wahlstrom and Taken by Defendants from the Monies Held in Trust for Her**

51. The unjustified expenses improperly charged to Ms. Wahlstrom included a loan from Advocate Capital to fund case costs during litigation. While Ms. Wahlstrom knew and approved a loan to cover litigation expenses, Hoey did not tell her that the company charges exorbitant fees and finance charges: on a principal loan of $415,761.58, Advocate Capital charged fees totaling $238,839.29, over 50% of the principal. Additionally, Defendants' expense accounting does not show what the $415,761.58 covered during the litigation. The use of this money should be subject to the accounting prayed for herein because Ms. Wahlstrom was required to directly and separately pay all expenses, such as approved experts. Thus the need for this large loan is suspect because Hoey informed Ms. Wahlstrom that Advocate Capital was "the

lender for the majority, but not all, of the litigation expenses" and then he separately billed to Ms. Wahlstrom over $800,000 more for expenses, including his internal firm costs such as office supplies ($1,992.87), copying ($9,964.60) and postage ($3,030.36) as well as billed Ms. Wahlstrom for media interview assistance and plaques commemorating the trial victory neither of which she received. None of these expenses were authorized or proper.

52. Defendants also improperly charged Ms. Wahlstrom $51,000 to pay Win Interactive, a litigation support firm, to develop an animation video of the attack in the garage that Defendants planned to offer into evidence at the premises liability trial which was deemed inadmissible. Defendants have claimed that this was an effort to prevent Ms. Wahlstrom from having to testify about the attack at trial. Yet, admissibility of this video was clearly impossible as a matter of evidence law, as well as completely detrimental to Plaintiff's case were she not to be seen by the jury describing the horrible events and details of the assault, and it is doubtful that Defendants truly believed they could win this case without Ms. Wahlstrom testifying about the attack and her damages. Ms. Wahlstrom was always prepared and ready to testify as she understood she would need to do so if the case went to trial. Further, this significant expense was undertaken for a demonstrative exhibit that had no chance to be admitted and was incurred before establishing its admissibility.

53. Ms. Wahlstrom made demand for a full accounting and documentation of the above expenses and other expenses and about the disposition of all the monies held in trust for her by Defendants and Defendants have not yet provided a complete accounting or all backup documentation. Ms. Wahlstrom will seek reimbursement for any additional improperly charged expenses uncovered by such accounting when it is provided by Defendants.

54.     On March 27, 2020, months after receipt of payment of the judgment (in November 2019), and after the transfer of funds to Ms. Wahlstrom (in December 2019) based on Defendants' assessment of fees and expenses, Hoey provided and had Ms. Wahlstrom sign an itemization of the above fees and expenses. He then sent another copy of the spreadsheet itemization via email, on March 29, 2020, with additional explanations for some of the charges, stating he was seeking her approval of the expenses, and yet Hoey and Keenan were disbursing funds from the recovery monies held in trust prior to that time in violation of the trust accounting rules of the Commonwealth of Massachusetts applicable to attorney trust accounts. And neither version of the Defendants' itemization sheet stated that the "attorney fee" total calculated included an extra 7% for the appeal paid to Keenan and Hoey.

55.     While Ms. Wahlstrom signed off on the expenses and distributions in March 2020, she did so trusting her attorneys Hoey and Keenan (in whom she had long placed her trust and confidence) that these were all reasonable and appropriate charges under their fee agreements, discovering and understanding only later that certain fees and expenses charged were improper because the fees were contrary to the limitations in the fee agreement and the expenses were unreasonable.

**The O'Toole Lawsuit**

56.     As cited above, when Hoey was first retained by Ms. Wahlstrom in 2010, he entered a referral agreement with attorney O'Toole (Exhibit B) under which O'Toole would receive 33% of the fee recovered by Hoey.

57.     On or around May 20, 2020, Hoey sent O'Toole a check for $250,000 as O'Toole's referral fee.

58.    On March 30, 2021, Attorney O'Toole filed suit against Hoey, Hoey Law and against Ms. Wahlstrom claiming that they all failed to pay O'Toole his proper referral fee. Under the original 2010 Contingency Fee Agreement where Hoey was to receive the 33.3% of any recovery, O'Toole would have received a payment of over $1,000,000 from Hoey rather than receiving $250,000. That case, entitled *O'Toole v. Hoey, et al.*, Civil Action No. 2021-0741, is pending in the Superior Court of Suffolk County.

59.    O'Toole amended his complaint on February 23, 2022, keeping Ms. Wahlstrom and Hoey as defendants while also adding Don Keenan and Keenan Law as defendants, alleging in part:

> The Keenan/Hoey/ Wahlstrom fee agreement (Ex. B) [the 2015 Contingency Fee Agreement] was, according to one percipient witness, created while Keenan was on one of his periodic visits to Massachusetts, and Keenan's and Hoey's expressed purpose in creating it was to significantly reduce Mr. O'Toole's fee by rearranging the waterfall of any fee distribution. Indeed, there was and is no other conceivable purpose for rearranging the funds flows so that Keenan was the lead attorney and doing so less than month before trial, when Keenan had *already* agreed to represent Ms. Wahlstrom and had *already* appeared for her months previously. By way of illustration and not limitation, under the original fee agreement (Ex. A), a $4,000,000 fee paid to Hoey would go 33.3% to O'Toole, resulting in a $1,332,000 fee to him. By contrast, under the 'superseding' fee agreement (Ex. B), a $4,000,000 fee paid to Keenan, 50% of which was then paid to Hoey, would result in a fee of only $660,000 to O'Toole (assuming, contrary to law and fact, that Keenan's and Hoey's unlawful scheme were given effect).

60.    The "percipient witness" is Hoey's former associate and key member of the *Wahlstrom v. JPA* trial team, Krzysztof Sobczak. He provided a sworn affidavit dated February 6, 2022 that stated, to his knowledge, there was no discussion of any other purpose of the Keenan 2015 Contingency Fee Agreement other than reducing the referral fee recovery of O'Toole and that at the time the new agreement was presented to Ms. Wahlstrom to sign, there was no explanation of why and how it would affect how any of the attorneys would be paid. Sobczak also states to his knowledge that Ms. Wahlstrom was not aware of the arrangement between

Hoey and Keenan as it would not affect the total attorneys' fees she was obligated to pay under the terms of the new fee agreement she executed (attached as **Exhibit F**).

61.     Ms. Wahlstrom did not know the specific fee arrangement between Hoey and Keenan nor was she aware of or involved in any plan to reduce O'Toole's referral fee from that promised him.

62.     As stated above, Hoey and Keenan collectively paid themselves more than 40% of Ms. Wahlstrom's judgment. Although Hoey initiated Ms. Wahlstrom's premises liability case and acted as lead counsel over five years of contentious litigation through trial, Hoey claims that his fee totaled only $750,000. He has explained that his fee was derived not from the actual recovery amount but from 33% of the last settlement offer ($2,250,000) made by the JPA defendants prior to the verdict in the premises liability case.

63.     In the O'Toole case, Ms. Wahlstrom was at first represented by attorney Amy Goganian, the same attorney that had represented Hoey in litigating the Sobczak attorney lien.

64.     Hoey paid the first three Goganian invoices for her time billed in the O'Toole case from March 2021 through May 31, 2021 (totaling over $21,000) though it is uncertain the source of funds used for these payments and this is a matter to be determined by the accounting Wahlstrom has sought by this Complaint.

65.     On August 30, 2021, attorney Goganian, on behalf of Ms. Wahlstrom, made a written request that Hoey and Hoey Law pay all legal fees and expenses associated with Ms. Wahlstrom's defense in the O'Toole case stating "regardless of the merits of Attorney O'Toole's allegations … I think we can all agree that Ms. Wahlstrom should never had been put in a position that exposed her to any claim for fees above and beyond what she has paid to date." Attorney Bolan initially responded to attorney Goganian that it was his understanding that Hoey

had been reimbursing Ms. Wahlstrom for attorney fees in the O'Toole case but Ms. Wahlstrom was neither reimbursed nor were any further invoices of Goganian paid by Hoey.

66.     On February 16, 2022, counsel for Hoey and Hoey Law, Christine Knipper, appeared in Suffolk Superior Court on the O'Toole case and stated: "we do agree on behalf of my clients that Kira Wahlstrom does not belong in the case."

67.     Hoey and Hoey Law have not paid these fees and the Goganian bills, since accumulated, remain outstanding.  Goganian has now made demand on Ms. Wahlstrom to pay the outstanding bills totaling over $40,000 with interest of 18% per annum.

68.     On July 14, 2022, the Honorable Justice Peter B. Krupp of the Superior Court granted Ms. Wahlstrom's motion to dismiss O'Toole's complaint while denying Keenan's motion to dismiss O'Toole's claims against him and his firm. Judge Krupp's opinion denying Keenan's motion to dismiss included, *inter alia*, the following related to O'Toole's interference with contractual relations claim against Keenan:

> Based on information from a "percipient witness," plaintiffs have specifically pled that the express intent of the 2015 Contingent Fee Agreement was to deprive O'Toole of his referral fee. In addition, plaintiffs have alleged improper means, namely the "sham" arrangement of work between Hoey and Keenan – Hoey's large investment of time and money in the case, while letting Keenan take the lion's share of the fee – all for the purpose of minimizing the fee to be paid to O'Toole. Such a sham transaction may rise to the level of mail or wire fraud and clearly amounts to actionable conduct. At this pleadings stage, plaintiffs' allegations demonstrate a plausible basis to believe plaintiffs will be able to show improper motive and means. Plaintiffs have alleged facts, not merely labels and conclusions.

Order, July 14, 2022, *O'Toole v. Hoey, et al*., Civil No. 2021-0741, Suffolk Superior Court.

**Defendants' Willful and Knowing Misconduct**

69.     Defendants observed first-hand Ms. Wahlstrom's vulnerability and the distress, anxiety, and turmoil she endured throughout litigation in the underlying case because of the

conduct, and often times, to use Hoey's word, "heartless" antics of insurance carriers and their defense counsel.[2]

70.     However, Defendants' conduct has unnecessarily and unreasonably further prolonged Ms. Wahlstrom's severe emotional distress and mired her in additional litigation through no fault of her own. She has now realized that the very attorneys in whom she placed her trust and confidence for the last twelve years, the attorneys on whom she relied on to protect her and pursue just compensation for the trauma she has suffered (and continues to suffer) also took advantage of and betrayed her.

71.     This is not a situation of mere negligence or accounting errors. Defendants knowingly and willfully deceived Ms. Wahlstrom into paying excessive attorneys' fees and costs doing so without her prior knowledge and invoking her trust that these charges were proper when they were clearly not under the contracts these attorneys signed, their representations to Ms. Wahlstrom, and the ethics rules.  Defendants knew that not only did Ms. Wahlstrom totally trust them, but that she was not at all knowledgeable about litigation and challenged by dyslexia and difficulty with math, as Hoey well knew because she explained these conditions to him.

72.     Upon receiving the judgment, and having control over the funds, Defendants kept more than the 33.33% owed for their fee, literally stealing this extra money amounting to $695,808.57, and thereafter using Ms. Wahlstrom's funds to pay attorneys that represented the interests of Hoey and Keenan rather than Ms. Wahlstrom among the other improper fees and expenses itemized above.

---

[2]     Ms. Wahlstrom has claims for bad faith settlement practices pending against the insurance carriers of the JPA defendants based on their conduct during the underlying litigation. (*Wahlstrom v. Zurich, et al.* Case No. 1:19-cv-12208-LTS (D. Mass) and *Wahlstrom v. Zurich, et al*. Case No. 1:22-cv-10037-LTS (D. Mass))

73. Defendants drafted and directed Ms. Wahlstrom to sign the 2015 Contingency Fee Agreement with Hoey specifically representing to Ms. Wahlstrom that the agreement was the same as the 2010 agreement but with Keenan's name on it and that it did not change the percentage she owed and would not cost her more money. The original 2010 Contingency Fee Agreement provided for an attorney's fee of 33.3% of the recovery and yet under the 2015 Contingency Fee Agreements, Defendants kept 40.33%, charging for an appeal they did prosecute as required by the terms of the agreement for them to be entitled to this extra money.

74. Wahlstrom relied on her attorneys and trusted their advice and representations in signing the fee agreement and paying the fees and expenses they itemized. As a result, Defendants have taken funds from Ms. Wahlstrom to which they were not entitled, and their conduct also resulted in her being named a defendant in the O'Toole case in relation to which she has been charged more legal fees.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF M.G.L. CHAPTER 93A, SECTION 9

### (Defendants Hoey, Hoey Law, Keenan and Keenan Law)

75. Ms. Wahlstrom realleges each and every allegation stated in each of the paragraphs above as if separately repleaded in full herein.

76. Defendants Hoey, Hoey Law, Keenan, and Keenan Law, acting together in a coordinated effort, engaged in unfair and deceptive acts, unlawful under Section 2 of Chapter 93A, Massachusetts General Laws, through overcharging and deceiving Ms. Wahlstrom into paying improper, unearned and excessive fees and unreasonable expenses for their representation of her in the underlying case before the Superior Court of Suffolk County.

77.     Defendants took advantage of Ms. Wahlstrom's trust in them, as her attorneys, to deceive her into overpaying them and paying other fees and expenses she was not obligated to pay.

78.     As described in detail above:

a.  After Ms. Wahlstrom had agreed to and executed the 2010 Contingency Fee Agreement with Hoey to initiate and pursue her premises liability case, Defendants advised and instructed Ms. Wahlstrom to sign a second 2015 Contingency Fee Agreement with Keenan, which Hoey specifically represented would not change the percentage Ms. Wahlstrom would owe for attorney's fees and would not cost her more money but was just to put Keenan's name on the agreement since he would be trying the case with Hoey.

b.  Defendants then took an extra 7% for their fee under the 2015 Contingency Fee Agreement that was unearned as they did not prosecute the appeal for which they claimed this fee and the appeal itself was required because of the trial judge's problems with Defendants' trial team conduct during trial – e.g., raising subjects in opening statements in direct violation of a pretrial order and asking improper questions of witnesses including questions that violated court rulings.

c.  Defendants charged Ms. Wahlstrom for additional attorneys they engaged for their own purposes including charging Ms. Wahlstrom the fees for counsel that represented Hoey and Hoey Law on the fee dispute with Sobczak and charging Ms. Wahlstrom for counsel that appeared for Keenan's non-profit foundation, Defendant Keenan's Kids Foundation, to seek protection of intellectual property rights of Keenan.

d.  Defendants charged Ms. Wahlstrom unreasonable expenses including but not limited

to excessive loan finance charges, an inadmissible and unnecessary animation video,

media consulting and a plaque both of which Ms. Wahlstrom never received.

79.     Defendants' deceptive and unfair billing for improper fees and expenses put their

own financial interest above their client and thereby violated their duties and professional

responsibility.

80.     Defendants' conduct by which they took unearned and improper fees and

expenses from Ms. Wahlstrom directly harmed Ms. Wahlstrom in an amount to be proved at trial

of at least $900,000 of overcharged fees and expenses and loss of use of this money.

81.     All of the above were unfair and deceptive practices in violation of M.G.L c. 93A

and Ms. Wahlstrom is entitled to damages doubled or trebled under the statute because of the

extent of the violations and because Defendants violated their fiduciary duty to their client and

did so knowingly and willfully.

82.     Ms. Wahlstrom served Defendants each with a demand letter pursuant to M.G.L.

c. 93A over thirty days before filing this suit and Defendants have refused to return these monies

taken through unfair and deceptive practices.

## COUNT II

## BREACH OF FIDUCIARY DUTY

### (Defendants Hoey, Hoey Law, Keenan and Keenan Law)

83.     Ms. Wahlstrom realleges each and every allegation stated in each of the

paragraphs above as if separately repleaded in full herein.

84.     As her attorneys, Defendants Hoey, Hoey Law, Keenan, and Keenan Law had a

fiduciary duty to Ms. Wahlstrom including a duty of loyalty and a duty of fidelity.

85. Defendants breached their duty to Ms. Wahlstrom by putting their own financial interests ahead of hers and using her trust in them to deceive her into paying unearned fees and fees of other attorneys for which she was not obligated to pay as well as unreasonable expenses as detailed above, knowing that all these fees and expenses were unjustified.

86. Ms. Wahlstrom was damaged by the loss of at least $900,000 which was in part taken by Defendants as a fee for appellate work that was not earned as well as to pay other attorneys for work done on behalf of Defendants and other fees and unreasonable expenses which Ms. Wahlstrom was not obligated to pay as specified above.

87. Defendants' breach of their duty to Ms. Wahlstrom directly caused her losses by deceitfully and wrongfully using their position as her trusted counsel to take these monies from her and she has been damaged in the amount to be proven at trial amounting to at least $900,000.00.

## COUNT III

## FRAUD

### (Defendants Hoey, Hoey Law, Keenan and Keenan Law)

88. Ms. Wahlstrom realleges each and every allegation stated in each of the paragraphs above as if separately repleaded in full herein.

89. Defendants knowingly made false representations to Ms. Wahlstrom to induce her to pay more money as follows and as detailed above.

90. In an email dated June 11, 2015, Defendants Hoey and Hoey Law specifically deceived Ms. Wahlstrom into executing a new fee agreement, the 2015 Contingency Fee Agreement, by falsely stating that the 2015 fee agreement was "the same fee agreement as before but with Don's [Keenan] name since he is also trying the case with me on July 13th. It doesn't

change your percentage or cost you more money. I'll show it to you next time I see you." Hoey induced Ms. Wahlstrom to sign the fee agreement relying on this representation.

91.     On June 19, 2015, Ms. Wahlstrom came in person to Hoey Law offices and Hoey had Ms. Wahlstrom sign the new 2015 Contingency Fee Agreement without any further explanation.

92.     Yet while the original 2010 Contingency Fee Agreement provided that the 33.3% attorney fee paid to Hoey as compensation would include "any associated counsel" and did not name or limit such associated counsel, the later 2015 Contingency Fee Agreement, that Defendants had Ms. Wahlstrom sign, limited associated counsel to Hoey under that section. Hoey did not alert or explain to Ms. Wahlstrom that this change would be used to charge her for other attorneys associated and working with their team on the case (the same way Keenan and Hoey associated themselves though from different firms to work on this case) though he knew he would charge her for the services of these other attorneys and thereafter, after obtaining the recovery from the defendant insurers in the underlying case, Defendants charged to Ms. Wahlstrom and took payment for additional attorneys.

93.     Additionally, while the original fee agreement reflected the same percentage – 33.33% – that would be owed for attorney's fees if there was a recovery, the new agreement provided that the attorney's fee would be paid to Keenan rather than Hoey and that Hoey would receive a portion of the compensation paid to Keenan. Hoey did not disclose to Ms. Wahlstrom that this agreement would be used by Defendants to reduce the recovery of the referring attorney, Austin O'Toole. Defendants' change in the fee agreement and the reduced payment to O'Toole resulted in O'Toole filing a lawsuit claiming his fee was wrongfully reduced and suing Ms.

Wahlstrom as one of the defendants, requiring representation, attorneys' fees and costs for which Ms. Wahlstrom has been billed over $40,000.

94.     On March 27 and March 29, 2020, Hoey and Hoey Law, with the approval and agreement of Keenan and Keenan Law, falsely represented that Ms. Wahlstrom must pay an extra 7% of the recovery, totaling $695,808.57, in the underlying case as attorneys' fees under the 2015 Contingent Fee Agreement with Keenan, in addition to paying her appellate team, by claiming that the total attorney fee owed was $4,025,036.50, when Defendants well knew they were not entitled to the fee and had no good faith basis to believe they were entitled to or had earned that total fee.

95.     On or around March 27 and 29, 2020, Hoey and Hoey Law, with the approval and agreement of Keenan and Keenan Law, falsely represented to Ms. Wahlstrom in their itemization presented to her in person (March 27) and then by email (March 29) that Ms. Wahlstrom must pay fees for additional attorneys when they well knew that Ms. Wahlstrom was not obligated to pay these attorneys because they had performed work on behalf of Hoey and on behalf of Keenan and not Ms. Wahlstrom. Specifically, Defendants falsely represented that Ms. Wahlstrom was obligated to pay the fees for attorney Goren (counsel for Keenan's Kids Foundation), attorney Bolan (counsel for Hoey), and attorney Goganian (counsel for Hoey) which totaled over $70,000. Defendants also falsely represented that Ms. Wahlstrom was obligated to pay the fees for attorney Vail, attorney Giordano, and the firm Lewis Brisbois Bisgaard & Smith LLP for consulting on the Sobczak/Hoey lien dispute and for "research and writing" which totaled over $4,500 that should have been paid out of the attorney fee.

96.     Ms. Wahlstrom relied to her detriment on the representations and fee itemizations of Defendants, her attorneys, who used her trust in them against her and to their own benefit to induce her to pay for these legal fees she should not have been made to pay.

97.     As a result of Defendants' fraud, Ms. Wahlstrom was damaged in an amount to be proved at trial of at least $900,000.

## COUNT IV

## CONVERSION

**(Defendants Hoey, Hoey Law, Keenan, Keenan Law, and Keenan's Kids Foundation)**

98.     Ms. Wahlstrom realleges each and every allegation stated in each of the paragraphs above as if separately repleaded in full herein.

99.     As shown above, Defendants Hoey, Hoey Law, Keenan, and Keenan Law intentionally and wrongfully exercised ownership, control and dominion over Ms. Wahlstrom's funds by presenting a misleading and inaccurate itemization of fees and expenses owed for the underlying case in order to keep unearned funds for themselves and to pay other fees and expenses that should have been paid out of Defendants own fee recovery.

100.    Defendant Keenan's Kids Foundation, through Keenan, intentionally and wrongfully exercised ownership, control and dominion over at least $20,824.00 of Ms. Wahlstrom's funds by taking those funds to pay the attorney's fees billed by the Foundation's own attorney for work performed for the Foundation and not for Ms. Wahlstrom.

101.    Defendants knew or lacked a good faith belief that they had earned or were entitled to take these monies from Ms. Wahlstrom.

102.    Using their trusted role as attorneys for Ms. Wahlstrom, Defendants converted funds from her in an amount to be proved at trial totaling at least $900,000.

## COUNT V

## DEMAND FOR ACCOUNTING

### (Defendants Hoey, Hoey Law, Keenan and Keenan Law)

103.    Ms. Wahlstrom realleges each and every allegation stated in each of the paragraphs above as if separately repleaded in full herein.

104.    Despite demand, Defendants have failed to fully account to Plaintiff for the disposition of all the monies they received and held in trust for her from the recovery in the of premises liability case. The itemizations, explanations, and supporting documentation provided as of the date hereof are incomplete and inaccurate for the reasons described above.

105.    Ms. Wahlstrom demands and is entitled to a full accounting from Defendants including for the Advocate Capital loan they claim was used for litigation expenses in Ms. Wahlstrom's case.

106.    Defendants should have maintained and retained complete records of the receipt, maintenance, and disposition of their client's funds and been able to render a full written accounting upon demand in compliance with Massachusetts Rules of Professional Conduct Rule 1.15.

107.    Defendants have failed to do so.

## COUNT VI

## MONEY HAD AND RECEIVED

### (Defendant Keenan's Kids Foundation)

108.    Ms. Wahlstrom realleges each and every allegation stated in each of the paragraphs above as if separately repleaded in full herein

109.     As shown above, Defendant Keenan's Kids Foundation are in possession of funds that belong in good conscience to Ms. Wahlstrom as the Foundation had its own attorney's fees paid by Ms. Wahlstrom in the amount of at least $20,824.00.

110.     Defendant Keenan's Kids Foundation knew that the appearance of attorney Richard Goran in Ms. Wahlstrom's case was strictly limited to appearing on behalf of the Foundation to defend Keenan's copyright for his litigation strategy manual in which Ms. Wahlstrom had no interest and received no benefit and they knew that Ms. Wahlstrom had no obligation to pay the Foundation's legal fees billed by its own attorney for work performed for the Foundation.

111.     Defendant Keenan's Kids Foundation was unjustly enriched at Ms. Wahlstrom's expense and the money taken from Ms. Wahlstrom and used to pay the Foundation's own attorney's fees, which should have been paid by the Foundation, should be returned to Ms. Wahlstrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kira Wahlstrom respectfully demands relief as follows:

1. Enter judgment in favor of Plaintiff and against Defendants on each of the counts in this Complaint;

2. Award compensatory damages in favor of Plaintiff and against Defendants on Count I (93A violations) in at least the amount of $900,000 and for these damages to be doubled or trebled in this Court's discretion;

3. Award compensatory damages in favor of Plaintiff and against Defendants on Counts II (breach of fiduciary duty), III (fraud), IV (conversion), and VI (money had and received) in at least the amounts stated above;

4. Order Defendants to produce a full accounting under Count V;

5. Order that Defendants pay over to Plaintiff any monies now being held by Defendants that belongs to her as shown by the accounting prayed for herein;

6.  Order disgorgement of ill-gotten profits and restitution of same;

7.  Award reasonable attorneys' fees as permitted or authorized by law;

8.  Award costs of suit herein incurred as permitted by applicable law; and

9.  Order such other and further relief at law or in equity to which the Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: August 2, 2022              Respectfully submitted,

*/s/ Bridget A. Zerner*
Bridget A. Zerner (BBO No. 669468)
*/s/ John J.E. Markham, II*
John J.E. Markham, II (BBO No. 638579)
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
bzerner@markhamreadzerner.com
jmarkham@markhamreadzerner.com
*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2022 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

Additionally, I provided a copy of the foregoing document to attorney John O'Connor of Peabody Arnold LLP who has informed undersigned that he is representing Defendant Don Keenan and Defendant Keenan Law in this matter though he has not been authorized to accept service on behalf of Keenan and Keenan Law and has not yet filed an appearance.

*/s/ Bridget A. Zerner*
Bridget A. Zerner

# EXHIBIT A - 1

<u>MASSACHUSETTS CONTINGENT FEE AGREEMENT</u>

<u>(TO BE EXECUTED IN DUPLICATE)</u>

<u>Date: February 2, 2010</u>

<u>The Client:</u>

| Kira Wahlstrom | 1 Whittier Place | Haverhill, MA 01832 |
|---|---|---|
| (Name) | (Street and Number) | (City or town) |

retains as "Attorney" the Law Offices of David J. Hoey, P.C. with an address of 352 Park St, Suite 105, North Reading MA 01864 and Austin S. O'Toole, Esquire with an address of 18 Tremont Street, Suite 1010, Boston, MA 02108 to perform the legal services referred to in Paragraph (1) below. The Attorney agrees to perform them faithfully and with due diligence.

(1)   The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

(2)   The fee is to be paid only upon recovery.

(3)   The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none.

(4)   Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client.

     33.3% of the gross amount recovered;

(5)   The Client is to be liable to the attorney for his reasonable expenses and disbursements **only** if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

# EXHIBIT A - 2

a) It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b) AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.

(6) In the event that the Law Offices of David J. Hoey, P.C. makes a recommendation regarding the pursuit of the claim including that a claim not be pursued or that the claim should be settled or that the claim may be dismissed and the Client refuses to accept the recommendation by the Law Offices of David J. Hoey, P.C., the Client agrees to pay all costs and expenses as incurred from that time forward, payable in advance. If the client fails or refuses to pay any such costs or expenses, the Client agrees that the Law Offices of David J. Hoey, P.C. may, at its option, withdraw from representation if permitted by the court to dismiss the claim.

(7) This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

a) We understand that current law and regulations regarding Medicare, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, law firm defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. We agree that the law firm may take all steps in this matter deemed advisable for the handling of our claim, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from our net recovery and shall not be paid out of the law firm's contingent fee in this matter.

# EXHIBIT A - 3

This agreement and its performance are subject to Rule 1.5 of the Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court.

**WE HAVE EACH READ AND AGREED THE ABOVE AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.**

Signatures

X _Kira Wahlstrom_
Client (Print)

_____
Attorney (Print)

X _____
(Signature of Client)

_David Hoey_
(Signature of Attorney)

# EXHIBIT B



## HOEYLAW

### LAW OFFICES OF DAVID J. HOEY, P.C.

David J. Hoey*
Richard T. Bromby
Andrew A. Hamilton
Suzanne CM McDonough*
Nicole R. G. Paquin*
*also admitted in New Hampshire

352 Park Street, Suite 105
North Reading, MA 01864
hoeylaw@earthlink.net
www.hoeylaw.com
P: (978) 664-3633
F: (978) 664-3643

February 2, 2010

Austin S. O'Toole, Esq.
Legal Counsel
18 Tremont Street, Suite 1010
Boston, MA 02108

Re: Kira Wahlstrom v. Jose Ruben Rivera, et al

Dear Attorney O'Toole:

This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be a recovery in this case:

33% of my fee from the sum recovered.

Will you kindly acknowledge your acceptance of the above on the additional copy of this letter, adding the date and return to this office at your earliest convenience.

Very truly yours,

DAVID J. HOEY

ACCEPTED AND AGREED TO: _____ DATE: _____

I, Kira Wahlstrom, hereby consent to Attorney Austin O'Toole receiving a referral fee in this matter and understand that I will not be charged any additional legal fees for this referral by Attorney Hoey to Attorney O'Toole.

ACCEPTED AND AGREED TO: _____ DATE: 2/10/10

**From:** kira wahlstrom
**Sent:** Thursday, June 11, 2015 9:24 AM
**To:** David Hoey
**Subject:** RE: Case Questions

# EXHIBIT C - 1

Perfect I'll be there!!!!

Sent from my MetroPCS 4G Wireless Phone

-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 12:22 PM (GMT-05:00)
To: kira wahlstrom <kirawahlstrom@live.com>
Cc:
Subject: RE: Case Questions

19th is good for signature and to visit Ann.
Meet me here at office at 9

**From:** kira wahlstrom [mailto:kirawahlstrom@live.com]
**Sent:** Thursday, June 11, 2015 12:14 PM
**To:** David Hoey
**Subject:** RE: Case Questions

Oh were not meeting at your office ok then can we do like 10 am. ?I'll meet you at your office
at 9 am.  I have to be back to get scarlett for 4 pm.

I remember you said that about Don I just forgot.
I went to Dean for travel management.  I didn't go back to Bridgewater because I failed math,
and school was very hard for me I am dislexic.  I love to work so I chose that path .

I can come by anytime to sign when is best. Do you need me to do it before the 19th or can I
do it then?

Kira

Sent from my MetroPCS 4G Wireless Phone

-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 11:15 AM (GMT-05:00)
To: kira wahlstrom <kirawahlstrom@live.com>
Cc:

Subject: RE: Case Questions

EXHIBIT C - 2

I mentioned it to you one of the last couple of visits. It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money. Ill show it to you next time I see you.

What science?
Why didn't go back for second semester at Bridgewater?
9am would mean we would have to leave here at 8AM. I can do that if that is best

---

**From:** kira wahlstrom [mailto:kirawahlstrom@live.com]
**Sent:** Thursday, June 11, 2015 11:04 AM
**To:** David Hoey
**Subject:** RE: Case Questions

What is the new fee agreement?
I went to Nauset high school in eastham. Dean college in Franklin ma associate of science degree. And Bridgewater state for 1 semester.

19th would be best. What time do you think I'd prefer around 9 am

Kira

Sent from my MetroPCS 4G Wireless Phone


-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 10:56 AM (GMT-05:00)
To: "kira wahlstrom (kirawahlstrom@live.com)" <kirawahlstrom@live.com>
Cc:
Subject: Case Questions

1) I need you to stop by and sign the new fee agreement with DON.
2) What high school did you graduate from and what year? What schooling did you have after high school? Any degrees? What school? What year?
3) Can you meet with Ann and me on June 19 or 22nd?

David J. Hoey, Esq.
Law Office of David J. Hoey, P.C.
352 Park Street, Suite 105
North Reading, MA 01864
p: 978-664-3633 | f: 978-664-3643
dhoey@hoeylaw.com
www.hoeylaw.com

# EXHIBIT D - 1

## MASSACHUSETTS CONTINGENT FEE AGREEMENT
### (TO BE EXECUTED IN DUPLICATE)

Date: 6/1/15   6/19/15

The Client(s):

Kira Wahlstrom                          1227 Boston Road              Haverhill, MA 01835

_____

(Name)                      (Street and Number)              (City or town)

following the Court's allowance of the Pro Hac Vice admission motion, retains as "Attorney"
**DON C. KEENAN and THE KEENAN LAW FIRM. P.C.** with an address of 148 Nassau St.
NW, Atlanta GA to perform the legal services referred to in Paragraph (1) below. The Attorney
agrees to perform them faithfully and with due diligence.

(1)   The claim, controversy, and other matters with reference to which the services are to be
      performed are:
      *Premises liability claims and injuries received as a result of assault on or about May 1,
      2009 in the Radisson Hotel Boston parking lot*

      The Attorney will be providing services, including legal services and consulting, to the
      Client in connection with the Claim identified in paragraph 1 above. Because the
      engagement is limited to this specific undertaking, the Attorney's acceptance of this
      engagement does not involve an undertaking to provide any services to the Client or any
      of the Client's interests in any other matter unless specifically requested by the Client and
      agreed to by the Attorney in writing. After completion of this matter, changes may occur
      in pertinent laws or regulations that may have an impact upon your future rights and
      liabilities. Unless the Client engages the Attorney after completion of this matter to
      provide advice on future issues arising from this matter, the Attorney will have no
      obligation to provide any advice to the Client with respect to future legal developments.

      The Client may limit or expand the scope of this engagement from time to time, provided
      that the Attorney must agree in writing to any changes in the scope of the representation.
      Except as otherwise agreed to in writing, the terms of this Agreement apply to all changes
      in the scope of engagement and to all additional engagements for the Client which the
      Attorney may undertake.

(2)   The contingency upon which compensation is to be paid is: **recovery of damages,
      whether by settlement, judgment or otherwise.**

(3)   The Client is not to be liable to pay compensation otherwise than from amounts collected
      for (him) / (her) by the Attorney except as follows: If no recovery is made, the Client
      shall not owe the Attorney any sum as attorney's fees, nor shall the Client be responsible
      to reimburse the Attorney for any costs, except as provided in Sections 6, 7 and 8.

# EXHIBIT D - 2



(4)  Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:

**33 and 1/3 % (thirty-three and one-third percent)** of gross amount recovered

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.

The percentage shall be applied to the amount of the recovery not including any attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

Referring/Associated Counsel:
The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees. Client understands that the Client will not be charged any additional legal fees.



(5)  The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of the Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may choose to do so, and may choose to cease doing so for any reason whatsoever, with notice to the Client.

(6)  In the event that the Attorney makes a recommendation regarding the pursuit of the claim, including that a claim not be pursued, or that the claim should be settled, or that the claim should be dismissed, and the Client refuses to accept the recommendation by the Attorney, the Attorney may, at its option, withdraw from representation. If the claim

# EXHIBIT D - 3

is in litigation, withdrawal will be subject to Court approval. Should the Attorney continue representation, the Client agrees to reimburse the Attorney for the amount of such costs, reasonable expenses and disbursements incurred thus far, and to pay all costs and expenses as incurred from that time forward, payable in advance.

(7)     This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, and resolutions of Medicare liens and Medicaid claims.


x DCK

Pursuant to Massachusetts General Laws, any net proceeds (gross recovery less compensation, costs, and expenses) due to the Client at the time of settlement may, and if applicable, will, be subject to liens/attachment by, but not limited to, Medicare, Medicare Advantage Plans, MassHealth, Medicaid, Department of Revenue, Department of Transitional Assistance, Department of Estate Recovery, Department of Liability Recovery, SSI, private Health Insurance, Short Term/Long Term Disability claims, and medical providers, if any, that may be owed by the Client. All proper Liens will have to be satisfied before the balance of the settlement can be remitted to the Client.

Client hereby acknowledges and understands that current law and regulations regarding Medicare, Medicare Advantage Plans, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, attorney, defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. Client agrees that the Attorney may take all steps in this matter deemed advisable for the handling of such claims, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from the net recovery and shall not be paid out of the attorney's contingent fee in this matter.

(8)     If the client terminates the attorney-client relationship before the conclusion of the case for any reason, the attorney may seek payment for the work done and expenses advanced. Whether Attorney will receive any payment for the work done before the termination, and the amount of any payment, will depend on the benefit for the client of the services performed by Attorney as well as the timing and circumstances of the termination. Such payment shall not exceed the lesser of (i) the fair value of the legal services rendered by Attorney or (ii) the contingent fee to which the lawyer would have been entitled upon the occurrence of the contingency. This paragraph does not give Attorney any rights to payment beyond those conferred by existing law.

x DCK

(9)     The Attorney may withdraw from representing the Client if withdrawal can be accomplished without material adverse effect on the interest of the Client, or if:

x DCK

# EXHIBIT D - 4

(a) the Client persists in a course of action involving the Attorney's services that the Attorney reasonably believes is criminal or fraudulent;

(b) the Client has used the Attorney's services to perpetuate a crime or fraud;

(c) the Client insists upon pursuing an objective that the Attorney considers repugnant or imprudent;

(d) the Client fails substantially to fulfill an obligation to the Attorney regarding its services and has been given reasonable warning that the Attorney will withdraw unless the obligation is fulfilled;

(e) the representation will result in an unreasonable financial burden on the Attorney or has been rendered unreasonably difficult by the Client; or

(f) other good cause for withdrawal exists.



(10) The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1), **except** if the former/prior counsel is identified as the referring or associated counsel in paragraph (4),

(11) During the course of the engagement, the Attorney shall maintain a file on the Client's behalf that will include both physical documents and electronically stored information ("the file"). The file may include either original or copies of material such as pleadings, transcripts, exhibits, reports, contracts, wills, certificates and other documents as are determined to be reasonably necessary to the representation. The file shall be and remain the Client's property. The Law Firm may also include in the file attorney work product, mental impressions and notes (collectively "work product"). The work product shall be and remain the property of the Attorney.

At the termination of the engagement, if requested in writing by the Client, the Attorney will return to the Client all original documents that were provided. Further, for a period of six (6) years (unless otherwise required by the Rules of Professional Conduct or applicable laws) after termination or upon conclusion of the engagement, and provided there are no outstanding unpaid statements for fees and/or costs or expenses owed by the Client to the Attorney, the Client shall have the right on request to take possession of the file, not including the work product, unless at the conclusion of the engagement, the Client has requested and/or confirmed in writing, that the Attorney properly dispose all or parts of the file (unless otherwise required by the Rules of Professional Conduct or applicable laws). In either such event, the Attorney, at his/her/its expense may make and retain copies of all or portions of the file. If the Client does not request possession of the file within this time period, the Attorney will have no further responsibility for the retention and maintenance of the file and may at its option properly dispose of all or parts of the file without further notice to you.



(12) The Client hereby acknowledges and confirms, by signature on this agreement, and by initialing by all paragraphs (1-14), that the Attorney has explained the provisions of this agreement, where it differs from the SJC Model Form agreement, and specifically with the respect to responsibility for court costs and expenses of litigation. Additionally, the

# EXHIBIT D - 5

Client acknowledges that the Attorney has advised the Client that different forms of agreements may be available, and that the Client selects the provisions as stated herein. By signing below, the Client acknowledges that he or she has carefully read this Agreement, understands its contents, and agrees to be bound by all of its terms and conditions; that the Attorney has made no representation to the Client as to the likelihood of the outcome of any proceeding now pending or to be brought by or against the Client, and that the Client believes this Agreement to be fair and reasonable. The Client understands that the Attorney cannot and does not promise or even predict that its efforts will be successful, and this Agreement is not based upon any such promises or anticipated results. Furthermore, the Client understands it is possible that the cost to the Client of the Attorney's work may exceed the value of whatever the Client may gain.

(13)   This Contingent Fee Agreement (6 pages, 14 paragraphs, and attachments) encompasses the entire agreement of the parties (the Client and the Attorney), and supersedes all previous understandings and agreements between the parties, whether oral or written. The parties hereby acknowledge and represent that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this agreement.   This agreement may only be modified in writing, signed by all parties the agreement.



(14)   This agreement and its performance are subject to rule 1.5 of the Rules of Professional Conduct as adopted by the Supreme Judicial Court ("SJC") of Massachusetts. (Last updated and effective as of January 1, 2013) (copy attached)

# EXHIBIT D - 6

WE HAVE EACH READ, UNDERSTOOD AND AGREED TO THE ABOVE
AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES
RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.

Signatures

Kira Wahlstrom
_____
Client(s) (Print)

_____
(Signature of Client(s))

  DON C. KEENAN
_____
for THE KEENAN LAW FIRM, P.C.
(Attorney)

_____
(Signature of Attorney)

**THIS AGREEMENT BECOMES EFFECTIVE WHEN RETURNED TO AND SIGNED
BY THE ATTORNEY FOR THE LAW FIRM.**

# EXHIBIT E - 1

## ENGAGEMENT AGREEMENT

This engagement agreement contains the terms under which Law Offices of David J. Hoey, P.C. and its principal David J. Hoey (collectively the "Client") agree to retain Goganian & Associates, P.C. ("the Firm") to provide, and the Firm agrees to provide, legal representation in responding to the Attorney's Lien filed by Krzysztof Sobczak, Esq. in the matter of *Kira Wahlstrom v. Jose Ruben Rivera, III, et al.*, Suffolk Superior Court Civil Action No. 2010-01022.

1. Consistent with Mass. R. Prof Conduct 1.5(b), the Firm requires execution and delivery of this Agreement before it undertakes legal representation of the Client.

2. The Firm will issue monthly invoices to Law Offices of David J. Hoey, PC for its fees on a time-expended basis and for all out-of-pocket expenses it incurs in its representation of the Client. Payment is due within 30 days. The Firm reserves the right to charge interest on any overdue payments at the rate of 18% per annum.

3. The Client acknowledges that it is impossible to determine in advance the specific amount of time or expense that will reasonably be needed to provide it with proper representation in connection with the above-described matter, that the total amount of fees and expenses cannot accurately be predicted, and that no estimate of the total amount of fees and expenses has been made.

4. All time devoted by the Firm to the above-described matter, including among other things time devoted to meetings, conferences, telephone calls, paper and electronic correspondence, factual and legal research and analysis, preparation for and participation in mediations and other alternative dispute resolution proceedings, settlement negotiations, and reasonably necessary travel will be billed on an hourly basis in multiples of tenths of an hour.

5. Hourly billing rates will be as follows:

   | | |
   |---|---|
   | Amy E. Goganian | $300/hour |
   | Associates | $225/hour |
   | Paralegals | $90/hour |

   The Firm anticipates that Amy E. Goganian will bear primary responsibility for handling the above-described matter, but the services of others may be used in circumstances where the Firm judges that by doing so representation of equal quality can be provided at lower cost to the Client. The hourly rates quoted in this paragraph are subject to change upon 30 days advance written notice.

# EXHIBIT E - 2

6.    The Client agrees to pay all out-of-pocket expenses reasonably incurred on its behalf in connection with the above-described matter, including among other things automobile mileage expense at the federally-approved rate, parking charges, tolls, other reasonable travel expenses, mediators' fees and charges, investigative expenses, experts' and consultants' fees, on-line research charges, copying charges, delivery and/or courier fees, and extraordinary postage expense. The Firm will not retain any technical expert, consultant, or outside investigator without first obtaining the Client's approval.

7.    Subject to the provisions of any applicable court rules and subject to the provisions of the Massachusetts Rules of Professional Conduct, the Client may at any time, with or without cause, discharge the Firm and the Firm may at any time, with or without cause, terminate its representation of the Client.

8.    The Firm's representation of the Client is limited to the above-described matter. The Client acknowledges that the Firm does not represent it in connection with other matters in which it is or may become involved.

**Law Offices of David J. Hoey, P.C.**            **Goganian & Associates, P.C.**

By: David J. Hoey, Esq.                           By: Amy E. Goganian, Esq.
352 Park Street, Suite 105                        144 Gould Street, Suite 202
North Reading, MA 01864                           Needham, MA 02494
Tel: (877) 529-4639                               Tel: (781) 433-9812

Dated: _6/18/2019_                                Dated: _6/18/2019_

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED **EXHIBIT F - 1**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss
                                    SUPERIOR COURT DEPARTMENT
                                    CIVIL ACTION NO. 2184CV00741

|  |  |
|---|---|
| AUSTIN O'TOOLE, and THE LAW OFFICES OF AUSTIN SCOTT O'TOOLE, P.C., | ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) |
| DAVID HOEY AND THE LAW OFFICES OF DAVID HOEY, P.C., AND KIRA WAHLSTROM, | ) ) ) ) |
| Defendants | ) ) |

### AFFIDAVIT OF KRZYSZTOF SOBCZAK

I, Krzysztof Sobczak, am an attorney licensed to practice law in the Commonwealth of

Massachusetts. I have been in active practice and in good standing in the Commonwealth of

Massachusetts since 2011. Prior to my admission to the Massachusetts bar, I graduated from

Boston College Law School with a J.D. in 2010, having previously received M.S. from Boston

University in 2013, and B.S. from Massachusetts Institute of Technology in 2000. I make these

averments based on my personal knowledge and recollections:

1.      In 2014 I started to work at and for the Law Offices of David J. Hoey, P.C.

("Hoey Law").

2.      While working for Hoey Law, among other cases, I worked on the matter of *Kira*

*Wahlstrom v. Rivera et al*, C.A. 1084-cv-01022 (Suffolk), having first filed my appearance in

1

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

# EXHIBIT F - 2

said case in April 2014. The Wahlstrom matter was a major premises liability case that derived from an attack that Kira suffered in the Radisson Boston parking garage. The case tried in July and August, 2015 resulting in jury verdict for the Plaintiff. As a result of pleadings that Mr. Hoey filed in that case subsequently, it is a matter of public record that on November 18, 2019, Ms. Wahlstrom recovered $9,987,683.80.

3.      I was part of the trial team that successfully tried the Wahlstrom case.  I was involved in all phases of the preparation for the trial and examined or cross-examined many of the witnesses. I also drafted many of the pre-trial and in-trial motions and was involved with nearly every aspect of preparing the case for trial.

4.      During the time that we were preparing the case for trial, I was frequently in contact with Kira.  I also was in frequent contact with the third member of the trial team, Attorney Don C. Keenan of Atlanta, as well as his associate, Attorney Andrew Gould.  It is a matter of public record that on March 13, 2015, a motion to admit Attorney Keenan *pro hac vice* was filed in the Wahlstrom case, a motion that the court allowed.

5.      During the time that I worked at Hoey Law, it was customary for Attorney Keenan, on Attorney Hoey's request, to become involved in certain cases where the damages appeared to be significant.  Hoey very seldom tried cases on his own and preferred to settle them or if they were to be tried, sought other counsel to try them with him or for him.

6.      When Hoey would hire Keenan into a case, the portion of the attorney fee that was recovered that Keenan was to paid upon successful resolution varied, and escalated depending upon the extent of Keenan's involvement in the case. When Keenan consulted on a case, his usual fee was 30% of all the attorney's fees recovered. When Keenan tried a case with

2

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

# EXHIBIT F - 3

Hoey (the highest level of involvement), Keenan was entitled to higher percentage. I have seen copies the contract between Hoey and Keenan in the Wahlstrom case, and it called for 40% or 50% percent of all attorneys' fees to be due to Keenan. To the best of my recollection, at the time Hoey hired Keenen to help on the Wahlstrom case the client, Kira Wahlstrom was not aware of this arrangement, as it would not affect the total attorneys' fees either way.

7.      Throughout the time that I worked at Hoey Law, Hoey maintained a recording system that taped certain important calls on cases, including conference calls to and from Keenan.  When there was an important call about a case, the conversation was usually taped. After the recordings were made, Hoey would send them out to a commercial service for transcription.

8.      Before the trial of the Wahlstrom case, there were multiple discussions about the division of the potential attorney's fee, once and when the case is successfully resolved, as I was also promised a portion of the attorneys' fees recovered on the case, and since Hoey had taken the Wahlstrom case on referral from attorney Austin O'Toole, he also was potentially due a portion of the attorneys' fees. In discussions with Keenan where I was present, Hoey described the referral fee agreement as one in which O'Toole was entitled to one third of Hoey's fee. Given that O'Toole was to get one-third of the fee in the case, and Keenan was to get 50% of the fee, that would potentially leave Hoey with a very small fee for five years of work and a very substantial outlay of costs.

9.      Initially, Hoey though that he might not have to pay O'Toole because the BBO had ordered that O'Toole be suspended from the practice of law for six months, and looked into this, including potentially hiring outside counsel, to determine whether or not O'Toole would need to be paid out of this case.

3

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGED

**EXHIBIT F - 4**

10.     I was not directly privy to whatever advice Hoey was given, but in any event the

conclusion was made that O'Toole would need to be paid the referral fee. However, in order to

reduce what O'Toole would be potentially paid, Hoey decided that Kira should sign a new fee

agreement directly with Keenan on which Hoey would become the referring attorney, thus

whatever fee O'Toole would be due would be only from the Hoey portion and not the full

attorneys' fees amount. However, both the original and the new contingent fee agreement that

the client (Kira Wahlstrom) as presented indicated that she would be paying one fixed amount

for attorneys' fees and all involved and associated attorneys would be paid out of that fee. To

illustrate their thinking, if Hoey was paid the full fee, then O'Toole would get one third of that

amount. However, under this new scheme, if the full fee was paid directly to Keenan, O'Toole

would not get any part of that portion of the fee. Instead, O'Toole would only get one third of the

portion of the fee allocated to Hoey, in other words, one-third of 50% or 60% of the fee, rather

than one third of 100% of the fee if it were paid to Hoey.

11.     To my recollection and knowledge, there was no discussion of any other purpose

of the new fee agreement other than reducing O'Toole's recovery. There were also no

conversations about possibly informing O'Toole about the situation or inviting him to discuss the

situation. Nor was there any explanation to Kira as to why the new fee agreement was being

presented to her and how that would affect how any and all attorneys would get paid. Indeed, at

the time that the discussions were taking place in May and June 2015 (just before the Wahlstrom

trial was scheduled to begin), Keenan had already entered his notice of appearance for Kira

months earlier. The fee agreement between Keenan and Hoey dividing Hoey's fee with Keenan

had also been signed many months before the Keenan/Wahlstrom agreement.

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGE

# EXHIBIT F - 5

12. To my recollection and knowledge there was no discussion at this time about reducing or reallocating the percentage of the recovery that would go to Hoey or Keenan. There was also nothing that changed about the allocation of Hoey's and Keenan's responsibilities in the case once the new agreement was signed. We continued preparing for trial just as we had, and the relative responsibilities all stayed the same. Based on discussions that I was a part of, the only purpose of the new fee agreement between Kira and Keenan was to ensure that there was more money for Hoey and less money for O'Toole.

13. After we obtained a successful jury verdict on the case, multiple post trial motions ensued, and additional attorneys, including appellate attorneys were brought onboard to the team.

14. While this case was pending on appeal, in or around January 2017, with advice and consultation from attorney Keenan, I ended my employment with Hoey Law, and thus client choice of counsel letters were to be sent to all the pending active cases in which I had an appearance, which included the Wahlstrom case.

15. Hoey generally refused to send such letters out, and specifically with regard to this case, on January 22, 2017, Hoey send me a copy of a January 20, 2017 letter he sent to the Plaintiff, informing Kira Wahlstrom that with her permission and consent, Sobczak will remain on this case until its conclusion.

16. On January 24, 2017 Plaintiff Kira Wahlstom confirmed to me that she wants to retain me to stay on the case, thus authorizing and ratifying in writing my continued employment on the matter, now under my own firm, as an associated lawyer under the terms of the last active fee agreement she signed on this case.

CONFIDENTIAL INFORMATION – ATTORNEY CLIENT PRIVILEGE

# EXHIBIT F - 6

17.     However, after Hoey-Sobczak relationship deteriorated further, upon information and belief, Hoey subsequently pressured certain client to discharge me, and on March 6, 2017 I received a letter from attorney DeJuneas (who was brought into the case after the verdict to assist with the post trial motions (and had an appearance on the case since 2015) with an alleged note from the Plaintiff, dated in 2007 asking me to withdraw from the case to assist with the appeal, but not relieving me as her counsel.

18.     Around this time I also heard from Attorney Keenan, who learned that Hoey also owed a portion of the potential legal fee on this case to me, asking that I only communicate with him via his counsel, as we were now at potential conflict over portions of the legal fee.

19.     Having learned that the Plaintiff was allegedly relieving all her "trial" counsel as part of the appeal strategy, I filed my notice of withdrawal with the Court.

20.     On June 10, 2019, the Appeals Court essentially reversed the trial court's order, correcting several of the false allegations in the trial court's 2016 order and restoring the jury verdict.

21.     Thus, on June 11, 2019, following the Appeals Court decision in this matter, I filed an attorney's lien pursuant to Mass. G. L. ch. 221, sec. 50, to put the various parties on notice of my claim, which at this point would be on the basis of quantum meruit for the 1200 plus hours on worked on this case.

22.     As of the date of this affidavit, my attorney's fees dispute is a live controversy.

Signed and sworn under the pains and penalties of perjury on February 6, 2022.

Krzysztof Sobczak

# EXHIBIT B

## MASSACHUSETTS CONTINGENT FEE AGREEMENT
### (TO BE EXECUTED IN DUPLICATE)

Date: February 2, 2010

The Client:

| Kira Wahlstrom | 1 Whittier Place | Haverhill, MA 01832 |
|---|---|---|
| (Name) | (Street and Number) | (City or town) |

retains as "Attorney" the Law Offices of David J. Hoey, P.C. with an address of 352 Park St, Suite 105, North Reading MA 01864 and Austin S. O'Toole, Esquire with an address of 18 Tremont Street, Suite 1010, Boston, MA 02108 to perform the legal services referred to in Paragraph (1) below. The Attorney agrees to perform them faithfully and with due diligence.

(1)   The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

(2)   The fee is to be paid only upon recovery.

(3)   The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none.

(4)   Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client.

   33.3% of the gross amount recovered;

(5)   The Client is to be liable to the attorney for his reasonable expenses and disbursements only if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

EXHIBIT ꝫ

2

Wahlstrom 1-31-2

LDH 0000010

a) It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b) AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.

(6) In the event that the Law Offices of David J. Hoey, P.C. makes a recommendation regarding the pursuit of the claim including that a claim not be pursued or that the claim should be settled or that the claim may be dismissed and the Client refuses to accept the recommendation by the Law Offices of David J. Hoey, P.C., the Client agrees to pay all costs and expenses as incurred from that time forward, payable in advance. If the client fails or refuses to pay any such costs or expenses, the Client agrees that the Law Offices of David J. Hoey, P.C. may, at its option, withdraw from representation if permitted by the court to dismiss the claim.

(7) This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

a) We understand that current law and regulations regarding Medicare, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, law firm defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. We agree that the law firm may take all steps in this matter deemed advisable for the handling of our claim, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from our net recovery and shall not be paid out of the law firm's contingent fee in this matter.

LDH 0000011

This agreement and its performance are subject to Rule 1.5 of the Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court.

**WE HAVE EACH READ AND AGREED THE ABOVE AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.**

Signatures

X Kim Wahlstrom
_____
Client (Print)

_____
Attorney (Print)

X
_____
(Signature of Client)

David Hoey
_____
(Signature of Attorney)

LDH 0000012

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION – BOSTON)

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>                    Plaintiff,<br><br>          -against-<br><br>DAVID J. HOEY, LAW OFFICES OF DAVID J. HOEY, P.C., DON C. KEENAN, D.C. KEENAN & ASSOCIATES, P.C. D/B/A THE KEENAN LAW FIRM, P.C., AND KEENAN'S KIDS FOUNDATION, INC.<br><br>                    Defendants. | Civil No. Civil No. 1:22-cv-10792-RGS |

**PLAINTIFF KIRA WAHLSTROM'S RESPONSE TO THE FIRST SET OF
INTERROGATORIES BY DEFENDANT D.C. KEENAN & ASSOCIATES, P.C.
D/B/A THE KEENAN LAW FIRM**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 26.1, Plaintiff Kira Wahlstrom ("Plaintiff") herein responds to the First Set of Interrogatories by Defendant D.C. Keenan & Associates, P.C. d/b/a The Keenan Law Firm, P.C. ("Keenan").

Ms. Wahlstrom responds with the information available to her now and will supplement as appropriate as more information is developed during discovery including after receiving document production from Defendants and any other appropriate third-parties and after the taking of depositions.

**RESPONSES TO INTERROGATORIES**

1. **State your name, address, date of birth, place of employment, and job title.**

**Response:**

Name: Kira Wahlstrom
Address: 5375 Sunny Ridge Place, Paso Robles, California 93446
Date of Birth: 11/29/1973

1

Place of Employment: N/A
Job Title: N/A

**2. Regarding the 2010 Contingency Fee Agreement that is attached to your amended complaint, state whether: (1) you read it in full before you executed it; and (2) whether you ever discussed its terms with Don Keenan or any other Keenan employee.**

**Response:**

I read the agreement before I executed it after conferring with David Hoey.

I never discussed the 2010 Contingency Fee Agreement with Don Keenan or anyone from his firm.

**3. If you did discuss the terms of the 2010 Contingency Fee Agreement with Don Keenan or a Keenan employee, state; (1) the approximate date/timeframe of each such discussion; and (2) everything that you said and everything said to you.**

**Response:**

Not applicable.

**4. If you ever discussed the 2010 Contingency Fee Agreement with David Hoey or any Hoey employee, state: (1) the approximate date/timeframe of each such discussion; and (2) everything that you said and everything David Hoey said to you.**

**Response:**

My memory is that David Hoey mailed the 2010 Contingency Fee Agreement to me and that we then discussed the agreement on the phone. It would have been right around the time before it was executed on or around February 2, 2010. I do not have a specific memory of the exact date(s) of the discussions nor do I have a specific memory of what was said.

**5. Regarding the 2015 Contingent Fee Agreement that is attached to your amended complaint, state: (1) whether you ever discussed its terms with Don Keenan and/or Andrew Gould and/or David Hoey and/or Krzysztof Sobczak; and/or anyone else from their respective firms; and (2) if so, the approximate date/timeframe of each such discussion; and (3) everything that you said and everything that was said to you.**

**Response:**

I discussed the terms of the 2015 Contingent Fee Agreement with David Hoey before I signed it. I did not discuss the new agreement with Don Keenan or anyone else from either law firm before I signed it.

On June 11, 2015, after David Hoey had emailed saying he needed me to stop by to sign a new fee agreement, I asked him via email "What is the new fee agreement?" And he responded: "It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money." Thereafter, I went in to Hoey's office to sign the agreement and he reiterated then the same thing that the new agreement did not change anything for me and that I would not be paying any more in fees rather that the agreement only added Don Keenan to the agreement so that he could represent me in the case and at trial.

6. **State whether: (1) you ever exchanged emails, texts, or voicemail messages with Don Keenan, Andrew Gould, David Hoey, Krzysztof Sobczak, and/or anyone else from their respective firms regarding the 2015 Contingent Fee Agreement; (2) if so, the approximate date/timeframe and the substance of everything you said and everything that was said to you; and (3) whether the messages/communications still exist.**

**Response:**

I have exchanged emails, texts, and voicemails with David Hoey. Regarding communicating about the 2015 Contingent Fee Agreement, I have the email chain that is attached to my Amended Complaint as Exhibit C in which he said to me on June 11, 2015: "It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money. Ill show it to you next time I see you."  If I locate additional emails or texts that specifically address the 2015 Contingent Fee Agreement in my possession, I will produce them.

I did not text or email with anyone else from these two law firms specifically about the 2015 Contingent Fee Agreement to my memory.

7. **If you contend that the provisions of the 2015 Contingent Fee Agreement regarding increasing the compensation of counsel by up to 7% following an appeal, and referred to in paragraph 26 of your amended complaint, are not binding on or enforceable as against you, describe in detail all facts and evidence in support of that contention.**

**Response:**

The 2015 Contingent Fee Agreement specifically provides (emphasis added):

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery *if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney* [Don C. Keenan and The Keenan Law Firm PC] *on behalf of the Client*, and an additional 5% of gross recovery Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.

3

Don Keenan and The Keenan Law Firm did not file the appellate brief on my behalf or otherwise handle the appeal as appellate counsel. Keenan did not seek to get admitted before the appellate court, he did not write the brief, or handle the oral argument. Thus, Keenan and Keenan Law were not entitled to take an additional fee for appellate work (which they did not provide) under the terms of the 2015 Contingent Fee Agreement.

The fee agreement I had with the law firm of Patty DeJuneas made clear that I was paying her and her firm to handle the appeal. And I agreed to pay for Robert Cordy to assist with the appeal as well. I was never told that I would also have to pay Keenan (and Hoey) for this appeal on top of paying the appellate attorneys, nor does the 2015 Contingency Fee Agreement require me to do so.

I am aware of Don Keenan himself acknowledging in an email that he was not appellate counsel. On April 15, 2016, Don Keenan stated in reply to an email from DeJuneas:

*Y'all know me so my first reaction is to attack and hit 'em hard. However I'm not an appellate lawyer, don't pretend to be, don't see the world through the POV of an appellate lawyer.*

*So since we've got a very good appellate lawyer, one who has impressed me, I would suggest we listen to her and do what she says.*

*Papa Don*

This email is included in my document production.

8. **Regarding the itemization and spreadsheet referred to in paragraph 54 of your amended complaint, state whether: (1) you read them both in full; (2) you ever discussed either of them with Don Keenan, Andrew Gould, or anyone else (other than David Hoey) associated with Keenan & Associates, P.C.; and (3) if so, everything that you said and everything that was said to you.**

**Response:**

On March 27, 2020, Hoey provided me an itemization falsely representing that all the fees and expenses taken from my recovery were properly charged and owed by me. Hoey induced me to sign off on the expenses knowing that I trusted him and his representations that these expenses were appropriate and required under our fee agreement.

On March 29, 2020, Hoey emailed the spreadsheet itemization again falsely representing that the fees and expenses charged to me were proper and not fully explaining all the charges in the line items, knowing that I trusted him and his representations that these expenses were appropriate and required under our fee agreement.

9. **If you contend that you were harmed or damaged by delays associated with the appeal from the $4 million judgment referred to in paragraph 29 of your amended complaint, describe in detail all facts and evidence in support of contention, itemizing all alleged damages and losses.**

4

**Response:**

During the appeal, I continued to struggle financially and had to take out a loan to support myself which David Hoey secured for me. While I was able to pay back the loan ultimately after the recovery, my financial struggles during the appeal were distressing along with the prospect that I might have to go through a second trial and the accompanying time and costs that would be involved and the prospect of publicly reliving my trauma and enduring cross-examination by defense counsel again.

**10. Regarding the "misconduct" alleged in paragraph 30 of your amended complaint, state: (1) exactly what actions and behavior that you consider to be "misconduct"; and (2) all actions and behavior, if any, on the part of Don Keenan and/or Andrew Gould and/or other Keenan employee that you allege was "misconduct."**

**Response:**

This paragraph does not refer to my opinion. It first refers to the "misconduct" alleged by JPA in their motion for new trial, as paragraph 30 first states "After the verdict was rendered, JPA (the garage managers/owners) filed a motion for new trial based on attorney misconduct by Ms. Wahlstrom's trial attorneys." One should refer to their motion papers for their arguments as to what was argued to be misconduct and the motion papers should already be in the possession of Keenan.

This paragraph then states "The trial judge (Associate Justice Paul D. Wilson) agreed that two of her attorneys (Hoey and his associate) engaged in misconduct that adversely affected JPA's substantial rights, misconduct such as repeatedly defying court orders and arguing after court rulings, often in the presence of the jury. As a result, the trial court allowed JPA's motion, vacated the verdict, and ordered a new trial." And cites to *Wahlstrom v. LAZ Parking Ltd., LLC*, No. SUCV20101022, 2016 WL 3919503 (Mass. Super. May 19, 2016).

The Memorandum Decision and Order granting the new trial motion specifically found misconduct by David Hoey and Krzysztof Sobczak as could easily be determined by an attorney by just reading the order. As to Keenan, the order only stated:

Before addressing the specific issues, however, I will briefly comment on the complaint by the JPA Defendants that Plaintiff's counsel followed the "Reptile" playbook at trial. As defense counsel informed me in a pretrial Bench Memorandum, Plaintiff's counsel Mr. Keenan travels the country teaching seminars to plaintiffs' personal injury lawyers based on his book entitled "Reptile, The 2009 Manual of the Plaintiff's Revolution."[7] Mr. Keenan teaches that plaintiffs' lawyers should appeal to the primitive, reptilian portions of jurors' brains, which will cause them to decide cases based on a subconscious desire to protect themselves and their loved ones from the danger posed by the allegedly negligent behavior of any defendant. The "Major Axiom" of the book, Mr. Keenan states at its outset, is this: "When the Reptile [apparently a reference to a primitive part of the juror's subconscious] sees a survival danger, even a small one, she protects her genes by impelling the juror to protect himself and the community." *Id.* at 8.

I mention this argument at the outset because the new trial motion of the JPA Defendants is sprinkled with references to particularly inflammatory portions of Mr. Keenan's book, coupled with alleged examples of how Plaintiff's counsel allegedly put Mr. Keenan's Reptile theory into practice at this trial. Both before and at trial, I paid little attention to Mr. Keenan's philosophy, instead focusing on particular actions of Plaintiff's counsel without considering whether they were products of that philosophy. I will take that approach in this Memorandum of Decision as well, and will mention the Reptile theory no more.

*Wahlstrom v. LAZ Parking Ltd., LLC*, No. SUCV20101022, 2016 WL 3919503, at *4 (Mass. Super. May 19, 2016), *rev'd sub nom. Wahlstrom v. JPA IV Mgmt. Co., Inc.*, 96 Mass. App. Ct. 1108, 138 N.E.3d 1045 (2019)

I am not an attorney, judge or legal expert and cannot otherwise personally give an opinion on what qualifies as attorney "misconduct." All I know is that the trial judge granted a new trial motion finding that my attorneys had engaged in misconduct during trial.

**11. If you contend that David Hoey, Krzysztof Sobczak, or anyone else employed by David Hoey or his firm was an agent, representative, or servant of Keenan, describe in detail all facts and evidence in support of that contention.**

**Response:**

David Hoey, to my understanding, acted on behalf of Don Keenan by providing to me the 2015 Contingency Fee Agreement and inducing me to sign it. See my response to No. 5 above which is adopted and incorporated here. Hoey also, to my understanding, acted with and/or behalf of Keenan in advising me of the expenses that were required to be paid out of my recovery (including the fees paid to an attorney representing Keenan's own foundation) which funds Keenan then released from his trust account for payment of these claimed expenses.

**12. Regarding the fees charged by Patricia DeJuneas and Robert Cordy for their appellate work as referred to in paragraph 50(b) of your amended complaint, state: (1) whether you ever disputed the reasonableness of their charges totaling $213,091.52; (2) if so, the approximate date/timeframe and substance of all communications regarding that issue; and (3) whether you now dispute the reasonableness of the DeJuneas/Cordy charges.**

**Response:**

I did not raise any dispute with the reasonableness of the charges by Patty DeJuneas or Robert Cordy for their handling of my appeal and I do not dispute the reasonableness of the fees they charged now.

**13. If you contend that any actions or conduct of Keenan, including Don Keenan or Andrew Gould, was unfair or deceptive and caused you harm or damages, describe in detail all facts and evidence in support of that contention, itemizing all alleged damages and losses.**

**Response:**

As specifically detailed in the allegations in my Amended Complaint, which I adopt and incorporate herein, Keenan and Keenan Law, acting together with Hoey and Hoey Law in a coordinated effort, engaged in unfair and deceptive acts, unlawful under Section 2 of Chapter 93A, Massachusetts General Laws, through overcharging and deceiving me into paying improper, unearned and excessive fees and unreasonable expenses for their representation in my premises liability case.

After I agreed to and executed the 2010 Contingency Fee Agreement with Hoey to initiate and pursue my premises liability case, I was advised and instructed by Hoey, to my understanding with the agreement of and on behalf of Keenan, to sign the second 2015 Contingency Fee Agreement with Keenan named as the attorney on my case, which Hoey specifically represented would not change the percentage I would owe for attorney's fees and would not cost me more money than the prior agreement but was just to put Keenan's name on the agreement since he would be trying the case with Hoey.

While 2015 Contingency Fee Agreement stated that an extra fee would be charged if Keenan handled any appeal (by actually filing the appellate briefs), Keenan did not handle my appeal or file the appellate briefs yet still took an extra 7% for his fee ($695,808.57) that was unearned.  Keenan never told me that he would be taking this fee in addition to me having to pay for separate appellate counsel. Attorney DeJuneas will be able to further speak to this and her handling the appellate work.

Keenan and Hoey charged me for additional attorneys I now know they engaged for their own purposes. They charged me significant fees for Amy Goganian's handling of the Sobczak lien which I later learned was litigated in a manner at the direction of and to the benefit of Hoey, including litigating unnecessary issues that only served Hoey's purposes and not mine, specifically Hoey's defense against Sobczak claiming Hoey owed Sobczak more for the work performed on my case.

I was charged for counsel that appeared for Keenan's non-profit foundation, Defendant Keenan's Kids Foundation, which involved seeking protection of intellectual property rights of Keenan, not my interests or rights.

Keenan and Hoey charged me for Hoey's long-time personal attorney, James Bolan, in connection with defending Hoey against the Sobczak attorney lien caused by Hoey's dispute with Sobczak over payment for Sobczak's work as described above. Bolan never conferred with me much less obtained my agreement for this charge nor did I retain Bolan as my own counsel.

Keenan and Hoey improperly charged me $2,655.00 for "constitutional law attorney" John Vail, even though the case did not involve any constitutional issues that I am aware of. Hoey has claimed Vail provided necessary consultation on the appeal while Keenan has claimed that I approved and agreed to engage Vail to research and review the jury charge and other matters in the case when I did not. I never conferred with Vail nor did I ever enter an agreement for him to represent me or provide legal services for me.

Keenan and Hoey also charged me $1,316.00 for attorney Catherine Giordano for "research and writing" when this should have been paid out of the agreed upon attorney fee. Keenan and Hoey have claimed that I approved and agreed to engage Giordano to research and review the jury charge and other matters in the case when I did not.

Keenan and Hoey charged me $561.24 for the firm Lewis Brisbois Bisgaard & Smith LLP, a firm I understand to be involved with the Sobczak lien dispute and other matters concerning Hoey and Hoey Law. These attorneys never conferred with me and I did not retain them.

Keenan and Hoey induced me to agree to hiring Win Interactive, a litigation support firm, to develop an animation video of the attack in the garage that they planned to offer into evidence at the premises liability trial which was deemed inadmissible. I was charged $51,000 for this video that could not be used at trial. Keenan and Hoey have claimed that this was an effort to protect me from having to testify about the attack at trial. I was always prepared and ready to testify as I understood I would need to do so if the case went to trial. While I am not a lawyer, it is now my understanding that this significant expense was undertaken for a demonstrative exhibit that had little to no chance of being admitted and the cost was incurred before establishing its admissibility. I also understand that I could not have succeeded in my premises liability case if I did not testify to what happened to me.

In addition, Hoey did not fully disclose his arrangement with Advocate Capital which he used to fund case costs during litigation. While I knew and approved a loan to cover litigation expenses, Hoey did not tell me that the company charges exorbitant fees and finance charges: on a principal loan of $415,761.58, Advocate Capital charged fees totaling $238,839.29, over 50% of the principal. Additionally, the expense accounting provided to me does not show what the $415,761.58 covered during the litigation. Hoey has not fully accounted for all the litigation costs and the need for this large loan is suspect because Hoey informed me that Advocate Capital was "the lender for the majority, but not all, of the litigation expenses" and then he separately billed me over $800,000 more for expenses, including his internal firm costs such as office supplies ($1,992.87), copying ($9,964.60) and postage ($3,030.36) as well as billed me for media interview assistance and plaques commemorating the trial victory neither of which I did not receive.  And Keenan released funds from my recovery to pay all the expenses claimed by Hoey.

Finally, the decision of Keenan and Hoey to replace the 2010 Contingency Fee Agreement with the 2015 Contingency Fee Agreement that they had me sign and the reduced payment they then paid to referral attorney Austin O'Toole is what caused me to be sued by O'Toole. O'Toole's allegations made clear that in no way did O'Toole think I was the one who came up with the plan for a second fee agreement rather he specifically alleged that Keenan and Hoey devised an unlawful scheme to reduce the referral fee that O'Toole could collect from Hoey. O'Toole in part based his allegations on statements of Sobczak that said the purpose of the new agreement was to reduce O'Toole's fee. Moreover, Judge Krupp of the Superior Court made it clear that he thought it was inexcusable that neither Hoey nor Keenan took action to get me out of that case sooner. Rather, my current counsel had to fully litigate a motion to dismiss to obtain a dismissal.

As I stated in my Initial Disclosures, based on currently known information and documentation, my damages are the following along with the loss of use of the funds that should have been provided to me back in 2019:

1. $695,808.57 taken for the appeal which was unearned
2. $20,824.00 for attorney Richard Goran to appear and litigate on behalf of the Keenan's Kids Foundation, Inc.
3. $8,432.39 for fees for Hoey's attorney, James Bolan
4. $72,721.82 for attorney Amy Goganian's fees to defend against the Sobczak lien under the fee agreement between Goganian and Hoey
5. $2,655.00 for fees of attorney John Vail
6. $1,316.00 for fees of attorney Catherine Giordano
7. $561.24 for the firm Lewis Brisbois Bisgaard & Smith LLP
8. $623.70 That's Great News
9. $51,000 to pay Win Interactive for animation video
10. $40,406.95 for attorney Goganian's fees in the O'Toole case
11. $238,839.29 for Advocate Capital charges

Total: $1,133,188.96

**14. If you contend that any actions or conduct of Hoey, including David Hoey or Krzysztof Sobczak, was unfair or deceptive and caused you harm or damages, describe in detail all facts and evidence in support of that contention, itemizing all alleged damages and losses.**

**Response:**

Hoey's conduct includes all the matters specified above in response to No. 13 which I adopt and incorporate herein.

**15. Regarding the allegations in paragraph 94–95 of your amended complaint that David Hoey/Hoey Law made false representations to you "with the approval and agreement of Keenan and Keenan law," describe in detail all facts and evidence in support of the allegation that there was "approval" by Keenan.**

**Response:**

Keenan received the recovery money paid by the insurance carriers to his trust account. He was thus responsible for proper distributions. Therefore, Keenan was fully aware – or should have made himself aware – of the expenses being charged by Hoey and to the extent that Keenan distributed funds from his trust account to Hoey to pay expenses itemized by Hoey, Keenan approved of those expenses.

**16. If you contend that you have no obligation to defend and/or indemnify Keenan pursuant to the terms of the 2015 Contingent Fee Agreement, describe in detail all facts and evidence in support of that contention.**

**Response:**

Please see the order of Judge Stearns entered at Dkt. No. 42.

**17. If you contend that Keenan's actions caused you to be sued by Austin O'Toole and therefore caused you harm or damages for which you seek to recover in this suit, describe in detail all facts and evidence in support of that contention, itemizing all alleged damages and losses.**

**Response:**

Keenan's actions are described above in response to No. 13 which I adopt and incorporate herein along with the pleadings filed in the O'Toole case and the arguments made at the hearings on my motion to dismiss and Keenan's motion to dismiss which are all in the possession of and known to Keenan and his counsel. Keenan actually argued in the O'Toole case that paragraph 10 of the 2015 Contingency Fee Agreement – that Hoey on Keenan's behalf had me execute – made me liable for O'Toole's claims and then Keenan had the audacity to assert counterclaims against me in this case and claim the same and attempt to cover himself for his own wrongdoing.  Fortunately, this was promptly resolved by the dismissal of the counterclaims in the Order entered by Judge Stearns in this case on December 6, 2022 at Dkt. No. 42.

**18. If you contend that you were required to obtain medical care, psychological care, counseling, or other treatment due to the actions or conduct of the Defendants, identify by name and address all such providers.**

**Response:**

None.

**19. Identify by name and address all witnesses or other persons with any knowledge relating to the events and claims in your amended complaint.**

**Response:**

As identified in my Initial Disclosures:

1. Kira Wahlstrom – c/o counsel at Markham Read Zerner, One Commercial Wharf West, Boston, MA 02110, (617)-523-6329

   Knowledge of: the underlying premises liability case, her trauma and difficulties in recovery from the attack and rape including trust issues; legal representation by David Hoey and Don Keenan; the fee agreements that Hoey and Keenan had her execute; the referral agreement between Hoey and O'Toole; her understanding of fees and expenses; the representations made by Hoey and Keenan as to fees and expenses owed in the underlying premises liability case; her trust in Hoey and Keenan and her reliance on them during their representation; the appeal in the underlying case and her appellate counsel; her understanding of the Krzysztof Sobczak lien dispute between Sobczak and Hoey and Hoey's retention of Goganian & Associates; being sued by

O'Toole, distress caused by that suit, and Hoey's initial payment of legal fees; her discovery that she was misled by Hoey and Keenan as to fees and expenses.

2. David J. Hoey – Law Office of David J. Hoey, P.C. – 352 Park Street, Suite 105, North Reading, MA 01864 – (978)-664-3633

   Knowledge of: his and his law firm's representation of Kira Wahlstrom in premises liability case; of the 2010 Contingent Fee Agreement, Referral Agreement with O'Toole, and the 2015 Contingent Fee Agreement; his fee arrangement with Keenan under the 2015 Contingent Fee Agreement; the purpose of the 2015 Contingent Fee Agreement; referral fee payment to O'Toole; the Advocate Capital loan, charges and fees and what the loan was used to pay; litigation over the attorney lien filed by Krzysztof Sobczak and his retention of Goganian & Associates; all expenses and fees billed and paid from the recovery in the underlying premises liability case and representations made to Ms. Wahlstrom as to fees and expenses.

3. Don C. Keenan – D.C. Keenan & Associates – d/b/a - The Keenan Law Firm – 148 Nassau Street, N.W., Atlanta, GA 30303 – (404)-523-2200

   Knowledge of: his and his law firm's representation of Kira Wahlstrom in premises liability case; of the 2010 Contingent Fee Agreement, Referral Agreement with O'Toole, and the 2015 Contingent Fee Agreement; his fee arrangement with Hoey under the 2015 Contingent Fee Agreement; the purpose of the 2015 Contingent Fee Agreement; referral fee payment to O'Toole; his direction and control over Keenan's Kids Foundation / Keenan Trial Institute / Keenan Edge; intellectual property rights of Keenan's Kids Foundation / Keenan Trial Institute / Keenan Edge; all expenses and fees billed and paid from the recovery in the underlying premises liability case and representations made to Ms. Wahlstrom as to fees and expenses.

4. Austin O'Toole – Law Offices of Austin O'Toole, P.C. - 18 Tremont St, Boston, MA 02108 - (617) 263-1000.

   Knowledge of 2010 Contingent Fee Agreement, Referral Agreement with Hoey, payment received for referral, and his lawsuit filed against Hoey, Keenan, and Wahlstrom.

5. Krzysztof Sobczak – Sobczak Law - 58 Winter Street, Ste. 400, Boston, MA 02108 – 617-669-6972.

   Knowledge of: his representation of Kira Wahlstrom in premises liability case; of the 2010 Contingent Fee Agreement, Referral Agreement with O'Toole, and the 2015 Contingent Fee Agreement; the fee arrangement between Keenan and Hoey under the 2015 Contingent Fee Agreement; the purpose of the 2015 Contingent Fee Agreement; representations made to Ms. Wahlstrom about the 2015 Contingent Fee Agreement and fees and expenses; the relationship between Hoey and Keenan; his attorney lien

and dispute with Hoey over payment in the underlying premises liability case and the litigation over the lien.

6.  Patricia DeJuneas– DeJuneas Law LLC, One Commercial Wharf West, Boston, MA 02110 - (617) 529-8300

    Knowledge of: Ms. Wahlstrom's appeal and the work she and her team performed including drafting and filing a petition for interlocutory review, drafting and filing the appellate briefs, arguing the appeal, and communications with Hoey and Keenan concerning the appeal.

7.  Robert J. Cordy – McDermott Will & Emery LLP, 200 Clarendon Street, Floor 58, Boston, MA  02116-5021 – 617-535-4033

    Knowledge of the work performed for Ms. Wahlstrom's appeal.

8.  Ashley P. Allen - Law Office of A.P. Allen, 19 Hemlock Road, Boxford, Massachusetts 01921 (617) 925-7888

    Knowledge of the work performed for Ms. Wahlstrom's appeal.

9.  Amy Goganian – Goganian & Associates, P.C. – 144 Gould Street, Suite 202, Needham, MA 02494 – (781)-433-9812

    Knowledge of: being retained by Hoey to handle the attorney lien dispute with Sobczak; communications with Hoey on strategy and litigation of the Sobczak lien; billings for the Sobczak lien dispute; being retained to represent Ms. Wahlstrom in O'Toole case; her communications with Hoey and with James Bolan regarding Hoey paying Goganian's fees for the O'Toole case; billings in the O'Toole case.

10. Richard Goren – 225 Friend Street, Boston, MA 02110

    Knowledge of his representation of Keenan's Kids Foundation, billings, and payment of fees in the amount of $20,824.00.

11. James Bolan -   Brecher, Wyner, Simons, Fox & Bolan, P.C. – 189 Wells Avenue, Newton, MA, 02459 – (617) 614-1500

    Knowledge of: representing Hoey; new trial motion and order in Wahlstrom premises liability case; Board of Bar Overseers concern re new trial order; Sobczak lien dispute; the O'Toole dispute; receipt of $8,432.39 for fees billed to Ms. Wahlstrom.

12. John Vail – John Vail Law, PLLC – 1025 Thomas Jefferson Street, NW Suite 810, Washington, DC 20007 – (202) 589-1300

Knowledge of receiving $2,655.00 for "constitutional law advice" billed to Ms. Wahlstrom.

13. Catherine Giordano – PO Box 412 – North Reading, MA 01864 – (978) 276-0645

Believed to have knowledge of receiving the amount of $1,316.00 for "research and writing" as billed to Ms. Wahlstrom.

14. Andromedia Sweeney – 5375 Sunny Ridge Place, Paso Robles, California 93446

Knowledge of Ms. Wahlstrom's reaction when she realized that her attorneys Hoey and Keenan deceived her and overcharged her, taking fees to which they were not entitled and charging unreasonable expenses.

**20. As to each expert witness that you intend to consult and/or call at trial, state the expert's name and address, the subject matter on which the expert is expected to consult or testify, the substance of the facts as to which the expert is expected to consult or testify, the substance of the opinions that the expert is expected to express, and a summary of the grounds for all such opinions.**

<u>**Response**</u>:

Objection as premature as of this time. Pursuant to Judge Stearns' Scheduling Order at Dkt. No. 25: "If a party intends to utilize an expert, they must file a notice on the docket no later than 2/9/23, in order for the court to consider whether an expert is appropriate and, if so, to alter the existing schedule."  Ms. Wahlstrom will comply with the Court's Order.

## **VERIFICATION**

I certify under penalty of perjury under the laws of the United States of America that the foregoing Responses to Interrogatories are true and correct to the best of my knowledge and belief.

Executed this 20th day of December, 2022 in Paso Robels, California.

Kira Wahlstrom

14

Date: December 20, 2022               */s/ Bridget A. Zerner*
                                      Bridget A. Zerner (BBO #669468)
                                      Markham Read Zerner LLC
                                      One Commercial Wharf West
                                      Boston, MA 02110
                                      Tel: (617) 523-6329
                                      Fax: (617) 742-8604
                                      bzerner@markhamreadzerner.com
                                      *Counsel for Plaintiff Kira Wahlstrom*

## CERTIFICATE OF SERVICE

       I hereby certify that on December 20, 2022, this document was served by electronic mail on counsel of record using the email addresses registered on the CM/ECF system.

                                        */s/ Bridget A. Zerner*
                                        Bridget A. Zerner

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.:  1:22-cv-10792-RGS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

KIRA WAHLSTROM,

           Plaintiff,

V.

DAVID J. HOEY, LAW OFFICES OF DAVID J.

HOEY, P.C., DON C. KEENAN, D.C.

KEENAN & ASSOCIATES, P.C. D/B/A THE

KEENAN LAW FIRM, P.C., AND THE KEENAN'S

KIDS FOUNDATION, INC.

           Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

AUDIOVISUAL DEPOSITION OF KIRA WAHLSTROM


Wilson Elser Moskowitz Edelman & Dicker LLP

260 Franklin Street, 14th Floor

Boston, Massachusetts 02110


January 31, 2023

9:56 a.m. - 3:17 p.m.


JENNIFER M. VAILLANCOURT, CSR, RPR

(Pages 2 to 5)

## Page 2

```
 1                 APPEARANCES
 2    ON BEHALF OF THE PLAINTIFF:
          BRIDGET A. ZERNER, ESQ.
 3        Markham Read Zerner LLC
          One Commercial Wharf West
 4        Boston, Massachusetts  02110
          617.523.6329
 5        Bzerner@markhamreadzerner.com
 6    ON BEHALF OF DAVID J. HOEY:
          CHRISTINE A. KNIPPER, ESQ.
 7        JOHN P. LIBERTY, ESQ.
          Wilson Elser Moskowitz Edelman & Dicker LLP
 8        260 Franklin Street, 14th Floor
          Boston, Massachusetts  02110
 9        617.422.5300
          christine.knipper@wilsonelser.com
10        john.liberty@wilsonelser.com
11    ON BEHALF OF THE KEENAN LAW FIRM:
          JOHN J. O'CONNOR, ESQ.
12        Peabody & Arnold
          Federal Reserve Plaza
13        600 Atlantic Avenue
          Boston, Massachusetts  02210
14        617.951.2100
          joconnor@peabodyarnold.com
15
16    ON BEHALF OF THE KEENAN'S KIDS FOUNDATION:
          WILLIAM M. TAYLOR, ESQ.
17        Troutman Pepper Hamilton Sanders LLP
          High Street Tower
18        125 High Street
          19th Floor
19        Boston, Massachusetts  02110
          617.204.5100
20        william.taylor@troutman.com
21    ALSO PRESENT:
22        CAMERON DUNN - Videographer, Dunn Reporting
          Services
23        DAVID HOEY
24
```

## Page 3

```
 1                 INDEX PAGE
 2    AUDIOVISUAL DEPOSITION OF KIRA WAHLSTROM
 3        EXAMINATION      RE-EXAMINATION
 4    BY MS. KNIPPER     6          235, 241
      BY MR. O'CONNOR   207               237
 5    BY MR. TAYLOR      228
      BY MS. ZERNER      233
 6
 7                 EXHIBIT INDEX
 8    EXHIBIT      DESCRIPTION          PAGE
      Exhibit 1  Complaint             11
 9    Exhibit 2  2010 Contingent fee agreement    14
      Exhibit 3  2015 Contingent fee agreement    16
10    Exhibit 4  September 20, 2014 e-mail chain   27
      Exhibit 5  February 2, 2010 letter          29
11    Exhibit 6  March 29, 2020 e-mail            41
      Exhibit 7  March 29, 2020 e-mail            43
12    Exhibit 8  Spreadsheet                      45
      Exhibit 9  Distribution                     46
13    Exhibit 10 February 31, 2018 e-mail         78
      Exhibit 11 July 2016 e-mail chain           81
14    Exhibit 12 February 22, 2017 memo to file   85
      Exhibit 13 Litigation expenses              88
15    Exhibit 14 March, 1, 2017 e-mail            93
      Exhibit 15 March 6, 2017 e-mail             98
16    Exhibit 16 March 29, 2020 e-mail            103
      Exhibit 17 February 3, 2020 e-mail          105
17    Exhibit 18 February 25, 2020 e-mail         108
      Exhibit 19 September 2, 2020 e-mail         112
18    Exhibit 20 July 2020 e-mail chain           113
      Exhibit 21 November 17, 2020 e-mail         116
19    Exhibit 22 Undated e-mail                   119
      Exhibit 23 January and February 2022 e-mail 123
20        chain
      Exhibit 24 Answers to David J. Hoey's       167
21        interrogatories
      Exhibit 25 March 6, 2017 e-mail             181
22    Exhibit 26 August 3, 2021 e-mail            182
      Exhibit 27 October 24, 2020 e-mail          186
23    Exhibit 28 General release agreement        188
      Exhibit 29 June 6, 2018 e-mail              190
24
```

## Page 4

```
 1         EXHIBITS CONTINUED:
 2    Exhibit 30 June 24, 2016 e-mail          191
      Exhibit 31 Answers to Keenan Law Firm's  216
 3        interrogatories
 4
 5    (Original exhibits retained by Ms. Knipper.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1      AUDIOVISUAL DEPOSITION OF KIRA WAHLSTROM
 2               JANUARY 31, 2023
 3
 4          THE VIDEOGRAPHER:  We are on the record.
 5    This is the videotaped deposition of Kira Wahlstrom.
 6          My name is Cameron Dunn.  The court reporter
 7    is Jennifer Vaillancourt.  We are both from the firm
 8    of Dunn Reporting Services Incorporated located in
 9    Woburn, Massachusetts.
10          This deposition is taken on behalf of the
11    defendants in the matter of Kira Wahlstrom Versus
12    David J. Hoey, Law Offices of David J. Hoey, et al. in
13    the United States District Court for the District of
14    Massachusetts, Civil Action Number 122, dash, CV,
15    dash, 10792, dash, RGS.
16          Today's date is January 31st, 2023.  The
17    time is 9:57 a.m.  We are currently at the offices of
18    Wilson Elser, 260 Franklin Street, Boston,
19    Massachusetts 02110.
20          Counsel will now state their appearances,
21    and the court reporter will administer the oath.
22          MS. ZERNER:  Good morning.  Bridget Zerner
23    of Markham Read Zerner for the plaintiff Kira
24    Wahlstrom.
```

Page 6

```
 1          MS. KNIPPER:  Good morning.  Christine
 2   Knipper with Wilson Elser for the defendants David
 3   Hoey and Law Offices of David J. Hoey.
 4          MR. LIBERTY:  Good morning.  John Liberty
 5   for David J. Hoey and Law Offices of David J. Hoey.
 6          MR. O'CONNOR:  Jack O'Connor for Don Keenan
 7   and Keenan Law Firm.
 8          MR. TAYLOR:  William Taylor for Keenan's
 9   Kids Foundation.
10          KIRA WAHLSTROM, the witness, having been
11   satisfactorily identified and duly sworn by the Notary
12   Public, was examined and testified as follows:
13          EXAMINATION
14          BY MS. KNIPPER:
15     Q.   Good morning, Ms. Wahlstrom.
16     A.   Good morning.
17     Q.   Can you please state your name for the
18   record?
19     A.   Kira Wahlstrom.
20          MS. KNIPPER:  Ms. Zerner, all objections,
21   except as to form, reserved until the time of trial?
22          MS. ZERNER:  Agreed.
23          MS. KNIPPER:  Motions to strike reserved
24   until the time of trial?
```

Page 7

```
 1          MS. ZERNER:  Yes.
 2          MS. KNIPPER:  And witness will read and
 3   sign?
 4          MS. ZERNER:  Yes.  We'll see.
 5          MS. KNIPPER:  Okay.
 6          MS. ZERNER:  We'll talk to her if she wants
 7   to do that.
 8          MS. KNIPPER:  All right.
 9     Q.   Where do you live, ma'am?
10     A.   In California.
11     Q.   Okay.  And do you live at the same address
12   that you lived at when you answered the interrogatory
13   answers in this case?
14     A.   Yes.
15     Q.   And when did you move to California, month
16   and year?
17     A.   Month and year, in -- in July technically, I
18   guess, of 2020.
19     Q.   And where did you live before you moved to
20   California?
21     A.   Haverhill, Massachusetts.
22     Q.   And how long had you lived in Haverhill?
23     A.   Oh, boy.  I -- 16 years maybe.
24     Q.   At the same address?
```

Page 8

```
 1     A.   No, different addresses.
 2     Q.   And do you currently work?
 3     A.   No.
 4     Q.   When was the last job that you held?
 5     A.   In 2019.
 6     Q.   And where was that?
 7     A.   At Target.
 8     Q.   In Massachusetts?
 9     A.   Yes.
10     Q.   And you've testified before; is that
11   correct?
12     A.   I have.
13     Q.   And you've been deposed before; is that --
14     A.   I have.
15     Q.   -- correct?
16          MS. ZERNER:  If I could just --
17     Q.   Just one thing, if you could please wait
18   until I'm fully done with --
19     A.   I know.  It's a bad habit.
20          MS. ZERNER:  And you just did it again.
21     Q.   -- with my question, I know you're going to
22   anticipate what I'm going to say, but -- on a lot of
23   the questions, but please wait so that --
24     A.   Uh-huh.
```

Page 9

```
 1     Q.   -- we have a clear record.  In addition, I'm
 2   not the most eloquent person in the world, so if you
 3   do not understand one of my questions, let me know,
 4   and I will do my best to rephrase it.  Otherwise, I
 5   will assume that you have understood what I asked.
 6   Fair?
 7     A.   Yeah.
 8     Q.   Okay.  But just please wait until I'm
 9   completely done before you start answering, and I, in
10   turn, will try to do the same.
11     A.   Okay.
12     Q.   Thank you, ma'am.
13          And how long did you work at Target?
14     A.   I started there in 2015, so for four years
15   just about.
16     Q.   And prior to that, where did you work?
17     A.   During the same time, I've worked at
18   different night clubs and I worked at a school.
19     Q.   And what was the school?
20     A.   Hill View Montessori Charter Public School.
21     Q.   And why did you quit working at Target in
22   2019?
23     A.   Because I was going to move to California.
24     Q.   When did you make the plan to move to
```

Page 14

1      A.   2009, May 2009 I believe.
2      Q.   And prior to you receiving the 2010 fee
3   agreement with David's law firm, had you met with
4   David?
5      A.   Prior to signing it?
6      Q.   Yes.
7      A.   Yes.
8      Q.   And where had you met with David?
9      A.   At his office.
10     Q.   And how many times had you met with David?
11     A.   I think only once, but I don't remember
12   exactly.
13     Q.   But it's your memory that you met with him
14   at least once.
15     A.   Yes, before -- yeah, before I signed it.
16     Q.   Was Austin there when you met with David?
17     A.   The first -- yeah, I believe he was.
18     Q.   And was that at Austin's office or David's
19   office?
20     A.   No, David's office.
21        MS. KNIPPER:  We can mark this as 2.
22        (Exhibit-2, 2010 Contingent fee agreement,
23   marked for identification.)
24     Q.   Do you recognize what's in front of you as

Page 15

1   Exhibit Number 2 the February 2010 fee agreement that
2   you signed?
3      A.   (Witness viewing document.)  Yes.
4      Q.   And did you read it before you signed it?
5      A.   (Witness viewing document.)  Yes.
6      Q.   And if you go to paragraph 5 on the first
7   page.
8      A.   (Witness viewing document.)  Okay.
9      Q.   Do you see that?
10     A.   (Witness viewing document.)  Yes, I see it.
11     Q.   And did you understand at the time that you
12   would be responsible for reasonable expenses in
13   relation to your case, is that correct, if there was a
14   recovery?
15     A.   If there was a recovery, yes.
16     Q.   Okay.  And you understood at the time that
17   your lawyer could borrow money to finance the case; is
18   that correct?
19     A.   Yes.
20     Q.   Okay.  And you also understood that you were
21   responsible for reimbursement of any interest charge
22   or related expenses in relation to the financing of
23   your case; correct?
24     A.   Yes.

Page 16

1      Q.   And let me show you what we'll mark as
2   Exhibit Number 3.
3        (Exhibit-3, 2015 Contingent fee agreement,
4   marked for identification.)
5      Q.   And I've put in front of you what we've
6   marked as Exhibit Number 3.  Do you recognize this
7   document as the agreement that you signed in June 2015
8   and the fee agreement with Don Keenan and his firm?
9      A.   (Witness viewing document.)  Yes.
10     Q.   And going to paragraph 5 on the second
11   page, this paragraph makes you responsible for
12   expenses and disbursements if there's a favorable
13   decision; is that correct?
14        MS. ZERNER:  Objection.
15        Go ahead.
16     A.   (Witness viewing document.)  Yes.
17     Q.   Did you understand that if there was a
18   favorable disposition in the legal matter, that you
19   would be responsible for reasonable expenses and
20   disbursements?
21     A.   Yes.
22     Q.   And did you understand, at the time you
23   signed this agreement, that the attorney could finance
24   the case and borrow funds to finance the case?

Page 17

1      A.   Yes.
2      Q.   And did you understand, at the time you
3   signed this agreement, that you would be responsible
4   for reimbursement of interest charges and related
5   expenses incurring -- incurred in relation to
6   financing the case?
7      A.   Yes.
8      Q.   Now, when did you first meet Attorney
9   Keenan?
10     A.   I don't remember the year, but it was before
11   -- I met him at a hotel.  David -- he was in town for
12   something, and I met -- David had me come to the hotel
13   where he was speaking, and I met him there, I think is
14   the first time I met him before trial, and I don't --
15     Q.   Where --
16     A.   I'm sorry.
17     Q.   Go ahead.  Finish your answer.
18     A.   And then I -- I didn't see him again until
19   trial.
20     Q.   And --
21     A.   I don't remember the year.
22     Q.   Okay.  Was that in 2014 or 2015?  You don't
23   remember.
24     A.   I have no idea.  I really don't remember,

Page 18

1 but it was before trial.
2    Q.   If I were to represent to you that you met
3 him in February 2015 at a DoubleTree Hotel, would that
4 comport with your memory?
5    A.   Well, I know I met him at a hotel.  I -- I
6 don't think -- I don't remember if it was the
7 DoubleTree.  It was -- I thought it was, like, in
8 Woburn, but I'm not -- I don't -- I really don't
9 remember.
10    Q.   And did you meet with him alone at the time?
11    A.   I don't remember.  I think -- I thought
12 David was there and -- and -- yeah.
13    Q.   After -- do you remember David introducing
14 you to Mr. Keenan?
15    A.   Yeah.  I remember him introducing me at
16 the -- at the hotel.  He was there with me.
17    Q.   And after you were introduced, do you
18 remember if you met with Mr. Keenan alone?
19    A.   I don't remember if I was alone.  I thought
20 we all sat at a table.
21    Q.   You can't say either way as you sit here --
22    A.   I can't say either way.
23    Q.   -- today.
24       If you could please bear --

Page 19

1    A.   I know.  I'm sorry.
2    Q.   -- with me and let me finish.
3    A.   I know.  I'm so sorry.
4    Q.   Thank you.
5       And as a result of that meeting, did you
6 make a decision that you wanted to bring Mr. Keenan on
7 board?
8    A.   It was suggested to me by David that it was
9 a good move for my case and that it -- that's -- it
10 was something we should do, so, yes.
11    Q.   And you agreed to that.
12    A.   I agreed to that.
13    Q.   Okay.  And that was before -- a few months
14 at least before you signed the fee agreement; correct?
15    A.   It was before I signed the fee agreement,
16 yes.
17    Q.   Now, when you signed the fee agreement, do
18 you remember where you were located, the 2015
19 agreement?
20    A.   The 2015 agreement I believe I went in to
21 David's office to sign it.
22    Q.   Do you know that for certain?
23    A.   Yes, I...
24    Q.   Do you know if you met with David or Kris

Page 20

1 Sobczak?
2    A.   I believe it was David.
3    Q.   Do you remember what day of the week it was?
4    A.   No.
5    Q.   Do you remember if it was on the day that
6 you signed it?
7    A.   What do you mean?  I'm sorry.  I don't
8 understand if it was on the day I signed it.
9    Q.   If you could look at the last page, there's
10 your signature on your -- on the last page of Exhibit
11 Number 3.
12    A.   (Witness viewing document.) Right.
13    Q.   Is that your signature?
14       Okay.  And that's blue -- blue ink; correct?
15    A.   (Witness viewing document.) Correct.
16    Q.   Okay.  And if you look at the top of the
17 first page, there are two dates.
18    A.   (Witness viewing document.) Right.
19    Q.   Do you remember on which day -- well, do you
20 see the day of 6-19-2015?
21    A.   (Witness viewing document.) Uh-huh.
22    Q.   Is that a yes?
23    A.   Yes.  Sorry.
24    Q.   Is it your memory that you signed it on that

Page 21

1 day that's reflected on the agreement or on another
2 day?
3    A.   I -- I believe I signed it on the 6-19
4 because I signed it in the blue ink, so I signed it on
5 the day that I -- I would imagine.  I wouldn't write a
6 different date I don't think.
7    Q.   And is that your signature on the 6-19-2015?
8    A.   (Witness viewing document.) On the last
9 page?
10    Q.   No, on the date 6-19-2015.
11    A.   (Witness viewing document.) Is this my
12 writing?
13    Q.   Yes, ma'am.
14    A.   (Witness viewing document.) I -- it could
15 be.  I would imagine it is.  It almost looks a little
16 bit like David's, but I don't know.  I don't know if I
17 wrote the date or not.
18    Q.   Okay.  And did you initial on the right-hand
19 side at each one of the paragraphs where initials
20 appear?
21    A.   (Witness viewing document.) Yes, I did.
22    Q.   And which one is your initial?
23    A.   (Witness viewing document.) The one in the
24 blue ink.

Page 22

1      Q.   Was -- when you initialed this, was the DC
2  -- DCK initial below that already there?
3      A.   I believe it was already there.
4      Q.   Before you signed it, had you seen a copy of
5  this?
6      A.   When I went in to the office to sign it is
7  the first time I saw a copy of it.
8      Q.   And did you read it before you signed it?
9      A.   I did look it over, and David had explained
10 it to me in an e-mail, so...
11     Q.   At the time that you signed it, you read it
12 over; is that correct?
13     A.   I looked it over.  I don't remember if I
14 read every paragraph, but I believe I -- I did.
15     Q.   And the e-mail that you're referring to is
16 the e-mail that you attached to your complaint; is
17 that correct?
18     A.   Yes.
19     Q.   And it's an e-mail dated June 11, 2015.  Is
20 that the e-mail chain you're referring to?
21     A.   I don't remember if that was the date.
22     Q.   If you look at the Exhibit Number 1, it's
23 Exhibit C2.
24     A.   (Witness viewing document.) Oh, so June

Page 23

1  11th, yes.
2      Q.   Okay.  Did you know when you received this
3  particular e-mail whether or not David had actually
4  read the agreement?
5      A.   If -- I'm sorry.  If David had read the
6  agreement?
7      Q.   Yes.
8      A.   I don't -- I don't know.
9      Q.   You don't know; correct?
10     A.   Right.
11     Q.   Okay.  And did you ask him any questions
12 when you met at the office with whoever you met with
13 about the fee agreement?
14     A.   I don't remember if I did.  I know that I
15 asked him here, but I -- I don't know if we talked
16 about it when I signed it at the office.
17     Q.   And, as you sit here today, is it your
18 memory that it was David Hoey, not Kris Sobczak that
19 you met with?
20     A.   I -- I believe it was David to my memory.
21     Q.   Can you say that with certainty?
22          MS. ZERNER:  Asked and answered.
23     A.   Yeah.  I don't -- that's all.
24     Q.   Can you say it with certainty?

Page 24

1      A.   From what I remember, I thought it was David
2  that I met with, yes.
3      Q.   Prior to going to the office to sign this
4  agreement, your case had been ongoing since 2010;
5  correct?
6      A.   Correct.
7      Q.   And Sobczak had worked on your -- Kristopher
8  Sobczak or Krzysztof Sobczak -- do you know who that
9  is, by the way?
10     A.   Yes.
11     Q.   Okay.  When did he start working on your
12 case?
13     A.   I -- I do not know a date.
14     Q.   Okay.  Had it been more than a year?
15     A.   I, honestly, don't know when he started
16 working at David's office and when he started on my
17 case.  That I don't have any knowledge of.
18     Q.   Had you met him on a number of occasions
19 before the trial?
20     A.   Yes.
21     Q.   And when you went to David's office from
22 time to time --
23     A.   Did I --
24     Q.   -- did you meet on the case?

Page 25

1          Did you meet with Kris Sobczak?
2      A.   I -- there were times I met with Kris, yes.
3      Q.   Okay.  And you met with him alone.
4      A.   I'm sure I did, yes.
5      Q.   Okay.  And -- Strike that.
6          Were you aware, prior to your first meeting
7  with Mr. Keenan, of his focus group work on your case?
8      A.   I can't -- I don't know if I -- David could
9  have told me about it, but I don't remember.  I can't
10 recall that right now.
11     Q.   You can't say either way.
12     A.   Yeah.
13     Q.   It's possible that David could have told you
14 about it; correct?
15     A.   But I don't remember, yeah.
16     Q.   Did you have an understanding as to why Don
17 Keenan was brought on the case?
18     A.   I -- David told me it was a good addition to
19 my team and that he was a great lawyer and that it
20 would benefit us.
21     Q.   Do you remember anything else as to why
22 David -- what David expressed to you as to why he
23 would come on board?
24     A.   Other than he was good for the case, I mean,

Page 26

1    not -- I don't think so, not to my memory.
2        Q.  Do you remember that prior to Mr. Keenan
3    coming on board the last offer that was made by the
4    defendants was $450,000 on your case?
5        A.  I don't remember.  I don't have a memory for
6    when the amounts were.
7        Q.  Do you remember what was last offered prior
8    to trial by the defendants?
9        A.  I don't remember the exact amount, no.
10       Q.  Was it less than 2 million?
11       A.  I thought it was about 2 million, but I
12   really don't remember right now the timeline or
13   amounts.
14       Q.  And do you remember if -- there was a
15   mediation at a particular point in time in your case;
16   is that correct?
17       A.  I believe there was more than one.  I was
18   never at them, so I don't have --
19       Q.  Okay.
20       A.  -- a memory of -- of them exactly.
21       Q.  Did you understand what offers -- at the
22   time, you understood what offers had been exchanged at
23   the mediation from your counsel; correct?
24       A.  Yes.  David explained them to me.

Page 27

1        Q.  Okay.  Do you have any reason to believe, as
2    you sit here today, that an offer above 450 had been
3    made before Don Keenan came on board?
4        A.  I have no knowledge.  I don't know a
5    timeline on that, if Don was involved or not.
6        MS. KNIPPER:  If we can mark this as the
7    next exhibit.
8        (Exhibit-4, September 20, 2014 e-mail chain,
9    marked for identification.)
10       Q.  Do you have in front of you Exhibit Number
11   4?
12       A.  (Witness viewing document.) Yes.
13       Q.  And do you see that this is an e-mail from
14   Kris Sobczak to various attorneys dated September 10,
15   2014?
16       Do you see that at the top?
17       A.  (Witness viewing document.) Yes.
18       Q.  Okay.  And it attaches a letter if you turn
19   to the second page.
20       A.  (Witness viewing document.) Okay.  Yes.
21       Q.  Okay.  And the letter on the second page is
22   dated September 10, 2014.  Do you see that?
23       A.  (Witness viewing document.) I do.
24       Q.  And it references rejecting a 450,000 dollar

Page 28

1    joint offer of settlement.  Do you see that?
2        A.  (Witness viewing document.) Yes, I do.
3        Q.  Does this refresh your recollection that as
4    of late 2014 the offer on the table from the
5    defendants was 450?
6        A.  (Witness viewing document.) Yes, I see that.
7        Q.  Do you remember having any discussions with
8    David at around this letter or after, before
9    Mr. Keenan came on, about what needed to happen for
10   purposes of your trial and securing a verdict for you?
11       A.  David and I talked a lot about my case and
12   what needed to happen, yes, and, like I said, bringing
13   Don on, he told me was a good thing to do, so that's
14   what we did.
15       Q.  But besides a good thing to do, as you sit
16   here today, do you know what he expressed to you --
17       A.  I don't remember --
18       Q.  Do you remember what he expressed to you?
19       A.  Sorry.  I don't remember the exact
20   conversation, no.
21       Q.  Did you ever have a conversation with David
22   before -- before you agreed for Don to come on the
23   case about the possibility of a defense verdict in the
24   case?

Page 29

1        A.  The other side, is that what we're talking
2    about?
3        Q.  Yes, meaning the other side winning.
4        A.  I'm sure we did have a conversation about
5    it.  We talked about a lot of things.  I'm sure we had
6    a conversation at one point that there was always the
7    possibility that we didn't win, and that...
8        Q.  And you understood that you could lose;
9    correct?
10       A.  Yeah.  Yeah.
11       Q.  When you signed Exhibit Number 3, you
12   understood that David was going to -- David's firm was
13   going to receive a portion of the fee; is that
14   correct?
15       A.  Yes.
16       Q.  And when you signed Exhibit Number 2, you
17   understood that Mr. Austin O'Toole was going to
18   receive a portion of the fee; is that correct?
19       A.  Yes.
20       MS. KNIPPER:  Okay.  If we can mark this as
21   Exhibit Number 5.
22       (Exhibit-5, February 2, 2010 letter, marked
23   for identification.)
24       Q.  Do you recognize Exhibit Number 5?

Page 30

1      A.   (Witness viewing document.) Yes.
2      Q.   And what do you recognize it to be?
3      A.   It was I guess -- I don't know how to
4   explain it, but a referral fee thing for Austin.
5      Q.   And it's your signature at the bottom.
6      A.   (Witness viewing document.) Yes.
7      Q.   And it's dated 2 -- is that 2-16-2010?
8      A.   (Witness viewing document.) That's what I
9   believe it says, yes.
10     Q.   Okay. And is the date on the bottom
11   right-hand corner next to your signature, is that your
12   handwriting?
13     A.   (Witness viewing document.) I believe so,
14   yes. It looks like --
15     Q.   And where were you --
16     A.   -- mine.
17     Q.   Sorry.
18     A.   Sorry. It looks like mine.
19     Q.   Okay. And where were you when you signed
20   this letter?
21     A.   I have no memory of that. I don't know if I
22   was at home or at David's office.
23     Q.   Do you know if you signed it at the same
24   time that you signed Exhibit Number 2?

Page 31

1      A.   I don't remember.
2      Q.   Now, what was your understanding in 2010 and
3   in 2015 of who would pay the expenses if you lost?
4      A.   My understanding of that would be -- I -- I
5   guess I assumed David's law firm.
6      Q.   Meaning they would just eat it; right?
7      A.   I mean, I guess I didn't really think -- sit
8   and think about it 'cause I didn't really want to
9   lose, so -- but my understanding from that is that,
10   yes, David's law firm would cover it.
11     Q.   And you understood at the time both in 2010
12   and 2015 and after that David's office was advancing
13   money on your behalf for your case; correct?
14     A.   Yes.
15     Q.   And he did that for the appeal as well;
16   correct?
17     A.   Yes.
18     Q.   Did you ever ask him at any point in time
19   how much the case was costing Attorney Hoey's firm?
20     A.   I don't know if we had any real conversation
21   about it. I know that it was costing him money, but I
22   can't remember if we sat down and had conversations
23   about the exact cost of anything.
24          I don't believe we did. I know it was

Page 32

1   expensive and I know he had to take out a loan, but I
2   don't think we ever went into detail about anything.
3      Q.   And you couldn't afford to advance the
4   funds; correct?
5      A.   No.
6      Q.   When you -- did you ever have an
7   understanding up until the time of trial what David's
8   firm was paying from their own pocket versus what was
9   being financed?
10     A.   No.
11     Q.   Did you understand that it was a mixture of
12   both?
13     A.   Yes.
14     Q.   And you understood that what was being
15   financed, if you lost, Attorney Hoey's firm or
16   Mr. Keenan's firm would be responsible for it.
17     A.   Looking back on that, yes, I know that. Was
18   that a thought process at the time? No.
19     Q.   You didn't consider it.
20     A.   No.
21     Q.   But you knew that work was getting done on
22   your case; correct?
23     A.   Yes.
24     Q.   Experts were being retained; correct?

Page 33

1      A.   Yes.
2      Q.   WIN Interactive was being retained; correct?
3          MS. ZERNER: Objection.
4      Q.   You understood that WIN Interactive -- WIN
5   Interactive was retained; correct?
6      A.   Yes.
7      Q.   And you understood that they were working on
8   your case; correct?
9          MS. ZERNER: Objection.
10          Vague.
11     Q.   Did you understand that WIN Interactive was
12   working on your case?
13     A.   I understood they made a video. I don't
14   know if I would consider it working on my case, but I
15   don't know if that's the right terminology, but, yes,
16   I know they made a video.
17     Q.   When was the first time that you learned of
18   WIN Interactive's assistance on your case?
19     A.   I don't remember if it was David or Kris
20   that told me about a video.
21     Q.   Is it your testimony that besides them doing
22   a video that that's -- knowing that they were doing a
23   video, that's your only knowledge of their involvement
24   on the case?

## Page 34

1    A.   I knew about the video being made, and I
2  went in to -- when they were there, to tell them what
3  happened to me so that they could make the video, but
4  other than that involvement, I don't know if they were
5  doing anything else on the case, if that's the
6  question. I don't understand -- understand if that
7  was what you were asking.
8    Q.   What was your participation in the creation
9  of the animation?
10    A.   I explained to them how I was raped and what
11  happened to me and the rest of the attack.
12    Q.   And how long did you meet with WIN
13  Interactive?
14    A.   I have no recollection of time.
15    Q.   Was it more than an hour, more than two
16  hours?
17    A.   I don't remember.
18    Q.   Was it more than over one-day period?
19    A.   No. It was one time that I recall.
20    Q.   And do you remember who you met with?
21    A.   No clue. I know Kris was there, but I don't
22  know the people from WIN -- sorry -- the interactive.
23    Q.   And meaning Kris was Kris Sobczak; correct?
24    A.   Yes. Sorry.

## Page 35

1    Q.   Okay. It's your memory that he was there
2  when you met with the folks from WIN Interactive.
3    A.   Yes.
4    Q.   What was your understanding at the time as
5  to why the animation was being created?
6    A.   I don't know if I was ever told that but --
7  or I just assumed, but I -- it was in case, I guess, I
8  couldn't testify or I wasn't able to get on the stand.
9    Q.   And did David or Don explain that to you or
10  both?
11    A.   Don I never spoke to. I met him that one
12  time and then I didn't see him again till trial, but
13  David would have been my contact. Maybe Kris would
14  have told me. I don't know, but mostly David was my
15  contact.
16    Q.   But somebody told you; correct?
17    A.   Yes.
18    Q.   Okay. Did you ever ask questions about why
19  it may be necessary?
20    A.   I don't remember our conversation exactly
21  about it.
22    Q.   So they could have told you, but you don't
23  remember, as you sit here today --
24    A.   Right.

## Page 36

1    Q.   -- correct?
2        Okay. And do you remember describing to the
3  folks from WIN Interactive in as much detail as
4  possible what had happened to you?
5    A.   Do I remember what I said or do I remember
6  doing it?
7    Q.   No. Do you remember the process, that you
8  described it to them in as much detail as possible?
9    A.   I believe I did. I tend to block those
10  things out when I'm doing it, so, yes, I know I
11  described my rape in detail to them. That's all I can
12  say to it.
13    Q.   And did you review the animation to verify
14  its accuracy?
15    A.   I've never seen the animation.
16    Q.   Did you understand that it served a purpose
17  outside of trial?
18    A.   I -- I don't know that. I don't have an
19  answer for that.
20    Q.   David, Kris, or somebody could have
21  explained it to you from your lawyer's team, but, as
22  you sit here today, you don't remember.
23    A.   Right. I mean, I just knew it was in case I
24  couldn't get on the stand, but other than that, I

## Page 37

1  don't have a recollection of talking about it in
2  detail.
3    Q.   Did you understand that it could be
4  challenged by JPA and the other folks on the defense
5  side?
6    A.   I don't know if -- I don't know if I have --
7  knew that. I didn't --
8    Q.   It's possible that you were told.
9    A.   I -- I don't know. As I -- I really don't
10  know, as I sit here, and I don't -- didn't under --
11  yeah, I mean, I knew it was being made. I knew that
12  it might be used in court.
13    Q.   Did you ask how much it would cost?
14    A.   No, I did not. I don't think I did.
15    Q.   But you knew that somebody was paying for it
16  and it was your lawyer's team; right?
17    A.   Yes. I knew David's firm was paying for it.
18  Well, I assumed.
19    Q.   Do you have any understanding as to whether
20  it was -- well, strike that.
21        You were prepared for -- to testify at
22  trial; correct?
23    A.   Yes.
24    Q.   And you met with counsel to prepare you for

(Pages 38 to 41)

**Page 38**

1  trial; correct?
2      A.  Yes.
3      Q.  How many times did you meet?
4      A.  Oh, I don't know.  A lot.  I couldn't tell
5  you.
6      Q.  And they went through direct, potential
7  cross questions.  They did all of that with you;
8  right?
9      A.  Yes.
10      Q.  Okay.  Do you know how they prepared for
11  your preparation?
12      A.  I believe they -- I believe David told me
13  they did practices also just like I was doing.
14      Q.  And it's your testimony, as you sit here
15  today, that you never reviewed the animation to verify
16  its accuracy.
17      A.  Correct.
18      Q.  Did you ever raise concern -- well, strike
19  that.
20          Was Mr. Keenan there when you were being
21  prepared for -- to testify at trial?
22      A.  Yes, yes, when he was there, I mean, I
23  didn't -- preparing at the hotel, we prepared at the
24  hotel; we prepared at Suffolk Law, he was there for

**Page 39**

1  that.
2      Q.  Did you ever raise concerns about having to
3  testify?
4      A.  I was nervous and scared to testify, but
5  it's what I had -- was supposed to do, I mean.
6      Q.  Did you ever express that you didn't want to
7  testify?
8      A.  I didn't want to testify, but I knew I had
9  to.
10      Q.  And you understood that your team was going
11  to try to do everything possible to get the case to
12  verdict and to get a good outcome for you; correct?
13      A.  Correct.
14      Q.  And you saw them do it; correct?
15      A.  Yes.
16      Q.  Now, at some point case goes to trial.
17  Verdict comes down.  Judge Wilson throws out the
18  verdict.  Do you remember that?
19      A.  Yes.
20      Q.  Okay.  Appeal ensues.  Do you remember that?
21      A.  Yes.
22      Q.  Okay.  The appeal is successful; correct?
23      A.  Yes.
24      Q.  Okay.  And then the insurers for the

**Page 40**

1  defendants wire the funds to Don Keenan's office.  Do
2  you remember that?
3      A.  Yes.
4      Q.  Okay.  And you don't dispute that the funds
5  were wired to Don Keenan's office; correct?
6      A.  Yeah.  No.  I don't dispute that.
7      Q.  Okay.  And you don't dispute that Attorney
8  Hoey's firm did not get the 9-plus million from the
9  insurance carriers for the defendants; correct?
10          MS. ZERNER: Objection.
11      A.  Yeah.
12          MS. ZERNER: Go ahead.
13      A.  I mean, I know it was wired to Don.
14      Q.  Okay.
15      A.  I mean, I didn't -- that wasn't, like, a
16  thought process.
17      Q.  And when did you learn of that?
18      A.  I guess right after it was wired or while it
19  was wired David told me.
20      Q.  And at some point in time, you sat down with
21  David, correct, and went over the expenses?
22      A.  Yes.
23      Q.  Okay.  Do you remember what day of the week
24  that was?

**Page 41**

1      A.  No.
2      Q.  Do you remember when it was?
3      A.  I want to say it was mid-December, but I
4  don't remember the exact day.
5      Q.  It was in what?
6      A.  December of 20 -- 2019.
7      Q.  Do you remember getting an Excel spreadsheet
8  from David outlining the various expenses via e-mail?
9      A.  Yes.
10      Q.  Do you remember, as you sit here today, if
11  you met with David to go over the expenses before or
12  after you received that Excel spreadsheet?
13      A.  Before.
14      Q.  So you met with him before, and it's your
15  testimony that you received the Excel spreadsheet
16  after.
17      A.  Via e-mail, yes.
18          (Exhibit-6, March 29, 2020 e-mail, marked
19  for identification.)
20      Q.  Do you have Exhibit 6 in front of you?
21      A.  (Witness viewing document.) Yes, I do.
22      Q.  It's an e-mail dated March 29, 2020.  Do you
23  see that?
24      A.  (Witness viewing document.) Yes.

11

Dunn Reporting Services, Inc.
617-422-0005

Page 42

1    Q.   And it's from David to you; is that correct?
2    A.   (Witness viewing document.) Yes.
3    Q.   And that's your e-mail address at the time.
4    A.   (Witness viewing document.) Yes.
5    Q.   Is this still your e-mail address today?
6    A.   (Witness viewing document.) Yes.
7    Q.   Okay.  And attached -- obviously, we printed
8    this -- attached is four pages of an Excel
9    spreadsheet.  Do you see that?
10   A.   (Witness viewing document.) Yes.
11   Q.   And, obviously, because it's printed, it
12   doesn't print the way Excel would show on your
13   computer.  Do you understand that?
14   A.   (Witness viewing document.) Yes.
15   Q.   Okay.  Do you remember receiving this at the
16   time --
17   A.   Yes.  I'm sorry.
18   Q.   -- it was sent to you?
19   A.   Yes.
20   Q.   Yes.  Okay.
21        And did you open the Excel spreadsheet?
22   A.   Yes.
23   Q.   And did you read it?
24   A.   (Witness viewing document.) Yes.

Page 43

1    Q.   Okay.  And, by the way, do you see it says
2    before the bottom "We are actively pursuing fees and
3    costs against Sobczak Associates with this frivolous
4    lien."  Do you see that?
5    A.   (Witness viewing document.) I do.
6    Q.   You understood, as of then certainly, that
7    Mr. Sobczak was asserting a lien against you.
8    A.   That's what I was told, yes.
9    Q.   Okay.  And you understood that that lien was
10   in your case, your underlying case.
11   A.   I was -- I was told there was a lien against
12   my -- my money in the case.
13   Q.   Okay.  And you understood that he was making
14   that claim against you; right?
15   A.   Yes.
16   Q.   Now, let me show you what we'll mark as
17   Exhibit Number 7.
18        (Exhibit-7, March 29, 2020 e-mail, marked
19   for identification.)
20   Q.   Now, before we go to Exhibit Number 7, you
21   see in the e-mail David says "If you have any
22   questions or dispute any of the expenses, please let
23   me know"?
24   A.   (Witness viewing document.) This is on 6.

Page 44

1    Q.   Yes, ma'am.  Do you see that?
2    A.   (Witness viewing document.) Yes.
3    Q.   Okay.  Did you ask him any questions after
4    you got this e-mail?
5    A.   No.
6    Q.   Okay.  Did you raise any concerns about any
7    of the expenses that were outlined in the spreadsheet?
8    A.   No, at this time, I did not.
9    Q.   Okay.  And looking at Exhibit Number 7, do
10   you have it in front of you?
11   A.   (Witness viewing document.) I do.
12   Q.   And -- can I see the witness's Exhibit
13   Number 7?
14        For the record, this reattaches what was
15   marked as Exhibit Number 6, but looking at the top
16   page of Exhibit Number 7, it's an e-mail chain; is
17   that correct?
18   A.   (Witness viewing document.) Yes.
19   Q.   And you respond on March 30th to David's
20   March 29, 2020 e-mail.  Do you see that?
21   A.   (Witness viewing document.) Yes.
22   Q.   And then David responds to you, and he says
23   do you -- after thank you, he says "Can you sign off
24   on it from your location or should I send you a hard

Page 45

1    copy for signature, question mark?"  Do you see that?
2    A.   (Witness viewing document.) I do.
3    Q.   Okay.  And then he says "or you can always
4    stop by the office.  I'm the only one here."  Do you
5    see that?
6    A.   (Witness viewing document.) I do.
7    Q.   And then you respond "Oh, I could use an
8    outing.  I'll come by this week."  Do you see that?
9    A.   (Witness viewing document.) I do.
10   Q.   And then David responds to that "Thanks."
11   A.   (Witness viewing document.) I do.
12   Q.   Do you see that?  Okay.
13        Does this refresh your recollection that you
14   went to his office to go over the accounting sheet
15   after -- on or after March 30th, 2020?
16   A.   (Witness viewing document.) Yes.  And, to be
17   honest, I thought I did it before then, so I thought
18   we went over it first.
19        MS. KNIPPER:  If we could mark this as
20   Exhibit Number 8.
21        (Exhibit-8, Spreadsheet, marked for
22   identification.)
23   Q.   Do you recognize Exhibit Number 8 as being a
24   printout of the Excel spreadsheet that you were

Page 46

1 e-mailed on March 29, 2020?
2     A.   (Witness viewing document.) Yes.
3     Q.   When you met with David, did he give you
4 this particular document?
5     A.   (Witness viewing document.) I believe so.
6     Q.   Bear with me. I'm going to ask you a
7 couple -- I'm going to show you a couple more
8 documents before I ask you questions.
9         MS. KNIPPER:  If we could mark this. We'll
10 mark this as Exhibit Number 9.
11        (Exhibit-9, Distribution, marked for
12 identification.)
13    Q.   Now, before I ask you questions about these
14 -- further questions, do you have Exhibit 9 in front
15 of you?
16    A.   (Witness viewing document.) Yes, I do.
17    Q.   And it's your signature on each page of
18 Exhibit Number 9.
19    A.   (Witness viewing document.) Yes.
20    Q.   And it reflects a date of March 27, 2020.
21 Do you see that?
22    A.   (Witness viewing document.) Yes.
23    Q.   Is that why you believe that you met with
24 him before?

Page 47

1     A.   (Witness viewing document.) I thought we had
2 met -- I, honestly, thought we had met in, like,
3 December or January about this. I just didn't have a
4 recollection of -- of the timeline.
5     Q.   Okay. Is it possible that you met with him
6 in December and January and then went -- met with him
7 again to specifically go over these?
8     A.   A hundred percent accurate. I mean, it
9 could be that -- I mean, I met with David all the
10 time, so I don't necessarily have a timeline and what
11 we talked about at every meeting.
12    Q.   Okay. And looking at Exhibit Number 7,
13 does --
14    A.   (Witness viewing document.) Oh, sorry.
15 Yeah.
16    Q.   Looking at Exhibit Number 7 where you say
17 you're going to go meet with David --
18    A.   (Witness viewing document.) Uh-huh.
19    Q.   -- and those are March 29 and March 30th;
20 correct?
21    A.   (Witness viewing document.) Correct.
22    Q.   Is it possible that your date of March 27,
23 2020 on Exhibit Number 9 is a mistake?
24    A.   (Witness viewing document.) I can't answer

Page 48

1 that. It could be. It could not be. I -- I don't
2 know how I would have been there two days before I
3 said I was coming, but...
4     Q.   It's plausible that it's a mistake.
5     A.   Absolutely.
6     Q.   Correct?
7     A.   Absolutely.
8     Q.   All right. And neither -- and neither you
9 nor David picked up on the fact --
10    A.   Checked --
11    Q.   -- that you --
12    A.   Sorry.
13    Q.   -- put the wrong date; correct?
14    A.   Correct.
15    Q.   Okay.
16        MS. ZERNER:  Take a breath.
17    A.   Sorry.
18    Q.   Please wait until we're completely done with
19 the question. Thank you so much.
20        Now, when you -- was anybody else with you
21 when you met with David to go over what's been marked
22 as Exhibit Number 9 and Exhibit Number 8 in person?
23    A.   No.
24    Q.   And how long was your meeting?

Page 49

1     A.   I have no memory of that.
2     Q.   You went with -- you went to see David all
3 the time; correct?
4     A.   I did.
5     Q.   Even on weekends sometimes; correct?
6     A.   Correct.
7     Q.   He made himself available to you all the
8 time.
9     A.   He --
10        MS. ZERNER:  Objection.
11        Go ahead.
12    A.   He was always there for me.
13    Q.   And when he sat down with you, he explained
14 to you --
15        MS. ZERNER:  Hold on one second.
16        THE WITNESS:  You stole my water.
17        MS. ZERNER:  Oh, sorry. Shit.
18        THE WITNESS:  It's okay.
19        MS. ZERNER:  Excuse me.
20        THE WITNESS:  Sorry. Go ahead.
21    Q.   And when he sat down with you, he explained
22 to you each one of these categories; is that correct?
23    A.   I don't recall if he explained them all in
24 detail, but I'm sure we went over it.

Page 54

1    Q.   -- page 3 --
2    A.   (Witness viewing document.) Yes.
3    Q.   -- Kira Wahlstrom?  Okay.
4         And so under Kira Wahlstrom, that's the
5    amount that you received; is that correct?
6    A.   (Witness viewing document.) Yes.
7    Q.   And then under attorney fee, that's the
8    amount that was the attorney fee; correct?
9    A.   (Witness viewing document.) Correct.
10   Q.   Which were breakdown -- which were broken
11   down on page 1; right?
12   A.   (Witness viewing document.) Correct.
13   Q.   Okay.  With 3.275 million to Keenan Law
14   Firm, 750 to Attorney Hoey, 250 of which went to
15   Austin O'Toole; correct?
16   A.   Correct.
17   Q.   Okay.  And if you look at Exhibit Number 8,
18   those are the same case expenses as reflected on page
19   2 with a further explanation.
20   A.   (Witness viewing document.) Yes.
21   Q.   And if you go to page 2 of Exhibit Number 8,
22   those are the same expenses as reflected on page 3 of
23   Exhibit 9 with some further explanation on the
24   right-hand column; correct?

Page 55

1    A.   (Witness viewing document.) Yes.
2    Q.   Okay.  And so going through these, the third
3    line Advocate Capital.
4    A.   Which one are we on?
5    Q.   Exhibit Number 8.
6    A.   (Witness viewing document.) Okay.  Yes.
7    Q.   Okay.  And you understood at the time that
8    this was the lender.
9    A.   (Witness viewing document.) Yes.
10   Q.   And the entity that was helping finance your
11   case?
12   A.   Yes.
13   Q.   And you understood that interest was being
14   charged by Advocate Capital for the amount that was
15   taken out.
16   A.   Yes.
17   Q.   Okay.  Do you know how much money was
18   borrowed from Advocate Capital?
19   A.   At the time, I assumed it was just 238 --
20   839,000.
21   Q.   Okay.  What's your understanding today?
22   A.   That's what I know it to be.
23   Q.   Did you understand that 238 to be the amount
24   that was for the interest or the amount that was to

Page 56

1    fund the case?
2    A.   I don't know if I knew it.  I mean, it says
3    it was for the litigation expenses, so I guess I
4    assumed it was for -- to fund the case.
5    Q.   Did you ask David any questions about it?
6    A.   I don't believe I did.
7    Q.   And you understood at the time that there
8    would be financing charges associated with the
9    Advocate Capital loan; right?
10        MS. ZERNER:  Objection.
11        Go ahead.
12   A.   I assumed -- I'm sure I did, yes.  I don't
13   know.
14   Q.   And there's a line for Ms. DeJuneas;
15   correct?
16   A.   (Witness viewing document.) Yes.
17   Q.   And you understood that Ms. DeJuneas was
18   being paid while the appeal was pending; correct?
19   A.   Yes.
20   Q.   And who was paying Ms. DeJuneas, out of what
21   funds?
22   A.   I don't know out of what funds, but I assume
23   David Hoey's law office was paying for it.
24   Q.   Same thing for Mr. Cordy?

Page 57

1    A.   Yes.
2    Q.   And then if you go down to the line of Amy
3    Goganian, do you see that?
4    A.   (Witness viewing document.) Where is she?
5    Oh, I see it, yeah.
6    Q.   Where there's a number of 41,000 and change,
7    do you see that?
8    A.   (Witness viewing document.) Yes.
9    Q.   And it says next to it "This is who we hired
10   to fight the Sobczak lien."  Do you see that?
11   A.   (Witness viewing document.) Yes.
12   Q.   Did you understand at the time that
13   Ms. Goganian was representing you with respect to the
14   Sobczak lien?
15   A.   David told me that she was handling it.  I
16   don't know if I had it -- I don't know if I had a
17   thought process about it at this time.
18   Q.   You understood that the Sobczak lien was
19   against you; right?
20   A.   Yes.  I was told it was against -- there was
21   a lien on -- a lien on my money, and it -- that's...
22   Q.   You understood that it had to be fought;
23   correct?
24   A.   Yes.

Page 62

1    Q.   Okay.  You understood that a number of
2  people looked at your briefs for purposes of the
3  appeal; right?
4    A.   To be honest with you, no.  I don't know who
5  looked at them.
6    Q.   Did you ever ask David what type of work
7  went in to doing the appeal?
8    A.   I don't believe so.  I'm sure we talked
9  about it.  We talked about a lot of things, and I
10  talked with Patty a little bit about it, but I didn't
11  -- we didn't have -- I didn't go into, like, details I
12  don't believe.
13    Q.   While the appeal was ongoing, did you mainly
14  talk to David or Patty?
15    A.   I think maybe David but Patty also, but
16  David and I were together a lot.
17    Q.   Did you also talk to Mr. Cordy?
18    A.   I don't think we ever talked in person.
19    Q.   You understood that he was on board; right?
20    A.   Yeah.  I talked to him when we were at
21  court, but I don't think I talked to him before that.
22    Q.   And you understand that he was helping for
23  your case.
24    A.   Yes.

Page 63

1    Q.   And you agreed to pay his fee.
2    A.   Yes.
3    Q.   And that was something that was fronted by
4  my client's office; correct?
5    A.   I'm assuming.  I don't know.
6    Q.   And you don't have a signed agreement with
7  Mr. Cordy; correct?
8    A.   No.
9    Q.   The only person on this list that you say
10  you have a signed agreement with is Ms. DeJuneas and
11  Ms. Goganian in relation to the O'Toole litigation;
12  correct?
13    A.   At this time, I didn't have a signed --
14  anything signed with Amy.  I didn't sign anything with
15  Amy until after I went to California.
16    Q.   So the only -- the only attorneys on this
17  list that you had a signed agreement with was
18  Ms. DeJuneas' firm.
19    A.   And David Hoey at this time.
20    Q.   And Don Keenan?
21    A.   Oh, yes, and Don Keenan.
22    Q.   But in terms of the ones listed under this
23  first page, expenses, you did not have an agreement
24  with Mr. Cordy; right?

Page 64

1    A.   No, I did not.
2    Q.   Okay.  But you understood that he was
3  working on your appeal; correct?
4    A.   Yes.
5    Q.   And you understood that he was expecting to
6  be paid; correct?
7    A.   Yes.
8        MS. KNIPPER:  Okay.  I have to take a short
9  break.
10        THE VIDEOGRAPHER:  We are going off the
11  record.  The time is 10:59 a.m.
12        (Brief break from 10:59 a.m. to 11:08 a.m.)
13        THE VIDEOGRAPHER:  We are back on the
14  record.  The time is 11:08 a.m.
15    Q.   (BY MS. KNIPPER)  Ms. Wahlstrom, if you could
16  go back to Exhibit Number 3, it's the 2015 fee
17  agreement with --
18    A.   Okay.
19    Q.   -- Keenan Law Firm.
20    A.   (Witness viewing document.)  Got it.
21    Q.   You have it.  Okay.  If you can go to the
22  second page, and in the paragraph number 4 under 33
23  and a half percent, do you see that?
24    A.   (Witness viewing document.)  Yes.

Page 65

1    Q.   There's a paragraph about the percentages
2  being increased if an appeal.  Do you see that?
3    A.   (Witness viewing document.)  Yes.
4    Q.   And I'm paraphrasing, of course.
5        And you initialed on the right-hand side;
6  right?
7    A.   (Witness viewing document.)  Yes.
8    Q.   Okay.  And you read this before you signed
9  it.
10    A.   (Witness viewing document.)  Yes.
11    Q.   And you read it before you initialed it.
12    A.   (Witness viewing document.)  Yes.  I looked
13  over it.
14    Q.   And you previously testified that you read
15  the 2010 agreement before you signed it; correct?
16    A.   Yes.
17    Q.   And that agreement did not have that
18  contingency in it; is that correct?
19    A.   Correct.
20    Q.   I told you the wrong hotel, and I apologize.
21  I said -- I can't remember what I said.
22    A.   DoubleTree.
23    Q.   DoubleTree.  Thank you, ma'am.
24        Do you remember meeting with Mr. Keenan in

Page 70

1 the appeal, but I don't remember specific
2 conversations.
3    Q.   Okay.  Did you ask her if David had done any
4 work on the appeal?
5        MS. ZERNER:  She's asking you if you asked
6 the question.
7    A.   I did not ask that question.
8    Q.   Okay.  Did Patty DeJuneas relate to you any
9 information about the amount of work David did on the
10 appeal?
11        MS. ZERNER:  I'll just make an objection to
12 the extent you consulted with her on legal advice
13 related to the new case.
14    A.   Yeah.  I don't have an answer for that.  I
15 don't remember.
16        MS. KNIPPER:  Okay.  I don't think there's a
17 privilege that attaches to that, and so we can argue
18 about it on another day, and I know you've noted your
19 objection, but I disagree that the privilege attaches
20 because Ms. DeJuneas represented Ms. Wahlstrom on the
21 appeal along -- at the same time that Attorney Hoey
22 represented Ms. Wahlstrom on the appeal.
23        And if she does not represent Ms. Wahlstrom
24 in this case. I do not believe that there's a

Page 71

1 privilege that attaches, so we can argue about it on
2 another day, but note my objection to your objection.
3        MS. ZERNER:  Okay.  And I -- and you can ask
4 the question again because I'll have to hear because,
5 of course, there's a difference too between factual
6 issues versus legal advice, and -- but I would just,
7 for the record, say Ms. DeJuneas does not have to
8 appear in a case to have -- for there to be a
9 privilege between a client and counsel.
10    Q.   Does Ms. DeJuneas represent you in this
11 case?
12    A.   No.
13    Q.   Do you have a fee agreement with
14 Ms. DeJuneas concerning this case?
15    A.   No.
16    Q.   Do you have any current fee agreement with
17 Ms. DeJuneas related to any case?
18    A.   No.
19    Q.   Did Ms. DeJuneas receive any type of
20 referral fee in relation to your children's case?
21    A.   No.
22    Q.   Did you enter into any type of agreement
23 with Ms. DeJuneas in relation to the bad faith case?
24    A.   I don't believe so, no.

Page 72

1    Q.   Is that case still ongoing?
2    A.   The bad faith case, yes.
3    Q.   Okay.  The children's case is not ongoing;
4 is that correct?
5    A.   That is correct.
6    Q.   That case settled; correct?
7    A.   That is correct.
8    Q.   Okay.  And it's your testimony that
9 Ms. DeJuneas did not receive a part of that fee.
10    A.   It is my understanding, yes.
11    Q.   Okay.  And I think I just asked you this, so
12 I apologize.  The bad faith case is ongoing; correct?
13    A.   Yes.
14    Q.   What is your understanding as to when it's
15 scheduled for trial?
16    A.   I don't have an understanding.  We don't
17 have a date, as far as I know.
18    Q.   If I'm understanding you correctly, is it
19 your testimony that you've never asked Ms. DeJuneas
20 about David's involvement in the appeal?
21    A.   I never asked her that question, no.
22    Q.   Did you review any e-mails between
23 Ms. DeJuneas and David prior to the filing of the
24 complaint?

Page 73

1    A.   I don't think I went through any e-mails.  I
2 mean, I have learned of things that were in e-mails
3 that my attorney has shared, but I don't...
4    Q.   Are you aware that Ms. DeJuneas and David
5 communicated regularly concerning your appeal?
6    A.   I'm not -- I'm sure they did.  I don't --
7 I'm not -- I don't have that information though.
8    Q.   Okay.  Are you aware that they had strategy
9 calls concerning your appeal?
10    A.   Firsthand knowledge, no, but I'm -- I am
11 sure they did.
12    Q.   Okay.  Did you ever learn that -- prior to
13 Ms. Zerner being retained, did you ever learn during
14 the pendency of your appeal, after the appeal, when
15 the expenses were disbursed, did you ever learn that
16 they were having strategy calls?
17    A.   David and I talked about -- all the time,
18 and we did talk about my appeal, but I don't remember
19 if -- or know or I can't say right now that -- if we
20 talked in detail about phone calls him and Patty had.
21    Q.   Okay.  But you understood that they were
22 having those phone calls.
23    A.   I understood they talked, yes.
24    Q.   Okay.  Are you aware that David reviewed and

Page 82

1      A.   (Witness viewing document.) Yes.
2      Q.   You're not on this e-mail chain, but have
3   you ever seen this e-mail before?
4      A.   (Witness viewing document.) I will have to
5   read it. I don't know.
6      Q.   Yeah. Take your time.
7      A.   (Witness viewing document.) I don't think
8   I've ever seen it.
9      Q.   Okay. I'm going to direct you -- it's a
10   long e-mail chain between Patty, Kris Sobczak, David,
11   Don Keenan, Andrew Gould. Do you remember who
12   Mr. Gould is?
13      A.   Yes. I do.
14      Q.   Okay. And he worked for Mr. Keenan's
15   office; correct?
16      A.   Yes.
17      Q.   Okay. And Patty's on these e-mails, and
18   it's about the appeal; correct?
19      A.   (Witness viewing document.) It appears to
20   be, yes.
21      Q.   Okay. And they're going back and forth on
22   various things, and that's not -- I'm not going to ask
23   you questions about that, but if you go to the very
24   first page --

Page 83

1      A.   (Witness viewing document.) Okay.
2      Q.   -- in the middle, and I know it's a little
3   bit hard to read so I'm going to point right here.
4      A.   (Witness viewing document.) Please do, yes.
5      Q.   Okay. There's an e-mail from Patty to
6   Mr. Sobczak and David and Don Keenan and Andrew Gould
7   and Ashley Leavitt. Do you see that?
8      A.   (Witness viewing document.) Yes.
9      Q.   And it's dated July 20, 2016. Do you see
10   that?
11      A.   (Witness viewing document.) Yes.
12      Q.   Okay. And Patty says she attaches a
13   document and it's a simplified version. I'm
14   paraphrasing. Do you see that?
15      A.   (Witness viewing document.) I do.
16      Q.   Okay. And then she writes "Also, comma, I
17   very strongly believe that from this point on and
18   until the appeal is resolved, comma, that your name
19   should not appear on any pleadings, briefs,
20   et cetera." Do you see that?
21      A.   (Witness viewing document.) I do.
22      Q.   Okay. Did you know that before reading this
23   today?
24      A.   I don't think so, no.

Page 84

1      Q.   Okay. And then she says "When counsel's
2   conduct is at issue, I think their continued
3   involvement is a distraction." Do you see that?
4      A.   (Witness viewing document.) Yes.
5      Q.   Did you understand at the time of both JPA's
6   motion for a new trial and the judge's decision that
7   part of the issue, according to JPA and Judge Wilson,
8   was counsel's conduct?
9      A.   Yes.
10      Q.   And you understood that at the time.
11      A.   Yes.
12      Q.   And you went to the hearing for the motion
13   for the new trial.
14      A.   Yes.
15      Q.   And was Ms. DeJuneas and Mr. Hoey sitting at
16   counsel's table?
17      A.   I don't remember where everyone was sitting.
18      Q.   Okay. Was Ms. DeJuneas there?
19      A.   Yes.
20      Q.   Okay. Was Mr. Hoey there?
21      A.   Yes.
22      Q.   Was Mr. Sobczak there?
23      A.   I don't remember.
24      Q.   Okay. But you remember that Ms. DeJuneas

Page 85

1   and David were there --
2      A.   Yes.
3      Q.   -- for sure. Okay.
4         Why didn't you ask Patty before you filed
5   your lawsuit why David or Kris were not on any of the
6   pleadings, the appeal briefs?
7      A.   Why didn't I?
8      Q.   Yes.
9      A.   I -- I just assumed she was my appellate
10   lawyer, and that's how it worked. Her name was on it,
11   and David was my -- David and Kris were my lawyers for
12   the other case, so they had that.
13      Q.   Did you ever ask David what his involvement
14   was in the appeal once you started raising concerns
15   about the expenses in your own mind?
16      A.   No. I never talked to David about that.
17      Q.   Did you ever ask David why his name was not
18   on the appeal briefs?
19      A.   No.
20         MS. KNIPPER: If we can mark this as the
21   next exhibit.
22         (Exhibit-12, February 22, 2017 memo to file,
23   marked for identification.)
24      Q.   Do you have Exhibit 12 in front of you?

Page 98

1   appeal?
2      A.   I did read the appellate briefs from Patty,
3   yes.
4      Q.   Again, you have no reason to dispute that
5   Attorney Hoey made changes, comments, and was involved
6   in the drafting of the appellate briefs; correct?
7          MS. ZERNER:  Objection.
8      A.   I don't -- I can't answer that either way.
9   I don't know.
10     Q.   You don't know; correct?
11     A.   Correct.
12     Q.   Okay.  And you didn't check any of Patty's
13  file before you filed your complaint; correct?
14     A.   I personally did not, no.
15         (Exhibit-15, March 6, 2017 e-mail, marked
16  for identification.)
17         MS. KNIPPER:  Bridget, did I give you a
18  copy?
19         MS. ZERNER:  Yes.
20     Q.   Do you have Exhibit Number 15 in front of
21  you?
22     A.   (Witness viewing document.) I do.
23     Q.   Okay.  This is an e-mail chain, so it's two
24  e-mails, one back and forth; one from you to Patty and

Page 99

1   David, and one from David to you and Patty.  Do you
2   see that?
3      A.   (Witness viewing document.) Yes.
4      Q.   And it's on March 6, 2017.
5      A.   (Witness viewing document.) Yeah.
6      Q.   Do you see that?
7          And it -- and your -- your e-mail says "I
8   received this text today from Kris.  What would you
9   like me to do?"
10     A.   (Witness viewing document.) Yes, I see that.
11     Q.   Okay.  And is that when you referenced when
12  Mr. Sobczak texted you or communicated with you about
13  you not being on the -- him not being on the case
14  anymore?
15     A.   I don't -- yes.  Yes.  I do remember that he
16  contacted me.  I don't remember what it said.
17     Q.   Okay.
18     A.   But, yes.
19     Q.   And it's not attached.
20     A.   Yeah.
21     Q.   Okay.  But does this refresh your
22  recollection that you got a text from Kris?
23     A.   Yes.
24     Q.   Okay.  And then David responded "wait for

Page 100

1   Patty's direction"; correct?
2      A.   (Witness viewing document.) Correct.
3      Q.   Okay.  And that's what you did.
4      A.   I'm sure I did, yes.
5      Q.   Okay.  And that was on how you needed to
6   deal with Mr. Sobczak and whether he was going to
7   remain on your case; correct?
8      A.   I -- I don't know what her follow-up from
9   this was.  I would have to see it to refresh my
10  memory, but I'd assume so.
11     Q.   Are you alleging in this case that you did
12  not know at the time Ms. Goganian filed papers on your
13  behalf in the Kris Sobczak lien dispute that the lien
14  was filed in your case?
15     A.   David said she was doing work, but I didn't
16  know that she was -- I didn't understand the whole ins
17  and outs of that case, no.
18     Q.   So you understood she was involved; correct?
19     A.   Correct.
20     Q.   Okay.  And you understood that the lien was
21  in your case; correct?
22     A.   Yes.
23     Q.   And you understood that the lien was against
24  you; correct?

Page 101

1      A.   Correct.
2      Q.   Okay.  Did Ms. DeJuneas ever tell you at the
3   time -- before the appeal issue, that she was helping
4   fight the Sobczak lien?
5      A.   I'm sorry.  Before the appeal issue for the
6   original case or --
7      Q.   No.
8      A.   -- for the Sobczak?
9      Q.   For the Sobczak lien.
10     A.   Did she ever tell me, I don't recall.
11     Q.   Do you know either way if she was involved
12  in helping to fight the Sobczak lien before it went up
13  on appeal?
14     A.   I don't know that.
15     Q.   Did you go to any of the hearings
16  involving -- well, the hearing for sanctions on the
17  Sobczak lien?
18     A.   Yeah.  I was there.  That was the one via
19  Zoom I believe.
20     Q.   And Ms. Goganian argued, correct, on your
21  behalf?
22     A.   Yes.
23     Q.   Okay.  And did you hear her say that she was
24  your lawyer?

Page 106

1    2020. I don't remember my first time speaking to her.
2        Q.   And when you spoke with her, did you
3    understand that she was acting as your lawyer?
4        A.   I signed a fee agreement with her at some
5    point in 20 -- I think it was late 2020.
6        Q.   Okay. And was that relating --
7        A.   I don't remember.
8        Q.   -- to what case?
9        A.   The O'Toole case I think.
10       Q.   And when you signed the fee agreement with
11   her on the O'Toole case, did you ever ask her at that
12   particular point in time about the Sobczak lien and
13   her role as your lawyer in the Sobczak lien?
14       A.   No, I did not.
15       Q.   Did you ask her why she wasn't making you
16   sign a fee agreement in that -- in relation to the
17   Sobczak lien?
18       A.   No.
19       Q.   And she had you sign one for the O'Toole
20   case; right?
21       A.   Correct.
22       Q.   Why aren't you suing Ms. Goganian?
23       A.   I -- I don't have an answer for that. I'm
24   not...

Page 107

1        Q.   You believe -- you have an allegation in
2    your case that the motions for sanctions was
3    unsuccessful; correct?
4        A.   In the Sobczak case?
5        Q.   In your complaint --
6        A.   I'm sorry.
7        Q.   -- here you have --
8        A.   Yes.
9        Q.   -- an allegation; correct?
10       A.   Yes.
11       Q.   That the motion for sanctions was
12   unsuccessful; correct?
13       A.   Correct.
14       Q.   And Ms. Goganian drafted and argued that
15   motion; correct?
16       A.   Correct.
17       Q.   So why aren't you suing Ms. Goganian in
18   relation to that unsuccessful motion?
19       A.   I don't have an answer for that.
20       Q.   You didn't like Mr. Sobczak much; is that
21   correct?
22       A.   At what point?
23       Q.   Well, did you ever like him?
24       A.   Yes.

Page 108

1        Q.   Okay. When did you stop liking him?
2        A.   I don't know if I stopped liking him, but I
3    guess around the time that we asked him to leave my
4    case.
5        Q.   And why did you stop liking him at that
6    time?
7        A.   I was learning that he was -- I don't know
8    if hindrance is the right word, but it was detrimental
9    to my case.
10           (Exhibit-18, February 25, 2020 e-mail,
11   marked for identification.)
12       Q.   Do you have Exhibit 18 in front of you?
13       A.   (Witness viewing document.) I do.
14       Q.   And it's an e-mail back and forth between
15   you and David; correct?
16       A.   (Witness viewing document.) It is.
17       Q.   And the bottom is on February 25, 2020, and
18   your last response is on February 25, 2020 as
19   well; correct?
20       A.   (Witness viewing document.) Correct.
21       Q.   And at the bottom, David outlines various
22   options and says "We have to decide on the next step."
23   Do you see that?
24       A.   (Witness viewing document.) I do.

Page 109

1        Q.   And it concerns the SOB lien on the subject
2    line. Do you see that?
3        A.   (Witness viewing document.) I do.
4        Q.   What do you understand the SOB lien to be?
5        A.   The Sobczak lien.
6        Q.   And then David says "He cost you 35,000 in
7    filing the lien he filed." Do you see that?
8        A.   (Witness viewing document.) I do.
9        Q.   And you understood that at the time;
10   correct?
11       A.   Correct.
12       Q.   And he goes on to state, David to you, says
13   "The lien was found to be invalid and it was
14   dismissed." Did I read that correctly?
15       A.   (Witness viewing document.) Yes.
16       Q.   And then he outlines -- he says a number of
17   other things, and then he outlines four options.
18   Number 1, do nothing; Number 2, 93A demand letter;
19   Number 3, move for cost by motion; Number 4 do both
20   motion and 93A. Did I read that correctly?
21       A.   (Witness viewing document.) Yes.
22       Q.   Okay. And you respond with some choice
23   words. You say "Yeah. Fuck him."
24       A.   (Witness viewing document.) Uh-huh.

Page 110

1    Q.   Did I read that correctly?
2    A.   (Witness viewing document.) Yes.
3    Q.   And you say "Let's do option 4, a motion and
4  93A"; correct?
5    A.   (Witness viewing document.) Yes.
6    Q.   All right. And you understood that doing a
7  motion would be done by Ms. Goganian; correct?
8    A.   I don't think I had that thought process
9  when I read this, no.
10    Q.   Okay. You understood somebody had to do it;
11  right?
12    A.   I did, yeah. Someone was going to do it.
13    Q.   Somebody was going to do it and somebody was
14  going to get paid for it, just not Mr. Hoey; correct?
15    A.   I don't know. I don't know if that was my
16  thought process at this time.
17    Q.   Okay. But you understood that the -- all
18  the individuals who are working on your case were
19  getting paid by -- from funds that Mr. Hoey was
20  fronting; correct?
21       MS. ZERNER: Objection.
22       MS. KNIPPER: I'll rephrase it.
23    Q.   Did you -- you understood that the other
24  lawyers, besides Mr. Hoey and Mr. Keenan, who were

Page 111

1  working on your case were getting paid from funds that
2  Attorney Hoey's office were fronting.
3       MS. ZERNER: Objection.
4    A.   Yeah. I don't -- I thought -- for the most
5  part, I thought some of it was coming out of the
6  reserve from the -- the winning -- the -- the money
7  from the first case, but other than that, I don't
8  think I had a process -- thought process on that, no.
9    Q.   Meaning you understood that there had been
10  money set aside from the verdict in the case against
11  JPA --
12    A.   Yes.
13    Q.   -- right, in order to fight the Sobczak
14  lien; correct?
15    A.   I don't know if it was just for that, but
16  I -- we had had discussions about paying for other
17  things.
18    Q.   Okay. So you understood that a certain
19  amount of money was set aside, and it's reflected in
20  the exhibits we've talked about before, and that was
21  going to go for both the Sobczak lien and cost of the
22  other things.
23    A.   Yes.
24    Q.   Correct? Okay.

Page 112

1       But aside from that money that was set
2  aside, prior to that and prior to the funds being
3  received, the individuals working on your case, aside
4  from Attorney Hoey and Mr. Keenan, were being paid
5  from funds that were being advanced by Mr. Hoey's
6  firm; correct?
7    A.   I don't -- yes, from that paper, but I don't
8  -- did not have that thought process at the time.
9    Q.   Okay.
10       (Exhibit-19, September 2, 2020 e-mail,
11  marked for identification.)
12    Q.   And showing you Exhibit Number 19, this is
13  an e-mail chain in September 2020; correct?
14    A.   (Witness viewing document.) Yes.
15    Q.   And David forwards an e-mail from Amy. Do
16  you see that?
17    A.   (Witness viewing document.) Yes.
18    Q.   And it's about the hearing on the motion for
19  fees and costs and Sobczak's violation of the
20  impounding orders. Do you see that?
21    A.   (Witness viewing document.) Yes.
22    Q.   And then David says to you "You're allowed
23  to attend by Zoom if you wish"; correct?
24    A.   (Witness viewing document.) Yes.

Page 113

1    Q.   And then you said, "Thank you. Yes, I think
2  I will attend."
3    A.   (Witness viewing document.) Yes.
4    Q.   And that's the hearing that you attended
5  that you talked about earlier.
6    A.   Yes.
7    Q.   Okay. Did you file an affidavit for that
8  hearing?
9    A.   I believe we did. I don't remember exactly
10  what it said.
11    Q.   Okay. But you filed an affidavit.
12    A.   I don't remember if that's what it's called,
13  but I filed something that I was going to say at the
14  -- at the hearing, but I don't remember.
15    Q.   And you don't remember what the affidavit
16  said.
17    A.   Right at this second, no. I would have to
18  look at it.
19    Q.   But it was against Mr. Sobczak; correct?
20    A.   Yes.
21    Q.   All right.
22       (Exhibit-20, July 2020 e-mail chain, marked
23  for identification.)
24    Q.   Showing you Exhibit 20, here, again, David

Page 118

1    distress which continues to this day; correct?
2        A.    (Witness viewing document.) Correct.
3        Q.    And in number 11, you say that you were
4    offended when Mr. Sobczak said that he was the victim
5    here.
6        A.    (Witness viewing document.) Yes.
7        Q.    And nothing can be further from the truth.
8    Is that -- did I read that correctly?
9        A.    (Witness viewing document.) Yes.
10       Q.    And then number 9, you say lawyers should
11   not be able to do what Sobczak -- what Mr. Sobczak has
12   done to me.  Did I read that correctly?
13       A.    (Witness viewing document.) Yes, you did.
14       Q.    And you signed this affidavit under the
15   pains and penalties of perjury.
16       A.    Correct.
17       Q.    And you believed it.
18       A.    Yes.
19       Q.    And you haven't sued Mr. Sobczak.
20       A.    No.
21       Q.    And you let go of the cross-appeal with him;
22   correct?
23       A.    Yes.
24       Q.    Are you aware that he's continuing with his

Page 119

1    appeal?
2        A.    I don't -- no, I don't know.
3        Q.    Did -- do you know if anybody notified the
4    court about your resolution -- the appeals court about
5    your resolution with Mr. Sobczak?
6        A.    I thought Patty did, but I -- as far as I
7    know.
8        Q.    You believe Ms. DeJuneas notified the
9    appeals court.
10       A.    I'm -- I'm -- don't know that for a fact.
11   I'm assuming.
12             (Exhibit-22, Undated e-mail, marked for
13   identification.)
14       Q.    Do you have Exhibit 22 in front of you?
15       A.    (Witness viewing document.) I do.
16       Q.    This was produced by your counsel in this
17   case. It's an e-mail chain between -- well, at the
18   bottom, it's Mr. Sobczak, and then it's an e-mail from
19   Patty to you. You're animation studios; correct?
20       A.    (Witness viewing document.) Well, I'm not
21   really, but I am.  My daughter messed with my e-mail a
22   hundred years ago, and I've never been able to get
23   that out of there.
24       Q.    Okay.  But that's you.

Page 120

1        A.    It is me.
2        Q.    Okay.  And it's -- Ms. Zerner is copied;
3    correct?
4        A.    (Witness viewing document.) I can't see.
5    Oh, yes.
6        Q.    Okay.  And there's no date on this e-mail,
7    which I can't explain, but do you remember getting
8    this e-mail?
9        A.    (Witness viewing document.) Let me just look
10   at it real quickly.  Yes.
11       Q.    And this attaches a draft or what I
12   understand to be a draft of your general release
13   agreement with Mr. Sobczak.
14       A.    Yes.
15       Q.    Did you sign this document?
16       A.    I believe I did.
17       Q.    Did you sign the same version that's
18   attached to this e-mail?
19       A.    I would have to go through and read it and
20   then look at the one that I signed just to be sure.
21       Q.    Do you have a copy of the one you signed?
22       A.    With me, no.
23       Q.    No.
24             But do you have a copy --

Page 121

1        A.    At my --
2        Q.    -- in general?
3        A.    -- house, I think that's -- I believe I do,
4    yes.
5        Q.    Okay.  And attached to the draft release is
6    an affidavit of you.
7        A.    (Witness viewing document.) Okay.  Hold on.
8    Is this Exhibit A?
9        Q.    Yes.
10       A.    (Witness viewing document.) Okay.
11       Q.    And this one is unsigned.  Do you see that?
12       A.    (Witness viewing document.) I don't know
13   what this is in regards to.  Yeah.  Yes, I see that.
14       Q.    Okay.  And did you sign this document?
15       A.    I don't have a recollection if -- I'm
16   assuming I did.  I don't remember.
17       Q.    Did you make any changes to the affidavit
18   before you signed it?
19       A.    I don't remember.  I have -- I have to read
20   this.
21       Q.    If you could look at paragraph 9 and 10?
22       A.    (Witness viewing document.) Okay.  Okay.
23       Q.    This resolution with Mr. Sobczak was reached
24   with the help of Ms. DeJuneas; correct?

Page 122

1    A.  (Witness viewing document.) Yes.
2    Q.  Okay.  And nowhere does it say between
3    paragraphs 9 and 10 that Ms. DeJuneas recommended that
4    Attorney Sobczak should withdraw from your case.
5    A.  (Witness viewing document.) I don't -- is
6    that a question?
7    Q.  Yes.
8    A.  Does it say it?
9    Q.  Nowhere does it say in your draft affidavit
10   that Attorney DeJuneas or at the recommendation of
11   Attorney DeJuneas you instructed Attorney Sobczak to
12   withdraw from the case.
13   A.  It doesn't say that, no.
14   Q.  But it says before that that you responded
15   to both Attorneys Hoey and Sobczak that, yes, you
16   wanted him to stay on your case --
17   A.  Originally, yes.
18   Q.  -- right?  Okay.
19       What's the purpose of this affidavit?
20   A.  I -- I don't know what the purpose is, I
21   mean.
22   Q.  Why did you agree to sign this affidavit?
23   A.  If I -- if -- I don't even know when it was
24   sent in.  If it was sent in with the other one, then

Page 123

1    it was recommended by my lawyer, and I would have to
2    have a conversation with her.  I don't remember.
3    Q.  And that would be --
4    A.  I'm sure we talked about it.
5    Q.  -- Patty.
6    A.  Yes.
7    Q.  And is it your understanding that
8    Mr. Sobczak is trying to continue with his appeal?
9    A.  I didn't know that, no.
10       MS. ZERNER:  And, Christine, if I can ask,
11   did you get a signed version of these in the
12   production?  Did you get a copy?
13       MS. KNIPPER:  As far as we can tell, we have
14   not received a signed version.
15       MS. ZERNER:  Okay.  Then I'll check on that
16   and make sure you have it.
17       MS. KNIPPER:  Thank you.
18   Q.  And at the same time you're doing this,
19   reaching this resolution with Mr. Sobczak, you are
20   preparing to sue Mr. Hoey; correct?
21   A.  I don't remember the timeline.  I don't know
22   if we were doing it at the same time.
23       (Exhibit-23, January and February 2022
24   e-mail chain, marked for identification.)

Page 124

1    Q.  Do you have Exhibit 23 in front of you?
2    A.  (Witness viewing document.) Yeah.
3    Q.  And these -- the first page shows e-mails in
4    February 2022; correct?
5    A.  (Witness viewing document.) Correct.
6    Q.  And at the top -- well, right before your
7    e-mail at the top, Patty says to you that she saw a
8    draft today of B's 92A letter and it's good.  Do you
9    see that?
10   A.  (Witness viewing document.) Yes.
11   Q.  And do you understand B to be Ms. Zerner?
12   A.  Yes.
13   Q.  And do you understand 92A letter to
14   technically be the 93A letter that you sent to
15   Attorney Hoey and his firm?
16   A.  Yes.
17   Q.  Okay.  And you respond "OMG.  I can't wait
18   to read it too" with seven exclamation points;
19   correct?
20   A.  (Witness viewing document.) Yes.
21   Q.  And you sound happy about the prospect of
22   asserting a claim against Attorney Hoey.  Fair to say?
23   A.  I guess I was excited to read it.
24   Q.  And this is at the same time that you're

Page 125

1    entering into an agreement with Mr. Sobczak; correct?
2    A.  I guess it's about the same time.  I just --
3    I wouldn't know the exact timeline.
4    Q.  What I'm saying is correct, it's
5    approximately the same time.
6    A.  (Witness viewing document.) Yes.  I'm
7    looking at the dates on these two, and they are --
8    Q.  Yes, February 2022; correct?
9    A.  (Witness viewing document.) Yes.
10   Q.  And so, as you sit here today, besides
11   speaking with Ms. DeJuneas, as you expressed before,
12   what changed from your dislike of Mr. Sobczak to
13   resolving with Mr. Sobczak and now having a dislike
14   for Mr. Hoey?
15   A.  I don't -- I never stopped having a dislike
16   for -- for Kris necessarily.  I just needed -- I just
17   -- I don't want to keep paying for cases that I didn't
18   need to be involved in.
19       It was my understanding I didn't need to be
20   involved in the Sobczak case, that we could come --
21   that could come to an end, so why would I not want to
22   end it.
23   Q.  At the time Mr. Sobczak filed his lien, at
24   that particular time he was pursuing it; correct?

Page 126

1    A.   At the time he filed?
2    Q.   Filed his lien.
3    A.   I'm assuming he was pursuing it, yes.
4    Q.   And he continued; correct?
5    A.   He did continue.  I don't know if he still
6  is.  That I don't know.  I don't have knowledge of
7  that.
8    Q.   So you don't want to fight with Mr. Sobczak
9  anymore; correct?
10   A.   No.
11   Q.   That's correct what I'm saying.
12   A.   That is correct.
13   Q.   Okay.  But you're willing to fight with
14 Mr. Hoey and Mr. Keenan and the Keenan's Kids
15 Foundation; correct?
16   A.   Yes.
17   Q.   And why is that?
18   A.   Because they destroyed my trust in them I
19 feel.
20   Q.   After you approved all the expenses, you
21 went to speak to Patty; correct?
22   A.   No, not right after, no.
23   Q.   Okay.  Sometime after actually; right?
24   A.   Sometime after, yes.

Page 127

1    Q.   Okay.  And at no point in time -- when did
2  you first go speak to Patty when you first had
3  concerns according to you?
4    A.   I -- I spoke to Patty in October, but I went
5  to Amy first actually.
6    Q.   Okay.  And that was in the summer 2021.
7    A.   Yes.
8    Q.   Okay.  And in the summer 2021, your
9  children's case was ongoing; correct?
10   A.   Yes.
11   Q.   And the bad faith case was ongoing; correct?
12   A.   Yes.
13   Q.   And you were in regular communications with
14 Mr. Hoey during that time frame?
15   A.   Yes.
16   Q.   And in the children's case, the defense was
17 trying to depose your mother and your sister,
18 correct --
19   A.   Yes.
20   Q.   -- during that time frame?
21   A.   I don't know the exact times, but, yes, they
22 were.
23   Q.   But at some point in time?
24   A.   Yes.  Yes.

Page 128

1    Q.   And when you started, according to you,
2  having concerns during summer of 2021 --
3    A.   Yes.
4    Q.   -- at any point in time, did you call David
5  and just ask him?
6    A.   No.  I didn't feel I could ask him about the
7  expenses or about my concerns with the other cases.
8    Q.   Why?
9    A.   Because I thought that we were too closely
10 connected to them and that he -- I needed an outside
11 opinion.
12   Q.   Did you ever even broach the issue with him,
13 I want this money back, why did you charge me for
14 this --
15   A.   No.
16   Q.   -- anything like that?
17   A.   I did not.
18   Q.   You continued to talk to him on the other
19 cases; correct?
20   A.   Correct.
21   Q.   For months; correct?
22   A.   Correct.
23   Q.   And you didn't terminate him until March of
24 2022; correct?

Page 129

1    A.   I don't remember the exact date, but, yes.
2    Q.   February or March 2022?
3    A.   It was sometime in -- in early February
4  2022.
5    Q.   Okay.  And at no point in time during that
6  entire time period, phone calls, e-mails, did you ever
7  raise the issue with him?
8    A.   No, I did not.
9    Q.   And did you ever go back and look at those
10 spreadsheets that he gave you and send them to him and
11 say, hey, David, I have concerns about X, Y, Z, can we
12 talk?
13   A.   I did go back over them.  No, I did not send
14 them to David.
15   Q.   Okay.  Instead you went to Amy; correct?
16   A.   Uh-huh.  Yes.
17   Q.   Who got paid on the case; correct?
18   A.   Yes.
19        MS. ZERNER:  Objection.
20   A.   I mean.
21   Q.   And you went to Ms. DeJuneas; correct?
22   A.   I did.
23   Q.   And she was paid also for her work on the
24 case.

Page 138

1    A.  Except for what's on that paper.
2    Q.  Those papers?
3    A.  The -- the spreadsheet.
4    Q.  Okay.  All right.  You were given multiple
5  papers; correct?
6    A.  I was.
7    Q.  Okay.  Do you have any reason to dispute the
8  accuracy of how the money was distributed between
9  counsel?
10       MS. ZERNER: Objection.
11    A.  I have no knowledge to that.
12    Q.  Did you look at any of the documents that
13  were produced in the case?
14    A.  I've looked at -- I've seen some documents.
15  I have not seen all of the documents, no.
16    Q.  And you understand that in the O'Toole
17  litigation, Attorney Hoey has represented in discovery
18  responses that the fee was based upon the last offer
19  at trial, his percentage of the fee.
20    A.  I did -- I believe I did read that. I don't
21  remember exactly the wording.
22    Q.  It's included in your --
23    A.  Yes.
24    Q.  -- complaint; correct?

Page 139

1    A.  Yes.
2    Q.  Okay.  And so that would not be based upon
3  any appeal; correct?
4    A.  That would not be based on an appeal.  I
5  don't understand.
6    Q.  Meaning the amount of money you received was
7  not based upon any appeal; correct?
8       MS. ZERNER: Objection.
9    A.  I -- yeah.  I don't have -- I don't -- no.
10    Q.  Meaning you understand?
11    A.  I -- I understand.  I don't know the answer
12  to that question.
13    Q.  Okay.  So you don't know either way.
14    A.  I don't know.
15    Q.  Now, back to the O'Toole litigation,
16  Ms. Goganian represented you in that case; correct?
17    A.  For a while, yes.
18    Q.  Okay.  And you were ultimately dismissed
19  from the case; correct?
20    A.  I was.
21    Q.  And there were multiple motions in that case
22  and multiple hearings.  Do you remember that?
23    A.  I'm sure there were.
24    Q.  Okay.

Page 140

1    A.  I don't remember all of them, no.
2    Q.  Do you remember the November 2021 hearing on
3  the first motion to dismiss?
4    A.  I don't.  I would have to -- I don't
5  remember it exactly.
6    Q.  Do you remember participating in the hearing
7  by Zoom?
8    A.  I believe I did, but I don't remember.  I
9  don't remember the...
10    Q.  Do you remember participating in at least
11  one Zoom hearing?
12    A.  I believe I did.
13    Q.  Okay.
14    A.  But I'm not -- I really don't have a
15  recollection.
16    Q.  And Ms. Goganian, do you remember
17  Ms. Goganian arguing on your behalf?
18    A.  Yeah.  Yes.
19    Q.  And I argued on behalf of Attorney Hoey.
20    A.  Yes.
21    Q.  And then there was Mr. Foy arguing on behalf
22  of Mr. O'Toole.
23    A.  Yes.
24    Q.  And at that particular hearing, was

Page 141

1  Mr. O'Toole present?
2    A.  I don't remember, but I think he was.
3    Q.  Okay.  And he was on the Zoom too.
4    A.  Yeah.  I believe he was on the Zoom.
5    Q.  And you and Mr. O'Toole were silent;
6  correct?
7    A.  Yeah.  I don't say anything.
8    Q.  Okay.  And do you understand that Mr. Foy is
9  Mr. O'Toole's lawyer?
10    A.  Yes.
11    Q.  Okay.  And do you remember, during that
12  particular Zoom hearing, that the judge showed clear
13  displeasure towards Mr. O'Toole at keeping you in the
14  case?
15    A.  I don't remember what happened during that.
16  I remember there was -- I don't remember the
17  discussions.  I don't.
18    Q.  Did you --
19    A.  I would have to go back and -- and if we had
20  the transcript, read it, but I don't remember.
21    Q.  Okay.  Do you remember learning from
22  Ms. Goganian that the judge was not pleased with you
23  being in the case?
24    A.  I don't remember exactly.  I remember I

Page 142

1    think it was a woman judge and I remember that she
2    wasn't happy, but I don't remember what was said.
3        Q.   And do you remember did you ever learn --
4    well, strike that.
5        Are you aware that Mr. Foy indicated that
6    his client would not agree to voluntarily dismiss you
7    from the case?
8        A.   I don't remember it from that time.
9        Q.   Okay.  Do you remember ever learning that?
10       A.   I think there was some discussion about it
11   at some point.  I don't remember when.
12       Q.   And you're aware that there had been
13   multiple requests for you to be dismissed from the
14   case --
15       A.   I believe so.
16       Q.   -- by your counsel.
17       A.   I'm sorry.  I believe so, yes.
18       Q.   Okay.  And Mr. O'Toole would not agree;
19   correct?
20       A.   To my knowledge, yeah.
21       Q.   And, ultimately, the court made the
22   decision; correct?
23       A.   Correct.
24       Q.   Okay.  And you agree that Mr. Hoey and his

Page 143

1    firm did not sue you in that case.
2        A.   No.  I mean, yes, they did not.
3        Q.   Okay.  And, in fact, they worked with Amy to
4    try to get you out of the case; is that correct?
5        A.   That is -- yes.
6        Q.   That's your understanding.
7        A.   That's my understanding.
8        Q.   Okay.  How is Mr. Hoey responsible for
9    another person suing you?
10       A.   Because -- I feel because he -- I got
11   included in it because I was in the -- because of our
12   contract.
13       Q.   You understand that Mr. Hoey does not
14   control Mr. O'Toole.
15       A.   Yes, I do.
16       Q.   Okay.  You understand that Mr. Hoey cannot
17   make Mr. O'Toole not sue you even if he wishes to.
18       A.   I -- well, at the time, I didn't know that,
19   but I also was aware that he could of -- I believe the
20   word is indemnify me or release me from that, and that
21   had never happened.
22       Q.   What is your understanding of what
23   indemnification is?
24       A.   I wouldn't -- sorry.  I'm not going to say

Page 144

1    it in the right terms, but release me from the -- he
2    could of -- I don't know how to explain it because I'm
3    not very good at it, but it was, I believe, so that
4    he -- it would release me out of the case.
5        Q.   Meaning Mr. Hoey would have released you out
6    of the case of somebody else who was not willing to
7    release you out of the case?
8        MS. ZERNER:  Objection.
9        A.   Yeah.  I don't know how to explain it.  I'm
10   not savvy in the real legal terms, so I don't want to
11   say the wrong words, but, from my understanding, is
12   this last judge said that there was a way that Hoey
13   could have indemnified me out of the case.
14       Q.   And did you ever look on what theory that
15   would have been?
16       A.   Did I ever look?  I might have looked it up.
17   I don't remember.
18       Q.   Okay.  Do you have an understanding if there
19   is such a legal theory in Massachusetts in the
20   circumstances of this case?
21       A.   I don't have knowledge to that, no.
22       Q.   And you don't know; correct?
23       A.   No, I don't.
24       Q.   Did you ever ask Attorney Hoey about

Page 145

1    Mr. Sobczak's affidavit?
2        A.   I don't remember.
3        Q.   You asked Amy about it.
4        A.   I don't remember.
5        Q.   Okay.  Did you ask Patty about it?
6        A.   I don't remember.
7        Q.   Mr. O'Toole was your friend at some point.
8        A.   Yes, he was.
9        Q.   And are you still friends?
10       A.   No, we are not.
11       Q.   Why aren't you friends?
12       A.   We haven't talked in many years since --
13   basically since he sued me.
14       Q.   And why aren't you blaming Mr. O'Toole for
15   the fees incurred in defending you from his lawsuit?
16       A.   I don't -- say that one more time.  I'm
17   sorry.
18       Q.   Why aren't you blaming Mr. O'Toole for the
19   fees that you incurred in defending the lawsuit that
20   he brought?
21       A.   I don't have an answer for that I guess.
22       Q.   Do you agree that Mr. Hoey cannot control
23   either Mr. O'Toole or Mr. Sobczak; correct?
24       A.   I agree to that, yes.

(Pages 146 to 149)

Page 146

1    Q.    Okay.  Do you own the home where you live?
2    A.    Yes, I do.
3    Q.    Is it a ranch?
4    A.    Yes.
5    Q.    And when did you purchase it?
6    A.    In May of 2020.
7    Q.    And did you take out a loan for that?
8    A.    Yeah, I did.
9    Q.    Okay.  And did you read and sign --
10         MS. ZERNER:  Objection.
11   I want to know how much further you're going
12   to go into this.  We've made an objection about the --
13   you know, what's the relevance of her purchasing her
14   home with money that she was entitled to receive?
15        MS. KNIPPER:  I didn't ask that.
16        MS. ZERNER:  Okay.  But --
17        MS. KNIPPER:  I did not ask that question.
18        MS. ZERNER:  I'm just wondering where it's
19   going.
20        MS. KNIPPER:  I'm going to ask the
21   questions, and you can object --
22        MS. ZERNER:  All right.  Well --
23        MS. KNIPPER:  -- if you disagree.
24   Q.    But did you take out a loan?

Page 147

1    A.    I did.
2    Q.    Okay.  Did you read and sign those
3    documents?
4    A.    I did.
5    Q.    Were you represented by counsel when you did
6    that?
7    A.    No, I was not.
8    Q.    Okay.  Did your dyslexia preclude you from
9    reviewing and understanding those documents?
10   A.    I read them, and then I had my investor read
11   them to me so that I understood them and they
12   explained them.
13   Q.    Okay.  And who's your investor?
14   A.    New England Wealth Group or New England
15   Investment.
16   Q.    Okay.  Do you own the truck?
17   A.    Do I own a truck, yes.
18   Q.    Yes.
19         And did you purchase that truck?
20   A.    I did.
21   Q.    And did you sign any documents in relation
22   to that truck?
23   A.    Yes.
24   Q.    And did you read and sign those documents?

Page 148

1    A.    Yes, I did.
2    Q.    Did you have somebody read those to you?
3    A.    I did have someone -- I don't remember if I
4    had someone look over those.  I don't have a
5    recollection.
6    Q.    Okay.  Did your dyslexia preclude you from
7    reviewing and understanding those documents?
8    A.    I don't remember at the time, but I'm sure I
9    reread them.
10   Q.    Okay.  And we talked about you worked at
11   Target; correct?
12   A.    I did work at Target.
13   Q.    And we've already talked about you had
14   various steps in your career there.  How many
15   promotions or jobs that would have promoted you that
16   you sought out to get?
17   A.    I think only two from my original position.
18   Q.    And you had to apply for those.
19   A.    It's, like, still an interview -- one you
20   don't really -- one you apply for, but there's no,
21   like, interviewer process.  The second one I had an
22   interview process.
23   Q.    Okay.  And did you have to fill out any
24   forms or review any forms for that?

Page 149

1    A.    I don't think I did.
2    Q.    Okay.  And did your dyslexia preclude you
3    from working at Target and understanding what you had
4    to do there?
5    A.    I've always had to go back over things more
6    than one time.
7    Q.    You haven't gone back over things today.
8    A.    I've -- I've relooked at them from before,
9    yes.
10   Q.    Okay.  Do you have any trouble understanding
11   anything that you read today?
12   A.    No, I don't think I did.
13   Q.    Okay.  After you received the funds from the
14   verdict, you met with a financial advisor; correct?
15   A.    Yes.
16   Q.    And you entered into agreements with that
17   financial advisor.
18   A.    I did.
19   Q.    Did an attorney represent you with respect
20   to those transactions?
21   A.    No.
22   Q.    Did you sign paperwork in relation to those
23   transactions?
24   A.    I did.

## Page 150

1    Q.   Did your dyslexia and difficulty with math,
2  as you allege in your complaint, prevent you from
3  entering into those transactions?
4    A.   Did they prohibit me?  I'm sorry.
5    Q.   Prevent you?
6    A.   No.  They did not prevent me.  I reread
7  them.
8    Q.   Okay.  You're not suggesting that people
9  with dyslexia cannot enter into contracts; right?
10   A.   I'm not suggesting that, no.
11   Q.   Okay.  And you read the documents before you
12 signed them as you testified today.
13   A.   Yes.
14   Q.   And you had the opportunity to ask
15 questions; correct?
16   A.   Correct.
17   Q.   And you understood them when you signed
18 them; correct?
19   A.   All the documents I've ever signed or these
20 documents?
21   Q.   The documents that we've talked about today.
22   A.   Yes.
23   Q.   Yes.  Okay.
24        And are you still planning to do the movie

## Page 151

1  or the book with Stewart Lytle?
2    A.   No, I'm not.
3    Q.   Did you terminate Mr. Lytle?
4    A.   I don't know if I would call it terminate.
5  We just stopped working together, but...
6    Q.   How did you part ways?
7    A.   The -- it wasn't going the way I wanted it
8  to.
9    Q.   Okay.  Did you find somebody else?
10   A.   No.  I have not found someone else to help
11 me with my book.
12   Q.   Are there -- is there anything in the works
13 in terms of agreements with anybody to do the book or
14 do the movie?
15   A.   Not to do the book, to do the movie.
16   Q.   Okay.  And with whom to do the movie?
17 Somebody besides Mr. Lytle?
18        MS. ZERNER:  What's the relevance of this?
19        MS. KNIPPER:  Are you instructing her not to
20 answer?
21        MS. ZERNER:  I'm just asking --
22        MS. KNIPPER:  We're in a deposition.  Are
23 you instructing her not to answer?
24        MS. ZERNER:  I know that we're in a

## Page 152

1  deposition, and I'm not going to have -- and I know we
2  have the reservations, but I'm not going to -- I am
3  going to object if it's going to go into completely
4  irrelevant matters and take time on that, so...
5        MS. KNIPPER:  Are you instructing -- are you
6  instructing her not to answer?  I'm sorry.
7        MS. ZERNER:  I think you can explain if you
8  think it has relevance to --
9        MS. KNIPPER:  I do think it's relevant, but
10 I think the witness needs to answer the question.
11       MS. ZERNER:  You won't give me any
12 explanation of why it's relevant --
13       MS. KNIPPER:  Not at this time.
14       MS. ZERNER:  -- whether she has new
15 agreements now with anybody else or in a movie to the
16 claims of --
17       MS. KNIPPER:  Correct.
18       MS. ZERNER:  -- your client breaching his
19 fiduciary duty and taking money wrongfully from her.
20       MS. KNIPPER:  Are you instructing her not to
21 answer?
22       MS. ZERNER:  I'm just asking if you'll give
23 me a basis so we can cover this ground.
24       MS. KNIPPER:  I'll go back to some other

## Page 153

1  questions, and you can continue to object.
2    Q.   Did Ms. DeJuneas find you an entertainment
3  lawyer?
4    A.   No.
5    Q.   She did not.  Okay.
6        Did Ms. DeJuneas help you find anybody in
7  order to get the movie or the book in place?
8    A.   No.
9    Q.   Does Ms. DeJuneas have any agreement with
10 you for purposes of the book or the movie?
11   A.   No.
12   Q.   Who currently is working on the movie?
13       MS. ZERNER:  Objection.
14       MS. KNIPPER:  Are you instructing her not to
15 answer?
16       MS. ZERNER:  Yes.  I'm going to instruct her
17 not to answer.  We can have a conversation off the
18 record --
19       MS. KNIPPER:  We'll reserve.
20       MS. ZERNER:  -- to see if we can resolve
21 this today or not.
22       MS. KNIPPER:  We'll reserve.
23   Q.   When you met with -- did you meet with
24 Mr. Lytle?

Page 154

1    A.   Yeah, I met with him, yeah.
2    Q.   Okay.  Did you turn over your boxes of the
3  file to him?
4    A.   I did.
5    Q.   Did you get them back?
6    A.   I did.
7    Q.   Did you turn them over to this new person?
8    A.   No.
9    Q.   What of your file have you turned over to
10 these -- this new person for the movie?
11       MS. ZERNER:  Objection.
12       Go ahead.
13    A.   Yeah.  I don't -- I don't remember.  There
14 was maybe a couple things -- I'm sorry.  What's it
15 called -- from my testimony.  I'm drawing a blank.
16       MS. ZERNER:  Transcripts.
17    A.   Transcripts from the testimony, and that was
18 it.
19    Q.   That's the only thing you've turned over.
20    A.   That I can remember right now.  I don't know
21 off the top of my head.
22    Q.   At some point, you picked up all of your
23 boxes, your file materials from Attorney Hoey's
24 office; correct?

Page 155

1    A.   I did.
2    Q.   And that was when you were moving to
3  California.
4    A.   Correct.
5    Q.   And you put them in your car.
6    A.   Correct.
7    Q.   And you drove down to California.
8    A.   Yes.
9    Q.   Okay.  Did you make photocopies of it before
10 you gave it to Mr. Lytle or you gave it to him as is?
11    A.   I did not make photocopies.  He only took
12 part of -- or I don't remember how much of it he
13 took -- he kept, but he had some of it.
14    Q.   I will represent to you that he wrote in an
15 e-mail that you dropped off 12 boxes.
16    A.   That -- that could be --
17    Q.   Does that comport with your memory?
18    A.   That could be true.  I don't know how many
19 it was.
20    Q.   Okay.  And did you do any type of recorded
21 statements or interviews that were transcribed with
22 Mr. Lytle?
23    A.   I don't know if he took notes, but other
24 outside -- like, an outside person, no.

Page 156

1    Q.   No.  No.  No.  Meaning you met with -- I
2  apologize.  I was not clear.  You met with Mr. Lytle
3  by phone or in person --
4    A.   Yes.  Yes.
5    Q.   -- or by Zoom; correct?
6    A.   In phone and person and Zoom.
7    Q.   And then did he ever transcribe what you and
8  him talked about either in an e-mail or in notes, in
9  memos?
10    A.   I don't have knowledge what he --
11    Q.   That you ever saw?
12    A.   I don't -- I don't know.  I don't remember.
13    Q.   Okay.  And how about with this new person,
14 have you done that?
15    A.   Have I had meetings with them?
16    Q.   Yes.
17    A.   Yes.
18    Q.   And have they transcribed what you said and
19 wrote?
20    A.   I don't know.
21    Q.   Okay.  Did you write anything and turned it
22 over to these new people?
23    A.   No.
24    Q.   Okay.

Page 157

1    A.   I don't believe so.
2    Q.   Okay.  You didn't fill out, like, background
3  about the case or anything like that in writing that
4  you would have given.
5    A.   I don't believe in writing.
6    Q.   Okay.  And what is the status of the movie?
7    A.   It's in -- the script is in development.
8  That's -- that's it.  It's just a script at this -- or
9  not even a script yet.
10    Q.   And is it your understanding that you're
11 supposed to give more information to these people for
12 purposes of them doing the movie or they have all the
13 information from you that they need?
14    A.   I don't have an answer for what -- for what
15 they need.  I don't know.
16    Q.   Do you plan on honoring the 2.5 percent fee
17 that you had promised to Mr. Hoey?
18    A.   With the book with Stewart Lytle --
19    Q.   Yes.
20    A.   No, because I'm not making a book with
21 Stewart Lytle anymore.
22    Q.   So the answer is, no, you don't plan on
23 honoring it.
24    A.   There is nothing to honor because there's no

Page 162

1   Bear with me.
2        If you look -- if you go back to Exhibit
3   Number 9 -- actually, Exhibit Number 8. I apologize.
4        A.   It's okay. I'm sorry. What number did you
5   say?
6        Q.   Number 8. It's this one.
7        A.   I'm probably looking right at. Oh, okay.
8        Q.   It's this one. So on the first page, this
9   one has 41,231 and change to Amy Goganian --
10       A.   (Witness viewing document.) Correct.
11       Q.   -- right?
12       So this was taken out and had already been
13  paid to Amy Goganian.
14       A.   Right.
15       Q.   And then were -- was included in the case
16  expenses; correct?
17       A.   Correct.
18       Q.   Okay. And then if you look at the last
19  page, there's $83,387.53. Do you see that?
20       A.   (Witness viewing document.) I do.
21       Q.   And that's -- is that what you mean?
22       A.   That's what I meant by the reserve. Sorry.
23  Yes.
24       Q.   And you had a discussion at that time with

Page 163

1   David about that money being kept aside in part for
2   fees of Ms. Goganian.
3        A.   I don't remember if it was exactly. We used
4   her name and said that's what it was for, but I
5   remember we had -- he -- we had a discussion that we
6   were keeping it aside for other expenses.
7        Q.   Okay. And at the time, there was the bad
8   faith case that was also ongoing; correct?
9        A.   Correct.
10       Q.   And the children's case?
11       A.   I don't remember. I think we filed after
12  this. I think we filed in June of 2020, but I don't
13  remember the exact date, but I'm sure there was work
14  being done on it. I just don't remember when we
15  started it.
16       Q.   If you can go to paragraph 92, it's on page
17  28 of Exhibit Number 1.
18       A.   Page 92?
19       Q.   No, page 28.
20       A.   (Witness viewing document.) 28.
21       Q.   Paragraph 92?
22       A.   (Witness viewing document.) Okay.
23       Q.   And this is your fraud count, if you look at
24  the prior page, and if you can read the paragraph?

Page 164

1        A.   (Witness viewing document.) Okay.
2        Q.   So at the time the 2010 CFA was signed,
3   there was no case even filed; correct?
4        A.   I don't remember, but I believe there was
5   not.
6        Q.   Okay. At the time the 2015 CFA was signed,
7   the case hadn't yet gone to trial; correct?
8        A.   Correct.
9        Q.   All right. So the case had not gone to
10  trial, and there was no appeal; correct?
11       A.   Correct.
12       Q.   All right. And there's -- what's the basis
13  -- there's no basis for your allegation that in June
14  of 2015 the defendants knew that there would be a
15  charge for the services for the appeal.
16       A.   I'm sorry. I don't understand.
17       Q.   What --
18       A.   Can you say that one more time?
19       Q.   There was no basis for your -- in this
20  paragraph --
21       A.   Right.
22       Q.   -- right, if you look at the word though, do
23  you see that, fourth line before down?
24       A.   (Witness viewing document.) No, and I'm

Page 165

1   probably looking right at it. Fourth from the bottom
2   of the paragraph you said. Do you see it? Can you
3   just show me, point?
4        Q.   Right.
5        A.   (Witness viewing document.) All right. Oh,
6   though he knew. Okay.
7        Q.   Okay. So if you read at the top, you allege
8   that the defendants had you sign this 2015 agreement;
9   right?
10       A.   (Witness viewing document.) Correct.
11       Q.   And did not alert or explain to you that
12  this charge -- this change would be used to charge her
13  for other attorneys associated and working with the
14  team. Did I read that correctly?
15       A.   Yes.
16       Q.   Okay. And then I'm skipping the paragraph,
17  the parentheses. Sorry.
18       A.   (Witness viewing document.) Okay.
19       Q.   And then you go "though he knew he would
20  charge her for the services of these other attorneys."
21       A.   (Witness viewing document.) Correct.
22       Q.   Right?
23       At the time you signed the agreement, there
24  were no other attorneys that had been retained. Patty

Page 166

1  DeJuneas had not been retained.  Amy had not been
2  retained; correct?
3        MS. ZERNER:  Objection.
4     Q.   Amy Goganian had not been retained.
5     A.   As far as -- yeah.  No, I don't think they
6  had.
7     Q.   Okay.  So this sentence is incorrect;
8  correct?
9        MS. ZERNER:  Objection.
10    A.   I don't know.  I don't have an answer for
11  that if it's incorrect or not.
12    Q.   How can somebody know that certain charges
13  for certain attorneys would be charged if the event
14  has not yet happened?
15    A.   I can't answer that.
16    Q.   You disagree that this paragraph is
17  incorrect.
18    A.   I do.
19    Q.   But you can't explain why.
20    A.   No.
21    Q.   What's your basis of the fraud claim?
22    A.   My basis for it is that they didn't tell me
23  the truth, that they gave me -- some of these charges
24  and some of the things that I read were not entirely

Page 167

1  true.
2     Q.   Meaning as you've outlined in your
3  complaint?
4     A.   Yes, as I've outlined in my complaint.
5     Q.   Okay.  Any other basis for the fraud claim
6  besides the allegations you've made in your complaint?
7     A.   No.
8        (Exhibit-24, Answers to David J. Hoey's
9  interrogatories, marked for identification.)
10    Q.   And do you have Exhibit 24, ma'am?
11    A.   (Witness viewing document.) I do.
12    Q.   Okay.  And these are your answers to David
13  Hoey and the Law Offices of David J. Hoey, P.C.'s
14  interrogatories.
15    A.   (Witness viewing document.) Correct.
16    Q.   And you signed these on page 15; is that
17  correct?
18    A.   (Witness viewing document.) Correct.
19    Q.   And you read these before you signed them.
20    A.   Correct.
21    Q.   And you signed them under the pains and
22  penalties of perjury; is that correct?
23    A.   Correct.
24    Q.   Going to your Answer Number 4, it's on page

Page 168

1  5.
2     A.   (Witness viewing document.) Yes.
3     Q.   And I've already asked you about the appeal
4  and I won't go over that again.  But in the second
5  paragraph, you admit that you're not -- that you were
6  not party to all the communications between Patty,
7  Hoey, and Keenan; correct?
8     A.   As I've said, yes.  I already said that.
9     Q.   We've already covered that.  And then you
10  say "I am now aware of specific communications that
11  reinforce that Hoey and Keenan were not acting as
12  appellate attorneys or handling my appeal"; is that
13  correct?
14    A.   (Witness viewing document.) Correct.
15    Q.   Okay.  And you outline one e-mail.
16    A.   (Witness viewing document.) Yes.
17    Q.   Okay.  Anything else that you're aware of
18  besides this one e-mail?
19    A.   (Witness viewing document.) Not that I'm
20  aware of.
21    Q.   Did you see -- Strike that.
22        If we can go to number 6 -- 5 -- I
23  apologize -- page 6, you're not claiming as damages
24  the loss of the funds, correct, as a result of

Page 169

1  the appeal?
2     A.   (Witness viewing document.) I'm sorry.
3     Q.   Yes.  Take your time, if you need to.
4     A.   Okay.  I'm sorry.  Can you just ask me?
5     Q.   Sure.
6        In the first paragraph, you say that you are
7  not claiming as damages the loss of use of the funds
8  as the recovery --
9     A.   Correct.
10    Q.   -- right?
11        So you're not claiming that in this case;
12  correct?
13    A.   Correct.
14    Q.   Okay.  In the second paragraph, you say that
15  you suffered from emotional distress.  Do you see
16  that?
17    A.   (Witness viewing document.) Yes.
18    Q.   Okay.  Have you sought treatment for that?
19    A.   I have not.
20    Q.   Okay.  And you state here that you
21  suffered -- if I'm understanding this correctly --
22  emotional distress because of the uncertainty of how
23  the appeal would turn out and the prospect of a second
24  trial and you having to testify; is that correct?

Page 170

1    A.  Yes.
2    Q.  Okay.  During the appeal, do you remember
3  that JPA offered 3.5 million dollars to settle the
4  case?
5    A.  During the appeal, yes, I do remember that.
6    Q.  And you declined.
7    A.  Yes.
8    Q.  And you understood that if the case didn't
9  settle and you lost the appeal, that you would have to
10  testify again; correct?
11    A.  That I might have to, yes.
12    Q.  Okay.  But you still declined the 3.5
13  million dollars.
14    A.  I did.
15    Q.  If you can go to page 7, the bottom is the
16  Question Number 10, and your answer starts on Number
17  8, on page 8, but just to orient you.
18    A.  (Witness viewing document.) Okay.
19    Q.  Did you read your answer?
20    A.  I did.
21    Q.  And this is -- we've already talked about
22  some of this --
23    A.  Yes.
24    Q.  -- today; correct?

Page 171

1    And this is when you say when you started
2  becoming suspicious or questioning what was involving
3  in your case; right?
4    A.  Correct.
5    Q.  For the Kris Sobczak lien?
6    Now, in the second paragraph, in October
7  2021, you went to speak to Boston College; correct?
8    A.  Correct.
9    Q.  And that was at the request of Ms. Burgess.
10    A.  Yes.
11    Q.  Okay.  And you had done that on a number of
12  times before; right?
13    A.  I've done it since 2015.
14    Q.  Okay.  And she works there; is that correct?
15    A.  Yes, she does.
16    Q.  And she's an expert who helped you in your
17  case.
18    A.  Correct.
19    Q.  And she was found by David; is that correct?
20    A.  Yes.
21    Q.  And she's one of the best in the country, if
22  I understand --
23    A.  Yes.
24    Q.  -- correctly.

Page 172

1    And what type of setting is it?
2    Is it you speaking to college students about
3  your case?
4    A.  Yes.
5    Q.  Okay.  And you previously invited David to
6  attend them.
7    A.  Yes.  David's gone.
8    Q.  And you invited David this time, is that
9  correct, but he couldn't attend?
10    A.  In October of 2021?
11    Q.  Yes.
12    A.  Yes.
13    Q.  Yes.
14    So you invited him to go, but he couldn't
15  attend.
16    A.  Correct.
17    Q.  And so he did not attend; correct?
18    A.  Correct.
19    Q.  But on the other times, he had attended.
20    A.  On some of them, yes, not all of them.
21    Q.  Okay.  Do you remember -- do you remember
22  how many times?
23    Is it once a year that you go?
24    A.  I go once a year, yes.

Page 173

1    Q.  Okay.  And, generally, do you talk about
2  what happened to you and the litigation?
3    Is that what you talk about?
4    A.  Every time is a little bit different
5  depending on -- I don't like -- I don't prepare
6  something ahead of time.
7    Q.  And is it fair to say that when you've
8  spoken to these college students, you praised Attorney
9  Hoey and Attorney Keenan?
10    A.  Yes, absolutely.
11    Q.  Okay.  And did you do that again in October
12  2021?
13    A.  I -- I don't remember, but probably.  I
14  don't remember.  I don't remember what I said every
15  time.
16    Q.  Okay.  And by then, you had already grown
17  concerned; right?
18    A.  Yes.
19    Q.  But you still praised them.
20    A.  Because what they did for my -- the work on
21  my case and winning, yes.  I -- they won that case for
22  me.  They did a great job.  That wasn't in question.
23    Q.  And in your last sentence -- I think it's
24  one sentence, of this paragraph, you talk about the

(Pages 178 to 181)

Page 178

1    A.   That he was represented.
2    Q.   That he --
3    A.   That he --
4    Q.   That Attorney Goran's participation in the
5  case was strictly limited?
6    A.   I -- I spoke to my lawyers about that. I
7  don't know.
8    Q.   So aside -- and I don't want to hear what
9  your --
10   A.   No.
11   Q.   -- what Ms. Zerner said, but aside from what
12  you learned from your lawyer, you don't have an --
13   A.   I don't have --
14   Q.   -- independent basis.
15   A.   -- an opinion, no.
16   Q.   Okay. Now, when I originally asked you
17  about who you met with in 2015 when you signed the
18  2015 Keenan fee agreement, you indicated David,
19  correct --
20   A.   I --
21   Q.   -- if I remember correctly?
22   A.   Sorry. I didn't mean to jump on you.
23   Q.   That's fine.
24   A.   I'm so sorry. Yes. I thought it was David.

Page 179

1    Q.   Okay.
2    A.   My memory is that I met with David.
3    Q.   Okay. But is it possible -- and I know
4  we've covered this -- is it possible that it was
5  Mr. Sobczak?
6    A.   I don't have a memory of that. I -- my
7  memory is going in the office and signing it at the
8  front desk with David, but that also could be a
9  different paper. I went in the office millions of
10  times.
11   Q.   Okay. So, as you sit here today, you can't
12  say who spoke with you when you signed that agreement.
13   A.   I thought -- I believe it to be David.
14   Q.   Okay. But you can't say --
15   A.   That's my memory.
16   Q.   -- with certainty; correct?
17   A.   That's my memory for that, yeah.
18   Q.   Meaning you can't say with certainty?
19   A.   No, I guess I cannot.
20   Q.   As you sit here today, do you have a memory
21  of Attorney Hoey discussing that fee agreement with
22  you, not the e-mail but discussing it with you?
23   A.   I thought that we discussed it when I went
24  in, but that was my memory.

Page 180

1    Q.   Okay. If you look at your response on page
2  12, under number 14, middle of the paragraph?
3    A.   (Witness viewing document.) Uh-huh.
4    Q.   Where you reference that June 11, 2015
5  e-mail, do you see that?
6    A.   (Witness viewing document.) Yeah.
7    Q.   Yeah.
8        And then you talk about going in the office.
9    A.   (Witness viewing document.) Uh-huh.
10   Q.   Do you see that?
11       And then you say Attorney Hoey reiterated
12  then the same thing.
13   A.   (Witness viewing document.) Uh-huh.
14   Q.   Do you see that?
15   A.   (Witness viewing document.) I do. I'm
16  reading it. I'm sorry. I'm reading it right now.
17   Q.   No. Go right ahead.
18   A.   Okay.
19   Q.   As you sit here today, you can't say either
20  way if that happened.
21   A.   I -- to my memory, I believe I talked to
22  David about it and I went in and signed it with him.
23   Q.   But, again, you could be mistaken.
24   A.   I believe that I -- that David is the one I

Page 181

1  signed it with.
2    Q.   You've used the word induced a lot in your
3  papers. What do you mean by that?
4    A.   I -- I can't answer that. I don't know.
5        MS. KNIPPER: If I can take a short break.
6  Thank you.
7        THE VIDEOGRAPHER: We are going off the
8  record. The time is 1:26 p.m.
9        (Lunch break from 1:26 p.m. to 2:11 p.m.)
10       THE VIDEOGRAPHER: We are back on the
11  record. The time is 2:11 p.m.
12   Q.   (BY MS. KNIPPER) Hi, Ms. Wahlstrom.
13   A.   Hi.
14   Q.   Just a couple of things.
15       MS. KNIPPER: If we could mark this as the
16  next exhibit. I believe it's 25.
17       (Exhibit-25, March 6, 2017 e-mail, marked
18  for identification.)
19   Q.   Do you remember we talked about the e-mail
20  back and forth between you and David and Patty where
21  you received a text message from Kris?
22   A.   Yes.
23   Q.   Do you remember that?
24       Okay. If you can take a look at Exhibit 25,

Page 190

1     A.   I don't recall.  I don't -- I don't think we
2  talked about it.
3     Q.   Do you have an understanding that he intends
4  on trying to pursue Attorney Hoey or his firm?
5     A.   I don't know anything about it after I -- I
6  didn't follow it.
7     Q.   Did you ask any questions about why of your
8  counsel -- it was Patty; correct?
9     A.   Patty.
10    Q.   Okay.  About why you needed to provide this
11 affidavit?
12    A.   I am sure we talked about it.  I don't
13 remember the exact conversation, no.
14    Q.   Just a couple of exhibits that I intended to
15 mark before and did not.
16        (Exhibit-29, June 6, 2018 e-mail, marked for
17 identification.)
18    Q.   Do you have in front of you Exhibit 29?
19    A.   (Witness viewing document.) I do.
20    Q.   And it's an e-mail from David to you on June
21 6th, 2018; is that correct?
22    A.   (Witness viewing document.) Yes.
23    Q.   And it attaches the brief by JPA, correct,
24 or the JPA defendants?

Page 191

1     A.   (Witness viewing document.) Yes.
2     Q.   And you read it at the time you received it.
3     A.   (Witness viewing document.) Did I read it
4  thoroughly, I can't answer to that.
5     Q.   But you received it.
6     A.   I did receive it.
7     Q.   Okay.  And you would have glanced over it at
8  least.
9     A.   Sometimes it was too hard for me to read
10 things that came from the other side so I didn't
11 always read them.
12    Q.   Okay.  Do you know either way if you glanced
13 at this?
14    A.   I can't speak to that right now.  I don't
15 know.
16    Q.   You don't remember either way.
17    A.   No.
18    Q.   Okay.  But you received it.
19    A.   Yes.
20    Q.   Okay.
21        (Exhibit-30, June 24, 2016 e-mail, marked
22 for identification.)
23    Q.   And we've marked the next exhibit as Number
24 30.  Do you have it in front of you, ma'am?

Page 192

1     A.   (Witness viewing document.) I do.
2     Q.   And this is another e-mail from David to
3  you; correct?
4     A.   (Witness viewing document.) Yes.
5     Q.   And it includes two documents, according to
6  the first page, the memo in support of the petition
7  for interlocutory review.  Do you see that?
8     A.   (Witness viewing document.) Yes, I do.
9     Q.   And it includes the petition for
10 interlocutory review; correct?
11    A.   (Witness viewing document.) Yes.
12    Q.   And if you flip to the first -- sorry -- the
13 second page of this exhibit?
14    A.   (Witness viewing document.) Yes.
15    Q.   That's the brief or part of it on -- filed
16 on your behalf; correct?
17    A.   Correct.
18    Q.   And did you read this brief?
19    A.   Yes, I did at the time.
20    Q.   You did read that brief.
21        And if you look at page 6 of the brief, of
22 the first one, do you see the rationale for allowing a
23 new trial?  Do you see that?
24    A.   (Witness viewing document.) Yes.

Page 193

1     Q.   And there it's outlined what is alleged to
2  have been counsel misconduct; correct?
3     A.   (Witness viewing document.) Yes.
4     Q.   And during this time, you understood that
5  Attorney Hoey's firm was funding the payment of the
6  fees of Ms. DeJuneas; correct?
7     A.   Correct.
8     Q.   And you understood that back in at least the
9  time of these in 2016; correct?
10    A.   Correct.
11    Q.   Going back to the WIN Interactive animation,
12 do you remember any of your lawyers explaining to you
13 that there was a question as to whether Judge Wilson
14 would allow Mr. Rivera to testify?
15    A.   I remember we did have some conversation
16 about whether or not he -- they would allow him to
17 testify, yes.
18    Q.   And do you remember them explaining to you
19 the benefit or the potential benefit of the animation
20 if that occurred?
21    A.   I don't remember that conversation.
22    Q.   But you're not saying it didn't happen.  You
23 just don't remember.
24    A.   Yeah.  I just don't remember that

Page 194

1   conversation.
2       Q.   Okay.  Does Mr. Lytle have all the original
3   trial exhibits, like the boards and everything of that
4   sort?
5       A.   No.  I -- I believe he mailed everything
6   back to me.
7       Q.   He sent it back to you so you have them.
8       A.   Yes.
9       Q.   Okay.  Do you remember that you filed a
10  judicial complaint against Judge Wilson?
11      A.   Yes.
12      Q.   Do you know the outcome of that?
13      A.   Is that the one where he recused him?  I
14  don't remember.  I'm sorry.
15      Q.   Do you remember sending -- your counsel
16  sending on your behalf -- well, strike that.
17          There was a motion to have Judge Wilson
18  recused.  Do you remember that?
19      A.   Yes.
20      Q.   Okay.  Do you remember also filing a
21  complaint with the supervisory governance, so to
22  speak, over judges concerning Judge Wilson?
23      A.   Yes.
24      Q.   Okay.  Do you know the outcome of that?

Page 195

1       A.   I don't.
2       Q.   But --
3       A.   I don't --
4       Q.   Sorry.  Were you done?
5       A.   No.  I was just going to say I don't
6   remember.  I don't know.
7       Q.   Okay.  Did you testify in the hell making
8   case?
9       A.   Did I testify?
10      Q.   Yes, ma'am.
11      A.   No.
12      Q.   Okay.
13      A.   We didn't go to trial.
14      Q.   Okay.  Did you -- were you deposed?
15      A.   Yes.
16      Q.   When were you deposed?
17      A.   I don't remember the date.  It was last
18  year.
19      Q.   Okay.
20      A.   Sorry.
21      Q.   In 2022?
22      A.   Yes.
23      Q.   Okay.  Attorney Hoey was no longer
24  representing you in that case at that time.

Page 196

1       A.   Correct.
2       Q.   Are you aware that Attorney Goran became
3   involved in the case because the defendants attached
4   copyrighted and trademarked documents to certain
5   filings?
6           Do you remember that?
7       A.   No.
8       Q.   Okay.  Are you aware that he became involved
9   because the defendants when they did that, were trying
10  to argue and generate a wedge between you and your
11  lawyers and in addition to unduly influence the trial
12  judge?
13          Do you remember that?
14          MS. ZERNER:  Objection.
15          Go ahead.
16      A.   I wasn't at trial.  I don't -- I don't
17  remember that.
18      Q.   Do you remember did you ever become aware of
19  that through your lawyers?
20      A.   I -- I can't speak to that.  I don't
21  remember.
22      Q.   Meaning you don't know either way.
23      A.   I don't remember either way.
24      Q.   Okay.  It's possible they told you.  You

Page 197

1   just don't --
2       A.   I --
3       Q.   -- remember.
4       A.   -- don't know.
5           MS. ZERNER:  Just take a breath.  Let her --
6           THE WITNESS:  I know.  I know.  I know.
7           MS. ZERNER:  -- finish the question.
8           THE WITNESS:  I always rush.  I don't mean
9   to.  It's not on purpose by any means.
10      Q.   Has Ms. DeJuneas gone to visit you in
11  California?
12      A.   No.
13      Q.   When did you fly in?
14      A.   Like this week?
15      Q.   Yes.
16      A.   Sunday.
17      Q.   Okay.  And where are you staying?
18      A.   At the Omni Seaport.
19      Q.   In a hotel?
20      A.   Uh-huh.
21      Q.   Mr. O'Toole didn't do any work on the case;
22  is that correct?
23      A.   On the original --
24      Q.   Yes.

## Page 198

1    A.   -- case?  After David took it, no, not that
2  I'm aware.
3    Q.   Meaning what I'm saying is correct?
4    A.   Yeah.
5    Q.   Okay.  And he didn't do any work at all on
6  the appeal; correct?
7    A.   No, not that I'm aware of, no.
8    Q.   Did he come to trial?
9    A.   I don't remember.  I wasn't there every day.
10   Q.   You heard of him as soon as the verdict came
11 down; correct?
12   A.   I heard of him.
13   Q.   Meaning he contacted you?
14   A.   I don't remember if I talked to him after
15 the verdict came down.
16   Q.   Okay.  Are you grateful for the verdict in
17 your case?
18   A.   Very.
19   Q.   Then you understand that all of the expenses
20 and the time that went into the verdict were necessary
21 to achieve that result.
22      MS. ZERNER:  Objection.
23   A.   Yeah.  I don't know how to answer that
24 because I believe some of them weren't necessarily

## Page 199

1  truthful, he was -- necessarily truthful in where the
2  money was and if it was really for my case or my -- my
3  needs, so, yes, I think some are.  No, I don't think
4  others are.
5    Q.   Are you saying some of the expenses or fees
6  that you were charged were not related to your case?
7    A.   Yes.  That's what I'm saying.
8    Q.   Okay.  Which ones were not related --
9    A.   The ones --
10   Q.   -- to your case?
11   A.   Oh, I'm sorry.  I did not mean to jump on
12 you again.  I can't help it.
13      Like, the -- I can't -- I don't know which
14 one it is.  When the -- the ones where we paid for,
15 like, the constitutional lawyer and things like that,
16 I believe, weren't.
17   Q.   Meaning --
18   A.   And the --
19   Q.   -- Mr. Vail?
20   A.   And -- I'm sorry.  Where -- I'm looking for
21 it just so I can see the names so I know what I'm
22 halfway talking about, so I know what I'm talking
23 about here.
24   Q.   It's Exhibit 6, 7, or 8.

## Page 200

1    A.   (Witness viewing document.) I'm looking for
2  it, so, yeah, like, you know, James Bolan and things
3  like that I don't believe were charges that should
4  have been -- that weren't my responsibility to pay
5  for, I guess, is the way to say it.
6    Q.   Okay.  So Attorney Bolan you've said; right?
7    A.   Uh-huh.
8    Q.   And is that a yes?
9    A.   Yes.  I'm sorry.
10   Q.   Okay.  That you do not think were related to
11 your case, is that what you're saying?
12   A.   Yes.
13   Q.   Okay.  And I believe you've testified that
14 you don't -- well, do you know what Attorney Bolan did
15 on your case?
16   A.   No, I do not.
17   Q.   Okay.  And his name was on Exhibit 8 when
18 you were given Exhibit 8; correct?
19   A.   (Witness viewing document.) His name is on
20 here, yes.
21   Q.   Yes.  With an explanation; correct?
22   A.   (Witness viewing document.) Uh-huh.
23   Q.   Is that correct?
24   A.   Yes.

## Page 201

1    Q.   Okay.  And you had an opportunity to ask or
2  dispute any of these charges at the time; correct?
3    A.   I did, correct.
4    Q.   Okay.  And you did not.
5    A.   No, I did not.
6    Q.   Okay.  Besides Mr. Bolan, what other ones do
7  you believe were not related to your case?
8    A.   I think we outlined that in my complaint, so
9  should I go back and read my complaint?
10   Q.   No.  I'm asking you if you can look at
11 Exhibit Number 8 and say which ones you believe are
12 not related to your case?
13   A.   Well, I would need to refer to my complaint
14 to get all of that -- them accurate.  I don't want to
15 misspeak, and is Exhibit 1 the complaint?
16      MS. ZERNER:  Exhibit 1 is the first amended
17 complaint.
18   A.   (Witness viewing document.) Is it in this
19 one?  Why am I looking through this for no reason?  So
20 we have the list on page 14 of all the in -- right, on
21 page 14 of all the in -- what we believe -- I believe
22 to be incorrect charges.
23   Q.   So the question was not what you're claiming
24 should not have been charged to you.  You were talking

(Pages 202 to 205)

Page 202

1  and you -- you just testified unrelated to your case,
2  so my question is: Which are the charges that you say
3  were unrelated to your case?
4     A.  I'm -- then I must have misunderstood. I
5  thought you meant -- you were referring to this. I
6  wasn't -- I mean, some of these have to do with my
7  case, but they -- he represented David, so I don't
8  know how to answer that.
9     Q.  When you say that, what are you talking
10  about?
11     A.  (Witness viewing document.) Like, James
12  Bolan and -- and Richard Goran, I don't know who those
13  people were and what they did for my case, so I just
14  assume they represent David. I don't know how to
15  answer that then. I mean, I -- we outlined it in the
16  complaint.
17     Q.  Okay. So Attorney Goran, Attorney Bolan,
18  any of the other charges you've outlined in your case
19  that you say were unrelated to your case?
20     A.  I suppose -- I know that -- I don't know how
21  to answer that because I'm sure they're related, but
22  they're not my -- I don't know how to answer it. I
23  feel like I'm running in circles here.
24     Q.  Okay. So you referenced the constitutional

Page 203

1  lawyer; that's Mr. Vail; right?
2     A.  Yeah.
3     Q.  Okay. Are you aware that he reviewed your
4  brief for the appeal?
5     A.  No.
6     Q.  Are you aware that Patty approved him
7  reviewing the brief for the appeal?
8     A.  No.
9     Q.  So you're disputing that charge, but you're
10  not saying it's not related; correct?
11     A.  Yeah. I -- yes. I -- I mean, I just don't
12  -- yeah, I don't know if I'm using the right word.
13     Q.  As you sit here, you can't say which ones
14  are or are not related.
15       MS. ZERNER: I just didn't hear the end of
16  her last answer.
17       THE WITNESS: I said I don't know if I'm
18  using the right words. Sorry.
19     Q.  As you sit here, you cannot say which ones
20  are the ones you believe are related or are not
21  related.
22       MS. ZERNER: Objection.
23     Q.  Am I understanding you correctly?
24     A.  Yes.

Page 204

1     Q.  Attorney Hoey represented you for 12 years;
2  correct?
3     A.  Yes.
4     Q.  You retained him in February 2010 and you
5  terminated him in early 2022.
6     A.  Correct.
7     Q.  Correct?
8       And during that time, did you need money
9  from time to time to help you live?
10     A.  Yeah.
11     Q.  And did you go to David for that?
12     A.  Yeah. David helped me secure a loan.
13     Q.  Okay. And he helped you get that loan.
14     A.  Yes, he did.
15     Q.  And when you didn't have enough money on the
16  loan, you went back to him to ask him to get you more
17  money either on that loan or another loan; correct?
18     A.  Correct.
19     Q.  And he did that --
20     A.  Yes.
21     Q.  -- right?
22     A.  He did.
23     Q.  And when you were being evicted, he helped
24  you; correct?

Page 205

1     A.  He did.
2     Q.  When you needed medical care, he helped you
3  find doctors when doctors wouldn't see you.
4     A.  When I couldn't find a therapist, yes.
5     Q.  Okay. When your children needed medical
6  care at one point?
7     A.  A therapist, when we were looking for
8  therapists for the case, yes.
9     Q.  Okay. And when the school where you were
10  working wanted to fire you, he helped you; correct?
11     A.  He did.
12     Q.  And you reached an agreement with the
13  school; correct?
14     A.  Yes.
15     Q.  Right?
16     A.  Sure.
17     Q.  And when -- well, you didn't get fired.
18     A.  Well, I did not, no.
19     Q.  And when you needed a financial manager, he
20  helped you find one; correct?
21     A.  He did, yeah. I trusted David.
22     Q.  And he found Anne Burgess.
23     A.  He -- yes, he found the expert witness for
24  my case, yes.

Page 206

1    Q.   And he worked on your case for 12 years and
2  he left his family on holidays to meet with you,
3  Sundays, vacations; correct?
4    A.   I -- well, I -- yes, I don't...
5    Q.   And he spent a lot of time and effort.
6    A.   Yes.  There's no doubt.
7    Q.   Okay.  And he did all those things and now
8  you say he broke your trust.
9    A.   Yes.
10    Q.   Okay.  And you didn't -- seven years after
11  the verdict and two years after the -- you received
12  the funds is when you brought your claim; correct?
13    A.   Correct.
14        MS. KNIPPER:  Okay.  I have no more
15  questions.  Thank you.
16        MR. O'CONNOR:  Do we need a break or are we
17  just going to carry right on?
18        MS. ZERNER:  How are you doing?
19        MS. KNIPPER:  Do you want to come here?
20        MS. ZERNER:  How are you doing, the court
21  reporter, are you okay?
22        THE COURT REPORTER:  I'm okay, yeah.  I
23  would prefer it if you guys switched places.
24        MS. ZERNER:  It's up to you.

Page 207

1        THE WITNESS:  I think I'm okay.
2        MS. ZERNER:  Do you want to take a break?
3        MS. KNIPPER:  We're good.
4        MR. TAYLOR:  Off the record for a minute.
5        THE VIDEOGRAPHER:  Going off the record.
6  The time is 2:38 p.m.
7        (Brief break from 2:38 p.m. to 2:40 p.m.)
8        THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 2:40 p.m.
10        EXAMINATION
11        BY MR. O'CONNOR:
12    Q.   Good afternoon, Ms. Wahlstrom.  My name's
13  Jack O'Connor.
14    A.   Hi, Jack.
15    Q.   I represent Don Keenan and the Keenan Law
16  Firm.  I only have three or four hours of questions so
17  we'll move through it as quickly as I can.
18        MS. ZERNER:  That's one of my favorite
19  jokes.
20    Q.   I just want to ask you who brought you and
21  Patty DeJuneas together?
22        How did you folks first meet?
23    A.   David Hoey.
24    Q.   And when was that roughly?

Page 208

1    A.   Oh, I don't have a date, but it had to have
2  been some time in 2015.  I think the first time I met
3  her was at court.
4    Q.   Okay.  Was it after the verdict?
5    A.   After the original verdict?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Okay.  And what was -- did you and David
9  talk about getting her involved?
10        Can you explain to me how her name came up
11  and what he said to you about her?
12    A.   I don't remember conversations that we had
13  about her.  I believe the first time I saw her and
14  knew that she -- he might have mentioned something, I
15  don't recall -- but the first time I met her and the
16  first time I knew of her is when we went for the
17  hearing in front of Judge Wilson -- and I'm going to
18  say the wrong thing -- when he was going to overturn
19  it, the verdict, I don't -- the hearing --
20    Q.   Okay.
21    A.   -- in December.
22    Q.   What was your understanding as to why she
23  was brought into the case at that point?
24    A.   I don't know.  I don't remember.

Page 209

1    Q.   Okay.  But at some point, she became your
2  appellate --
3    A.   Appellate --
4    Q.   -- counsel handling the appeal; correct?
5    A.   Sorry.  I didn't mean to jump on you.  Yes.
6    Q.   Okay.  And what I'm trying to get an
7  understanding of is how did that transition occur and
8  why did that transition occur, as you understand it,
9  as you recall it?
10    A.   Because I needed an -- it was going to
11  appeal so you had an appeal lawyer.  I mean, that's my
12  understanding of it.
13    Q.   Did you ever talk with David Hoey or with
14  Don Keenan about the concept of them handling the
15  appeal?
16    A.   I did not speak to them about them handling
17  the appeal, no.
18    Q.   How come?
19    A.   David recommended Patty, we went to the
20  office and met her, and that's who I went with.
21    Q.   Okay.  And when he recommended her, what did
22  he say?
23        What do you recall about that conversation?
24    A.   I don't remember the exact conversation.

Page 230

1  strategies that your counsel used; right?
2      A.  Yes.
3      Q.  And you referenced the complaints that those
4  defendants raised in your complaint; right?
5      A.  Correct.
6      Q.  As part of the -- the efforts that your
7  counsel made, they had to rebuff those challenges that
8  defendant's counsel made; right?
9      A.  Can you just say that one more time? I'm
10  sorry.
11     Q.  Sure. Yeah.
12         Your -- the defendant's counsel attacked the
13  strategies that your attorneys were using; right?
14     A.  Correct.
15     Q.  And then your attorneys had to fight those
16  challenges --
17     A.  Correct.
18     Q.  -- right?
19         And they successfully fought those
20  challenges; right?
21         MS. ZERNER: Objection.
22         Go ahead.
23     A.  I -- I don't remember the outcome of what
24  they fought in court.

Page 231

1      Q.  Okay.  Well, do you recall that defendant's
2  counsel raised challenges to what was referred to as
3  the Reptile playbook?
4      A.  I heard about it after, but I was not there
5  for when any of that happened.
6      Q.  Okay.  You're aware now that defendant's
7  counsel did raise that issue.
8      A.  Correct.
9      Q.  And that -- you're aware that your counsel
10  had to fight those efforts; right?
11     A.  I am now, yes.
12     Q.  And those efforts were ultimately
13  successful; right?
14     A.  I don't know.  I can't even say.  I assume.
15  I don't know the outcome of those.  I don't know off
16  the top of my head.
17     Q.  Now, are you aware that when -- now, that
18  when those challenges were made by defendant's counsel
19  to your counsel's strategy, that defendant's counsel
20  attached some materials related to that strategy and
21  what they filed in to court?
22     A.  I vaguely remember at one point David
23  telling me something about it, but I don't remember.
24     Q.  Okay.  But you're aware --

Page 232

1      A.  But I'm aware now that it had to do with the
2  Reptile book or something like that.
3      Q.  Now, are you aware that Attorney Goran was
4  brought in to address the defendant's counsel's use of
5  those materials?
6      A.  At the time, I don't believe I was, but if I
7  was told about it, I don't remember.
8      Q.  And are you aware of that now?
9      A.  I am now, yes.
10     Q.  And you'd agree that it was important for
11  your counsel to fight the efforts that defendant's
12  counsel had made with respect to your -- your
13  counsel's litigation strategies.
14     A.  I don't know if I can answer if it was
15  important.  It was -- can you say it one more time?
16  I'm sorry.
17     Q.  Sure.  Sure.
18         So defendant's counsel, as we've
19  established, was -- was attacking the strategies that
20  your counsel was making.
21     A.  Right.
22     Q.  The reason defendant's counsel was doing
23  that was so that they could win the case; right?
24     A.  Correct.

Page 233

1      Q.  And so your counsel had to fight those
2  efforts; right?
3      A.  Correct.
4      Q.  And they did so; right?
5      A.  Yes.
6      Q.  And they ultimately won the case; right?
7      A.  Correct.
8      Q.  And as part of those efforts, they had to
9  defend the litigation strategies that they used during
10  the case; right?
11     A.  Yes, I guess they would have to.  I don't
12  know.
13         MR. TAYLOR:  No further questions.
14         THE WITNESS:  Okay.  Thank you.
15         MS. ZERNER:  I have very brief.
16         EXAMINATION
17     BY MS. ZERNER:
18     Q.  When Mr. Sobczak was involved in your trial,
19  did you have an understanding of whether or not he
20  worked for Hoey Law?
21     A.  I believe he did work for Hoey Law, yes.
22     Q.  And if you take a look at Exhibit 21.
23     A.  (Witness viewing document.) Oh, boy.
24  They're not in order.  Which one does it look like?

|  | Page 242 |
|---|---|
| 1 | MS. ZERNER: Objection. |
| 2 | Excuse me. Go ahead. |
| 3 | A.   I -- no. |
| 4 | Q.   You don't know. |
| 5 | MS. KNIPPER: Okay. Thank you. |
| 6 | THE VIDEOGRAPHER: All right. This |
| 7 | concludes today's deposition. The time is 3:17 p.m. |
| 8 | We are going off the record. |
| 9 | (Audiovisual deposition of KIRA WAHLSTROM |
| 10 | concluded at 3:17 p.m.) |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 243 |
|---|---|
| 1 | CERTIFICATE |
| 2 | I, KIRA WAHLSTROM, hereby certify under the |
| 3 | pains and penalties of perjury that I have read the |
| 4 | foregoing transcript of my testimony and further |
| 5 | certify that said transcript is a true and accurate |
| 6 | record of my testimony (with the exceptions of the |
| 7 | corrections noted below.) |
| 8 | PAGE  LINE          CORRECTIONS |
| 9 | _____ ____ _____ |
| 10 | _____ ____ _____ |
| 11 | _____ ____ _____ |
| 12 | _____ ____ _____ |
| 13 | _____ ____ _____ |
| 14 | _____ ____ _____ |
| 15 | _____ ____ _____ |
| 16 | _____ ____ _____ |
| 17 | _____ ____ _____ |
| 18 | _____ ____ _____ |
| 19 | _____ ____ _____ |
| 20 | Signed under the pains and penalties of |
| 21 | perjury this _____ day of _____ 20__. |
| 22 | |
| 23 | _____ |
| 24 | KIRA WAHLSTROM |

|  | Page 244 |
|---|---|
| 1 | CERTIFICATION |
| 2 | |
| 3 | I, Jennifer M. Vaillancourt, a Certified |
| 4 | Shorthand Reporter, Registered Professional Reporter, |
| 5 | and Notary Public, within and for the State of |
| 6 | Massachusetts, do hereby certify: |
| 7 | That, KIRA WAHLSTROM, the witness whose |
| 8 | examination is hereinbefore set forth, was first duly |
| 9 | sworn by me and that this transcript of said testimony |
| 10 | is a true record of the testimony given by said |
| 11 | witness. |
| 12 | I further certify that I am not related to |
| 13 | any of the parties to this action by blood or |
| 14 | marriage, and that I am in no way interested in the |
| 15 | outcome of this matter. |
| 16 | |
| 17 | IN WITNESS WHEREOF, I have hereunto set my |
| 18 | hand this 10th day of February, 2023. |
| 19 | |
| 20 | |
| 21 | _____ |
| 22 | Jennifer M. Vaillancourt, Notary Public in |
| 23 | and for the Commonwealth of Massachusetts. |
| 24 | My Commission Expires June 29, 2023. |

# EXHIBIT E

# EXHIBIT B



LAW OFFICES OF DAVID J. HOEY, P.C.

David J. Hoey*
Richard T. Bromby
Andrew A. Hamilton
Suzanne CM McDonough*
Nicole R. G. Paquin*
*also admitted in New Hampshire

352 Park Street, Suite 105
North Reading, MA 01864
hoeylaw@earthlink.net
www.hoeylaw.com
P: (978) 664-3633
F: (978) 664-3643

February 2, 2010

Austin S. O'Toole, Esq.
Legal Counsel
18 Tremont Street, Suite 1010
Boston, MA 02108

Re: Kira Wahlstrom v. Jose Ruben Rivera, et al

Dear Attorney O'Toole:

This will confirm that in connection with the above referenced matter you will receive the following referral fee should there be a recovery in this case:

33% of my fee from the sum recovered.

Will you kindly acknowledge your acceptance of the above on the additional copy of this letter, adding the date and return to this office at your earliest convenience.

Very truly yours,

DAVID J. HOEY

ACCEPTED AND AGREED TO: _____ DATE: _____

I, Kira Wahlstrom, hereby consent to Attorney Austin O'Toole receiving a referral fee in this matter and understand that I will not be charged any additional legal fees for this referral by Attorney Hoey to Attorney O'Toole.

ACCEPTED AND AGREED TO: _____ DATE: X 2/10/10

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KIRA WAHLSTROM** )<br>)<br>                              **Plaintiff,** )<br>)<br>**v.** )<br>)<br>**DAVID J. HOEY, LAW OFFICES OF DAVID J.** )<br>**JOEY, P.C., DON C. KEENAN, D.C. KEENAN** )<br>**& ASSOCIATES, P.C. d/b/a THE KEENAN** )<br>**LAW FIRM, P.C., and KEENAN'S KIDS** )<br>**FOUNDATION, INC.,** )<br>)<br>                              **Defendants.** )<br>) | **Civil Action No.: 1:22-CV-10792-RGS** |

**DON C. KEENAN'S RESPONSE TO PLAINTIFF'S QUESTIONS IN LIEU OF
APPEARING FOR A DEPOSITION PER AGREEMENT OF PARTIES**

1.      Identify the date that you first started working on Kira Wahlstrom's premises liability
case that was filed in Suffolk Superior Court, Civil Action No. SUCV2010-01022 in
Massachusetts (herein, the "Wahlstrom premises liability case") and describe your role.

**RESPONSE:** The Keenan Law Firm accepted the Wahlstrom matter in the Referring Attorney

Group as a Premise Case in about June 2012.  At that time, my role was to mentor David Hoey

and help him with the preparation of the Wahlstrom case.

2.      Confirm that you and/or your firm charged the expenses reflected on the attached
document (Bates No. LDH 0000194-195) in the Wahlstrom premises liability case and
explain why each expense was necessary, including the administrative fee.

**RESPONSE:** I confirm that those are my expenses.  The admin fee is a charge I charge all

clients.  It is the fee for my firm to create binders we use, organize the file, add everything to our

database, and other tasks necessary to open and maintain a file.  The research fee was related to

issues that came up during trial that needed to be researched.  The "silhouette cut-out" was

demonstrative evidence we created for trial.  "Copies" refer to the photocopies made in 2015

once I transitioned from mentoring David Hoey to representing Ms. Wahlstrom.  The "Focus

Groups" are how I test information to better understand how a jury will process the information

at trial.  Finally, the trial costs are the costs of traveling to Boston, staying in Boston during trial,

meals, and supplies.

3.      See the attached Contract for Legal Representation (Bates No. KEENAN 08658¬8663
        with cover letter and attachments) and state whether you signed the document and agreed
        to the terms stated in the contract.

**RESPONSE:** I agreed to the terms at the time I signed it, but that changed as the case

proceeded.

4.      Describe any and all in-person, telephone, and/or videoconference conversations you had
        with Kira Wahlstrom concerning fee agreements, concerning retention of any additional
        counsel, and/or concerning any expenses incurred for the Wahlstrom premises liability
        case (including pre-trial, during trial, and post-trial) by identifying the date of the
        conversation and describing the topics discussed and all specific details you recall
        discussing with Ms. Wahlstrom.

**RESPONSE:** I met with Ms. Wahlstrom in February 2015.  I was assessing her case in my mind

as to the extent of her damages and I was obtaining factual verification.  The remainder of the

time was spent getting to know one another.  I asked if she had any questions. She did not. I later

learned that she agreed to retain me as additional counsel for the purposes of trial. I extensively

prepared Kira Wahlstrom for her trial testimony.

        I would discuss retention of additional counsel and expenses pre-trial, during trial, and

post-trial with Hoey Law and they would discuss with Ms. Wahlstrom.

5.      Confirm that you signed the attached 2015 Contingent Fee Agreement (Bates No.
        LDH0000093-98) on June 1, 2015 and describe who drafted the agreement and why this
        fee agreement was entered when Ms. Wahlstrom had already executed a fee agreement in
        2010 with the Law Offices of David J. Hoey for the case.

**RESPONSE:** I did sign the 2015 Fee Agreement.  The agreement was drafted by my office with

the assistance of Mr. Sobczak.  The agreement was entered into because ethically I cannot

157473347v3

represent a client that I do not have a signed agreement with. I was also unwilling to try the case

without a written fee agreement in place.

6.      Explain how you and David Hoey agreed to divide the attorneys' fee recovered as
        referenced in the 2015 Contingent Fee Agreement.

**RESPONSE:** We agreed that he would get 100% of the attorney fee from last offer prior to

closing and that I would get the remaining attorney fee.

7.      Describe any and all conversation(s) you had with David Hoey about the expenses
        itemized on the attached breakdown of expenses (Bates No. LDH 0000007-9) before it
        was provided to Ms. Wahlstrom.

**RESPONSE:** I discussed with Mr. Hoey that I could not ethically disburse any funds for costs or

attorney fees unless the client approved the disbursement. Once Mr. Hoey provided me with the

documents showing that Ms. Wahlstrom approved in writing the costs, I paid said costs from my

trust account to Hoey Law.

8.      Explain why a 40.33% attorneys' fee was taken from the total recovery in the Wahlstrom
        premises liability case.

**RESPONSE:** I object to the word "taken." This was a fee that was earned. That is what the

contract provides. I was involved in all strategy decisions related to the appeal and read and

commented on the draft when necessary or called upon to do so.

9.      Identify and explain all compensation paid to David Hoey and/or his law firm by you
        and/or your law firm in 2019 and in 2020 including the date(s) and amount(s).

**RESPONSE:** Don C. Keenan specifically objects to Request No. 9 on the grounds that it seeks

personal and confidential information unrelated to the underlying subject matter of the case and

is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and

without waiving these objections, Don C. Keenan responds as follows: In March of 2020 Mr.

Hoey was paid $750,000 as his share of the fee in the Wahlstrom matter. Later that year Mr.

3

Hoey joined the Keenan Law Firm as a partner. He was paid a $1 million advance on fees and was also paid $26,924.24 in fees on cases he worked as part of the Keenan Law Firm.

10.   Do you disagree with anything stated in the Affidavit of Krzysztof Sobczak filed in this case at Dkt. No. 11-6 as Exhibit F to Plaintiff's Amended Complaint and, if so, explain what statements you disagree with and why.

**RESPONSE:** All statements made by Mr. Sobczak related to an alleged conversation between Mr. Hoey and me are a figment of Mr. Sobczak's imagination. Specifically, I deny the statements regarding my involvement made in paragraphs 4-8, 10-12, 14, and 18 of Mr. Sobczak's February 6, 2022 Affidavit, which was filed as part of Plaintiff's Amended Complaint.

11.   Describe any and all conversations you had with David Hoey concerning how David Hoey and/or his law firm would be compensated in any way for his legal services provided for the Wahlstrom premises liability case including but not limited to through any arrangements related to other cases involving you and Hoey and/or Hoey's partnership with Keenan Law Group.

**RESPONSE:** Don C. Keenan specifically objects to Request No. 11 on the grounds that it seeks personal and confidential information unrelated to the underlying subject matter of the case and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Don C. Keenan responds as follows: The only conversation related to compensation for the Wahlstrom case is set forth in response to number 6. There are no other arrangements related to other cases or through the partnership regarding the Wahlstrom case.

4

157473347v3

I, Don C. Keenan, hereby certify that these answers are true and accurate to the best of my knowledge, I am of sound mind and memory to certify the truth and accuracy of these written responses under oath, and I have taken no medication that would impair my memory. SO SWORN UNDER THE PENALTIES OF PERJURY THIS 22ND DAY OF MAY, 2023.

_____
Don C. Keenan

Dated:  May 23, 2023

On behalf of Defendant Don C. Keenan

/s/ William M. Taylor
_____
William M. Taylor, Esq. (BBO #624981)
Danni L. Shanel, Esq. (BBO #710378)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
125 High Street, 19th Floor
Boston, MA 02110
Telephone: (617) 204-5138
Email: William.Taylor@Troutman.com
         Danni.Shanel@Troutman.com

*Counsel for Keenan's Kids Foundation, Inc.*

5

157473347v3

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2023, a true copy of the foregoing document was served via e-mail upon the following parties:

Bridget A. Zerner
Markham Read Zerner LLC
One Commercial Wharf West
Boston, MA 02110
617-523-6329
Email:Bzerner@markhamreadzerner.com

*Counsel for Kira Wahlstrom*

Christine A. Knipper
John P. Liberty
Wilson Elser Moskowitz Edelman & Dicker
260 Franklin Street, 14th Fl.
Boston, MA 02110
617-422-5300
Christine.Knipper@wilsonelser.com
John.Liberty@wilsonelser.com

*Counsel for David J. Hoey and the Law Offices of David J. Hoey*

John J. O'Connor
Kristyn St. George
Peabody & Arnold LLP
Federal Reserve Plaza 600 Atlantic Avenue
Boston, MA 02210-2261
617-951-4724
Joconnor@peabodyarnold.com
Kstgeorge@peabodyarnold.com

*Counsel for Don C. Keenan and the Keenan Law Firm*

/s/ Danni L. Shanel
Danni Shanel (BBO #710378)

157473347v3

# EXHIBIT G

1

VOLUME:  I
PAGES:  1 - 336
EXHIBITS:  See Index

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION-BOSTON)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*)
KIRA WAHLSTROM,              )
                Plaintiff,   )
                             )
    -against-                )  Civil No.
                             )  1:22-cv-10792-RGS
DAVID J. HOEY, LAW OFFICES   )
OF DAVID J. HOEY, P.C.,      )
DON C. KEENAN, D.C.,         )
KEENAN & ASSOCIATES, P.C.,   )
D/B/A THE KEENAN LAW FIRM,   )
P.C., AND KEENAN'S KIDS      )
FOUNDATION, INC.,            )
                Defendants.  )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*)

DEPOSITION OF DAVID J. HOEY, a
witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the
offices of Wilson Elser Moskowitz Edelman &
Dicker, LLP, 260 Franklin Street, Boston,
Massachusetts, on Monday, February 20, 2023,
commencing at 9:58 a.m.

COPLEY COURT REPORTING
71 Commercial Street
Boston, Massachusetts 02109
(617) 423-5841

COPLEY COURT REPORTING

---

2

1  APPEARANCES:

2

3  **MARKHAM READ ZERNER LLC**
   (By:  Bridget A. Zerner, Esquire)
4  11a Commercial Wharf West
   Boston, Massachusetts 02110
5  Counsel for the Plaintiff

6

7  **WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
   (By:  Christine Knipper, Esquire)
   260 Franklin Street
8  14th Floor
   Boston, Massachusetts 02110
9  Counsel for the Defendants, David J. Hoey
   and Law Offices of David J. Hoey
10

11 **PEABODY & ARNOLD LLP**
   (By:  John J. O'Connor, Esquire)
12 Federal Reserve Plaza
   600 Atlantic Avenue
13 Boston, Massachusetts 02210-2261
   Counsel for the Defendants, Don C. Keenan
14 and D.C. Keenan & Associates d/b/a
   Keenan Law Firm
15

16 **TROUTMAN PEPPER HAMILTON SANDERS**
   (By:  Danni Shanel, Esquire)
17 125 High Street
   19th Floor
18 Boston, Massachusetts 02114
   Counsel for the Defendant, Keenan's
19 Kids Foundation, Inc.

20

21 **ALSO PRESENT:**

22 Dan Lohaus, CLVS

23

24

COPLEY COURT REPORTING

---

3

1                    **I N D E X**

2

3  Witness            Direct  Cross  Redirect  Recross
4  DAVID J. HOEY
5  (By Ms. Zerner)                        8
6  **CONFIDENTIAL PORTION OF PROCEEDINGS WILL BE
   FOUND ON PAGES 330-34.**

7

8                    **E X H I B I T S**

9  Exhibit No.                                      Page

10 1        Declaration of David J. Hoey,            25
            dated 1/25/22.
11
12 2        Massachusetts Contingent Fee             47
            Agreement, dated 2/2/10.
13 3        Letter, dated 2/2/10.                    50

14 4        Series of e-mails.                       52

15 5        Massachusetts Contingent Fee             56
            Agreement, dated 6/19/15.
16
17 6        2020 Form 1099-MISC.                     80

18 7        Letter, dated 7/3/12.                    81

19 8        Contract for Legal                       82
            Representation, dated 2/14/13.
20 9        Series of e-mails.                       95

21 10       TTD Memo/Revised, dated                  100
            6/30/15.
22
23 11       E-mail, dated 3/29/20, and               103
            spreadsheet, consisting of two
            pages.
24

COPLEY COURT REPORTING

---

4

1                    **E X H I B I T S**

2

   Exhibit No.                                      Page
3
4  12       Letter, dated 3/28/22.                   125

5  13       Letter, dated 2/6/23,                    133
            consisting of three pages.
6  14       Invoice, dated 7/31/17.                  141

7  15       Account Summary, dated 2/27/16.          143

8  16       Series of e-mails, dated                 154
            6/2/16.
9
10 17       Series of e-mails, dated                 155
            6/9/16.
11 18       Series of e-mails, dated                 161
            5/30/16.
12
13 19       Series of e-mails.                       169

14 20       Series of e-mails, dated                 179
            2/21/18.
15 21       Series of e-mails.                       181

16 22       Series of e-mails.                       182

17 23       E-mail, dated 6/6/18.                    184

18 24       Series of e-mails.                       186

19 25       Series of e-mails.                       189

20 26       Series of e-mails, dated                 189
            3/23/18.
21
22 27       Series of e-mails.                       192

23 28       Letter, dated 2/28/18.                   194

24 29       Series of e-mails, dated                 200
            1/16/19.

COPLEY COURT REPORTING

---

**Page 5**

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 30 | Notice of Attorney's Lien, dated 6/11/19. | 201 |
| 31 | Engagement Agreement, dated 6/18/19. | 205 |
| 32 | Letter, dated 9/12/19, consisting of six pages. | 213 |
| 33 | Plaintiff's Kira Wahlstrom's Motion to Dismiss Notice of Attorney's Lien and Request for Sanctions, dated 8/13/19. | 223 |
| 34 | E-mail, dated 5/22/17, with attachment. | 226 |
| 35 | Series of e-mails. | 228 |
| 36 | Series of e-mails. | 232 |
| 37 | Series of e-mails. | 236 |
| 38 | Series of e-mails. | 237 |
| 39 | E-mail, dated 11/22/19. | 240 |
| 40 | Business Account Statement for 11/1/19 through 11/30/19. | 243 |
| 41 | Series of e-mails. | 243 |
| 42 | Series of e-mails. | 244 |
| 43 | Series of e-mails. | 246 |
| 44 | Series of e-mails. | 249 |
| 45 | Series of e-mails. | 251 |
| 46 | E-mail, dated 3/7/20, with attachment. | 253 |

COPLEY COURT REPORTING

**Page 6**

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 47 | E-mail, dated 5/9/20. | 254 |
| 48 | Affidavit of James S. Bolan, Esquire, dated 7/22/20. | 256 |
| 49 | Series of e-mails, dated 7/23/20. | 258 |
| 50 | Series of e-mails, dated 10/24/20. | 259 |
| 51 | Series of e-mails. | 261 |
| 52 | Series of e-mails. | 267 |
| 53 | Letter, dated 3/1/21. | 270 |
| 54 | Affidavit of Krzysztof Sobczak, dated 2/6/22. | 284 |
| 55 | Series of e-mails. | 291 |
| 56 | Series of e-mails. | 295 |
| 57 | Series of e-mails. | 296 |
| 58 | Case Balance Detail as of 4/13/21. | 300 |
| 59 | Group of documents. | 303 |
| 60 | Amended and Restated Master Loan and Security Agreement, dated 5/25/09. | 312 |
| 61 | Series of e-mails. | 327 |
| 62 | E-mail, dated 7/20/21. | 332 |

COPLEY COURT REPORTING

**Page 7**

PROCEEDINGS

THE VIDEOGRAPHER: Here begins Media Unit No. 1 in the videotaped deposition of David J. Hoey in the matter of Wahlstrom versus David J. Hoey, et al, filed in the United States District Court for the District of Massachusetts, Eastern Division, Case No. 1:22-cv-10792-RGS.

Today's date is February 20th, 2023, and the time on the video monitor is 9:58 a.m. The Videographer today is Dan Lohaus, representing New England Video Depositions. This video deposition is taking place at 260 Franklin Street in Boston, Massachusetts.

Would counsel now please identify themselves and state whom they represent beginning with the taking attorney?

MS. ZERNER: Bridget Zerner of Markham Read Zerner, LLC, for Plaintiff, Kira Wahlstrom.

MS. KNIPPER: Christine Knipper with Wilson Elser for the Deponent, David J. Hoey, and Law Offices of David J. Hoey, P.C., also a Defendant.

COPLEY COURT REPORTING

**Page 8**

MS. SHANEL: Danni Shanel of Troutman Pepper on behalf of Keenan Kids Foundation.

MR. O'CONNOR: Jack O'Connor for Don Keenan and the Keenan Law Firm.

THE VIDEOGRAPHER: Our Court Reporter today is Kathy McHugh, representing Copley Court Reporting. Would the Reporter please swear in the witness?

DAVID J. HOEY, having been satisfactorily identified and duly sworn by the Notary Public, testified as follows in answer to direct interrogatories by Ms. Zerner:

Q. Good morning, Mr. Hoey.

A. Good morning.

Q. If you could state your whole name for the record, please?

A. Sure, David John, J-o-h-n, Hoey, H-o-e-y.

Q. And what's your current address?

A. I live at 8 Jill, J-i-l-l, Circle, North Reading, Massachusetts.

Q. And I certainly know you're very familiar with the deposition process so we don't

COPLEY COURT REPORTING

21

| | |
|---|---|
| 10:14:35 | 1 unless Mr. Keenan is going to go to trial and |
| 10:14:38 | 2 the appearance is necessary or the pro hac is |
| 10:14:42 | 3 necessary. |
| 10:14:42 | 4        Q.    Okay.  Just so -- I'm just trying to |
| 10:14:45 | 5 understand. |
| 10:14:45 | 6        A.    Oh, yeah. |
| 10:14:46 | 7        Q.    So for these kind of cases there's |
| 10:14:48 | 8 some other attorney in that jurisdiction who is |
| 10:14:50 | 9 handling the case for the client but in some -- |
| 10:14:53 | 10 seeks out assistance from Keenan Law Firm? |
| 10:14:55 | 11       A.    Exactly. |
| 10:14:56 | 12       Q.    And then you're a resource from the |
| 10:14:59 | 13 Keenan Law Firm? |
| 10:15:00 | 14       A.    You got it. |
| 10:15:00 | 15       Q.    You're an attorney with the Keenan |
| 10:15:03 | 16 Law Firm as well? |
| 10:15:04 | 17       A.    Well, I have my own practice still. |
| 10:15:06 | 18       Q.    Right. |
| 10:15:06 | 19       A.    And I'm a partner in the Keenan Law |
| 10:15:11 | 20 Firm.  I'm not an employee of the Keenan Law |
| 10:15:14 | 21 Firm. |
| 10:15:14 | 22       Q.    Okay.  You are a partner? |
| 10:15:15 | 23       A.    Yeah. |
| 10:15:16 | 24       Q.    That's -- and when did you become a |

COPLEY COURT REPORTING

22

| | |
|---|---|
| 10:15:19 | 1 partner with Keenan Law Firm? |
| 10:15:21 | 2        A.    I think it was September of 2020. |
| 10:15:24 | 3        Q.    And are you -- do you receive any |
| 10:15:38 | 4 compensation whatsoever as a partner of Keenan |
| 10:15:41 | 5 Law Firm? |
| 10:15:41 | 6        A.    Not as a partner but on cases in |
| 10:15:44 | 7 which I'm assigned or work on for those out-of- |
| 10:15:49 | 8 state lawyers. |
| 10:15:51 | 9        Q.    You're compensated for your time? |
| 10:15:54 | 10       A.    Not the time.  It's all on |
| 10:16:02 | 11 percentage. |
| 10:16:02 | 12       Q.    Okay.  And is there a standard |
| 10:16:03 | 13 percentage or do you work that out case by case? |
| 10:16:06 | 14       A.    No, a standard percentage. |
| 10:16:09 | 15       Q.    And what's your percentage? |
| 10:16:10 | 16       A.    I think I have 30 percent of the |
| 10:16:12 | 17 Keenan Law Firm fee. |
| 10:16:16 | 18       Q.    Okay.  Do you know how many cases |
| 10:16:28 | 19 you've worked on since September of 2020? |
| 10:16:32 | 20       A.    Well, COVID was around so, you know, |
| 10:16:36 | 21 I inherited cases from somebody else who left |
| 10:16:44 | 22 and so I had to -- it took me over a year to |
| 10:16:47 | 23 get familiar with those cases and those |
| 10:16:50 | 24 jurisdictions because each jurisdiction has |

COPLEY COURT REPORTING

23

| | |
|---|---|
| 10:16:51 | 1 different rules and stuff.  So then after that |
| 10:16:57 | 2 it was probably 12 cases but only five or six |
| 10:17:04 | 3 are what I call cleaned up, meaning resolved on |
| 10:17:11 | 4 the short. |
| 10:17:11 | 5        Q.    Resolved, sorry? |
| 10:17:14 | 6        A.    On the short. |
| 10:17:15 | 7        Q.    And what do you mean by that? |
| 10:17:16 | 8        A.    The dollar value -- the dollar value |
| 10:17:22 | 9 of the cases that the Keenan Law Firm usually |
| 10:17:25 | 10 takes in is seven-figure, plus, you know, seven, |
| 10:17:30 | 11 eight-figure cases and these weren't in that |
| 10:17:34 | 12 realm.  So I did what I can to move those out |
| 10:17:41 | 13 and then focus on the ones that should stay. |
| 10:17:44 | 14       Q.    The other six or so? |
| 10:17:46 | 15       A.    Yeah. |
| 10:17:46 | 16       Q.    So are those six still pending? |
| 10:17:48 | 17       A.    Yes. |
| 10:17:56 | 18             MS. KNIPPER:  Can we take a short |
| 10:17:58 | 19 break? |
| 10:18:00 | 20             THE VIDEOGRAPHER:  Stand by.  We |
| 10:18:02 | 21 are going off the record.  The time is 10:18. |
| 10:18:35 | 22             (Recessed at 10:18 a.m.) |
| 10:18:35 | 23             (Resumed at 10:19 a.m.) |
| 10:19:23 | 24             THE VIDEOGRAPHER:  We are going |

COPLEY COURT REPORTING

24

| | |
|---|---|
| 10:19:23 | 1 back on the record.  The time is now 10:19 a.m. |
| 10:19:31 | 2        Q.    Other than what you've described, do |
| 10:19:33 | 3 you have any other capacities or roles related |
| 10:19:35 | 4 to any entity with Mr. Keenan? |
| 10:19:38 | 5        A.    No, so the dean of the Keenan Trial |
| 10:19:42 | 6 Institute and now a partner on those out-of- |
| 10:19:45 | 7 state cases. |
| 10:19:46 | 8        Q.    Okay.  And were you at one point |
| 10:19:56 | 9 planning to transition over to just work solely |
| 10:19:59 | 10 with the Keenan Law Firm? |
| 10:20:01 | 11       A.    Not entirely.  I was transitioning. |
| 10:20:09 | 12 COVID kind of hindered my nursing home part of |
| 10:20:12 | 13 my practice.  The governor had put immunity in |
| 10:20:16 | 14 place and the nursing home industry got hit hard |
| 10:20:19 | 15 with COVID and so it was uncertain as to whether |
| 10:20:22 | 16 that line of work was going to survive COVID and |
| 10:20:26 | 17 I made a decision that it was not in my best |
| 10:20:32 | 18 interest to -- after 27 years or whatever doing |
| 10:20:39 | 19 nursing home cases, a lot of nursing home cases, |
| 10:20:39 | 20 that it would be worthwhile. |
| 10:20:42 | 21             So I was starting to make the |
| 10:20:43 | 22 transition and that transition was two-fold.  I |
| 10:20:47 | 23 would maintain my own practice but only carry |
| 10:20:50 | 24 about three cases at a time, three eight-figure |

COPLEY COURT REPORTING

### 29

| | |
|---|---|
| 10:26:04 1 | Mr. Keenan's seminars when Mr. Keenan came here |
| 10:26:06 2 | to Massachusetts.  As a favor to -- I was on the |
| 10:26:09 3 | board of MATA, Mass. Academy of Trial Attorneys, |
| 10:26:14 4 | for a long time and I was also on the board with |
| 10:26:19 5 | Freddie Halstrom.  Freddie is well-known to the |
| 10:26:24 6 | plaintiff's bars, I guess, both bars, plaintiffs |
| 10:26:28 7 | and defense bars, in Massachusetts and Mr. |
| 10:26:32 8 | Sobczak was working for Freddie. |
| 10:26:33 9 |         So as a favor to me and Mike Rezendes |
| 10:26:38 10 | was a lawyer out of Braintree and Quincy -- he |
| 10:26:42 11 | has passed away from esophageal cancer, but we |
| 10:26:47 12 | were both on the board together.  We had asked |
| 10:26:49 13 | Mr. Keenan and Mr. Ball if they would come and |
| 10:26:53 14 | do seminars to the Massachusetts -- Mass. |
| 10:26:57 15 | Academy of Trial Attorneys attorneys and they |
| 10:27:00 16 | did.  They agreed to do that. |
| 10:27:02 17 |         They came up.  They did depositions. |
| 10:27:06 18 | They did voir dire because voir dire became new |
| 10:27:10 19 | in Massachusetts and a couple other ones and |
| 10:27:16 20 | Mr. Sobczak attended and we kind of took a |
| 10:27:20 21 | liking to him and then he quit Freddie and then |
| 10:27:24 22 | he called me for, you know, do I need help, and |
| 10:27:30 23 | we met a couple times and talked in January of |
| 10:27:37 24 | 2014 and so in February, beginning of February, |

COPLEY COURT REPORTING

### 30

| | |
|---|---|
| 10:27:41 1 | of 2014 he came over to me.  He left Freddie. |
| 10:27:46 2 | He came over to me as an "of counsel" role by |
| 10:27:51 3 | his choice because he wanted to maintain his own |
| 10:27:54 4 | practice out of Newton.  He was only three years |
| 10:27:59 5 | admitted. |
| 10:28:01 6 |     Q.     At that time in 2014? |
| 10:28:03 7 |     A.     Yeah, yeah, the beginning of 2014, |
| 10:28:06 8 | and I had a need.  I needed -- at that point I |
| 10:28:09 9 | was very busy and I needed someone to -- I |
| 10:28:14 10 | wanted someone I could mentor.  Mr. Keenan was |
| 10:28:17 11 | mentoring me.  I wanted someone I could mentor |
| 10:28:20 12 | and I can teach to try cases and I thought that |
| 10:28:24 13 | that would be somebody. |
| 10:28:30 14 |     Q.     For a while it worked out? |
| 10:28:32 15 |     A.     The first year it was fine.  2014, he |
| 10:28:36 16 | was fine.  He was a gentleman.  Everything was |
| 10:28:38 17 | yes, sir, yes, sir, followed direction, followed |
| 10:28:45 18 | advice.  I gave him a couple cases to try on his |
| 10:28:48 19 | own with some office help.  He lost them and |
| 10:28:55 20 | that's when I started to hear some complaints |
| 10:28:58 21 | from clients and defense counsel and judges |
| 10:29:04 22 | about his behavior. |
| 10:29:09 23 |         But that 2014 year we had a |
| 10:29:12 24 | substantial verdict in Middlesex County, the |

COPLEY COURT REPORTING

### 31

| | |
|---|---|
| 10:29:18 1 | highest of its kind in all of New England by the |
| 10:29:22 2 | way, and all of a sudden he had an ego and it |
| 10:29:28 3 | went to his head.  So 2014 was fine.  2015 |
| 10:29:34 4 | started the -- it started to become difficult. |
| 10:29:41 5 |     Q.     And so that verdict was in 2014, |
| 10:29:44 6 | right? |
| 10:29:44 7 |     A.     Yeah, summer, like, July and -- July |
| 10:29:48 8 | or August. |
| 10:29:48 9 |     Q.     Okay.  And to clarify, when you said |
| 10:29:51 10 | Mr. Sobczak was three years admitted, do you |
| 10:29:54 11 | mean he had only been practicing for three years |
| 10:29:56 12 | or just had been admitted to the Massachusetts |
| 10:29:58 13 | bar for three years? |
| 10:30:00 14 |     A.     I thought he was admitted to both |
| 10:30:02 15 | Illinois and Massachusetts and he was only three |
| 10:30:05 16 | years admitted to bar. |
| 10:30:06 17 |     Q.     Okay.  Just to clarify, so to your |
| 10:30:09 18 | understanding he wasn't practicing before that? |
| 10:30:10 19 |     A.     No. |
| 10:30:11 20 |     Q.     Okay. |
| 10:30:11 21 |     A.     Whatever time he did have it was with |
| 10:30:13 22 | Freddie Halstrom's office. |
| 10:30:16 23 |     Q.     Okay.  All right.  So then starting |
| 10:30:18 24 | in 2015 there was a change in his personality |

COPLEY COURT REPORTING

### 32

| | |
|---|---|
| 10:30:22 1 | and his technique, would you say? |
| 10:30:24 2 |     A.     Correct. |
| 10:30:25 3 |     Q.     And when did you first -- do you |
| 10:30:28 4 | recall when exactly you started hearing |
| 10:30:31 5 | complaints about that? |
| 10:30:32 6 |     A.     I can't put specific time frames on |
| 10:30:34 7 | it, but it started to become repetitive. |
| 10:30:37 8 |     Q.     Sometime in 2015? |
| 10:30:39 9 |     A.     Yeah, it started to become |
| 10:30:42 10 | repetitive.  Then it got really worse in 2016. |
| 10:30:44 11 |     Q.     And what exactly were the complaints |
| 10:30:46 12 | that you recall happening in 2015? |
| 10:30:47 13 |     A.     Oh, God, he was reprimanded by a |
| 10:30:51 14 | discovery master.  That could have been '15 or |
| 10:30:57 15 | '16.  I'm just going to try to put them all |
| 10:31:00 16 | together for you a little bit. |
| 10:31:01 17 |         He was reprimanded by a discovery |
| 10:31:03 18 | master for his deposition techniques and |
| 10:31:06 19 | questioning.  There was a time when he made the |
| 10:31:11 20 | defending female attorney leave a deposition |
| 10:31:15 21 | room and cry to the parking lot in which I had |
| 10:31:19 22 | to go to her rescue and I got yelled at by her |
| 10:31:23 23 | senior partner at Morrison Mahoney.  I had to |
| 10:31:26 24 | remove him from that process and take over the |

COPLEY COURT REPORTING

41

10:42:40 1   interrogatories, very reluctant to have her
10:42:42 2   deposition taken.  That was a lot of hand
10:42:44 3   holding, a lot of hours with her, a lot of
10:42:47 4   visits with her to get her just enough to do
10:42:49 5   that, those things, but later on she -- I was
10:42:54 6   adamant that you need to get help and nobody
10:42:56 7   would see her because she was on Medicaid at one
10:43:02 8   time and no one who saw her -- M.D.s, I'm
10:43:06 9   talking, doctors, wouldn't see her because she
10:43:09 10  had the stigma of a lawsuit hanging over her
10:43:12 11  head.
10:43:13 12         I found somebody for her in
10:43:15 13  Lexington, a doctor that she could see, and she
10:43:16 14  saw that doctor -- she needed to see the doctor
10:43:19 15  at least every week or every other week but she
10:43:22 16  was missing those appointments all the time.
10:43:24 17  She didn't want to go through the process.  I
10:43:26 18  don't blame her.  So I found her somebody that
10:43:28 19  she did have some visits with.
10:43:30 20      Q.    Did you observe Kira to have any
10:43:32 21  difficulty trusting others, in general?
10:43:35 22         MS. KNIPPER:  Objection.
10:43:36 23      A.    Yeah.  She started to distrust -- how
10:43:43 24  do you put this?  I don't know if it was

42

10:43:47 1   distrust.  I guess that's not the right word.
10:43:49 2   She started to -- started to dislike Todd.  She
10:43:59 3   started to have a conflict with her mother.  She
10:44:01 4   started to have a conflict with her sister.  She
10:44:03 5   started to have a conflict with some of her
10:44:07 6   friends.  I don't know if they were distrust
10:44:09 7   issues but some kind of conflict was occurring
10:44:13 8   in all these facets and she would come to me for
10:44:19 9   comfort.  I guess that's the best way to
10:44:24 10  describe it.
10:44:24 11      Q.    Was it your impression she trusted
10:44:26 12  you?
10:44:27 13      A.    As I trusted her and I trusted the
10:44:29 14  court.
10:44:30 15      Q.    But I think you implied it there, but
10:44:39 16  certainly was your impression as you worked
10:44:42 17  together all that time that she trusted you?
10:44:44 18      A.    Oh, yeah.
10:44:45 19      Q.    And you mentioned you were always
10:44:47 20  there for her if she just needed to vent or, you
10:44:50 21  know, she had a lot of emotional stuff going on,
10:44:53 22  right?
10:44:53 23      A.    Yes.  She would have anxiety days,
10:44:56 24  especially when it got closer to -- if something

43

10:44:59 1   triggered it.  She had a bunch of different
10:45:02 2   triggers.  So she would often call me mostly --
10:45:08 3   she wasn't big on a lot of e-mail stuff,
10:45:12 4   one-sentence, two-sentence stuff, but not, you
10:45:15 5   know, getting her emotions out that way.
10:45:18 6       Q.    Mm-hmm.
10:45:18 7       A.    So she'd always ask if I was around,
10:45:22 8   Saturdays, Sundays, holidays, night times,
10:45:25 9   mornings, afternoons, and if I could make the
10:45:27 10  time, I'd make the time.  It's probably
10:45:33 11  estimated that I've lost over a year's time from
10:45:37 12  my family and friends dedicated to her, but that
10:45:43 13  was her comfort zone, my office -- and she
10:45:45 14  testified to this in the trial -- my office was
10:45:47 15  her comfort zone.  My staff treated her nicely
10:45:50 16  and well.  They knew not to talk about the rape.
10:45:59 17  Sometimes she'd bring coffee.  Sometimes we'd
10:46:01 18  walk over and go get coffee, whatever made her
10:46:04 19  comfortable.
10:46:06 20      Q.    Is it fair to say this was a special
10:46:08 21  case?  I assume you haven't given up a year of
10:46:11 22  your life for every single client?
10:46:13 23      A.    No.  This one was -- this one was a
10:46:18 24  hard case to move through the system and the

44

10:46:23 1   court wasn't very helpful in this process, and
10:46:28 2   I mean, if you look at the transcripts, this
10:46:30 3   case was defended by four tall-building,
10:46:36 4   mahogany-and-brass law firms.  You had Jones Day
10:46:39 5   sitting in here.  You had Sloane & Walsh whose
10:46:41 6   office was right next door to the courthouse.
10:46:44 7   You had Litchfield Cavo and you had Boyle
10:46:48 8   Shaughnessy.  So the bullets were coming at us
10:46:50 9   from every damn direction.
10:46:52 10      Q.    And you mentioned you have a wife and
10:47:00 11  two daughters.  Did they meet Kira?
10:47:02 12      A.    Oh, yeah.  My wife had never met Kira
10:47:05 13  but my daughters have.
10:47:06 14      Q.    And had Kira -- did you observe
10:47:12 15  any -- Kira to have any problems early on when
10:47:16 16  you were talking about just after -- a year
10:47:19 17  after the rape and in those early days, did you
10:47:22 18  personally observe Kira to have any trouble with
10:47:25 19  physical interaction with people?
10:47:27 20         MS. KNIPPER:  Objection.
10:47:27 21      A.    Well, I knew of it.  So, if somebody
10:47:30 22  came up behind her -- let me break it down.  I
10:47:34 23  knew not to hug her unless she asked for a hug
10:47:36 24  or initiated the hug; same with shaking her

53

| | | |
|---|---|---|
| 10:58:46 | 1 | A.      June 11th? |
| 10:58:47 | 2 | Q.      Right. |
| 10:58:48 | 3 | A.      At 10:56 a.m.? |
| 10:58:50 | 4 | Q.      Exactly.  That's the start of the |
| 10:58:51 | 5 | chain.  So do you recognize that? |
| 10:58:56 | 6 | A.      Yes. |
| 10:58:57 | 7 | Q.      And just to confirm, that's your |
| 10:58:59 | 8 | e-mail address, right? |
| 10:59:00 | 9 | A.      Yes. |
| 10:59:01 | 10 | Q.      And that's the one you regularly used |
| 10:59:03 | 11 | in your business? |
| 10:59:04 | 12 | A.      Yes. |
| 10:59:05 | 13 | Q.      You still use it today? |
| 10:59:06 | 14 | A.      Yes. |
| 10:59:06 | 15 | Q.      Now, if you go up -- so the way, I |
| 10:59:13 | 16 | think, that the document is, the first page of |
| 10:59:15 | 17 | the document has the start of the original |
| 10:59:17 | 18 | message at the bottom of the page if you flip |
| 10:59:19 | 19 | over.  Do you see at the bottom it says from the |
| 10:59:24 | 20 | David Hoey on June 11th, 2015? |
| 10:59:27 | 21 | A.      Oh, I got it, okay. |
| 10:59:29 | 22 | To Kira, right? |
| 10:59:31 | 23 | A.      Mm-hmm. |
| 10:59:31 | 24 | Q.      And then on the next flip side is the |

COPLEY COURT REPORTING

54

| | | |
|---|---|---|
| 10:59:33 | 1 | actual text of the e-mail, right? |
| 10:59:35 | 2 | A.      Mm-hmm, yes. |
| 10:59:37 | 3 | Q.      Well, sorry, prior to that -- just so |
| 10:59:42 | 4 | now we're all oriented, the very first e-mail |
| 10:59:47 | 5 | you sent at the bottom at 10:56 a.m. says, "I |
| 10:59:47 | 6 | need you stop by and sign a new fee agreement |
| 10:59:50 | 7 | with Don," right? |
| 10:59:51 | 8 | A.      Yes. |
| 10:59:51 | 9 | Q.      And she then asks "What is the new |
| 10:59:54 | 10 | fee agreement"? |
| 10:59:54 | 11 | A.      That's the one up above, yes. |
| 10:59:56 | 12 | Q.      And then you say in the text of your |
| 10:59:59 | 13 | message, "It's the same fee agreement as before |
| 11:00:01 | 14 | but with Don's name since he is also trying the |
| 11:00:04 | 15 | case with me on July 13th.  It doesn't change |
| 11:00:08 | 16 | your percentage or cost you more money.  I'll |
| 11:00:10 | 17 | show it to you next time I see it you." |
| 11:00:14 | 18 | A.      Correct. |
| 11:00:14 | 19 | Q.      So how did this come about, the need |
| 11:00:17 | 20 | for this second agreement? |
| 11:00:18 | 21 | A.      It's my understanding that Mr. Keenan |
| 11:00:24 | 22 | met with Kira Wahlstrom in February and she |
| 11:00:28 | 23 | agreed for him to come on board to be part of |
| 11:00:31 | 24 | the trial team.  His pro hac was allowed in |

COPLEY COURT REPORTING

55

| | | |
|---|---|---|
| 11:00:34 | 1 | March of -- did I say '20?  I'm sorry, '15 -- |
| 11:00:38 | 2 | his pro hac and then it's my understanding that |
| 11:00:42 | 3 | either his lawyer in Atlanta or his insurance |
| 11:00:45 | 4 | company requires him to have a fee agreement |
| 11:00:48 | 5 | with the client before he tries a case.  I also |
| 11:00:50 | 6 | believe that's his custom and practice. |
| 11:00:52 | 7 | Q.      In your view at this time in 2015 |
| 11:01:15 | 8 | upon execution did the agreement with Don Keenan |
| 11:01:19 | 9 | replace the 2010 agreement? |
| 11:01:21 | 10 | A.      It superseded all prior agreements. |
| 11:01:25 | 11 | Q.      And did you explain that to Kira? |
| 11:01:29 | 12 | A.      I don't recall.  I'm sure I did. |
| 11:01:36 | 13 | There was lengthy discussions on all -- on |
| 11:01:39 | 14 | everything. |
| 11:01:40 | 15 | Q.      And in your e-mail where you say, |
| 11:01:43 | 16 | "It's the same fee agreement as before but with |
| 11:01:46 | 17 | Don's name.  It doesn't change the percentage or |
| 11:01:49 | 18 | cost you more money," why did you say that? |
| 11:01:52 | 19 | A.      Because that's correct.  The |
| 11:01:55 | 20 | underlining fee in the first fee agreement is |
| 11:01:57 | 21 | 33.3 percent of the underlining recovery.  Mr. |
| 11:02:01 | 22 | Keenan's is 33 percent on the underlining |
| 11:02:04 | 23 | recovery.  There was no vision or thought that |
| 11:02:07 | 24 | the case would ever go to an appeal and it's a |

COPLEY COURT REPORTING

56

| | | |
|---|---|---|
| 11:02:11 | 1 | separate paragraph. |
| 11:02:15 | 2 | Q.      Okay.  Let's take a look at that |
| 11:02:21 | 3 | agreement. |
| 11:02:23 | 4 | A.      Which one, exhibit -- |
| 11:02:25 | 5 | MS. ZERNER:  Did we already mark |
| 11:02:26 | 6 | it, no, the 2015 one. |
| 11:02:28 | 7 | (Massachusetts Contingent |
| 11:02:28 | 8 | Fee Agreement, dated 6/9/15, was marked Exhibit |
| 11:03:09 | 9 | No. 5 for identification.) |
| 11:03:09 | 10 | Q.      Okay.  So now we're looking at what's |
| 11:03:15 | 11 | been marked as Exhibit 5 and do you recognize |
| 11:03:18 | 12 | this as the 2015 contingency fee agreement |
| 11:03:21 | 13 | between Keenan and Kira that we were just |
| 11:03:23 | 14 | talking about? |
| 11:03:24 | 15 | A.      That's correct. |
| 11:03:29 | 16 | Q.      Okay.  Did you draft this? |
| 11:03:31 | 17 | A.      I did not draft this. |
| 11:03:32 | 18 | Q.      Do you know who did? |
| 11:03:34 | 19 | A.      Not specifically.  What I do know |
| 11:03:37 | 20 | is that Mr. Keenan needed a Massachusetts |
| 11:03:40 | 21 | contingency fee agreement and I believe he had |
| 11:03:43 | 22 | somebody from his office contact our office for |
| 11:03:47 | 23 | a sample Massachusetts contingency fee agreement |
| 11:03:52 | 24 | which in all likelihood we provided to him and |

COPLEY COURT REPORTING

61

11:08:03 1 Hoey, P.C., and consents to this division of

11:08:07 2 fees.  Client understands that the client will

11:08:09 3 not be charged any additional legal fees."

11:08:12 4     A.   For that, that's correct.

11:08:14 5     Q.   What do you mean "for that"?

11:08:15 6     A.   For -- to me, to the law office.

11:08:18 7     Q.   Okay.  So you're saying the last line

11:08:21 8 applies to you only?

11:08:23 9     A.   That's correct.

11:08:24 10     Q.   And did you discuss this paragraph

11:08:30 11 with Kira before she signed?

11:08:33 12     A.   I personally did not, but she was

11:08:38 13 aware that Mr. Keenan and I were going to share

11:08:41 14 in a fee.

11:08:43 15     Q.   Okay.  And did you discuss with her

11:08:45 16 the particulars of that division?

11:08:48 17     A.   No, because I don't have to.

11:08:50 18     Q.   All I asked is did you discuss it

11:08:53 19 with her?

11:08:53 20     A.   No, not at that time.  I do later.

11:08:56 21     Q.   Okay.  When do you mean by later?

11:08:59 22     A.   December -- I think December, 2019.

11:09:12 23     Q.   After the money came in?

11:09:15 24     A.   The money came in -- the money was

COPLEY COURT REPORTING

62

11:09:19 1 about to come in, I think, or maybe just came

11:09:21 2 in.

11:09:21 3     Q.   I believe it came in November, 2019.

11:09:24 4     A.   Did it come in November, okay, so

11:09:26 5 then November it came in.

11:09:27 6     Q.   And then after it came in you

11:09:30 7 discussed with Kira the way it would be

11:09:32 8 distributed?

11:09:33 9     A.   And the sticker shock of the expenses

11:09:36 10 and the way the money would be distributed and

11:09:40 11 how is she doing health-wise and what's the next

11:09:44 12 plan and where else does she need help, yeah,

11:09:47 13 everything.  It was December -- around

11:09:50 14 December 19th of 2020 when she came back in

11:09:54 15 March.  Oh, we had to pay off her personal loan.

11:10:05 16 We had to get that paid off.

11:10:07 17     Q.   That was right around that time?

11:10:14 18     A.   Yes.

11:10:14 19     Q.   Okay.  All right.  So at the time

11:10:19 20 this is signed in June, 2019 --

11:10:24 21     A.   Okay.

11:10:24 22     Q.   -- I'm just tracking here.  Let me --

11:10:28 23 this is the first page.  Again this is signed --

11:10:30 24 your understanding is the date 6/1/15 applies to

COPLEY COURT REPORTING

63

11:10:34 1 Mr. Keenan signing it and then 6/19/15 applies

11:10:38 2 to Kira signing it?

11:10:39 3     A.   I believe that's correct.

11:10:40 4     Q.   Okay.  So as of this point, as of

11:10:42 5 June 1st, 2015, had you and Mr. Keenan settled

11:10:46 6 on how you would divide the fee?

11:10:48 7     A.   No.

11:10:48 8     Q.   Did you come to a -- well, you

11:11:01 9 obviously came to a decision on that later,

11:11:04 10 right?

11:11:04 11     A.   Yeah, shortly -- not too long after

11:11:07 12 that.  The case was tried in August.  The case

11:11:10 13 was mediated in July.

11:11:12 14     Q.   When did you two reach a decision on

11:11:14 15 how you would divide the fee?

11:11:16 16     A.   It was either right after the

11:11:18 17 mediation or right around the last offer at

11:11:23 18 trial which Kira rejected and the position that

11:11:32 19 we might lose the case.

11:11:35 20     Q.   So it's my understanding -- so you

11:11:42 21 had a mediation in June, 2015?

11:11:45 22     A.   That was July.

11:11:47 23     Q.   July, I think you're right.  Thank

11:11:49 24 you.  So about July 15th you have your

COPLEY COURT REPORTING

64

11:11:52 1 mediation?

11:11:53 2     A.   Yes.

11:11:53 3     Q.   And that's the first time that the

11:11:55 4 primary, One Beacon, put their full one million

11:11:59 5 dollar policy on the table?

11:12:00 6     A.   Yeah, some -- I mean, you're crossing

11:12:03 7 over to the bad-faith case.  We have to be

11:12:05 8 careful.

11:12:05 9     Q.   I'm just tracking.  I'm not asking

11:12:07 10 for any details.  I'm just confirming that, so

11:12:10 11 right?

11:12:10 12     A.   Zurich and One Beacon were both

11:12:14 13 present.

11:12:15 14     Q.   Okay.  And so I was just clarifying

11:12:18 15 though in terms of you and your contemplation of

11:12:20 16 compensation at that point, that over a million

11:12:23 17 dollars had been offered at the mediation, not

11:12:27 18 way over but --

11:12:28 19     A.   Yeah, give me a second here.  I think

11:12:35 20 a couple brackets were exchanged.  I do remember

11:12:39 21 what the last number was.

11:12:40 22     Q.   Okay.  Before we get there, so those

11:12:43 23 offers were made and we can always confirm them?

11:12:45 24     A.   Yup.

COPLEY COURT REPORTING

65

| | |
|---|---|
| 11:12:46 1 | Q. So then my understanding is the trial |
| 11:12:48 2 | started. Kira had to testify on Friday and that |
| 11:12:52 3 | Friday after she testified that's when the |
| 11:12:55 4 | defendants came back with their 2.25 million |
| 11:12:59 5 | dollar offer? |
| 11:12:59 6 | A. That's -- I think you're right |
| 11:13:02 7 | because then the weekend -- we had the weekend |
| 11:13:05 8 | to talk to her about it. We had the weekend |
| 11:13:08 9 | with the media and we had -- Kira on the media, |
| 11:13:12 10 | I mean, and we had the weekend to assess. I |
| 11:13:17 11 | think you're right. |
| 11:13:17 12 | Q. So is it at that point that you're, |
| 11:13:20 13 | you know, weighing the concern that you could |
| 11:13:23 14 | lose? |
| 11:13:23 15 | A. Yeah, I think you're right. |
| 11:13:25 16 | Q. And then -- okay. |
| 11:13:26 17 | A. That weekend. |
| 11:13:27 18 | Q. So that weekend is when you and |
| 11:13:29 19 | Mr. Keenan agreed that your cut of this case, if |
| 11:13:32 20 | there was a recovery, would be limited to that |
| 11:13:34 21 | offer? |
| 11:13:35 22 | A. Yes. David, you got us this far so |
| 11:13:39 23 | you should get the fee. |
| 11:13:43 24 | Q. And is that -- is that partly because |

COPLEY COURT REPORTING

66

| | |
|---|---|
| 11:13:45 1 | you weren't certain you'd get more than that? |
| 11:13:48 2 | A. Right. Our value -- I mean, bridge |
| 11:13:51 3 | debt, I don't want to cross over into the |
| 11:13:55 4 | bad-faith world, but our assessment was possibly |
| 11:14:02 5 | could be less than that. |
| 11:14:04 6 | Q. We all understand you were in the |
| 11:14:05 7 | middle of a trial. There was no guarantee, |
| 11:14:09 8 | right? |
| 11:14:09 9 | A. That was the biggest part and having |
| 11:14:10 10 | that conversation with Kira was very hard |
| 11:14:12 11 | because she had just testified, but also at that |
| 11:14:24 12 | point she had just testified. So now she wanted |
| 11:14:28 13 | a jury to believe her. |
| 11:14:30 14 | Q. Right. Okay. And did you and Mr. |
| 11:14:37 15 | Keenan put this agreement in writing? |
| 11:14:39 16 | A. That's a good question. I believe so |
| 11:14:42 17 | because Andrew Gould was there and I actually |
| 11:14:46 18 | think Sobczak was there at the same time but I |
| 11:14:48 19 | can't be certain of that because he tended to go |
| 11:14:50 20 | home for a day on the weekend and be with his |
| 11:14:54 21 | wife and kids, but Mr. Gould was there and I can |
| 11:14:57 22 | remember Mr. Keenan telling Mr. Gould get Hoey |
| 11:15:01 23 | confirmation. |
| 11:15:04 24 | Q. So you think it should be in writing |

COPLEY COURT REPORTING

67

| | |
|---|---|
| 11:15:05 1 | somewhere? |
| 11:15:06 2 | A. I do believe it's somewhere in |
| 11:15:07 3 | writing and it's probably down in Atlanta and |
| 11:15:11 4 | I haven't been there since pre-COVID and Mr. |
| 11:15:15 5 | Keenan hasn't been to the Atlanta office in |
| 11:15:24 6 | probably three years, plus, and Mr. Gould no |
| 11:15:26 7 | longer works there. He and his wife had a |
| 11:15:26 8 | couple children and I'm not sure what he's doing |
| 11:15:31 9 | right now. |
| 11:15:32 10 | Q. Do you know if Mr. Keenan's office, |
| 11:15:42 11 | you know, that office building that he operated |
| 11:15:44 12 | from, is he still operating from there? |
| 11:15:46 13 | A. No. |
| 11:15:46 14 | Q. Do you know when that ended? |
| 11:15:49 15 | A. Well, the building is still there. |
| 11:15:51 16 | The office address is still there. There's two |
| 11:15:55 17 | individuals that work in there for the Keenan |
| 11:16:01 18 | Kids Foundation. They're -- I don't even know |
| 11:16:06 19 | if they have a title but they're not lawyers. |
| 11:16:11 20 | The executive director is no longer there. It's |
| 11:16:15 21 | a historic building so it kind of has to stay |
| 11:16:21 22 | its image or it's, you know, you can't do much |
| 11:16:24 23 | to it. |
| 11:16:25 24 | Q. Right, right, without an approval? |

COPLEY COURT REPORTING

68

| | |
|---|---|
| 11:16:31 1 | A. Right, right, right. |
| 11:16:31 2 | Q. Okay. Well, after the recovery, |
| 11:16:34 3 | after the jury verdict came in, did you and |
| 11:16:37 4 | Mr. Keenan have any discussions about |
| 11:16:39 5 | renegotiating? |
| 11:16:42 6 | A. We didn't have any discussions about |
| 11:16:45 7 | renegotiating because -- just because the |
| 11:16:48 8 | verdict came in doesn't mean we were going to |
| 11:16:50 9 | get to keep it. We were certain that the |
| 11:16:52 10 | defense was going to appeal because that was |
| 11:16:55 11 | their chatter except Larry Kenney went on TV and |
| 11:17:00 12 | said they don't have any -- that they disagree |
| 11:17:02 13 | with the jury's verdict but will respect it and |
| 11:17:05 14 | do not anticipate an appeal, but we felt that |
| 11:17:09 15 | they were going to appeal for certain. |
| 11:17:14 16 | So, no, it did not become a further |
| 11:17:18 17 | discussion and, quite frankly, Mr. Keenan is the |
| 11:17:21 18 | reason that the verdict was as high as it was. |
| 11:17:21 19 | Larry Kenney said it was one of the best closing |
| 11:17:27 20 | arguments he's ever seen. |
| 11:17:29 21 | Q. I also understand Mr. Keenan's direct |
| 11:17:34 22 | of Kira was very effective? |
| 11:17:36 23 | A. Very effective and the silent |
| 11:17:38 24 | witness, if you read the transcript, which was |

COPLEY COURT REPORTING

69

11:17:41 1  all those books that she read and reread, very
11:17:45 2  powerful.
11:17:47 3      Q.   Okay.  So, even once you got to 2019
11:17:51 4  and, you know, you believe you're -- the verdict
11:17:54 5  was going to be reinstated and it was, in fact,
11:17:56 6  reinstated, you and Mr. Keenan then didn't
11:17:59 7  discuss renegotiating your fee?
11:18:01 8      A.   I didn't, you know.  I was ready to
11:18:04 9  move on.  It was a long haul.  It was a long
11:18:14 10 battle, multiple, multiple, people involved.  I
11:18:17 11 was ready to move on.  This case -- and you'll
11:18:24 12 see it in the e-mail discovery -- was never
11:18:24 13 about the money for me.  It was about winning
11:18:26 14 and it was about protecting Kira and she knew it
11:18:31 15 and -- I don't know.  You want me to think back,
11:18:34 16 yeah, I probably should have went back and got
11:18:37 17 more money, but it was over, I thought.
11:18:44 18     Q.   And would you say, I mean, Kira,
11:18:50 19 herself, and her ability to take the stand and
11:18:53 20 go through all of those horrible details was
11:18:55 21 critical to this verdict?
11:18:57 22     A.   We interviewed a lot of jurors.  I
11:19:00 23 think, yeah, Kira went through a lot of prep.
11:19:05 24 We role-played this at Suffolk Law School

70

11:19:09 1  courtroom.  I played the judge.  Sobczak played
11:19:12 2  Larry Kenney.  Attorney Wendy Beth Kahn played
11:19:20 3  Bethany Minick.  Mr. Keenan did his direct exam.
11:19:23 4  Kira sat in the witness box and we had some law
11:19:27 5  students kicking around, used them in the jury
11:19:30 6  box, so that she can have the most closest
11:19:34 7  real-life experience to what it would be like to
11:19:36 8  testify, and once she got emotional Mr. Keenan
11:19:42 9  shut it down.
11:19:43 10     Her testimony at trial was because of
11:19:46 11 the witness prep that he did with her in the
11:19:50 12 hotel room and in the role-playing that we did
11:19:57 13 for Kira.  It was -- it got so emotional and it
11:20:05 14 was so quiet in there you could hear a pin drop
11:20:09 15 and Judge Wilson wasn't very kind.  We still
11:20:12 16 don't believe he believed Kira.
11:20:13 17     So Mr. Keenan asked if we could take
11:20:17 18 a break and the judge was reluctant to give the
11:20:19 19 break but finally conceded and gave the break.
11:20:24 20 And, of course, Kira and Don leave first -- the
11:20:24 21 jury leaves first, Kira and Don leave second,
11:20:24 22 and then everybody else flows right behind them,
11:20:38 23 and Mr. Keenan and Kira went around the corner,
11:20:41 24 over by where judge's chambers are up in Suffolk

71

11:20:43 1  to the right, and he balled his eyes out and
11:20:48 2  Kira started to cry.  Then she went to the
11:20:52 3  ladies' room with one of the females, I think,
11:20:58 4  from my office, and both of them -- both of them
11:21:03 5  had to regain their composure before we could go
11:21:07 6  back and finish the examination.
11:21:10 7      I think it was very telling about how
11:21:13 8  much Mr. Keenan cared for her and how passionate
11:21:16 9  he was about this.  I mean, other than seeing my
11:21:20 10 father cry at his father's funeral, I've never
11:21:24 11 seen a grown man cry.  That's an image I can't
11:21:29 12 erase.
11:21:29 13     Q.   I certainly understand a lot of work
11:21:32 14 went into this, but would you agree that as much
11:21:36 15 prep as you did Kira was still the one that had
11:21:39 16 to take the stand and discuss in front of a
11:21:42 17 crowded courtroom every excruciating detail of
11:21:48 18 the rape she suffered?
11:21:49 19     A.   Yes.  But there's other facets to it.
11:21:56 20 You just can't win the case with her alone.  You
11:21:59 21 had to have -- we had before and after
11:22:02 22 witnesses, people --
11:22:02 23     Q.   That wasn't my question and I know
11:22:04 24 you have a lot to say, I'm sure, about the

72

11:22:06 1  trial.  I was just confirming that you, at
11:22:09 2  least, give Kira some credit for taking the
11:22:11 3  stand and being able to go through all that in
11:22:11 4  front of these people?
11:22:15 5      A.   I've never given her discredit for
11:22:17 6  anything.  I've always given her credit.  She's
11:22:20 7  very strong, she's very smart, and we knew this
11:22:22 8  was going to be very hard for her and that's why
11:22:25 9  we prepared her extensively, including putting
11:22:27 10 the animation together which was a major part of
11:22:30 11 her preparing for her testimony and a way for us
11:22:35 12 to, at least, make an effort that she wouldn't
11:22:38 13 have to testify and we made that effort and it
11:22:43 14 educated the judge who was doubtful of her story
11:22:47 15 and educated the defense who was doubtful of her
11:22:51 16 story.
11:22:52 17     Up until that animation was made and
11:22:54 18 presented to them they were still calling it an
11:22:57 19 alleged sexual assault.  They wouldn't even put
11:23:00 20 the word rape in their description.
11:23:02 21     Q.   So, if you had gotten a ruling that
11:23:05 22 you could admit the animation, you were not
11:23:06 23 going to call Kira to the stand?
11:23:08 24     A.   No.

73

| 11:23:09 | 1 | Q. And do you think you would have won |
| 11:23:12 | 2 | that way? |
| 11:23:12 | 3 | A. I don't know but we had to protect |
| 11:23:15 | 4 | her. We had to do what's in the best interest |
| 11:23:20 | 5 | of Kira and there was many, many, many decisions |
| 11:23:21 | 6 | that had to be made within the best interests of |
| 11:23:26 | 7 | Kira. She did not want to be part of the |
| 11:23:27 | 8 | day-to-day operations of the case because it |
| 11:23:29 | 9 | upset her, so we had to, at least, try. |
| 11:23:34 | 10 | Q. And what was your argument for its |
| 11:23:37 | 11 | admissibility? |
| 11:23:38 | 12 | A. I'd have to go back to the |
| 11:23:41 | 13 | memorandum. |
| 11:23:42 | 14 | Q. We can find it there, the filing -- |
| 11:23:44 | 15 | A. Oh, yeah. |
| 11:23:45 | 16 | Q. -- because it was a motion in |
| 11:23:46 | 17 | liminae? |
| 11:23:47 | 18 | A. Yes, and it was an oral -- oral |
| 11:23:51 | 19 | argument. The judge took it into chambers, |
| 11:23:54 | 20 | reviewed it, came out -- came back, had oral |
| 11:23:56 | 21 | argument on it, and then part of it was would be |
| 11:24:03 | 22 | harmful to her, detrimental to her, and there |
| 11:24:06 | 23 | was other arguments about its admissibility. So |
| 11:24:10 | 24 | there's oral argument and there's, I believe, a |

COPLEY COURT REPORTING

74

| 11:24:14 | 1 | memorandum, a legal memorandum, on its |
| 11:24:17 | 2 | admissibility or opposing their motion to keep |
| 11:24:19 | 3 | it out at the time. |
| 11:24:22 | 4 | Q. But, just so I'm clear, your primary |
| 11:24:25 | 5 | purpose for that animation was to use that |
| 11:24:27 | 6 | instead of Kira's testimony? |
| 11:24:29 | 7 | A. It's not the primary purpose. It had |
| 11:24:31 | 8 | multiple purposes. So, if it wasn't going to be |
| 11:24:35 | 9 | used in stay of Kira's testimony, it prepared |
| 11:24:43 | 10 | her -- this was the first time she was getting |
| 11:24:45 | 11 | the details out of the case, I mean, the |
| 11:24:47 | 12 | nitty-gritty details, having her car keys in her |
| 11:24:51 | 13 | hand, trying to trigger her car alarm and the |
| 11:24:54 | 14 | trunk popped open and the alarm never went off |
| 11:24:57 | 15 | and, you know, dragged by her hair 40 feet, and |
| 11:24:59 | 16 | this is the only way to educate the court, |
| 11:25:03 | 17 | educate Kira and for us to preserve for her |
| 11:25:06 | 18 | witness prep the nitty-gritty details of what |
| 11:25:10 | 19 | happened. |
| 11:25:11 | 20 | Kira is the one that spent about five |
| 11:25:13 | 21 | or more hours with Win Interactive putting this |
| 11:25:17 | 22 | together, just the two of them. We left them |
| 11:25:20 | 23 | alone because we wanted no influence on what |
| 11:25:22 | 24 | this animation -- it has to be a hundred percent |

COPLEY COURT REPORTING

75

| 11:25:25 | 1 | accurate. You can't have anything that's not |
| 11:25:25 | 2 | accurate when you're doing animation so -- |
| 11:25:33 | 3 | Q. Did you show the final product to |
| 11:25:35 | 4 | Kira? |
| 11:25:35 | 5 | A. I believe we did because we needed to |
| 11:25:38 | 6 | have it 100 percent accurate and she had to sign |
| 11:25:41 | 7 | off on it. I know she said in her deposition |
| 11:25:43 | 8 | that she doesn't recall doing that. There's a |
| 11:25:45 | 9 | lot of things that she intentionally put out of |
| 11:25:48 | 10 | her mind because it's, you know, it triggers |
| 11:25:52 | 11 | stuff. It brings stuff back that she doesn't |
| 11:25:54 | 12 | really want to do it. |
| 11:25:56 | 13 | And if I can remember correctly, she |
| 11:26:02 | 14 | started to watch it and didn't want to finish it |
| 11:26:08 | 15 | and I think I went back to Mr. Keenan and said |
| 11:26:11 | 16 | she doesn't want to finish watching it. He said |
| 11:26:14 | 17 | you know what, it's okay, we'll deal with it in |
| 11:26:17 | 18 | the witness prep. |
| 11:26:19 | 19 | Q. Did this attempt to watch it happen |
| 11:26:20 | 20 | in front of you? |
| 11:26:21 | 21 | A. This -- it was either I or Sobczak. |
| 11:26:26 | 22 | Let me think about that for a second. You know, |
| 11:26:35 | 23 | Bridget, I don't recall. For some reason I can |
| 11:26:37 | 24 | remember sitting on this side of a computer and |

COPLEY COURT REPORTING

76

| 11:26:39 | 1 | she watching something on the computer. |
| 11:26:42 | 2 | Q. Are you certain that it was the final |
| 11:26:45 | 3 | version? |
| 11:26:47 | 4 | A. Yeah, I think so, because the |
| 11:26:52 | 5 | work-in-progress version, you know, they were |
| 11:26:55 | 6 | building it with her. They were building it |
| 11:26:57 | 7 | with her and then they had the final product. |
| 11:27:02 | 8 | Q. But to your memory she couldn't |
| 11:27:08 | 9 | finish it? |
| 11:27:08 | 10 | A. Right. |
| 11:27:09 | 11 | Q. Okay. |
| 11:27:13 | 12 | A. And it helped in the witness prep |
| 11:27:15 | 13 | because we had the animation and if she forgot |
| 11:27:25 | 14 | something we knew it was missing because we had |
| 11:27:27 | 15 | it already done in the animation. |
| 11:27:27 | 16 | Q. Any other purpose for that animation |
| 11:27:30 | 17 | that you haven't described already? |
| 11:27:33 | 18 | A. Which ones did I describe? An |
| 11:27:37 | 19 | attempt for her not to have to testify because |
| 11:27:39 | 20 | she'd be more traumatized and hurt, to prepare |
| 11:27:45 | 21 | her for her -- oh, yeah, to prepare her for her |
| 11:27:49 | 22 | live testimony if the animation was denied and |
| 11:27:52 | 23 | to educate the judge. That was a big piece. |
| 11:27:55 | 24 | Q. Because your impression was the judge |

COPLEY COURT REPORTING

**77**

| | |
|---|---|
| 11:27:57 | 1  did not believe this rape happened at all? |
| 11:28:00 | 2  **A.    No, no, not at all, sexual assault** |
| 11:28:02 | 3  **versus rape.** |
| 11:28:04 | 4  Q.    Okay. |
| 11:28:06 | 5  **A.    Now, he's supposed to be impartial,** |
| 11:28:10 | 6  **but we can tell by his body language and rulings** |
| 11:28:13 | 7  **and what have you that he wasn't a hundred** |
| 11:28:15 | 8  **percent on board with her situation.** |
| 11:28:18 | 9  Q.    Okay.  And you watched the final |
| 11:28:21 | 10  version? |
| 11:28:21 | 11  **A.    Oh, yeah.** |
| 11:28:22 | 12  Q.    And what was your impression of it, |
| 11:28:27 | 13  of its quality and for -- use for trial? |
| 11:28:31 | 14  **A.    I felt that it was going to do its** |
| 11:28:33 | 15  **job for educating the judge and helping us** |
| 11:28:38 | 16  **prepare Kira for witness prep.  I felt that it** |
| 11:28:44 | 17  **was hard to watch.  I felt that it was -- I** |
| 11:28:49 | 18  **learned things from it.  I learned how many** |
| 11:28:51 | 19  **times she was hit.  I didn't know that prior to** |
| 11:28:55 | 20  **going through that process.  I had a better** |
| 11:29:00 | 21  **understanding of where the condom ended up.  So** |
| 11:29:05 | 22  **I learned things from it.** |
| 11:29:06 | 23  Q.    And if a court had granted your |
| 11:29:11 | 24  request to use it in place of Kira's testimony, |

COPLEY COURT REPORTING

**78**

| | |
|---|---|
| 11:29:15 | 1  in your opinion do you think the final version |
| 11:29:19 | 2  of the animation would have been effective? |
| 11:29:21 | 3       MS. KNIPPER:  Objection. |
| 11:29:22 | 4  **A.    Based upon what I saw, yeah, it was** |
| 11:29:28 | 5  **like CSI.  But we would have focus-grouped it.** |
| 11:29:33 | 6  **We would have put it before a focus group at** |
| 11:29:36 | 7  **night or an opening day or opening afternoon and** |
| 11:29:39 | 8  **got a focus group's opinion on it.** |
| 11:29:41 | 9  Q.    What do you mean at night or opening |
| 11:29:43 | 10  day? |
| 11:29:43 | 11  **A.    An opening day like a Saturday or** |
| 11:29:46 | 12  **Sunday or afternoon where you have two hours to** |
| 11:29:49 | 13  **do that.** |
| 11:29:49 | 14  Q.    I see.  If the judge had ruled |
| 11:29:52 | 15  pretrial, you would have taken the time to run |
| 11:29:54 | 16  it through with the focus group -- |
| 11:29:54 | 17  **A.    Absolutely.** |
| 11:29:56 | 18  Q.    -- before you used it? |
| 11:29:57 | 19  **A.    Absolutely.** |
| 11:29:58 | 20  Q.    Okay.  And if the focus group results |
| 11:30:05 | 21  were that it was not effective, would you then |
| 11:30:08 | 22  have decided not to use that animation? |
| 11:30:11 | 23  **A.    I don't know as we didn't go down** |
| 11:30:13 | 24  **that road.** |

COPLEY COURT REPORTING

**79**

| | |
|---|---|
| 11:30:18 | 1  Q.    But in your practice you take the |
| 11:30:18 | 2  focus group's result into consideration? |
| 11:30:20 | 3  **A.    We have to.** |
| 11:30:22 | 4  Q.    All right. |
| 11:30:25 | 5       MS. KNIPPER:  Bridget, is this a |
| 11:30:27 | 6  good time for break? |
| 11:30:31 | 7       MS. ZERNER:  It is.  Thank you.  I |
| 11:30:33 | 8  wanted to check in with Kathy. |
| 11:30:39 | 9       THE VIDEOGRAPHER:  We're going off |
| 11:30:40 | 10  the record.  The time is 11:30 a.m. |
| 11:30:44 | 11       (Recessed at 11:30 a.m.) |
| 11:39:15 | 12       (Resumed at 11:39 a.m.) |
| 11:39:15 | 13       THE VIDEOGRAPHER:  We are back on |
| 11:39:17 | 14  the record.  The time is now 11:39 a.m. |
| 11:39:22 | 15  Q.    Okay.  So, back to the underlying |
| 11:39:26 | 16  case for Kira Wahlstrom, while the case is |
| 11:39:30 | 17  pending did you use your own money to pay for |
| 11:39:33 | 18  expenses? |
| 11:39:34 | 19  **A.    I used my own money and Advocate** |
| 11:39:40 | 20  **Capital money, a combination.** |
| 11:39:41 | 21  Q.    Got it.  And do you recall telling |
| 11:39:46 | 22  anyone that you had advanced $400,000 on the |
| 11:39:49 | 23  case? |
| 11:39:52 | 24  **A.    That I -- I'm sorry.** |

COPLEY COURT REPORTING

**80**

| | |
|---|---|
| 11:39:54 | 1  Q.    Let me rephrase it.  Do you recall |
| 11:39:57 | 2  back then telling anyone that you had put |
| 11:39:59 | 3  $400,000 of your own money into the case? |
| 11:40:01 | 4  **A.    No, I don't know.** |
| 11:40:02 | 5  Q.    Let's move on to -- |
| 11:40:43 | 6       (2020 Form 1099-MISC was |
| 11:40:44 | 7  marked Exhibit No. 6 for identification.) |
| 11:40:44 | 8  Q.    And do you recognize Exhibit 6 as the |
| 11:40:48 | 9  2020 1099 that you produced? |
| 11:40:53 | 10  **A.    Yes.** |
| 11:40:53 | 11  Q.    And this reflects the $750,000 that |
| 11:40:59 | 12  you've indicated is what you received on the |
| 11:41:01 | 13  Wahlstrom case? |
| 11:41:02 | 14  **A.    Correct.** |
| 11:41:04 | 15  Q.    Have you received 1099s from the |
| 11:41:08 | 16  Keenan Law Firm at any other point in time? |
| 11:41:10 | 17  **A.    I have.** |
| 11:41:10 | 18  Q.    Okay.  And is it -- the 1099s that |
| 11:41:15 | 19  you have received separate from this, are they |
| 11:41:17 | 20  to the Law Offices of David Hoey or to you |
| 11:41:19 | 21  personally or both? |
| 11:41:21 | 22  **A.    Not to me personally, office.** |
| 11:41:23 | 23  Q.    Okay.  And is that related to your |
| 11:41:27 | 24  business relationship you've already described |

COPLEY COURT REPORTING

81

| | |
|---|---|
| 11:41:29 | 1   to us? |
| 11:41:29 | 2       **A.**   **That's correct.** |
| 11:41:31 | 3       **Q.**   Did you get a 1099 from the Keenan |
| 11:41:34 | 4   Law Firm before 2020? |
| 11:41:37 | 5       **A.**   **No.** |
| 11:41:38 | 6       **Q.**   And how many -- well, never mind. |
| 11:41:45 | 7   Strike that. |
| 11:41:45 | 8       And have you received any other |
| 11:41:59 | 9   compensation for Kira's case, the underlying |
| 11:42:10 | 10   negligence case, separate from this 750,000? |
| 11:42:07 | 11       **A.**   **I have not.** |
| 11:42:19 | 12           (Letter, dated 7/3/12, was |
| 11:42:44 | 13   marked Exhibit No. 7 for identification.) |
| 11:42:44 | 14       **Q.**   Do you recognize what's been marked |
| 11:42:46 | 15   as Exhibit 7 which is a letter from the Keenan |
| 11:42:49 | 16   Law Firm, dated July 3rd, 2012? |
| 11:42:51 | 17       **A.**   **I see that it's a letter, dated** |
| 11:42:54 | 18   **July 3rd, 2012, to me, but, other than seeing it** |
| 11:43:00 | 19   **right now, I don't have any independent** |
| 11:43:02 | 20   **recollection of it.** |
| 11:43:02 | 21       **Q.**   Okay.  And it says it's regarding |
| 11:43:06 | 22   Wahlstrom versus Radisson Hotel? |
| 11:43:08 | 23       **A.**   **Yes.** |
| 11:43:08 | 24       **Q.**   And that was -- the Radisson Hotel |

COPLEY COURT REPORTING

82

| | |
|---|---|
| 11:43:12 | 1   was connected to the rape that you were dealing |
| 11:43:14 | 2   with, that case? |
| 11:43:15 | 3       **A.**   **The parking garage was adjacent to** |
| 11:43:17 | 4   **and connected to the Radisson Hotel.  That's** |
| 11:43:21 | 5   **correct.** |
| 11:43:21 | 6       **Q.**   All right.  Was Mr. Keenan working on |
| 11:43:27 | 7   Kira's case as of 2012? |
| 11:43:31 | 8       **A.**   **2012, I think so, as, like, what we** |
| 11:43:38 | 9   **discussed before, consultant-type relationship.** |
| 11:43:43 | 10       **Q.**   Okay.  Do you recall if you had any |
| 11:43:50 | 11   written agreement between you and Mr. Keenan |
| 11:43:54 | 12   related to Kira's case as of this time, |
| 11:43:57 | 13   July 3rd, 2012? |
| 11:43:58 | 14       **A.**   **We had a proposed one that never came** |
| 11:44:01 | 15   **to fruition.** |
| 11:44:02 | 16       **Q.**   And what was that? |
| 11:44:03 | 17       **A.**   **It was co-counsel or consult** |
| 11:44:17 | 18   **agreement.** |
| 11:44:26 | 19           (Contract for Legal |
| 11:44:26 | 20   Representation, dated 2/14/13, was marked |
| 11:45:08 | 21   Exhibit No. 8 for identification.) |
| 11:45:08 | 22       MS. ZERNER:  This is Exhibit 8? |
| 11:45:10 | 23       THE COURT REPORTER:  Yes. |
| 11:45:10 | 24       **Q.**   Do you have that there in front of |

COPLEY COURT REPORTING

83

| | |
|---|---|
| 11:45:12 | 1   you? |
| 11:45:12 | 2       **A.**   **I do.** |
| 11:45:12 | 3       **Q.**   This is entitled Contract for Legal |
| 11:45:14 | 4   Representation, Co-Counsel Contingent Fee |
| 11:45:16 | 5   Agreement, and the opening paragraph says, |
| 11:45:19 | 6   "David J. Hoey and the Law Office of David J. |
| 11:45:22 | 7   Hoey, P.C., quote, unquote, Attorney, North |
| 11:45:26 | 8   Reading, Mass., do hereby employ and retain |
| 11:45:29 | 9   Don C. Keenan and the Keenan Law Firm, P.C., |
| 11:45:29 | 10   Atlanta, Georgia, to represent us with regard to |
| 11:45:29 | 11   the following matter:  Kira Wahlstrom vs. |
| 11:45:29 | 12   Carlson Hotels, et al, Suffolk County Superior |
| 11:45:47 | 13   Court Case 2010-01022-G," right?  That's the |
| 11:45:48 | 14   first paragraph. |
| 11:45:49 | 15       **A.**   **Sure.** |
| 11:45:49 | 16       **Q.**   Do you recognize this? |
| 11:45:56 | 17       **A.**   **Sort of, 2013.** |
| 11:46:02 | 18       **Q.**   Well, on the second page do you |
| 11:46:04 | 19   recognize that as your signature? |
| 11:46:06 | 20       **A.**   **That's mine.** |
| 11:46:07 | 21       **Q.**   And it's dated February 24th, 2013? |
| 11:46:10 | 22       **A.**   **Correct.** |
| 11:46:10 | 23       **Q.**   And below is a line for the Keenan |
| 11:46:14 | 24   Law Firm? |

COPLEY COURT REPORTING

84

| | |
|---|---|
| 11:46:14 | 1       **A.**   **Yes.** |
| 11:46:15 | 2       **Q.**   And there's a signature there, right? |
| 11:46:16 | 3       **A.**   **Yes.** |
| 11:46:17 | 4       **Q.**   Do you personally -- are you familiar |
| 11:46:20 | 5   with that signature? |
| 11:46:21 | 6       **A.**   **Not necessarily familiar with it, but** |
| 11:46:23 | 7   **I would -- it looks like Mr. Keenan's.** |
| 11:46:27 | 8       **Q.**   You've seen his signature before? |
| 11:46:30 | 9       **A.**   **Yes.  It's usually a scribble.** |
| 11:46:32 | 10       **Q.**   So this is signed by you both and it |
| 11:46:36 | 11   has attached to it your fee agreement, your 2010 |
| 11:46:41 | 12   fee agreement, with Kira, right? |
| 11:46:42 | 13       **A.**   **Yes.** |
| 11:46:44 | 14       **Q.**   And that says -- in the second |
| 11:46:46 | 15   paragraph it says, attorney, referring to you |
| 11:46:46 | 16   and your law firm -- |
| 11:46:47 | 17       **A.**   **Yes.** |
| 11:46:47 | 18       **Q.**   -- has entered into an attorney- |
| 11:46:50 | 19   client contingency fee contract in the above |
| 11:46:53 | 20   matter receiving 33.3 percent of all sums |
| 11:46:55 | 21   recovered.  See attached Exhibit A, right? |
| 11:46:59 | 22       **A.**   **Correct.** |
| 11:47:00 | 23       **Q.**   Now, and then it has a fee |
| 11:47:04 | 24   distribution there where Paragraph 1 says that |

COPLEY COURT REPORTING

105

```
12:10:56  1      A.   No.
12:10:58  2      Q.   Okay.  All right.  Can you tell me
12:11:00  3  what exactly you went through in December, 2019?
12:11:03  4      A.   That's going back a little ways, not
12:11:09  5  with specifics, but there was a preliminary list
12:11:14  6  of expenses.  I think this is it actually or let
12:11:22  7  me try to remember.  December of '19 she came
12:11:26  8  in.  It was getting close to Christmas.  I
12:11:36  9  remember going through these with her.  I just
12:11:40 10  can't recall whether it was -- this was a
12:11:45 11  working list or if I did it on a pad, but we
12:11:56 12  went through a lot of things, not just this.
12:12:00 13  And then on these things that she had questions
12:12:02 14  on, I further elaborated in this e-mail and sent
12:12:05 15  it to her.
12:12:06 16      Q.   Okay.  Because those questions arose
12:12:09 17  in the December meeting?
12:12:09 18      A.   Yeah, but they were not really
12:12:12 19  questions.  They were just, like, inquiry, just
12:12:16 20  inquiry.
12:12:17 21      Q.   Okay.  And back in December did Kira
12:12:19 22  sign anything to approve any particular
12:12:22 23  expenses?
12:12:23 24      A.   Maybe on the loan, the Sage loan
```

106

```
12:12:28  1  maybe.
12:12:29  2      Q.   Okay.
12:12:29  3      A.   But, other than that, no, nothing was
12:12:32  4  finalized yet.
12:12:33  5      Q.   Okay.  So, just to be clear, so this
12:12:46  6  reflects the final itemization and it was right
12:12:51  7  around this time that Kira signed a different
12:12:53  8  version of this that had the same information?
12:12:55  9      A.   Yes, except it didn't have the
12:12:58 10  descriptions with them.
12:12:58 11      Q.   I don't have it here today, but we
12:13:00 12  know what --
12:13:01 13      A.   Yeah, yeah.
12:13:01 14      Q.   I'm just confirming that's the
12:13:03 15  one that you were --
12:13:05 16      A.   Yeah.
12:13:10 17      Q.   All right.  One of the questions -- I
12:13:12 18  know we already talked about some things.  On
12:13:26 19  the -- just going down the line here, where you
12:13:29 20  have 15,000, plus, dollars for travel, parking,
12:13:32 21  tolls and Uber --
12:13:36 22      A.   Let me see.  Hold on one second.
12:13:38 23  Okay.
12:13:39 24      Q.   -- I'm just confirming you produced
```

107

```
12:13:41  1  all possible receipts you have kept from that up
12:13:44  2  to this point?
12:13:47  3      A.   I don't know, Bridget, without
12:13:49  4  looking at what I gave you.
12:13:52  5      Q.   Okay.  I'm just going to assume that
12:13:56  6  it wasn't a conflict there.  I'm just assuming
12:13:58  7  that you produced everything you could find so
12:14:00  8  far?
12:14:00  9      A.   So far.  Everything I could find so
12:14:02 10  far I turned over.
12:14:04 11      Q.   Okay.  And it has here Amy Goganian,
12:14:12 12  the 41,231.72, and it says "This is who we hired
12:14:16 13  to fight Sobczak lien?"
12:14:18 14      A.   That's correct.
12:14:19 15      Q.   Kira hadn't personally met her as of
12:14:21 16  this point in March, right?
12:14:23 17      A.   As of March --
12:14:28 18      Q.   2020?
12:14:29 19      A.   No.  I don't think it's until October
12:14:33 20  or November.
12:14:35 21      Q.   Okay.  And then it has on here
12:14:41 22  Richard Goren, $20,824, and you have your
12:14:45 23  explanation there about this is who we hired to
12:14:48 24  fight intellectual property, patent, trademark
```

108

```
12:14:53  1  infringement?
12:14:54  2      A.   That's correct.
12:14:54  3      Q.   Did you explain this any further than
12:14:56  4  that to her?
12:14:57  5      A.   I did.
12:14:58  6      Q.   And what did you explain to her?
12:14:59  7      A.   That this was during the trial and
12:15:03  8  during the motion for new trial the defense was
12:15:10  9  trying to put a wedge between Kira and Don and
12:15:15 10  Don and the court by attaching a lot of Mr.
12:15:19 11  Keenan's book and trial blog articles and we
12:15:26 12  felt it was necessary and in her best interest
12:15:29 13  at that time to fight it and she agreed.
12:15:33 14  Everything was fight, fight, fight, and so
12:15:40 15  that's what we did.  She understood it at the
12:15:46 16  time; had a few choice words as usual.
12:15:56 17      Q.   To your knowledge had Kira met
12:15:58 18  Mr. Goren as of this time in March, 2020?
12:16:01 19      A.   No.  She did not meet Mr. Goren, I
12:16:05 20  don't think at all, but I do have a recollection
12:16:07 21  that Kira came to one of those post-trial
12:16:10 22  hearings where he may have been present.
12:16:17 23      Q.   Okay.  All right.  On this one then
12:16:20 24  we have James Bolan on there for $8,432.39?
```

117

12:26:36 1  Kira?

12:26:37 2      A.    At this time I did here and then

12:26:40 3  again when she met with me in March.

12:26:46 4      Q.    So at this time we're looking at

12:26:48 5  March.  So you e-mailed it her to in advance of

12:26:50 6  March.  So it was the March meeting when you

12:26:53 7  explained it to her?

12:26:54 8      A.    Yes.  If there's an explanation

12:26:56 9  here --

12:26:56 10     Q.    Yes.

12:26:56 11     A.    -- that means she inquired about it

12:26:59 12 in December.

12:26:59 13     Q.    And we know Win Interactive in here,

12:27:03 14 this charge includes not just the animation but

12:27:05 15 also their courtroom services?

12:27:08 16     A.    Yes, their courtroom services, other

12:27:10 17 demonstrative aids, all the exhibits on the

12:27:13 18 computer to put up on the live screen, the

12:27:15 19 rental screen, you know, the full services.

12:27:18 20     Q.    You had that tech person there.  Was

12:27:20 21 that Tom Gibson?

12:27:21 22     A.    Yeah.

12:27:26 23     Q.    Because at trial it was you and

12:27:29 24 Mr. Sobczak from Hoey Law and then Don Keenan

COPLEY COURT REPORTING

118

12:27:32 1  and Andrew Gould from Keenan Law?

12:27:35 2      A.    Right.  Don was first chair, I was

12:27:37 3  second chair, Sobczak was third chair and Gould

12:27:41 4  as -- what do you want to call -- support chair.

12:27:45 5      Q.    I was going to ask did he take any

12:27:47 6  witnesses?

12:27:47 7      A.    We did.  We gave him a before and

12:27:49 8  after witness.

12:27:50 9      Q.    Okay.

12:27:50 10     A.    Yup.

12:27:51 11     Q.    What else did he do during trial,

12:27:54 12 Mr. Gould?

12:27:54 13     A.    He did a lot of running around.  He

12:28:00 14 also did -- he was in our planning sessions, in

12:28:03 15 all the prep sessions, and his job at jury

12:28:09 16 selection days was to be with Kira at all

12:28:14 17 times --

12:28:14 18     Q.    Okay.

12:28:14 19     A.    -- and to communicate any messages

12:28:16 20 that Kira had about the jury to us.

12:28:19 21     Q.    Okay.

12:28:20 22     A.    It's her jury.  She has to sign off

12:28:22 23 on it.

12:28:24 24     Q.    All right.  So, moving down here,

COPLEY COURT REPORTING

119

12:28:28 1  we're on the second page.

12:28:32 2          MS. ZERNER:  Thank you.

12:28:33 3      Q.    You have John Vail, Esquire, on here?

12:28:37 4      A.    I do.

12:28:38 5      Q.    Did you get Kira's agreement to use

12:28:43 6  his services before they were incurred --

12:28:47 7      A.    I did not.

12:28:49 8      Q.    -- this charge is incurred.  And

12:28:52 9  Catherine Giordano?

12:28:54 10     A.    Yes.  She was legal memorandums

12:28:57 11 during trial so that was just in trial moments

12:29:02 12 situations.  So we would not have brought that

12:29:04 13 to Kira's attention until later.

12:29:06 14     Q.    Okay.  So just not in advance of

12:29:09 15 incurring those fees?

12:29:11 16     A.    Right, right.

12:29:12 17     Q.    Can I clarify, since you, you know,

12:29:14 18 you've done a lot of contingency fee cases,

12:29:18 19 right, and you had before this one?

12:29:19 20     A.    Yeah.

12:29:20 21     Q.    So is it typical -- in your field was

12:29:25 22 it typical in your practice that this would

12:29:27 23 arise where you'd have the need for additional

12:29:29 24 attorneys and so they would be expensed to the

COPLEY COURT REPORTING

120

12:29:32 1  client?

12:29:32 2      A.    This case was unique.  This case was

12:29:35 3  different.  We needed additional services

12:29:39 4  because -- now, this was an up-all-night, 24/7

12:29:46 5  case.  We needed a lot of help.  In fact, there

12:29:51 6  is a lot of other attorneys involved in this

12:29:53 7  case that their services are not being assessed

12:29:57 8  or charged at all.  The courtroom was packed

12:30:04 9  every single day.  I have a list of 30 lawyers

12:30:07 10 that observed during trial and at the end of the

12:30:11 11 trial day we would take in their observations

12:30:14 12 and incorporate it into the case.  This was a

12:30:21 13 unique situation.

12:30:21 14     Q.    Okay.  But, just to clarify, prior to

12:30:24 15 this case --

12:30:26 16     A.    Yeah.

12:30:27 17     Q.    -- was there ever an occasion where

12:30:29 18 you would use additional attorneys where their

12:30:33 19 time would be included as expenses for a

12:30:33 20 particular case?

12:30:34 21     A.    Yeah, I think so.

12:30:38 22     Q.    Okay.

12:30:38 23     A.    A little bit, yeah, not on this grand

12:30:42 24 scale.

COPLEY COURT REPORTING

161

| | | |
|---|---|---|
| 13:24:15 | 1 | When we argued the motion for new |
| 13:24:18 | 2 | trial, against the motion for new trial, we did |
| 13:24:20 | 3 | not have -- only Patty and I sat at counsel |
| 13:24:23 | 4 | table.  We did not have Sobczak sit at counsel |
| 13:24:26 | 5 | table.  We had him sit in the back and we made |
| 13:24:30 | 6 | sure Wilson knew it.  We were pulling Sobczak |
| 13:24:33 | 7 | away from the Wilson conflict. |
| 13:24:35 | 8 | Q.   And Sobczak was still in |
| 13:24:39 | 9 | communication with Kira, as necessary? |
| 13:24:41 | 10 | A.   Oh, yeah. |
| 13:24:41 | 11 | Q.   They had gotten along to your |
| 13:24:43 | 12 | knowledge? |
| 13:24:43 | 13 | A.   For -- yeah.  They even went out and |
| 13:24:46 | 14 | got drunk together the night of the verdict. |
| 13:24:48 | 15 | Q.   All right.  So -- okay.  And then we |
| 13:24:57 | 16 | get to the point -- so Justice Wilson though |
| 13:25:01 | 17 | grants the new trial in about May, 2016, right? |
| 13:25:05 | 18 | A.   Yeah. |
| 13:25:12 | 19 | (Series of e-mails, dated |
| 13:25:12 | 20 | 5/30/16, was marked Exhibit No. 18 for |
| 13:25:13 | 21 | identification.) |
| 13:25:34 | 22 | Q.   And so Exhibit 18 is e-mails between |
| 13:25:41 | 23 | you and Mr. Sobczak on May 30th, 2016, not long |
| 13:25:45 | 24 | after the Judge Wilson ruling, right? |

COPLEY COURT REPORTING

162

| | | |
|---|---|---|
| 13:25:48 | 1 | A.   Yeah. |
| 13:25:50 | 2 | Q.   That's where you on May 30th you say |
| 13:25:53 | 3 | to Sobczak I'm going to put the burden on you to |
| 13:25:55 | 4 | stay in contact with Kira every day? |
| 13:25:57 | 5 | A.   Sure. |
| 13:25:58 | 6 | Q.   And you give your three reasons? |
| 13:26:00 | 7 | A.   That's right. |
| 13:26:01 | 8 | Q.   And this is -- |
| 13:26:02 | 9 | A.   I was worried about her stability, |
| 13:26:03 | 10 | you know, because this is a big thing.  This is |
| 13:26:06 | 11 | a big thing.  Somebody had to be in contact with |
| 13:26:09 | 12 | her every single day.  I think I was getting |
| 13:26:14 | 13 | ready to try my next case.  May, '16, I think |
| 13:26:19 | 14 | right around that time I was getting ready. |
| 13:26:21 | 15 | Q.   Maybe in New Hampshire or something? |
| 13:26:24 | 16 | A.   Yes. |
| 13:26:24 | 17 | Q.   So I guess part of that was -- so -- |
| 13:26:28 | 18 | but also you were concerned that she could |
| 13:26:30 | 19 | authorize us not to litigate anymore and drop |
| 13:26:32 | 20 | the case, as you wrote here? |
| 13:26:35 | 21 | A.   That's correct.  That was one of her |
| 13:26:37 | 22 | options. |
| 13:26:38 | 23 | Q.   And you were also concerned she could |
| 13:26:40 | 24 | find another attorney? |

COPLEY COURT REPORTING

163

| | | |
|---|---|---|
| 13:26:41 | 1 | A.   That's one her options. |
| 13:26:41 | 2 | Q.   And two and three, you're out of a |
| 13:26:51 | 3 | lot of money? |
| 13:26:53 | 4 | A.   That's correct. |
| 13:26:55 | 5 | Q.   Thank you.  All right.  So when -- |
| 13:27:00 | 6 | after -- so after the new trial motion ruling |
| 13:27:04 | 7 | comes in, then you need to appeal that, right, |
| 13:27:09 | 8 | obviously? |
| 13:27:10 | 9 | A.   Oh, yeah, yeah.  He took the verdict |
| 13:27:13 | 10 | away and then the issue has to be whether we |
| 13:27:16 | 11 | could appeal and then you have to start with the |
| 13:27:23 | 12 | interlocutory.  If you're successful, then you |
| 13:27:26 | 13 | go to the panel.  If you're not successful, you |
| 13:27:28 | 14 | have to retry the case. |
| 13:27:29 | 15 | Q.   And you consulted with DeJuneas on |
| 13:27:32 | 16 | that? |
| 13:27:32 | 17 | A.   Yes. |
| 13:27:33 | 18 | Q.   And did you also have questions for |
| 13:27:36 | 19 | Patty DeJuneas about the process and the rules |
| 13:27:38 | 20 | for appeals? |
| 13:27:39 | 21 | A.   I'm not sure, back then, 2015, '16, |
| 13:27:44 | 22 | probably. |
| 13:27:44 | 23 | Q.   Did you record any of your phone |
| 13:27:46 | 24 | calls with Patty DeJuneas? |

COPLEY COURT REPORTING

164

| | | |
|---|---|---|
| 13:27:48 | 1 | A.   Just her and I, no.  There was one |
| 13:27:52 | 2 | with Mr. Keenan, Mr. Sobczak, myself, Mr. Gould |
| 13:27:59 | 3 | where Mr. Sobczak recorded it.  It went to |
| 13:28:02 | 4 | SpeakWrite.  It got transcribed and everybody |
| 13:28:06 | 5 | got a copy of it. |
| 13:28:06 | 6 | Q.   Okay.  I think I saw a copy of that |
| 13:28:08 | 7 | in the -- |
| 13:28:09 | 8 | A.   Yeah. |
| 13:28:10 | 9 | Q.   All right. |
| 13:28:10 | 10 | A.   It was, like, the early planning |
| 13:28:12 | 11 | stage or the early meeting. |
| 13:28:17 | 12 | Q.   And do you recall what the specific |
| 13:28:22 | 13 | issues were for the appeal, the legal issues? |
| 13:28:26 | 14 | A.   Yeah, they -- we all knew right away |
| 13:28:30 | 15 | but I needed confirmation of it that Wilson made |
| 13:28:35 | 16 | an error, that he applied the wrong standard. |
| 13:28:38 | 17 | So now we had to go out and confirm that that |
| 13:28:40 | 18 | was the case and Patty believed it and it ended |
| 13:28:45 | 19 | up being confirmed by Judge Cordy.  So that was |
| 13:28:49 | 20 | going to be the issue from day one. |
| 13:29:01 | 21 | Q.   Now, I understand you participated in |
| 13:29:07 | 22 | the appeal by reviewing draft briefs by Patty |
| 13:29:11 | 23 | DeJuneas and giving her your feedback? |
| 13:29:13 | 24 | A.   Did more than that. |

COPLEY COURT REPORTING

197

```
14:42:36  1   spreadsheet, the John Vail entry where it says
14:42:41  2   constitutional law attorney --
14:42:41  3       A.    Yes.
14:42:41  4       Q.    -- why did you enter that as an
14:42:46  5   explanation to Kira?
14:42:48  6       A.    I was just identifying as to what he
14:42:49  7   is.  He was a constitutional law attorney.  But
14:42:51  8   in the December meeting I told her what he did.
14:43:00  9       Q.    That was a face-to-face meeting?
14:43:02 10       A.    The one in December was, yeah.
14:43:04 11       Q.    Okay.
14:43:06 12       A.    And it was during COVID, too, so, you
14:43:10 13   know, it was hard to schedule stuff.
14:43:14 14       Q.    Okay.  So Mr. Vail, just to clarify
14:43:18 15   that, he wasn't working on constitutional law
14:43:21 16   issues for this case?
14:43:23 17       A.    That's absolutely correct.  He was
14:43:29 18   looking at the very hard appellate issues and
14:43:33 19   Patty was very receptive to his work.
14:43:36 20       Q.    Patty knew he was involved from the
14:43:40 21   jump, from the start, was --
14:43:43 22       A.    Yeah, she --
14:43:44 23       Q.    Let me rephrase my question.  Was
14:43:47 24   Patty DeJuneas informed of Mr. Vail's
```

COPLEY COURT REPORTING

198

```
14:43:52  1   participation at the time that you started to
14:43:54  2   consult him?
14:43:55  3       A.    That's why she wanted to meet him
14:43:56  4   and she felt that his appellate experience and
14:43:59  5   her appellate experience would be a good
14:44:01  6   intellectual meeting.
14:44:15  7       Q.    As part of your work on the appeal,
14:44:19  8   do you recall, did you suggest referencing jury
14:44:22  9   interview answers as part of the appellate
14:44:26 10   briefing?
14:44:28 11       A.    I don't know.  I think the jury
14:44:31 12   interviews were more related to the new trial
14:44:36 13   opposition, but I can't be certain.  At some
14:44:39 14   point in time we found it necessary to interview
14:44:41 15   the jurors on one of the two issues.
14:44:48 16       Q.    Okay.  And how did you go about
14:44:51 17   interviewing jurors?
14:44:52 18       A.    We looked at the statute; saw that it
14:44:55 19   was allowed -- it was a new statute by the way
14:44:58 20   at the time -- and we hired our private
14:45:01 21   investigator to go and interview jurors.
14:45:04 22       Q.    And who was the private investigator?
14:45:06 23       A.    I believe at that time it was Sarah
14:45:11 24   Alcorn.
```

COPLEY COURT REPORTING

199

```
14:45:11  1       Q.    Was that part of the expenses to
14:45:20  2   Kira?
14:45:20  3       A.    I don't know.  Can I look?
14:45:21  4       Q.    Sure.  I think it's Exhibit 11 is
14:45:24  5   that spreadsheet.
14:45:34  6       A.    I think her company is Greystone.
14:45:40  7   Yes, she's on here, Greystone, but understand
14:45:44  8   that she not only interviewed the jurors, she
14:45:52  9   went on some of the prison visits.
14:45:54 10       Q.    With Mr. Rivera?
14:45:57 11       A.    Yeah.
14:45:58 12       Q.    Okay.  Did you -- after Judge
14:46:05 13   Wilson's decision did you have anyone else other
14:46:07 14   than who we described today review the Wilson
14:46:13 15   decision and assess whether there was
14:46:14 16   misconduct?
14:46:18 17             MS. KNIPPER:  Objection.
14:46:19 18       A.    I don't know.
14:46:19 19       Q.    Do you recall indicating to Patty
14:46:27 20   DeJuneas or anyone else that you had various
14:46:30 21   scholars review the opinion to assess whether
14:46:33 22   there really was misconduct?
14:46:34 23       A.    I probably did.  I just don't have a
14:46:36 24   specific memory of it right now.
```

COPLEY COURT REPORTING

200

```
14:46:38  1       Q.    Okay.  So do you have any memory of
14:46:40  2   who those scholars are?
14:46:42  3       A.    I don't.
14:46:53  4             (Series of e-mails, dated
14:46:53  5   1/16/19, was marked Exhibit No. 29 for
14:46:56  6   identification.)
14:47:28  7       Q.    So, moving ahead now, now we're in
14:47:31  8   November, 2019, and there's an e-mail from you
14:47:38  9   on November 6th, 2019?
14:47:41 10       A.    That went to Bob?
14:47:43 11       Q.    Right.
14:47:44 12       A.    Yup.
14:47:45 13       Q.    And you copied Patty or actually it's
14:47:48 14   to Bob and Patty?
14:47:49 15       A.    And Patty, that's right.
14:47:50 16       Q.    This is after the second appellate
14:47:52 17   decision where the verdict was reinstated?
14:47:55 18       A.    That's correct.
14:47:56 19       Q.    Okay.
14:47:56 20       A.    Only one was published.  The first
14:47:58 21   one was published.  The second one wasn't
14:48:01 22   published.
14:48:02 23       Q.    And in your e-mail you say, "I can't
14:48:06 24   thank the two of you enough for your brilliance
```

COPLEY COURT REPORTING

**201**

14:48:10 1 and dedication to see to it that the law is
14:48:12 2 followed and that judges can be accountable for
14:48:14 3 their wrong decisions, too.  Bob, if you get a
14:48:18 4 chance, can you please let me know what were the
14:48:21 5 tipping points that had the Appeals Court write
14:48:23 6 it in a way that they did.  I want to learn and
14:48:25 7 I continue to teach my craft."
14:48:28 8          A.    Yes.
14:48:28 9          Q.    Were you able to talk with Judge
14:48:31 10 Cordy after that about the particulars?
14:48:34 11          A.    I talked with Judge Cordy after that
14:48:38 12 on all sorts of things.  He lived in North
14:48:41 13 Reading.  I'm sure I -- I'm sure we specifically
14:48:48 14 talked about it.
14:48:48 15          Q.    All right.
14:49:20 16                (Notice of Attorney's Lien,
14:49:20 17 dated 6/11/19, was marked Exhibit No. 30 for
14:49:20 18 identification.)
14:50:02 19          Q.    So, Exhibit 30, this is the Notice of
14:50:05 20 Attorney's Lien filed by Mr. Sobczak, right?
14:50:07 21          A.    It is.
14:50:07 22          Q.    And this is June 11th, 2019?
14:50:10 23          A.    That's what it's dated.
14:50:11 24          Q.    And to your knowledge does -- he

COPLEY COURT REPORTING

**202**

14:50:15 1 filed this notice and nothing else at that time,
14:50:17 2 right?
14:50:18 3          A.    Right, right, right.
14:50:21 4          Q.    And when I say specifically in this
14:50:23 5 case or did he file any documents with this
14:50:25 6 notice to your knowledge?
14:50:26 7          A.    No.
14:50:26 8          Q.    Okay.  And you and Mr. Sobczak had
14:50:33 9 already been involved in at least two other
14:50:36 10 cases litigating over disputes that involved
14:50:39 11 Mr. Sobczak's claims that he was owed money from
14:50:41 12 your firm?
14:50:42 13          A.    That's correct.
14:50:44 14          Q.    Okay.  And one was in Middlesex and
14:50:46 15 one was in Suffolk?
14:50:47 16          A.    Correct.
14:50:48 17          Q.    And what was your reaction when you
14:50:53 18 saw that he filed this Notice of Attorney's Lien
14:50:57 19 in this case?
14:51:03 20          A.    I was appalled.  I called Patty.
14:51:06 21          Q.    And I understand you might think it's
14:51:09 22 obvious, but for the record can you explain why
14:51:12 23 you were appalled?
14:51:13 24          A.    I felt it was a slap in Kira's face.

COPLEY COURT REPORTING

**203**

14:51:19 1 I felt and Patty believed that he was doing this
14:51:24 2 because he feels that he was wrongfully
14:51:26 3 discharged by Kira.  We also felt that he was
14:51:30 4 doing this because he already lost his pursuit
14:51:33 5 against me where he was seeking a piece of the
14:51:37 6 Wahlstrom fee from me in Middlesex.  He lost.
14:51:42 7 He appealed it.  He lost.  His appeal was found
14:51:46 8 frivolous.  He had to pay me 15,500 -- 15,750
14:51:51 9 bucks, something like that.  He then refused to
14:51:55 10 pay it.  I had to file a complaint for contempt
14:51:57 11 of court.  He eventually paid it and then was
14:52:03 12 found to owe me another $3200 for a complaint
14:52:07 13 for contempt.
14:52:09 14                He then filed the exact same lawsuit
14:52:12 15 in Suffolk County, again seeking a piece of the
14:52:15 16 Wahlstrom fee from me.  He lost.  He appealed
14:52:19 17 it.  He lost.  Then he filed a Notice of an
14:52:26 18 Attorney's Lien against Kira Wahlstrom.  It was
14:52:29 19 a slap in her face.  He's an officer of the
14:52:33 20 court.  He had no right to do it.  It was two
14:52:35 21 years after he was terminated.  That's contrary
14:52:39 22 to the law.  Choice words were said by Kira and
14:52:47 23 Patty.
14:52:48 24          Q.    And when this notice was filed, did

COPLEY COURT REPORTING

**204**

14:52:57 1 you believe you had to take action in the case
14:53:01 2 or could the lien sit there?  I should say the
14:53:08 3 notice of lien.  It's not a lien.
14:53:10 4                So did you believe that you had to
14:53:12 5 take action against this notice of lien?
14:53:14 6          A.    The certificate of service went to
14:53:20 7 Patty.  So Patty and I discussed that, yes, we
14:53:23 8 felt that it had to be addressed and that it
14:53:25 9 shouldn't be addressed by me or her.
14:53:30 10          Q.    What do you mean?
14:53:31 11          A.    That she shouldn't be -- that Patty
14:53:33 12 shouldn't be the one where she was the lawyer on
14:53:35 13 the appeal and I shouldn't be the one because
14:53:37 14 I'm the lawyer on the underlining case and this
14:53:42 15 is a direct hit against Kira and we felt it
14:53:47 16 would be better in Kira's best interest if
14:53:51 17 neither Patty or I represented Kira in defending
14:53:55 18 the attorney's lien against Mr. Sobczak.  We
14:53:59 19 believed from the get-go that this was done in
14:54:02 20 bad faith.
14:54:02 21          Q.    Did you also consider it a direct hit
14:54:05 22 at you?
14:54:07 23          A.    No, because I was already done.  All
14:54:10 24 his avenues against me were over, complete, in

COPLEY COURT REPORTING

213

| | |
15:04:29 1  A.   Not like that.  We have it in
15:04:33 2  specific -- I shouldn't say specific.  We have
15:04:37 3  it in the general sense.  Hey, Kira, I got to
15:04:40 4  pay -- I forget the name of the doctor in
15:04:44 5  California -- 10,000 per kid.  Hey, Kira, we got
15:04:48 6  deposition transcripts.  Here's a copy of the
15:04:50 7  deposition I just took.  Hey, we had to use
15:04:54 8  31,000 towards the defense of the lien, that
15:04:57 9  kind of acknowledgment and notice.
15:04:59 10  Q.   I see.  To update her after those
15:05:06 11  expenses were incurred?
15:05:07 12  A.   Right, right, right.
15:05:12 13  Q.   Okay.
15:05:38 14         (Letter, dated 9/12/19,
15:05:38 15  consisting of six pages, was marked Exhibit
15:06:07 16  No. 32 for identification.)
15:06:07 17  Q.   So Exhibit 31 should be a cover
15:06:09 18  letter, dated August 12th, 2019, from Goganian &
15:06:15 19  Associates, and while the cover letter indicates
15:06:16 20  multiple filings for this exhibit, the only one
15:06:20 21  attached is the Motion to Impound with the
15:06:24 22  Memorandum in Support of Impoundment, okay?
15:06:28 23  A.   Yes.
15:06:28 24  Q.   All right.  So did -- so at this

214

15:06:37 1  point in August, 2019, Attorney Goganian is
15:06:42 2  filing documents on behalf of the Law Offices of
15:06:46 3  David Hoey as well as for Kira Wahlstrom,
15:06:48 4  correct?
15:06:48 5  A.   That's correct, for Kira Wahlstrom's
15:06:54 6  benefit, behalf, by the way.
15:06:56 7  Q.   And if we take a look at the motion
15:06:59 8  to impound --
15:07:01 9  A.   Yes.
15:07:01 10  Q.   -- did you collaborate with Amy
15:07:03 11  Goganian -- excuse me, Amy Goganian, and give
15:07:08 12  your input on her filings?
15:07:10 13  A.   Probably.  I would envision that I
15:07:14 14  probably would do that.
15:07:14 15  Q.   Okay.  And this Motion to Impound
15:07:18 16  seeks to impound the actual Notice of Attorney's
15:07:22 17  Lien --
15:07:22 18  A.   Yeah.
15:07:22 19  Q.   -- in addition to related documents,
15:07:25 20  right?
15:07:25 21  A.   Anything with Kira's name on it.
15:07:28 22  Q.   The basis was because it had Kira's
15:07:34 23  name on it?
15:07:34 24  A.   The basis was where we believed

215

15:07:39 1  Sobczak was going to go.
15:07:39 2  Q.   Can you elaborate?
15:07:41 3  A.   Yes.  Attorney-client privileged
15:07:43 4  information, he was going to -- we were in fear
15:07:45 5  that he was going to take attorney-client
15:07:48 6  privileged information and disseminate it, and,
15:07:50 7  in fact, our fear came true because that's what
15:07:52 8  he did.
15:07:52 9  Q.   And so again this -- your impoundment
15:07:56 10  motion for the Law Offices of David Hoey seeks
15:07:59 11  to impound the notice of lien, itself, in
15:08:02 12  addition to any of those type of documents,
15:08:02 13  right?
15:08:04 14  A.   That's right.  Let me elaborate a
15:08:08 15  little bit more.  The notice of lien, although
15:08:10 16  it was not a proven lien, we felt, was going to
15:08:13 17  affect Zurich in a defense.
15:08:21 18  Q.   And by Zurich you mean the insurance
15:08:26 19  company for the JPA defendants in the underlying
15:08:28 20  case where you had secured a verdict?
15:08:30 21  A.   The excess -- the excess carrier.
15:08:32 22  Q.   And how -- what was your fear about
15:08:35 23  how it would affect Zurich?
15:08:37 24  A.   That one is that when the day comes

216

15:08:44 1  to release the money, they weren't going to
15:08:46 2  release the money if they knew there was a lien
15:08:49 3  in the case.  That was one fear.  Another fear
15:08:52 4  is we don't need them to know what's going on in
15:08:55 5  our tent.
15:09:04 6  Q.   Well, your prior litigation with
15:09:09 7  Mr. Sobczak in Middlesex and Suffolk --
15:09:12 8  A.   Yes.
15:09:12 9  Q.   -- was that completely impounded or
15:09:15 10  under seal that no one could even tell there had
15:09:18 11  been a lawsuit?
15:09:19 12  A.   No, but all the client references are
15:09:21 13  redacted.  All the attorney-client privileged
15:09:28 14  information is redacted.  So the public record
15:09:30 15  has multiple, multiple redactions in it.  Oh,
15:09:35 16  and the Suffolk case is impounded.  I'm sorry.
15:09:38 17  Lawsuit No. 1 up in Middlesex is a redacted
15:09:41 18  file.  Any attorney-client privileged
15:09:44 19  information, any client names, that's all
15:09:47 20  redacted, business transactions, work product,
15:09:48 21  all that kind of thing, all redacted in
15:09:50 22  Middlesex file.
15:09:51 23         The Suffolk file was impounded and
15:09:54 24  he lost the appeal and he didn't appeal the

COPLEY COURT REPORTING

## 333

| | |
|---|---|
| 17:59:53 | 1   ***CONFIDENTIAL PORTION OF PROCEEDINGS*** |
| 17:59:53 | 2      A.   ████████████ |
| 17:59:53 | 3      Q.   ██████████████████████ |
| 17:59:55 | 4   ██████████████████████ |
| 17:59:58 | 5   ██████████████████████ |
| 18:00:00 | 6   ████████████████████ |
| 18:00:01 | 7   ██████████████ |
| 18:00:03 | 8   ██████████████████████ |
| 18:00:05 | 9   ████████████████████ |
| 18:00:09 | 10  ████████████████████ |
| 18:00:10 | 11  ██████████ |
| 18:00:12 | 12     A.   ████████████████████ |
| 18:00:16 | 13  ██████████████████████████ |
| 18:00:19 | 14     Q.   ██████ |
| 18:00:20 | 15     A.   ████████ |
| 18:00:22 | 16     Q.   ██████████████ |
| 18:00:24 | 17  ██████ |
| 18:00:25 | 18     A.   ████████████████ |
| 18:00:26 | 19     Q.   ██████ |
| 18:00:33 | 20          MS. ZERNER:  I think we'll -- I'm |
| 18:00:35 | 21  going to suspend.  I know that's with an |
| 18:00:37 | 22  objection and we'll -- |
| 18:00:40 | 23          MS. KNIPPER:  Yes.  We're going to |
| 18:00:41 | 24  object to suspending and we're always open to |

COPLEY COURT REPORTING

## 334

| | |
|---|---|
| 18:00:44 | 1   ***CONFIDENTIAL PORTION OF PROCEEDINGS*** |
| 18:00:44 | 2   discussing it.  Of course, you asked if we would |
| 18:00:47 | 3   discuss it and we're open to discussing it, |
| 18:00:49 | 4   but right now we object to suspending the |
| 18:00:51 | 5   deposition. |
| 18:00:52 | 6          MS. ZERNER:  Understood. |
| 18:00:53 | 7          THE VIDEOGRAPHER:  This marks the |
| 18:00:55 | 8   end of today's deposition of David J. Hoey.  We |
| 18:00:58 | 9   are going off the record.  The time is 6:00 p.m. |
| 18:01:00 | 10         (Whereupon the deposition was |
| | 11  adjourned at 6:00 p.m.) |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |

COPLEY COURT REPORTING

## 335

**C E R T I F I C A T E**

1

2          I, **DAVID J. HOEY**, do hereby certify

3  that I have read the foregoing transcript of my

testimony given on February 20, 2023, and I

4  further certify that said transcript is a true

and accurate record of said (with the exception

of the following corrections listed):

5

6     Page      Line      Correction

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16

17    Dated at _____, this ____ day

18    of _____, 2023.

19    _____

      **DAVID J. HOEY**

20

Signed under the pains and penalties of perjury.

21

22

23

24

COPLEY COURT REPORTING

## 336

**C E R T I F I C A T E**

1

2

3    COMMONWEALTH OF MASSACHUSETTS

4    SUFFOLK, SS.

5          I, Kathleen M. McHugh, a Notary Public

6    in and for the Commonwealth of Massachusetts,

7    do hereby certify:

8          That **DAVID J. HOEY**, the witness whose

9    testimony is hereinbefore set forth, was duly

10   sworn by me and that such testimony is a true

11   and accurate record of my stenotype notes taken

12   in the foregoing matter, to the best of my

13   knowledge, skill and ability.

14         IN WITNESS WHEREOF, I have hereunto

15   set my hand and Notarial Seal this 25th day of

16   February, 2023.

17   _____

18   KATHLEEN M. MCHUGH

     CRR/RPR/CSR #120093

19   Notary Public

20

My Commission Expires:  June 29, 2029

21

22

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

23   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME

     BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL

24   AND/OR DIRECTION OF THE CERTIFYING REPORTER.

COPLEY COURT REPORTING

# EXHIBIT H

| From: | Krzysztof Sobczak <ksobczak@hoeylaw.com> |
|---|---|
| Sent: | Wednesday, September 10, 2014 4:59 PM |
| To: | Michael Kerrigan <mkerrigan@sloanewalsh.com>; David Hoey <dhoey@hoeylaw.com> |
| Cc: | Jarosak, John <Jarosak@litchfieldcavo.com>; jhanify@jonesday.com; Jeanne Russo <jrusso@sloanewalsh.com>; Lawrence Kenney <LKenney@sloanewalsh.com> |
| Subject: | RE: Wahlstrom v. Rivera - 3508 - Mediation & Offer |
| Attach: | 2014_09_10 DJH to MJK re settlement offer.pdf |

Dear Counsel,

Please see the attached.

Thank you,

Kris Sobczak

Krzysztof G. Sobczak, Esq.

Of Counsel

*Law Offices of David J. Hoey, P.C.*

352 Park Street, Suite 105

North Reading, MA 01864

p: 978-664-3633 | f: 978-664-3643

ksobczak@hoeylaw.com

NOTICE REGARDING PRIVILEGED/CONFIDENTIAL COMMUNICATION

The information contained in this electronic message, including any attachments, is intended only for the above-named addressee. The contents of this message are/may be protected by the attorney-client privilege, work product doctrine, joint defense privileges, and/or other applicable protections from disclosure. If the reader is not the intended recipient, you are hereby notified that any use, dissemination, distribution or reproduction of this communication is strictly prohibited. If you have received this communication in error or no longer have privileges thereto, please immediately notify The Law Offices of David J. Hoey at 978-664-3633.

From: Michael Kerrigan [mailto:mkerrigan@sloanewalsh.com]

Sent: Monday, September 08, 2014 6:49 PM

To: David Hoey

Cc: Jarosak, John; jhanify@jonesday.com; Krzysztof Sobczak; Jeanne Russo; Lawrence Kenney

Subject: Wahlstrom v. Rivera - 3508 - Mediation & Offer

David,

Please see the attached in response to your September 6, 2014 letter.

Thank you.

MJK

Michael J. Kerrigan, Esq.

Sloane & Walsh, LLP

3 Center Plaza, 8th Floor

Boston, MA 02108

Tel.: 617-523-6010

Fax: 617-227-0927

mkerrigan@sloanewalsh.com



EXHIBIT JV

4

Wahlstrom 1-31-23

LDH 0091991



## LAW OFFICES OF DAVID J. HOEY, P.C.

David J. Hoey*
Dale B. Andrews*
Richard T. Bromby *of counsel*
Krzysztof G. Sobczak *of counsel***
  **also admitted in New Hampshire*
 ****also admitted in Illinois*

352 Park Street, Suite 105
North Reading, MA 01864
T: (978) 664-3633
F: (978) 664-3643
www.hoeylaw.com

September 10, 2014

**Via First Class Mail & E-Mail**

Michael Kerrigan, Esq.
*Sloane & Walsh, LLP*
3 Center Plaza
Boston MA 02108-2012

    RE:    *Wahlstrom v. Rivera III et al.; Civil Action No.: SUCV2010-01022-G*

Dear Attorney Kerrigan:

My client and I are in receipt of your "joint offer of settlement." Your joint letter addresses many, many points, but it fails to address the most important point, and that is, the value of this case.

I mentioned in my letter that it has come to my attention that the defendants, or their insurance carriers do not value this case in the seven or eight figures range and therefore, mediating the case for less than that would be a waste of time.

Therefore, the "joint offer of settlement" of $450,000.00 is rejected.

Thank you for your prompt attention to this matter. Please do not hesitate to contact me with any questions.

Very truly yours,

David J. Hoey

DJH/kgs

cc:    All Counsel of Record (via e-mail only)

LDH 0091992

# EXHIBIT I

EXHIBIT C - 1

**From:** kira wahlstrom
**Sent:** Thursday, June 11, 2015 9:24 AM
**To:** David Hoey
**Subject:** RE: Case Questions

Perfect I'll be there!!!!

Sent from my MetroPCS 4G Wireless Phone

-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 12:22 PM (GMT-05:00)
To: kira wahlstrom <kirawahlstrom@live.com>
Cc:
Subject: RE: Case Questions

19th is good for signature and to visit Ann.
Meet me here at office at 9

**From:** kira wahlstrom [mailto:kirawahlstrom@live.com]
**Sent:** Thursday, June 11, 2015 12:14 PM
**To:** David Hoey
**Subject:** RE: Case Questions

Oh were not meeting at your office ok then can we do like 10 am. ?I'll meet you at your office at 9 am.  I have to be back to get scarlett for 4 pm.

I remember you said that about Don I just forgot.
I went to Dean for travel management.  I didn't go back to Bridgewater because I failed math, and school was very hard for me I am dislexic.  I love to work so I chose that path .

I can come by anytime to sign when is best. Do you need me to do it before the 19th or can I do it then?

Kira

Sent from my MetroPCS 4G Wireless Phone

-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 11:15 AM (GMT-05:00)
To: kira wahlstrom <kirawahlstrom@live.com>
Cc:

**EXHIBIT C - 2**

Subject: RE: Case Questions

I mentioned it to you one of the last couple of visits. It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money. Ill show it to you next time I see you.

What science?
Why didn't go back for second semester at Bridgewater?
9am would mean we would have to leave here at 8AM. I can do that if that is best

---

**From:** kira wahlstrom [mailto:kirawahlstrom@live.com]
**Sent:** Thursday, June 11, 2015 11:04 AM
**To:** David Hoey
**Subject:** RE: Case Questions

What is the new fee agreement?
I went to Nauset high school in eastham. Dean college in Franklin ma associate of science degree. And Bridgewater state for 1 semester.

19th would be best. What time do you think I'd prefer around 9 am

Kira

Sent from my MetroPCS 4G Wireless Phone

-------- Original message --------
From: David Hoey <DHoey@hoeylaw.com>
Date:06/11/2015 10:56 AM (GMT-05:00)
To: "kira wahlstrom (kirawahlstrom@live.com)" <kirawahlstrom@live.com>
Cc:
Subject: Case Questions

1) I need you to stop by and sign the new fee agreement with DON.
2) What high school did you graduate from and what year? What schooling did you have after high school? Any degrees? What school? What year?
3) Can you meet with Ann and me on June 19 or 22nd?

David J. Hoey, Esq.
Law Office of David J. Hoey, P.C.
352 Park Street, Suite 105
North Reading, MA 01864
p: 978-664-3633 | f: 978-664-3643
dhoey@hoeylaw.com
www.hoeylaw.com

# EXHIBIT J

# EXHIBIT D - 1

## MASSACHUSETTS CONTINGENT FEE AGREEMENT
### (TO BE EXECUTED IN DUPLICATE)

Date: 6/1/15   6/19/15

The Client(s):

| Kira Wahlstrom | 1227 Boston Road | Haverhill, MA 01835 |
|---|---|---|
| (Name) | (Street and Number) | (City or town) |

following the Court's allowance of the Pro Hac Vice admission motion, retains as "Attorney" **DON C. KEENAN and THE KEENAN LAW FIRM. P.C.** with an address of 148 Nassau St. NW, Atlanta GA to perform the legal services referred to in Paragraph (1) below. The Attorney agrees to perform them faithfully and with due diligence.

(1)    The claim, controversy, and other matters with reference to which the services are to be performed are:
*Premises liability claims and injuries received as a result of assault on or about May 1, 2009 in the Radisson Hotel Boston parking lot*

The Attorney will be providing services, including legal services and consulting, to the Client in connection with the Claim identified in paragraph 1 above. Because the engagement is limited to this specific undertaking, the Attorney's acceptance of this engagement does not involve an undertaking to provide any services to the Client or any of the Client's interests in any other matter unless specifically requested by the Client and agreed to by the Attorney in writing. After completion of this matter, changes may occur in pertinent laws or regulations that may have an impact upon your future rights and liabilities. Unless the Client engages the Attorney after completion of this matter to provide advice on future issues arising from this matter, the Attorney will have no obligation to provide any advice to the Client with respect to future legal developments.

The Client may limit or expand the scope of this engagement from time to time, provided that the Attorney must agree in writing to any changes in the scope of the representation. Except as otherwise agreed to in writing, the terms of this Agreement apply to all changes in the scope of engagement and to all additional engagements for the Client which the Attorney may undertake.

(2)    The contingency upon which compensation is to be paid is: **recovery of damages, whether by settlement, judgment or otherwise.**

(3)    The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: If no recovery is made, the Client shall not owe the Attorney any sum as attorney's fees, nor shall the Client be responsible to reimburse the Attorney for any costs, except as provided in Sections 6, 7 and 8.

# EXHIBIT D - 2



(4)  Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:

**33 and 1/3 % (thirty-three and one-third percent)** of gross amount recovered

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.

The percentage shall be applied to the amount of the recovery not including any attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater.  The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

Referring/Associated Counsel:
The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees.  Client understands that the Client will not be charged any additional legal fees.



(5)  The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of the Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney.  However, this agreement in no way obligates the Attorney to advance/lend any funds on this case.  The Attorney may choose to do so, and may choose to cease doing so for any reason whatsoever, with notice to the Client.



(6)  In the event that the Attorney makes a recommendation regarding the pursuit of the claim, including that a claim not be pursued, or that the claim should be settled, or that the claim should be dismissed, and the Client refuses to accept the recommendation by the Attorney, the Attorney may, at its option, withdraw from representation.  If the claim

# EXHIBIT D - 3

is in litigation, withdrawal will be subject to Court approval. Should the Attorney continue representation, the Client agrees to reimburse the Attorney for the amount of such costs, reasonable expenses and disbursements incurred thus far, and to pay all costs and expenses as incurred from that time forward, payable in advance.

(7)    This fee agreement applies to all services rendered in pursing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, and resolutions of Medicare liens and Medicaid claims.


x DCK

Pursuant to Massachusetts General Laws, any net proceeds (gross recovery less compensation, costs, and expenses) due to the Client at the time of settlement may, and if applicable, will, be subject to liens/attachment by, but not limited to, Medicare, Medicare Advantage Plans, MassHealth, Medicaid, Department of Revenue, Department of Transitional Assistance, Department of Estate Recovery, Department of Liability Recovery, SSI, private Health Insurance, Short Term/Long Term Disability claims, and medical providers, if any, that may be owed by the Client. All proper Liens will have to be satisfied before the balance of the settlement can be remitted to the Client.

Client hereby acknowledges and understands that current law and regulations regarding Medicare, Medicare Advantage Plans, Medicaid or private health insurance plans (healthcare providers) may require all parties involved in this matter (client, attorney, defendant, and any insurance companies) to compromise, settle, or execute a release of healthcare providers' separate claim for reimbursement / lien for past and future payments prior to distributing any verdict or settlement proceeds. Client agrees that the Attorney may take all steps in this matter deemed advisable for the handling of such claims, including hiring separate experts / case workers who assist with resolving any healthcare providers' reimbursement claims or liens for past and / or future injury-related medical care. The expense of any such service shall be treated as a case expense and deducted from the net recovery and shall not be paid out of the attorney's contingent fee in this matter.

(8)    If the client terminates the attorney-client relationship before the conclusion of the case for any reason, the attorney may seek payment for the work done and expenses advanced. Whether Attorney will receive any payment for the work done before the termination, and the amount of any payment, will depend on the benefit for the client of the services performed by Attorney as well as the timing and circumstances of the termination. Such payment shall not exceed the lesser of (i) the fair value of the legal services rendered by Attorney or (ii) the contingent fee to which the lawyer would have been entitled upon the occurrence of the contingency. This paragraph does not give Attorney any rights to payment beyond those conferred by existing law.


x DCK

(9)    The Attorney may withdraw from representing the Client if withdrawal can be accomplished without material adverse effect on the interest of the Client, or if:

x DCK

# EXHIBIT D - 4

(a)    the Client persists in a course of action involving the Attorney's services that the Attorney reasonably believes is criminal or fraudulent;

(b)    the Client has used the Attorney's services to perpetuate a crime or fraud;

(c)    the Client insists upon pursuing an objective that the Attorney considers repugnant or imprudent;

(d)    the Client fails substantially to fulfill an obligation to the Attorney regarding its services and has been given reasonable warning that the Attorney will withdraw unless the obligation is fulfilled;

(e)    the representation will result in an unreasonable financial burden on the Attorney or has been rendered unreasonably difficult by the Client; or

(f)    other good cause for withdrawal exists.

(10)    The Client is responsible for payment of all of the Client's former/prior counsel's reasonable attorney's fees and reasonable costs and expenses and the cost of resolving any dispute between the Client and any other prior counsel over fees or expenses relating to the claim identified in paragraph (1), **except** if the former/prior counsel is identified as the referring or associated counsel in paragraph (4),



(11)    During the course of the engagement, the Attorney shall maintain a file on the Client's behalf that will include both physical documents and electronically stored information ("the file"). The file may include either original or copies of material such as pleadings, transcripts, exhibits, reports, contracts, wills, certificates and other documents as are determined to be reasonably necessary to the representation. The file shall be and remain the Client's property. The Law Firm may also include in the file attorney work product, mental impressions and notes (collectively "work product"). The work product shall be and remain the property of the Attorney.

At the termination of the engagement, if requested in writing by the Client, the Attorney will return to the Client all original documents that were provided. Further, for a period of six (6) years (unless otherwise required by the Rules of Professional Conduct or applicable laws) after termination or upon conclusion of the engagement, and provided there are no outstanding unpaid statements for fees and/or costs or expenses owed by the Client to the Attorney, the Client shall have the right on request to take possession of the file, not including the work product, unless at the conclusion of the engagement, the Client has requested and/or confirmed in writing, that the Attorney properly dispose all or parts of the file (unless otherwise required by the Rules of Professional Conduct or applicable laws). In either such event, the Attorney, at his/her/its expense may make and retain copies of all or portions of the file. If the Client does not request possession of the file within this time period, the Attorney will have no further responsibility for the retention and maintenance of the file and may at its option properly dispose of all or parts of the file without further notice to you.



(12)    The Client hereby acknowledges and confirms, by signature on this agreement, and by initialing by all paragraphs (1-14), that the Attorney has explained the provisions of this agreement, where it differs from the SJC Model Form agreement, and specifically with the respect to responsibility for court costs and expenses of litigation. Additionally, the

# EXHIBIT D - 5

Client acknowledges that the Attorney has advised the Client that different forms of agreements may be available, and that the Client selects the provisions as stated herein. By signing below, the Client acknowledges that he or she has carefully read this Agreement, understands its contents, and agrees to be bound by all of its terms and conditions; that the Attorney has made no representation to the Client as to the likelihood of the outcome of any proceeding now pending or to be brought by or against the Client, and that the Client believes this Agreement to be fair and reasonable. The Client understands that the Attorney cannot and does not promise or even predict that its efforts will be successful, and this Agreement is not based upon any such promises or anticipated results. Furthermore, the Client understands it is possible that the cost to the Client of the Attorney's work may exceed the value of whatever the Client may gain.



(13)    This Contingent Fee Agreement (6 pages, 14 paragraphs, and attachments) encompasses the entire agreement of the parties (the Client and the Attorney), and supersedes all previous understandings and agreements between the parties, whether oral or written. The parties hereby acknowledge and represent that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this agreement. This agreement may only be modified in writing, signed by all parties the agreement.

(14)    This agreement and its performance are subject to rule 1.5 of the Rules of Professional Conduct as adopted by the Supreme Judicial Court ("SJC") of Massachusetts. (Last updated and effective as of January 1, 2013) (copy attached)

# EXHIBIT D - 6

WE HAVE EACH READ, UNDERSTOOD AND AGREED TO THE ABOVE
AGREEMENT BEFORE SIGNING IT. EACH PARTY HERETO ACKNOWLEDGES
RECEIPT OF AN EXECUTED DUPLICATE OF THIS AGREEMENT.


Signatures


*Kira Wahlstrom*
Client(s) (Print)


(Signature of Client(s))


DON C. KEENAN
for THE KEENAN LAW FIRM, P.C.
(Attorney)


(Signature of Attorney)


**THIS AGREEMENT BECOMES EFFECTIVE WHEN RETURNED TO AND SIGNED
BY THE ATTORNEY FOR THE LAW FIRM.**

# EXHIBIT K

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                                    SUPERIOR COURT
                                               C.A. NO. SUCV2010-01022

                                               *Recd*
                                               *7-17-15*
                                               *@ 10:12*

| |
|---|
| KIRA WAHLSTROM,<br>            Plaintiff,<br><br>v.<br><br>JOSE RUBEN RIVERA III,<br>RADISSON HOTELS INTERNATIONAL, INC.,<br>LAZ PARKING LIMITED, LLC,<br>JPA IV MANAGEMENT COMPANY, INC.<br>As Trustee of the John Philopoulos Associates<br>Trust and JPA I MANAGEMENT COMPANY,<br>INC.<br>            Defendants. |

## DEFENDANT, LAZ PARKING LIMITED, LLC'S MOTION IN LIMINE TO PRECLUDE USE OF COMPUTER ANIMATION AS DEMONSTRATIVE AID AT TRIAL

Now comes defendant, LAZ Parking Limited, LLC ("LAZ"), and submits a Memorandum of Law in support of its request that this Court issue an order precluding the plaintiff, Kira Wahlstrom, from making use of a computer animation as a "chalk" or "demonstrative aid" in support of her testimony at trial, on the basis that the animation is not probative of any fact actually at issue in this action, and therefore not helpful to the trier of fact; and is, by its nature, highly inflammatory and prejudicial.

It is within the trial judge's sound discretion to decide whether a chalk or demonstrative aid may be used, excluded, or admitted as evidence. *Everson v. Cas. Co. of Am.*, 208 Mass. 214, 220 (1911); *Commonwealth v. Mimless*, 53 Mass. App. Ct. 534, 539–40 (2002) (a thirty-four-page bar chart was found admissible where the witness was competent to testify regarding the chart's contents and the time standards used in it were based on industry guidelines);

*Commonwealth v. DiFonzo*, 31 Mass. App. Ct. 921, 923 (1991) ("a judge has considerable, but

not unrestrained, discretion as to the degree to which chalks can be used"); see also

*Commonwealth v. Mulica*, 401 Mass. 812, 821 (1988)(judge did not err in excluding films

depicting Vietnam war experiences, when offered as 'chalk' to explain origin of defendant's

post-traumatic stress disorder).

 A chalk or demonstrative aid may be used so long as it is "fair and accurate" *Cocco v.*

*Deluxe Systems, Inc.*, 25 Mass. App. Ct. 151, 157-58 (1987)(drawing of product, in product

liability action, depicting location of shredding start switch, was appropriate because it was a

'fair and accurate' depiction, based on witness testimony). Use of a demonstration, or

demonstrative aid, should not be allowed unless it is helpful to the fact-finder. <u>Compare</u>

*Commonwealth v. McGee*, 469 Mass. 1, 10 (2014)(live demonstration of manner in which victim

lay on couch during attack); <u>with</u> *Alholm v. Town of Wareham*, 371 Mass. 621, 631 (1976) (state

trooper's diagram not permitted, as state trooper arrived too late for testimony, and therefore,

diagram, to be useful as evidence of locations and orientations of vehicles at time of accident).

 Although Massachusetts courts have allowed "demonstrations" depicting how a violent

crime occurred, these "demonstrations" have been probative of an issue of fact actually in

dispute. In *Commonwealth v. McGee*, a witness was allowed to demonstrate how his mother lay

passively during her murder. 469 Mass. at 10. However, the manner in which the victim lay on

the couch was directly relevant to whether the defendant acted "in the heat of passion" or had an

opportunity to "cool off" between strangling and stabbing his victim. *Id*. Likewise, although

courts outside of Massachusetts have allowed use of computer animations as a "demonstrative

aid," these animations have only been allowed where the animation assists the fact-finder in

understanding a witness' testimony, or determining a fact actually in dispute. See, <u>e.g.</u> *Com. v.*

LDH 0006561

*Hardy*, 918 A.2d 766, 778 (PA, 2007)(computer animation allowed where it assisted fact-finder in understanding mechanism by which shaking infant leads to shaken-baby syndrome); *State v. Holmes*, 707 N.W.2d 337 (Iowa Ct. App. 2005)(same); *People v. Cauley*, 32 P.3d 602, 607 (Colo. App. 2001)(same).

The plaintiff has announced her intent to use an eight-minute, graphic, computer-animated depiction of her rape, as a "chalk" in connection with her verbal testimony at trial. This is an inappropriate use of a demonstrative aid, as it will not assist the fact-finder in understanding the plaintiff's testimony, or in determining any issue of disputed fact. The defendants do not dispute that the plaintiff was raped, or that the plaintiff was injured as a result of her rape. Neither the details of the rape, or the length of time that the assault spanned, have been disputed by the defendants. As such, the use of this "chalk" will not aid the jury in determining any fact actually at issue in this trial; rather, the chalk will only serve to inflame the jury, confuse the issues, and generate prejudice towards defendants and sympathy for the plaintiff.

The Defendant,
LAZ Parking Limited, LLC
By its attorneys,

John J. Jarosak, BBO #545988
Bethany P. Minich, BBO# 648163
Nora R. Adukonis, BBO #676932
Litchfield Cavo, LLP
6 Kimball Lane, Suite 200
Lynnfield, MA  01940
(781) 309-1500

Dated: July _____, 2015

# EXHIBIT L

**FOR TRIAL PURPOSES**
Volume:                    VI
Pages:                     92
Exhibits:                  22
Identification:            E-F


**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss.                    SUPERIOR COURT
SUCV10-1022-G                   DEPARTMENT OF THE
                                TRIAL COURT


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


KIRA WAHLSTROM
          Plaintiff


v


JOSE RUBEN RIVERA, III,
LAZ PARKING LIMITED, LLC,
JPA IV MANAGEMENT COMPANY, INC.,
as Trustee of the
John Philopoulos Associate Trust
JPA I MANAGEMENT COMPANY, INC.
          Defendants


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


          **DAY SIX - JURY TRIAL**
          **PORTION OF TRIAL**

          Before:  **WILSON, J. and JURY**
          Suffolk County Courthouse
          Boston, Massachusetts
          Tuesday, July 21, 2015




          **Elena Mercurio, CVR**
          **Certified Court Reporter**
     Video Transcript Specialists, Inc.
             P.O. Box 6343
          Boston, MA  02114
     Tel 617-267-3434 Fax 617-267-3232
          *VideoTranscript@gmail.com*

1     clear.

2           THE COURT:  If you have a

3     motion for a directed verdict, you

4     can stand and make that and tell me

5     why but I told you not to further

6     argue what I've already ruled on and

7     I said it four or five times.  And

8     please, when I say it, please,

9     please honor my wishes.  All right?

10    Thank you.

11          Now, do you want to make a

12    directed verdict motion?

13          MR. SOBCZAK:  Yes, your

14    Honor.  In light of the Court's

15    ruling that there be no testimony

16    coming on the affirmative defenses,

17    plaintiff moves for a directed

18    verdict on all affirmative defenses.

19          THE COURT:  All right.

20    Denied.  Thank you.  Now let's move

21    on.  Let me pause for a moment.

22          We get to the subject next of

23    the animation.  I've reviewed the

24    case law at some length.  I find

1    that it talks more about

2    demonstrations than simulations.  I

3    find that it gives me considerable

4    discretion with regard to admitting

5    or excluding a demonstration or an

6    animation of the sort proposed by

7    the plaintiffs.

8          I looked at the animation on

9    Friday and my analysis goes like

10   this.  First, what does the

11   animation illustrate?  It

12   illustrates an admissible topic

13   here, obviously, the details of Ms.

14   Wahlstrom's rape.

15         Is it based on -- what is it

16   based on?  It needs to be based on

17   evidence that will be in the record.

18   The evidence that it is based on, I

19   gathered from our conversation about

20   it, is entirely the testimony of Ms.

21   Wahlstrom.

22         MR. SOBCZAK:  No, your Honor.

23         THE COURT:  Is that wrong,

24   Mr. Kenney -- pardon me -- Mr.

1    Keenan?

2           MR. KEENAN:  If it was

3    anybody else.

4           THE COURT:  My apologies,

5    sir.

6           MR. KEENAN:  As I've tried to

7    enunciate at the hearing, the

8    forensic things like the distance

9    between the elevator stairwell, the

10   number of parking slots, the

11   lighting, all of that was the

12   forensic people verifying by a site

13   inspection.  And the most critical

14   thing is the time.  And the time is

15   verified by the videotape that shows

16   both of them coming in and then

17   Rivera leaving.  So those are things

18   -- well, perhaps Ms. Wahlstrom may

19   have known that, but she wasn't

20   counting.  She wasn't paying

21   attention to the other things and

22   really should have.  So it's a

23   combination of both.

24           THE COURT:  All right.  Thank

1          you for the clarification.

2                  I've encountered these video

3          simulations rarely and entirely in

4          cases where there's evidence coming

5          from different directions that would

6          be -- and a jury would be well-

7          served by seeing something that

8          wrapped it into one picture -- the

9          auto crash.  I have not encountered

10         airplane crashes, but I understand

11         it's used in airplane crashes, as

12         well -- where lots of fact

13         witnesses, or in the case of a plane

14         crash maybe not fact witnesses, but

15         experts are testifying to different

16         pieces of information that are then

17         put together in one simulation.

18                 That's not the situation we

19         have here except to the extent that

20         Mr. Keenan has suggested that there

21         are parameters of time and space

22         that are added to the testimony of

23         the one witness on whose testimony

24         the simulation is primarily based.

1      So that distinguishes it from cases

2      in which I see it to be particularly

3      probative.

4              It's true that Ms. Wahlstrom

5      would not be able to testify about

6      time or maybe number of parking

7      spaces, but that evidence can be

8      adduced from other sources, as Mr.

9      Keenan says, such as the time, based

10     on the videos of the rapist coming

11     and going.  And the number of

12     parking spaces, that's simply a

13     matter that anyone can go and

14     measure and testify to.  In fact,

15     maybe you're going to cross-examine

16     the hotel employees on that topic.

17             So the simulation starts off,

18     I think, as essentially explaining

19     the testimony of one witness.  So

20     then the question becomes, does it

21     accurately depict what it purports

22     to depict?  That is, does it

23     accurately reflect the testimony of

24     the one witness who is going to be

LDH 0010192

1          -- whose testimony will be
2          illustrated by it.
3                If Ms. Wahlstrom can remember
4          everything and therefore provide in
5          her testimony an adequate basis for
6          the simulation, I question whether
7          the simulation is necessary.  If she
8          can't, because as Mr. Keenan
9          properly says, this was a stressful
10         event, to put it mildly, and she
11         can't remember how long, for
12         instance, or she can't remember some
13         other details, then I question
14         whether the simulation does properly
15         reflect her testimony.
16               But I'll put that aside for
17         the moment and get to, I think, the
18         ultimate question with regard to any
19         simulation, which is:  Is it
20         helpful?
21               Where it's particularly
22         helpful to have a simulation or a
23         demonstration seems to me is best
24         illustrated by the most recent SJC

1      decision in the area, which is the
2      *McGee* case from a couple of years
3      ago.  That's a case in which the
4      witness was six years old and was
5      testifying about the struggle
6      between his parents that led to his
7      mother's murder.  And the judge,
8      Judge Tuttman, a very experienced
9      and well-respected criminal trial
10     judge, allowed a couch to be brought
11     into the courtroom and allowed the
12     six-year-old to simulate the
13     position of his mother on the couch
14     when she was -- at or around the
15     time of her murder.
16          And Judge Tuttman, the trial
17     court judge, said that she was doing
18     it because the boy was six years
19     old.  She quoted her testimony on
20     the subject of the position of his
21     mother on the couch and determined
22     appropriately, based on what he
23     said, that the child simply did not
24     have the vocabulary to describe the

LDH 0010194

1    spatial relations involved.

2         And the SJC quoted Judge

3    Tuttman and affirmed her decision to

4    allow that demonstration to take

5    place because it did not only

6    illustrate what the child was trying

7    to say but better explained to the

8    jury what he didn't have the

9    vocabulary to say.

10        This is also the reasoning in

11   cases in the sex offender area where

12   children are the complainants and

13   anatomically correct dolls are

14   permitted to be used in a

15   demonstration, such as the

16   *Trowbridge* case, I think.

17        Here, I think Ms. Wahlstrom

18   doesn't have the lack of capacity to

19   explain that a six-year-old does.

20   She can explain.  I expect she will

21   explain.  I expect it will be

22   painful for her to explain, and I

23   sympathize with her for that reason,

24   if I can say that word.  But I don't

LDH 0010195

1     see that this case has the same

2     characteristics as *McGee* or

3     *Trowbridge* or the other cases in

4     which the simulation actually added

5     to the -- gave the jury something

6     that could have come from the

7     testimony of a witness, but did not,

8     because of the witness's own

9     deficits, usually related to age,

10     and ability to explain things.

11     So I'm going to -- and on the

12     other side of the coin -- so as for

13     probative value, in addition to what

14     Ms. Wahlstrom will testify to, I

15     don't see that it's got much,

16     although it has some.

17     On the other side of that

18     balance, of course, is unfair

19     prejudice to the defendants.  Judge

20     Tuttman and the SJC were both very

21     clear in the *McGee* case that the

22     demonstration of the child where he

23     took the position on the couch that

24     he saw his mother in as she was

LDH 0010196

1        being murdered was very brief and
2        was not inflammatory.  This
3        simulation, by contrast, goes on for
4        eight or nine minutes, and it would
5        inevitably have the effect of
6        inflaming the emotions of the jury,
7        either angering them at Mr. Rivera
8        -- certainly a proper subject of
9        their anger -- but I wonder if that
10       anger then gets taken out on these
11       defendants who are before the jury
12       today.
13            And of course, it would evoke
14       sympathy for Ms. Wahlstrom, which,
15       as I said to the jury and will say
16       again in my closing instructions to
17       the jury, sympathy is a human
18       emotion that is to be respected and
19       honored, but it has no place in a
20       courtroom or in a jury deliberation
21       room.  And so I think that the
22       possibility of evoking sympathy --
23       inappropriate in their deliberations
24       -- on the jury's behalf or in making

25

1        it angry, generally speaking, is too

2        -- it far outweighs, substantially

3        outweighs the likelihood -- the

4        probative value of this lengthy and

5        powerful animation, and so I'm going

6        to exclude it from evidence.

7              I will give it to the court

8        reporter and ask her to mark it as

9        the next exhibit for identification

10       so it's there for the purposes of

11       the appellate record, but that's my

12       ruling on the animation.

13                    (DVD, marked E for

14                    Identification)

15             MR. KEENAN:  Your Honor, very

16       briefly.  I wish more judges,

17       frankly, would outline the reasons

18       for their rulings, because your

19       Honor's been most kind after that's

20       done to give us the opportunity to

21       come back the next morning and, if

22       there's something that we believe

23       the Court has missed, to be able to

24       reconsider it and go on.

LDH 0010198

1          So in that light, with all

2     due respect, your Honor, the second

3     and maybe most important reason for

4     that animation is damages.

5          THE COURT:  Yes.

6          MR. KEENAN:  And your Honor,

7     you yourself said it's powerful.

8          THE COURT:  It is.

9          MR. KEENAN:  And it's

10    emotional.  And it's powerful and

11    it's emotional not because of

12    distances and lighting, it's

13    powerful and emotional because of

14    what the woman went through, which

15    is damages.  And in this case, where

16    we have a particular obstacle of

17    essentially these being only

18    intangible damages -- we don't have

19    a life care plan or loss of income.

20    That's it.  Okay?

21          To deprive us being able to

22    visualize the circumstances and then

23    for her to talk about how it made

24    her feel, you know, hobbles our case

1    and I believe deprives us of the

2    ability to try the whole case, and

3    we would respectfully request to be

4    able to rebrief it and for your

5    Honor to reconsider it in light of

6    that.

7              THE COURT:  Well, I had in

8    mind damages.  I guess I didn't say

9    that.  It seems to me that damages

10   is the only topic on which it would

11   be relevant, or certainly the most

12   powerful -- the most obvious topic

13   on which it would be relevant.

14             MR. KEENAN:  Right.

15             THE COURT:  And I had that in

16   mind and I still worry that the

17   unfair prejudice, given the anger it

18   would inspire and the sympathy that

19   it would inspire even weighed

20   against the probative value on the

21   damages question, I think it is

22   outweighed substantially by the

23   danger of unfair prejudice, namely,

24   the anger at Rivera, which might be

1      misplaced under these defendants,

2      and the sympathy evoked for the

3      plaintiff, which, as I said, while

4      perfectly understandable and

5      appropriate, is not a proper subject

6      of a jury deliberation.

7          That being said, I'm not

8      going to prevent you from rebriefing

9      it, if you want.  I just would be

10     surprised.  I have given this a lot

11     of thought.  I spent the weekend

12     thinking about it.  I've read the

13     case law.  I've looked for

14     analogies, such as the *McGee* case

15     and the *Trowbridge* cases that I've

16     cited by name, but I've read lots of

17     other cases.  And I don't think I'm

18     going to change my mind, but if

19     you'd like to rebrief it, you can do

20     that.

21          MR. KEENAN:  Well, your

22     Honor, I have been down this road in

23     nearly a hundred cases.  I can tell

24     you that the way it comes in and

LDH 0010201

29

1       enunciated by the courts is damages.

2               THE COURT:  Yes, I recognize

3       that.

4               MR. KEENAN:  And I think your

5       Honor can see that.

6               THE COURT:  I recognize that.

7               MR. KEENAN:  Thank you, your

8       Honor.

9               THE COURT:  There's a related

10      issue, I suppose, of the silhouette.

11      I don't know that there's any

12      probative value to that.  I

13      understand, Mr. Keenan, your

14      argument again is damages.  You need

15      to see how large the man is and

16      here's the silhouette.

17              To put it into evidence,

18      first of all, would require somebody

19      to get up on the stand who prepared

20      it, it seems to me, and say here's

21      where I got these dimensions.

22      Height and weight on a police report

23      are one thing.  Breadth, et cetera,

24      is something else.  So someone will

LDH 0010202

92

## CERTIFICATE

I, Elena Mercurio, CVR, do hereby certify that the foregoing record, pages 1 through 92, inclusive, is a true and accurate transcription in the aforementioned matter to the best of my skill and ability.


_____

Elena Mercurio, CVR
Certified Court Reporter

LDH 0010265