IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION - BOSTON)

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>                              Plaintiff,<br>        -against-<br><br>DAVID J. HOEY, LAW OFFICES OF<br>DAVID J. HOEY, P.C., DON C. KEENAN,<br>D.C. KEENAN & ASSOCIATES, P.C. D/B/A<br>THE KEENAN LAW FIRM, P.C., AND<br>KEENAN'S KIDS FOUNDATION, INC.<br><br><br>                              Defendants | Civil Case No. 1:22-cv-10792-RGS |

**PLAINTIFF KIRA WAHLSTROM'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Kira Wahlstrom ("Kira"), through undersigned counsel, moves for partial summary judgment on some of her claims against Defendants David J. Hoey, Law Offices of David J. Hoey, P.C., Don C. Keenan, D.C. Keenan & Associates, P.C. d/b/a The Keenan Law Firm, P.C. and Keenan's Kids Foundation Inc. As shown below, they charged her unreasonable and unfair attorneys' fees and expenses in violation of Massachusetts General Law Chapter 93A, in breach of their fiduciary duty to her, and converted these monies they held in trust for her from the recovery in the premises liability case in which they represented her. Kira also moves for judgment on her conversion claim against the Foundation for money taken to pay its attorney.

To summarize, Hoey and Keenan between them: 1) induced Kira to enter a new second fee agreement late in the litigation which benefitted Hoey and Keenan at the expense of Kira without properly advising her of the changes in its fee terms; 2) charged an appeal fee that they did not earn and did not advise Kira would be owed; 3) charged her for additional attorneys as expenses, without obtaining Kira's informed consent, even though these other attorneys were engaged to protect Hoey and Keenan's own interests rather than Kira's; and 4) charged

exorbitant fees incurred for financing her litigation without properly advising and obtaining

Kira's consent before such an expense was incurred.

## UNDISPUTED FACTS

Kira relies on the separate statement of material undisputed facts submitted with this

memorandum (cited to as "SOF") which is summarized here.

### *The 2010 Fee Agreement with Hoey*

Kira met and entered a contingent fee agreement with David J. Hoey and his law firm

(referred to collectively as "Hoey") in February 2010. SOF 6, 7. Hoey was retained to pursue a

premises liability case against the owners of the garage where Kira was brutally raped on May 1,

2009. SOF 1-7. This agreement provided that upon any recovery in the case, Hoey was entitled

to 33.3% of the gross recovery and recovery of "his reasonable expenses and disbursements."[1]

SOF 7-9.

The case was filed in 2010 and in June 2012, Hoey enlisted the assistance of attorney

Don Keenan of Atlanta, Georgia and his law firm (collectively as "Keenan") but did not disclose

this to Kira. SOF 11-13. Keenan was incurring expenses on the case as of this time. SOF 13.

Keenan identified himself as "lead counsel" on the case as of July 3, 2012, a fact not known to

Kira. SOF 14. On February 24, 2013, Hoey and Keenan, without notifying and obtaining Kira's

consent as required Rule 1.5(3),[2] executed a "Contract for Legal Representation" which provided

---

[1]     The provision on expenses included hat "the attorney may borrow funds from time to time to pay
certain of the costs associated with pursuing and litigating the case and agree that, in addition to
reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any
interest charges and related expenses the attorney incurs in connection with such borrowings." SOF 9

[2]     Rule 1.5(e), Mass. R. Prof. C.: A division of a fee (including a referral fee) between lawyers who
are not in the same firm may be made only if the client is notified before or at the time the client enters
into a fee agreement for the matter that a division of fees will be made and consents to the joint
participation in writing.

terms on how they would divide any attorney fee recovered in Kira's case. SOF 15. As Hoey

admitted: "Kira Wahlstrom never approved this and she had to so because she didn't that makes

it invalid."  SOF 16.[3] Separately, in November 2013, Keenan founded the Keenan Ball Trial

College (now the Keenan Trial Institute), an educational program for trial attorneys, and Hoey

became its Dean of Students. SOF 17.

### The 2015 Fee Agreement with Keenan

Three years after Keenan had started working on her case, Kira met Keenan for the first

time in February 2015, just months before the July 2015 start date of her trial, and at that time

and at Hoey's suggestion, agreed to Keenan assisting with her going forward. SOF 19. On April

8, 2015, Hoey emailed attorney Andrew Gould of Keenan Law stating, "We need a new fee

agreement with the client" and attaching a draft Massachusetts contingency fee agreement with

Don Keenan and the Keenan Law Firm replacing Hoey as the "Attorney" to receive the

contingent fee. SOF 23. On June 1, 2015, Keenan executed that agreement. SOF 24. On June 11,

2015, Hoey emailed Kira stating that he needed her to sign a new fee agreement with Don

Keenan and when Kira asked, "What is the new fee agreement?", Hoey replied (SOF 25):

> I mentioned it to you one of the last couple of visits. It's the same fee agreement
> as before but with Don's [Keenan's] name since he is also trying the case with me
> on July 13th. It doesn't change your percentage or cost you more money. I'll
> show it you next time I see you."

On or around June 16, 2015, just a month before her trial, Kira was presented this 2015

Contingent Fee Agreement ("2015 CFA") to sign. SOF 27. It provided that Kira retained Don C.

Keenan and his firm as the "Attorney" to perform legal services for her case. *Id*. Neither Keenan

nor Hoey reviewed the terms of the new agreement with Kira, neither explained the differences

---

[3]      Rule 1.5(e) is intended to protect clients from unreasonable fees. *See, Saggese v. Kelley*, 445
Mass. 434, 441, 837 N.E.2d 699, 704 (2005) The client, as the intended beneficiary of the rule, may
invoke the rule to challenge a fee-sharing agreement as well as the fees. *Id.*

between the prior agreement and the new one, nor how expenses would be charged, and they did not advise Kira to seek independent counsel before signing the agreement. SOF 28-31. Hoey testified that Krzysztof Sobczak, of Hoey Law at the time, reviewed the fee agreement with Kira but Hoey does not know what Sobczak advised Kira. SOF 30. Sobczak does not recall reviewing the agreement with Kira and believes Hoey would have been the one to do so which Hoey did not do. SOF 29-31. Thus, the undisputed record is that no attorney reviewed with Kira the changes, much less advised her about any of them or how the new agreement benefitted the attorneys over Kira this late in litigation. SOF 25-33.

Yet, there were material differences between the 2010 CFA and the 2015 CFA including: Keenan was now the attorney to receive the contingency fee rather than Hoey; Kira was now responsible for the "reasonable expenses" of Keenan in addition to Hoey's expenses even though the agreement did not so state and this was not otherwise explained by the attorneys; and, most significantly given what they later charged Kira, the 2015 agreement added an appeal contingency fee of an extra seven percent, not mentioned in the 2010 CFA. *Compare*, Exhibit 1 (2010 CFA) and Exhibit 11 (2015 CFA).

