IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION - BOSTON)

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>                              Plaintiff,<br><br>              -against-<br><br>DAVID J. HOEY, LAW OFFICES OF<br>DAVID J. HOEY, P.C., DON C. KEENAN,<br>D.C. KEENAN & ASSOCIATES, P.C. D/B/A<br>THE KEENAN LAW FIRM, P.C., AND<br>KEENAN'S KIDS FOUNDATION, INC.<br><br>                              Defendants | Civil Case No. 1:22-cv-10792-RGS |

**PLAINTIFF KIRA WAHLSTROM'S L.R. 56.1 STATEMENT OF FACTS**

Pursuant to Rule 56, Fed. R. Civ. P. and Local Rule 56.1, plaintiff Kira Wahlstrom

submits this statement of material facts of record as to which the moving party contends there is

no genuine issue to be tried.

**The Premises Liability Case**

1. On May 1, 2009, Plaintiff Kira Wahlstrom was brutally raped by Jose Rivera III in a
   parking garage attached to the Radisson hotel, located in downtown Boston just twelve
   days after Rivera raped another woman in the same garage before he returned to the
   garage and raped Ms. Wahlstrom. Dkt. 11, First Amended Complaint ("FAC"), ¶11; Dkt.
   16, Answer of David J. Hoey and Law Offices of David J. Hoey ("Hoey Answer"), ¶11;
   Dkt. 24, Answer of Don C. Keenan and the Keenan Law Firm ("Keenan Answer"), ¶11;
   Dkt. 30, Answer of Keenan's Kids Foundation ("KKF Answer"), ¶11.

2. The garage was owned by JPA IV Management Company, Inc. and managed/operated by
   JPA I Management Company, Inc. (collectively "JPA"). Dkt. 11, FAC, ¶12; Dkt. 16,
   Hoey Answer, ¶12; Dkt. 24, Keenan Answer, ¶12; Dkt. 30, KKF Answer, ¶12.

3. After the attack and rape of the first victim by Rivera, JPA failed to take measures to
   warn and failed to put in place increased security measures to protect other garage
   customers, like Ms. Wahlstrom, from the risk of a future rape. Dkt. 11, FAC, ¶12; Dkt.
   16, Hoey Answer, ¶12; Dkt. 24, Keenan Answer, ¶12; Dkt. 30, KKF Answer, ¶12.

4.  Just hours after Ms. Wahlstrom was attacked and brutalized, the Boston police finally arrested Rivera at nearby Tufts Medical Center when he came to the facility at the same time Ms. Wahlstrom was there in the emergency room for treatment for her injuries. Dkt. 11, FAC, ¶14; Dkt. 16, Hoey Answer, ¶14; Dkt. 24, Keenan Answer, ¶14; Dkt. 30, KKF Answer, ¶14.

5.  When Ms. Wahlstrom was subpoenaed to testify against Rivera before the grand jury, she contacted one of the few attorneys she knew, her then-friend, Austin O'Toole, for assistance. Dkt. 11, FAC, ¶15; Dkt, 16, Hoey Answer, ¶15; Dkt. 24, Keenan Answer, ¶15; Dkt. 30, KKF Answer, ¶15.

6.  Thereafter, O'Toole referred Ms. Wahlstrom to attorney Defendant David Hoey to handle her civil claims because O'Toole was not qualified to handle the premises liability case against the garage owners. Dkt. 11, FAC, ¶15; Dkt. 16, Hoey Answer, ¶15; Dkt. 24, Keenan Answer, ¶15; Dkt. 30, KKF Answer, ¶15.

**The 2010 Fee Agreement**

7.  On or about February 2, 2010, Ms. Wahlstrom entered a Contingent Fee Agreement with Defendant Law Offices of David J. Hoey, P.C. for Defendant David J. Hoey and his firm to a premises liability case against the garage owners. Exhibit 1, 2010 Contingent Fee Agreement.

8.  Ms. Wahlstrom agreed with Defendant Hoey to a contingent fee arrangement whereby he would receive payment of 33.3% of the gross amount recovered from fees recovered (referred to herein as the "2010 CFA"). Exhibit 1, 2010 Contingent Fee Agreement; Exhibit 2, Deposition of Kira Wahlstrom ("Wahlstrom Dep."), p. 13 line 6 to 12.

9.  The 2010 CFA provided in part:

    (1) The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*

    (2) The fee is to be paid upon recovery.

    (3) The Client is not to be liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none.

    (4) Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associate counsel shall be the following percentage of the gross amount collected for the client.

           33.3% of the gross amount recovered;

(5) The Client is to be liable to the attorney for his reasonable expenses and disbursements only if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

a)  It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

b)  AUSTIN S. O'TOOLE, ESQUIRE will receive periodic reports from the Attorney concerning the progress and disposition of the matter referred to in Paragraph (1) above. However, representation of the Client is to be undertaken by the Attorney and not the firm of AUSTIN S. O'TOOLE, ESQUIRE, personally. All questions, comments, inquiries and correspondence and the like concerning the legal matter which is the subject of this Agreement is to be directed to the Attorney and not to AUSTIN S. O'TOOLE, ESQUIRE, personally.
*   *   *

(7) This fee agreement applies to all services rendered in pursuing the above referenced claim, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships and trusts or estate services, resolutions of Medicare liens and Medicaid claims.

Exhibit 1, 2010 Contingent Fee Agreement.

10. With the consent of Ms. Wahlstrom, Hoey and O'Toole agreed that O'Toole would receive "33% of my [Hoey's] fee from the sum recovered." Exhibit 3, Referral Agreement.

11. On March 12, 2010, Hoey filed suit on behalf of Ms. Wahlstrom against the owner and operator of the hotel garage, JPA, and others, for negligence in Suffolk Superior Court titled *Wahlstrom v. JPA IV Management Company, Inc. et al.* No. 1084CV01022 (the "premises liability case." Dkt. 11, FAC, ¶20; Dkt. 16, Hoey Answer, ¶20; Dkt. 24, Keenan Answer, ¶20; Dkt. 30, KKF Answer, ¶20.

**Hoey and Keenan's Collaboration**

12. David Hoey and Defendant Don Keenan of Defendant D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C. (herein, "Keenan Law") met and started a professional relationship in 2010. Exhibit 4, Deposition of David Hoey ("Hoey Dep."), p. 12, line 23 to p. 15, line 16.

13. In June 2012, Keenan began assisting Hoey with the Wahlstrom case and incurring expenses but this was not disclosed to Ms. Wahlstrom. Exhibit 5, Don C. Keenan's Response to Plaintiff's Questions in Lieu of Appearing for a Deposition ("Keenan Response in Lieu of Deposition"), No. 1 and No. 4; Exhibit 4, Hoey Dep., p 82, line 6 to 9; Exhibit 6, Letter from Keenan Law, 7/3/2012; Exhibit 2, Wahlstrom Dep. p.17, line 8 to p. 19, line 9; Exhibit 7, Keenan Law Litigation Expenses, 12/9/2019; Declaration of Kira Wahlstrom ("Wahlstrom Declaration"), ¶5.

14. On July 3, 2012, in a letter to Hoey regarding "Wahlstrom v. Radisson Hotel, et al." Keenan identified himself as "lead counsel on this case" of which Ms. Wahlstrom was unaware at the time. Exhibit 6, Keenan Letter 7/3/2012; Wahlstrom Declaration, ¶5.

