UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>   Plaintiff,<br><br>v.<br><br>DAVID J. HOEY, LAW OFFICES OF DAVID J. HOEY, P.C., DON C. KEENAN, D.C. KEENAN & ASSOCIATES, P.C. d/b/a THE KEENAN LAW FIRM, P.C., AND KEENAN'S KIDS FOUNDATION, INC.,<br><br>   Defendants. | C.A. NO. 1:22-cv-10792-RGS |

**PLAINTIFF, KIRA WAHLSTROM'S RESPONSE TO DEFENDANTS DON C. KEENAN AND D.C. KEENAN & ASSOCIATES, P.C. d/b/a THE KEENAN LAW FIRM, P.C.'S STATEMENT OF UNDISPUTED MATERIAL FACTS (AT DKT. 86)**

I. <u>Background; The 2010 Fee Agreement</u>

  1. On May 1, 2009, the Plaintiff Kira Wahlstrom was raped in a Boston hotel parking garage. The garage was owned by JPA IV Management Company and managed/operated by JPA I Management Company, Inc. (collectively "JPA"). First Amended Complaint, ¶¶ 1, 11, 12.[1]

**RESPONSE:** **Undisputed.**

  2. On February 2, 2010, the Plaintiff entered into a contingent fee agreement ("2010 CFA") with the Defendant Law Offices of David J. Hoey, P.C. ("Hoey Firm") to pursue claims for negligence against JPA. First Amended Complaint, ¶ 16; Affidavit of John J. O'Connor, Exhibit A.

---

[1] Citations are to the paragraphs in the First Amended Complaint and to the lettered exhibits attached to the accompanying Affidavit of John J. O'Connor.

1

**RESPONSE**: **Undisputed.**

3. The Plaintiff met with Mr. Hoey at his firm and reviewed the 2010 CFA. O'Connor Aff., Ex. D, Wahlstrom Depo. at 14-15. She was given time to review and consider it, and she signed it at her home. The Plaintiff read the 2010 CFA, understood it, and had the opportunity to ask questions about it. O'Connor Aff. Ex. D, Wahlstrom Depo. at 13, 150, 165.

**RESPONSE**: **Undisputed.**

4. At the time she signed it, the Plaintiff understood that she would be responsible for reasonable expenses, that her lawyers could borrow money to finance the case, and that she would be responsible for any related interest charges. O'Connor Aff. Ex. D, Wahlstrom Depo. at 15.

**RESPONSE**: **Undisputed.**

5. The 2010 CFA provided that the Hoey Firm would be paid 33.3% of the gross amount recovered, and that the Plaintiff would be responsible for reasonable expenses and disbursements, including costs related to financing. First Amended Complaint, ¶ 18; O'Connor Aff., Ex. A, 2010 CFA.

**RESPONSE: Undisputed except disputed that the 2010 CFA term addressing litigation financing allows for the attorney to borrow money under any terms or arrangement without advance notice, disclosure and agreement of Ms. Wahlstrom. Exhibit 65, Expert Report of Erin K. Higgins, Esq., ¶¶ 24, 27 88 ("Attorney Hoey also failed to meet the standard of care when he used litigation funding from Advocate Capital to pay for expenses relating to Ms. Wahlstrom's case without providing any explanation to Ms. Wahlstrom about how litigation financing works, and what the ultimate cost to her would be of using litigation funding. This is an area outside the knowledge of the average client."); Exhibit 66, Deposition of Erin Higgins ("Higgins Dep."), p. 41 line 14 to p. 42, line 2. ("Q: Is it your opinion that at the time the 2010 agreement was signed the Attorney Hoey had an obligation to provide Miss Wahlstrom information about the terms on which Advocate Capital would be advancing the funds for the litigation expenses? A: As I said in my report, and certainly not just my opinion, I've cited BBA, an ABA opinion, and an article written by assistant bar counsel that a lawyer has to explain what litigation financing is to the extent that the client understands what they're taking on, the obligations that they're taking on.")**

II.     The Suit; The 2015 Fee Agreement

6.      On March 12, 2010, Mr. Hoey filed suit on the Plaintiff's behalf against JPA and others for negligence in Suffolk Superior Court, C.A. No. 1084CV01022. First Amended Complaint, ¶ 20.

