IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION - BOSTON)

| | |
|---|---|
| KIRA WAHLSTROM,<br><br>        Plaintiff,<br><br>-against-<br><br>DAVID J. HOEY, LAW OFFICES OF DAVID J. HOEY, P.C., DON C. KEENAN, D.C. KEENAN & ASSOCIATES, P.C. D/B/A THE KEENAN LAW FIRM, P.C., AND KEENAN'S KIDS FOUNDATION, INC.<br><br>        Defendants | Civil Case No. 1:22-cv-10792-RGS |

**PLAINTIFF KIRA WAHLSTROM'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (DKT. 88) FILED BY DEFENDANTS DAVID J. HOEY AND LAW OFFICES OF DAVID J. HOEY, P.C.**

Plaintiff Kira Wahlstrom herein opposes the Motion for Summary Judgment filed by Defendants David J. Hoey and Law Offices of David J. Hoey, P.C. (collectively, "Hoey") (at Dkt. 88). Hoey's Memorandum in Support (Dkt. 89), is cited herein as "Hoey Memo." In support of her opposition Kira relies on and herein cites to evidence filed in support of her own motion for summary judgment (Dkt. 92-96) as well as additional declarations and exhibits filed with this opposition (and filed in opposition to the motion for summary judgment filed by Defendant Don Keenan and his firm).

This case raises allegations that Hoey engaged in unfair practices and other wrongs during his representation of Kira Wahlstrom. Whether Hoey engaged in misconduct is not at all governed by the size of the verdict obtained after trial nor by whether he worked through vacations and holidays. While his opening seems to be suggesting as much, no lawyer may offer as a defense to violating his client's rights, breaching her trust, and engaging in unfair practices

1

that he worked hard on the case or obtained a good result. A good result never allows the lawyer to take a bonus above the fee agreement absent agreement of the client. *Beatty v. NP Corp.,* 31 Mass. App. Ct. 606, 612 (1991). In any event, any payment to the lawyer above the agreed upon legal fees and reasonable expenses can never be obtained in the manner used by Hoey.

## I. Kira Has Sufficiently Plead and Has Established Sufficient Material Facts to Try her Fraud Claim Against Hoey

### A. There is a Material Dispute on the Reliance Element of Fraud to be Tried

Hoey only challenges Kira's proof on her fraud claim as to the reliance element (Hoey Memo, p. 9) – effectively saying that Kira was unreasonable in relying on the representations of Hoey, her trusted attorney of five years, and accepting what he told her in the midst of preparing for a trial less than one month away. While Kira certainly agrees with this sentiment now, she had no reason to know she should not trust Hoey at the time to truthfully represent and fully explain matters in her case. And the record clearly supports her reasonable reliance on him when he was her attorney.

Hoey's email that falsely stated to his client that the new 2015 CFA with Keenan was "the same agreement as before but with Don's name" and "doesn't cost you more money" disarmed Kira of any notice at all that the new agreement was significantly changing the deal she agreed to five years earlier. *See*, Dkt. 95, Wahlstrom Dec., ¶¶6-13. Combining this fact with Hoey's failure to specifically review and explain the terms of the agreement to be sure Kira understood the changes and his failure to advise she could seek independent counsel, in violation of the Rules of Professional Conduct, raises a material dispute as to whether Kira was reasonable in trusting and relying on Hoey's prior false statement when she was presented with and signed the 2015 CFA at Hoey's office and did not have the 2010 CFA to compare or understand the significant differences between the two. *Id*., Ex. 96-4, Ex. 4, Hoey Dep., p. 56, line 10 to p. 61,

line 20*; Exhibit 65, Expert Report of Erin Higgins, ¶¶96-106 (Hoey did not meet standard of care required in negotiation of the 2015 CFA with Wahlstrom).

"*In the absence of fraud*, one who signs a written agreement is bound by its terms whether he reads and understands it or not," but where the facts present a substantial issue of fraud, summary judgment should be denied. *See, Schell v. Ford Motor Co.*, 270 F.2d 384, 386 (1st Cir. 1959)(emphasis added)(finding a genuine issue as to a material fact, as to whether contractor's waiver of liability was procured by fraudulent misstatement of manufacturer guard as to nature of instrument he directed contractor to sign where guard's description of the card was only partially true, even though the contractor would have discovered that he was signing a waiver had he completely read the documents he signed); *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928–29 (1st Cir. 1983); *Mulford v. Marago,* 35 Mass.App.Ct. 805, 809 (1994)(in cases where motive, intent or other state of mind questions are at issue, as in fraud, summary judgment is generally disfavored); *In re Discipline of an Att'y*, 451 Mass. 131, 141, 884 N.E.2d 450, 459 (2008)(in assessing client understanding, "[r]eading the agreement does not necessarily equate with understanding all its provisions"); *Redlich v. Lanell*, No. SUCV200203213C, 2006 WL 1000353, at *22 (Mass. Super. Mar. 3, 2006)("fee agreement contracts between attorneys and clients are not enforced on the same basis as ordinary commercial contracts because of the fiduciary relationship between attorney and client"). *See also, Beatty v. NP Corp.,* 31 Mass. App. Ct. 606, 612 (1991) which held that:

> As a general proposition, the meaning of a written document, if placed in doubt, is construed against the party that wrote it, *Merrimack Valley Natl. Bank v. Baird*, 372 Mass. 721, 724, 363 N.E.2d 688 (1977), and the principle surely counts double when the drafter is a lawyer writing on his or her own account to a client. In setting fees, lawyers "are fiduciaries who owe their clients greater duties than are owed under the general law of contracts." Restatement (Third) of the Law Governing Lawyers § 46, comment b (Tent.Draft No. 4, 1991).

