UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIRA WAHLSTROM,

    *Plaintiff*

v.

DAVID J. HOEY, LAW OFFICES OF
DAVID J. HOEY, P.C., DON C. KEENAN,
AND D.C. KEENAN & ASSOCIATES, P.C.
D/B/A THE KEENAN LAW FIRM, P.C.

    *Defendant*

1:22-cv-10792-RGS

## PLAINTIFF KIRA WAHLSTROM'S REPSONSE TO DEFENDANTS DAVID J. HOEY AND THE LAW OFFICES OF DAVID J. HOEY, P.C.'S STATEMENT OF UNDISPUTED[1] FACTS (AT DKT. 90)

### I.   INCIDENT

1.    On May 1, 2009, Plaintiff Kira Wahlstrom ("Plaintiff") was assaulted in a parking garage attached to the Radisson hotel in downtown Boston. Exhibit A ("Ex."), First Amended Complaint ("Compl."), ¶ 11.

**RESPONSE: Undisputed.**

### II.   UNDERLYING PREMISES LIABILITY LAWSUIT

    a.   2010 Contingent Fee Agreement between Plaintiff and the Law Offices of David J. Hoey, P.C.

2.    Due to the complexity of the case, Plaintiff, through her then-friend Austin O'Toole, Esq., was introduced to David J. Hoey and referred to the Law Offices of David J. Hoey, P.C. ("Hoey Law" and collectively the "Hoey Defendants") Ex. A, Compl., ¶ 15.

---

[1] These facts are submitted as undisputed for purposes of this motion only.

1

**RESPONSE: Undisputed.**

3.      On February 2, 2010, Plaintiff entered into a contingency fee agreement with Hoey Law ("2010 CFA"). Ex. B, 2010 Contingent Fee Agreement ("2010 CFA") (Wahlstrom Ex. 02—LDH 0000010-0000012). Per Paragraph 1, "The claim, controversy, and other matters with reference to which the services are to be performed are: *premises liability and injuries received on or about May 1, 2009 in the Radisson parking garage*[.]" Id. at ¶ 1.

**RESPONSE: Undisputed.**

4.      Per the 2010 CFA, the "fee is to be paid only upon recovery[,]" and "the Client is not liable to pay compensation otherwise than from amounts collected for (him) / (her) by the Attorney except as follows: none." Ex. B, 2010 CFA, ¶¶ 2-3.

**RESPONSE: Undisputed.**

5.      The 2010 CFA also provides:

> (4) Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client.
>
>      33.3% of the gross amount recovered;
>
> (5) The Client is to be liable to the attorney for his reasonable expenses and disbursements **only** if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is calculated. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain of the costs associated with pursuing and litigating the case and agree that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.
>
> The client acknowledges the following with respect to (his) (her) legal representation by the Attorney:

> a) It is understood and agreed by the Client that the Client has been referred to and that any fee to be paid pursuant to a matter referred to in Paragraph (1), above, is to be divided in part with AUSTIN S. O'TOOLE, ESQUIRE, pursuant to the applicable provisions of the Code of Professional Responsibility as the same is in force in Massachusetts as Rule 3:08 of the Supreme Judicial Court.

Ex. B, 2010 CFA, ¶¶ 4-5.

**RESPONSE: Undisputed.**

6.    Plaintiff read the 2010 CFA before she signed it and after conferring with Hoey.

Ex. C, Plaintiff Kira Wahlstrom's Response to the First Set of Interrogatories by Defendant D.C. Keenan & Associates, P.C. d/b/a The Keenan Law Firm ("Plaintiff Responses to Keenan's Interrogatories"), No. 2; Ex. D, Audiovisual Deposition of Kira Wahlstrom ("Dep. of Wahlstrom"), 15:4-5.

**RESPONSE: Undisputed.**

7.    When she reviewed and executed the 2010 CFA, Plaintiff understood that if there were a recovery, she would be responsible for reasonable expenses in relation to her case. Ex. D, Dep. of Wahlstrom, 15:11-15.

**RESPONSE: Undisputed.**

8.    Plaintiff understood that Hoey Law could borrow funds to finance the case and that she would be responsible for reimbursement of any interest charges or other expenses related to the financing of her case. Ex. D, Dep. of Wahlstrom, 15:16-24.

**RESPONSE: Undisputed except disputed that the 2010 CFA term addressing litigation financing allows for the attorney to borrow money under any terms or arrangement without advance notice, disclosure and agreement of Ms. Wahlstrom. Exhibit 65, Expert Report of Erin K. Higgins, Esq., ¶¶ 24, 27 88 ("Attorney Hoey also failed to meet the standard of care when he used litigation funding from Advocate Capital to pay for expenses relating to Ms. Wahlstrom's case without providing any explanation to Ms. Wahlstrom about how litigation financing works, and what the ultimate cost to her would be of using litigation funding. This is an area outside the knowledge of the average client.");**

3

**Exhibit 66, Deposition of Erin Higgins ("Higgins Dep."), p. 41 line 14 to p. 42, line 2. ("Q: Is it your opinion that at the time the 2010 agreement was signed the Attorney Hoey had an obligation to provide Miss Wahlstrom information about the terms on which Advocate Capital would be advancing the funds for the litigation expenses? A: As I said in my report, and certainly not just my opinion, I've cited BBA, an ABA opinion, and an article written by assistant bar counsel that a lawyer has to explain what litigation financing is to the extent that the client understands what they're taking on, the obligations that they're taking on.")**

9.      In a letter dated February 2, 2010 to O'Toole, which materialized the referral agreement, Hoey confirmed that in connection with <u>Kira Wahlstrom v. Jose Ruben Rivera et al.</u>, should there be a recovery, O'Toole would receive "33% of my [Hoey's] fee from the sum recovered." <u>Ex.</u> E, 2010 Referral Fee Agreement. O'Toole and Plaintiff signed the Referral Fee Agreement. <u>Id.</u>

**RESPONSE: Undisputed.**

> b.      <u>Underlying Lawsuit Filed</u>

10.     On March 12, 2010, Hoey filed suit on behalf of Plaintiff against the JPA defendants and others ("Underlying Defendants") for negligence in Suffolk Superior Court, titled <u>Wahlstrom v. JPA IV Management Company, Inc. et al.</u>, Civil Action No. 1084CV01022 ("Underlying Lawsuit"). <u>Ex. A</u>, Compl., ¶ 20.

**RESPONSE: Undisputed.**

11.     In June 2012, the Keenan Law Firm accepted the Wahlstrom matter in the Referring Attorney Group as a premise case. <u>Ex.</u> F, Don C. Keenan's Response to Plaintiff's Questions in Lieu of Appearing for a Deposition Per Agreement of Parties ("Keenan's Resp. to Plaintiff's Questions"), No. 1; <u>Ex.</u> G, Deposition of David J. Hoey ("Dep. of Hoey"), 82:6-9. At that time, Don Keenan's role was to mentor Hoey and help him prepare Plaintiff's Underlying Case. <u>Ex.</u> F, Keenan's Resp. to Plaintiff's Questions, No. 1.

**RESPONSE: Undisputed except to the extent that Keenan's role was not limited to "mentoring" as Keenan and Hoey entered a "co-counsel" contract under which Hoey was to pay Keenan part of any fee recovered for Keenan's services. Dkt. No. 96-8, Exhibit 8, Contract for Legal Representation between Hoey and Keenan, 2/24/2013.**

12.     In February 2014, Krzysztof Sobczak became affiliated as of counsel with Hoey Law and began working on the Underlying Lawsuit. Ex. G, Dep. of Hoey, 29:20-30:4.

**RESPONSE: Undisputed except that despite the "of counsel" listing, Sobczak worked as an employee of Hoey Law and it's Director of Litigation Department. Dkt. No. 96-13, Ex. 13, Sobczak Dep., p. 4 (Tr., p. 12, line 17 to p. 13, line 9), p. 6 (Tr., p. 20, line 6 to p. 21, line 17) and p. 44 (Tr., p. 172, line 2 to 173, line 1); Dkt. 96-4, Ex. 4, Hoey Dep., p. 34, line 23 to p. 36, line 15.**

13.     In late 2014, prior to Keenan's admission *pro hac vice*, the last offer that the Underlying Defendants made was $450,000. Ex H, September 10, 2014 email/letter (Wahlstrom Ex. 4 – LDH 0091991-0091992). This offer was rejected by Plaintiff, and due to the direction the underlying case was going and the prospects of an unfavorable verdict, Hoey suggested to Plaintiff that Keenan should be brought on board as additional counsel. Id.; Ex. D, Dep. of Wahlstrom, 28:7-29:10.  Keenan is a well-known national trial attorney, whose firm usually takes on high value cases. Ex. G, Dep. of Hoey, 13:9-10; 23:8-12.