### *The Trial and Post-Trial Motions*

Kira's case went to trial on July 14, 2015 and ended with a verdict in her favor of $4,000,000 on August 11, 2015. SOF 36-37. Her trial attorneys were Hoey and his associate Kris Sobczak and Keenan and his associate Andrew Gould. SOF 36. A total judgment of $6,650,829.58 (adding statutory interest) entered thereafter in September 2015. SOF 37. On September 24, 2015, the garage managers/owners (JPA) filed a motion for new trial arguing they should be granted a new trial based on attorney misconduct by Kira's trial attorneys. SOF 38. JPA attached as exhibits to their new trial motion excerpts from Keenan's book *The Keenan*

4

*Edge* and from Keenan's book *Reptile: The 2009 Manual of the Plaintiff's Revolution* -- both books discussing plaintiff trial attorney tactics. SOF 39. Keenan's Kids Foundation (d/b/a The Keenan Trial Institute) is the owner of the intellectual property rights in *The Keenan Edge* and *Reptile* books which are available for sale. SOF 40. Keenan and Hoey sought to seal the contents of the book, arguing that they were proprietary and engaged Attorney Richard Goren to litigate that motion which was ultimately denied. SOF 41, 42, 46. Goren never met Kira Wahlstrom, had no fee agreement with Kira, and directed his invoices to Hoey, not Kira. SOF 44. Hoey and Keenan took these fees from Kira's money they held in trust. SOF 126. Neither the 2010 nor the 2015 CFA even hinted that any such fees could be charged to her. *See*, Exhibits 1 and 11.

On May 19, 2016, the JPA defendants' new trial motion in the case was granted by the trial judge (Associate Justice Paul D. Wilson) ruling that Attorneys Hoey and Sobczak engaged in misconduct during trial. SOF 47. On May 30, 2016, Hoey emailed Sobczak:

> I'm gonna put the burden on you to stay in contact with Kira every day.
> Reason is threefold:
> 1) Her health and well-being
> 2) She could authorize us NOT to litigate anymore and drop the case
> 3) She could find another attorney.
> Two and three I'm out a lot of money.

SOF 48. Having recognized this conflict, Hoey did not advise Kira that there was any potential conflict of interest between her and him (or Keenan) after her verdict was taken away based on Hoey's misconduct during trial. SOF 48, 49.

After the new trial ruling, Hoey consulted his personal "ethics counsel" James Bolan. SOF 50-54. Bolan never met Kira, had no fee agreement with Kira, did not direct any invoices to her and Kira was not advised (in either CFA or otherwise) that he would be incurring fees on her behalf before any such fees were incurred. SOF 95-97. Yet Hoey charged Kira for his fees. SOF 127. Attorney Bolan's invoices reflect that after the JPA defendants filed their motion for new

trial, Bolan was consulted by Hoey and Sobczak on this motion *and* regarding a possible complaint or proceeding against them before the Massachusetts Board of Bar Overseers. SOF 52; Exhibit 21, Bolan Invoices. In June 2017, Sobczak consulted separately with the firm Lewis Brisbois Bisgaard & Smith LLP regarding a BBO disciplinary matter related to his conduct during Kira's trial. SOF 53-55. Kira was not informed of these attorneys' services or the disciplinary matters involving her own attorneys (SOF 53, 97) but years later she was improperly induced to pay for them by Hoey and Keenan (SOF 22, 117, 127, 131), as described below.

### *The Appeal*

To overturn the new trial order Kira retained Attorney Patricia DeJuneas to file a petition for interlocutory review with a Single Justice of the Appeals Court which was allowed permitting an interlocutory appeal. SOF 56. On February 28, 2017, Kira entered a separate fee agreement directly with Attorney DeJuneas to litigate the appeal. SOF 57. When Kira met with Attorney DeJuneas to review and sign the agreement, Hoey was also present but did not inform Kira that she would have to pay both Attorney DeJuneas and pay the 7% appeal contingency to Keenan under the 2015 CFA. SOF 58 (Hoey's testimony: Q. And during that meeting [with DeJuneas and Wahlstrom to sign the fee agreement] was it made clear to her that she [Kira] would also be paying the seven percent to you and Mr. Keenan? A. Not at that time, no. We were focusing on winning the appeal.")

Attorney DeJuneas, with assistance from retired Justice Robert J. Cordy, drafted and filed the appellate briefs for Kira and DeJuneas argued the case before the Massachusetts Appeals Court. SOF 59. Keenan did not file an appearance in the Appeals Court, nor did he draft the appellate briefs, stating at one point "I'm not an appellate lawyer, don't pretend to be, don't see the work through the POV of an appellate lawyer" and "since we've got a very good appellate

lawyer [DeJuneas], one who has impressed me, I would suggest we listen to her and do what she says." SOF 60, 61. Hoey also stated that he is not an appellate attorney and he did not draft or file the appellate briefs nor argue the appeal. SOF 59, 62, 69, 72.

During her drafting process, DeJuneas sent working drafts to Hoey and Keenan. SOF 63. Hoey contacted another attorney, John Vail, and asked Vail "as a favor to me" to review DeJuneas' draft appellate brief to "read it and make suggestions as if they were my [Hoey's] suggestions" and "Bill me directly for your time." SOF 64. Hoey did not inform Kira that he was enlisting Vail's help and would be charging her for Vail's work (SOF 65) nor did either CFA. Hoey received comments on the draft brief from Vail and then he cut and pasted Vail's comments in emails to DeJuneas as though they were his own comments. SOF 66. Kira did not know of Vail's involvement until provided the final expense itemization in March 2020 that inaccurately identified Vail as "Constitutional Law attorney." SOF 65, 129. She was charged for his time. SOF 129.

While Hoey was often in communication with DeJuneas during the appeal, generally, DeJuneas did not view Hoey's comments on her work as "participating on the appeal" but rather as "interfering" including because Hoey repeatedly urged her to defend his conduct at trial on the appeal which DeJuneas refused to do. SOF 67, 68. Instead DeJuneas' approach, which was ultimately successful, was to argue that the trial judge had used the wrong standard in granting the new trial. SOF 69. Attorney DeJuneas filed the opening appellant brief on March 9, 2018 and on June 6, 2018, after the JPA defendants filed their appellee brief, Hoey emailed Cordy and DeJuneas stating "I am too emotionally attached to the client and the case to read the Brief. I hope that you and Patty can put your heads together and come up with a solid Reply Brief." SOF 69, 71.  They did so and DeJuneas argued the appeal on November 9, 2018. SOF 72.

Before DeJuneas had even succeeded in overturning the new trial order on appeal (in November 2019), Hoey and Keenan were counting their money including the appeal upcharge. SOF 70. Emails between Keenan and Hoey concerning how to pay DeJuneas for her appellate work:

> 5/9/2018, Hoey to Keenan: Any thoughts on a % [contingency fee % to DeJuneas]

> 5/10/2018 Keenan to Hoey: The range of a Contingency fee is between five and 7% of the total money not of the Atty fees. That standard around the country but here I assume she's already been paid a boatload of money so the percentage should be lower. If she [DeJuneas] wins the appeal and as a result we collect the fee what would 3% be?