15. On February 24, 2013, Hoey and Keenan executed a Contract for Legal Representation which provided terms on how they would divide any attorney fee recovered including that Keenan would be entitled to 30% of all attorney's fees for consulting services through trial and that Keenan would be entitled to 40% of all attorney's fees if Keenan entered the case as attorney of record. Exhibit 8, Contract for Legal Representation, 2/24/2013; Exhibit 4, Hoey Dep, p. 83, line 3 to p. 84, line 13; Exhibit 5, Keenan Response in Lieu of Deposition, No. 3.

16. Hoey and Keenan did not inform Ms. Wahlstrom of this arrangement and she did not know that Keenan was working on her case in 2013. Exhibit 4, Hoey Dep., p. 86, line 15 to p. 89, line 3 (…So this was the agreement between us prior to him entering into a contingency fee agreement with Kira Wahlstrom. . . . Kira Wahlstrom never approved this and she had to so because she didn't that makes it invalid"); Exhibit 5, Keenan Response in Lieu of Deposition, No. 4; Wahlstrom Declaration, ¶4 and 5.

17. Keenan and his partner launched the Keenan Ball Trial College in November 2013 and then Hoey became the Dean of Students. It is now called the Keenan Law Institute and Hoey remains the Dean today. Exhibit 4, Hoey Dep., pp. 16-19.

18. In 2020, Hoey joined the Keenan Law Firm as a partner and was advanced $1 million on fees. Exhibit 5, Keenan Response in Lieu of Deposition, No. 9.

19. Kira Wahlstrom met Keenan for the first time in February 2015 and agreed to him assisting with her premises liability case at the recommendation of Hoey at that time. Wahlstrom Declaration, ¶4; Exhibit 4, Hoey Dep., p. 54, lines 3-24; Exhibit 5, Keenan Response in Lieu of Deposition, No. 4.

20. On March 13, 2015, just months before the trial date in the premises liability case, Keenan sought *pro hac vice* admission to appear which was allowed on March 27, 2015. Exhibit 9, Docket in Premises Liability Case, p. 15, Dkt. 150.

21. Hoey was the attorney that handled most communications with Ms. Wahlstrom throughout the 10-year litigation of her premises liability case. Wahlstrom Declaration, ¶3.

22. Ms. Wahlstrom and Hoey formed a close working relationship over the years during which Ms. Wahlstrom was coping with the trauma and difficulties in recovery from the attack and rape and she had come to particularly rely on Hoey for support and placed substantial trust in him in his role as her advocate and protector. Wahlstrom Declaration, ¶3; Exhibit 4, Hoey Dep. p. 42, line 11 to p. 43, line 19.

**The 2015 Fee Agreement**

23. On April 8, 2015, Hoey emailed attorney Andrew Gould of Keenan Law stating "We need a new fee agreement with the client" and attaching a draft Massachusetts contingency fee agreement with Don Keenan and the Keenan Law Firm replacing Hoey as the "Attorney" to receive the contingent fee.  Exhibit 10, Email from Hoey to Andrew Gould, 4/8/2015.

24. On June 1, 2015, Keenan executed the contingency fee agreement sent to his firm by Hoey. Exhibit 11**,** 2015 Contingency Fee Agreement ("2015 CFA").

25. On June 11, 2015, Hoey contacted Ms. Wahlstrom stating that he needed her to sign a new fee agreement with Don Keenan and when Ms. Wahlstrom asked "What is the new fee agreement?", Hoey replied "I mentioned it to you one of the last couple of visits. It's the same fee agreement as before but with Don's [Keenan] name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money. I'll show it you next time I see you." Exhibit 12, Email Exchange Between Hoey and Wahlstrom, 6/11/2015.

26. In the same email chain between Wahlstrom and Hoey on June 11, 2015, Ms. Wahlstrom stated "I didn't go back to Bridgewater because I failed math, and school was very hard for me I am dislexic." [sic]. Exhibit 12, Email Exchange Between Hoey and Wahlstrom, 6/11/15.

27. On June 16, 2015, just a month before her trial, Ms. Wahlstrom went to David Hoey's office and was presented the 2015 Contingent Fee Agreement that provided that Ms. Wahlstrom retains as "Attorney" Don C. Keenan and The Keenan Law Firm P.C. to perform legal services for her "Premises liability claims and injuries received as a result of assault on or about May 1, 2009, in the Raddison Hotel Boston parking lot." Exhibit 11, 2015 CFA.

28. Keenan did not review the terms of the new agreement with Kira Wahlstrom, he did not explain the differences between the prior agreement and the new one, and he did not advise Kira to seek independent counsel before signing the agreement. Exhibit 5, Keenan Response in Lieu of Deposition, No. 4.

29. Hoey did not explain the differences between the prior agreement and the new one and he did not advise Kira to seek independent counsel before signing the agreement. Exhibit 4, Hoey Dep., p. 56, line 10 to p. 61, line 20; Wahlstrom Declaration, ¶ 12 to 13.

30. While Hoey testified that Krzysztof Sobczak, an attorney working at his office at the time, reviewed the fee agreement with Kira, Hoey does not know what Sobczak advised Kira. Exhibit 4, Hoey Dep., p. 56, line 10 to p. 61, line 20; Exhibit 14, Hoey Dep. in O'Toole Case, p. 55, line 4 to p. 56, line 20.

31. Sobczak does not recall that he reviewed the 2015 CFA agreement with Kira Wahlstrom and believes Hoey did so and Kira has no memory of Sobczak explaining the 2015 CFA. Exhibit 13, Deposition of Attorney Krzysztof Sobczak ("Sobczak Dep.") p. 39, line 14 to p. 42, line 9 ("…I believe Mr. Hoey is the one that went over with her this. … I understand that was another one of those discussions that when it came to money, Mr. Hoey wanted to talk to the clients himself because it was his money."); Wahlstrom Declaration, ¶7.

32. The 2015 Contingent Fee Agreement (herein, "2015 CFA") provided for compensation as follows at paragraphs 4 and 5:

> (4) Reasonable compensation (including that of any referring and/or associated counsel) on the forgoing contingency is to paid by the Client to the Attorney [Don C. Keenan and The Keenan Law Firm PC], but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:
>
> 33 and 1/3 (thirty-three and one-third percent) of gross amount recovered
>
> The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney [Don C. Keenan and The Keenan Law Firm P.C.] on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retired/concluded/settled following an appellate decision.
>
> The percentage shall be applied to the amount of recovery not including an attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater.  The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

Referring/Associated Counsel:

The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: the Law Offices of David J. Hoey, P.C. and consents to this division of fees. Client understands that the client will not be charges any additional legal fees.

(5) The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses, and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.

The Attorney agrees to advance, on behalf of Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may chose to do so, and may choose to cease doing so for any reason, whatsoever, with notice to the Client.

Exhibit 11, 2015 CFA.

33. The 2015 CFA did not state the specific fee splitting arrangement between Keenan and Hoey nor did Hoey or Keenan otherwise disclose the arrangement to Ms. Wahlstrom. Exhibit 4, Hoey Dep., p. 60 line 11 to p. 62, line 18; Exhibit 5, Keenan Response in Lieu of Deposition, No. 4.

34. While the new 2015 CFA put in place only required Ms. Wahlstrom to pay the reasonable expenses of Keenan, Hoey continued to advance expenses that he was going to charge to Ms. Wahlstrom because "This is what we've been doing since 2010. We just stayed the course." Exhibit 14, Deposition of Hoey in O'Toole Case ("O'Toole Hoey Dep.") p. 82, line 8 to p. 84, line 8.

35. Hoey and Keenan did not explain that despite the language of the 2015 CFA, she would still have to pay all of Hoey's expenses as well as Keenan's expenses. Wahlstrom Declaration, ¶10.