**RESPONSE: Undisputed.**

7.      In February, 2013, Mr. Hoey contacted the Defendant Attorney Don Keenan of D.C. Keenan & Associates P.C. d/b/a The Keenan Law Firm P.C. about working for Mr. Hoey on the case. Mr. Keenan is one of the foremost plaintiff's personal injury practitioners in the country, with extensive experience handling premises-liability cases. First Amended Complaint, ¶ 21; Mr. Hoey and Mr. Keenan executed a contract confirming their agreement. O'Connor Aff., Ex. I, Contract for Representation.

**RESPONSE: Undisputed except disputed as to the characterization that Keenan was "working for Mr. Hoey" rather than the two working together as co-counsel. Dkt. 96-8, Ex. 8, contract's subtitle "Co-counsel Contingent Fee Agreement")**

8.      The Plaintiff met Mr. Keenan in February of 2015, and she decided that it would be beneficial for her to engage him to represent her in the case. O'Connor Aff., Ex. D, Wahlstrom Depo. at 18, 19.

**RESPONSE: Undisputed as suggested by Hoey. *Id.***

9.      The Plaintiff's designated expert Attorney Erin Higgins concedes that there is no evidence and she has no opinion to the effect that the 2013 contract between Attorneys Hoey and Keenan caused any harm to the Plaintiff. O'Connor Aff., Ex. F, Higgins Depo. at 163-64.

**RESPONSE: Disputed that expert Attorney Erin Higgins "concedes that there is no evidence" that the 2013 contract caused harm as the quoted testimony does not so state but only states and it is undisputed that expert Higgins did not give an opinion as to whether the 2013 contract entered between Hoey and Keenan without disclosure to Ms. Wahlstrom as required caused harm. Dkt. No. 87-6, Keenan's Ex. F, Higgins Dep., at 163-64; see also, Exhibit 66, Higgins Dep., p. 163, line 18 to p. 164, line 2 ("Q: Why don't we back up to the**

3

start with that. Do you have an opinion as to whether Miss Wahlstrom suffered any harm because of what you're referring to here in paragraphs 28 and 92 and 95? A: So my opinion in that instance is that they breached the standard of care, I don't have an opinion as to whether it caused harm to Miss Wahlstrom."); Exhibit 65, Higgins Report ¶¶14-15.

10. Mr. Keenan required (consistent with the Rules of Conduct) that the Plaintiff sign a new contingent fee agreement with him. Mr. Hoey emailed the draft agreement to the Plaintiff and represented that the new fee agreement would not change her percentage owed of the recovery or cost her more money. He did not copy Mr. Keenan or anyone from his firm on the email. First Amended Complaint, ¶ 22.

**RESPONSE: Undisputed (and for completeness, Hoey stated in the same email: "It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th." at Dkt. No. 96-12, Exhibit 12)**

11. On or about June 16, 2015, after reviewing it with Hoey and/or his of-counsel Attorney Kris Sobczak, the Plaintiff signed the contingent fee agreement with Mr. Keenan ("2015 CFA"). The 2015 CFA provided that Mr. Keenan would be paid 33.3% of gross amounts recovered, with an additional 2% of gross recovery if the matter concluded after an appellate brief was filed, and an additional 5% thereafter (for a total of 7%) if the matter concluded/settled following an appellate decision. First Amended Complaint, ¶¶ 25-26. In addition, the Plaintiff was responsible for reasonable expenses, including the cost of borrowing to cover case expenses. The 2015 CFA also provided that a portion of Mr. Keenan's percentage would be paid to the Hoey Firm. Id. at ¶ 26; O'Connor Aff., Ex. B, 2015 CFA.