The cases relied on by Hoey are not cases involving the special relationship between attorney and client. For example, *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 781 N.E.2d 787 (2003) (Hoey Memo, p. 8), was a dispute between companies over whether a deal was reached on purchasing computer systems and the court found that the plaintiff's claim of reliance that they entered a contract was unreasonable where it was based on a quote that clearly stated it was an "invitation to offer only" and that any contract must still be accepted by the head office. Such a case is not at all comparable to the attorney-client relationship and facts here. Neither is *Scalli v. Citizens Fin. Grp., Inc.*, No. CIV.A. 03-12413-DPW, 2006 WL 1581625 (D. Mass. Feb. 28, 2006) (Hoey Memo, p. 9, fn. 6) which involved loan officers suing their former employer where these employees claimed that they were entitled to earlier promises of additional compensation which were not reflected in the contracts they executed. The court found the contracts were integrated agreements (as cited by Hoey) but in that case, the plaintiffs both claimed they had received several prior versions of the initial offer letter from the defendant which reflected the additional promises made and yet signed a final offer letter that changed and omitted these promises with the verbal promise that the inconsistency would be fixed later. The court found it unreasonable as a matter of law for the plaintiffs to purport to rely on additional promises made during the negotiation phase, when they were aware that the contracts they executed did not contain those additional terms. *Id.*, *13.

In our case, not only did Hoey have a fiduciary duty to Kira unlike corporate transactions or employment negotiations, but at the time of presenting this second CFA to her, Kira was preparing to have to testify in front of a full courtroom about the most painful and traumatic day of her life when she was raped and believed she was going to die at the hands of her rapist. In his defense when it comes to failing to tell Kira about significant expenses incurred in her case,

Hoey claims he did not inform Kira about day-to-operations because it would "upset her." Dkt. 96-4, Ex. 4, Hoey Dep., p. 73. But when confronted with his own written, undeniably false statement to Kira about a change in the fee agreement, his defense is, she should have paid more attention and he did not have to explain the significant changes to her. There is a genuine issue of material fact as to whether the 2015 CFA was procured by Hoey's false statement that the new fee agreement was the same as before. Indeed, this is why Kira did not move for summary judgment on this claim.

Kira's fraud claim is also based on Hoey's false representations inducing her to write "I approve" on the fee and expense itemization in March 2020. Hoey had Kira sign off on a fee breakdown that omitted an explanation that the $4,025,036.50 taken for a fee was 40.3% that included the 7% appeal upcharges rather than 33.3%. Hoey never explained in advance, including when Kira signed a separate agreement with appellate counsel, that he and Keenan would and then did tack on the extra 7% for themselves. *See* Dkt. 96-4, Ex. 4, Hoey Dep., p. 152, line 16 to p. 154, line 4. His defense now is that the 2015 CFA clearly provided that "should there be an appeal…she would be charged an increased fee." Hoey Memo, p. 10. But Hoey himself conceded otherwise at his deposition:

> Q. And to be more specific here, it [2015 CFA] says, "after an appellate brief is filed in an applicable appellate court or body by the [A]ttorney."[1] What's your understanding of that?

---

[1]    The 2015 CFA provision referenced in this question is (emphasis added) (Dkt. 96-11, p. 2):

(4) Reasonable compensation (including that of any referring and/or associated counsel) on the forgoing contingency is to paid by the Client to the Attorney [Don C. Keenan and The Keenan Law Firm PC], but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:

     33 and 1/3 (thirty-three and one-third percent) of gross amount recovered

*The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney [Don C. Keenan and The Keenan Law Firm P.C.] on*

A. Well, the way it reads is that he [Keenan] would have to file the brief is the way it reads, but that's not how it happened.

Dkt. 96-4, Ex. 4, Hoey Dep., p. 173. That's not how it happened and neither Hoey nor Keenan explained that to Kira, instead, specifically omitting from their explanation that an extra 7% was charged while she also paid her actual appellate counsel separately.[2] Alternatively, to the extent the 2015 CFA appeal contingency fee is considered ambiguous, that is another question of fact. *See Tokatlian v. E.I. DuPont de Nemours & Co*., No. CIV.A. 85-3699-MA, 1987 WL 34093, at *3 (D. Mass. Dec. 16, 1987)("Where the meaning of a term of a contract does not appear unambiguously from the instrument, its interpretation is a matter for the jury."); *Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Massachusetts, Inc.*, 79 Mass. App. Ct. 300, 307, 945 N.E.2d 964, 971 (2011) ("Once a contractual ambiguity emerges, the meaning …becomes a question of fact for the trier…[who] may then consult extrinsic evidence including the circumstances of the formation of the agreement and the intentions and objectives of the parties."); *see also*, Ex. 65, Higgins Report, ¶105 ("To the extent the provision was ambiguous, it was incumbent on Attorney Hoey to make it clear to Ms. Wahlstrom at the time she signed the agreement that it would be applied in a way that favored Attorneys Hoey and Keenan, and disfavored Ms. Wahlstrom.")