**RESPONSE: Undisputed.**

14.     Thus, Plaintiff testified as follows at her deposition:

> Q. Do you remember having any discussions with David at around this letter or after, before Mr. Keenan came on, about what needed to happen for purposes of your trial and securing a verdict for you?
> A. David and I talked a lot about by case and what needed to happen, yes, and, like I said, bringing Don on, he told me was a good thing to do, so that's what we did.
>
> …
>
> Q. Did you ever have a conversation with David before…you agreed for Don to come on the case about the possibility of a defense verdict in the case?

A. The other side, is that what we're talking about?
Q. Yes, meaning the other side winning.
A. I'm sure we did have a conversation about it. We talked about a lot of things. I'm sure we had a conversation at one point that there was always the possibility that we didn't win, and that…
Q. And you understood that you could lose; correct?
A. Yeah. Yeah.

Ex. D, Dep. of Wahlstrom, 28:7-14; 28:21-29:10.

**RESPONSE: Undisputed.**

15. Plaintiff and Keenan first met in February 2015. Ex. F, Keenan's Resp. to Plaintiff's Questions, No. 4. During their meeting, Keenan got to know Plaintiff, assessed her case as to the extent of her damages and obtained factual verification. Id.

**RESPONSE: Undisputed.**

16. As a result of the meeting, Plaintiff agreed to retain Keenan per Hoey's recommendation. Ex. D, Dep. of Wahlstrom, 19:5-12.

**RESPONSE: Undisputed.**

17. On March 13, 2015, Plaintiff moved to admit Keenan *pro hac vice*, as counsel on her behalf and the motion was allowed on March 27, 2015. See Ex. A, Compl., ¶ 21.

**RESPONSE: Undisputed.**

c. 2015 Contingent Fee Agreement

18. As the trial was approaching, on June 11, 2015, Hoey emailed Plaintiff regarding a meeting to sign the new fee agreement with Keenan. Ex. I, June 11, 2015 Email Chain. When asked, "[w]hat is the new fee agreement?" Hoey responded that he previously explained it to Plaintiff and that "[i]t's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th. It doesn't change your percentage or cost you more money.

6

Ill (sic) show it to you next time I see you." Id. According to Plaintiff, she recalled Hoey

mentioning the agreement and agreed to meet Hoey at his office on June 19, 2015. Id. When

these emails were exchanged, Plaintiff did not know if Hoey had read the agreement. Ex. D,

Dep. of Wahlstrom, 23:2-10.

**RESPONSE: Undisputed.**

19.     At deposition, Hoey explained that he was referring to the underlying fee, which

in the 2010 CFA is 33.3 percent of the underlying recovery and remains the same—33.3 percent

on the underlining recovery—in the 2015 CFA as well. Ex. G, Dep. of Hoey, 55:15-56:1. The

parties were not specifically thinking of an appeal (as the case had not gone to trial).  Id.

**RESPONSE: Undisputed that Hoey has now so testified but Hoey's email words are clear
on their face where he states "*It's the same fee agreement as before but with Don's name
since he is also trying the case with me on July 13th.*" [emphasis added] and so Ms.
Wahlstrom understood Hoey to be referring to the entire agreement as he stated. *See,* Dkt.
No. 95, Wahlstrom Declaration, ¶¶6-12.**

20.     Although Plaintiff claims to be dyslexic, she testified that her dyslexia did not

prevent her from reviewing and understanding any documents presented to her at her deposition,

including the 2010 CFA and 2015 Contingent Fee Agreement ("2015 CFA") that she signed,

loan documents related to her home, documents related to purchasing her truck, or agreements

with her financial advisor, or advancement at Target. Ex. D, Dep. of Wahlstrom, 146:24-150:22.

She was not represented by counsel when she read and signed the documents related to her home

or agreement with her financial advisor. Ex. D, Dep. of Wahlstrom, 147:5-6; 149:19-21.

**RESPONSE: Undisputed.**

21.     The Keenan Law Firm drafted the 2015 CFA with the assistance of Krzysztof

Sobczak. Ex. F, Keenan's Resp. to Plaintiff's Questions, No. 5.  Keenan was unwilling to try the

case without a written fee agreement in place and, according to Keenan, he could not ethically

represent a client that he does not have a signed agreement with. Id.

**RESPONSE: Undisputed except that Hoey was also involved in drafting the 2015 CFA. Dkt. No. 96-10, Exhibit 10, Hoey Email of 4/8/2015 to Andrew Gould of Keenan Law with 2015 CFA attached ("We need a new fee agreement with the client. … Enclosed is a draft that complies with the new fee agreement rules of Massachusetts."); Dkt. No. 96-13, Exhibit 13, Deposition of Krzystof Sobczak, p. 117, line 19 – p. 118, line 4 (Sobczak testified that he probably helped draft 2015 CFA "at the direction of Mr. Hoey")**

22.     On June 19, 2015, while at  Hoey's office, Plaintiff executed the new contingency

fee agreement with the Keenan Defendants related to her "[p]remises liability claims and injuries

received as a result of assault on or about May 1, 2009 in the Radisson Hotel Boston parking

lot[.]" Ex. J, 2015 Contingent Fee Agreement ("2015 CFA") (Wahlstrom No. 3—LDH 0049913-

0049918); Ex. D, Dep. of Wahlstrom, 19:17-23.

**RESPONSE: Undisputed.**

23.     Plaintiff claims that she discussed the terms of the 2015 CFA with Hoey before

she signed it.[2] Ex. C, Plaintiff Responses to Keenan's Interrogatories, No. 5. She could not recall

if she asked any questions at the office. Ex. D, Dep. of Wahlstrom, 23:11-16. She stated she

exchanged emails, texts, and voicemails with Hoey regarding the 2015 CFA. Ex. C, Plaintiff

Responses to Keenan's Interrogatories, No. 6.

**RESPONSE:  Undisputed except that Hoey did not fully explain the 2015 CFA (Dkt. No. 95, Wahlstrom Dec., ¶¶12-13) and disputed that she "exchanged emails, text and voicemails regarding the 2015 CFA" as the interrogatory clearly indicates that she exchanged such communications generally. As to the 2015 CFA, she only exchanged emails with Hoey on June 11, 2015 when Hoey said with respect to the 2015 CFA that "It's the same fee agreement as before but with Don's name since he is also trying the case with me on July 13th" and then when she went to Hoey's office to sign Hoey "reiterated then the same thing that the new agreement did not change anything for me and that I would not be paying any more in fees rather that the agreement only added Don Keenan to the agreement so that he**

_____
[2] According to Hoey, Sobczak met with Plaintiff. However, for purposes of this summary judgment motion only, the Hoey Defendants are citing to Plaintiff's version, which they deny.

**could represent me in the case and at trial." Dkt. No. 91-1, Exhibit C, Wahlstrom Response to Interrogatories Nos. 5 and 6.**

24.     At the time, the 2015 CFA was executed no other attorneys had been retained,

including, Patricia DeJuneas or Amy Goganian. <u>Ex.</u> D, Dep. of Wahlstrom, 165:23-166:6.

**RESPONSE: Undisputed.**

25.     Plaintiff signed the 2015 CFA and initialed each paragraph in blue ink. <u>Ex.</u> D,

Dep. of Wahlstrom, 21:3-6, 21:18-24; 22:11-14.