> Hoey to Keenan: That makes sense since our CFA is for 33.3.3 but if appeal add 7%

> Hoey to Keenan: At $6.6mill At 3% Patty's cut would be $200K

> Keenan to Hoey: What amt if 10 Milliron? [sic]

> Hoey to Keenan: Ahh. That's my number!! About $300k if 3%

SOF 70. Hoey and Keenan did not pay DeJuneas from the appeal contingency – they took that sum separately from the trust monies and paid DeJuneas separately, also from the trust monies. SOF 124.

On June 10, 2019, the Appeals Court ruled that the trial judge had applied the wrong legal standard in allowing a new trial but stayed the appeal until a ruling was made on a pending motion to disqualify the trial judge filed by DeJuneas based on public statements the judge had made about the case and the attorneys who appeared before him at the trial. SOF 73. On July 31, 2019, the trial judge recused himself and the Appeals Court then lifted the stay to decide the matter itself and, on November 6, 2019, the Appeals Court issued a Memorandum and Order holding that, even though Hoey and his associate engaged in misconduct during trial, a review of the record as whole showed "that the cumulative effect of the attorneys' misconduct does not

meet the 'relatively high' burden necessary to warrant a new trial." SOF 74, 75. The verdict and judgment thus stood. *Id*.

### The Sobczak / Hoey Fee Dispute

During the pendency of the appeal, a dispute arose between Hoey and his former associate Sobczak, over Sobczak's payment for his work on Kira's case. SOF 76, 77.l Sobczak and Hoey litigated their disputes in cases in Suffolk and Middlesex County Superior Courts in which Hoey was represented by James Bolan. SOF 78. On June 13, 2019, Sobczak filed a notice of lien for attorney's fees pursuant to Mass. G. L. ch. 221 §50 in Kira's case. SOF 79. Hoey well understood at the time Sobczak filed the lien that Sobczak was still seeking money from Hoey and he did not advise Kira as to any conflict of interest between Hoey and Kira with respect to the Sobczak lien dispute. SOF 86, 87. Hoey's attorney, Bolan, contacted attorney Amy Goganian of Goganian & Associates P.C. to respond to Sobczak's lien and around June 18, 2019, Hoey entered a fee agreement with Goganian identifying Hoey (not Kira) as the client and Hoey (not Kira) as the one responsible for paying Goganian's fees. SOF 81. Kira was not consulted nor provided this agreement before Hoey signed it and was not advised of Goganian's rates or terms of engagement or given the choice to hire anyone else. SOF 82. Hoey did not tell Kira that Goganian was being retained to represent Hoey and his law firm with respect to the Sobczak lien. *Id.* Some of the work for which Kira was charged were filings on behalf of Hoey only and motion papers in which Hoey participated in drafting, recognized that any valid claim by Sobczak for fees from the Wahlstrom case would be a claim against Hoey Law and not Kira. SOF 86, 89, 90. Kira did not enter a fee agreement with Goganian for the Sobczak lien and did not even meet or speak to Goganian who handled these matters until over a year later in or around October 2020. SOF 83, 84. Attorney Bolan represented Hoey against Sobczak in the

Suffolk and Middlesex County litigation and worked on behalf of Hoey with Goganian on

seeking dismissal of Sobczak's notice of lien filed in Kira's premises liability case and making

arguments on behalf of Hoey. SOF 93, 94, 96.

Neither Goganian nor Hoey contacted Sobczak to discuss whether he was seeking fees

directly from Kira. SOF 85. After over a year of litigation in November 2020, Sobczak emailed

counsel involved in the lien dispute and stated: "Presuming that you all have Ms. Wahlstrom's

best interest in mind, I assume someone has long ago explained to her that the notice of lien I

filed does not affect the amount of attorneys' fees she is responsible for on her case, as the

percentage amount stays the same regardless of how many attorneys are splitting it, and all these

alleged cost and fees that attorney Hoey is racking up is all just part of his ongoing personal

vendetta against me." SOF 91. Yet not one of these attorneys, least of all Hoey, had explained

any of this to Kira. SOF 85, 86, 87, 88. Attorney Goganian's invoices for handling the Sobczak

lien were directed to Hoey and she received payment from Hoey. SOF 92. Also, Attorney Bolan

did not direct any invoices for his work related to the Sobczak lien to Kira and, at his deposition,

Bolan could not explain how any of the time he billed to Hoey on his invoices benefited Kira

Wahlstrom. SOF 95, 98. Yet both Goganian and Bolan's fees to fight Sobczak were later charged

to Kira. SOF 127, 128.

### *Recovery in the Premises Liability Case*

After the Appeal Court reversed the new trial order, the insurance companies for JPA

paid the judgement in full which, with interest, totaled $9,987,683.80, and was wired to

Keenan's trust account on November 19, 2019. SOF 99, 100, 101. On November 20 and

November 22, 2019, Hoey emailed Keenan requesting $973,000 be wired to Hoey's account

(SOF 105) and Keenan promptly did so. SOF 106. On or around December 17, 2019, Hoey

arranged to wire $4,850,000.00 from Keenan's account to Kira and he emailed Kira's financial representative, copying Kira, and stated: "I just authorized a wire in the amount of $4.85 million. (More to come later)."  SOF 107. Yet he never sent additional funds to Kira. SOF 108.

On January 24, 2020, in an email to Hoey, Wahlstrom stated "We still need to go over the bill and the last of the money." SOF 110. Two months later, on March 29, 2020, Hoey emailed Kira stating "here is Excel accounting sheet" which provided the case fee and expense itemization. SOF 115. Kira did not double-check the math on the percentage calculation for the attorney's fees trusting that her attorneys had calculated it correctly and fairly and did not realize she paid an extra 7% ($695,808.57) to Keenan and Hoey which they charged her for the appeal as well as charging her for DeJuneas' and Cordy's fees separately. SOF 117. This expense sheet also included fees for additional attorneys engaged without Kira's prior consent.[4] SOF 44, 53, 55, 65, 82, 83, 97, 152. Kira was not provided any invoices for these additional attorneys at this time nor provided their fee agreements nor any other documentation of these charges. SOF 115. She was only given the expense itemization spreadsheet stating the total fees for each attorney and a few one-liners describing some of the expenses which did not fully explain these expenses or why they were incurred nor reveal how the work really was to benefit Hoey and Keenan rather than Kira. SOF 115. Kira was confused about these other additional attorney fee expenses but did not feel she could challenge or question Hoey or Keenan. SOF 117.