**The Trial and Post-Trial Motions**

36. David Hoey, with his law associate Krysztof Sobczak, and Don Keenan, with his associate Andrew Gould, tried the case that began with jury selection on July 14, 2015,

and ended with a verdict on August 11, 2015.  Dkt. 11, FAC, ¶28; Dkt. 16, Hoey Answer, ¶28; Dkt. 24, Keenan Answers, ¶28; Dkt. 30, KKF Answer, ¶28.

37. Defendants obtained a jury verdict of $4 million against the garage owners and operators (JPA) that, with prejudgment interest and costs, resulted in a total judgment of $6,650,829.58 in 2015. Dkt. 11, FAC, ¶29; Dkt. 16, Hoey Answer, ¶29; Dkt. 24, Keenan Answer, ¶29; Dkt. 30, KKF Answer, ¶29.

38. On September 24, 2015, the garage managers/owners (JPA) filed a motion for new trial arguing they should be granted a new trial based on attorney misconduct by Ms. Wahlstrom's trial attorneys. Exhibit 15, JPA's Memorandum of Law in Support of Their Motion for New Trial, 9/24/2015.

39. JPA attached as exhibits to their new trial motion excerpts from Keenan's book *The Keenan Edge* and from Keenan's book *Reptile: The 2009 Manual of the Plaintiff's Revolution*. Exhibit 15, JPA's Memorandum of Law in Support of Their Motion for New Trial, pp. 7, 16 (citing to the exhibits).

40. Defendant Keenan's Kids Foundation is the owner of the intellectual property rights in *The Keenan Edge* and *Reptile* books which are offered for sale. Exhibit 16, KKF's Answers to Plaintiff Kira Wahlstrom's First Set of Interrogatories, No. 4; Exhibit 17, pp. 19-22, Supplemental Affidavit of Don C. Keenan.

41. Keenan and Hoey engaged Attorney Richard Goren to file and litigate a motion for impoundment of *The Keenan Edge* and *Reptile* book materials. Exhibit 17, Engagement Letter, p 1 to 6; Exhibit 5, Keenan Response in Lieu of Deposition, No. 4; Exhibit 18, Deposition of Attorney Richard Goren ("Goren Dep."), p. 17 line 18 to p. 19, line 18, and p. 24, line 10 to 21; Exhibit 17, pp. 1-6, Engagement Agreement; Exhibit 17, pp. 8-18, Motion for Impoundment.

42. The motion for impoundment sought to put the book materials under seal because "the owners of the proprietary material believed that it would harm their economic interests or their copyrights." Exhibit 18, Goren Dep., p. 29, lines 13-21; Exhibit 17, pp. 8-18, Motion for Impoundment (The filing in the public records of the Foundation's works will create a substantial risk of harm that cannot be remedied by an action at law. And because the market for these two works is compromised solely of trail lawyers, the availability of these works in the Clerk's Office for reading and copying will tend to interfere with the marketability of both works." Exhibit 17, p. 9)

43. Attorney Goren filed an appearance only on behalf of the Keenan's Kids Foundation. Exhibit 17, Notice of Appearance, p. 7.

44. Attorney Goren never met Kira Wahlstrom, had no fee agreement with Wahlstrom, and directed his invoices to Hoey, not Wahlstrom. Exhibit 18, Goren Dep., p. 17, line 1 to 23.

45. Attorney Goren required a release from Hoey (and his firm), Keenan (and his firm) and the Keenan's Kids Foundation before he would produce any documents from his files to Kira Wahlstrom concerning the impoundment motion in the instant case. Exhibit 18, Goren Dep., p. 8, line 22 to p. 11, line 16.

46. The motion for impoundment filed in the premises liability case on behalf of the Keenan's Kids Foundation was denied. Exhibit 17, Motion for Impoundment, p. 8 to 18.

47. On May 19, 2016, the JPA defendants' new trial motion in the premises liability case was granted by the trial judge (Associate Justice Paul D. Wilson) ruling that Attorneys Hoey and Sobczak engaged in misconduct. *See, Wahlstrom v. LAZ Parking Ltd. LLC.* No. SUCV20101022, 2016 WL 3919503 (Mass. Super. May 19, 2016); Exhibit 64, pp. 1 to 9.

48. On May 30, 2016, Hoey emailed Sobczak:

    I'm gonna put the burden on you to stay in contact with Kira every day.
    Reason is threefold:
        1)  Her health and well-being
        2)  She could authorize us NOT to litigate anymore and drop the case
        3)  She could find another attorney.
    Two and three I'm out a lot of money.

    Exhibit 19, Email from Hoey to Sobczak, 5/30/2016.

49. Hoey did not advise Ms. Wahlstrom that there was any potential conflict of interest between her and her trial attorneys after her verdict was taken away on the grounds that Hoey and Sobczak committed misconduct during trial. Wahlstrom Declaration, ¶15.

50. Attorney James Bolan has represented Hoey and has been referred to as Hoey's "ethics counsel."  Exhibit 20, Deposition of Attorney James Bolan ("Bolan Dep.") p. 20, line 18 to p. 22, line 19; Exhibit 4, Hoey Dep., p. 108, line 23 to p. 109, line 5.

51. During his deposition taken in the instant case, when Attorney Bolan was asked if he provided any legal services to Hoey related to Judge Wilson's finding of misconduct, Attorney Bolan was instructed not to answer the question by Hoey's counsel. Exhibit 20, Bolan Dep. p. 85, line 8 to p. 87, line 10.

52. Attorney Bolan's invoices reflect that after the JPA defendants files their motion for new trial on September 24, 2015 arguing that Hoey and others committed misconduct during trial, Bolan was consulted by Sobczak and Hoey on the motion and a later entry, after Judge Wilson issued his new trial order, reflects the following time entry by Bolan on June 2, 2017:

    Board of Bar Overseers: Attention to e-mails from and to D. Hoey and P. DeJuneas regarding Wahlstrom appeal. Review of comments of J. Wilson (clearly focused on KS not DJH)

Exhibit 21, Attorney James Bolan Invoices

53. On July 31, 2017, Lewis Brisbois Bisgaard & Smith LLP issued an invoice to the Law Office of David J. Hoey, PC regarding "Krzysztof Sobczak Disciplinary Matter" which was received by Hoey but Ms. Wahlstrom was not informed of this firm's work nor informed that she would have to pay for them.  Exhibit 22, Lewis Brisbois Bisgaard & Smith LLP Invoices; Exhibit 4, Hoey Dep., p. 141, line 13 to p. 142 line 23; Wahlstrom Declaration, ¶¶ 15, 20, 38.

54. The Lewis Brisbois firm represented Sobczak concerning a complaint to the Board of Bar Overseers for his conduct during the Wahlstrom trial. Exhibit 13, Sobczak Dep., p. 64, line 1 to 11 ("that was the counsel that was hired by the [Hoey Law] firm's insurer dealing with the decision, Judge Wilson decision. My understanding is that was the counsel that was personally assigned to me, Mr. Hoey had a different counsel assigned"); p. 64, line 24 to p. 66, line 5.

55. Kris Sobczak did not discuss the Lewis Brisbois invoice with Ms. Wahlstrom nor tell her she would be charged for their work. Exhibit 13, Sobczak Dep., p. 67, lines 4-24; Wahlstrom Declaration, ¶ 20 and 38.

## The Appeal

56. Ms. Wahlstrom, through Attorney Patricia DeJuneas, filed a petition for interlocutory review with a Single Justice of the Appeals Court, who allowed an immediate interlocutory appeal. Exhibit 23, Plaintiff's Notice of Interlocutory Appeal.