**RESPONSE: Undisputed that Ms. Wahlstrom signed the 2015 CFA and undisputed as to the terms reflected in the 2015 CFA but disputed that it provided for an additional recovery "after an appellate brief was filed" but rather required Keenan to be appellate counsel that filed the brief to be entitled to a fee and disputed as to counsel sufficiently reviewing the agreement with Ms. Wahlstrom before signing this new agreement and disputed that the 2015 CFA terms addressing expenses and litigation financing allows for the attorney to borrow money to cover case expenses under any terms or arrangement without advance notice, disclosure and agreement of Ms. Wahlstrom. Dkt. 96-11, Ex. 11, 2015 CFA; Dkt. 96-4, Ex. 4, Hoey Dep., p. 173, lines 5-11; Exhibit 65, Higgins Report, ¶¶**

4

**24, 27 88 (failure to meet standard of care re litigation financing); ¶¶ 96-109 (Hoey and Keenan breached standard of care in negotiation of 2015 CFA); Dkt. No. 96-4, Exhibit 4, Deposition of David Hoey ("Hoey Dep."), p. 56, line 10 to p. 61, line 20 (Hoey testimony that he did not review the 2015 CFA with Wahlstrom before she signed); Dkt. No. 96-13, Exhibit 13, Deposition of Attorney Krzysztof Sobczak ("Sobczak Dep.") p. 39, line 14 to p. 42, line 9 (testimony that he did not review the 2015 CFA with Wahlstrom), Dkt. No. 4, Keenan Response to Questions in Lieu of Deposition, No. 4 (did not review 2015 CFA with Wahlstrom, left it to Hoey); Dkt. No. 95, Wahlstrom Declaration, ¶7 ("My memory is that David [Hoey] provided me the agreement to sign but neither David nor his associate Kris Sobczak provided any explanation of the terms other than what David said in his June 11 emails cited above.") and ¶¶ 8-13.**

12. The experts agreed that contingent fee agreements providing for extra fees where judgments were appealed, and providing for contingency payments of 40%, are not uncommon in personal-injury practice. O'Connor Aff., <u>Exs. F-G</u>.

**RESPONSE:** Disputed as the testimony of expert Higgins cited does not so state. *See also*, **Exhibit 67, Deposition of Charles Kazarian ("Kazarian Dep."), p. 146, lines 11-19 ("Q: In your experience, have you regularly seen clients charge both appeal contingency up-charge as well as separately charge for appellate counsel handling the appeal? A. I've never seen that.")**

13. The Plaintiff read the 2015 CFA, understood it, and had the opportunity to ask questions about it before executing it. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. Trans. p. 150. The Plaintiff admits that she chose not to speak to or ask Mr. Keenan any questions regarding the 2015 CFA. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. at 211-212.

**RESPONSE: Disputed that Wahlstrom understood how Hoey and Keenan planned to charge her under the 2015 CFA at the time she signed it and disputed that "she chose not to speak to" Keenan but undisputed that Keenan did not speak to Wahlstrom about the terms of the 2015 CFA or how it differed from the 2010 CFA before she signed it. Dkt. No. 95, Wahlstrom Declaration, ¶¶6-13; Dkt. No. 96-5, Keenan Response to Questions, No. 4.**

14. The Plaintiff thought it was reasonable for the 2015 CFA to include an additional charge for Mr. Hoey and Mr. Keenan in the event of an appeal. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. at 214-215.

**RESPONSE: Disputed as to the characterization that Wahlstrom thought it reasonable to include an additional charge "in the event of an appeal" rather than if Hoey and Keenan**

5

were appellate counsel doing the appellate work, drafting and filing the appellate briefs. Dkt. No. 87-4, Wahlstrom Dep., p. 214, lines 2-6 ("In the 2015 agreement was if they were my appellate lawyers for the appeal, then they would get more money, which seems obvious, you know, to me at the time, it was obvious. If they -- if they're the lawyers in the appeal, then they would get the money.")