---

*behalf of the Client*, and an additional Five Percent (5%) of gross recovery if matter is retired/concluded/settled following an appellate decision.

[2]     Hoey's assertion that "Hoey's and Keenan's names were left off Plaintiff's brief was nothing more than a strategic decision by DeJuneas" (Hoey Memo, p. 9, fn. 5) is yet another false statement. *See,* Exhibit 69, Declaration of Patricia DeJuneas, ¶11.

Hoey makes little effort in his motion to defend his other false statements and material omissions[3] at the time he presented the final fee and expense itemization to Kira in March 2020, on which Kira also bases her fraud claim (Dkt. 11, FAC, ¶¶50(a) to (h), 88-97), such as:

- representing she was required to pay $20,824.00 for attorney Richard Goran to appear for Keenan's Foundation strictly to attempt to impound exhibits that included Keenan's copyrighted litigation strategy manual to protect their financial interests;

- representing that she had to pay $8,432.39 for fees for James Bolan, while omitting that Bolan was Hoey's long-time personal and ethics attorney who worked on Hoey's behalf;[4]

- representing that she had to pay $41,231.72 for attorney Amy Goganian's fees to defend against the Sobczak lien while failing to disclose Goganian's fee agreement was entered with Hoey / Hoey Law, that she provided work that benefitted Hoey alone, that Sobczak did not seek for Kira to pay extra fees to him and without advising Kira of the conflict between Kira and Hoey regarding the Sobczak dispute and failing to obtain a waiver of the conflict;

---

[3]  *See, Sahin v. Sahin*, 435 Mass. 396, 402, 758 N.E.2d 132, 138 (2001)("Fraud by omission requires both concealment of material information and a duty requiring disclosure.")

[4]  Both during deposition questioning (*see, e.g.*, Exhibit 66, Deposition of Expert Erin Higgins, p. 136) and now in his motion papers, Hoey has stated that "the Hoey Defendants sent Plaintiff a check for Bolan's expenses ($8,432.99), which she returned" (Hoey Memo, p. 11, fn. 8) as if he should be given credit for that. What Hoey has repeatedly omitted on this point is that he sent the Bolan check (along with certain other check payments) as a settlement offer which he required must be kept confidential if Wahlstrom accepted the checks in order to attempt to hide his misconduct. Wahlstrom responded:

> These amounts plainly should not have been charged as expenses and deducted from the recovery paid to Kira Wahlstrom. In addition, the fact that these four items were taken from Ms. Wahlstrom is evidence of Mr. Hoey's carelessness (if not, worse) in executing his fiduciary duty to Kira and complying with his professional responsibilities. Thus, these charges have evidentiary value even if reimbursed now.

> Kira will accept these checks as reimbursement for these expenses wrongfully charged only if there are no restrictions on their use in evidence. We will stipulate that Mr. Hoey paid back these particular expenses as of this time, after Kira filed her federal complaint. We have every intention of offering the payments into evidence. So if you are offering to pay only if there is an agreement that the payment cannot be used in evidence, that offer is rejected.

*See* Exhibit 73, p. 5. Hoey would not agree to the above terms but wanted to keep the checks confidential and preclude their use in evidence so the checks were returned. *Id.,* pp. 6-7. This included a check for commemorative plaques for the underlying case that Hoey used Wahlstrom's money to pay for so he could hang such a plaque on his office wall which will also be part of Wahlstrom's evidence at trial.

- representing that she must pay $2,655.00 for John Vail as a "constitutional law attorney," another false statement, as Vail's work did not involve any constitutional issues but rather Vail was hired by Hoey as a "favor" to Hoey to give comments on DeJuneas' draft appellate briefs that Hoey cut and pasted into emails as though they were his own comments, and then charged Kira for it;

- representing that she had to pay $1,316.00 for attorney Catherine Giordano for "research and writing" without explaining why this extra attorney was needed or getting prior consent for this attorney to incur fees;

- representing she had to pay $561.24 for the firm Lewis Brisbois Bisgaard & Smith LLP without fully explaining that this firm was defending Hoey Law's Sobczak for his misconduct during trial and without explaining the conflict of interest or obtaining a waiver.

Hoey's only defense to all the above is that the 2015 CFA specifically identifies "Referring/Associated Counsel" as Hoey Law and so "work by other lawyers outside of Hoey Law and the Keenan Law Firm is plainly not within [that] provision of the 2015 CFA" and this is "further evidenced by the fact that DeJuneas' firm had its own agreement with Wahlstrom." Hoey Memo, p. 11. But the fact that DeJuneas and Kira had their own fee agreement further makes the point as to why Kira is not contesting the DeJuneas fees while she is contesting all these additional attorneys with whom she had no fee agreement but also did not even know about in advance or approve of retaining. Dkt. 95, Wahlstrom Dec., ¶¶ 28-41. The 2015 CFA nowhere indicates that Keenan or Hoey can hire additional attorneys on their own, with no notice to Kira, and then make Kira pay for them at the end.[5] And the above challenged attorney charges are not "reasonable expenses" which Kira agreed to paying through the 2015 CFA. In addition to being unreasonable, the CFA provision on expenses nowhere indicates that such expenses could include additional attorneys. The fee agreement specifically indicates the contrary, stating that other than paying the contingency to Keenan which would be divided with Hoey, "Client