**RESPONSE: Undisputed.**

26.     Plaintiff read every paragraph. <u>Ex.</u> D, Dep. of Wahlstrom, 22:11-14.

**RESPONSE: Disputed. Dkt. No. 96-2, Wahlstrom Dep. line 13-14 ("When I went in to the office to sign it is the first time I saw a copy of it. … I did look it over, and David had explained it to me in an e-mail, so... I looked it over. I don't remember if I read every paragraph, I believe I – I did."); Dkt. No. 95, Wahlstrom Declaration, ¶¶8, 12 ("I signed the 2015 CFA the same day I was presented it at David's office. I looked it over and initialed next to each paragraph of the 2015 CFA, but I did not carefully review it and no one else went over all the changes with me. I trusted my attorneys that all was in order and that the fee agreement was in my best interest and did not change the fee arrangement already in place, as David promised when he told me I had to sign the 2015 CFA.")**

27.     Plaintiff further testified that she read Paragraph 4 of the 2015 CFA before she

signed and initialed it. Thus, Plaintiff testified as follows:

> Q. …If you can go to the second page, and in the paragraph number
> 4 under 33 and a half percent, do you see that?
> A. Yes.
> Q. There's a paragraph about the percentages being increase if an
> appeal. Do you see that?
> A. Yes.
> Q. …And you initialed on the right-hand side; right?
> A. Yes.
> Q. And you read this before you signed it.
> A. Yes.
> Q. And you read it before you initialed it.
> A. Yes. I looked over it.

<u>Ex.</u> D, Dep. of Wahlstrom, 64:21-65:13.

**RESPONSE: Undisputed.**

      28.    Paragraph 4 of the 2015 CFA states as follows:

> (4) Reasonable compensation (including that of any referring and/or associated counsel) on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation including that of any associated counsel shall be the following percentage of the gross amount collected for the client:
>
> **33 and 1/3 % (thirty-three and one-third percent)** of gross amount recovered
>
> The above stated percentage shall be increased by an additional Two Percent (2%) of gross recovery if the matter is concluded/settled after an appellate brief is filed in an applicable appellate court or body by the Attorney on behalf of the Client, and an additional Five Percent (5%) of gross recovery if matter is retried/concluded/settled following an appellate decision.
>
> The percentage shall be applied to the amount of the recovery not including any attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. The compensation determined is separate and independent from costs and expenses of litigation, detailed in paragraph 5.

<u>Ex.</u> J, 2015 CFA, ¶ 4.

**RESPONSE: Undisputed.**

      29.    A separate provision below Paragraph 4 entitled "Referring/Associated Counsel"

states:

> The Client understands that a portion of the compensation payable to the Attorney pursuant to the paragraph above shall be paid to: <u>the Law Offices of David J. Hoey, P.C.</u> and consents to this division of fees. Client understands that the Client will not be charged any additional legal fees.

This "Referring/Associated Counsel Provision" was initialed by Plaintiff and Keenan. <u>Ex.</u> J, 2015

CFA, Referring/Associated Counsel provision.

**RESPONSE: Undisputed.**

30.     The 2015 CFA also provided,

> (5)  The Client is liable to the attorney for his reasonable expenses and disbursements if there is a favorable disposition of the legal matter. In the event of a favorable disposition, expenses and disbursements will be deducted after the contingent fee is deducted. The Client acknowledges and agrees that the attorney may borrow funds from time to time to pay certain costs associated with pursuing and litigating the case and agrees that, in addition to reimbursing the attorney for the amount of such costs, the client also will reimburse the attorney for any interest charges and related expenses the attorney incurs in connection with such borrowings.
>
> The Attorney agrees to advance, on behalf of the Client, all reasonably necessary out-of-pocket costs and expenses of litigation at the discretion of the Attorney. However, this agreement in no way obligates the Attorney to advance/lend any funds on this case. The Attorney may choose to do so, and may choose to cease doing so for any reason whatsoever, with notice to the client.

Ex. J, 2015 CFA, ¶ 5.

**RESPONSE: Undisputed.**

31.     Plaintiff understood that if there was a favorable disposition of the case that she would be responsible for reasonable expenses and disbursements. Ex. D, Dep. of Wahlstrom, 16:17-21. She also understood that her attorney could finance the case and borrow funds to finance the case and that she would be responsible for reimbursement of interest charges and related expenses incurred in related to financing the case. Ex. D, Dep. of Wahlstrom, 16:22 – 17:7.

**RESPONSE: Undisputed.**

32.     Plaintiff understood that if she lost her case, Hoey Law would be responsible for the expenses, which included the money being financed. Ex. D, Dep. of Wahlstrom, 31:2-10; 32:14-20.

**RESPONSE: Undisputed.**

33.     Plaintiff could not afford to advance funds to prosecute the underlying case and

was aware that the Hoey Defendants were advancing funds, including their own money and

through financing, on her behalf for the case and the appeal. Ex. D, Dep. of Wahlstrom, 31:11-

32:5.

**RESPONSE: Undisputed.**

34.     At the time, Plaintiff was indifferent to the cost of prosecuting her case if she lost.

Ex. D, Dep. of Wahlstrom, 32:14-20. Plaintiff stated numerous times that she and Hoey met and

talked about her case all the time, including her appeal. See, e.g., Ex. D, Dep. of Wahlstrom,

28:11-14; 29:4-7; 47:8-11; 49:2-12; 73:17-20; 179:9-10.

**RESPONSE:  Undisputed except <u>disputed</u> that Ms. Wahlstrom was "indifferent" to the
cost of prosecuting her case, rather Hoey and Keenan failed to keep her regularly and fully
informed as to fees and expenses and failed to obtain her consent to significant expenses
and fees of additional attorneys that they incurred, despite Hoey being in regular
communication with her. Dkt. No. 95, Wahlstrom Declaration, ¶¶ 20-41; *See also, e.g.*, Dkt.
No. 96-2, Exhibit 2, Wahlstrom Dep., p. 58, line 1 to 8, ("Q: Okay. And did you ever ask
David who was Amy [Goganian], what is she doing, what is she working on, is she my
lawyer, anything like that?...A: Sorry. David told me that she was handling it, and I trusted
David. I didn't know all the details of the case, no."); p. 59, line 15 to 17, ("Q: before seeing
this document [March 2020 itemization], did you know who Mr. Goran was?  A: Not to my
knowledge."); p. 60, line 8 to 9 ("Okay. Did you know who Mr. Bolan was? A: At the time,
no."); p. 62, line 1 to 4, ("Q: Okay. You understood that a number of people looked at your
briefs for purposes of the appeal; right? A: To be honest with you, no. I don't know who
looked at them."); Dkt. No. 96-4, Exhibit 4, Hoey Dep., p. 152, line 16 to p. 154, line 4; p.153
line 8 to 9 (when appellate counsel was engaged, Hoey did not inform Wahlstrom that he
and Keenan would also charge the appeal contingency in addition to separate appellate
counsel fees)**

    d.     <u>Underlying Trial</u>

35.     Trial in the Underlying Lawsuit began on July 24, 2015, and ended with a jury

verdict on August 11, 2015. Ex. A, Compl., ¶ 28.

**RESPONSE: Undisputed.**

36.     Throughout the litigation and at trial, the Underlying Lawsuit was aggressively defended and the Underlying Defendants were represented by major Boston law firms, including Jones Day, Sloane & Walsh, Litchfield Cavo, and Boyle Shaughnessy. Ex. G, Dep. of Hoey, 44:2-9.

**RESPONSE: Undisputed**.

37.     Prior to trial, an animation of the incident was created by WIN Interactive with the help of Plaintiff, who explained to them the details. Ex. D, Dep. of Wahlstrom, 34:8-11. Plaintiff understood that the purpose of the animation was to both help her prepare for her testimony, and, in the event she was unable to give that testimony, to present her story. Ex. D, Dep. of Wahlstrom, 35:4-8; 36:20-37:2. It was also used, in part, to help prepare her for her live testimony. Ex. G, Dep. of Hoey, 76:12-23; see also 72:5-20.

**RESPONSE: Undisputed except <u>disputed</u> that Ms. Wahlstrom used the animation to prepare her testimony as she never watched the video. Dkt. No. 96-2, Wahlstrom Deposition, p. 36, lines 13-15.**

38.     On July 17, 2015, defendant LAZ Parking Limited, LLC moved in limine to preclude use of a computer animation as a demonstrative aid at trial. Ex. K, LDH 0006560-0006562. At a hearing on July 21, 2015, Judge Paul Wilson explained his reasons for allowing the motion and rejecting the animation, including that the animation would unfairly prejudice the Underlying Defendants given its length and the anger and sympathy it would inspire. See Ex. L, LDH 0010174-LDH 0010265, pertinent parts only.