---

[4]     Including: Goganian's fees for the Sobczak lien ($41,231.72), Goran's fees for defending the Foundation's intellectual property ($20,824.00), Bolan's fees for assisting Hoey ($8,432.39), Vail's fees for providing comments on the appeal to Hoey though he was identified as a "constitutional law attorney" ($2,655.00), Catherine Giordano's fees for "research and writing" ($1,316.00), and Lewis Brisbois Bisgaard's fees ($561.25) for defending Sobczak against the Board of Bar Overseers. SOF 115, 126-131. Kira did not have a fee agreement with any of these attorneys whose work was not for her benefit but rather for the benefit of Keenan and Hoey. She did not authorize their being retained nor did she learn of it when they were retained by Keenan and Hoey – yet she was charged for their time, as shown herein.

Also, as indicated on the March 2020 spreadsheet, Kira was told by Hoey that she owed $238,839.29 for "Advocate Capital" identified as "the lender for the majority, but not all, of the litigation expenses." SOF 132, 135. During the litigation of the case, Kira was told by Hoey that he had taken out a loan to cover costs but was never informed of any material details of Hoey's contract with Advocate Capital, including the interest rate, the origination fees, or finance charges charged for each advance request which resulted in the $238,839.29 owed in interest charged on the $415,761.58 advanced to Hoey by Advocate Capital. SOF 132, 133. Neither Hoey nor Keenan ever advised Kira of any other option for litigation financing. SOF 113. Kira was not provided any documentation accounting for how Advocate Capital funds were used to pay expenses in her case. SOF 115, 133-137. Hoey did not (and still cannot) track each loan advance from Advocate Capital to any particular Wahlstrom expense to justify the advances he took and the associated fees incurred even though the advances should have been for expenses already incurred and thus documented.[5] SOF 137-140. Kira did not think she had any choice but to pay this cost but was never advised nor told to seek advice.[6] SOF 135. Despite the inappropriate charges and lack of explanation, thus not informed, Kira signed the final expense itemization at Hoey's office within a few days after she received it via email in March 2020. SOF 115, 117, 123.

---

[5]     The amounts advanced by Advocate Capital as reflected on the Case Balance Detail ledger do not match any particular expense on the final expense itemization and Hoey cannot show that each amount advanced was actually used to pay an expense in Kira's case.  SOF 137, 140; Compare, Exhibit 52, Final Fee and Expense Itemization with Exhibit 57, Advocate Capital Case Balance Detail.

[6]     Hoey had been advised by Keenan, his mentor, that Keenan thought financing was unfair to the client but did not discuss this with Kira. SOF 134.

*Kira Discovers that her Trial Attorneys Overcharged Her*

Kira had been referred to Hoey in 2010 by attorney Austin O'Toole. SOF 5, 6. At that time, O'Toole and Hoey entered a referral agreement, with the consent of Kira, that O'Toole would get 1/3 of Hoey's attorney fee recovery in the premises liability case, which would not have affected her recovery. SOF 10. On March 30, 2021, Attorney O'Toole filed suit against Hoey, Hoey Law *and against Kira* claiming that they all failed to pay O'Toole that agreed upon referral fee.[7] SOF 141. Hoey arranged for Goganian to represent Kira in this suit. *Id*. Kira had already been wondering why she was involved in the Sobczak lien dispute (described above) and now was questioning why she was a party to Hoey's dispute with O'Toole but did not know who to turn to address her concerns about continuing to pay for these attorney disputes as she felt she could no longer confide in David Hoey as he was directly involved in these fights. SOF 142, 143. As the litigation with Sobczak and O'Toole continued, Kira began going back over what Hoey had sent her regarding fees and expenses for her case and eventually first consulted with Attorney Goganian and then with Attorney DeJuneas, and after this consultation realized how she had been overcharged for the appeal and other expenses in her case. SOF 144. Kira then hired Markham Read Zerner and terminated Hoey from her other pending cases.[8] SOF 144.

On February 24, 2022 and March 2, 2022, Kira made demand on Hoey and Keenan, respectively, for return of: the appeal overcharge for the Hoey/Keenan "appeal" work never done nor authorized as well as for the fees of Goganian, Goran, Bolan, Vail, Giordano, and Lewis Brisbois Bisgaard totaling $770,828.93 as well as raising concerns about Advocate Capital and

---

[7]     Under the original 2010 CFA where Hoey was to receive the 33.3% of any recovery, and under the O'Toole/Hoey agreement O'Toole would have received a payment of over $1,000,000 but Hoey paid O'Toole only $250,000. Whatever the merits between these two lawyers, it was not Kira's liability.

[8]     These included a bad faith case against the insurers for unfair settlement practices in the premises liability case and her children's loss of consortium case. SOF 123.

demanding an accounting for the Advocate Capital financing and other expenses. SOF 154. On March 28, 2022, Hoey served a response to the demand through counsel in which he refused to pay anything back to Kira. SOF 155. On April 1, 2022, Keenan served a response to the demand through in which he offered $25,000 "as nuisance value." SOF 156. Keenan responded to the accounting demand: "we respectfully refer you to Mr. Hoey for that information because his office was in charge of tracking and documenting these costs, expenses and disbursements." SOF 158. Hoey provided some documentation but failed to provide a complete accounting of all expenses including failing to track all the monies advanced from him to Advocate Capital to paying legitimate and actual expenses in Kira's case. SOF 155; 136-140.

Kira would not have agreed to pay any of the fees and expenses on the belatedly sent and incomplete fee and expense itemization if she was fully informed about them and how and why they were being incurred. SOF 145-153.

## ARGUMENT

### I.    Summary Judgment Standard

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has properly supported her motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact could reasonably find in his favor." *Denovellis v. Shalala,* 124 F.3d 298, 305–06 (1st Cir.1997). While the Court views the record "in the light most favorable to the non-moving party" *Pineda v. Toomey,* 533 F.3d 50, 53 (1st Cir. 2008), the nonmovant "may not rely on conclusory allegations, improbable inferences, or unsupported speculation" but must, instead, 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.*

We start the legal discussion below by stating the well accepted law applicable to Chapter 93A, breach of fiduciary duty, and conversion as they specifically relate to attorneys, and then we discuss each of the wrongful takings from Kira's trust funds, including the appeal fees, the payments for other attorneys never agreed to, and the huge finance charges.

II.   **Massachusetts Law Applicable to Kira's Claims for Violations of M.G.L. 93A, for Breach of Fiduciary Duty, for Conversion, and for Money Had and Received**

   A.  **Massachusetts General Law Chapter 93A as Applied to Attorneys**

"General Laws c. 93A 'is a statute of broad impact' that prohibits 'unfair methods of competition' and 'unfair or deceptive acts or practices in the conduct of any trade or commerce.' " *Exxon Mobil Corp.* v. *Attorney General*, 479 Mass. 312, 315–316 (2018), cert. denied sub nom. *Exxon Mobil Corp.* v. *Healey*, 139 S. Ct. 794 (2019. An act or practice is "unfair" within the meaning of c. 93A "if it falls within at least the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers." *Id.* at 316. The standard in Massachusetts has been characterized in the often-quoted phrase as "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble ... world of commerce." *Gen. Elec. Co. v. Lyon*, 894 F. Supp. 544, 551 (D. Mas. 1995) (Ponsor, J.) Chapter 93A requires that the defendant's acts be either deceptive *or* unfair. G.L.c. 93A, § 2(a). A determination of what is fair or unfair is not dependent upon traditional tort or contract law concepts. *Heller v. Silverbranch Constr. Corp.,* 376 Mass. 621, 626 (1978). An equity standard is generally applied. *See Swanson v. Bankers Life Co.,* 389 Mass. 345, 349 (1983).