57. On February 28, 2017, Ms. Wahlstrom entered a fee agreement directly with Attorney DeJuneas to litigate the appeal. Exhibit 24, Attorney Patricia DeJuneas Fee Agreement.

58. When Ms. Wahlstrom met with Attorney DeJuneas to review and sign the agreement, Hoey was also present but did not inform Ms. Wahlstrom that she would have to pay both Attorney DeJuneas and pay the appeal contingency to Keenan under the 2015 CFA. Exhibit 4, Hoey Dep., p. 152, line 16 to p. 154, line 4; Exhibit 4, Hoey Dep., ("Not at that time, no. We were focusing on winning the appeal"), p.153 line 8 to 9.

59. Attorney DeJuneas with assistance from Robert J. Cordy, drafted and filed the appellate briefs for Ms. Wahlstrom and Attorney DeJuneas argued the case before the Massachusetts Appeals Court which Hoey and Ms. Wahlstrom attended together to watch. Exhibit 25, Attorney Patricia DeJuneas Deposition ("DeJuneas Dep.")  p. 15, line 24 to p. 16 line, 19; Exhibit 2, Wahlstrom Dep., p. 74, line 19 to p. 76, line 4.

60. Keenan did not file an appearance in the Appeals Court nor did he seek permission to do so via a motion for *pro hac vice* admission nor did he draft the appellate briefs. Dkt. 11, FAC, ¶35; Dkt. 24, Keenan Answer, ¶35; Exhibit 5, Keenan Response in Lieu of Deposition, No. 8.

61. Keenan stated to Attorney DeJuneas, Hoey, and others that he is not an appellate lawyer, nor does he pretend to be. Exhibit 26, Keenan Email 4/15/2016 ("Y'all know me so my first reaction is to attack and hit 'em hard. However I'm not an appellate lawyer, don't pretend to be, don't see the work through the POV of an appellate lawyer. So since we've got a very good appellate lawyer, one who has impressed me, I would suggest we listen to her and do what she says.")

62. Hoey is not an appellate attorney. Exhibit 4, Hoey Dep., p. 155, line 5 to line 9; Exhibit 27, Email from Hoey to Sobczak, 6/2/2016 ("We are trial attorneys. Not appealant [sic] attorneys or media attorneys")

63. During her drafting process, DeJuneas sent working drafts to Hoey and Keenan. Exhibit 28, Hoey Emails to Vail, p. 3.

64. Hoey contacted Attorney John Vail and asked Vail "This is a favor to me" to review Attorney DeJuneas' draft appellate brief and "read it and make suggestions as if they were my suggestions" and "Bill me directly for your time." Exhibit 4, Hoey Dep., p. 192, line 9 to p. 193, line 4; Exhibit 28, Hoey Emails with Vail, p. 3.

65. Hoey did not inform Ms. Wahlstrom that he was enlisting Vail's help and would be charging her for Vail's work. Exhibit 4, Hoey Dep., p. 194, line 19 to p. 195, line 20.

66. Hoey received comments on the draft brief from Attorney Vail and then he cut and pasted Vail's comments in emails to Attorney DeJuneas as though they were his own comments. Exhibit 4, Hoey Dep., p. 186, line 8 to p. 189, line 3; Exhibit 28, Hoey Emails with Vail, p. 2 and 5.

67. Attorney DeJuneas did not view Hoey's comments on her appellate work as "participating on the appeal" but rather as "interfering" including because Hoey repeatedly urged her to defend his conduct at trial on the appeal which Attorney DeJuneas refused to do. Exhibit 25, DeJuneas Dep., p. 46, line 7 to p. 47, line 1; Exhibit 28, Hoey Emails with Vail, p. 7 to 10; Exhibit 29, 11/24/2016 DeJuneas Email to her associate ("Hoey is driving me nuts. Now he wants me to argue that they didn't engage in misconduct. Ummmm…yeah, you did. It just doesn't warrant a new trial.")

68. Hoey engaged more with Attorney DeJuneas about the appeal than Keenan but claims he personally received no part of the appeal contingency. Exhibit 4, Hoey Dep., p. 153, line 10 to line 23; Exhibit 25, DeJuneas Dep., p. 96, lines 11-22 (DeJuneas: "I don't think I ever had any discussions with Don about the appeal other than the petition for interlocutory appeal…").

69. Attorney DeJuneas filed the opening appellant brief on March 9, 2018 arguing that the trial judge had applied the wrong standard in grating a new trial. Exhibit 30, Appellant Brief.

70. Hoey and Keenan always planned to take the 7% appeal contingency even though Ms. Wahlstrom engaged separate appellate counsel to draft and file the appellate briefs and not Keenan. Exhibit 31, Emails between Hoey and Keenan, 5/9-5/10/2018; Exhibit 4, Hoey Dep., p. 153, line 5 to 9.

71. On June 6, 2018, after the JPA defendants filed their appellee brief, Hoey emailed Cordy and DeJuneas stating "I am too emotionally attached to the client and the case to read the Brief. I hope that you and Patty can put your heads together and come up with a solid Reply Brief." Exhibit 28, p.12, Email from Hoey, 6/6/2018.

72. Attorney DeJuneas filed the reply brief and argued the appeal on November 9, 2018, and Hoey attended with Ms. Wahlstrom to watch. Exhibit 4, Hoey Dep., p. 167, line 10 to 17; Exhibit 25, DeJuneas Dep., p. 15, line 24 to p. 16, line 10; Exhibit 2, Wahlstrom Dep., p. 74, line 21 to p. 75, line 3; Exhibit 28, p.12 Email from Hoey, 6/6/2018.

73. On June 10, 2019, the Appeals Court issued its opinion that the trial judge applied the wrong legal standard in allowing a new trial and observed that "the purpose of an order granting a new trial motion is not to punish attorney misconduct" and that "egregiousness of misconduct absent an effect upon the jury is not a basis for finding the type of miscarriage of justice that warrants nullifying the jury's verdict" and stayed the case pending a ruling on the pending motion to disqualify the trial judge. *Wahlstrom v. JPA IV Mgmt. Co., Inc.,* 95 Mass. App. Ct. 445, 449-50, 453, 127 N.E.3d 274, 279, 282 (2019); Exhibit 64, pp. 10 to 17.

74. On July 31, 2019, Judge Wilson recused himself from the case in response to a motion to disqualify filed by Attorney DeJuneas based on public statements the judge had made about the case and the attorneys who appeared before him at the trial. Exhibit 33, Order of Recusal.

75. On November 6, 2019, the Appeals Court issued a memorandum and order holding that, even though Hoey and his associate engaged in misconduct during trial, a review of the record as whole showed "that the cumulative effect of the attorneys' misconduct does not meet the 'relatively high' burden necessary to warrant a new trial." *See, Wahlstrom v. JPA IV Mgmt. Co., Inc.,* 96 Mass.App.Ct. 1108, 138 N.E.3d 1045 (Mass. App. 2019); Exhibit 64, pp. 18 to 21.

**Sobczak v. Hoey**

76. Sobczak began working for Hoey in 2014 and thereafter became the Director of Litigation at Hoey Law. Exhibit 4, Hoey Dep. p. 28, line 22 to p. 30, line 5; Exhibit 13, Sobczak Dep., p. 12, line 10 to 16.