15. When she executed the 2015 CFA, the Plaintiff understood that she would be responsible for expenses if there was a favorable decision, that the attorneys could finance the case through borrowed funds, and that she would be responsible for interest charges on the financing. O'Connor Aff., Ex. D, Wahlstrom Depo. at 16-17. The Plaintiff also understood that, if she lost the case, Mr. Hoey, not the Plaintiff, would be responsible for all fees and costs. O'Connor Aff., Ex. D, Wahlstrom Depo. at 31.

**RESPONSE: Undisputed except that Wahlstrom understood she was responsible for "reasonable" expenses as stated in the CFA. Dkt. No. 96-11, Exhibit 11, 2015 CFA, ¶5 referenced in testimony ("The Client is to be liable to the attorney for his reasonable expenses and disbursements if there is favorable disposition of the legal matter.")**

16. Despite knowing for years that Mr. Hoey was advancing case expenses on her behalf, she never at any point asked how much money the case was costing his firm. O'Connor Aff., Ex. D, Wahlstrom Depo. at 31.

**RESPONSE: Disputed as the testimony cited does not so state (and disputed that it was Ms. Wahlstrom's obligation to inquire rather than Hoey and Keenan's obligation to disclose the costs). Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep. p. 31, line 18 to p. 32, line 2; Exhibit 66, Higgins Dep., p. 41 line 14 to p. 42, line 2.**

17. Before executing the 2015 CFA, the Plaintiff looked it over and read it. O'Connor Aff., Ex. D, Wahlstrom Depo. at 22. She met with Mr. Hoey prior to signing it and had the opportunity to ask him any questions about it. O'Connor Aff., Ex. D, Wahlstrom Depo. at 23; and Ex. E, Hoey Depo. at 55.

**RESPONSE: Undisputed that Ms. Wahlstrom looked over and signed the 2015 CFA but disputed that Hoey met with Ms. Wahlstrom to explain the 2015 CFA for her to be able to ask any questions about it. Dkt. No. 95, Wahlstrom Dec., ¶¶5-13; Dkt. No. 96-4, Exhibit 4,**

6

**Hoey Dep., p. 56, line 10 to p. 61, line 20 (Hoey testimony that he did not review the 2015 CFA with Wahlstrom before she signed).**

18. The Plaintiff reviewed and initialed the paragraphs of the 2015 CFA on the right-hand side of each page. She initialed the provision providing that the percentages to be paid to the attorneys would increase if there was an appeal. O'Connor Aff., Ex. B., 2015 CFA.

**RESPONSE: Undisputed except disputed that the provision provides the percentages would increase "if there was an appeal" but rather provided that the percentage would increase "if the matter is concluded/settled *after an appellate brief is filed in an applicable appellate court or body by the Attorney [Don Keenan]* on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision." Dkt. No. 96-11, 2015 CFA, ¶4 (emphasis added).**

19. The Plaintiff did not testify that, had anyone explained the 2015 CFA to her differently, or in more detail, she would not have agreed to sign it. O'Connor Aff., Ex. F, Higgins Depo. at 153.

**RESPONSE: Disputed as Keenan does not cite to Ms. Wahlstrom's testimony for support and if there was no such testimony it was due to defense counsel's failure to ask the question. *See also* Higgins testimony cited by Keenan at Dkt. No. 87-6, Exhibit F, p. 153, lines 6-16 ("I think that more probably than not --again, I wasn't asked to render an opinion on this but I am a lawyer, a trial lawyer, I think probably more than not had Miss Wahlstrom been told there are significant changes to this fee agreement that could work against you, you should consult with your own counsel, separate attorney on that, had she done that another attorney would have negotiated a different fee agreement, I think that's very much more likely than not."); Dkt. No. 95, Wahlstrom Declaration, ¶¶ 9-13, 24.**

20. The Plaintiff's designated expert conceded that she did not find or opine that Mr. Keenan made any misrepresentations, engaged in fraud, or engaged in conduct that violated G.L. c. 93A. O'Connor Aff., Ex. F, Higgins Depo. at 149-150.