---

[5] And such failure to communicate these significant developments to Wahlstrom during her case violated the Rules of Professional Conduct and fell below the standard of care Hoey and Keenan owed to Wahlstrom. *See* Exhibit 65, Higgins Report, ¶¶ 89-91; Exhibit 66, Higgins Dep., pp. 126-131.

understands that the Client will not be charged any additional legal fees." Dkt. 96-11, Ex. 11, 2015 CFA, p. 2 at para. 4. At the time, Kira reasonably relied on and trusted her long-time attorney Hoey's false representations that she had to pay all these extra attorneys when she really was not required to do so under the CFA terms (and contrary to the ethics rules).

The above-described material disputed facts as to Kira's fraud claim against Hoey should be tried to a jury and his motion for summary judgment should be denied.

## B. Kira Sufficiently Plead Her Fraud Claim With Particularity

Hoey challenges the pleading but then continues to argue the merits of the claim rather than whether it was sufficiently plead. Hoey Memo, pp. 12-13. Kira has sufficiently plead her fraud claim against Hoey under the requirements of Rule 9(b) by specifying the false statements and material omissions of Hoey: in his June 11, 2015 email, Hoey misrepresented the 2015 CFA to Kira as "the same agreement as before but with Don's name" when inducing her to sign it using his position of trust to do so (Dkt. 11, FAC ¶¶ 22, 73, 74, 90); part of the motivation to induce Kira to sign the new fee agreement with Keenan rather than Hoey was to reduce the fee owed to the referral attorney but Hoey did not disclose this material fact to her in his email or verbal statements about the new CFA in June 2015 (*Id.*, ¶93); and Kira alleges that after the recovery money came in, "Hoey and Hoey Law, with the approval and agreement of Keenan and Keenan Law, falsely represented that Ms. Wahlstrom must pay" the extra percentage for the appeal and "falsely represented to Ms. Wahlstrom in their itemization presented to her in person (March 27) and then by email (March 29) that Ms. Wahlstrom must pay fees for additional attorneys when they well knew that [she] was not obligated to pay these attorneys because they had performed work on behalf of Hoey and on behalf of Keenan and not Ms. Wahlstrom" (*Id.*, ¶¶94-96), and Kira relied to her detriment on the false representations and fee itemizations of

Hoey and Keenan which damaged her in an amount of at least $900,000 (*Id.*, ¶¶ 96-97), which includes the specific attorney charges enumerated in paragraph 50 of the First Amended Complaint adopted and incorporated into the fraud claim. Kira alleged the elements of fraud against Hoey including his intent to defraud[6] and stated with sufficient particularly "the who, what, where, and when" of the misleading representations. *See*, *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016); *see also*, *Grundy v. HSBC Bank USA, N.A. as Tr. for Registered Noteholders of Renaissance Home Equity Loan Tr. 2006-3*, No. CV 17-11449-PBS, 2020 WL 1326269, at *35 (D. Mass. Feb. 10, 2020)(Bowler, MJ.) (Rule 9(b) argument fails to warrant summary judgment on fraud claim where complaint sets out the time, place and content of fraudulent charges on monthly statements at issue). Hoey's motion for summary judgment based on the Rule 9(b) pleading standard should be denied.

Hoey's additional arguments on the merits of the fraud claim are also in dispute. As to Hoey's argument that "Wahlstrom can present no evidence to show that Hoey misrepresented the associated counsel clause" (Hoey Memo, p. 12), that is not Kira's claim but rather that he failed to explain the clause at all and then misrepresented that she was required to pay for the additional attorneys when she was not as shown above. As to his argument that Kira cannot show Hoey "somehow knew there would be charges for services of other attorneys at the time the 2015 CFA was signed," Hoey testified that it had been his practice before the Wahlstrom case to charge his clients for the fees incurred by additional attorneys (*see,* Dkt. 96-4, Ex. 4, Hoey Dep., p. 120, line 14 to 121, line 24) and yet he did not explain or notify Kira of that practice with other clients when she signed the agreement or at any point before incurring such charges. *See* Dkt. 95,

---

[6]     *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23, 325, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)("The inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" and "personal financial gain may weigh heavily in favor of a scienter inference")

Wahlstrom Dec., ¶¶ 6-12, 20; Ex. 65, Higgins Report, ¶¶ 89-91. This was another material omission in Hoey's communications with his client.