**RESPONSE: Undisputed**.

39.     During trial, the JPA defendants offered $2.25 million to settle the case. Ex. G, Dep. of Hoey, 65:1-11. This was the last offer at trial. Ex. G, Dep. of Hoey, 63:14-19. Hoey and

Keenan agreed that Hoey would get 100% of the attorney fee of this offer (~$750,000), and

Keenan would get the remaining fee should the case proceed and a higher result be achieved. Ex.

F, Keenan's Resp. to Plaintiff's Questions, No. 6; Ex. G, Dep. of Hoey, 65:18-66:13.

**RESPONSE: Undisputed that during trial the JPA defendants offered $2.25 million to settle the case and this was the last offer before the high/low offers made during jury deliberations but disputed that Hoey and Keenan reached the fee agreement they claim during trial that Hoey would be paid $750,000. Dkt. No. 96-13, Sobczak Dep., p. 98, line 7 to p. 103, line 13 (trial co-counsel disputing this agreement occurred); p. 28, line 17 to p. 31, line 24 ("Mr. Hoey was concerned that he's going to have to give away most of his fee to other attorneys, . . . because if he owed a third of his fee to Mr. O'Toole and then if he owed 50 to 60 percent to Mr. Keenan, it would leave him with 10 to 15 percent for himself, and if I was supposed to receive my pay or my bonus based on what he was receiving, that's when I was learning that okay, that is not a good business decision on his part . . . And I believe at the same time he used one of the firm's lawyers or ethical lawyers [Jim Bolan] to find out if there's any way he can get away from paying Mr. O'Toole the fee."); Dkt. No. 96-20, Exhibit 20, Deposition of James Bolan, p. 113, line 16 to p. 114, line 17 (Q: Mr. Sobczak testified that you were consulted regarding a payment of any fee to Austin O'Toole back in 2015 before there was a verdict in Kira Wahlstrom's case. Is that true or not?" [Hoey's counsel objected and instructed Bolan not to answer]); Dkt. No. 96-5, Exhibit 5, Keenan Response to Questions, No. 6 (Keenan provides no date or details for when he and Hoey came to agreement about fee division); No. 9 ("In March of 2020 Mr. Hoey was paid $750,000 as his share of the fee in the Wahlstrom matter. Later that year Mr. Hoey joined the Keenan Law Firm as a partner. He was paid a $1 million advance on fees and was also paid $26,924.24 in fees on cases he worked as part of the Keenan Law Firm.")**

40. At the conclusion of the trial, a jury awarded Plaintiff $4,000,000 against the JPA

defendants and no negligence against LAZ parking, Ltd. Ex. A, Compl., ¶ 29. The total judgment

entered against the JPA defendants in 2015 totaled $6,650,829.58. Ex. A, Compl., ¶ 29.

**RESPONSE: Undisputed.**

    e.   Motion for New Trial

41. On or about September 24, 2015, the JPA defendants served Plaintiff with a

Motion for New Trial based on alleged misconduct by Plaintiff's trial attorneys. Ex. M, LDH

0014137 – LDH 0014163.

**RESPONSE: Undisputed.**

42.     On November 19, 2015, the JPA defendants in the Underlying Lawsuit filed their

Motion for New Trial. <u>See</u> <u>Ex.</u> N, <u>Wahlstrom v. JPA IV Management Company, Inc. et al.</u>, Civil

Action No. 1084CV01022, Docket No. 256.

**RESPONSE: Undisputed.**

43.     In December 2015, DeJuneas was consulted with regard to the motion for new

trial. <u>Ex.</u> O, Deposition of Patricia DeJuneas ("Dep. of DeJuneas"), 15:14-16:9.

**RESPONSE: Undisputed.**

44.     Oral argument was held in December 2015, with DeJuneas and Hoey appearing

and arguing on behalf of Plaintiff. <u>Ex.</u> O, Dep. of DeJuneas, 17:7-18:6. Plaintiff attended the

hearing and confirmed that DeJuneas was there along with Hoey. <u>Ex.</u> D, Dep. of Wahlstrom,

84:12-21.

**RESPONSE: Undisputed except that Hoey did not argue the motion; DeJuneas argued the
motion. Dkt. No. 96-25, Exhibit 25, p. 18, lines 4-6, lines 21-24 and p. 19, lines 6-15.**

45.     On May 19, 2016, Judge Wilson allowed the JPA defendants' Motion for New

Trial. <u>See</u> <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022, Docket No. 266; <u>Ex.</u> P,

<u>Wahlstrom v. JPA IV Mgmt. Co., Inc.</u>, 127 N.E.3d 274, 276 (Mass. App. Ct. 2019).

**RESPONSE: Undisputed.**

      f.   <u>Appeal</u>

46.     After Judge Wilson allowed the Motion for New Trial, DeJuneas was consulted

with regard to the appeal process. <u>Ex.</u> G, Dep. of Hoey, 163:5-17; <u>Ex.</u> O, Dep. of DeJuneas,

19:10-15; 33:1-9.

**RESPONSE: Undisputed**.

47.     On June 24, 2016, Plaintiff filed her Petition for Interlocutory Relief from Order of Suffolk Superior Court Allowing Defendants' Motion for New Trial with the Massachusetts Appeals Court, which was subsequently granted by a Single Justice (Trainor, J.) on July 18, 2016, permitting Plaintiff to appeal to a full panel. Ex. Q, <u>Wahlstrom v. Rivera, et al.</u>, Docket No. 2016-J-0267, Paper Nos. 1 and 6.

**RESPONSE: Undisputed.**

48.     In addition to filing her Petition, on October 23, 2017, Plaintiff filed a motion to disqualify Judge Wilson, citing certain disparaging remarks about her trial lawyers and other extrajudicial comments about his reasons for allowing a new trial, which were suggestive of judicial bias. <u>See</u> <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022, Docket No. 256.

**RESPONSE: Undisputed.**

49.     On February 28, 2017, Plaintiff entered into a Legal Services Agreement with Attorney DeJuneas in connection with the interlocutory appeal from the judgment ordering a new trial. <u>Ex.</u> R, Legal Services Agreement between Plaintiff and DeJuneas (LDH 0033988-0033989). Hoey advanced the funds to pay DeJuneas throughout her affiliation with the case. <u>Ex.</u> D, Dep. of Wahlstrom, 56:17-23; 193:4-10.

**RESPONSE: Undisputed.**

50.     On the same day—February 28, 2017—via letter to Sobczak, after consultation with DeJuneas, Plaintiff requested that Sobczak withdraw as counsel in the case, which he did on March 17, 2017. <u>Ex.</u> S, February 28, 2017 Letter to Sobczak (Wahlstrom Ex. 14, in part); <u>See</u> <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022. Sobczak previously ended his affiliation

with Hoey Law in January 2017 but remained on the case with Plaintiff's consent. See Ex. N, Wahlstrom, Civil Action No. 1084CV01022, Docket No. 373.

**RESPONSE: Undisputed.**

51.     To assist Sibbison & DeJuneas with the Petition for Direct Appellate Review in the Underlying Lawsuit, Retired Judge Robert J. Cordy of McDermott Will & Emery LLP was brought on board. The engagement of Cordy's services was between Cordy and Sibbison & DeJuneas. Ex. T, June 26, 2017 Engagement Letter (LDH 0024008-0024014). However, DeJuneas did not pay Cordy; rather the Hoey Defendants' fronted payment for Cordy's services, despite DeJuneas' agreement with him. Ex. U, June 7, 2018 Email (LDH 0020257-0020258).

**RESPONSE: Undisputed.**

52.     According to DeJuneas, Cordy's input consisted of consulting and revising the brief.  Ex. O, Dep. of DeJuneas, 44:18-23. Cordy was paid $16,000.00 for his services. Ex. V, Executed Fee Breakdown (Wahlstrom Ex. 9).

**RESPONSE: Undisputed.**

53.     Plaintiff does not dispute the reasonableness of the charges by Cordy for assisting in her appeal and agreed to pay his fee, even though she did not have a signed agreement with him. Ex. C, Plaintiff Responses to Keenan's Interrogatories, No. 12; Ex. D, Dep. of Wahlstrom, 62:17-63:8. At the end of the appeal, Cordy sent a note to Plaintiff praising her lawyers (which included Hoey and Keenan). Ex. X, Cordy's Note (LDH 0054003).