Unlawful billing or other unethical conduct by attorneys can constitute a violation of 93A. *See Sears, Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 15–20 (1st Cir. 1997); *see also, Doucette v. Kwiat,* 392 Mass. 915, 467 N.E.2d 1374 (1984) (finding that an attorney's

collection of a fee to which he was not entitled under his fee agreement violated Chapter 93A);

*Brown v. Gerstein*, 17 Mass.App.Ct. 558, 460 N.E.2d 1043, 1051–52 (1984) (lawyer's unethical

deceit toward his clients concerning the status of litigation violated Chapter 93A); *Guenard v.*

*Burke*, 387 Mass. 802, 443 N.E.2d 892, 896 (1982) (reliance on an illegal contingent fee

agreement to collect a fee violates Chapter 93A) Violations of the rules governing the legal

profession are relevant in Chapter 93A determinations. *Sears, supra*, 128 F.3d at 19. A finding of

a Chapter 93A violation does not depend on whether an attorney knowingly devised a scheme to

defraud the client or was merely opportunistic and reckless. *Id.* Omissions, as well as

misstatements, trigger 93A. *Costa v. FCA US LLC*, No. 20-CV-11810-ADB, 2022 WL

18910359, at *9 (D. Mass. Sept. 30, 2022)(Burroughs, J.)

To warrant an award of damages under G.L. c. 93A, there must be a causal connection

between the unfair or deceptive conduct and an adverse consequence or loss. *See, Casavant v.*

*Norwegian Cruise Line, Ltd.*, 76 Mass. App. Ct. 73, 77–78, 919 N.E.2d 165, 169–70 (2009),

*aff'd*, 460 Mass. 500, 952 N.E.2d 908 (2011) Causation is established if the deception "could

reasonably be found to have caused a person to act differently from the way he [or she]

otherwise would have acted." *Id*. Causation can also be established by determining whether

nondisclosure was of a material fact. *Id*. In the context of c. 93A claims based on nondisclosure,

"materiality ... is in a sense a proxy for causation." *Id*.

**B.  Breach of Fiduciary Duty Law as Applied to Attorneys**

To prevail on a claim for breach of fiduciary duty Kira must show: (1) the existence of a

fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach

of the duty and the damages. *See Baker v. Wilmer Cutler Pickering Hale & Dorr LLP*, 91 Mass.

16

App. Ct. 835, 842, 81 N.E.3d 782, 789 (2017)[9] There must be a causal connection between the client's claimed losses and the breach of duty on the part of the attorneys. *Meehan v. Shaughnessy*, 404 Mass. 419, 439, 535 N.E.2d 1255, 1266 (1989).

The relationship between attorney and client is fiduciary as matter of law. *Id*. A fiduciary relationship gives rise to "duty on the part of the fiduciary to act for the benefit of the other party to the relationship as to matters within the scope of the relationship." *Doe v. Harbor Sch., Inc.,* 446 Mass. 245, 252, 843 N.E.2d 1058 (2006) An attorney is liable to a client that suffers substantial injury from the attorney's breach of duty whether from "[i]ntentional breaches of fiduciary duties, such as the misappropriation of funds" or "inappropriate conflicts of interest, and the use of advantages arising out of the client-lawyer relationship." *Clark v. Rowe*, 428 Mass. 339, 345, 701 N.E.2d 624, 628 (1998)

"An attorney owes a client the obligations of full and fair disclosure..." *Opert v. Mellios,* 415 Mass. 634, 639 (1993). In Massachusetts, an attorney is held to the standard owed by a fiduciary, that of utmost good faith and loyalty. *Den Norske Bank A.S. v. First National Bank of Boston, N.A.,* 838 F.Supp. 19, 27 (D.Mass 1993); *Walsh v. Menton*, No. 932738H, 1994 WL 879470, at *2–3 (Mass. Super. Sept. 23, 1994)(where attorney ceased sending accountings to client and failed to return client's money upon demand without a good faith justification there was a breach of fiduciary duty)

The rules of professional responsibility set strict requirements for communications between a lawyer and client regarding fees.[10] *See* Mass.R.Prof.C. 1.4(b), as appearing in 471

---

[9]     The burden of establishing causation on a breach of fiduciary duty claim is low. *See, Resol. Tr. Corp. v. Gladstone*, 895 F. Supp. 356, 369 (D. Mass 1995)(Gertner, J.)

[10]     While a violation of a canon of ethics or a disciplinary rule may not itself create a cause of action, a violation of a disciplinary rule is evidence of the attorney's negligence. *Fishman v. Brooks*, 396 Mass. 643, 649–50, 487 N.E.2d 1377, 1381–82 (1986)

Mass. 1319 (2015) (lawyers must explain matters to their clients "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"); Mass.R.Prof.C. 1.5(b)(1), as appearing in 463 Mass. 1302 (2012) ("Any change[ ] in the basis or rate of the fee ... shall ... be communicated in writing to the client" [emphasis added] ). Also, "Massachusetts has established that a lawyer always bears the burden of proof in any proceeding to resolve a billing dispute…" *Sears, supra,* 128 F.3d at 17.

### C.  Conversion

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts, § 222A (1964). In order to recover for conversion, the plaintiff must show that "at the time of the alleged conversion he or she had actual possession or a right to immediate possession or control" in the allegedly converted property. *In re 604 Columbus Avenue Realty Trust,* 968 F.2d 1332, 1358 (1st Cir.1992). *See also, Walsh v. Menton*, No. 932738H, 1994 WL 879470, at *2 (Mass. Super. Sept. 23, 1994)(attorney's continuing possession of client's money after client's rightful demand for its return constitutes conversion).

As shown herein, applying the above law to the undisputed facts, the taking of Kira's monies held in trust by these attorneys was both deceptive and unfair by any measure and involved significant funds and thus obviously material charges requiring advance full and fair disclosure. When it comes to complying with the ethics rules applied to communicating with the client and obtaining informed consent for such expenses, these attorneys failed miserably. It is surely a breach of fiduciary duty to take over a million dollars from a client's recovery without

explaining or obtaining her informed consent but instead using her trust in her attorneys to

mislead and steal from her.