77. During the pendency of the appeal, a dispute arose between Hoey and his associate Krzysztof Sobczak, over Sobczak's payment for his work on Ms. Wahlstrom's case. Exhibit 4, Hoey Dep., p. 95, line 17 to p. 96, line 12; Exhibit 13, Sobczak Dep, p. 24, line

10 to p. 25, line 10; Exhibit 34, Wahlstrom Email Regarding Massachusetts Lawyers Weekly Article.

78. Sobczak and Hoey litigated their disputes in Suffolk and Middlesex County Superior Courts in which Hoey was represented by attorney James Bolan. Exhibit 4, Hoey Dep., p. 201, line 16 to p. 202, line 16; Exhibit 13, Sobczak Dep., p. 24 line 10 to p. 27 line 2.

79. On June 11, 2019, Sobczak filed a notice of lien for attorney's fees pursuant to Mass. G. L. ch. 221 §50 in Ms. Wahlstrom's premises liability case. Exhibit 35, Notice of Lien.

80. Sobczak filed the lien to give notice of his dispute with Hoey over payment he claimed was owed to him by Hoey for his work on the Wahlstrom trial. Exhibit 13, Sobczak Dep., p. 70, line 4 to p. 71, line 22 ("...it seemed that Mr. Hoey was doing everything humanly possible to not pay any of the attorneys. . . . My understanding of a contingency fee agreement is that the client only pays one fee. You only pay a single fee and other lawyers get paid out of it. So the notice was not for Miss Wahlstrom, it was more for the insurers to let them know that when they're divvying out the checks, there are other people that may be entitled to it."); Exhibit 4, Hoey Dep., p. 201, line 19 to p. 203, line 23; ("We also felt that he was doing this because he already lost his pursuit against me where he was seeking a piece of the Wahlstrom fee from me in Middlesex."); Exhibit 4, Hoey Dep., p. 203, line 3 to 6.

81. After Sobczak filed his lien notice, Attorney Bolan contacted Amy Goganian of Goganian & Associates P.C. to appear and respond to the attorney's lien and on or around June 18, 2019, Hoey engaged Goganian and executed a fee agreement which identifies Hoey as the client and the one responsible for paying Goganian's fees. Exhibit 37, Attorney Amy Goganian Deposition ("Goganian Dep.") p.13, line 12 to 20; Exhibit 36, Attorney Amy Goganian Fee Agreement.

82. Ms. Wahlstrom was not shown the fee agreement that Hoey entered with Goganian concerning the Sobczak lien before Hoey signed it, Hoey did not tell Ms. Wahlstrom that Goganian was being retained to represent Hoey and his law firm with respect to the Sobczak lien, Hoey did not inform Ms. Wahlstrom of Goganian's rates and terms of engagement and did not give Ms. Wahlstrom the choice to hire anyone else. Exhibit 2, Wahlstrom Dep., p. 102, line 9 to p. 103, line 1; Exhibit 4, Hoey Dep., p. 207, line 21 to p. 209, line 9.

83. Ms. Wahlstrom did not enter any fee agreement with Goganian concerning the Sobczak lien and did not authorize Amy Goganian to file an appearance on her behalf. Exhibit 2, Wahlstrom Dep., p. 101, line 15 to p. 103, line 1; Exhibit 2, Wahlstrom Dep., p. 105, line 21 to p. 106, line 5; Exhibit 37, Goganian Dep., p. 17, line 3 to p. 18, line 3; Exhibit 37, Goganian Dep., p. 20, line 8 to 20.

84. Ms. Wahlstrom did not even meet or speak to Attorney Goganian who handled these matters until over a year later in or around October 2020. Exhibit 2, Wahlstrom Dep., p. 105, line 21 to p. 106, line 5; Exhibit 37, Goganian Dep., p. 40, line 1 to p. 42, line 7.

85. Neither Attorney Goganian nor Attorney Hoey contacted Attorney Sobczak to discuss whether he was seeking fees directly from Kira Wahlstrom. Exhibit 13, Sobczak Dep., p. 73, line 23 to p. 74, line 8 ("No, nobody contacted me directly. I believe the next notice I got was some kind of a notice of an emergency motion being filed by Mr. Hoey or one of his attorneys trying to allegedly dismiss the lien on behalf of Kira."); Exhibit 4, Hoey Dep. p. 261, line 21 to p. 264, line 5.

86. Hoey well understood at the time Sobczak filed the lien that Sobczak was still seeking money from Hoey. *See*, e.g., Motion to Impound of August 12, 2019 arguing that "The Lien is Sobczak's thinly veiled attempt to seek compensation from Hoey Law…"; Exhibit 38, Hoey Email 9/5/2019 ("His affidavit is in furtherance of his bogus claims against me and do not support a lien against Kira Wahlstrom. His delay in filing a lien dictates his motives…He is targeting this case as a last resort to shake me down for money and he's putting pressure on Kira Wahlstrom. Discovery only allows him to continue his pursuit against me and has nothing to do with proving a lien.").

87. Hoey and Keenan did not advise Ms. Wahlstrom of any conflict of interest between her and Hoey with respect to the Sobczak lien. Wahlstrom Declaration, ¶28.

88. Hoey represented to Ms. Wahlstrom that Sobczak had filed the lien "against" her and was trying to get money from her directly. Exhibit 39, Hoey email to Walstrom 10/24/2020 ("The Court gave Mr. Sobczak a pass … I am very upset about this and cannot understand why the courts of Massachusetts will not protect you"); Exhibit 2, Wahlstrom Dep., p. 43 line 6 to 8 ("Q: You understood, as of then certainly, that Mr. Sobczak was asserting a lien against you. A: That's what I was told, yes."); Wahlstrom Declaration, ¶28 and 29.

89. The filings by Goganian against Sobczak included filings on behalf of Hoey and his firm alone and not Ms. Wahlstrom and made arguments that only applied to Hoey. *See*, e.g., Exhibit 19, Attorney Goren Work on Impoundment, (arguing the "disclosure of information related to the Wahlstrom matter, including any potential fee or other economic value, will be highly prejudicial to Hoey Law and will cause immediate and irreparable harm."); Exhibit 40, Motion to Dismiss Notice of Attorney's Lien and Request for Sanctions with a memorandum (arguing res judicata based on prior litigation between Sobczak and Hoey arguing that any claim by Sobczak "would be against Hoey Law as to any fee Hoey Law may realize in the his case."); Exhibit 37, Goganian Dep, p. 15 line 1 to p. 16, line 4 (motion to impound included proprietary business information of Hoey Law)

90. Hoey participated in the drafting of the motions and responses filed by Goganian on behalf of Wahlstrom and Hoey Law against Sobczak and pressed Goganian to make arguments on his behalf. Exhibit 4, Hoey Dep., p. 276, line 22 to p. 227, line 6; Exhibit 32, Hoey Email 7/20/2019 ("it will need to be Impounded. I cannot let the media or other law firms see this dispute.")

91. It was never Sobczak's intent to obtain an additional fee from Ms. Wahlstrom and he expressed that to Goganian and Bolan.  Exhibit 13, Sobczak Dep., p. 71, line 2 to 10. ("So the notice was not Miss Wahlstrom, it was more for the insures to let them know that when they're divvying out checks, there are other people that may be entitled to it. But as far as my understanding and my knowledge at the time I filed notice is that I am entitled to some portion of the fee that would be on contingency, if there is a contingency."); Exhibit 41, Email from Sobczak 11/3/2020  ("Presuming that you all have Ms. Wahlstrom's best interest in mind, I assume someone has long ago explained to her that the notice of lien I filed does not affect the amount of the attorneys' fees she is responsible for on her case, as the percentage amount stays the same regardless of how many attorneys are splitting it, and all these alleged cost and fees that attorney Hoey is racking up is all just part of his ongoing personal vendetta against me.")