**RESPONSE: Undisputed as expert Higgins was not engaged to give an opinion on whether Defendants engaged in fraud or violated G.L. c. 93A and did not review every page of document production in the case to make a determination. Exhibit 66, Higgins Dep., p. 107, line 17 to p. 108, line 10; p. 149, line 15 to p. 150, line 13.**

7

III. <u>The Trial And Appeal</u>

21. Mr. Hoey and Mr. Keenan (and associates) tried the case from July 14 to August 11, 2015. First Amended Complaint, ¶ 28.

**RESPONSE: Undisputed.**

22. The jury issued a verdict of $4M against JPA. With interest and costs, this resulted in a judgment of $6,650,829.58 in 2015, which was over $3 million more than the JPA's previous high settlement offer of $2.25 million.

**RESPONSE: Undisputed (except for the high/low offers made by JPA).**

23. After the verdict, the Court ordered a new trial, and the Plaintiff's appellate counsel, Patricia DeJuneas, obtained leave to prosecute an interlocutory appeal. First Amended Complaint, ¶¶ 30-31.

**RESPONSE: Undisputed.**

24. Mr. Hoey and Mr. Keenan both participated in the preparation of and strategy for the appeal. For example, on February 22, 2017, Mr. Hoey met with the Plaintiff and Ms. DeJuneas to discuss the appeal and strategy. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. Ex. 12. Mr. Keenan communicated regularly with Mr. Hoey regarding appeal strategy and filings, and Hoey in turn communicated with DeJuneas. They exchanged hundreds of emails and had multiple strategy calls. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. at 73, 74. Mr. Hoey also reviewed the appeals brief and made comments on it before it was submitted. O'Connor Aff., <u>Ex. D</u>, Wahlstrom Depo. at 79, 98.

**RESPONSE: Disputed that Hoey and Keenan participated in the appellate work to entitle them to the appeal contingency fee nor do the citations to the Wahlstrom testimony prove the facts asserted. Dkt. No. 96-25, Exhibit 25, DeJuneas Dep., p. 46, line 7 to p. 47, line 1 (appellate counsel DeJuneas viewed Hoey as interfering with her work on the appeal); Dkt. No. 96-28, Exhibit 28, Hoey Emails with Vail, p. 7 to 10; Dkt. No. 96-29, Exhibit 29, 11/24/2016 DeJuneas Email to her associate ("Hoey is driving me nuts. Now he wants me to**

8

argue that they didn't engage in misconduct. Ummmm…yeah, you did. It just doesn't warrant a new trial."); Dkt. No. 96-25, DeJuneas Dep., p. 96, line 11 to 22 ("I don't think I ever had any discussions with Don [Keenan] about the appeal other than the petition for interlocutory appeal, and I did not view David as participating on the appeal. I viewed it more as him interfering on the appeal."); Dkt. No. 96-26, Exhibit 26, Email of 4/15/2016 from Don Keenan to Appellate Counsel Patty DeJuneas, Hoey and Sobczak (Keenan: "I'm not an appellate lawyer, don't pretend to be, don't see the world through the POV of an appellate lawyer. So since we've got a very good appellate lawyer, one who has impressed me, I would suggest we listen to her and do what she says."); Dkt. No. 96-27, Exhibit 27, Hoey Email of 7/2/2016 to Sobczak ("We are trial attorneys. Not appealant attorneys [sic]")**

25. On June 10, 2019, the Appeals Court held that the trial judge applied the wrong legal standard in ordering a new trial. First Amended Complaint, ¶ 36.