Kira's allegations of his false representations as to each of the additional attorney charges are sufficiently specific in her complaint. Kira has shown in her own motion that she did not understand (and could not have understood) the fees and expenses when Hoey reviewed them with her because they were not fully explained. It is a material factual dispute whether Hoey's explanations of these charges constituted fraud. Hoey claims the fees and expenses "were all laid out to Wahlstrom" in his spreadsheet but what he "laid out" with a few one-liner explanations had material omissions more than sufficient to state a fraud claim. For Amy Goganian, he explained "This is who we hired to fight the Sobczak lien" without any explanation of his conflict of interest and how Goganian was working on Hoey's fight with Sobczak with extensive unnecessary (and unsuccessful) motion practice[7] pressed by Hoey in conflict with Kira's interest to avoid extensive and expensive litigation. Ex. 65, Higgins Report, ¶¶124-126 (failure to disclose conflict of interest) For Goren, Hoey wrote "This is who we hired to fight Intellectual Property, Patent, Trademark Infringment [sic] and confidentiality" which omits the material fact

---

[7]    *See, e.g.,* Dkt. 96-32, Ex. 32 (Hoey to Goganian regarding motion to dismiss Sobczak's lien: "It will need a motion and it will need to be Impounded. I cannot let the media or other law firms see this dispute."); Dkt. 96-40, Ex. 40, Motion to Dismiss Notice of Attorney's Lien filed by Goganian (Part B arguing res judicata based on prior litigation between Sobczak and Hoey and Part C arguing Sobczak cannot use attorney's lien to establish a lien against Hoey Law); Dkt. 96-37, Ex. 37, Goganian Dep, p. 15 line 1 to p. 16, line 4; Exhibit 75, Hoey Law Memo in Support of Motion to Impound filed by Goganian (arguing "disclosure of information related to the Wahlstrom matter, including any potential fee or other economic value, will be highly prejudicial to Hoey Law and will cause immediate and irreparable harm"); Exhibit 76, p. 1 (12/27/19, Hoey email to Goganian instructing her to file reply brief over her warning that the judge "is already irritated and clearly felt the file had been over papered."); Dkt. 96-42, Ex. 42, Goganian Invoices (identifying Hoey as "client" in billing entries including 12/27/19 entry re "multiple emails to and from client and Attorney Bolan" and review of "impoundment orders" from Hoey's other cases and time spent on unsuccessful motions urged by Hoey); Dkt. 96-9, Ex. 9, Docket in Underlying Case (e.g., 10/15/20, Order denying motion for sanctions against Sobczak; 10/15/20, Order denying motion for fees and costs against Sobczak; 3/1/21, Order denying motion for reconsideration of denial of sanctions against Sobczak)

that the intellectual property was owned by Keenan and his foundation and was only to benefit

Keenan's financial interest to protect his book sales and not Kira. Dkt. 96-18, Ex. 18, Goren

Dep., pp. 17-19, 24, 29. For James Bolan, Hoey explained "This was Ethics counsel who

consulted regarding Wilson, Sobczak, the Appeal and other areas of concern" which omitted that

this was Hoey's ethics counsel who was consulting with Hoey on his interests and defenses to his

misconduct during trial. Dkt. 96-20, Ex. 20, Bolan Dep., pp. 20-22. As for the Lewis Brisbois

firm, he explained "Related to Sobczak and complaint to the Board" and nothing more thus

omitting he was having Kira pay for the defense firm for Sobczak's misconduct which was not

her obligation. Dkt. 96-13, Ex. 13, Sobczak Dep., pp. 63-67. As for John Vail, as explained

above, Hoey cryptically explained only "constitutional law attorney" which was false and

omitted what Vail was really doing, providing comments on the appellate issues for Hoey as a

favor which Hoey cut and pasted into emails with DeJuneas as though they were his own

thoughts. Dkt. 96-4, Ex. 4, Hoey Dep., p. 186, line 8 to p. 189, line 3; Dkt. 96-28, Ex. 28,

Hoey/Vail Emails, p. 2 and 5.

   So, in response to Hoey's repeated question "where is the misrepresentation?", the above

is his answer.

## II.  Kira Is Entitled to Summary Judgment Against Hoey on Her 93A Claim and There Are Additional 93A Violations to Be Pursued at Trial

Kira is entitled to summary judgment on her 93A claim for the appeal overcharge and for

the additional attorneys charged (Goganian, Goren, Bolan, Vail, Giordano, and Lewis Brisbois)

and for the Advocate Capital financing charges as shown in Kira's motion for partial summary

judgment. *See*, Dkt. Nos. 92 to 96. While Kira has sufficient evidence to try her fraud claim,

either way, her "93A claim for false and deceptive trade practices is independent of any related

claim for common law fraud." *See New Faith Missionary Baptist Church v. Pizziferri*, 81 Mass.

App. Ct. 1116, 962 N.E.2d 244 (2012).

> In particular, reasonable reliance is not a necessary element of a c. 93A claim in all circumstances. Thus, for example, an act of deception that deprives a vulnerable individual or entity of something of value, or a deceptive act or scheme that takes advantage of someone who of something of value a vulnerable individual or entity, or one that is unlikely to discover it because, for example, of a particularly trusting nature or a lack of resources of which the perpetrator is or should be aware, could give rise to a cause of action under c. 93A even if all the elements of common law fraud or any other cause of action have not been demonstrated.

*Id*. The cases cited by Hoey here do not apply including *Fernandes v. Rodrigue*, 38 Mass. App.