**RESPONSE: Undisputed (and Ms. Wahlstrom was informed of Cordy's participation and fee in advance of his work on the appeal unlike the other attorneys and appeal contingency in dispute, *see, e.g.,* Exhibit 68, 6/23/2017, Hoey email to Wahlstrom regarding Cordy)**

54.     Throughout the appellate process, similar to Cordy, Hoey also reviewed and commented on the briefs and was in frequent contact with DeJuneas' concerning the appeal, including thousands of emails between them and numerous telephone calls. Ex. O, Dep. of DeJuneas, 45:17-19; 46:3-6; and 47:17-18; see e.g., Ex. Y, Various Emails with DeJuneas (LDH 0024160; 0022547; 0022022; 0021966; 0021911; 0021903; 0021846; and 0021761).

**RESPONSE: Undisputed that Hoey was in frequent contact with DeJuneas through emails and calls but disputed that Hoey's review and comments on briefs were "similar to Cordy" as unlike Cordy's contribution, Hoey interfered with appellate counsel's work and his contributions were not substantial or necessary. Dkt. No. 96-25, DeJuneas Dep., p. 46, line 7 to p. 47, line 1 (appellate counsel DeJuneas viewed Hoey as interfering with her work on the appeal); p 96, line 11 to p. 98, line 7 (Hoey sought to make arguments on appeal that were not in Ms. Wahlstrom's interest); Dkt. No. 96-29, Exhibit 29, 11/24/2016 DeJuneas Email to her associate ("Hoey is driving me nuts. Now he wants me to argue that they didn't engage in misconduct. Ummmm…yeah, you did. It just doesn't warrant a new trial."); Dkt. No. 96-4, Exhibit 4, Hoey Dep., p. 186, line 8 to p. 189, line 3 and Dkt. No. 96-28, Exhibit 28, Hoey Emails with Vail, p. 2 and 5 (unknown to Ms. Wahlstrom or appellate counsel, Hoey enlisted Attorney John Vail to make comments on the draft appellate briefs and then Hoey cut and pasted Vail's comments in emails to DeJuneas as though they were Hoey's own comments); Dkt. No. 96-28, Exhibit 28, p.12, Email from Hoey to Cordy, 6/6/2018 (Hoey: "I am too emotionally attached to the client and the case to read the Brief. I hope that you and Patty can put your heads together and come up with a solid Reply Brief."); Exhibit 69, Declaration of Patricia DeJuneas, ¶¶ 6, 11.**

55.     On March 9, 2018, Plaintiff filed her appeal brief. Ex. Z, Wahlstrom v. Rivera, et al., Docket No. 2017-P-1524, Paper No. 10. Hoey's and Keenan's names were left off the brief as a strategy decision made by DeJuneas. Ex. AA, July 25, 2016 Email Chain (Wahlstrom Ex. 11—LDH 0071282-0071291); Ex. O, Dep. of DeJuneas, 50:18-21.

**RESPONSE: Undisputed that the Wahlstrom appeal brief was filed on March 9, 2018 but disputed that Hoey and Keenan's names were left off as "strategy decision" but rather only DeJuneas and Cordy's names were on the brief because they were appellate counsel that handled the appeal and wrote the brief, not Hoey or Keenan. Exhibit 69, DeJuneas Dec., ¶11.**

56.     After Sobczak's departure from Hoey Law on January 21, 2017, Sobczak sued Hoey in Middlesex Superior Court claiming, among other things, a piece of the Wahlstrom fee. See Ex. A, Compl., ¶ 40; Ex. G, Dep. of Hoey, 203:3-8; see also Ex. BB, Sobczak v. Law Offices of David J. Hoey, P.C., et al., Civil Action No. 1781CV01281, Docket No. 1. On February 5, 2018, Sobczak's complaint was dismissed with prejudice pursuant to Mass. R. Civ. P. 41(b)(2) for his intentional failure to obey court orders. Id. at Docket No. 20. A dismissal pursuant to Rule 41(b)(2) is a dismissal on the merits. Sobczak appealed the dismissal and on January 4, 2019, the judgment was affirmed. Id. at Docket No. 28. Sobczak's application for further appellate review was denied and a finding of frivolous appeal was made. Ex. G, Dep. of Hoey, 203:3-8; see Ex. CC, FAR-26616, Public Docket.

**RESPONSE: Undisputed.**

57.     On May 1, 2019, four months later, Sobczak filed a new complaint in Suffolk County claiming, among other things, a piece of the Wahlstrom fee. Ex. G, Dep. of Hoey, 203:14-17. Sobczak appealed the dismissal and on May 2, 2022, the judgment was affirmed. Ex. G, Dep. of Hoey, 203:14-17.

**RESPONSE: Undisputed.**

58.     On June 10, 2019, the Appeals Court issued the *Wahlstrom I* decision, concluding that "[t]he standard applied by the judge in assessing the motion for a new trial was the wrong standard. Consequently, the order allowing the motion for a new trial was in error." Ex. P, Wahlstrom, 127 N.E.3d at 276. Due to Plaintiff's pending motion to disqualify Judge Wilson, the Appeals Court elected to "stay this appeal in order to allow the motion to disqualify to be litigated and decided forthwith." Id. at 282.

**RESPONSE: Undisputed**.

59.     On June 13, 2019, more than two years after termination by Plaintiff and despite having no fee agreement with Plaintiff, Sobczak filed a Notice of Attorney's Lien for his alleged reasonable fees and expenses for representing Plaintiff in the Underlying Lawsuit. See Ex. A, Compl., ¶¶ 40-41; Ex. N, Wahlstrom, Civil Action No. 1084CV01022, Docket No. 278. Goganian was brought in to defend against Sobczak's lien and filed limited appearances on Plaintiff's behalf as well as on behalf of Hoey Law to protect against Sobczak's dissemination of attorney-client privileged information. Ex. DD, Deposition of Amy Goganian ("Dep. of Goganian"), 14:1-10; Ex. G, Dep. of Hoey, 214:24-215:8. At that time, Goganian considered Plaintiff to be her client. Ex. DD, Dep. of Goganian, 14:11-14. Plaintiff understood Goganian was involved and that Sobczak's lien was against her. Ex. D, Dep. of Wahlstrom, 100:11-101:1.

**RESPONSE: Undisputed except disputed that Goganian filed an appearance on behalf of Hoey Law *only* to protect against dissemination of Ms. Wahlstrom's privileged information as she filed pleadings to the benefit of Hoey's interests and disputed that Ms. Wahlstrom had a full understanding of the lien dispute and Wahlstrom did not understand at the time Goganian was retained that Wahlstrom would have to pay the fees. Dkt. No. 96-36, Exhibit 36, Goganian / Hoey Fee Agreement (with Hoey as Client); Dkt. No. 96-37, Deposition of Amy Goganian, p. 13, lines 12-20 (Hoey's attorney Bolan contacted Goganian to handle lien), p. 15, line 1 to p. 16, line 4 (Hoey/Bolan wanted to impound Sobczak lien to protect Hoey's business information after litigation with Sobczak in other cases over fees), p. 17, lines 15-21 (Goganian: "the way it was presented to me was that I was being retained to get the lien dismissed. Attorney Hoey and Miss Wahlstrom both had an interest in getting the lien dismissed. But that Attorney Hoey would be responsible for my bills, that was the way he wanted to handle it."); Dkt. No. 96-4, Exhibit 4, Hoey Dep., p. 276, line 22 to p. 227, line 6; Dkt. No. 96-32, Exhibit 32, Hoey Email 7/20/2019 (Hoey: "it will need to be Impounded. I cannot let the media or other law firms see this dispute."); Dkt. No. 96-40, Exhibit 40, Motion to Dismiss Notice of Attorney's Lien and Request for Sanctions (arguing res judicata based on prior litigation between Sobczak and Hoey arguing that any claim by Sobczak "would be against Hoey Law as to any fee Hoey Law may realize in the his case."); Dkt. No. 95, Wahlstrom Dec., ¶¶ 28-34.**

60.     Sobczak's lien was partially dismissed on November 8, 2019, only leaving his claims for quantum meruit for the period between January 20, 2017 and February 28, 2017. See Ex. N, Wahlstrom, Civil Action No. 1084CV01022, Docket No. 287. Judge Wilkins stated in his Order, Plaintiff "had no obligation to pay Sobczak on any theory." Id.; see also, Ex. EE, November 8, 2017 Order (LDH 0015378). His quantum merit claim was subsequent dismissed on February 5, 2020, after he failed to provide any evidence of the value he added. Ex. FF, February 5, 2020 Order (LDH 0014967). The decision was affirmed on March 31, 2023, after subsequent motion practice and appellate proceedings. Ex. N, Wahlstrom, Civil Action No. 1084CV01022, Docket No. 373.