### III.     Hoey and Keenan Induced Kira to Enter the 2015 Contingency Fee Agreement in Violation of 93A and in Breach of their Fiduciary Duty to Her

The undisputed facts establish that Hoey and Keenan's conduct with regard to inducing

Kira to sign the 2015 CFA was unethical under 93A. *See, Cambridge Plating Co. v. Napco, Inc.,*

85 F.3d 752, 769 (1st Cir.1996). Hoey and Keenan failed to explain the terms and properly

advise Kira of the material differences between the first and second agreement in breach of their

fiduciary duty. And given the extra appeal charge and significant expenses charged for additional

attorneys they were certainly material. Neither Hoey nor Keenan advised her to seek independent

counsel when they were changing the agreement after five years of litigation and just one month

before trial to the benefit of the attorneys and not Kira. Additionally, Hoey's statement to Kira

that the 2015 CFA was the same as the 2010 CFA, when inducing her to sign, was unfair and

deceptive (completely false):

> . . . changes to the terms of an existing fee arrangement in the midst of an ongoing matter must "be viewed with special scrutiny." Id. at *23. This is especially true where the change benefits the attorney, so that the attorney must be able to "show the fairness of the transaction in all respects." Id. at *24 (internal quotation and citation omitted).
>
> *     *     *
>
> . . . the court must examine "whether the client's decision to agree to such a fee structure was an informed one." Id. In all circumstances, the court has the power to refuse to enforce a fee contract which is found to be "excessive and unreasonable" as a matter of law. *McInerney v. Massasoit Greyhound Assoc., Inc.*, 269 N.E.2d 211, 218 (1971).

*20 Atl. Ave. Corp. v. Allied Waste Indus., Inc.*, No. CV 03-10987-JGD, 2009 WL 10692728, at

*2 (D. Mass. Oct. 1, 2009) (Dein, MJ) By inducing Kira to enter this agreement, Hoey and

Keenan unfairly imposed more fees and expenses than were owed under the original agreement

causing her damage including the appeal upcharge and additional fees for other attorneys charged as expenses described above.

The 2015 CFA is thus void. *See*, *Guenard v. Burke*, 387 Mass. 802, 808, 443 N.E.2d 892, 895 (1982)("Where a fee agreement is entered in violation of a court rule, "[d]enying enforcement of the contingent fee agreement achieves" the purpose of the rule")[11] Hoey and Keenan therefore had no right to the extra money they took under 2015 CFA. Nor were they entitled to charge these additional expenses under the 2010 CFA, all of which is specifically discussed below.

### IV.    The Appeal Upcharge - $695,808.57

Hoey and Keenan wrongfully charged the appeal contingency to Kira. If the 2015 CFA is unenforceable, as described above, no appeal contingency was owed at all. Even if the 2015 CFA is enforceable, it was a clear breach of the terms of that agreement for Hoey and Keenan to take the appeal contingency when they were not appellate counsel and also where they did not even use that part of the fee to pay the actual appellate attorneys but instead separately charged Kira for those fees as well.

The 2015 CFA unambiguously provides:

(4) Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney [Don C. Keenan and The Keenan Law Firm PC], but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:

33 and 1/3 (thirty-three and one-third percent) of gross amount recovered

The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body *by the Attorney [Don C. Keenan and The*

---

[11]    Rule 1.5(e) is intended to protect clients from unreasonable fees. *See, Saggese v. Kelley*, 445 Mass. 434, 441, 837 N.E.2d 699, 704 (2005) The client, as the intended beneficiary of the rule, may invoke the rule to challenge a fee-sharing agreement as well as the fees. *Id.*

*Keenan Law Firm PC] on behalf of the Client, and an additional 5% of gross recovery Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.*

*The percentage shall be applied to the amount of the recovery not including an attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.*

SOF 32 [emphasis added] The unambiguous language provides that the appeal upcharge only applies if Keenan files an appellate brief in the appellate court, which he did not do nor did he handle the appeal. Instead, Hoey and Keenan waited until the end of the case and provided their itemization via email and in hardcopy for Kira to sign, neither of which indicated that their total fee amount was calculated as 40.3% of the recovery rather than 33.3%. There was no ratification by Kira as addressed below. Rather, inducing Kira to sign off on this upcharge at the end of the case was unfair and unethical under 93A and a breach of their fiduciary duty to her which caused her damage of at least $695,808.57 and the loss of use of those funds.[12] *See Sears, supra,* 128 F.3d at 19–20 ("Whether or not Goldstone's conduct [double-billing scheme] was knowingly fraudulent, the record clearly shows that his conduct fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'") Additionally, Hoey and Keenan have converted these funds by both taking them from Kira's trust funds and thereafter failing to return the money after demand.

---

[12]   Hoey testified that he contributed more to the appeal process than Keenan but that he personally received no part of the appeal upcharge that was taken from the recovery. SOF 68. It does not matter whether he received the appeal contingency or not because he clearly was involved in informing Kira of the fees and expenses she had to pay and failed to give her advance notice in order for her to give informed consent though he was the attorney that handled most communications on her case and he and Keenan are jointly liable.

V.      **The Advocate Capital Financing Charges - $238,839.29**

After ten years of litigation, Hoey gave Kira the final expense itemization including a

total of $238,839.29 for Advocate Capital litigation financing with the one-line explanation

"This is the lender for the majority, but not all, of the litigation expenses." Only in March 2020,

did Hoey tell Kira "who Advocate Capital is and what they do and how it benefited her case," at

a time when Kira felt she had no choice but to pay the expenses her attorneys told her she was

obligated to pay and even then the Advocate Capital contract terms were not disclosed.

The provision of the 2010 CFA (and identical provision in 2015 CFA) concerning

litigation financing did not give Hoey authorization to borrow funds through any arrangement

whatsoever and then charge the associated interest and related expenses to Kira without

explaining those substantial costs to her to obtain her informed consent in advance. It would be

unreasonable to read that paragraph providing that the attorney "may borrow funds" to be an

agreement to and approval of any financing arrangement without any further disclosures of such

an arrangement's terms and fees. Any ambiguity is construed against the drafter and that

"principle is particularly applicable where an attorney drafts a contingent fee contract which he

knows will be signed by a person without legal training." *Benalcazar v. Goldsmith*, 400 Mass.

111, 114, 507 N.E.2d 1043, 1045 (1987); *see also, Beatty v. NP Corp.*, 31 Mass. App. Ct. 606,

612, 581 N.E.2d 1311, 1315 (1991)("the meaning of a written document, if placed in doubt, is

construed against the party that wrote it" and "the principle surely counts double when the

drafter is a lawyer writing on his or her own account to a client")

Moreover, Hoey had a duty to Kira beyond the terms of the contract under the ethical

rules requiring Hoey to "promptly inform the client of any decision or circumstance with respect

to which the client's informed consent" is needed and requiring him to "explain a matter to the

extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.4(a), Mass. R. Prof. C. The CFA provision on borrowing funds itself is insufficient for Kira to give informed consent to any particular financing arrangement. Yet both Hoey and Keenan imposed these high finance costs on Kira (totaling $238,839.29 which amounted to over 50% of the $415,761.58 advanced to Hoey and Keenan to cover expenses during litigation that Kira also had to pay). In light of the undisputed facts, Hoey and Keenan unfairly imposed the Advocate Capital finance expense on Kira in violation of 93A and in breach of their fiduciary duty to her and have converted these funds by first taking them and by failing to repay after demand.