92. Attorney Goganian's invoices for handling the Sobczak lien were directed to Hoey and she received payment from Hoey. Exhibit 42, Attorney Amy Goganian Invoices; Exhibit 37, Goganian Dep., p. 18, line 4 to 17 ("I remember a conversation or conversations with Attorney Hoey that I was to send my bills to him and that he would pay them. I don't recall there being any discussion about any kind of arrangement between him and Ms. Wahlstrom with respect to my fees."); Exhibit 4, Hoey Dep., p. 211, line 12 to p. 212, line 2.

93. Attorney James Bolan represented Hoey against Sobczak in the Suffolk and Middlesex County litigation. Exhibit 20, Bolan Dep., p. 18, line 18 to 2; Exhibit 20, Bolan Dep., p. 62, line 15 to p. 63, line 5.

94. Attorney Bolan worked on behalf of Hoey with Attorney Goganian on seeking dismissal of Sobczak's notice of lien filed in Ms. Wahlstrom's premises liability case. Exhibit 20, Bolan Dep., p. 37, lines 2-10; Exhibit 37, Goganian Dep., p. 15, line 1 to p. 16, line 4.

95. Attorney Bolan never met Kira Wahlstrom, never had any fee agreement with Kira Wahlstrom, and did not direct any invoices for his work related to the Sobczak lien to Kira Wahlstrom. Exhibit 20, Bolan Dep., p. 26, line 23 to p. 24, line 6; Exhibit 20, Bolan Dep., p. 45, line 8 to line 18.

96. Ms. Wahlstrom was never the client of James Bolan. Exhibit 20, Bolan Dep., p. 27, lines 5-6.

97. Ms. Wahlstrom did not agree to engage Bolan on her behalf and was not told in advance of Hoey incurring the Bolan fees that she would be charged for any of his work. Wahlstrom Declaration, ¶ 20; Exhibit 4, Hoey Dep., p. 114, line 14 to p. 115, line 4; Exhibit 13, Sobczak Dep., p. 56, lines 3-7.

98. Attorney Bolan cannot explain how any of the time he billed to Hoey on his invoices benefited Kira Wahlstrom. Exhibit 20, Bolan Dep., p. 50, line 18 to p. 53, line 7.

**The Recovery in the Premises Liability Case**

99. After the Appeal Court decision was issued on November 6, 2019, reversing the order granting a new trial in the underlying Wahlstrom case, the insurance companies for JPA ultimately did not pursue a further appeal.  Dkt. 11, FAC, ¶46; Dkt 16, Hoey Answer, ¶46; Dkt. 24, Keenan Answer, ¶46; Dkt. 30, KKF Answer, ¶46.

100. On November 18, 2019, One Beacon (the primary insurer for JPA) wired $1,670.336.42 to Don Keenan's account. Exhibit 43, Emails to Insurance Companies.

101. On November 19, 2019, Zurich American Insurance Company (JPA's excess insurer) wired $8,317,347.38 to Keenan's account. Judgement was thereby paid in full with interest totaling $9,987,683.80. Exhibit 43, Emails to Insurance Companies.

102. Prior to receipt of these funds, on November 15, 2019, Hoey represented to the excess insurer, Zurich, that Defendants assumed responsibility for the Sobczak attorney's lien that had been filed. ("We stand ready to receive our funds. And will sign any assumption of lien [sic] you draft"). Exhibit 43, Emails to Insurance Companies.

103.  On November 22, 2019, Keenan emailed Hoey concerning when the funds could be disbursed in light of the Sobczak lien litigation and specifically stating in part:

   …The other matter is disbursement. Each one of us has a decision to make as to when to take the money. You're free take all of your money now. That's fine if you want to do that. As for me with this pending lien of Sobczak my people are telling me to wait until there is final resolution as there is with Kira … there's nothing to do right now unless you want to get your money which just say the word and I'll get it to you.

   Exhibit 44, Keenan and Hoey Email Regarding Wire.

104. On November 22, 2019, Hoey replied to Keenan's email stating:

   Fee stays to be disbursed later after the 29th of November.
   All that is needed today is $973,000 to cover expenses and Kira's loan.

   Exhibit 44, Keenan and Hoey Email Regarding Wire.

105.  On November 22, 2019, Hoey re-sent to Keenan a November 20, 2019 email requesting $973,000 be wired to Hoey's account along with his account information for the wire. Exhibit 44, Keenan and Hoey Email Regarding Wire.

106.  On November 26, 2019, Keenan wired $973,000 to Hoey's account. Exhibit 44, Keenan and Hoey Email Regarding Wire

107.  On or around December 17, 2019, Hoey arranged to wire $4,850,000.00 from Keenan's account to Ms. Wahlstrom and he emailed Ms. Wahlstrom's financial representative,

copying Ms. Wahlstrom, and stated: "I just authorized a wire in the amount of $4.85 million. (More to come later)." Exhibit 45, Hoey Email, 12/17/2019.

108. No additional funds were sent to Ms. Wahlstrom from her premises liability recovery. Wahlstrom Declaration, ¶18.

109. On December 21, 2019, Keenan emailed Hoey about "Walstrom funds" that included a request that Hoey send a "signed settlement statement" and Hoey responded with an unsigned Excel spreadsheet itemizing the fee total, expenses and other items along with a request to send Hoey additional money for expenses. Exhibit 46, Email Exchange Between Keenan and Hoey, 12/21/2019.

110. On January 24, 2020, in an email to Hoey, Wahlstrom stated "We still need to go over the bill and the last of the money."  Exhibit 47, Wahlstrom Email to Hoey, 1/24/2020.

111. On February 20, 2020, Hoey informed Ms. Wahlstrom that Sobczak's lien was dismissed. Exhibit 48, Hoey Email to Wahlstrom 2/20/2020.

112. On February 25, 2020, Hoey emailed Ms. Wahlstrom that Sobczak had cost her $35,000 to fight the lien he filed and asking me Ms. Wahlstrom if she wanted to pursue Sobczak for fees and costs and that Hoey would "hate to do nothing." Exhibit 49, Hoey Email Exchange with Wahlstrom.

113. On March 2, 2020, Hoey emailed Keenan concerning fee and expense amounts in Wahlstrom's case and Keenan responded that he needed an "itemization" and "statement of why we can release now." Exhibit 50, Hoey and Keenan Email Exchange, 3/2/2020.

114. On March 7, 2020, Hoey emailed an unsigned Excel spreadsheet, formally addressing "Mr. Keenan" and stating the attached spreadsheet "contains the breakdown of Kira Wahlstrom Judgment proceeds." Exhibit 51, Email from Hoey to Keenan, 3/7/2020 with attachment.

115.  On March 29, 2020, Hoey emailed Ms. Wahlstrom stating "here is Excel accounting sheet" which provided the case expense itemization along with some explanations next to some of the expenses and no other supporting documentation for these expenses was provided to Ms. Wahlstrom at this time. Exhibit 52, Email from Hoey to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Wahlstrom Declaration, ¶¶ 21 to 22, 37 to 38, 40, and 45 to 50.

116. The March 2020 final expense itemization listed "Amy Goganian, Esq. $41,231.72" with the comment "This is who we hired to fight the Sobczak lien." Exhibit 52, Email from Hoey to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization.