**RESPONSE: Undisputed.**

26. The Plaintiff's designated expert Attorney Erin Higgins concedes that there is no evidence (and she does not opine) that any alleged breaches of duty by Mr. Keenan made any difference in the outcome of the Plaintiff's trial or appeal. O'Connor Aff., Ex. F, Higgins Depo. at 151.

**RESPONSE: Disputed as expert Higgins only conceded that she did not render an opinion on this matter, she did not concede that there was no evidence that Keenan's breach of his fiduciary duty to Mrs. Wahlstrom made a difference in the outcome. Exhibit 66, Higgins Dep., p. 151, line 5 to p. 156, line 4.**

27. As it turned out, bringing Mr. Keenan on as counsel was hugely beneficial to the Plaintiff. Prior to his appearance, no offer of settlement above $450,000 had been made. Wahlstrom Depo. at 27-28. During the trial no offer above $2.25 million was made. Yet the jury returned a record verdict of $4 million. O'Connor Aff., Ex. E, Hoey Depo. at 68.

**RESPONSE: Undisputed.**

IV. Post Appeal/Billing

28. On November 18 and 19, JPA's insurers paid $9,987,683.80 -- the full judgment with interest. First Amended Complaint, ¶ 48. This total figure exceeded by more than $7 million the most that the JPA had previously offered to settle.

**RESPONSE: Undisputed (except that there were post-trial offers to settle made by the JPA insurers but that is not relevant to the issues on these motions).**

29. The Plaintiff and Mr. Hoey met in December of 2019 to begin discussing the attorneys' fees and the case expenses. The Plaintiff had questions, which he answered. O'Connor Aff., Ex. E, Hoey at 105. During this meeting she was shown expenses and the litigation-financing loan information. Id. at p. 105-106.

**RESPONSE: Disputed as Wahlstrom was not provided any documentation regarding expenses prior to March 2020 and all she was provided on March 29, 2020 via email was a spreadsheet list of expenses and she was not provided any other supporting documentation and was not provided litigation-financing loan information. Dkt. No. 96-47, Email from Wahlstrom to Hoey on January 24, 2020 ("We still need to go over the bill and the last of the money"); Dkt. No. 96-2, Wahlstrom Dep. p. 41, line 10 to 17; Dkt. No. 93, Wahlstrom Declaration, ¶¶ 20-22, 25-41, 50; Dkt. No. 96, Ex. 4, Hoey Dep., p. 316, line 7 to p. 318, line 8 (Hoey did not disclose his Advocate Capital contract to Wahlstrom or the details of the finance charges); Exhibit 83, Second Wahlstrom Dec., ¶¶7-8.**

30. On March 27, 2020, Mr. Hoey provided the Plaintiff an updated itemization of the fees and expenses. The Plaintiff met with Mr. Hoey and again went over the expenses and attorneys' fees in the spreadsheet. O'Connor Aff., Ex. D, Wahlstrom Depo. at 41, 45. On March 29, 2020 he sent a spreadsheet with additional details regarding the charges. First Amended Complaint, ¶ 54; O'Connor Aff., Ex. J, Hoey email and attachments.

**RESPONSE: Undisputed that on March 29, 2020, Hoey provided an expense itemization via email for the first time but otherwise disputed. Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep., p. 43, line 16 to p. 47, line 11; Dkt. No. 95, Wahlstrom Declaration, ¶20-22.**

31. On March 30, 2020, the Plaintiff responded to the March 29, 2020 email/spreadsheet indicating she did not have any more questions about it and would stop by Mr. Hoey's office to execute it. O'Connor Aff., Ex. K, Wahlstrom email to Hoey.

**RESPONSE:** **Undisputed.**

32. Mr. Hoey specifically told the Plaintiff that, if she had any questions or disputes regarding any of the expenses listed, she should let him know. O'Connor Aff., Ex. D, Wahlstrom Depo. at 43; and Ex. J, March 29, 2020 email. The Plaintiff raised no concerns. O'Connor Aff., Ex. D, Wahlstrom Depo. at 44, 201.