Ct. 926, 928, 646 N.E.2d 414, 416–17 (1995) (Hoey Memo, pp. 14-15) holding that "Chapter

93A does not make actionable the failure to disclose a fact unknown to the person who the

plaintiff thinks ought to have disclosed it" which involved a buyer suing a broker after

completing a purchase of property and realizing the space was too small for the store and

warehouse intended. The court observed "One would hardly expect the broker to have a survey

made; that would ordinarily be the buyer's responsibility if a certain minimum area was a matter

of importance." *Id*. In contrast, not only would one expect an attorney to make proper disclosures

to his client, but the ethics rules require it. Hoey not only disregards the facts (that Kira seeks to

hold him accountable for failure to disclose information *he well knew*) but he completely ignores

his fiduciary duties and ethical obligations owed to his client. Hoey blames Kira for what she did

not know or understand because he did not disclose it: "She was given the opportunity to ask any

questions and to dispute any of the charges. She did not do so." Hoey Memo, p. 15. Hoey opens

his memorandum with (Hoey Memo, p. 1):

> For twelve years, David J. Hoey zealously represented Wahlstrom. He was not only her attorney but her friend and confidant. Whether it was assistance with obtaining a loan, eviction proceedings, her job, or to talk, Hoey was there. He missed vacations, holidays, and countless times with his family to be available and to help Wahlstrom.

And then turns right around and argues its Kira's fault for trusting and relying on him when it came to his unfair and deceitful conduct and his repeated violations of the ethics rules which clearly caused her harm, in an amount over $1 million.

In addition to her claims at issue on her motion for partial summary judgment, Kira has an additional 93A claim for trial – that Hoey's unfair and deceitful conduct in inducing Kira to sign the new 2015 CFA, which resulted in Kira being sued by the referral attorney, Austin O'Toole, and forced Kira to retain counsel and incur over $50,000 in attorney fees charged by Amy Goganian in defending the O'Toole case. If the 2015 CFA is determined to be void based on Hoey and Keenan's ethics rules violations (as Kira argues in her motion for partial summary judgment), then they had no grounds to reduce the referral fee charged, and thus but for their unethical conduct, Kira would never have been sued by O'Toole.

Separate from the validity of the 2015 CFA, O'Toole's lawsuit is premised entirely on his claim that Hoey and Keenan had engaged in wrongful and deceptive conduct which created a conflict of interest between Hoey and Keenan and their client, Kira, because Kira was required to defend against litigation arising solely out of alleged misconduct by her attorneys. *See,* Ex. 65, Higgins Report, ¶127 citing *Maddocks v. Ricker,* 403 Mass. 592, 586 (1988) (under prior version of Rule 1.7, an attorney whose conduct is challenged cannot continue the representation without client's informed consent); *see also Maples v. Thomas,* 565 U.S. 266, 285 n. 8 (2012) (finding that a firm's interest in preventing damage to its reputation in light of default was at odds with the client's strongest argument-that his attorneys had abandoned him - and therefore constituted a conflict of interest). Hoey violated 93A by failing to disclose to and advise Wahlstrom of this conflict. Exhibit 83, Second Wahlstrom Dec., ¶5; Ex. 65, Higgins Report, ¶¶81-83, 125-26; Dkt. 96-4, Ex. 4, Hoey Dep., pp. 293-94. And Hoey failed to obtain Kira's informed consent to his

continued representation of her a year after O'Toole's lawsuit was filed. *Id*. Instead, despite the conflict, Hoey was actively involved with how Attorney Goganian litigated on Kira's behalf in defending the O'Toole litigation. *See,* Exhibit 77, Goganian Invoices (multiple entries conferring with Hoey and Attorney Bolan). Hoey used Kira's attorney-client privilege to attempt to block O'Toole from learning the details of the fee and expense distribution. Exhibit 78 (Hoey response to O'Toole inquiring how fee was calculated: "You are apparently seeking more money and information, neither of which you are entitled to – the former because you've been paid $250,000 and the latter because the information you seek is privileged, which privilege Kira holds.") Hoey's tactic continued after the O'Toole litigation was initiated in his effort to limit disclosures to O'Toole (as well as to hide this attorney fee dispute from the public record). *See, e.g.* Exhibit 79 (Goganian: "David wants to talk …and I am sure will press for us to supplement our papers on the seal issue …as David feels strongly that it is in your best interests to at least try to shield the disbursement document for reasons that go beyond the size of the recovery." Kira: "I'm not sure what David is thinking but there is nothing on that disbursement paper to hide as I can tell.")

At one point, Attorney Goganian did make demand on Hoey to pay the fees being incurred by Wahlstrom in the *O'Toole* case, writing:

> Ms. Wahlstrom hereby respectfully requests that your clients, David Hoey and the Law Offices of David J. Hoey, PC, pay all legal fees and expenses associated with Kira Wahlstrom's defense in the O'Toole matter, including fees and expenses incurred to date as well as any future fees and expenses Ms. Wahlstrom may incur during the pendency of this lawsuit. I strongly believe that Attorney O'Toole does not have a rightful claim against Ms. Wahlstrom, and I am hopeful that the court will dismiss the action against her. However, the pending Motion to Dismiss will not be heard until the end of this year, and likely not decided until sometime in 2022. As such, Ms. Wahlstrom has, and will continue, to incur legal fees and expenses defending herself against Attorney O'Toole's claims against her. If the Motion is denied, her legal fees and costs could be substantial, particularly given the extremely aggressive approach Attorney Foye has taken up to this point.