**RESPONSE: Undisputed.**

61.     After Sobczak's lien was dismissed, Hoey informed Plaintiff how much he was costing her ($35,000) and presented her with four options to take action against Sobczak, including (1) do nothing, (2) 93A demand letter, (3) move for costs by motion, or (4) do both motion and 93A. Plaintiff chose option 4. Ex. GG, February 25, 2020 Email Chain (Wahlstrom Ex. 18—LDH 0042127). Plaintiff understood that money set aside from the Underlying Trial Verdict was being applied towards the Sobczak lien. Ex. D, Dep. of Wahlstrom, 111:18-23.

**RESPONSE: Undisputed except Ms. Wahlstrom's understanding that her reserve money from the Underlying Trial Verdict was used for the Sobczak lien came after Hoey first charged her for Goganian's fees out of her own money and then continued to litigate against Sobczak using Wahlstrom's reserve money that was initially meant for her other case against the insurance company for bad faith settlement practices and her children's loss of consortium case. Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep., p. 234, line 24 to p. 235, line 12 (Q: "The 83,000 sum that was set aside as a reserve from your recovery in the premises liability case -- was that specifically set aside solely to fight with Sobczak? / A. No. I thought it was set aside to pay out expenses for my cases, the -- the kids' case and the other [bad faith] case."); Dkt. No. 46, Exhibit 41, p. 2 (fee and expense distribution from Hoey of 12/23/2019 indicating "$25,000 Escrow for Bad Faith [case]") Dkt. No. 96-52, Exhibit 52 (March 2020 Itemization charging Wahlstrom for Goganian "to fight Sobczak lien" and identifying $83,387.53 as "Remaining"); Exhibit 70, Hoey Email 5/14/2020**

**($83,387.53 reserve money transferred to Hoey escrow); Dkt. 96-53, Ex. 53 (5/19/2020 email from Keenan to Hoey: "We are beginning the early state of working up the children's cases and as yet have not incurred any expense, but if we do we will request funds from the $80,000 which the client, I understand, authorized to be held for expenses on the case.)**

62.     Plaintiff had moved for her fees and costs against Sobczak which included Goganian's fees but was denied. <u>Ex.</u> HH, Wahlstrom's Motion for Fees (Wahlstrom Ex. 16 – LDH 0042077-0042115); see also <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022, Docket Nos. 303 and 305.   Plaintiff, with the assistance of DeJuneas filed a cross-appeal against Sobczak's appeal for the denial of her motion for fees and costs defending the Sobczak lien. <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022, Docket Nos. 309. Plaintiff later withdrew her cross-appeal. <u>Ex.</u> II, K.W. v. JPA IV Management Company, Inc., et al., 2021-P-0626, Paper Nos. 19 and 25.

**RESPONSE: Undisputed.**

63.     Ultimately, while being represented by DeJuneas, Plaintiff entered into a General Release Agreement with Sobczak on February 22, 2022. <u>Ex.</u> D, Dep. of Wahlstrom 121:23-122:1; <u>Ex.</u> JJ, General Release Agreement (Wahlstrom Ex. 28). Plaintiff did not receive any money from Sobczak. <u>Ex.</u> JJ, General Release Agreement (Wahlstrom Ex. 28).

**RESPONSE: Undisputed.**

64.     Following *Wahlstrom I*, and the filing of Plaintiff's second motion to disqualify Judge Wilson, on August 1, 2019, Judge Wilson issued an Order of Recusal, recusing himself from further proceedings in the Underlying Case. <u>See</u> <u>Ex.</u> N, <u>Wahlstrom</u>, Civil Action No. 1084CV01022, Docket Nos. 279 and 281.

**RESPONSE: Undisputed.**

65. Three months later, on November 6, 2019, the Appeals Court issued the *Wahlstrom II* decision, concluding "that the cumulative effect of the attorneys' misconduct does not meet the 'relatively high' burden necessary to warrant a new trial." Ex. KK, <u>Wahlstrom v. JPA IV Mgmt. Co., Inc.</u>, 138 N.E.3d 1045 (Mass. App. Ct. 2019). As a result, the JPA defendants' motion for new trial was reversed, and the verdict was reinstated. <u>Id.</u>

**RESPONSE: Undisputed.**

66. Following the Appeals Court's decision, in January 2020, Plaintiff filed a judicial complaint against Judge Wilson. <u>Ex.</u> D, Dep. of Wahlstrom, 194:20-23.

**RESPONSE: Undisputed.**

### III.    DISBURSEMENT OF FEES

67. After the *Wahlstrom II* decision was issued reversing the order granting a new trial in the Underlying Action, JPA did not pursue a further appeal. <u>Ex.</u> A, Compl., ¶ 46. However, on June 28, 2019, the JPA defendants filed a Further Appellate Review Application, which was subsequently withdrawn after payment was issued. <u>Ex.</u> LL, <u>Wahlstrom v. Carlson Hotels Management Corp., et al.</u>, FAR-26934, Paper Nos. 1 and 6.

**RESPONSE: Undisputed.**

68. On November 18, 2019, and November 19, 2019, the JPA defendants' insurer(s) wired a total of $9,987,683.80 to Keenan's IOLTA account, satisfying the judgment. <u>Ex.</u> A, Compl.,¶ 47.

**RESPONSE: Undisputed.**

69. Thereafter, Plaintiff and Hoey met in mid-December 2019 to review the expenses. <u>Ex.</u> D, Dep. of Wahlstrom, 40:20-41:6.

**RESPONSE: Undisputed but disputed that the expenses were disclosed and fully reviewed in December 2019 and the written itemization was not provided until March 2020. Dkt. No. 96-47, Email from Wahlstrom to Hoey on January 24, 2020 ("We still need to go over the bill and the last of the money"); Dkt. No. 95, Wahlstrom Declaration, ¶¶ 19, 20-22; Exhibit 83, Second Wahlstrom Dec., ¶7.**

70.     Plaintiff was wired $4.85 million from Keenan's account from the judgment funds to her financial advisor per her instructions and direction. Ex. MM, December 17, 2019 email (Hoey Ex. 41—LDH 0042194).

**RESPONSE: Undisputed.**

71.     On March 29, 2020, Hoey emailed Plaintiff an Excel spreadsheet outlining the various expenses. Ex. NN, March 29, 2020 Email (Wahlstrom Ex. 6—LDH 0042116-0042120). In his email, Hoey stated, "[i]f you have any questions or dispute any of the expenses please let me know." Ex. NN, March 29, 2020 email (Wahlstrom Ex. 6). This provided disclosure of all service providers and all expenses. Ex. NN, March 29, 2020 email (Wahlstrom Ex. 6); Ex. V, Executed Fee Breakdown (Wahlstrom Ex. 9).

**RESPONSE: Undisputed except disputed this was a complete "disclosure" of the expenses and why they were incurred. Dkt. No. 95, Wahlstrom Dec., ¶¶ 23-41; Exhibit 83, Second Wahlstrom Dec., ¶8.**

72.     The spreadsheet included the following descriptions  related to the Goganian, Goren, James Bolan, Lewis Brisbois, John Vail, and Catherine Giordano expenses:

| | | |
|---|---|---|
| Amy Goganian, Esq. | $41,231.72 | This is who we hired to fight the Sobczak lien. |
| Richard Goren, Esq. | $20,824.00 | This is who we hired to fight Intellectual Property, Patent, Trademark Infringment [sic] and confidentiality. |
| James Bolan, Esq. | $8,432.39 | This was Ethics counsel who consulted regarding Wilson, Sobczak, the Appeal and other areas of concern. |
| Lewis Brisois Bisgaard | $561.24 | Related to Sobczak and complaint to the Board |
| John Vail, Esq. | $2,655.00 | Constitutional Law attorney |
| Catherine Giordano, Esq. | $1,316.00 | Research and writing attorney |

24

Ex. NN, March 29, 2020 email (Wahlstrom Ex. 6).