### VI.   Attorney Fees of Those Hired by Hoey and Keenan

Hoey and Keenan charged to Kira as expenses the following fees: Attorney Richard Goren Fees of $20,824.00, Bolan ($8,432.39), Vail ($2,655.00), Goganian ($41,231.72), Giordano ($1,316.00) and Lewis Brisbois Bisgaard & Smith LLC ($561.24) all in violation of 93A and in breach of their fiduciary duty and have converted these funds by taking them and failing to return the money after demand. Where fee agreements were actually entered with these additional attorneys, Hoey was the "client" and none were disclosed to Kira before these fees were incurred. Moreover, the work performed was not for the benefit of Kira. As just one example (of several), to show their brazenness, Hoey and Keenan charged Kira for the attorney they hired to seek to protect their Trial Institute's proprietary interest in a book in which Kira had no ownership or interest.

### VII.    There is No Merit to Defendants' Ratification Defense

Defendants' claim[13] that Kira voluntarily paid all these fees and expenses at issue here (discussed in Parts IV, V and VI above) when they provided her the expense itemization sheet in March 2020 to sign (after the money had already been taken) and thus, they argue, she "ratified" them such that she cannot now claim those charges were a breach of fiduciary duty or otherwise wrongful. This is ludicrous. Examination of the itemization spreadsheet and representations made by Hoey and Keenan shows that they failed to disclose any of the needed details for Kira to comprehend what the charges were for, much less why she should pay for them, both requirements of a fiduciary to his client. "Ratification must be based upon full knowledge of all material facts," or evidence of "wilful ignorance." *Fergus v. Ross*, 477 Mass. 563, 568, 79 N.E.3d 421, 426 (2017). *See, Puritan Medical Ctr., Inc. v. Cashman*, 413 Mass. 167, 172, 596 N.E.2d 1004 (1992), a case dealing with corporate ratification, which makes clear that "there may be no ratification of self-dealing without full disclosure" citing *Durfee v. Durfee & Canning*, 323 Mass. 187, 203, 80 N.E.2d 522, 531 (1948) which held:

> The mere existence of a suspicion that there has been a breach of trust is not sufficient to constitute a confirmation. For 'a cestui que trust to 'ratify' or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions.

The undisputed record shows that Kira did not have "full knowledge of all material facts" nor did she purposely shut [her] eyes to means of information with respect to the fees and expenses at issue. Kira, after having trusted and relied on Hoey for 10 years after the most traumatic and painful event of her life and after Hoey repeatedly represented himself as her protector, had no

---

[13]    *See*, Dkt. 16, Hoey Answer, p. 17 Affirmative Defense 11 (ratification); Dkt. 24, Keenan Answer, p. 9, Third Affirmative Defense (voluntary payment)

reason to think that her own attorneys were improperly charging her or were acting in their own self-interest, despite her initial unease about some of the listed expenses. *See, Berman v. Coakley*, 243 Mass. 348, 354–55, 137 N.E. 667, 670 (1923)("The attorney and client do not deal with each other at arm's length. The client often is in many respects powerless to resist the influence of [her] attorney.")

At the time she signed off on the expense itemization in March 2020, Kira had no reason to double-check the math on the fee and did not realize that the fee taken was 40.3% which included the appeal upcharge in addition to her paying appellate counsel DeJuneas and Cordy thus more than double paying for the appeal.[14] Kira was not provided the contract terms between Hoey and Advocate Capital nor provided an accounting of how that money was borrowed and used for her case (and Hoey still cannot track it to this day). Nor was Kira informed that Hoey had entered fee agreements with the other lawyers to help himself or any of the conflicts of interest involved.

### VIII.   Multiple Damages for Willful or Knowing Conduct Under 93A

The undisputed record establishes Hoey and Keenan knowingly employed an unfair or deceptive practice causing injury to Kira entitling her to double or treble damages.

> Chapter 93A, § 9(3), allows multiple damages of from two to three times actual damages for "a *willful or knowing* violation of ... section two...." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added). The "willful or knowing" requirement "is directed against callous and intentional violations of the law...." *Heller v. Silverbranch Constr. Corp.,* 376 Mass. 621, 382 N.E.2d 1065, 1070 (1978). The Supreme Judicial Court has said that "a finding of 'wil[l]ful' conduct within the meaning of [Ch.] 93A is satisfied where the defendant has acted recklessly." *Kattar v. Demoulas,* 433 Mass. 1, 739 N.E.2d 246, 259 (2000) (citations omitted). On the other hand, courts equate "knowing" conduct "with intentional acts." *Id.*

---

[14]      *See also, Kidder v. Greenman*, 283 Mass. 601, 615, 187 N.E. 42, 48 (1933) where SJC held that lessee did not ratify the terms in the lease where she received a copy of the lease but did not review the terms because "[s]he had no reason to think that the defendant… had not completed the lease in the authorized manner and, therefore, no occasion to examine it, when it was returned to her, to see if he had done so."

(citation omitted) (internal quotations omitted). "Ultimately, [Ch.] 93A ties
liability for multiple damages to the degree of the defendant's culpability." *Id.*
(citation omitted).

*In re Porcaro*, 545 B.R. 384, 397 (B.A.P. 1st Cir. 2016) G.L. c. 93A "ties liability for multiple

damages to the degree of the defendant's culpability by creating two classes of defendants" such

that "[t]hose defendants who have committed "relatively innocent violations" of the statute are

not liable for multiple damages, while a second class of defendants who have committed "willful

or knowing" violations are." *Datacomm Interface, Inc. v. Computerworld, Inc*., 396 Mass. 760,

779, 489 N.E.2d 185, 197 (1986) The violations here were not relatively innocent but violations

by attorneys knowingly taking advantage of their client and her trust in them to benefit their own

interests in violation of their duty of loyalty to Kira by taking more for themselves from Kira's

recovery awarded to her by a jury for the pain and suffering from the rape she suffered. *See, e.g.*

*Karasavas v. Gargano*, No. MICV201001419, 2014 WL 861029, at *7 (Mass. Super. Feb. 7,

2014), *aff'd,* 87 Mass. App. Ct. 1125, 31 N.E.3d 1191 (2015) ("Because of the number of

violations of Chapter 93A, and the fact they occurred not in an ordinary commercial relationship

but in attorney/client relationship in which the attorney owes a higher duty to the other party, I

conclude that it is appropriate to award treble damages to Plaintiff.")