117. Though confused about some of the expenses, Ms. Wahlstrom did not feel she could challenge her attorneys that she long trusted (nor did she double-check their math not realizing that the fee calculated included an extra 7% for the appeal in addition to paying

appellate counsel separately), and so Ms. Wahlstrom signed the final expense itemization on around March 29, 2020.  Exhibit 2, Wahlstrom Dep., p. 43, line 18 to p. 48, line 14; Exhibit 4, Hoey Dep., p. 105, line 21 to p. 106, line 16; Wahlstrom Declaration ¶¶ 23 to 24, and 43 to 44.

118. Keenan's expenses were presented to Ms. Wahlstrom for the first time around March 29, 2020, and she signed off on them at the same time as Hoey's expense itemization. Wahlstrom Declaration, ¶21.

119. Keenan's recent sworn statement that "Once Mr. Hoey provided me with the documents showing that Ms. Wahlstrom approved in writing the costs, I paid said costs from my trust account to Hoey Law" is contradicted by the undisputed record – Keenan transferred to Hoey all the money Hoey requested for expenses months before Keenan was provided any written approval by Ms. Wahlstrom. Exhibit 5, Don C. Keenan Response to Plaintiff's Questions in Lieu of Appearing for a Deposition, No. 7; Exhibit 44, Keenan and Hoey Email Regarding Wire.

120. Before the Wahlstrom case and after, on other occasions Hoey would charge other clients for the fees of additional attorneys as expenses. Exhibit 4, Hoey Dep., p. 119, line 17 to p. 121, line 24.

121. The $83,387.54 identified on the final itemization as "remaining" was to be held and used for the expenses for pursuing Ms. Wahlstrom's claims against the insurance companies involved in the premises liability case for unfair and bad faith settlement practices and for expenses in her children's loss of consortium claims against the garage owners for what her children suffered after she was raped. Exhibit 2, Wahlstrom Dep., p. 162, line 18 to p. 163, line 15 and p. 234, line 24 to p. 235, line 12.

122. On May 19, 2020, Keenan emailed Hoey re "Walstrom funds" [sic] stating:

> This is will [sic] confirm receipt of your total fees of $750,000 and at your direction you will pay the referring attorney anything owed. It's obviously your judgement as to how much, if any, to pay your referring attorney, since I have no understanding of your relationship and frankly haven't ever met the man and he sure contributed notion to the outcome.
>
> We are beginning the early state of working up the children's' [sic] cases and as yet have not incurred any expense but if we do then we will request funds from the $80,000 which the client, I understand, authorized to be held for expenses on the case.
>
> Don

Exhibit 53, Email from Keenan to Hoey, 5/19/2020

**Fees and Expenses At Issue Here**

123. When Hoey presented Ms. Wahlstrom the final itemization for her premises liability case he was still representing her and pursuing her claims for bad faith and unfair settlement practices against the insurance companies and her children's loss of consortium claims. Wahlstrom Declaration, ¶19; *Wahlstrom v. Zurich American Ins. Co, et al.*, D.Mass. Civil No. 1:19-cv-12208-LTS; *Helmeke et al v, JPA Management Co., et al* (Mass. Superior Court - Lawrence, Civ. No. 2077CV00542)

124. Hoey and Keenan took $4,025,036.50 of the $9.987,683.80 recovery as an attorney fee, or 40.33% of the total recovery which included $695,808.57 for the appeal contingency while Ms. Wahlstrom was also charged separately $197,091.52 for DeJuneas' fee and $16,000.00 for Cordy's fee from her part of the recovery.  Dkt. 11, FAC, ¶50(a)**;** Dkt. 16, Hoey Answer, ¶50(a); Dkt. 30, KKF Answer, ¶50; Exhibit 54, March 2020 Expense Spreadsheet signed by Kira Wahlstrom.

125. During his deposition, when Hoey reviewed the language of the 2015 CFA appeal contingency provision, and was asked about his understanding of when the appeal contingency applied, he testified:

> Q. And to be more specific here, it says, "after an appellate brief is filed in an applicable appellate court or body by the attorney." What's your understanding of that?

> A. Well, the way it reads is that he [Keenan] would have to file the brief is the way it reads, but that's not how it happened.

Exhibit 4, Hoey Dep., p 173, lines 5-11

126. Hoey and Keenan charged Ms. Wahlstrom $20,824.00 for attorney Richard Goren to appear for Keenan's Kids Foundation, Inc. (that does business as the Keenan Trial Institute) and file a motion to impound book materials to protect the Foundation's proprietary and economic interest. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Exhibit 55, Attorney Richard Goren Invoices ("Goren Invoices").

127. Hoey and Keenan charged Ms. Wahlstrom $8,432.39 for fees for work performed by Hoey's personal attorney James Bolan. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Exhibit 21, Bolan Invoices.

128. Hoey and Keenan charged Ms. Wahlstrom $41,231.72 for attorney Amy Goganian's fees to litigate the Sobczak lien. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with attachment; Exhibit 42, Goganian Invoices.

129. Hoey and Keenan charged Ms. Wahlstrom $2,655.00 for "constitutional law attorney" John Vail. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Exhibit 56, Attorney John Vail Invoices ("Vail Invoices").

130. Hoey and Keenan charged Ms. Wahlstrom $1,316.00 for attorney Catherine Giordano for "research and writing." Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization.

131. Hoey and Keenan charged Ms. Wahlstrom $561.24 billed by Lewis Brisbois Bisgaard & Smith LLP concerning a disciplinary case against Sobczak. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with attachment; Exhibit 23, Lewis Brisbois Bisgaard & Smith Invoices.

132. Hoey and Keenan charged to Ms. Wahlstrom $238,829.29 for fees incurred on Hoey's litigation funding from Advocate Capital who had advanced a total of $415,761.58 to Hoey in increments over time. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Exhibit 57, Advocate Capital Case Balance Detail; Exhibit 58, Advocate Capital Funding Records

133. While during the litigation Hoey had told Ms. Wahlstrom that he had taken a loan to cover costs in her case, Hoey never showed to Ms. Wahlstrom his contracts with Advocate Capital and did not inform her the interest rate, origination fees, finance charges or administrative fees before they were incurred and did not advise her other options for litigation financing. Exhibit 4, Hoey Dep., p. 316, line 17 to p. 318, line 12; Wahlstrom Declaration, ¶¶ 26 to 27.

134. Keenan had expressed to Hoey that Keenan does not believe in engaging lending companies for clients because "they charge high interest rates" and "they are not fair to the client" and that Keenan does not use financing from companies like Advocate Capital but they did not tell this to Ms. Wahlstrom. Exhibit 14, Hoey Dep. in O'Toole Case, 3/17/2023, p. 102, line 14 to p. 104, line 5; Wahlstrom Declaration, ¶27.

135. Hoey stated on his itemization that Advocate Capital was "the lender for the majority, but not all, of the litigation expenses" and Ms. Wahlstrom did not think she had any choice but to pay this as represented by her attorneys. Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Wahlstrom Declaration, ¶26.

136. After Ms. Wahlstrom made a demand for an accounting through her present counsel, Hoey provided to her an Advocate Capital Case Balance Detail showing the dates and amounts advanced by Advocate Capital along with the fees for those advances. Wahlstrom Declaration, ¶50.

137. None of the particular advances on the Advocate Capital Balance Detail match any particular expense on the final expense itemization even though when Hoey made requests from Advocate Capital it was to be for expenses already incurred. Exhibit 4,

Hoey Dep., p. 314, lines 16-20; Exhibit 52, Hoey Email to Wahlstrom, 3/29/2020 with Final Fee and Expense Itemization; Exhibit 57, Advocate Capital Case Balance Detail; Exhibit 58, Advocate Capital Funding Records.