**RESPONSE:** **Undisputed.**

33. Specifically, the Plaintiff did not raise any concerns regarding the litigation funding expenses (Depo. at 56); the fees paid to Attorney Amy Goganian (58); the fees and work of Attorney Edward Goren (58); Mr. Bolan's work or fees (60); the cost of the WIN Interactive video (60); or who John Vail was and what work he did on her case (61-62). O'Connor Aff., Ex. D, Wahlstrom Depo.

**RESPONSE:** **Undisputed that Ms. Wahlstrom did not raise concerns with Hoey at that time in March 2020.**

34. In general, the lawyers refrained from apprising the Plaintiff of day-to-day case developments, because it upset her. O'Connor Aff., Ex. E, Hoey Depo. at 73. But the Plaintiff was still kept regularly informed, and she never objected to the lawyers' strategy decisions or expenses in real time. O'Connor Aff., Ex. E, Hoey Depo. at 47, 110, 112-113.

**RESPONSE: Disputed as Hoey was regularly in contact with Ms. Wahlstrom discussing her case and yet Hoey and Keenan failed to keep her regularly and fully informed as to fees and expenses and failed to obtain her consent to significant expenses and fees of additional attorneys that they incurred. Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep., p. 28 lines 11-12 ("David [Hoey] and I talked a lot about my case and what needed to happen…"), p. 73, lines 17-18 ("David and I talked about -- all the time, and we did talk about my appeal…"), p. 58, line 1 to 8, ("Q: Okay. And did you ever ask David who was Amy [Goganian], what is she doing, what is she working on, is she my lawyer, anything like that?...A: Sorry. David told me that she was handling it, and I trusted David. I didn't know all the details of the case, no."); p. 59, line 15 to 17, ("Q: before seeing this document [March 2020 itemization], did you know who Mr. Goran was? A: Not to my knowledge."); p. 60, line 8 to 9 ("Okay. Did you know who Mr. Bolan was? A: At the time, no."); p. 62, line 1 to 4, ("Q: Okay. You understood that a number of people looked at your briefs for purposes of the appeal; right?**

11

**A: To be honest with you, no. I don't know who looked at them.");  Dkt. No. 95 Wahlstrom Declaration, ¶¶ 20-41; Dkt. No. 96-4, Exhibit 4, Hoey Dep., p. 152, line 16 to p. 154, line 4; p.153 line 8 to 9 (when appellate counsel was engaged, Hoey did not inform Wahlstrom that he and Keenan would also charge the appeal contingency in addition to separate appellate counsel fees); Exhibit 65, Expert Higgins Report, ¶¶87-91 (Hoey and Keenan failed to meet standard of care in terms of communications with Wahlstrom on case developments, fees and expenses)**

35. After the Plaintiff reviewed and understood all of the itemized case charges, she initialed the settlement statements and also wrote/signed two notes of approval: (1) one dated March 27, 2020 and stating "Kira Wahlstrom I am aware of the above fee distribution and approve"; and (2) a second dated March 27 and stating "Kira Wahlstrom, I approve of the above itemized expenses."  First Amended Complaint, Dkt. No. 11, ¶ 55; O'Connor Aff., Ex. C.

**RESPONSE: Disputed that Ms. Wahlstrom understood all the itemized case charges as she was not fully informed at the time she signed in March 2020. Dkt. No. 95, Wahlstrom Declaration, ¶¶ 20-41; Exhibit 83, Second Wahlstrom Dec., ¶8. *See also,* Wahlstrom testimony cited in Response to No. 34 above which is adopted and incorporated in response to No. 35; Exhibit 65, Expert Erin Higgins Report, ¶¶130-132 ("In my opinion, Attorneys Keenan and Hoey had a conflict of interest in preparing these settlement statements and asking Ms. Wahlstrom to approve them, where these calculations represented an interpretation of provisions of the 2015 CFA that resulted in the maximum amount payable flowing to the attorneys, and the minimum amount payable flowing to Ms. Wahlstrom … the standard of care would have required Attorneys Keenan and Hoey to notify Ms. Wahlstrom that there was room for disagreement on the proper interpretation of the CFA, that their interests were in conflict with her interests, and that she was free to seek independent legal advice with respect to the reasonableness of their approach …because Attorneys Keenan and Hoey did not make the appropriate disclosures to Ms. Wahlstrom in connection with their request that she approve their spreadsheets showing the distribution of funds, Attorneys Keenan and Hoey failed to meet the pertinent standard of care.").**