Ms. Wahlstrom is appreciative of your clients' rigorous prosecution of her various legal matters thus far. However, regardless of the merits of Attorney O'Toole's allegations against your clients, I think we all can agree that Ms. Wahlstrom should never have been put in a position that exposed her to any claim for fees above and beyond what she has paid to date.

Exhibit 80, p. 3. Hoey ignored the request. *Id.* [8] Nor did he take any action when the Honorable

Judge Krupp admonished him given that Kira was named in the dispute between Hoey and

O'Toole:

…it's inexcusable that counsel have not prioritized that as the highest number one thing to do in this case, is to make sure that she [Wahlstrom] is not going to part with a dime given that -- given the circumstances. Okay. You do not have to name her. And Mr. Hoey should be in a position of protecting her from any claim by you, by the plaintiff, okay, as against Ms. Wahlstrom.

Exhibit 72, Transcript of Motion Hearing in *O'Toole* Case, 5/24/2022, pp. 11–13, 19.

There is a triable claim on Hoey's liability under 93A for the *O'Toole* case costs Kira

incurred [9] along with whether Kira is entitled to double or treble damages for the knowing or

willful conduct of Hoey including where he well knew of the distress caused to Kira by being

involved in that lawsuit with the evidence that he preferred to have Kira in the case so he could

use Kira's attorney-client privilege to his own benefit to block disclosure of evidence to be used

against him.

Hoey's motion for summary judgment on the 93A claim should be denied.

---

[8]       While Attorney Goganian received payment from Hoey for her first three invoices in the *O'Toole* case, it seems Hoey may have used Wahlstrom's reserve money from the underlying case (meant for expenses in her bad faith case against the insurance companies and her children's loss of consortium case) to pay those invoices. *See*, Exhibit 82 (Hoey expense itemizations provided in March 2020 identifying payment to Amy Goganian for the period of "March 20, 2020 until February 8, 2022" to which the reserve money was applied. Hoey labeled this as payment for the Sobczak lien dispute but no Goganian invoices have been produced for this work to verify. The only Goganian invoices for work on the Sobczak lien are for prior to this time period. Dkt. No. 96-42, Ex. 42, Goganian Invoices re Sobczak.)

[9]       While Wahlstrom has a claim for 93A violations against Hoey and Keenan for their conduct whatever their motive in having her sign the 2015 CFA, whether they had Wahlstrom enter a new fee agreement in order to reduce O'Toole's referral fee to be paid from any recovery remains a material factual dispute as well. *See,* Dkt. 96-13, Ex. 13, Sobczak Dep., p. 91-102; *see also*, Ex. 67, Kazarian Dep., p. 134, lines 7-20. Either way, Hoey and Keenan's conduct resulted in the *O'Toole* suit.

### III. Kira Did Not Ratify Hoey's Misconduct

Kira relies on and incorporates here her previously filed argument that she did not ratify Hoey's conduct when she signed the March 2020 itemization in her motion for partial summary judgment. *See,* Dkt. 93, Memorandum, Part VII, pp. 24-25. As shown in Kira's motion papers, she was clearly not fully informed as to why she was being charged for these attorneys nor did she know what work they really did – to benefit Hoey and Keenan rather than her – in order to "ratify" them. Hoey met with Kira once in December but did not provide her a copy of the breakdown in writing to review any of these charges (Ex. 83, Second Wahlstrom Dec., ¶7) and then, three months later, he gave her the very cryptic spreadsheet breakdown, and nothing more, which was an inadequate explanation. Ex. 96-52, Ex. 52. Then he had her come to the office and sign off with the "I approve" language when she had trusted him for 10 years and he was still representing her on other pending cases. Dkt. 95, Wahlstrom Dec., ¶¶3, 20; Ex. 83, Second Wahlstrom Dec., ¶8. While Kira submits she is entitled to summary judgment, alternatively, there is clearly a material dispute on ratification to be tried.

The cases cited by Hoey do not support a finding of ratification of the fees and expenses by Kira. *See* Hoey Memo, p. 16. In *Dorn v. Astra USA*, 975 F. Supp. 388 (D. Mass. 1997), former employees brought suit seeking declaratory judgment that settlement agreements and general releases they executed at termination should be rescinded because they were obtained by coercion or duress. The court held that the plaintiffs ratified the agreements and waived the duress defenses by accepting the benefits of their respective bargains and by waiting too long to disavow the agreements because of the alleged duress. *Id*., at 393. This involved bargained-for settlement agreements where the plaintiffs accepted significant benefits in exchange for a release of all claims against Astra Dorn, benefits they were not offering to return and they waited

between eleven to thirty-four months to disavow the contracts. The court held that "[o]ne who wishes to repudiate a contract on grounds that it was obtained under duress must do so within a reasonable amount of time." *Id*., at 394. Kira is not repudiating an agreement but rather never ratified these overcharges in the first place because she was not fully informed of all the facts to be able to ratify or truly agree to them. *See,* Dkt. 93, Wahlstrom Memo, Part VII, pp. 24-25. Nor did Kira wait two years to challenge the fee and expense distribution, rather, she only discovered she was defrauded and overcharged near the end of 2021, after consulting independently with attorney Patty DeJuneas. Dkt. 95, Wahlstrom Dec, ¶¶45-49. Hoey had still been representing Kira on other cases after the March 2020 fee and expense settlement in the premises liability case.[10] But after figuring out that Hoey had deceived her, Kira promptly interviewed new counsel to take over the cases that Hoey continued to handle and once she secured new counsel, she formally terminated Hoey in February 2022 within months of her discovery. *Id*. She then promptly served her 93A Demand Letters within a month thereafter and filed her lawsuit. *Id*. She did not remain silent or acquiesce once she discovered the misconduct and harm she suffered.