**RESPONSE: Undisputed.**

73.     Plaintiff read the Excel spreadsheet and did not have any questions or concerns.

Ex. D, Dep. of Wahlstrom, 42:20-24; 43:20-44:8. On March 30, 2020, she stated in an email that

"I dont (sic) think I really have any questions about this." Ex. OO, March 30, 2020 Email Chain

(Wahlstrom Ex. 7—LDH 0042071-0042072).

**RESPONSE: Undisputed.**

74.     Plaintiff met with Hoey again to review the expenses.  Ex. PP, Plaintiff's

Response to the Hoey Defendants' Interrogatories, No. 9. Plaintiff acknowledged that Hoey went

over the expenses with her during the meeting. Ex. D, Dep. of Wahlstrom, 49:21-24. She

testified as follows:

> Q. And when he sat down with you, he explained to you each one
> of these categories; is that correct?
> A. I don't recall if he explained them all in detail, but I am sure we
> went over it.

Plaintiff also signed the Fee Breakdown, and wrote "i [sic] am aware of the above fee

distribution and approve." Ex. D, Dep. of Wahlstrom, 49:21-24; see also Ex. V, Executed Fee

Breakdown (Wahlstrom Ex. 9).

**RESPONSE: Undisputed there was one meeting in March 2020 but disputed that there was
a complete review of the expenses. Dkt. No. 95, Wahlstrom Dec., ¶¶ 22-41; Exhibit 83,
Second Wahlstrom Dec., ¶¶7-8; Exhibit 65, Expert Erin Higgins Report, ¶¶130-132 ("In
my opinion, Attorneys Keenan and Hoey had a conflict of interest in preparing these
settlement statements and asking Ms. Wahlstrom to approve them, where these
calculations represented an interpretation of provisions of the 2015 CFA that resulted in
the maximum amount payable flowing to the attorneys, and the minimum amount payable
flowing to Ms. Wahlstrom … the standard of care would have required Attorneys Keenan
and Hoey to notify Ms. Wahlstrom that there was room for disagreement on the proper
interpretation of the CFA, that their interests were in conflict with her interests, and that
she was free to seek independent legal advice with respect to the reasonableness of their**

approach …because Attorneys Keenan and Hoey did not make the appropriate disclosures to Ms. Wahlstrom in connection with their request that she approve their spreadsheets showing the distribution of funds, Attorneys Keenan and Hoey failed to meet the pertinent standard of care.")

75.     Plaintiff executed a copy of the Fee Breakdown approving the itemized expenses and distribution. Ex. V, Executed Fee Breakdown (Wahlstrom Ex. 9); Ex. PP, Plaintiff's Response to the Hoey Defendants' Interrogatories, No. 9.

**RESPONSE: Undisputed.**

76.     Plaintiff had an opportunity to ask or dispute the charges and she did not. Ex. D, Dep. of Wahlstrom, 201:1-5.

**RESPONSE: Undisputed.**

77.     Per the Fee Breakdown, the Hoey Defendants received $750,000.00, with $250,000.00 going to O'Toole. Ex. V, Executed Fee Breakdown (Wahlstrom Ex. 9). The Hoey Defendants' were wired the $750,000.00 on May 15, 2020. Ex. QQ, LDH 0000540.

**RESPONSE: Undisputed that Hoey and Keenan so claim. Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep. P. 234, lines 21-23 ("Q. Do you know firsthand what exactly Mr. Hoey received as payment for your case? A. No."); Dkt. No. 96-5, Exhibit 5, Keenan Response to Questions, No. 9 ("In March of 2020 Mr. Hoey was paid $750,000 as his share of the fee in the Wahlstrom matter. Later that year Mr. Hoey joined the Keenan Law Firm as a partner. He was paid a $1 million advance on fees and was also paid $26,924.24 in fees on cases he worked as part of the Keenan Law Firm.")**

## IV.   O'TOOLE LAWSUIT

78.     On May 20, 2020, Hoey Law sent the Law Office of Austin O'Toole, P.C. a check for $250,000.00 pursuant to the 2010 Referral Fee Agreement. See Ex. A, Compl., ¶¶ 56-57; Ex. RR, May 20, 2020 Letter (LDH 0000078).

**RESPONSE: Undisputed.**

79.     Almost a year after O'Toole received his referral fee of $250,000 from Hoey, on March 30, 2021, O'Toole and the Law Office of Austin O'Toole, P.C. filed suit against Plaintiff and the Hoey Defendants related to the 2010 Referral Fee Agreement. See Ex. A, Compl., ¶ 58. As to Plaintiff, O'Toole alleged in part that Plaintiff breached her agreement with him and personally owed him more money. See Ex. SS, O'Toole v. Hoey, et al., Civil Action No. 2184CV00741, Docket No. 42. He further sought a declaratory judgment that Plaintiff owed him further fees for the children's loss of consortium lawsuit and Plaintiff's Chapter 176D lawsuit. Id.

**RESPONSE: Undisputed.**

80.     Plaintiff retained Goganian to defend the claims. Ex. D, Dep. of Wahlstrom, 106:2-9; 106:19-21; and 139:15-17; see also, Ex. TT, KW003505-KW003507.

**RESPONSE: Undisputed as initially arranged by Hoey without advising Wahlstrom of any conflict of interest. Exhibit 71, Hoey Email to Wahlstrom, 3/1/2021 ("Scott [O'Toole] got a lawyer and is intending on suing us. I'll have Amy [Goganian] draft a response on your behalf and my lawyers can draft on my behalf."); Exhibit 65, Expert Report of Erin Higgins, ¶¶127-128.**

81.     O'Toole and his firm amended their Complaint to add the Keenan Defendants on February 23, 2022, according to the claims made by Sobczak in his Affidavit dated February 6, 2022.  See Ex. SS, O'Toole, Civil Action No. 2184CV00741, Docket No. 42.

**RESPONSE: Undisputed.**

82.     The Hoey Defendants, on multiple occasions, requested that O'Toole voluntarily dismiss Plaintiff from the O'Toole matter and also worked with Goganian, Plaintiff's counsel in the O'Toole matter for a period of time, to get Plaintiff out of the case. Ex. D, Dep. of Wahlstrom, 142:5-143:7. O'Toole refused. Ex. D, Dep. of Wahlstrom, 142:5-143:7.

**RESPONSE:** Disputed as the testimony is that Wahlstrom's own counsel made multiple requests for dismissal not the Hoey Defendants and disputed that Hoey worked to get Wahlstrom out of the case rather than using his client to his benefit in defending O'Toole's claims and Hoey would not agree to an indemnification agreement to release her from the case. Dkt. No. 96-2, Exhibit 2, Hoey Dep., p. 282, line 3 to p. 283, line 20; Exhibit 72, Transcript of Proceedings in O'Toole Case, May 24, 2022, p. 19 (Court: "I'm going to see you in a week to find out why Ms. Wahlstrom is still in this case. And the parties are going to work together to figure out some arrangement where she is out of the case, because there is -- it's inexcusable that counsel have not prioritized that as the highest number one thing to do in this case, is to make sure that she is not going to part with a dime given that -- given the circumstances. Okay. You do not have to name her. And Mr. Hoey should be in a position of protecting her from any claim by you, by the plaintiff, okay, as against Ms. Wahlstrom."); Exhibit 73, Transcript of Proceedings in O'Toole Case, June 8, 2022, p. 45, line 19 to p. 46, line 7 ("[The Court]: Any luck? MR: FOYE: Well, Your Honor, I made one or two proposals. I said that I am willing to dismiss Ms. Wahlstrom without prejudice if Mr. Keenan will agree and stipulate that if there is liability under the 2015 contract, the liability is his and not hers. It would be in effect an indemnification expect since she wouldn't party anymore, he wouldn't have to pay her legal fees or her – he is the one who got her into this, he is one who drafted that contract. He's the one who put in the representations. THE COURT: It was a simple question. MR: FOYE: Well – I' sorry. THE COURT: Did you – did you reach an agreement? MR. FOYE: No, Your Honor. We didn't."); Exhibit 78 (Hoey asserting Wahlstrom's privilege to block O'Toole from information on the fee distribution prior to O'Toole suing); Exhibit 79 (Goganian: "David wants to talk …and I am sure will press for us to supplement our papers on the seal issue …as David feels strongly that it is in your best interests to at least try to shield the disbursement document for reasons that go beyond the size of the recovery." Kira: "I'm not sure what David is thinking but there is nothing on that disbursement paper to hide as I can tell.")