Hoey and Keenan knowingly induced Kira to sign the 2015 CFA without either even

attempting to explain the differences and how it would cost her more money in fees and

expenses. Hoey explicitly misrepresented the agreement falsely as "the same fee agreement as

before" that "doesn't change your percentage or cost you more money" so Kira would not be

concerned about signing it. *See Brandt v. Olympic Constr., Inc*., 16 Mass.App.Ct. 913, 916

(1983) (deliberate misrepresentation is willful and knowing violation of G.L. c. 93A giving rise

to multiple damages). Hoey well knew the agreement was not the same. He sent the draft

agreement to Keenan two months earlier indicating he was familiar with the new version.
Keenan relied on Hoey to confer with Kira and made no effort to confirm that she was
sufficiently advised before she signed. Hoey well knew that Kira trusted him and knowing that
he told her that she needed to sign a new agreement so that Keenan could try the case with him,
that it was the same agreement just with Keenan's name, and would not cost her more money
when he well knew at the time that it would cost her more. *See*, *Datacomm,* 396 Mass. at 780
(actions involving fraudulent representations in knowing disregard of the truth encompass
culpable, "willful" behavior under the statute and entitle party to multiple damages); *Shaw v.
Rodman Ford Truck Center, Inc*., 19 Mass.App.Ct. 709, 711-12 (1985)( A "willful or knowing"
violation is one where either the defendant affirmatively knew that a material representation was
false or that the defendant made the representation with reckless disregard of its truth or falsity.")

Taking the 7% appeal upcharge from Kira's recovery was "a willful breach of contract
for the purpose of securing unbargained-for benefits" giving rise to liability under Chapter 93A.
*City of Revere v. Bos./Logan Airport Assocs., LLC.*, 443 F. Supp. 2d 121, 129 (D. Mass. 2006)
(Gorton, J.) citing *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 598 N.E.2d 666, 670
(Mass.App.Ct.1992) (summarizing rule that, in order for a breach of contract to constitute an
unfair act under Chapter 93A, the breach must be used "as a lever to obtain advantage for the
party committing the breach in relation to the other party; i.e., the breach of contract has an
extortionate quality that gives it the rancid flavor of unfairness"). When Kira engaged Attorney
DeJuneas as her appellate counsel, neither Hoey nor Keenan advised that they would take the 7%
appeal upcharge as well upon a recovery. Before DeJuneas had even succeeded in overturning
the new trial order on appeal (in November 2019), Hoey and Keenan were counting their money
including the upcharge, as shown by their emails cited above. Hoey and Keenan did not disclose

to DeJuneas that there was an appeal contingency in the 2015 CFA with Kira and they did not pay DeJuneas from the appeal contingency. Instead, they had Kira pay the $197,091.52 billed by DeJuneas for all her work on winning the appeal along with the $16,000 fee for the assistance of Cordy, while Hoey and Keenan took $695,808.57 as part of their own fee when they did not do the appellate work and, in fact, Hoey interfered with DeJuneas' efforts. Hoey and Keenan's failure to disclose to Kira that they would take an upcharge of 7% on top of Kira paying DeJuneas and Cordy was a knowing material omission and an unfair and deceptive act violation 93A.

As to the additional attorney's fees (those of the other lawyers listed as expenses) charged to Kira, Hoey and Keenan also knowingly failed to disclose to Kira in advance that they would charge her for the assistance of additional attorneys despite the fee agreement and Hoey's representation's that only the contingency fee would be taken to pay attorneys. Hoey had charged attorney fees as "expenses" in other cases prior to Kira and continued this practice here without advising Kira of his plan in advance. Hoey knew he would continue to charge Kira all expenses he chose to incur even after he had her sign the 2015 CFA which only required her to pay Keenan's expenses and no longer required her to pay expenses of Hoey. This included not only the additional attorneys' fees but also the Advocate Capital finance charges Hoey continued to accumulate by making many requests for funds that do not track with expense totals on the final itemization. Indeed, Hoey had also been advised by his mentor, Keenan, that Keenan thought financing was unfair to the client though made no mention of that to Kira.

Also, evidence of the knowing conduct of Hoey and Keenan in unfairly charging Kira is the fact that there is not just one wrongful charge but several, from the relatively small attorney invoice of $561.25 to that of $41,231.72. A clear pattern is established that anything at all related

to Kira's case was put on her bill even when these attorneys well knew they had not obtained her informed consent as required by the ethics rules and knew (or should have known) it was unfair to charge her for attorney services that benefitted them and not Kira. Also telling is that the additional attorneys themselves (Goganian, Bolan, Vail, Goren) were not told that Kira would ultimately have to pay their fees but thought they were being paid by Hoey.

The undisputed record shows Hoey and Keenan had a subjectively culpable state of mind by making deliberate misrepresentations and material omissions in their communications with Kira to constitute willful or knowing unfair and deceptive conduct in their dealings, from which they benefitted at her expense.

## IX.     Statutory Penalty Under Massachusetts Law

Massachusetts General Laws c. 221, § 51 imposes the following statutory penalty: "An attorney at law who unreasonably neglects to pay over money collected by him for and on behalf of a client, when demanded by the client, shall forfeit to such client five times the lawful interest of the money from the time of the demand." *See also, Auburn v. Tarvezian*, 85 Mass. App. Ct. 1106, 5 N.E.3d 1 (2014) (violation where "refusal to release the proceeds was not premised on a "good faith justification"); *Doucette v. Kwiat*, 392 Mass. 915, 917, 467 N.E.2d 1374, 1376 (1984) (attorney's collection of an additional fee was both an unfair act under 93A and violation of G.L. c. 221, § 51) Kira is therefore additionally entitled to five times the 12% per annum interest under Massachusetts law from the date of her demand.[15]

---

[15]     *See,* Mass. Gen. Laws Ann. ch. 231, § 6C ("In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.")

## CONCLUSION

Hoey and Keenan obtained a good result at Kira's trial with a high verdict. Nothing in the ethics rules, the common law or in any statute allows that to be a license to steal. Yet that is what they did. Summary judgment should enter against Defendants for taking Kira Wahlstrom's money to pay these fees and expenses: the appeal overcharge of $695,808.57, Goganian's fees of $41,231.72, Goran's fees of $20,824.00, Bolan's fees of $8,432.39, Vail's fees of $2,655.00, Giordano's fees of $1,316.00, Lewis Brisbois Bisgaard's fees of $561.25, and the Advocate Capital finance charges of $238,829.29 totaling: $1,009,658.22.

Damages should be multiplied for the knowing and willful conduct and penalty interest applied under Massachusetts law.

Dated: August 14, 2023                        Respectfully submitted,

                                              */s/ Bridget A. Zerner*
                                              Bridget A. Zerner (BBO No. 669468)
                                              John J.E. Markham, II (BBO No. 638579)
                                              MARKHAM READ ZERNER LLC
                                              11A Commercial Wharf West
                                              Boston, Massachusetts 02110
                                              Tel: (617) 523-6329
                                              Fax:(617) 742-8604
                                              bzerner@markhamreadzerner.com
                                              jmarkham@markhamreadzerner.com
                                              *Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

                                    */s/ Bridget A. Zerner*
                                    Bridget A. Zerner