138. Hoey used Advocate Capital for several of his cases at the same time and would make a request for a total sum of money that would cover more than one client rather than making a request for an advance for a single client at a time. Exhibit 4, Hoey Dep., p. 303, line 16 to p. 306, line 6; Exhibit 58, Advocate Capital Funding Records.

139. When Hoey made a request to Advocate Capital to advance funds for his cases, he was not required to provide documentation of all the actual case expenses to Advocate Capital. Exhibit 4, Hoey Dep., p. 305, lines 15-20 ("Q. Okay. And did Advocate Capital require you to give the actual invoice or other documentation of exactly what the expense was for each client? A. No. What they would do is – that part was kind of on the honor system…")

140. Hoey has not provided an accounting to show how each amount advanced by Advocate Capital was actually used to pay an expense in Ms. Wahlstrom's case and cannot track each advance to any particular case expense. Exhibit 4, Hoey Dep., p. 309, lines 6-12 (Q. And as you look at this detail here on Exhibit 58 [Advocate Capital Case Balance Detail], as you sit here are you able to identify any of these advances going to any particular, specific expense in Kira Wahlstrom's case? A. No. That would be -- from memory and just looking at these numbers, no."); p. 315, line 18 to p. 316, line 3 (Q. …Are you able to track what exactly was paid for in Kira's case with Advocate Capital advance money? A. Probably not. It would take hundreds of hundreds of hours. I mean, at some point I had 70, plus, cases running at any given time, a tremendous amount of manpower."); Exhibit 57, Advocate Capital Case Balance Detail

### Demand for Payment and Refusal

141. On March 30, 2021, Austin O'Toole filed a lawsuit against David Hoey, his law firm, and Kira Wahlstrom alleging he was underpaid the referral fee he was to receive from Hoey in the premises liability case and Hoey arranged for Attorney Amy Goganian to represent Ms. Wahlstrom in this suit. Wahlstrom Declaration, ¶42; *O'Toole v. Hoey, et al.*, 2184CV00741, Suffolk Superior Court. Exhibit 37, Goganian Dep., p. 46, line 7 to p. 47, line 5.

142. In the summer of 2021, Ms. Wahlstrom started questioning why she was involved in and had to pay for the O'Toole case as well as the ongoing Sobczak lien dispute that was going to an appeal. Wahlstrom Declaration, ¶¶ 42 to 43; Exhibit 59, Kira Wahlstrom Emails, 2021.

143. Ms. Wahlstrom no longer felt she could confide in David Hoey as he was involved in these fee disputes with O'Toole and Sobczak and she was confused about her involvement and why she had to pay for these attorney fights. Wahlstrom Declaration, ¶42.

144. After consulting with Attorney Goganian and then with Attorney DeJuneas, and after going back over what she was charged in her premises liability case, Ms. Wahlstrom realized that she had been overcharged in fees and improper expenses by Hoey and Keenan and thereafter hired Markham Read Zerner and terminated Hoey from her other cases. Wahlstrom Declaration, ¶43 to 46.

145. Ms. Wahlstrom would not have signed as approving the final fee itemization in March 2020 if she had been fully informed and properly advised on all the fees and expenses included. Wahlstrom Declaration, ¶24-41.

146. Ms. Wahlstrom did not and would not have agreed to paying the appeal upcharge to Keenan if she had been fully informed that Keenan and Hoey were charging her an extra 7% as an appeal contingency when Ms. Wahlstrom had hired and paid separate counsel to litigate the appeal. Wahlstrom Declaration, ¶41.

147. Ms. Wahlstrom would not have agreed to paying the Advocate Capital litigation finance fees if she had been fully advised on the unfair and exorbitant cost of such financing and that Hoey could not actually track the Advocate Capital money to her case expenses. Wahlstrom Declaration, ¶27.

148. Ms. Wahlstrom would not have agreed to pay the Amy Goganian fees incurred on the Sobczak lien dispute if she had been fully informed of all the facts and circumstances involved in handing the lien, including the conflicts of interests involved. Wahlstrom Declaration, ¶33.

149. Ms. Wahlstrom would not have agreed to pay for the fees incurred for Richard Goren if she had been fully informed of all the facts and circumstances involved in his engagement and the work he performed. Wahlstrom Declaration, ¶36.

150. Ms. Wahlstrom would not have agreed to pay for Hoey's attorney, James Bolan, if she had been fully informed of all the facts and circumstances concerning his fees. Wahlstrom Declaration, ¶37.

151. Ms. Wahlstrom would not have agreed to pay for the fees incurred by John Vail if she had been fully informed of all the facts and circumstances concerning his fees. Wahlstrom Declaration, ¶39.

152. Ms. Wahlstrom did not have a fee agreement with Catherine Giordano, had not met Giordano, was not informed in advance of these fees being incurred, and would not have agreed to pay the fees of Catherine Giordano if she had been fully informed of all the facts and circumstances concerning her fees. Wahlstrom Declaration, ¶¶ 40.

153. Ms. Wahlstrom would not have agreed to pay the fees for the Lewis Brisbois firm if she had been fully informed of all the facts and circumstances concerning their fees. Wahlstrom Declaration, ¶38.

154. On February 24, 2022 and March 2, 2022, Ms. Wahlstrom made demand on Hoey and Keenan, respectively, for return of: the appeal overcharge ($695,808.57), Goganian's fees for the Sobczak lien ($41,231.72), Goren's fees ($20,824.00), Bolan's fees ($8,432.39), Vail's fees ($2,655.00), Giordano's fees ($1,316.00), and Lewis Brisbois Bisgaard's fees ($561.25) which all total $770,828.93 and making demand for an accounting including for the Advocate Capital charge.  Exhibit 60, 93A Demand Letter to Hoey; Exhibit 61, 93A Demand Letter to Keenan.

155. On March 28, 2022, Hoey served a response to the demand through counsel in which he refused to pay anything back to Ms. Wahlstrom and provided some but not all documentation of the expenses incurred. Exhibit 62, Hoey Response to 93A Demand Letter.

156. On April 1, 2022, Keenan served a response to the demand through in which he offered $25,000 "as nuisance value." Exhibit 63, Keenan Response to 93A Demand Letter.

157. Ms. Wahlstrom made demand for full accounting and documentation of the above expenses and other expenses and about the disposition of all the monies held in trust for her by Hoey and Keenan. Exhibit 62, 93A Demand Letter to Hoey; Exhibit 63, 93A Demand Letter to Keenan.

158. In response to Ms. Wahlstrom's accounting demand, Keenan stated:

> With respect to your request for an accounting concerning a loan from Advocate Capital the costs of an exhibit produced by Win Interactive, an expert witness from Atlas Safety and trial transcripts, and other expenses, we respectfully refer you to Mr. Hoey for that information because his office was in charge of tracking and documenting these costs, expenses and disbursements.

Exhibit 63, Keenan Response to 93A Demand Letter.


Dated: August 14, 2023                    Respectfully submitted,

                                          */s/ Bridget A. Zerner*
                                          Bridget A. Zerner (BBO No. 669468)
                                          John J.E. Markham, II (BBO No. 638579)
                                          MARKHAM READ ZERNER LLC
                                          11A Commercial Wharf West
                                          Boston, Massachusetts 02110
                                          Tel: (617) 523-6329
                                          Fax:(617) 742-8604
                                          bzerner@markhamreadzerner.com
                                          jmarkham@markhamreadzerner.com
                                          *Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 14, 2023 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

                        */s/ Bridget A. Zerner*
                        Bridget A. Zerner