36. The Plaintiff agrees that she read the settlement statements explaining the fees and expenses, understood them, and had the opportunity to ask questions before executing them.

O'Connor Aff., Ex. D, Wahlstrom Depo. at 150, 201, and Exs. J-K, Plaintiff/Hoey emails.

**RESPONSE:  Disputed that Ms. Wahlstrom fully understood the fees and expenses when she signed. Dkt. No. 95, Wahlstrom Declaration, ¶¶ 20-41; Exhibit 83, Second Wahlstrom Dec., ¶8; Exhibit 65, Expert Erin Higgins Report, ¶¶130-132.**

37. At all times relevant to the process of reviewing the fees/expenses, the Plaintiff was represented by and had access to other counsel in addition to Attorneys Hoey and Keenan. Attorney DeJuneas, who had appeared and worked with and for the Plaintiff starting in 2015, was still representing the Plaintiff and available to answer any questions. O'Connor Aff., Ex. D, Wahlstrom Depo. at 207, 208. But the Plaintiff did not feel any concern or any need to ask her to review the fees and expenses. O'Connor Aff., Ex. D, Wahlstrom Depo. at 226.

**RESPONSE: Undisputed except disputed that "Plaintiff did not feel any concern" about the fees and expenses. Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep., p. 226, lines 9-17 (Q. You thought the figures were all reasonable at that point; is that correct? A. I had no opinion either way. I just trusted that David [Hoey] -- that these were correct."); p. 128, lines 6-7 ("I didn't feel I could ask him [Hoey] about the expenses or about my concerns with the other cases."); Dkt. No. 95, Wahlstrom Dec., ¶42 ("As soon as I was told by David Hoey about the attorney lien and litigation with Krzysztof Sobczak in 2019, I began questioning to myself why I had to be involved in fighting the lien, especially since David had earlier told me and sent me an article about contentious lawsuits between him and Kris over fees that allegedly David promised to pay but later refused.")**

38. From the time that the Plaintiff signed off on the expenses and fees in March of 2020, though March of 2022, she never raised any issues or concerns with Attorneys Hoey or Keenan, and never in any way disputed or questioned their attorneys' fees and/or expenses. O'Connor Aff., Ex. D, Wahlstrom Depo. at 128-129.

**RESPONSE: Undisputed that Ms. Wahlstrom did not raise issues or concerns to Hoey or Keenan as to the March 2020 fee and expense itemization while Hoey continued to represent her in other cases until she terminated him on February 7, 2022 and served a 93A Demand Letter on Hoey on February 24, 2022 and served a 93A Demand Letter on Keenan on March 2, 2022 after discovery of their misconduct in later 2021. Dkt. Nos. 96-60 and 96-61; Dkt. 95, Wahlstrom Dec., ¶¶43-50.**

September 22, 2023   Respectfully submitted,

  */s/ Bridget A Zerner*
  Bridget A. Zerner (BBO No. 669468)
  John J.E. Markham, II (BBO No. 638579)
  MARKHAM READ ZERNER LLC
  11A Commercial Wharf West
  Boston, MA 02110

13

Tel: (617) 523-6329
Fax: (617) 742-8604
bzerner@markhamreadzerner.com
jmarkham@markhamreadzerner.com
*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

*/s/ Bridget A. Zerner*
Bridget A. Zerner