In *Mantia v. Bactes Imaging Solutions, Inc*., 29, Mass. L. Rep. 21 (Mass.Super.Ct. 2011) (Hoey Memo, p. 16), a personal injury plaintiff raised a dispute with a vendor over the cost of copies of medical records after receiving the invoices and paying them. This is not at all like an attorney providing his client an expense itemization with the names and amounts charged but without a full explanation of the work performed by these extra attorneys and where the attorney had a fiduciary duty to do so because the client was in a position of trust and reliance on him. Nor is *Selectmen of Hull v. Cnty. Comm'rs of Plymouth Cnty.*, 12 Mass. App. Ct. 900, 422

---

[10]     *Compare Murphy v. Smith*, 411 Mass. 133, 137, 579 N.E.2d 165, 168 (1991)(Under continuing representation doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered.")

N.E.2d 787 (1981) (Hoey Memo, p. 16) applicable here, a case holding that where the town of Hull paid county taxes assessed against it for six years without duress and without objection or protest, the town was not entitled to restitution by reason of alleged disproportionate assessments in the absence of fraud or mistake of fact. In *Hills v. Chambers*, No. 96-0072B, 2000 WL 1532335 (Mass. Super. Aug. 18, 2000) (Hoey Memo, p. 17), a business partner at Herb Chambers entered an agreement, after consulting with his counsel, and then he operated under the terms of that agreement for three years before he tried to challenge it. In addition to failing to seasonably disavow his obligations, the court held, distinguishable from Kira's circumstance, that "because there is no evidence that Hills was deprived of any knowledge of the facts comprising the fraud, this court concludes that he has not exercised "reasonable promptness" in asserting his claim for rescission." *Id.*, *9-10.

Finally, *Grishman v. Clark*, No. CV 22-11009-RGS, 2023 WL 3742814, at *7 (D. Mass. May 31, 2023) (Hoey Memo, p. 17, fn. 12) is aligned with Kira's argument that there was no ratification because ratification requires obtaining "full knowledge of the transaction." In *Grisham*, ratification was established by the record where "Clark had contemporaneous knowledge of each action she alleges to have constituted a breach of fiduciary duty" and "yet remained a willing party to the agreement ...." In contrast, Kira did not have full knowledge of the fees and expenses charged to her when she signed the itemization in March 2020. And when she did discover that she was overcharged she did not willingly go along with it but promptly found new counsel, terminated Hoey and pursued her claims against him and Keenan for their misconduct.

### IV. Fees Kira Paid for Sobczak Dispute and the O'Toole Litigation

Kira relies on and incorporates herein her argument and evidence in her motion for partial summary judgment for the grounds as to why Hoey is liable for the fees incurred by both attorneys Goganian and Bolan related to the Sobczak lien which Sobczak filed as part of his dispute with Hoey over fees owed to him by Hoey while Sobczak worked for Hoey Law. *See,* Dkt. 92-96. While Hoey had no control over Sobczak, he had control over himself and he failed to advise Kira of the conflict of interest between them in how the Sobczak dispute was to be handled and failed to advise her of Goganian rates and the fee agreement Hoey entered with Goganian in advance. Instead, Hoey handled the litigation his way (*see* footnote 7 above) – directing Goganian to aggressively litigate with motion practice that caused a state court judge to become upset with them, instructing Goganian to file for impoundment because he did not want the media to know about his dispute with his former associate, having Goganian make arguments on his behalf and incurring fees billed for unsuccessful sanctions motions against Sobczak. Then Hoey turned around and gave the bill to Kira.

Kira also has triable claims against Hoey related to O'Toole under both 93A and as a breach of his fiduciary duty to her as described above.

### V. Conversion

Wahlstrom relies on the evidence submitted in support of her conversion claim on her own motion for summary judgment. *See,* Dkt. 93, Wahlstrom Memorandum.

### VI. Accounting

"An accounting is an equitable remedy available where there is 'a fiduciary relation between the parties.'" *McQuilly v. Belfi*, 99 Mass. App. Ct. 1115, 165 N.E.3d 171 (2021) Wahlstrom's claims entitle her to this equitable remedy against Hoey as to date he has failed to account for all expenses in the case.

Dated: September 22, 2023                    Respectfully submitted,

                                             */s/ Bridget A. Zerner*
                                             Bridget A. Zerner (BBO No. 669468)
                                             John J.E. Markham, II (BBO No. 638579)
                                             MARKHAM READ ZERNER LLC
                                             11A Commercial Wharf West
                                             Boston, Massachusetts 02110
                                             Tel: (617) 523-6329
                                             Fax:(617) 742-8604
                                             bzerner@markhamreadzerner.com
                                             jmarkham@markhamreadzerner.com
                                             *Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2023 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

                                             */s/ Bridget A. Zerner*
                                             Bridget A. Zerner