[Note: this "fact" asserted by Hoey concerning his work with Wahlstrom's prior counsel, Goganian, raises the potential for the need to seek waiver of privileged communications involving Hoey and his counsel and Wahlstrom's prior counsel during defense of the O'Toole litigation and Wahlstrom reserves her right to do so if necessary. *See*, Zerner Declaration filed with the is opposition at paragraph 4.]

83.    The court granted Plaintiff's motion to dismiss on July 14, 2022. <u>Ex.</u> A, Compl., ¶ 68; <u>Ex.</u> D, Dep. of Wahlstrom, 142:21-23.

**RESPONSE: Undisputed.**

84. It is undisputed that Hoey does not control O'Toole or Sobczak. Ex. D, Dep. of Wahlstrom, 143:13-15; 145:22-24.

**RESPONSE: Undisputed.**

## V. PRESENT LAWSUIT

85. Prior to moving to California, Plaintiff picked up all of her file materials related to the Underlying Litigation. Ex. D, Dep. of Wahlstrom, 154:22-155:1; Ex. UU, LDH 0042016.

**RESPONSE: Undisputed.**

86. Prior to filing her Complaint, Plaintiff terminated Hoey in February 2022, after twelve (12) years of representation. Ex. D, Dep. of Wahlstrom, 204:1-6. During those twelve (12) years, Plaintiff acknowledged that Hoey "was always there for [her,]" and he helped her secure a loan, with her eviction, finding a therapist, with her job, etc. Ex. D, Dep. of Wahlstrom, 49:12; 204:8-205:24.

**RESPONSE: Undisputed.**

87. Plaintiff and Hoey met and talked about her case all the time, including her appeal—"I went in the office millions of times." See, e.g., Ex. D, Dep. of Wahlstrom, 28:11-14; 29:4-7; 47:8-11; 49:2-4; 73:17-20; 179:9-10.

**RESPONSE: Undisputed except, despite all these communications, disputed that Hoey talked with Wahlstrom about the fees and expenses to be charged in her case such as the appeal upcharge, the additional attorneys engaged and incurred, and the details of the Advocate Capital financing and disputed that Hoey talked about conflicts of interest that arose as he was required. Dkt. No. 95, Wahlstrom Declaration; Exhibit 65, Expert Higgins Report, ¶¶ 13, 14, 87-91, 110-132 (Hoey and Keenan failed to meet standard of care in terms of communications with Wahlstrom on case developments, fees and expenses, and conflicts of interest)**

88.     Despite her constant contact with Hoey, including when she allegedly started to question the payout amounts made in the Underlying Lawsuit the summer of 2021, just shy of two years (ten months) while the Hoey Defendants were still representing her in other matters, Plaintiff, at no point in time, raised any concerns, questions, or issues with Hoey concerning her expenses. <u>Ex.</u> PP, Plaintiff's Response to the Hoey Defendants' Interrogatories, No. 10; <u>Ex.</u> D, Dep. of Wahlstrom, 128:1-129:8.

**RESPONSE: Undisputed.**

89.     Instead, according to Plaintiff, she consulted with Goganian and DeJuneas about her concerns, who were paid for their work in the Underlying Lawsuit. <u>Ex.</u> D, Dep. of Wahlstrom, 129:15-24.

**RESPONSE: Undisputed (and for completeness** *see,* **Dkt. No. 96-2, Exhibit 2, Wahlstrom Dep., p. 126, lines 18-19 ("[Hoey and Keenan] destroyed my trust in them"); p. 128, lines 6-11 ("I didn't feel I could ask him [Hoey] about the expenses or about my concerns with the other cases. … Because I thought that we were too closely connected to them and that he -- I needed an outside opinion.")**

90.     At the request of Anne Burgess, a renowned expert that Hoey found for Plaintiff, since 2015 Plaintiff spoke to students at Boston College about her experience. <u>Ex.</u> D, Dep. of Wahlstrom, 171:6-173:10. She usually invite Hoey, who was unable to make it to the October 2021 presentation. <u>Id.</u>

**RESPONSE: Undisputed.**

91.     Plaintiff continued to praise the efforts of the Hoey Defendants and the Keenan Defendants in October 2021. <u>Ex.</u> D, Dep. of Wahlstrom, 173:7-22.

**RESPONSE: Undisputed.**

92. Despite Plaintiff's allegations of fraud, violations of Chapter 93A, and unreasonableness of the expenses in the Underlying Lawsuit, her expert does not offer an opinion on any of those allegations. Higgins testified as follows:

> A. …nobody asked me to determine that there was fraud. But as I noted – as my report says in one instance I concluded there was a misrepresentation.
> Q. Okay. Beyond that one instance, any other findings or opinions that you express in the report as to fraud?
> A. I wouldn't know -- no, I did not see sufficient information to reach that conclusion other than in that one instance.

Ex. VV, Deposition of Erin Higgins ("Dep. of Higgins"), 149:20-150:5

> Q. Same question as to alleged violations of Chapter 93A, unfair and deceptive conduct, 93A, any opinions on that? Were you asked to render any opinions on that issue?
> A. On whether the conduct described in my report rose to the level of a 93A violation?
> Q. Right.
> A. I was not asked to express an opinion.
> Q. In fact, you never expressed that opinion on that issue; correct?
> A. In my report, no.
> Q. To the extent we don't see a concern or critique expressed in your report you don't have anything more to say in that respect; is that correct?
> A. That's correct. I didn't have sufficient information to make – to render opinions other than what's there.

Ex. VV, Dep. of Higgins, 150:6-15; 150:22-151:4.

> Q. Do you have an opinion as to the reasonableness of the fee that Patty DeJuneas and Bob Corde [sic] charged?
> A. No, I was not asked to render an opinion on that.
> Q.…For that matter with respect to all other attorneys that contributed to the matter, Goren, Bolan, Giacomo, et cetera, I'm probably leaving some out, are you opining as to the reasonableness to the specific fees they charged, is that part of what you're doing here?
> A. so I'm not opining as to the reasonableness of fees charged by any of those attorneys.

Ex. VV, Dep. of Higgins, 172:19-24; 173:6-15.

**RESPONSE: Undisputed.**

93.     Plaintiff's expert, Erin Higgins, has no opinion on whether the act of filing of the brief alone was significant. Ex. VV, Dep. of Higgins, 197:2-21.

**RESPONSE: Disputed as the cited testimony is not so simple or as stated above but is as follows:**

> **Q. Finally, you would agree with me the quote/unquote filing of a brief by itself, that notion to the abstract, is not terribly meaningful or helpful to any of us in trying to interpret this paragraph for the 2015 agreement?**
>
> **A. I don't have an opinion. I can't agree with that.**
>
> **Q. Do you have an opinion on that issue?**
>
> **A. The words are there so, again, whoever -- if Attorney Keenan despite the language of the agreement had a different understanding what this says that's something he has an obligation to explain to Miss Wahlstrom.**
>
> **Q. Right. That's still not responsive to my question. My question is what's your opinion as to the significance, if any at all, the language about the filing of the brief, what's your opinion on that?**
>
> **A. I don't have an opinion on that.**

*Id.*  **See also, Exhibit 65, Higgins Report, ¶¶ 47, 48, 52 (including as relevant facts: "Attorney DeJuneas signed and filed the appellate briefs on behalf of Ms. Wahlstrom in the Appeals Court. Attorney Keenan's and Attorney Hoey's names do not appear on the appellate briefs.")**


September 22, 2023                              Respectfully submitted,

                                                 */s/ Bridget A Zerner*
                                                Bridget A. Zerner (BBO No. 669468)
                                                John J.E. Markham, II (BBO No. 638579)
                                                MARKHAM READ ZERNER LLC
                                                11A Commercial Wharf West
                                                Boston, MA 02110
                                                Tel: (617) 523-6329
                                                Fax: (617) 742-8604
                                                bzerner@markhamreadzerner.com
                                                jmarkham@markhamreadzerner.com

*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023 this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

*/s/ Bridget A. Zerner*
Bridget A. Zerner